## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re*<br><br>HOSPITALITY INVESTORS TRUST, INC., *et al.*,[1]<br>Debtors. | Chapter 11<br><br>Case No. 21-_____(___)<br><br>(Joint Administration Requested) |

## DECLARATION OF BRUCE A. RIGGINS IN SUPPORT OF
## CHAPTER 11 FILING AND FIRST DAY PLEADINGS

Pursuant to 28 U.S.C. § 1746, I, Bruce A. Riggins, do hereby declare, under penalty of perjury, the following to the best of my knowledge and belief:

1.      I am the Chief Financial Officer ("CFO") and Treasurer of Hospitality Investors Trust, Inc. ("HIT"), the general partner of Hospitality Investors Trust Operating Partnership, L.P. ("HITOP," and together with HIT, the "Debtors"), and have served in this capacity since May 2019.  From February 2018 until joining the Debtors, I served as chief operating officer for Skyline Investments ("Skyline"), a publicly-traded real estate investment company that owns hotels and resorts in the U.S. and Canada.  Prior to my employment at Skyline, from October 2016 until December 2017, I was a principal at GemStar Ventures ("GemStar"), a real estate consulting firm.  Prior to that, between July 2005 and April 2016, I served non-concurrently as CFO of two different publicly-traded real estate investment trusts (each, a "REIT") and a publicly-traded hotel management company.  I received my bachelor's degree in accounting from Virginia Tech University.

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Hospitality Investors Trust, Inc. (3668) and Hospitality Investors Trust Operating Partnership, L.P. (0136).  The Debtors' executive offices are located at Park Avenue Tower, 65 East 55th Street, Suite 801, New York, NY 10022.

2.      In my capacity as the Debtors' CFO and Treasurer, I am responsible for, among other things, overseeing the accounting, treasury, financial planning, tax, investor relations, and internal audit functions of the Debtors and their non-debtor subsidiaries (the "Non-Debtor Subsidiaries," and together with the Debtors, the "Company").

3.      On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief with the United States Bankruptcy Court for the District of Delaware (the "Court") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), thereby commencing these chapter 11 cases (collectively, the "Chapter 11 Cases"). The Debtors intend to operate their business and manage their properties as debtors in possession during the pendency of these Chapter 11 Cases.

4.      The Debtors commenced these Chapter 11 Cases to implement a comprehensive financial restructuring through the *Joint Prepackaged Chapter 11 Plan of Reorganization for Hospitality Investors Trust, Inc. and Hospitality Investors Trust Operating Partnership, L.P.* (as may be amended, modified, or supplemented from time to time, the "Plan"),[2] filed simultaneously herewith. The Plan contemplates the consummation of the Restructuring Transactions that, among other things, will (a) cancel the Debtors' Existing Preferred Equity Interests, (b) issue 100% of new common equity interests in Reorganized HIT to the Plan Sponsor, (c) provide the Debtors with up to $65 million in debtor in possession financing to fund working capital needs and anticipated transaction fees and expenses, and an exit facility effective upon the Effective Date (the "Exit Facility") with a maximum revolving drawn principal amount of (i) $25 million, plus (ii) the DIP Facility Undrawn Amount to fund go-forward working capital needs, and

---

[2]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

(d) leave unimpaired and provide for payment in the ordinary course for all of the Company's employees, vendors, lenders, franchisors, and hotel management companies. Notably, the Plan is structured so that, of the Debtors' many affiliated entities, only the Debtors are commencing these Chapter 11 Cases, which eliminates the uncertainty and expense associated with filing the operating Non-Debtor Subsidiaries.

5.     The Restructuring Transactions are supported by: (a) Brookfield Strategic Real Estate Partners II Hospitality REIT II LLC (the "Brookfield Investor" or the "Plan Sponsor"), who holds all of the interests in the Existing Preferred Equity Interests, which is the fulcrum security in the Debtors' capital structure; and (b) the Company's key contract counterparties, who entered into amendments, consent agreements, and forbearance agreements and waivers of defaults (the "Third Party Restructuring Documents").

6.     Over the past year, the Company and its industry have suffered the severe consequences of the novel coronavirus pandemic. The pandemic has caused a significant decline in travel and demand for hotels and guestrooms, which continues to adversely impact the Debtors' business. Additionally, the pandemic has significantly impacted credit and capital market conditions, such that the Debtors were unable to access these markets. At the direction of a special conflicts committee of HIT's board of directors (the "Board" and such committee, the "Special Conflicts Committee"), comprised of four independent and one management director, all five of whom are disinterested with respect to the interests of the Plan Sponsor, and with the assistance of the Debtors' professional advisors, the Debtors investigated all options available to restructure and recapitalize the Company.

7.     Over the past several months, the Debtors negotiated the terms of (i) a comprehensive restructuring support agreement (the "RSA") that is embodied in the Plan, and

3

(ii) the Third Party Restructuring Documents.  The Debtors seek to implement the Plan on a timeline

that will maximize enterprise value, which the Debtors believe will allow the Company to emerge

from chapter 11 well-positioned to capitalize on their proposed reorganized and refinanced capital

structure.   Accordingly, the Debtors solicited votes with respect to the Plan prior to the

Petition Date, and have filed a motion contemporaneously herewith seeking to schedule a hearing

to consider confirmation of the Plan on or about June 18, 2021, subject to the Court's availability,

and to emerge from bankruptcy in advance of June 30, 2021, as required by the RSA and certain of

the Third Party Restructuring Documents.

        8.     The Plan provides for the treatment of Claims against and Interests in the

Debtors through, among other things:  (a) reinstating or otherwise paying in full all Allowed

General Unsecured Claims, (b) the issuance of the New HIT Common Equity Interests and New

HITOP Interests to the Plan Sponsor; and (c) the issuance of contingent value rights ("CVRs") to

holders of Existing HIT Common Equity Interests.   Specifically, the Plan contemplates the

following:

- on the Effective Date, holders of Allowed Secured Claims shall receive, at the sole option of the Debtors with the consent of the Plan Sponsor, either (a) payment in full, in Cash, of the unpaid portion of its Allowed Secured Claim, (b) delivery of the Collateral securing such Allowed Secured Claim, or (c) other treatment such that the Secured Claim shall be rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code;

- holders of Allowed Unsecured Priority Claims shall receive payment in full in Cash or as otherwise provided in the Bankruptcy Code;

- holders of Allowed General Unsecured Claims shall, at the sole option of the Debtors with the consent of the Plan Sponsor (a) have its Allowed General Unsecured Claim reinstated, and paid in full, on the later to occur of the Effective Date or when such Allowed General Unsecured Claim becomes due in the ordinary course of the Debtors' or Reorganized Debtors' business operations, or (b) have its Allowed General Unsecured Claim otherwise rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code;

- Allowed Intercompany Claims shall be reinstated;

- on the Effective Date, Existing HIT Preferred Interests will be extinguished in exchange for each holder's Pro Rata Share, together with the holders of DIP Claims (excluding, for the avoidance of doubt, any Claims in respect of the DIP Facility Undrawn Amount) and Existing HITOP Preferred Interests, of 100% of the New HIT Common Equity Interests issued on the Effective Date;

- on the Effective Date, (a) 98% of the Existing HITOP Preferred Interests will be extinguished in exchange for each holder's Pro Rata Share, together with the holders of DIP Claims (excluding, for the avoidance of doubt, any Claims in respect of the DIP Facility Undrawn Amount) and Existing HIT Preferred Interests, of 100% of the New HIT Common Equity Interests issued on the Effective Date, and (b) 2% of the Existing HITOP Preferred Interests in the Debtors will be canceled in exchange for each holder's Pro Rata Share of 2% of New HITOP Interests; and

- Allowed Existing HIT Common Equity Interests shall be canceled, extinguished, and discharged in exchange for each holder receiving one CVR in respect of each share of the Allowed Existing HIT Common Equity Interests outstanding immediately prior to the Effective Date and such holders shall be automatically deemed to have accepted the terms of the CVR Agreement and to be a party thereto, in each case in accordance with the terms of the CVR Agreement.

9.    Additionally, as described below in greater detail, the Third Party Restructuring Documents provide significant benefits and are essential to the long-term success of the Company. For instance, the Company has entered into loan modification agreements with their lenders providing the Company with relief on certain financial and performance covenants and cash reserve requirements. The Company has also entered into amendments to hotel management agreements reducing base management fees and providing certain expanded termination rights. The modifications contained in the Third Party Restructuring Documents are, further, contingent on the Debtors consummating the proposed restructuring in a timely manner.

10.    Given the Plan Sponsor's role in the Debtors' capital structure and management structure, and the consequences the Plan would have for such party, the Plan was considered and ultimately recommended for approval by the Special Conflicts Committee, a subset of the Board that is disinterested and independent with respect to the interests of the Plan Sponsor, and which was delegated the exclusive power and authority to: (A)(i) solely to the extent required

as part of the negotiations with the Plan Sponsor, to review and evaluate potential strategic alternatives, including, but not limited to, the filing of these Chapter 11 Cases and the Plan; (ii) to make recommendations to the Board relating to any strategic alternatives that the Special Conflicts Committee determines would be in the best interests of the Debtors and their estates; and (iii) conduct negotiations with the Plan Sponsor on behalf of the Debtors regarding a potential amendment to the *Amended and Restated Agreement of Limited Partnership of HITOP*, dated as of March 31, 2017 (as amended from time to time, the "HITOP LPA") and any related agreements; (B) determining whether any such amendment, related agreement, or strategic alternatives, as applicable, are advisable, fair to, and in the best interests of the Debtors and their estates and, upon such a determination by the Special Conflicts Committee, authorizing the Debtors to enter into any such amendment or related agreements; and (C) taking all other such actions as may be determined by the Special Conflicts Committee to be necessary or appropriate in connection with the foregoing and the matters contemplated thereby, including providing such periodic updates to the Board as the Special Conflicts Committee deems appropriate from time to time; *provided*, *however*, (i) any such action shall not modify or impair the Brookfield Investor's rights under the *Articles Supplementary* with respect to the redeemable preferred share in HIT owned by the Brookfield Investor filed with the Maryland State Department of Assessments and Taxation on March 31, 2017 (the "Articles Supplementary"), the HITOP LPA, HIT's bylaws, or the *Securities Purchase, Voting and Standstill Agreement*, dated as of January 12, 2017 (the "SPA") by and among the Debtors and the Brookfield Investor without the prior written consent of the Brookfield Investor, and (ii) any such action requiring the prior approval of a Redeemable Preferred Director appointed by the Brookfield Investor pursuant to the Articles Supplementary or prior approval of the majority of the outstanding Existing HITOP Preferred Equity Interests pursuant to the HITOP LPA may not be

approved by the Special Conflicts Committee, but shall instead be recommended by the Special Conflicts Committee to the Board for its review and approval in accordance with the Articles Supplementary and/or approval by the holders of Existing HITOP Preferred Equity Interests in accordance with the HITOP LPA, as applicable.

11.     Prior to the Petition Date, the Debtors solicited acceptance of the Plan from the Plan Sponsor as the sole holder of the Existing HIT Preferred Interests and Existing HITOP Preferred Interests, who voted to accept the Plan prior to the Petition Date.  After receiving the requisite votes to confirm the Plan, the Debtors commenced these Chapter 11 Cases to effectuate the Restructuring Transactions.

12.     This declaration (this "Declaration") is submitted (i) to provide an overview of the Debtors and these Chapter 11 Cases and (ii) in support of the Debtors' chapter 11 petitions and "first day" motions (each a "First Day Motion", and collectively, the "First Day Motions"), which have been filed to minimize the adverse effects of filing for chapter 11 protection and enhance the Debtors' ability to maximize value for the benefit of their estates and creditors.

13.     If called as a witness, I could and would competently testify to the matters set forth herein.  Given my role as HIT's CFO, I have personal knowledge of the Debtors' day-to-day operations, business affairs, financial condition and books and records.  My testimony herein is based on (i) my personal knowledge as an officer and advisor to the Debtors, (ii) my review of the Debtors' books and records, and (iii) information compiled and communicated to me by other members of the Debtors' senior management, by other employees of the Debtors and the Debtors' professional advisors.

14.     Prior to the commencement of these Chapter 11 Cases, I (i) reviewed and discussed the Debtors' strategy regarding the development of potential restructuring alternatives

and, ultimately, implementation of the Plan; (ii) supervised the preparation of the documentation needed to implement the restructuring initiatives contemplated during these Chapter 11 Cases, including the Plan and the First Day Motions; and (iii) consulted on a regular basis with the Debtors' other senior management members and outside advisors with respect to the foregoing.

15.     <u>Section I</u> of this Declaration describes the Debtors' corporate structure, history, operations, management, and prepetition capital structure.  <u>Section II</u> describes the events and circumstances that triggered the commencement of these Chapter 11 Cases. <u>Section III</u> discusses the Restructuring Transactions, the Plan, efforts to obtain postpetition financing, and the Debtors' proposed confirmation timeline.  Finally, <u>Section IV</u> sets forth the relevant facts in support of the First Day Motions and summarizes the relief requested thereby.

## I.     Corporate Structure, Business History and Prepetition Capital Structure

### A.     Corporate Structure

16.     As reflected in the Corporate Organization Chart attached hereto as **<u>Exhibit A</u>**, Debtor HIT, the ultimate parent company in the Company's corporate structure, is the general partner and owns a majority of the limited partner interests of Debtor HITOP.  In turn, HITOP directly or indirectly wholly owns the Non-Debtor Subsidiaries, which own and operate the Company's hotel portfolio.[3]

### B.     The Debtors' History, Brands, and Business Operations

17.     Incorporated on July 25, 2013, HIT is a self-managed REIT that invests primarily in premium-branded select-service lodging properties in the United States.  An initial public offering of shares of common stock in HIT was conducted from January 2014 until November 2015 without listing shares of its common stock on a national securities exchange.  HIT

---

[3]     Two of the Non-Debtor Subsidiaries are not wholly owned by HITOP, but rather are owned as joint ventures with third parties.  HITOP instead owns, directly or indirectly, a majority interest in these joint ventures.

has not since listed its shares and there is currently no established trading market for the Existing HIT Common Equity Interests.

18. Substantially all of the Company's business is conducted through its operating partnership, Debtor HITOP, and its Non-Debtor Subsidiaries, which directly or indirectly own and operate the properties comprising the Company's hotel portfolio. The Debtors do not directly own any of the Company's hotels, but rather all hotels are owned indirectly through certain of the Non-Debtor Subsidiaries.

19. As of the date of Solicitation of the Plan, the Debtors indirectly own or have an interest in a total of 100 hotels with a total of 12,421 guest rooms located across 29 states. The Debtors have primarily acquired lodging properties in the upscale select-service, upscale extended stay and upper midscale select-service chain scale segments in secondary markets with strong demand generators, such as state capitals, major universities and hospitals, as well as corporate, leisure, and retail attractions. All of the Company's hotels are operated under a franchise or license agreement with a national brand owned by one of Hilton Worldwide, Inc. (47 hotels), Marriott International, Inc. (45 hotels), and Hyatt Hotels Corporation (8 hotels), or one of their respective subsidiaries or affiliates (collectively, the "Franchisors"). The Company wholly owns 98 of its hotels, and partially-owns two hotels through joint ventures with unaffiliated third-parties.

20. The Company's hotel portfolio was acquired through a series of seven portfolio purchases during the period from March 2014 to April 2017, which ranged in size from 116 hotels with a purchase price of $1.8 billion to two hotels with a purchase price of $48.6 million. Across 2019 and 2020, the Company sold a total of 43 hotels (the "Hotel Sales").

21. The Company generates a significant majority of its total revenues from the hotels through room bookings and other room operating revenues. In addition, the hotels generate

9

non-room revenue through the sale of food and beverages and through other ancillary products or offerings such as conference centers, markets, parking, telephone, and cancellation fees.  The Company also incurs operating expenses related to, among other things, room expenses (including labor costs for housekeeping and rooms operation staff, reservation systems, room supplies, linen and laundry services), food and beverage expenses (labor and the cost of food and beverages), management fees (calculated as a percentage of gross revenue), and other property-level operating costs (repair and maintenance and utility costs, administrative, sales, and marketing costs, and other costs associated with generating the ancillary revenues).

22.     The Debtors do not themselves own or operate any of the Company's hotels. Rather, the Company owns and operates its hotels through the Debtors' Non-Debtor Subsidiaries. The Debtors provide critical financial, logistical, and administrative support to the operating Non-Debtor Subsidiaries.  The Debtors employ the Company's senior management to oversee the Non-Debtor Subsidiaries.  In addition, the Debtors engage various third party professionals to provide tax, accounting, IT, audit, public reporting, and other services to the Company and acquires comprehensive insurance coverage on the Company's behalf.

C.     **Management**

23.     The following table sets forth the names of the Company's current executive officers:

| Name | Title |
|---|---|
| Jonathan P. Mehlman | Chief Executive Officer & President |
| Bruce A. Riggins | Chief Financial Officer & Treasurer |
| Paul C. Hughes | General Counsel & Secretary |

24.    The following table sets forth the names and relevant affiliations of the members of the Board:

| Name | Status |
|------|--------|
| Jonathan P. Mehlman | Management Director |
| Stanley R. Perla | Independent Director |
| Abby M. Wenzel | Independent Director |
| Stephen P. Joyce | Independent Director |
| Edward A. Glickman | Independent Director |
| Lowell G. Baron | Brookfield Investor Appointee |
| Bruce G. Wiles | Brookfield Investor Appointee – Chairman of the Board |

### D.    Prepetition Capital Structure

25.    As of the Petition Date, the Debtors do not have any outstanding funded debt, but have approximately $1.3 billion in unsecured obligations, most of which comprises contingent unsecured claims on account of the Debtors' guaranties of the secured debt of the Non-Debtor Subsidiaries.

#### (i)    Unsecured Guaranty Claims

26.    To fund the acquisition and operation of the Company's hotels, the Non-Debtor Subsidiaries have incurred mortgage and mezzanine indebtedness secured by the Non-Debtor Subsidiaries' hotel properties and, in the case of mezzanine indebtedness, the ownership interest in certain Non-Debtor Subsidiaries.  The mortgage and mezzanine loans are non-recourse obligations, with exceptions for certain environmental indemnities and with respect to certain so-

11

called "bad boy" events which if they occur liability is either fully recourse or recourse to the extent of losses incurred by the lender. The recourse obligations under the Non-Debtor Subsidiaries' mortgage and mezzanine loans are supported by guarantees from the Debtors (the "Guaranty Claims"). The Guaranty Claims are contingent General Unsecured Claims that will be unimpaired under the Plan.

(a)    Pool I Loans

27.    On May 1, 2019, the Company refinanced existing mortgage and mezzanine indebtedness with new mortgage and senior and junior mezzanine indebtedness of $1.04 billion secured by 92 of the Company's hotel properties (collectively, the "Pool I Loans").[4]  As of the Solicitation Date, (i) the Pool I mortgage loan had approximately $707.8 million in principal amount outstanding, (ii) the Pool I senior mezzanine loan had approximately $81.35 million in principal amount outstanding, and (ii) the Pool I junior mezzanine loan had approximately $56.95 million in principal amount outstanding.

28.    The Pool I mortgage loan requires monthly interest payments at a variable rate equal to one-month LIBOR plus 2.14%, the Pool I senior mezzanine loan requires monthly interest payments at a variable rate equal to one-month LIBOR plus 5.60%, and the Pool I junior mezzanine loan requires monthly interest payments at a variable rate equal to one-month LIBOR plus 8.50% for a combined weighted average interest rate of LIBOR plus 2.90%.  Pursuant to an interest rate cap agreement, the LIBOR portions of the interest rates due under the Pool I Loans are capped at 4.0%.

---

[4]    Thirty of the Hotel Sales were sales of hotels encumbered by the Pool I Loans, which sales generated funds sufficient to prepay approximately $162.2 million of principal under the Pool I mortgage loan and approximately $31.7 million of principal under the Pool I mezzanine loans.  As a result of the Hotel Sales, the Pool I Loans are secured by liens on 62 of the Company's hotel properties.

IMPAC 7203414v.1

29.     At the closing of the 2019 refinancing, the Company used the net proceeds from the Pool I Loans after accrued interest and closing costs to repay the then-outstanding $961.1 million in mortgage and mezzanine debt.  The Company also used $10 million of proceeds to fund a reserve with the lenders that the Company can utilize to fund expenditures for work required to be performed under property improvement plans ("PIPs") required by the Franchisors of the hotel properties.  During the term of the Pool I Loans, the Company is required to periodically deposit additional reserves with the lenders that the Company can utilize to fund a portion of future PIP work and other capital improvements.  During April and May 2020, as part of ongoing liquidity preservation measures being taken by the Company in response to the coronavirus pandemic and in conjunction with actions taken by the Company's Franchisors temporarily suspending obligations of hotel owners to perform capital improvements and fund capital reserves, the Company did not make required capital reserve payments to the mortgage lender of approximately $3.9 million, which resulted in an event of default under the Pool I Loans.

30.     In June 2020, the Company entered into forbearance agreements with the lenders under the Pool I Loans, agreeing to defer the PIP reserves required to be made in 2020 until 2021 and 2022 and temporarily suspending monthly capital reserves for repair and replacement of furniture, fixtures, and equipment ("FF&E"), while agreeing to pay all excess cash flows from the 62 hotel properties serving as loan collateral to account for future PIP reserves until all deferred PIP reserves have been deposited.  During January 2021, the Company entered into amendments to the forbearance agreements, under which the lenders agreed, among other things, to additional deferrals with respect to PIP and FF&E reserves.  The existing events of default will continue to exist in full force and effect until the deferred PIP and FF&E reserves have been deposited and other conditions have been met, but the lenders under the Pool I Loans have agreed to forbear from

13

collecting default interest and enforcing their rights and remedies under the loan documents as a result of the events of default during this period.

31.     Prior to the Petition Date, during May 2021, the Company became party to certain Third Party Restructuring Documents with the lenders under the Pool I Loans, agreeing to, among other things, (i) forbear and, subject to certain conditions, waive defaults triggered by the filing of the Chapter 11 Cases, and consent to the Restructuring Transactions contemplated under the Plan, (ii) defer certain PIP reserves, (iii) temporarily defer certain FF&E reserves, and (iv) the modification of the minimum debt yield test which could allow the Company to meet the minimum debt yield test and receive any excess cash flows from the properties securing the Pool I Loans (which the Company is not currently receiving) sooner than if no modification was made.

(b)     Pool II Mortgage Loan

32.     In October 2015, the Company refinanced existing mortgage indebtedness secured by 21 of the Company's hotel properties (the "Pool II Mortgage Loan").  As of the Solicitation Date, the Pool II Mortgage Loan had approximately $232 million in principal amount outstanding.  The Pool II Mortgage Loan carries a fixed annual interest rate of 4.96% per annum. The Pool II Mortgage Loan is secured by liens on 21 of the Company's hotel properties.

33.     Pursuant to the Pool II Mortgage Loan, the Company agreed to make periodic payments into an escrow account for the PIPs required by the Franchisors of the applicable hotels.  The Company made the final PIP reserve payment during June 2018.  The Company continues to have obligations to make periodic payments into other capital reserves.

34.     In May 2020, as part of ongoing liquidity preservation measures being taken by the Company in response to the coronavirus pandemic and in conjunction with actions taken by the Franchisors temporarily suspending capital improvement and capital reserve obligations, the

14

Company did not make required capital reserve payments to the lender under the Pool II Mortgage Loan in the amount of approximately $300,000, resulting in an event of default thereunder.

35.     In August 2020, the Company entered into a loan modification agreement, whereby (i) the maturity date of the Pool II Mortgage Loan was extended until October 6, 2022, subject to the Company's right to further extend the maturity date for an additional six months until April 6, 2023, upon satisfaction of certain conditions, including prepayment by the Company of at least 5% of the outstanding principal amount under the loan, (ii) the Company agreed to make monthly prepayments of the outstanding principal balance in the amount of $250,000 from October 2021 through September 2022, (iii) the Company's monthly capital reserve obligations for repair and replacement of FF&E was temporarily suspended, and (iv) agreeing to pay the excess cash flows from the 21 hotels securing the Pool II Mortgage Loan, after payment of interest and property operating expenses and certain other amounts, to prepay amounts outstanding under the Pool II Mortgage Loan.

36.     Prior to the Petition Date, during May 2021, the Company became party to certain Third Party Restructuring Documents with the lender under the Pool II Mortgage Loan, agreeing to, among other things, (i) forbear and, subject to certain conditions, waive defaults triggered by the filing of the Chapter 11 Cases and consent to the Restructuring Transactions contemplated under the Plan, (ii) temporarily suspend the collection of certain FF&E reserves, (iii) modify and temporarily waive certain financial covenants, and (iv) modify the requirement that all excess cash flows from the hotels will prepay the loan, such that all excess cash flows will instead be deposited into a reserve account and such funds may be utilized to fund any shortfalls in the payment of interest and property operating expenses, certain principal, and property improvement plan obligations or other capital expenditures for the hotels.

(c)    Term Loan

37.    On April 27, 2017, the Company entered into that certain Second Amended and Restated Term Loan Agreement (as amended, the "Term Loan") in the aggregate principal amount of $310 million, secured by 28 of the Company's hotel properties.   As of the Solicitation Date, the Term Loan has approximately $227.6 million in principal amount outstanding.  The Term Loan requires monthly interest payments at a variable rate of one-month LIBOR plus 3.0%. Pursuant to an interest rate cap agreement, the LIBOR portions of the interest rates due under the Term Loan were effectively capped at 4.0%.

38.    The Term Loan had an initial maturity date of May 1, 2019, subject to three one-year extension rights at the Company's option, which, if all extension rights were exercised, would have resulted in an outside maturity date of May 1, 2022.  In May 2019, the Company used $25 million of the net proceeds from the Pool I Loans to prepay principal under the Term Loan and entered into an amendment to the Term Loan, reducing the commitment from $310 million to $285 million and adding one additional one-year extension term such that the outside maturity date was extended to May 1, 2023.  In May 2020, the Company exercised its option to extend the maturity of the Term Loan to May 1, 2021, and in May 2021, the Company exercised its option to extend the maturity date of the Term Loan to May 1, 2022.

39.    In February 2021, the Company defaulted on its Georgia Tech Hotel & Conference Center ground lease, the Company's interest in which serves as a collateral property under the Term Loan, and entered into a forbearance agreement with the lenders under the Term Loan, and, as a result of this default, the ground lessor exercised its right to terminate the ground lease, effective as of March 31, 2021.

40.    During March 2021, the Company became party to certain Third Party Restructuring Documents with the lenders under the Term Loan, agreeing to, among other things:

IMPAC 7203414v.1

(i) forbearance and, subject to certain conditions, waiver of defaults triggered by the filing of the Chapter 11 Cases and certain defaults related to the Georgia Tech Hotel & Conference Center ground lease, (ii) temporary suspension of FF&E reserves, (iii) $1.3 million in brand-mandated property improvement plan reserves related to hotels that were sold during August 2020 have been credited to reduce the principal outstanding under the Term Loan, (iv) the lien related to the Georgia Tech Hotel & Conference Center ground lease may be released, subject to certain terms and conditions, (v) the borrowers will become obligated to repay $500,000 in principal each quarter for the seven consecutive quarters beginning with the quarter ending June 30, 2021, and the repayment of $9.2 million in principal less the aggregate amount of the quarterly principal prepayments will become a recourse obligation of the borrowers and guarantors, and (vi) certain modifications to the minimum debt yield test which could allow the Company to meet the minimum debt yield test and receive any excess cash flows from the properties securing the Term Loan (which the Company is not currently receiving) sooner than if no modification was made. The lenders additionally waived certain defaults under the Term Loan agreement and consented to the Restructuring Transactions contemplated under the Plan.

(d)      HGI Joint Venture

41.      One of the Company's Non-Debtor Subsidiaries owns a 56.5% joint venture interest in a Hilton Garden Inn located in Blacksburg, Virginia, and the hotel is subject to a mortgage loan (the "HGI JV Loan"). As of the Solicitation Date, the HGI JV Loan has approximately $9.9 million in principal amount outstanding. The HGI JV Loan requires monthly insurance payments based on the outstanding principal and a fixed annual interest rate of 4.31%.

42.      In June 2020, the Company and the lender under the HGI JV Loan agreed to extend the maturity date for 18 months until December 6, 2021. In connection with the extension, the Company and the lender also agreed to certain other modifications to the loan terms, including

17

temporarily suspending the Company's monthly capital reserve obligations for FF&E, a requirement to prepay $525,000 of the then-outstanding principal balance at closing, and a requirement that, until maturity, the Company will utilize any monthly excess cash flows from the property after payment of interest and property operating expenses and certain other amounts to prepay the principal balance of the loan.

43.     During May 2021, the Company became party to certain Third Party Restructuring Documents with the lender under the HGI JV Loan, agreeing to, among other things, (i) forbear and, subject to certain conditions, waive defaults triggered by the filing of the Chapter 11 Cases and consent to the Restructuring Transactions contemplated under the Plan and (ii) temporarily suspend the collection of FF&E reserves.

### *(ii)     Other General Unsecured Claims*

44.     In addition to their contingent, unsecured obligations outstanding under the Guaranty Claims, the Debtors owe (a) approximately $698,120 in rent obligations owed to the Debtors' landlords, and (b) approximately $151,000 in unpaid trade and other ordinary course obligations, in each case, as of the Petition Date.

### *(iii)     Existing Preferred Equity Interests*

45.     On January 12, 2017, the Debtors entered into the SPA with the Brookfield Investor, to secure a commitment of up to $400 million by the Brookfield Investor to make capital investments in the Company necessary for the Company to meet its short-term and long-term liquidity requirements and obligations by purchasing units of limited partnership interests in HITOP entitled "Class C Units" (the "Class C Preferred Units" or the "Existing HITOP Preferred Interests") through February 2019.  Following the final closing pursuant to the SPA on February 27, 2019, the Brookfield Investor no longer has any obligations or rights to purchase Existing HITOP Preferred Interests pursuant to the SPA or otherwise.  In addition to holding all of the issued and outstanding

Existing HITOP Preferred Interests, the Brookfield Investor holds the sole issued and outstanding redeemable preferred share in HIT (the "Redeemable Preferred Share" or the "Existing HIT Preferred Interests," and together with the Existing HITOP Preferred Interests, the "Existing Preferred Equity Interests").

46.     In connection with its holdings of the Existing Preferred Equity Interests, the Brookfield Investor has significant governance and other rights, including the right to appoint two members of the Board.[5]  The Existing HITOP Preferred Interests rank senior to all other equity interests in HITOP with respect to priority in payment of distributions and in the distribution of assets in the event of the liquidation, dissolution, or winding-up of HITOP, whether voluntary or involuntary, or any other distribution of the assets of HITOP among its equity holders for the purpose of winding up its affairs, and have a mandatory redemption date of no later than March 31, 2022.  As of the Petition Date, the total liquidation preference of the Existing HITOP Preferred Interests is approximately $462 million.

47.     Commencing on June 30, 2017, holders of Existing HITOP Preferred Interests are entitled to receive, with respect to each Class C Preferred Unit, fixed, quarterly cumulative cash distributions at a rate of 7.50% per annum from legally available funds.  If the

---

[5]     The Brookfield Investor also has approval rights under the Existing HITOP Preferred Interests and HITOP's limited partnership agreement that restricts HITOP from taking certain actions without the Brookfield Investor's consent (the "Brookfield Approval Rights").  In general, subject to certain exceptions, prior approval is required before the Company is permitted to take any of the following actions: equity issuances; organizational document amendments; debt incurrences; affiliate transactions; sale of all or substantially all assets; bankruptcy or insolvency declarations; declarations or payments of dividends or other distributions; redemptions or repurchases of securities; adoption of, and amendments to, the annual business plan (including the annual operating and capital budget) required under the terms of the Redeemable Preferred Share; hiring and compensation decisions related to certain key personnel (including executive officers); property acquisitions and property sales and dispositions that do not meet transaction-size limits and other defined criteria and would be outside of HITOP's normal course of business; entry into new lines of business; settlement of material litigation; changes to material agreements; increasing or decreasing the number of directors on the Company's board of directors; nominating or appointing a director (other than a Redeemable Preferred Director) who is not independent; nominating or appointing the chairperson of the Company's board of directors; and certain other matters.

Company fails to pay these cash distributions when due, the per annum rate will increase to 10% until all accrued and unpaid distributions required to be paid in cash are reduced to zero, and such failure may result in a material breach of the terms of the Existing HITOP Preferred Interests which would trigger the right of the Existing HITOP Preferred Interest holder to redeem the Existing HITOP Preferred Interests.  In addition, and also commencing on June 30, 2017, holders of Existing HITOP Preferred Interests are entitled to receive, with respect to each Class C Preferred Unit, a fixed, quarterly, cumulative PIK Distribution at a rate of 5% per annum ("PIK Distributions").[6]  If the Company fails to redeem the Brookfield Investor when required to do so pursuant to the amendment and restatement of HITOP's existing limited partnership agreement, the 5% per annum PIK Distribution rate will increase to a per annum rate of 7.50%, and would further increase by 1.25% per annum for the next four quarterly periods thereafter, up to a maximum per annum rate of 12.5%.  The Brookfield Investor is also entitled to receive tax distributions under certain limited circumstances.

48.    During each of December 2020, March 2021, April 2021, and May 2021, the Company entered into amendments to the HITOP LPA (the "LPA Amendments"), with the Brookfield Investor, as the holder of all issued and outstanding Existing HITOP Preferred Interests. Pursuant to the LPA Amendments, the cash distributions payable to the Brookfield Investor on December 31, 2020 and March 31, 2021 were converted into a PIK Distribution such that, on the applicable date, no cash distribution was paid and the quarterly PIK Distribution paid was at a rate of 12.5% per annum.  The LPA Amendments also provide that, if the Company and the Plan Sponsor do not enter into a definitive restructuring support agreement by May 19, 2021 (or if a

---

[6]    The number of Class C Preferred Units delivered in respect of the PIK Distributions on any distribution payment date will be equal to the number obtained by dividing the amount of the PIK Distribution by $14.75.

definitive restructuring support agreement is entered into and then terminated), on that date, HITOP

will be required to redeem 60% of the Existing HITOP Preferred Interests paid as PIK Distributions

on December 31, 2020 and March 31, 2021 (i.e., the Existing HITOP Preferred Interests paid in

respect of the cash distributions that would have been payable on December 31, 2020 and March

31, 2021 but were converted into a PIK Distribution, as described above) for an amount in cash

equal to the liquidation preference of such Existing HITOP Preferred Interests (a "PIK

Redemption").  A PIK Redemption is subject to certain conditions, including that HITOP has

Legally Available Funds (as defined in the amended and restated agreement of limited partnership

of HITOP) and that cash is available to make the payment after taking into account the actual cost

of certain capital expenditures and contractual reserves without requiring the incurrence of

additional debt, the issuance of additional securities or the consummation of any asset sales.

II.     **Key Events and Circumstances Leading to the Commencement of These
        Chapter 11 Cases and Prepetition Restructuring Efforts**

  A.  **The Coronavirus and Its Impact on the Debtors and the Hospitality Industry**

    49.  During 2019, as part of the Company's investment strategy to continue to

pursue the sale of non-core hotels and reallocate capital into other corporate purposes, including

debt reduction, the Company commenced marketing for 45 Hotel Sales, and closed on 43 such

sales.  Since then, the hospitality and travel sectors of the economy have been heavily impacted by

the novel coronavirus pandemic, and the Debtors' hotel properties have not been the exception.  In

early March 2020, the Company started to experience the effects of the coronavirus pandemic on

its business through softening of demand and revenue weakness across its portfolio triggered by

direct guest cancellations at its hotels as well as cancellations of business and industry conventions

and meetings in certain of its markets.  These conditions significantly worsened over the course of

the month and continued through 2020 and into the first and second quarters of 2021 as the level of

IMPAC 7203414v.1

overall travel has declined significantly due to concerns about the coronavirus pandemic and actions taken by governments, businesses, and other organizations to contain the coronavirus that have included restrictions on travel and the operation of many businesses as well as event cancellations, capacity limits, and social distancing measures. The Company anticipates that demand from business travelers will remain impaired at least until there has been adequate production and widespread distribution of the recently developed coronavirus vaccines, broader lifting of travel restrictions by businesses and governments, and wider re-establishment of consumer confidence in the safety of travel. The below table summarizes the devastating impact that the coronavirus has had on the Company's hotel business and liquidity, comparing pro-forma monthly Occupancy and Average Daily Rate ("ADR") for the months of March through December of 2020 and compared to the same months in 2019, for only the hotels in the Company's portfolio that were owned during both years.

| Month | Pro Forma Monthly Occupancy | | Pro Forma ADR | |
|---|---|---|---|---|
| | 2020 | 2019 | 2020 | 2019 |
| March | 40.8% | 80.4% | 125.49 | 135.54 |
| April | 15.8% | 81.2% | 93.10 | 131.82 |
| May | 25.9% | 79.5% | 87.90 | 133.70 |
| June | 36.2% | 83.3% | 97.34 | 136.05 |
| July | 42.8% | 82.3% | 100.97 | 131.97 |
| August | 46.6% | 79.7% | 100.13 | 130.03 |
| September | 48.8% | 76.4% | 96.31 | 131.07 |
| October | 52.3% | 81.6% | 96.59 | 134.84 |
| November | 44.3% | 74.3% | 91.14 | 125.04 |
| December | 41.7% | 64.6% | 88.19 | 117.70 |

50.    The table below compares pro-forma monthly Occupancy and ADR of only the hotels in the Company's portfolio that were owned as of March 31, 2021, for the months of January through April 2021 and compared to the same months in 2020. April 2021 Occupancy and ADR figures are preliminary estimates and are therefore subject to change.

| Month | Pro Forma Monthly Occupancy | | Pro Forma ADR | |
|---|---|---|---|---|
| | 2021 | 2020 | 2021 | 2020 |
| January | 46.0% | 67.3% | 91.46 | 123.18 |
| February | 55.1% | 76.1% | 93.76 | 131.63 |
| March | 65.4% | 41.1% | 99.92 | 124.82 |
| April | 66.6% | 16.1% | 105.82 | 93.10 |

51.     As a result of the historically low occupancy rates and lower pricing, the Company did not generate sufficient cash from its operations to cover its obligations and was required to utilize its cash on hand to fund non-hotel expenses such as interest on its debt obligations, payment of distributions on the Existing HITOP Preferred Interests, and general and administrative expenses.  During some months, the Company also utilized cash on hand to fund certain hotel operating expenses.

52.     In response to the coronavirus pandemic, the Company has implemented various property-level cost reduction and other liquidity preservation measures.  These measures have included determining to delay most of the PIPs required by the Franchisors that had been scheduled for 2020 as well as all projects scheduled for 2021, and determining not to make $4.2 million of capital reserve payments due to certain of the Company's lenders during April and May 2020.  In addition, the Company negotiated forbearance and loan amendment agreements with certain of its lenders, which included maturity date extensions for two loans that came due during 2020, as described in further detail above.

53.     The Company also worked closely with its third-party property managers to respond to these developments and to implement various property-level cost reduction and other liquidity preservation measures which have included temporary hotel staff reductions and temporary suspension of certain services.  Since the onset of the pandemic, the Company has implemented various corporate overhead savings initiatives, including permanent and temporary reduction in employee headcount, reduction in the 2020 incentive compensation pool and

temporary elimination of certain employee benefit programs.  Notwithstanding these measures, the

Company has not been able to successfully stem the liquidity crisis caused by the novel coronavirus,

and as a result of the forbearance and loan modification agreements the Company has entered into

with respect to its indebtedness, as well as the periodic debt yield and debt service coverage tests

the Company remains subject to under its indebtedness, the Company does not expect that excess

cash flows, if any, generated by its properties will be available to the Company for any other

purpose for the foreseeable future.  The Debtors' cash on hand decreased from $70.3 million at the

start of 2020 to $14.6 million by the end of the year, and to $8.7 million by the end of the first

quarter of 2021.  As of the Petition Date, the Debtors were left with only approximately $3.5 million

in cash on hand.

### B.    Pursuit of Strategic Alternatives

54.    During the third quarter of 2020, the Debtors determined that, as a result of

the impact of the coronavirus pandemic on the Company's business, absent additional liquidity

from a source other than property operations or additional modifications to the terms of its debt

obligations, the Company would no longer have sufficient cash on hand to continue to pay its

current obligations during the first half of 2021.  Having made the determination that additional

liquidity was needed, the Debtors pursued all available avenues to secure such additional liquidity.

Certain potential sources of additional liquidity such as proceeds from refinancings and asset sales,

were not available to the Company in any material amount due to the impact of the coronavirus

pandemic.  Although the Company was successful in negotiating favorable forbearance and loan

amendment agreements with its lenders, additional liquidity is still required for the Company to

meet its upcoming obligations in the first half of 2021.

55.    In the second quarter of 2020, the Debtors entered into discussions with its

largest investor—the Brookfield Investor—regarding a recapitalization of the Company.  With the

24

Brookfield Investor holding Brookfield Approval Rights, including regarding potential refinancing transactions, equity issuances, and further debt issuances, it is my understanding that the Special Conflicts Committee determined, in an exercise of its reasonable business judgment, that a recapitalization with the Plan Sponsor provided the greatest likelihood of securing much-needed capital infusions at a magnitude significant enough to address the Company's expected liquidity shortfall.

56.     In connection with these negotiations, the Debtors engaged restructuring counsel and a financial advisor to analyze their business plan, evaluate all strategic and liquidity alternatives, and negotiate a transaction with the Plan Sponsor and/or any other investors that would allow the Debtors to address their working capital needs for 2021.  The proposed Restructuring Transactions, which the Debtors have determined is the most value-maximizing transaction available to them, is the result of months of intense, arm's-length negotiations between the Debtors and the Plan Sponsor.

### III.    The Proposed Restructuring Transaction and Debtor-in-Possession Financing

#### A.    The Prepetition Solicitation, Proposed Plan, and Restructuring Transactions

57.     As set forth above, the Debtors intend to implement the proposed Restructuring Transactions through the confirmation and consummation of the Plan.  Among other things, the Plan provides that the Plan Sponsor will provide a $65 million DIP Facility on a secured basis to support critical working capital to the Company and a post-Effective Date revolving unsecured Exit Facility in an amount of $25 million.  Each holder of a DIP Claim (excluding, for the avoidance of doubt, any Claims in respect of the DIP Facility Undrawn Amount) will receive in exchange for its claim its Pro Rata Share, together with the holders of Existing Preferred Equity Interests, of 100% of the New HIT Common Equity Interests (subject to dilution for any applicable management or employee incentive plan adopted by the Reorganized Debtors after the Effective

Date).  Similarly, each holder of Existing HIT Preferred Interests and Existing HITOP Preferred Interests will receive, in exchange for its Interest, its Pro Rata Share, together with the holders of DIP Claims (excluding, for the avoidance of doubt, any Claims in respect of the DIP Facility Undrawn Amount), of 100% of the New HIT Common Equity Interests.  Additionally, 2% of Existing HITOP Preferred Interests shall be canceled, and the holder of such Existing HITOP Preferred Interests shall receive, in exchange for its Interest, its Pro Rata Share of 2% of New HITOP Interests.

58.     Importantly, holders of General Unsecured Claims will be unimpaired under the Plan and will be paid in full in the ordinary course of business.  Holders of the Existing HIT Common Equity Interests, who would otherwise be out of the money absent the Plan,[7] will each receive one CVR in respect of each share of the Allowed Existing HIT Common Equity Interests outstanding immediately prior to the Effective Date.  The Restructuring Transactions will provide the Company with the liquidity needed to survive the pandemic and thereby the potential for future recovery to holders of the Existing HIT Common Interests who would otherwise recover nothing.

59.     The Plan contemplates a comprehensive financial restructuring that will allow the Debtors to recapitalize the Company and provide necessary additional capital through a consensual Plan and Chapter 11 cases.  The Plan will also give the Debtors the opportunity to

---

[7]     In connection with the development and negotiations surrounding the Plan, and as described in greater detail in the Disclosure Statement, the Debtors directed Jefferies to perform an analysis of the value of the Debtors' assets—namely, their equity interests in the Non-Debtor Subsidiaries—and, based on Jefferies' Valuation, determined that no value would be allocated to the holders of Existing HIT Common Equity Interests on an absolute priority basis, because the liquidation preference of the Existing HITOP Preferred Interests exceeded the distributable value by at least $175 million in even the best-case scenario.  Importantly, in one of its two valuation methodologies, Jefferies utilized the Company's 2022 estimated EBITDA— a figure similar to the Company's 2019 performance—in calculating the value of the Debtors' assets, resulting in the same conclusion.  Accordingly, even ignoring the significant impact of COVID upon the Debtors' assets, the holders of Existing HIT Common Equity Interests are significantly out of the money.  The Debtors and the Special Conflicts Committee negotiated vigorously and at arm's-length to secure a recovery for holders of Existing HIT Common Equity Interests, and submit that the Plan provides the greatest possible recovery to all of the Debtors' stakeholders.

IMPAC 7203414v.1

revitalize their businesses under new ownership.   Accordingly, the Debtors believe the commencement of these Chapter 11 Cases is in the best interests of the Debtors, their creditors, and all other parties in interest.

60.    Moreover, the Third Party Restructuring Documents, which are contingent upon the consummation of the Restructuring Transactions and the Plan, are integral to the long-term success of the Company.  For instance, in addition to the loan modification agreements with the Non-Debtor Subsidiaries' secured lenders (as described above), which provide critical financial and operational relief, the Company has also entered into amendments to its hotel management agreements which, among other things, reduce the base management fees thereunder and provide certain expanded termination rights.  The valuable concessions achieved through these Third Party Restructuring Documents are, further, contingent on consummating the proposed restructuring in a timely manner.

61.    On May 18, 2021, the Debtors solicited votes to accept or reject the Plan from holders of Existing Preferred Equity Interests, which is Class 5A and B, the only class entitled to vote under the Plan.  The holders of claims in Class 1 (Secured Claims), Class 2 (Unsecured Priority Claims), Class 3 (General Unsecured Claims), Class 4 (Intercompany Claims), and Class 7 (Intercompany Interests) were deemed to accept the Plan and were not entitled to vote. Additionally, the holders of interests in Class 6 (Existing HIT Common Equity Interests) were deemed to reject the Plan (despite being entitled to an otherwise unwarranted recovery on account of their interests) and were not entitled to vote.

62.    The Debtors, with the assistance of their solicitation agent, Epiq Corporate Restructuring ("Epiq"), prepared and emailed the ballots to the appropriate entities in each voting class and received and tabulated the votes prior to the Petition Date.  Epiq has informed me that the

Plan was accepted by the Plan Sponsor, which holds 100% of the Existing Preferred Equity Interests. After receiving these necessary votes, and with the approval of the Board and at the recommendation of the Special Conflicts Committee, the Debtors commenced the Chapter 11 Cases, which I believe are in the best interests of the Debtors, their creditors, and all other parties in interest.

### B.    DIP Financing and Marketing Process

63.    To enable the Debtors to fund the administration of these Chapter 11 Cases and consummate the Plan, the Debtors, through Jefferies LLC ("Jefferies"), designed a competitive marketing process to solicit multiple viable proposals and to provide the flexibility to leverage competing proposals to negotiate the most favorable terms possible for the Debtors. In furtherance thereof, Jefferies solicited post-petition financing proposals from nineteen (19) parties, including the Plan Sponsor,[8] twelve of whom executed non-disclosure agreements to receive access to a virtual data room established for this marketing process. Of the twelve potential investors that had been invited to review the virtual data room, Jefferies received, in addition to the proposed DIP Facility, one alternative non-binding financing proposal (the "Non-Binding DIP Proposal"). Because the Debtors were seeking not just additional financing, but also a holistic restructuring that would maximize the value of their assets for the benefit of all parties, the Non-Binding DIP Proposal also included summary terms of a potential framework for a proposed plan of reorganization.

64.    The Special Conflicts Committee, with the assistance of the Debtors' professional advisors and its own counsel, evaluated each of the proposed DIP Facility and the Non-

---

[8]    A description of the post-petition financing marketing process undertaken by Jefferies is more fully set forth in the *Declaration of Robert J. White in Support of the Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral and (C) Grant Liens and Superpriority Administrative Expense Claims; (II) Granting Adequate Protection; (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "DIP Declaration"), filed contemporaneously herewith.

Binding DIP Proposal and determined, in an exercise of its reasonable business judgment, that the terms of the DIP Facility, as well as the Plan proposed by the Plan Sponsor, provided greater value and certainty to the Debtors and their stakeholders and was the most favorable proposal. As an initial matter, unlike the Plan, the proposed plan of reorganization accompanying the Non-Binding DIP Proposal (i) provided zero recovery to the holders of Existing HIT Common Equity Interests and (ii) valued the Existing Preferred Equity Interests at approximately $68.25 million (representing a recovery of only 14.8% on account of the liquidation preference). Additionally, as described further in the DIP Declaration, while the Non-Binding DIP Proposal provided certain terms similar to the proposed DIP Facility, it was materially less attractive because it required a pledge of the stock of the Debtors' interests in the Non-Debtor Subsidiaries, which would require the consent of the Non-Debtor Subsidiaries' property-level lenders, thus making the execution of the Non-Binding DIP Proposal speculative.

65.    In addition, under the Non-Binding DIP Proposal, the Company may not have received the benefits of the Third Party Restructuring Documents and the valuable concessions painfully negotiated thereunder, as such Third Party Restructuring Documents were negotiated with the respective counterparties in contemplation of the Plan Sponsor's involvement and, indeed, were contingent upon consummating the proposed Restructuring Transactions in a timely manner through the Plan.

66.    Finally, execution of the Non-Binding DIP Proposal would require approval of the Brookfield Investor pursuant to the Brookfield Approval Rights. Comparing the two available proposals, and given the need for immediate access to cash, I believe that the Brookfield Investor is the most practical, reasonable and, indeed, only viable source of financing. Accordingly, the Debtors propose to execute a secured post-petition financing facility with the Brookfield

Investor (in such capacity, the "<u>DIP Lender</u>") in the form of a $65 million new money term loan facility (the "<u>DIP Facility</u>"), $30 million of which will be available on an interim basis, and $35 million of which will be available upon entry of a final order approving the DIP Facility, pursuant to the terms set forth in that certain *Super-Priority Senior Secured Debtor-in-Possession Term Loan Agreement* (as the same may be amended, restated, supplemented, or otherwise modified from time to time, the "<u>DIP Credit Agreement</u>"), by and among the Debtors as borrower, Trimont Real Estate Advisors, LLC, as administrative and collateral agent (the "<u>DIP Agent</u>"), and the DIP Lender party thereto. As discussed in further detail in the DIP Declaration, the DIP Facility was negotiated at arm's-length, is approved by the Board, and at the recommendation of the Special Conflicts Committee, and I believe is in the best interests of the Debtors' estates.

67.     As of the Petition Date, the Debtors do not have sufficient liquidity to continue to operate their business or fund the administration of the Chapter 11 Cases, and without approval of the DIP Facility, I believe the Debtors will face immediate and irreparable harm. In my business judgment, access to the DIP Facility will provide the Debtors with the necessary liquidity to administer these Chapter 11 Cases and consummate the Plan. Importantly, the DIP Facility is also coupled with an agreement by the DIP Lender to provide the Debtors with the necessary exit financing to consummate the Plan and fund go-forward operations post-emergence. Without the DIP Lender's financing commitment, the Debtors' ability to continue to operate their business and successfully prosecute the Chapter 11 Cases would be jeopardized, to the detriment of all interested parties.

## C.     Proposed Confirmation Timeline & Immediate Objectives

68.     The Debtors seek authority to schedule the combined hearing for the Plan and Disclosure Statement approximately thirty (30) days after the Petition Date. I believe that this expedited proposed schedule is necessary to protect the value of the Debtors and the Company,

because protracted bankruptcy proceedings risks significantly and detrimentally impacting the Company's relationships with customers, employees, lenders, and franchisors.  Moreover, the RSA and the Third Party Restructuring Documents negotiated with the Company's critical constituencies contain events of default that would be triggered if the Plan and the Restructuring Transactions thereunder were unable to be consummated in a timely fashion.  Notably, certain of the Third Party Restructuring Documents require the Debtors to emerge from bankruptcy no later than June 30, 2021.  This would have significant adverse consequences for the Company, including the possible commencement of chapter 11 proceedings by certain or even all of the Non-Debtor Subsidiaries. In addition, the Exit Facility to fund the Debtors' business needs on a go-forward basis will become available only upon the Effective Date of the Plan.

69.     Finally, the Debtors have filed the First Day Motions described below in the interest of preserving and maximizing estate value for the benefit of their stakeholders.

## IV.    First-Day Motions[9]

70.     As a result of my first-hand knowledge, and through my review of various materials and information, discussions with members of the Debtors' management and the Debtors' outside advisors, I have formed opinions as to (a) the necessity of obtaining the relief sought by the Debtors in the First Day Motions, (b) the need for the Debtors to continue to operate effectively while working to maximize the value of their assets for the benefit of all stakeholders, (c) the deleterious effects upon the Debtors of not obtaining the relief sought in the First Day Motions, and (d) the immediate and irreparable harm to which the Debtors will be exposed upon the

---

[9]     Capitalized terms used in this section but not otherwise defined herein shall have the meanings ascribed to such terms in the First Day Motions, as applicable.

IMPAC 7203414v.1

commencement of these Chapter 11 Cases unless the relief requested in the First Day Motions is granted without delay.

71.     As described more fully below, the relief requested in the First Day Motions was carefully tailored by the Debtors, in consultation with their professionals, to ensure that the Debtors' immediate operational needs are met so as to allow the restructuring process and prosecution of the Plan to succeed, and that the Debtors suffer no immediate and irreparable harm during these Chapter 11 Cases.  I, or my colleagues at my instruction, participated in the analysis that informed each First Day Motion, and assisted in developing the relief requested therein and reviewing pleadings related thereto.  At all times, the Debtors' management and professionals remained cognizant of the limitations imposed on a debtor-in-possession and, in light of those limitations, the Debtors narrowed the relief requested at the outset of these Chapter 11 Cases to those matters that require urgent relief to sustain the Debtors' immediate operations and preserve value during the pendency of these Chapter 11 Cases.  It is my opinion that the Debtors would suffer immediate and irreparable harm if the relief requested in the First Day Motions is not granted.

A.     **Joint Administration Motion**

72.     The Debtors request entry of an order approving the joint administration of these Chapter 11 Cases for procedural purposes only.  I believe that it would be far more practical and expedient for the administration of the Chapter 11 Cases if the Court were to authorize their joint administration, which will reduce costs and facilitate the administrative process by avoiding the need for duplicative notices, applications, and orders.  It is my understanding that no prejudice will befall any party by the joint administration of the Debtors' cases, as the relief sought therein is solely procedural, and not intended to affect substantive rights.

**B.      Claims Agent Retention Application**

73.      The Debtors request entry of an order, pursuant to 28 U.S.C. § 156(c), Bankruptcy Rule 2002(f), and Local Rule 2002-1(f), authorizing the retention and appointment of Epiq as claims and noticing agent in these Chapter 11 Cases.  I believe that the relief requested in the Epiq retention application will ease the administrative burden on the Clerk of the Court in connection with these Chapter 11 Cases.  In addition, I have been advised by the Debtors' proposed counsel that Epiq's retention is required by the Local Rules given the Debtors' anticipated number of creditors.  In light of the foregoing and Epiq's competitive rates, the Debtors respectfully request that the application to retain Epiq as claims and noticing agent be approved.  Prior to selecting Epiq to serve as their claims and noticing agent, the Debtors reviewed the proposals of three service providers and selected Epiq based on their favorable pricing and significant experience in providing notice to holders of publicly-owned equity interests.

**C.      Cash Management Motion**

74.      By this motion (the "Cash Management Motion"), the Debtors seek entry of an order, among other things, authorizing continued use of their existing (a) bank accounts, (b) cash management system, and (c) checks and business forms.  In addition, the Debtors also request a waiver of certain of the operating guidelines established by the Office of the United States Trustee for the District of Delaware that require the Debtors to close all prepetition bank accounts, open new accounts designated as debtor-in-possession accounts, and provide new business forms and stationery.

75.      As described in detail in the Cash Management Motion, in the ordinary course of business, the Company utilizes an integrated, centralized cash management system to collect, transfer, and disburse funds generated by their operations (the "Cash Management System").  The Debtors' Cash Management System is comprised of three (3) bank accounts, each

held at Wells Fargo, N.A. (the "<u>Bank</u>"), to receive distributions from the Non-Debtor Subsidiaries, pay operating expenses and maintain and manage excess cash (collectively, the "<u>Bank Accounts</u>"). The Cash Management System is tailored to meet the Company's operating needs.  The Cash Management System enables the Company to efficiently collect and disburse cash generated by their business, pay their financial obligations, centrally control and monitor corporate funds and available cash, comply with the requirements of their financing agreements, reduce administrative expenses, and efficiently obtain accurate account balances and other financial data.

76.    The Debtors maintain current and accurate accounting records of daily transactions and submit that maintaining this Cash Management System will prevent undue disruption to the Debtors' operations while protecting the Debtors' cash for the benefit of their estates.  It is critical that the Debtors be able to consolidate management of cash and centrally coordinate transfers of funds to efficiently and effectively operate their business, and that the Cash Management System remain intact to ensure seamless continuation of transactions and uninterrupted receipt of cash and payment of expenses.  Absent obtaining the relief requested in the Cash Management Motion, the Debtors will not be able to maximize value through the proposed Restructuring Transactions.

77.    Accordingly, the Debtors request that the relief requested in the Cash Management Motion be approved.

### D.    Wages Motion

78.    Pursuant to this motion (the "<u>Wages Motion</u>"), the Debtors request entry of interim and final orders (i) authorizing, but not directing, the Debtors, on the terms set forth in the proposed orders and in accordance with their stated policies and in their discretion, to, among other things and subject to the statutory cap on priority claims, (a) pay prepetition Employee Obligations, including Employee Wages, PTO, and other compensation; (b) pay the Insperity Fees and other

34

administrative costs, and continue and maintain the CSA with Insperity; (c) pay prepetition Employee Expenses; (d) make contributions to and continue to honor and offer the Employee Benefit Programs; (e) honor Workers' Compensation Obligations; and (f) make payments to third parties incident to the foregoing payments and contributions, and (ii) authorizing the Banks to honor and process check and electronic transfer requests related to the foregoing.

79.     As of the Petition Date, the Debtors employ approximately twenty-three (23) full-time employees (collectively, the "<u>Employees</u>").  Although the Debtors have prepaid their wage, salary, and other obligations in accordance with their ordinary compensation schedule prior to the Petition Date, as of the date hereof, certain prepetition obligations for Employees may nevertheless be due and owing.  The Employees, as with any business entity, perform a variety of critical functions for the Debtors and will be instrumental in exiting bankruptcy in a timely manner. The Employees' skill, knowledge, and understanding with respect to the Debtors' operations, customer and brand relations, and infrastructure are essential to maintaining the Debtors' business during these Chapter 11 Cases.  Without the continued service and dedication of the Employees, it will be difficult, if not impossible, to operate the Debtors' businesses without an unexpected or inopportune interruption, and to prosecute these Chapter 11 Cases in a manner that will maximize the value of the Debtors' estates and in accordance with the timeline proposed by the Debtors.

80.     In the ordinary course of business, the Debtors incur wage obligations to their employees and, partially through their co-employment relationship with Insperity, provide a suite of employee benefits, including, but not limited to: (a) medical, dental, and vision coverage, (b) life insurance and accidental death and dismemberment insurance, and short and long-term disability programs, (c) paid time off, (d) 401(k) retirement savings plans, (e) workers' compensation insurance coverage, (f) reimbursement for certain employee expenses, and more.  In

accordance with their recent ordinary course business practices required by Insperity, the Debtors have pre-funded their payroll and, accordingly, as of the Petition Date, most Employee Obligations have been prepaid and the Debtors do not believe that any Insperity Fees have accrued but not been paid.  However, out of an abundance of caution, the Debtors seek Court authority to pay any amounts that are accrued and unpaid as of the Petition Date, and to continue to maintain and honor all employee benefit policies and payment obligations in the ordinary course of business:

| Employee Obligations | Amount Outstanding | Amount Due in Interim Period |
|---|---|---|
| Employee Wages | $0 | $0 |
| Wage Deductions | $0 | $0 |
| Trust Fund Taxes | $0 | $0 |
| Payroll Taxes | $0 | $0 |
| Health Benefits | $0 | $0 |
| Life, AD&D, and Disability Insurance | $0 | $0 |
| PTO | $460,000 | To be used in the ordinary course of business |
| 401(k) Plan | $0 | $0 |
| Workers' Compensation | $0 | $0 |
| Additional Benefits | $0 | $0 |
| Employee Expenses | $30,000 | $20,000 |
| Insperity Fees | $0 | $0 |
| **Total:** | **$490,000** | **$20,000** |

81.     Many of the Debtors' Employees rely on their compensation, benefits, and reimbursement of expenses to satisfy their daily living expenses.  Consequently, these Employees will be exposed to significant financial hardship if the Debtors are not permitted to honor obligations for unpaid compensation, benefits, and reimbursable expenses.  Moreover, if the Debtors are unable to satisfy such obligations, Employee morale and loyalty will be jeopardized at a time when Employee support is critical to the Debtors and the success of Plan.

82.     I believe that the relief requested in the Wages Motion is in the best interests of the Debtors' estates, their creditors, and all other stakeholders in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption to maximize the value

of their assets.  Accordingly, the Debtors respectfully request that the relief set forth in the Wages Motion be approved.

> **E.    All Trade Motion**

83.    By this motion (the "<u>All Trade Motion</u>"), the Debtors request (i) authority to pay Ordinary Course Creditors in the ordinary course of business on account of undisputed prepetition claims for goods and services related to the Debtors' operations and other ordinary course claims and (ii) related relief.  The Debtors also request authority to condition the payment of Ordinary Course Claims upon the Ordinary Course Creditors' agreeing to maintain or reinstate Customary Trade Terms during the pendency of these Chapter 11 Cases that are at least as favorable as those existing on or prior to the Petition Date or such other Customary Trade Terms acceptable to the Debtors in their sole discretion.

84.    To operate in the ordinary course of business, the Debtors utilize a number of Ordinary Course Creditors to provide goods and services to facilitate the Company's operations.  These essential goods and services include, among other things, information technology services, facility improvements and non-routine repairs, rent, shareholders services, audit fees, professional services, and more.  Based upon discussions with other members of the Debtors' senior management and the Debtors' outside advisors, it is my understanding that certain Ordinary Course Creditors could refuse to continue doing business with the Debtors without the risk of incurring material damages or other contractual obligations.  Such actions, however, would cause significant disruption to the Debtors' businesses.

85.    For the three months prior to the Petition Date, the Debtors' average monthly payments to Ordinary Course Creditors totaled approximately $600,000.  The Debtors estimate, as of the Petition Date, that approximately $200,000 remains outstanding, including approximately $150,000 that will come due in the first 21 days of these Chapter 11 Cases.

86.     It is my understanding that many of the Ordinary Course Creditors are not subject to long term contracts and instead operate under spot purchase orders such that they would have no obligation to continue shipping goods or providing services to the Debtors on a go-forward basis if the Debtors were to refuse or delay payment of their Ordinary Course Claims.  Additionally, because the Ordinary Course Creditors are already familiar with the Debtors' assets and business needs, often as a result of years-long relationships, I believe that they are in the best position to provide the necessary goods and services to the Debtors and are the most likely to do so on commercial terms.  Forcing the Debtors to obtain replacement goods and services, if replacement is an option, would likely cause unnecessary distraction at a substantial cost to the Debtors and their estates.

87.     Further, the relief requested reflects only a difference in timing as to when the Ordinary Course Claims will be paid, not in how much.  As indicated above, through the Plan, the Debtors propose to pay all Allowed General Unsecured Claims in full in cash in the ordinary course of business.  Accordingly, I believe that paying the Ordinary Course Claims in the ordinary course is prudent and will prevent disruption of the Debtors' businesses at a critical time for the success of these Chapter 11 Cases and the Plan.

**F.      DIP/Cash Collateral Motion**

88.     The Debtors have negotiated and reached agreement on the DIP Facility, pursuant to which the Debtors, subject to Court approval, will be provided with a senior secured superpriority postpetition financing facility from the DIP Lender.  I believe that the terms and amount of the proposed DIP Facility will permit the Debtors to meet their business and other obligations in connection with these Chapter 11 Cases in accordance with the Approved Budget, the DIP Order, and the DIP Credit Agreement.  As the Approved Budget demonstrates, without the

availability provided under the DIP Facility, the Debtors would be unable to prosecute these Chapter 11 Cases and consummate the Restructuring Transactions under the Plan.

89.     As further detailed in the DIP Declaration filed in support of the Debtors' proposed postpetition financing, the Debtors sought, but were unable to secure, postpetition financing on superior terms from another source, including a facility that would be on an unsecured, administrative expense basis.  Based on my understanding of the financing solicitation process, my experience, and in my business judgment, I believe that the terms of the DIP Facility are fair and reasonable to the Debtors and appropriate under the circumstances, and that good and sufficient cause exists to enter the proposed DIP Orders, absent which the Debtors would suffer immediate and irreparable harm.  With the Debtors' liquidity position dwindling, the DIP Lender provided critical funding to stave off a sub-optimal liquidation and to allow the Debtors to transition smoothly into these Chapter 11 Cases, permitting the Plan to be finalized and solicited to the great benefit of all of the Debtors' stakeholders.

### G.     Motion to Approve Solicitation Procedures and Schedule a Combined Hearing

90.     Under the RSA, Third Party Restructuring Documents, and the DIP Facility, the Debtors are bound by certain Milestones, including, but not limited to, deadlines for entry of a confirmation order and consummation of the Plan.  In light of these Milestones and the prepackaged nature of these Chapter 11 Cases, the Debtors have filed a motion seeking an order scheduling a combined hearing with respect to the approval of their plan solicitation procedures, their Disclosure Statement (which describes the Restructuring Transactions in detail and its effects on holders of claims against and interests in the Debtors), and confirmation of the Plan.  Moreover, the Debtors seek related relief, including a waiver of the requirement to file Schedules and SOFAs, given the terms of the Plan, the proposed payment in full for General Unsecured Creditors, and the limited

resources available to the Debtors on a postpetition basis.  The Debtors believe that it is imperative that the Plan be confirmed on the proposed timeline to avoid brand value deterioration and to minimize the costs associated with a protracted chapter 11 proceeding and, accordingly, submit that the relief requested should be granted.

H. **Motion to Establish Notification Procedures and Restrict Trading in Existing HIT Common Equity Interests**

91.    By this motion (the "NOL Motion"), the Debtors seek request that the Court establish certain procedures designed to protect the value of Debtor HIT's tax attributes, including, among other things, its net operating loss carryforwards.  The procedures proposed in the NOL Motion, which include notice and objection procedures related to the trading of the Existing HIT Common Equity Interests, are necessary to protect these valuable assets of the Debtors' estates.

92.    I understand that sections 382 and 383 of the Tax Code may, under certain circumstances, operate to limit HIT's ability to use its tax attributes to reduce future tax liabilities, specifically after the occurrence of an "ownership change."  I understand that HIT would be unable to use its tax attributes to reduce its future tax liabilities if such an ownership change occurs before the effective date of a chapter 11 plan.  Accordingly, the Debtors seek approval of the procedures proposed in their motion so that they may monitor any changes in ownership of the Existing HIT Common Equity Interests and protect against any trades that may constitute an ownership change for the purposes of section 382 and 383 of the Tax Code.  I believe that granting the relief requested is in the best interests of the Debtors, their estates, and all parties in interest, as the savings presented by the tax attributes could materially enhance the Debtors' future cash position.  As such, the Debtors request that the NOL Motion be approved.

## V.    Conclusion

93.    In conclusion, for the reasons stated herein and in each of the First Day Motions filed concurrently or in connection with the commencement of these Chapter 11 Cases, the Debtors respectfully request that each First Day Motion be granted in its entirety, together with such other and further relief as the Court deems just and proper.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  May 19, 2021

*/s/ Bruce A. Riggins*
Bruce A. Riggins
Chief Financial Officer and Treasurer

IMPAC 7203414v.1

# EXHIBIT A

**Corporate Organization Chart**



[1] The Company wholly owns 98 of its hotels, and two hotels are partially-owned through joint ventures with unaffiliated third-parties.