*Solicitation Version*

> **IMPORTANT:  THE SOLICITATION MATERIALS ACCOMPANYING THIS DISCLOSURE STATEMENT HAVE NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF 11 U.S.C. § 1125(a).  THE DEBTORS WILL FILE THIS DISCLOSURE STATEMENT WITH THE BANKRUPTCY COURT FOLLOWING SOLICITATION AND THE COMMENCEMENT OF THE CHAPTER 11 CASES AND WILL SEEK AN ORDER OR ORDERS OF THE BANKRUPTCY COURT, AMONG OTHER THINGS: (1) APPROVING THE SOLICITATION OF VOTES AS HAVING BEEN IN COMPLIANCE WITH 11 U.S.C. § 1126(b); AND (2) CONFIRMING THE PLAN OF REORGANIZATION PURSUANT TO 11 U.S.C. § 1129.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| *In re* | Chapter 11 |
| HOSPITALITY INVESTORS TRUST, INC., *et al.*,[1] | Case No. 21-_____(___) |
| Debtors. | (Joint Administration Requested) |

## DISCLOSURE STATEMENT FOR JOINT PREPACKAGED CHAPTER 11 PLAN FOR HOSPITALITY INVESTORS TRUST, INC., AND HOSPITALITY INVESTORS TRUST OPERATING PARTNERSHIP, L.P.

**PROSKAUER ROSE LLP**
Jeff J. Marwil (*pro hac vice* pending)
Paul V. Possinger (*pro hac vice* pending)
Jordan E. Sazant (DE Bar No. 6515)
70 West Madison, Suite 3800
Chicago, IL 60602
Telephone:  (312) 962-3550
Facsimile:  (312) 962-3551

**PROSKAUER ROSE LLP**
Joshua A. Esses (*pro hac vice* pending)
Eleven Times Square
New York, NY 10036
Telephone:  (212) 969-3000
Facsimile:  (212) 969-2900

*Proposed Attorneys for Debtors and Debtors in Possession*

**POTTER ANDERSON & CORROON LLP**
Jeremy W. Ryan (DE Bar No. 4057)
R. Stephen McNeill (DE Bar No. 5210)
1313 North Market Street
Wilmington, DE 19801
Telephone:  (302) 984-6000

*Proposed Attorneys for Debtors and Debtors in Possession*

Dated:  May 18, 2021
Wilmington, Delaware

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Hospitality Investors Trust, Inc. (3668) and Hospitality Investors Trust Operating Partnership, L.P. (0136).  The Debtors' executive offices are located at Park Avenue Tower, 65 East 55th Street, Suite 801, New York, NY 10022.

**THIS SOLICITATION OF VOTES IS BEING CONDUCTED TO OBTAIN SUFFICIENT ACCEPTANCES OF THE PLAN (AS DEFINED BELOW) IN CONNECTION WITH THE FILING OF VOLUNTARY CASES UNDER CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE (THE "__BANKRUPTCY CODE__") BY HOSPITALITY INVESTORS TRUST, INC. AND HOSPITALITY INVESTORS TRUST OPERATING PARTNERSHIP, L.P. BECAUSE THE CHAPTER 11 CASES HAVE NOT YET BEEN COMMENCED, THIS DISCLOSURE STATEMENT HAS NOT, AS OF THE DATE HEREOF, BEEN APPROVED BY THE BANKRUPTCY COURT (AS DEFINED BELOW) AS CONTAINING ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE. FOLLOWING THE COMMENCEMENT OF THE CHAPTER 11 CASES, THE DEBTORS (AS DEFINED BELOW) EXPECT TO PROMPTLY SEEK (I) BANKRUPTCY COURT APPROVAL OF (A) THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION, AND (B) THE SOLICITATION OF VOTES AS BEING IN COMPLIANCE WITH SECTIONS 1125 AND 1126(b) OF THE BANKRUPTCY CODE, AND (II) CONFIRMATION OF THE PLAN. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

**DISCLOSURE STATEMENT, DATED MAY 18, 2021**

**Solicitation of Votes on the
Joint Prepackaged Plan of Reorganization of**

**HOSPITALITY INVESTORS TRUST, INC. AND
HOSPITALITY INVESTORS TRUST OPERATING PARTNERSHIP, L.P.**

**IF YOU ARE IN CLASS 5 YOU ARE RECEIVING THIS DISCLOSURE STATEMENT AND THE ACCOMPANYING MATERIALS BECAUSE YOU ARE ENTITLED TO VOTE ON THE PLAN.**

| VOTING CLASS | | NAME OF CLASS UNDER THE PLAN |
|---|---|---|
| **CLASS 5** | **CLASS 5A** | **EXISTING HIT PREFERRED INTERESTS** |
| | **CLASS 5B** | **EXISTING HITOP PREFERRED INTERESTS** |

**HOLDERS OF CLASS 6 – EXISTING HIT COMMON EQUITY INTERESTS
ARE NOT ENTITLED TO VOTE ON THE PLAN**

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS MAY 18, 2021, UNLESS EXTENDED BY THE DEBTORS. THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF INTERESTS MAY VOTE ON THE PLAN IS MAY 17, 2021 (THE "__VOTING RECORD DATE__").**

This disclosure statement (as may be amended, supplemented, or otherwise modified from time to time in accordance with its terms, this "__Disclosure Statement__") provides information regarding the *Joint Prepackaged Chapter 11 Plan for Hospitality Investors Trust,*

*Inc. and Hospitality Investors Trust Operating Partnership, L.P.* **(as may be amended, supplemented, or otherwise modified from time to time, the "Plan"),[2] which the Debtors are seeking to have confirmed by the Bankruptcy Court. A copy of the Plan is attached hereto as Exhibit A. The Debtors are providing the information in this Disclosure Statement to holders of Class 5 Existing Preferred Equity Interests for the purpose of soliciting votes to accept or reject the Plan (the "Solicitation"). Because the holders of Class 6 Existing HIT Common Equity Interests are presumed to reject the Plan, the Debtors are not soliciting their votes to accept or reject the Plan.**

**This Disclosure Statement contains, among other things, descriptions and summaries of provisions of the Plan being proposed by the Debtors. Subject to the conditions and limitations set forth in the Restructuring Support Agreement, the Debtors reserve the right to modify the Plan consistent with Bankruptcy Code section 1127 and Rule 3019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").**

**The consummation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in Article XI of the Plan. There is no assurance that the Bankruptcy Court will confirm the Plan or, if the Bankruptcy Court does confirm the Plan, that the conditions necessary for the Plan to become effective will be satisfied or, in the alternative, waived.**

**The Debtors urge each holder of an Existing Preferred Equity Interest to consult with its own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, and each proposed transaction contemplated by the Plan. Holders of Existing Preferred Equity Interests should not construe the content of this Disclosure Statement as providing legal, business, financial, securities, or tax advice. The Debtors strongly encourage holders of Existing Preferred Equity Interests in Class 5 to read this Disclosure Statement (including the Risk Factors described in Section X hereof) and the Plan in their entirety before voting to accept or reject the Plan. Assuming the requisite acceptances to the Plan are obtained, the Debtors will seek the Bankruptcy Court's approval of this Disclosure Statement and confirmation of the Plan at the Combined Hearing.**

## RECOMMENDATION BY THE DEBTORS

**EACH OF THE DEBTORS STRONGLY RECOMMENDS THAT ALL HOLDERS OF CLASS 5 EXISTING PREFERRED EQUITY INTERESTS WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO ACCEPT THE PLAN BY RETURNING THEIR BALLOTS SO AS TO BE ACTUALLY RECEIVED BY EMAIL BY THE SOLICITATION AGENT NO LATER THAN MAY 18, 2021 PURSUANT TO THE INSTRUCTIONS SET FORTH HEREIN AND ON THE BALLOTS.**

**THE BOARD OF DIRECTORS OR GENERAL PARTNER, AS APPLICABLE, FOR EACH DEBTOR HAS APPROVED THE TRANSACTIONS CONTEMPLATED BY THE**

---

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan. To the extent any inconsistencies exist between this Disclosure Statement and the Plan, the Plan shall govern.

**PLAN AND DESCRIBED IN THIS DISCLOSURE STATEMENT, AND EACH DEBTOR BELIEVES THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF EACH OF THE DEBTORS' ESTATES, AND MAXIMIZE RECOVERIES TO ALL STAKEHOLDERS. IMPORTANTLY, NONE OF THE DEBTORS' BUSINESS PARTNERS AND TRADE CREDITORS WILL BE IMPAIRED UNDER THE PLAN. OTHER THAN HOLDERS OF CLASS 5 AND CLASS 6 INTERESTS, THE DEBTORS' STAKEHOLDERS WILL BE PAID IN FULL IN THE ORDINARY COURSE.**

**AT THIS TIME, EACH DEBTOR BELIEVES THAT THE PLAN AND RELATED TRANSACTIONS REPRESENT THE BEST ROUTE FOR ACCOMPLISHING THE DEBTORS' OVERALL RESTRUCTURING OBJECTIVES.**

[*Remainder of Page Intentionally Left Blank*]

**SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS**

**The Bankruptcy Court has not reviewed this Disclosure Statement or the Plan, and the Securities to be issued on or after the effective date of the Plan (the "<u>Effective Date</u>") will not have been the subject of a registration statement filed with the U.S. Securities and Exchange Commission (the "<u>SEC</u>") under the U.S. Securities Act of 1933 (as amended, the "<u>Securities Act</u>"), or any securities regulatory authority of any state under any state securities law ("<u>Blue Sky Laws</u>").  The Plan has not been approved or disapproved by the SEC or any state regulatory authority and neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of the information contained in this Disclosure Statement or the Plan.  Any representation to the contrary is a criminal offense. The Debtors are relying on Section 4(a)(2) and/or Regulation D of the Securities Act and similar Blue Sky Law provisions to exempt from registration under the Securities Act and Blue Sky Laws the offer to certain holders of DIP Claims and Existing Preferred Equity Interests that are "accredited investors" as defined in Rule 501 of the Securities Act (the "<u>Accredited Investors</u>"), respectively, of new securities prior to the Petition Date, including in connection with the Solicitation.**

**After the Petition Date, the Debtors will rely on Section 1145(a) of the Bankruptcy Code or, to the extent not available, Section 4(a)(2) and/or Regulation D of the Securities Act and similar Blue Sky Law provisions, to exempt from registration under the Securities Act and Blue Sky Laws the issuance of Securities, including the New HIT Common Equity Interests, in connection with the Plan.  Neither the Solicitation nor this Disclosure Statement constitutes an offer to sell or the solicitation of an offer to buy Securities in any state or jurisdiction in which such offer or solicitation is not authorized.**

**Certain statements contained in this Disclosure Statement, including statements incorporated by reference, projected financial information, and other forward-looking statements, are based on estimates and assumptions.  Certain of these forward-looking statements can be identified by the use of words such as "believes," "expects," "projects," "intends," "plans," "estimates," "assumes," "may," "should," "will," "seeks," "anticipates," "opportunity," "pro forma," "projections," or other similar expressions.  There can be no assurance that such statements will be reflective of actual outcomes.  Forward-looking statements are provided in this Disclosure Statement pursuant to the safe harbor established under the Private Securities Litigation Reform Act of 1995 and should be evaluated in the context of the estimates, assumptions, uncertainties, and risks described herein.**

**Readers are cautioned that any forward-looking statements herein are based on assumptions that are believed to be reasonable, but are subject to a wide range of risks identified in this Disclosure Statement.  Important assumptions and other important factors that could cause actual results to differ materially from those expected include, but are not limited to, those factors, risks, and uncertainties described in more detail under the heading "Certain Risk Factors to be Considered" and elsewhere in the financial information and projections included elsewhere herein.  Due to these uncertainties, readers cannot be assured that any forward-looking statements will prove to be correct.  The Debtors are under no obligation to (and expressly disclaim any obligation to) update or alter any forward-looking**

statements whether as a result of new information, future events, or otherwise, unless instructed to do so by the Bankruptcy Court.

Holders of Allowed General Unsecured Claims are not impaired by the Plan and, as a result, their right to receive payment in full or be treated in the ordinary course on account of valid obligations is not altered by the Plan. During the Chapter 11 Cases, the Debtors intend to operate their business in the ordinary course, and the Debtors will seek authorization from the Bankruptcy Court, if necessary, to make payment in full to, or treat in the ordinary course, all trade creditors, employees, and lease counterparties with respect to all amounts due by the Debtors prior to and during the Chapter 11 Cases.

No independent auditor or accountant has reviewed or approved the financial projections herein.

The statements contained in this Disclosure Statement are made as of the date hereof unless otherwise specified. The terms of the Plan govern in the event of any inconsistency with the summaries in this Disclosure Statement.

The information in this Disclosure Statement is being provided solely for purposes of voting to accept or reject the Plan or in connection with confirmation of the Plan. Nothing in this Disclosure Statement may be used by any party for any other purpose.

All exhibits to the Disclosure Statement are incorporated into and are a part of this Disclosure Statement as if set forth in full herein.

# TABLE OF CONTENTS

**Page**

**ARTICLE I. EXECUTIVE SUMMARY** ................................................................. 8

    A.    Purpose of this Disclosure Statement and the Plan.................................. 8

    B.    Overview of the Transactions Contemplated by the Plan....................... 8

    C.    Summary of Plan Classification and Treatment of Claims and Interests ............ 10

    D.    Voting on the Plan ................................................................. 13

    E.    Confirmation and Consummation of the Plan ....................................... 13

        1.    Combined Hearing. ................................................................ 14

        2.    Effect of Confirmation and Consummation of the Plan. ........................ 14

    F.    Additional Plan-Related Documents.................................................... 14

**ARTICLE II. OVERVIEW OF THE COMPANY'S OPERATIONS.................................. 15**

    A.    Corporate History and Organizational Structure ................................. 15

    B.    Company's Business ................................................................. 16

    C.    The Debtors' Operations.............................................................. 16

    D.    Management............................................................................. 17

    E.    Prepetition Capital Structure....................................................... 18

        1.    Unsecured Guaranty Claims ....................................................... 18

        2.    Other General Unsecured Claims .................................................. 22

        3.    Unsecured Priority Claims .......................................................... 22

        4.    Secured Claims ...................................................................... 22

        5.    Intercompany Claims ................................................................ 22

        6.    Existing Preferred Equity Interests .............................................. 22

**ARTICLE III. KEY EVENTS LEADING TO COMMENCEMENT OF THE CHAPTER 11 CASES** ................................................................. 24

**ARTICLE IV. ANTICIPATED EVENTS DURING CHAPTER 11 CASES** ..................... 27

    A.    Commencement of Chapter 11 Cases and First-Day Motions........................... 27

        1.    DIP Financing ...................................................................... 27

        2.    Cash Management System........................................................... 28

        3.    Trade Payables....................................................................... 28

        4.    Employee Wages and Benefits ..................................................... 29

        5.    Taxes ................................................................................ 29

    B.    Procedural Motions and Retention of Professionals............................... 29

    C.    Solicitation Procedures .............................................................. 29

**ARTICLE V. PENDING LITIGATION** ................................................................................ 29

**ARTICLE VI. SUMMARY OF PLAN** ................................................................................ 30

A.    DIP Claims, Administrative Expense Claims, Professional Fee Claims,
and U.S. Trustee Fees ........................................................................................ 30
    1.    DIP Claims .................................................................................... 30
    2.    Administrative Expense Claims ..................................................... 30
    3.    Professional Fee Claims ................................................................ 30
    4.    U.S. Trustee Fees .......................................................................... 31

B.    Classification of Claims and Interests ................................................................. 31
    1.    Summary of Classification of Claims and Interests ....................... 31
    2.    Separate Classification of Secured Claims .................................... 32
    3.    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code
or "Cramdown." ........................................................................... 32
    4.    Confirmation of All Cases ............................................................. 32

C.    Treatment of Claims and Interests ...................................................................... 32
    1.    Secured Claims (Class 1) .............................................................. 32
    2.    Unsecured Priority Claims (Class 2) ............................................. 33
    3.    General Unsecured Claims (Class 3) ............................................. 33
    4.    Intercompany Claims (Class 4) ..................................................... 33
    5.    Existing Preferred Equity Interests (Class 5) ................................ 34
    6.    Existing HIT Common Equity Interests (Class 6) ......................... 34
    7.    Intercompany Interests (Class 7) .................................................. 35

D.    Means for Implementation .................................................................................. 35
    1.    Non-Substantive Consolidation. ................................................... 35
    2.    Continued Corporate Existence, Vesting of Assets in the
Reorganized Debtors, and Assumption of the Indemnification
Agreements. ................................................................................. 35
    3.    Compromise of Controversies. ..................................................... 36
    4.    Sources of Cash for Plan Distribution. .......................................... 36
    5.    Restructuring Expenses. ................................................................ 36
    6.    Corporate Action. ......................................................................... 37
    7.    Exit Facility. ................................................................................. 38
    8.    Authorization and Issuance of New HIT Common Equity Interests. ....... 38
    9.    Exemption from Registration. ....................................................... 38
    10.    Cancellation of Existing Securities and Agreements. ..................... 39
    11.    Officers and Board of Directors. ................................................... 40
    12.    Restructuring Transactions. .......................................................... 40
    13.    Employee Matters. ....................................................................... 41
    14.    Release of Avoidance Actions. ..................................................... 42
    15.    Closing of Chapter 11 Cases. ....................................................... 42
    16.    Notice of Effective Date. .............................................................. 42

17.     Corporate and Other Action..................................................................... 42
18.     Approval of Plan Documents................................................................... 43

E.     CVR Distributions and Related Matters ........................................................ 43
1.     CVR Payments............................................................................................ 43
2.     Maturity Date of CVRs............................................................................. 43
3.     Securities Law Considerations................................................................. 44
4.     Certain Covenants..................................................................................... 44
5.     Reporting................................................................................................... 44
6.     Inconsistency Between Plan and CVR Agreement................................... 44

F.     Distributions.................................................................................................... 44
1.     Plan Distributions Generally..................................................................... 44
2.     Distribution Record Date........................................................................... 45
3.     Date of Plan Distributions......................................................................... 45
4.     Disbursing Agent....................................................................................... 45
5.     Rights and Powers of Disbursing Agent................................................... 45
6.     Expenses of Disbursing Agent.................................................................. 46
7.     Delivery of Plan Distributions................................................................... 46
8.     Proofs of Claim; Disputed Claims Process.............................................. 46
9.     Postpetition Interest................................................................................... 47
10.     Unclaimed Property................................................................................... 47
11.     Time Bar to Cash Payments...................................................................... 47
12.     Manner of Payment under Plan................................................................. 47
13.     Satisfaction of Claims............................................................................... 47
14.     Setoffs....................................................................................................... 48
15.     Withholding and Reporting Requirements. .............................................. 48

G.     Executory Contracts and Unexpired Leases .................................................. 49
1.     General Treatment; Assumption and Rejection of Executory
Contracts or Unexpired Leases. ............................................................... 49
2.     Cure of Defaults for Assumed Executory Contracts and Unexpired
Leases........................................................................................................ 50
3.     Rejection of Executory Contracts or Unexpired Leases. ......................... 51
4.     Survival of the Debtors' Indemnification Obligations and
Guarantees................................................................................................. 51
5.     Severance Contracts and Programs........................................................... 52
6.     Insurance Policies. .................................................................................... 52
7.     Intellectual Property Licenses and Agreements........................................ 52
8.     Modifications, Amendments, Supplements, Restatements, or Other
Agreements. .............................................................................................. 52
9.     Reservation of Rights................................................................................ 53

H.     Conditions Precedent ..................................................................................... 53
1.     Conditions Precedent to Effective Date ................................................... 53
2.     Waiver of Conditions Precedent. .............................................................. 54

3.      Effect of Failure of a Condition. ............................................................... 54

I.    Effect of Confirmation of Plan ........................................................................ 55
    1.      Vesting of Assets. ................................................................................. 55
    2.      Binding Effect. ..................................................................................... 55
    3.      Deemed Consent to Change of Control of Debtors. .............................. 55
    4.      Discharge of Claims and Termination of Interests. ............................. 55
    5.      Term of Injunctions or Stays. ............................................................... 56
    6.      Injunction. ............................................................................................ 56
    7.      Releases. ............................................................................................... 57
    8.      Ipso Facto and Similar Provisions Ineffective. ................................... 61
    9.      No Successor Liability. ......................................................................... 62

J.    Retention of Jurisdiction ................................................................................. 62
    1.      Retention of Jurisdiction ...................................................................... 62
    2.      Courts of Competent Jurisdiction ........................................................ 64

K.    Miscellaneous Provisions. ............................................................................... 64
    1.      Payment of Statutory Fees. .................................................................. 64
    2.      Substantial Consummation of the Plan. ............................................... 64
    3.      Expedited Determination of Taxes. ...................................................... 65
    4.      Exemption from Certain Transfer Taxes. ............................................. 65
    5.      Amendments. ....................................................................................... 65
    6.      Effectuating Documents and Further Transactions. .............................. 66
    7.      Revocation or Withdrawal of Plan. ...................................................... 66
    8.      Severability of Plan Provisions. ........................................................... 66
    9.      Governing Law. ................................................................................... 67
    10.    Time. .................................................................................................... 67
    11.    Dates of Actions to Implement the Plan. .............................................. 67
    12.    Immediate Binding Effect. ................................................................... 67
    13.    Deemed Acts. ....................................................................................... 67
    14.    Successor and Assigns. ........................................................................ 68
    15.    Entire Agreement. ................................................................................ 68
    16.    Exhibits to Plan. ................................................................................... 68
    17.    Reservation of Rights. .......................................................................... 68
    18.    Plan Supplement. ................................................................................. 68
    19.    Waiver or Estoppel. ............................................................................. 68
    20.    Notices ................................................................................................. 69
    1.      The Debtors at: .................................................................................... 69
    2.      Office of the U.S. Trustee at: ............................................................... 69
    3.      Counsel to the Debtors at: .................................................................... 69
    4.      The Plan Sponsor at: ............................................................................ 70
    5.      Counsel to the Plan Sponsor at: ........................................................... 70

**ARTICLE VII. FINANCIAL INFORMATION AND PROJECTIONS**...............................70

   A.    Overview of Financial Projections.................................................71

   B.    General Assumptions ........................................................................72

        1.    Overview...................................................................................72
        2.    Effective Date Assumption .....................................................72
        3.    Net Sales ..................................................................................72
        4.    Hotel Operating Expenses .......................................................72
        5.    General & Administrative Expenses .........................................73
        6.    Capital Expenditures ...............................................................73
        7.    Debt Balance ...........................................................................73

   C.    Financial Projections........................................................................74

**ARTICLE VIII. TRANSFER RESTRICTIONS AND CONSEQUENCES
UNDER FEDERAL SECURITIES LAWS** .................................................................75

**ARTICLE IX. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES
OF THE PLAN**...........................................................................................................75

   A.    In General.........................................................................................75

   B.    Certain U.S. Federal Income Tax Consequences to Holders with Respect
to New Contingent Value Rights .....................................................76
        1.    Contingent Value Rights (CVRs) ...........................................76
        2.    Other Tax Consideration..........................................................79

**ARTICLE X. CERTAIN RISK FACTORS TO BE CONSIDERED** ....................80

   A.    Certain Bankruptcy Law Considerations ..........................................80
        1.    General ....................................................................................80
        2.    Risk Related to the Restructuring Support Agreement.............81
        3.    Risk of Non-Confirmation of Plan...........................................81
        4.    Risk of Non-Occurrence of Effective Date...............................81
        5.    Risk Related to Obtaining First Day Relief ..............................81
        6.    Risk Related to Parties in Interest Objecting to the Debtors'
Classification of Claims and Interests......................................82
        7.    Risk Related to Possible Objections to the Plan .......................82
        8.    Conversion to Chapter 7 Cases ................................................82

   B.    Additional Factors Affecting Value of Reorganized Debtors..............82
        1.    Projections and Other Forward-Looking Statements Are Not
Assured, and Actual Results May Vary ....................................82

   C.    Risks Relating to Debtors' Business and Financial Condition ...........82
        1.    Risks Associated with COVID-19 in Debtors' Business and
Industry ...................................................................................82
        2.    Risks Associated with Capital Markets ....................................83

3.    Reliance on the Value of the Company's Brands ..................................... 83
4.    Post-Effective Date Indebtedness ............................................................ 83

D.    Factors Relating to Securities to be Issued Under Plan Generally ...................... 83
1.    No Current Public Market for Securities ................................................. 83
2.    Potential Dilution .................................................................................... 84

E.    Risks Related to Investment in New HIT Common Equity Interests .................. 84
1.    Interests Subordinated to Reorganized Debtors' Indebtedness ............... 84
2.    Implied Valuation of New HIT Common Equity Interests Not
Intended to Represent Trading Value of New HIT Common Equity
Interests ................................................................................................... 84

F.    Additional Factors ............................................................................................... 85
1.    Debtors Could Withdraw Plan ................................................................ 85
2.    Debtors Have No Duty to Update ............................................................ 85
3.    No Representations Outside Disclosure Statement Are Authorized......... 85
4.    No Legal or Tax Advice Is Provided by Disclosure Statement ............... 85
5.    No Admission Made ................................................................................ 85

**ARTICLE XI. VOTING PROCEDURES AND REQUIREMENTS ................................... 86**

A.    Voting Instructions and Voting Deadline ............................................................ 86

B.    Deemed Rejection by Class 6 (Existing HIT Common Equity Interests). ........... 86

C.    Agreements Upon Furnishing Ballots.................................................................. 87

D.    Change of Vote .................................................................................................... 87

E.    Waivers of Defects, Irregularities, *etc.* .............................................................. 87

F.    Miscellaneous ...................................................................................................... 87

**ARTICLE XII. CONFIRMATION OF PLAN .................................................................... 88**

A.    Combined Hearing ............................................................................................... 88

B.    Objections to Confirmation.................................................................................. 88
1.    The Debtors at: ........................................................................................ 88
2.    Office of the U.S. Trustee at: .................................................................. 88
3.    Counsel to the Debtors at:........................................................................ 89
4.    The Plan Sponsor at: ............................................................................... 89
5.    Counsel to the Plan Sponsor at: .............................................................. 89

C.    Requirements for Confirmation of Plan............................................................... 90
1.    Requirements of Section 1129(a) of the Bankruptcy Code ..................... 90
2.    Additional Requirements for Non-Consensual Confirmation ................. 93

**ARTICLE XIII. ALTERNATIVES TO CONFIRMATION AND
CONSUMMATION OF PLAN .............................................................................. 94**

A.    Alternative Plan of Reorganization...................................................................... 94

B.      Sale Under Section 363 of Bankruptcy Code ........................................................ 94

C.      Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law ..................... 94

**ARTICLE XIV. CONCLUSION AND RECOMMENDATION ............................................ 95**

**EXHIBITS**

EXHIBIT A:   Joint Prepackaged Chapter 11 Plan for Hospitality Investors Trust, Inc. and Hospitality Investors Trust Operating Partnership, L.P.

EXHIBIT B:  Organizational Chart

EXHIBIT C:  Liquidation Analysis

## ARTICLE I.

### EXECUTIVE SUMMARY

#### A.      Purpose of this Disclosure Statement and the Plan.

Hospitality Investors Trust, Inc. ("HIT") and Hospitality Investors Trust Operating Partnership, L.P. ("HITOP," and together with HIT, the "Debtors," and, together with their non-debtor subsidiaries, the "Company") submit this joint Disclosure Statement in connection with the solicitation of votes on the *Joint Prepackaged Chapter 11 Plan for Hospitality Investors Trust, Inc. and Hospitality Investors Trust Operating Partnership, L.P.*, dated May 18, 2021 (the "Plan") attached hereto as Exhibit A.  This Disclosure Statement is being distributed pursuant to sections 1125 and 1126 of the Bankruptcy Code to holders of Class 5 Existing Preferred Equity Interests in connection with the Solicitation of the Plan.  The Plan constitutes a separate chapter 11 plan for each Debtor.

The purpose of this Disclosure Statement, including the exhibits annexed hereto, is to provide information of a kind, and in sufficient detail, to enable holders of interests in the Debtors that are entitled to vote on the Plan to make an informed decision on whether to vote to accept or reject the Plan.  This Disclosure Statement contains summaries of the Plan, certain statutory provisions, events contemplated in the Chapter 11 Cases, and certain documents related to the Plan.

The Debtors believe that the compromises and settlements contemplated by the Plan are fair and equitable, maximize the value of the Debtors' estates, and maximize recoveries to all stakeholders.  The Debtors believe that the Plan is the best available alternative for implementing a restructuring of the Debtors' balance sheet.  The Debtors strongly recommend that you vote to accept the Plan.

#### B.      Overview of the Transactions Contemplated by the Plan.

The Debtors intend to commence their chapter 11 cases (the "Chapter 11 Cases") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") to implement financial restructuring transactions, including all transaction described in, approved by, contemplated by, or necessary to effectuate the Plan (the "Restructuring Transactions") that will eliminate the Debtors' Existing Preferred Equity Interests and the related cash distribution obligations.  The Restructuring Transactions will also provide the Debtors and Reorganized Debtors with $65 million in debtor in possession financing to fund working capital needs and the anticipated transaction fees and expenses, and a revolving $25 million credit facility upon the Effective Date to fund go-forward working capital needs.   Critically, the Restructuring

Transactions and the Plan will not impair any of the lenders, Franchisors, or hotel management companies to the Company's operating subsidiaries, none of which are Debtors in the Chapter 11 Cases, nor will the Company's workforce, vendors, or other unsecured creditors be impaired under the Plan.

The Debtors will seek joint administration of the Chapter 11 Cases for procedural purposes and, upon commencement of the Chapter 11 Cases, will file the Plan, this Disclosure Statement, a motion seeking to approve the Disclosure Statement and the Solicitation process, and motions seeking first-day relief.

On May 19, 2021, the Debtors and Brookfield Strategic Real Estate Partners II Hospitality REIT II LLC (collectively with its successors and permitted assigns, "Brookfield Investor" or the "Plan Sponsor"), as holders of 100% of (a) preferred stock of HIT (the "Existing HIT Preferred Interests") and (b) Class C Preferred Units of HITOP (the "Existing HITOP Preferred Interests" and, with the Existing HIT Preferred Interests, the "Existing Preferred Equity Interests") intend to enter into that certain *Restructuring Support Agreement* (as may be amended, supplemented, or otherwise modified from time to time in accordance with its terms, the "Restructuring Support Agreement") that sets forth the principal terms of the Restructuring Transactions and requires the Plan Sponsor to support the Plan. The Debtors' determination to enter into the Restructuring Support Agreement remain subject to approval by its board of directors, which approval is anticipated to be granted on May 19, 2021.

A lynchpin of the Restructuring Transactions and the Plan is a $65 million debtor-in-possession financing facility provided on a secured basis to support critical working capital to the Company and a post-Effective Date revolving secured credit facility in an amount of $25 million (the "Exit Facility"). Each holder of a DIP Claim will receive, in exchange for its Claim, its Pro Rata Share, together with the holders of Existing Preferred Equity Interests, of 100% of the new equity interests of Reorganized HIT (the "New HIT Common Equity Interests"). Similarly, each holder of Existing Preferred Equity Interests shall receive, in exchange for its Interest, its Pro Rata Share, together with the holders of DIP Claims, of 100% of the New HIT Common Equity Interests. Additionally, 2% of Existing HITOP Preferred Interests shall be canceled, and the holder of such Existing HITOP Preferred Interests shall receive, in exchange for its Interests, its Pro Rata Share of 2% of New HITOP Interests.

Existing HIT Common Equity Interests will be discharged and cancelled on the Effective Date. Holders of Allowed Existing HIT Common Equity Interests will receive one contingent value right (a "CVR" and, collectively, the "CVRs") in respect of each share of the Allowed Existing HIT Common Equity Interests outstanding immediately prior to the Effective Date, which CVRs shall mature five years from the Effective Date (subject to a potential extension of two years at the sole discretion of Reorganized HIT's board of directors) or earlier upon the occurrence of a Monetization Event (as defined in the CVR Agreement).

**The Company recognizes the importance of its business partners in this industry, including the lenders, Franchisors, and hotel management companies to the Debtors' operating subsidiaries, and has structured the Restructuring Transactions to have no impact on those critical relationships. Other than the holders of Existing Preferred Equity Interests and holders of Existing HIT Common Equity Interests, the Debtors' stakeholders (including**

**employees, vendors, and other general unsecured claim holders) will be paid in full or otherwise receive such treatment to render them unimpaired in the ordinary course. The operation of the Company's hotels will be unaffected by these Chapter 11 Cases and will continue uninterrupted.**

The Plan and Restructuring Transactions, therefore, implement a significant recapitalization of the Company, funding necessary working capital that will allow it to continue to operate its hotel business with the support of the Plan Sponsor.

As described below, you are receiving this Disclosure Statement because you are a holder of an Existing Preferred Equity Interest entitled to vote or accept or reject the Plan. **Prior to voting on the Plan, you are encouraged to read this Disclosure Statement and all documents attached to this Disclosure Statement in their entirety. As reflected in this Disclosure Statement, there are risks, uncertainties, and other important factors that could cause the Debtors' actual performance or achievements to be materially different from those they may project, and the Debtors undertake no obligation to update any such statement. Certain of these risks, uncertainties, and factors are described in Section X of this Disclosure Statement, entitled "Certain Risk Factors to be Considered."**

Accomplishing a speedy and efficient resolution of the Debtors' Chapter 11 Cases is essential to maximizing value and successfully reorganizing the Company. Under the Debtors' Restructuring Support Agreement, the Debtors are subject to certain milestones:

| Milestone | Deadline |
|---|---|
| Petition Date | The Petition Date shall occur no later than May 19, 2021 |
| Filing of Plan and Disclosure Statement | The Petition Date |
| DIP Financing Orders | The DIP Orders shall be entered by the Bankruptcy Court, subject to Bankruptcy Court availability, (i) on an interim basis, no later than five (5) Business Days after the Petition Date, and (ii) on a final basis (if necessary), no later than thirty (30) calendar days after the Petition Date. |
| Confirmation Order | The Confirmation Order shall be entered no later than thirty (35) calendar days after the Petition Date, subject to extension based on the Bankruptcy Court's calendar in completing the Combined Hearing. |
| Plan Effective Date | No later than ten (10) calendar days after the Confirmation Order entered by the Bankruptcy Court becomes a final order. |

### C.   Summary of Plan Classification and Treatment of Claims and Interests

Under the Bankruptcy Code, only holders of claims or interests in impaired Classes who are receiving distributions under the Plan are entitled to vote on the Plan (unless, for reasons

discussed in more detail below, such holders are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" unless (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan, among other things, cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

Holders of Interests in Class 5 (Class 5A (Existing HIT Preferred Interests) and Class 5B (Existing HITOP Preferred Interests)) are being solicited under and entitled to vote on the Plan.

The following table summarizes (i) the treatment of Claims and Interests under the Plan, (ii) which Classes are impaired by the Plan, (iii) which Classes are entitled to vote on the Plan, and (iv) the estimated recoveries for holders of Claims and Interests.  The table is qualified in its entirety by reference to the full text of the Plan.  For a more detailed summary of the terms and provisions of the Plan, *see* Article VI—Summary of the Plan, below.

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitled to Vote on the Plan | Approx. Recovery |
|---|---|---|---|---|---|
| 1 | Secured Claims | On the Effective Date or as soon as reasonably practicable thereafter in the ordinary course of business, except to the extent that a holder of a Secured Claim already has been paid during the Chapter 11 Cases or such holder, together with the Debtors, agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Secured Claim, each holder of an Allowed Secured Claim shall receive, at the sole option of the Debtors with the consent of the Plan Sponsor, either (a) payment in full, in Cash, of the unpaid portion of its Allowed Secured Claim, (b) delivery of the Collateral securing such Allowed Secured Claim, or (c) other treatment such that the Secured Claim shall be rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code. | Unimpaired | No (Presumed to accept) | 100% |
| 2 | Unsecured Priority Claims | On the Effective Date or as soon as reasonably practicable thereafter in the ordinary course of business, except to the extent that a holder of an Allowed Unsecured Priority Claim already has been paid during the Chapter 11 Cases or such holder, together with the Debtors, agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Unsecured Priority Claim, each holder of an Allowed Unsecured Priority Claim shall receive payment in full in Cash or as otherwise provided in the Bankruptcy Code.  Any ad valorem taxes and other taxes/fees will be extended to maximum statutory periods under, *inter alia*, 11 U.S.C. § 1129(a)(9)(C). Holders of such Claims will be rendered Unimpaired and as such will be deemed to have accepted the Plan and will not be entitled to vote. | Unimpaired | No (Presumed to accept) | 100% |

11

| Class | | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitled to Vote on the Plan | Approx. Recovery |
|---|---|---|---|---|---|---|
| 3 | | General Unsecured Claims | On or as soon as reasonably practicable after the Effective Date, except to the extent that a holder of an Allowed General Unsecured Claim, together with the Debtors, agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed General Unsecured Claim, each holder of an Allowed General Unsecured Claim shall (i) have its Allowed General Unsecured Claim reinstated, and paid in full, on the later to occur of the Effective Date or when such Allowed General Unsecured Claim becomes due in the ordinary course of the Debtors' or Reorganized Debtors' business operations, or (ii) have its Allowed General Unsecured Claim otherwise rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code. | Unimpaired | No (Presumed to accept) | 100% |
| 4 | | Intercompany Claims | On the Effective Date, Allowed Intercompany Claims shall be reinstated. | Unimpaired | No (Presumed to accept) | 100% |
| 5 | 5A | Existing HIT Preferred Interests | On the Effective Date, all outstanding shares, units, and interests (and rights, warrants, options, or other interests to acquire shares and interests) of the Existing HIT Preferred Interests will be extinguished in exchange for each holder's Pro Rata Share, together with the holders of DIP Claims and Class 5B Interests, of 100% of the New HIT Common Equity Interests issued on the Effective Date. | Impaired | Yes | 0% |
| | 5B | Existing HITOP Preferred Interests | On the Effective Date, (x) 98% of the outstanding shares, units, and interests (and rights, warrants, options, or other interests to acquire shares and interests) of the Existing HITOP Preferred Interests will be transferred to HIT in exchange for each holder's Pro Rata Share, together with the holders of DIP Claims and Class 5A Interests, of 100% of the New HIT Common Equity Interests issued on the Effective and (y) 2% of the outstanding shares, units, and interests (and rights, warrants, options, or other interests to acquire shares and interests) of the Existing HITOP Preferred Interests will be canceled in exchange for each holder's Pro Rata Share of 2% of New HITOP Interests. | Impaired | Yes | 11–62% |
| 6 | | Existing HIT Common Equity Interests | On the Effective Date, the Allowed Existing HIT Common Equity Interests shall be cancelled, extinguished and discharged in exchange for each holder receiving one CVR in respect of each share of the Allowed Existing HIT Common Equity Interests outstanding immediately prior to the Effective Date and such holders shall be automatically deemed to have accepted the terms of the CVR Agreement and to be a party thereto, | Impaired | No (Presumed to reject) | 0%[1] |

---

[1] This estimate excludes the value, if any, of the CVRs, which are speculative and may ultimately have no or minimal value.

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitled to Vote on the Plan | Approx. Recovery |
|-------|--------------------------|-----------|------------------------|------------------------------|------------------|
|  |  | in each case in accordance with the terms of the CVR Agreement.<br><br>Notwithstanding the foregoing, the Plan Sponsor has agreed that, on the Effective Date, any Existing HIT Common Equity Interest held by the Plan Sponsor shall be deemed to be fully vested, and shall not entitle the Plan Sponsor to any distributions of CVRs. |  |  |  |
| 7 | Intercompany Interests | On the Effective Date, the Allowed Intercompany Interests will be retained by the existing holders. | Unimpaired | No (Presumed to accept) | 100% |

### D.    Voting on the Plan

Certain procedures will be used to collect and tabulate votes on the Plan, as summarized in Section XI.A of this Disclosure Statement, entitled "Voting Instructions." Readers should carefully read the voting instructions.

Only holders of Existing Preferred Equity Interests, which are classified in Class 5 under the Plan, are entitled to vote on the Plan (the "Voting Class"). Holders of Claims in Classes 1, 2, 3, and 4 and holders of Interests in Class 7 are conclusively presumed to accept the Plan because they are Unimpaired under the Plan. Holders of Interests in Class 6 are Impaired and deemed to reject the Plan even though they will receive a recovery on account of their Interests.

**The Voting Deadline is May 18, 2021**. To be counted as votes to accept or reject the Plan, a ballot ("Ballot") must be **actually received** by email at the following address: Tabulation@epiqglobal.com on or before the Voting Deadline by Epiq Corporate Restructuring, LLC (the "Solicitation Agent") and must be completed following the instructions received with the Ballot. **Any Ballot received after the Voting Deadline or otherwise not in compliance with the voting instructions will not be counted except as determined by the Debtors**.

### E.    Confirmation and Consummation of the Plan

Under section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing to confirm a plan of reorganization. The Debtors intend to file a motion on the Petition Date requesting that the Bankruptcy Court set a date and time as soon as practicable after the Petition Date for a hearing (such hearing, the "Combined Hearing") for the Bankruptcy Court to determine whether this Disclosure Statement contains adequate information under section 1125(a) of the Bankruptcy Code, whether the Debtors' prepetition solicitation of acceptances in support of the Plan complied with sections 1125(g) and 1126(b) of the Bankruptcy Code, and whether the Plan should be confirmed in light of both the affirmative requirements of the Bankruptcy Code and objections, if any, that are timely filed, as permitted by section 105(d)(2)(B)(2)(v) of the Bankruptcy Code. The Combined Hearing, once set, may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on those parties who have

requested notice under Bankruptcy Rule 2002 and the Entities who have filed an objection to the Plan, if any, without further notice to parties in interest. The Bankruptcy Court, in its discretion and prior to the Combined Hearing, may put in place additional procedures governing the Combined Hearing. Subject to section 1127 of the Bankruptcy Code and the conditions and limitations set forth in the Restructuring Support Agreement, the Plan may be modified, if necessary, prior to, during, or as a result of the Combined Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation. The Debtors, in the same motion requesting a date for Confirmation of the Plan, will request that the Bankruptcy Court establish a date and time for parties in interest to file objections to the adequacy of the Disclosure Statement, the Debtors' prepetition Solicitation of acceptances in support of the Plan, and Confirmation of the Plan. All such objections must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the applicable order of the Bankruptcy Court so that they are received before the deadline to file such objections.

### 1. Combined Hearing.

At the Combined Hearing, the Bankruptcy Court will determine whether the Disclosure Statement contains adequate information under section 1125(a) of the Bankruptcy Code, whether the Debtors' prepetition Solicitation of acceptances in support of the Plan complied with section 1126(b) of the Bankruptcy Code, and whether the Plan should be confirmed in light of both the affirmative requirements of the Bankruptcy Code and objections, if any, that are timely filed, and subject to satisfaction or waiver of each condition precedent in Article XI of the Plan. For a more detailed discussion of the Combined Hearing, see Section XII of this Disclosure Statement, entitled "Confirmation of Plan."

### 2. Effect of Confirmation and Consummation of the Plan.

Following confirmation, and subject to satisfaction or waiver of each condition precedent in Article XI of the Plan, the Plan will be consummated on the Effective Date. Among other things, on the Effective Date, certain release, injunction, exculpation, and discharge provisions set forth in Article XII of the Plan will become effective. Accordingly, it is important to read the provisions contained in Article XII of the Plan very carefully so that you understand how Confirmation and Consummation—which effectuates such release, injunction, exculpation, and discharge provisions—will affect you and any Claim or Interest you may hold with respect to the Debtors so that you may cast your vote accordingly. These provisions are described in Section VI.I of this Disclosure Statement.

### F. Additional Plan-Related Documents.

The Debtors will file certain documents that provide more details about the implementation of the Plan in the Plan Supplement, which will be filed with the Bankruptcy Court no later than seven (7) calendar days before the deadline to object to Confirmation of the Plan and otherwise in accordance with the Restructuring Support Agreement. The Debtors will serve a notice that will

inform all parties that the initial Plan Supplement may be obtained on the Debtors' restructuring website at http://dm.epiq11.com/HospitalityInvestorsTrust.  The Plan Supplement will include:

- the Amended Constituent Documents;

- the Exit Facility Agreement;

- the Schedule of Rejected Contracts and Leases;

- the New Common Stock Certificates;

- the identity of the members of the Reorganized HIT board of directors (the "New Board") and the officers of Reorganized HIT; and

- any other necessary documentation relating to the Restructuring Transactions.

**THE FOREGOING EXECUTIVE SUMMARY IS ONLY A GENERAL OVERVIEW OF THIS DISCLOSURE STATEMENT AND THE MATERIAL TERMS OF, AND TRANSACTIONS PROPOSED BY, THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO, AND SHOULD BE READ IN CONJUNCTION WITH, THE MORE DETAILED DISCUSSIONS APPEARING ELSEWHERE IN THIS DISCLOSURE STATEMENT, INCLUDING THE PLAN.**

## ARTICLE II.

## OVERVIEW OF THE COMPANY'S OPERATIONS

### A.      Corporate History and Organizational Structure

Incorporated on July 25, 2013, HIT is a self-managed real estate investment trust ("REIT") that invests primarily in premium-branded select-service lodging properties in the United States. An initial public offering of shares of common stock in HIT was conducted from January 2014 until November 2015 without listing shares of its common stock on a national securities exchange. HIT has not since listed its shares and there is currently no established trading market for HIT's shares.

Substantially all of the Company's business is conducted through its operating partnership, Debtor HITOP, and its non-Debtor subsidiaries, which directly or indirectly own and operate the properties comprising the Company's hotel portfolio.  The Debtors do not directly own any of the Company's hotels, but rather all hotels are owned indirectly through certain of the non-Debtor subsidiaries.

The Company's organizational structure, as of the date hereof, is attached hereto as Exhibit B.

## B.    Company's Business

As of the date of Solicitation (the "Solicitation Date"), the Company owns or has an interest in a total of 100 hotels with a total of 12,421 guest rooms located across 29 states.  The Company has primarily acquired lodging properties in the upscale select-service, upscale extended stay and upper midscale select-service chain scale segments in secondary markets with strong demand generators, such as state capitals, major universities and hospitals, as well as corporate, leisure, and retail attractions.  All of the Company's hotels are operated under a franchise or license agreement with a national brand owned by one of Hilton Worldwide, Inc., Marriott International, Inc., and Hyatt Hotels Corporation, or one of their respective subsidiaries or affiliates (collectively, the "Franchisors").  The Company wholly owns 98 of its hotels, and two hotels are partially-owned through joint ventures with unaffiliated third-parties.

The Company's hotel portfolio was acquired through a series of seven portfolio purchases during the period from March 2014 to April 2017, which ranged in size from 116 hotels with a purchase price of $1.8 billion to two hotels with a purchase price of $48.6 million.  Across 2019 and 2020, the Company sold a total of 43 hotels (the "Hotel Sales").

The Company generates a significant majority of its total revenues from the hotels through room bookings and other room operating revenues.  In addition, the hotels generate non-room revenue through the sale of food and beverage and through other ancillary products or offerings such as conference centers, markets, parking, telephone, and cancellation fees.  The Company also incurs operating expenses related to, among other things, room expenses (including labor costs for housekeeping and rooms operation staff, reservation systems, room supplies, linen and laundry services), food and beverage expenses (labor and the cost of food and beverages), management fees (calculated as a percentage of gross revenue), and other property-level operating costs (repair and maintenance and utility costs, administrative, sales, and marketing costs, and other costs associated with generating the ancillary revenues).

## C.    The Debtors' Operations

The Debtors do not themselves own or operate any of the Company's hotels.  Rather the Company owns and operates its hotels through the Debtors' non-debtor subsidiaries (collectively, the "Non-Debtor Subsidiaries").  The Debtors provide critical financial, logistical, and administrative support to the operating Non-Debtor Subsidiaries.

Debtor HIT is the ultimate parent entity whose common stock is publicly held without being nationally listed.  The Debtors employ the Company's senior management to oversee the Non-Debtor Subsidiaries.  In addition, the Debtors engage various third party professionals to provide tax, accounting, IT, audit, public reporting, and other services to the Company and acquires comprehensive insurance coverage on the Company's behalf.

### D.      Management

The following table sets forth the names of the Company's current executive officers:

| Name | Title |
|------|-------|
| Jonathan P. Mehlman | Chief Executive Officer & President |
| Bruce A. Riggins | Chief Financial Officer & Treasurer |
| Paul C. Hughes | General Counsel & Secretary |

The following table sets forth the names and relevant affiliations of the members of HIT's board of directors:

| Name | Status |
|------|--------|
| Jonathan P. Mehlman | Management Director |
| Stanley R. Perla | Independent Director |
| Abby M. Wenzel | Independent Director |
| Stephen P. Joyce | Independent Director |
| Edward A. Glickman | Independent Director |
| Lowell G. Baron | Brookfield Investor Appointee |
| Bruce G. Wiles | Brookfield Investor Appointee – Chairman of the Board |

The composition of the boards of managers and boards of directors of the Reorganized Debtors will be disclosed, to the extent known and determined, prior to the entry of the order confirming the Plan in accordance with section 1129(a)(5) of the Bankruptcy Code.

### E.    Prepetition Capital Structure

### 1.    Unsecured Guaranty Claims

To fund the acquisition and operation of the Company's hotels, the Non-Debtor Subsidiaries have incurred mortgage and mezzanine indebtedness secured by the Non-Debtor Subsidiaries' hotel properties and, in the case of mezzanine indebtedness, the ownership interest in certain Non-Debtor Subsidiaries.    The mortgage and mezzanine loans are non-recourse obligations, with exceptions for certain environmental indemnities and with respect to certain so-called "bad boy" events which if they occur liability is either fully recourse or recourse to the extent of losses incurred by the lender.    The recourse obligations under the Non-Debtor Subsidiaries' mortgage and mezzanine loans are supported by guarantees from the Debtors (the "Guaranty Claims").    The Guaranty Claims are contingent General Unsecured Claims that will be unimpaired under the Plan.

### (a)    Pool I Loans

On May 1, 2019, the Company refinanced existing mortgage and mezzanine indebtedness with new mortgage and senior and junior mezzanine indebtedness of $1.04 billion secured by 92 of the Company's hotel properties (collectively, the "Pool I Loans").[2]    As of the Solicitation Date, (i) the Pool I mortgage loan had approximately $707.8 million in principal amount outstanding, (ii) the Pool I senior mezzanine loan had approximately $81.35 million in principal amount outstanding, and (ii) the Pool I junior mezzanine loan had approximately $56.95 million in principal amount outstanding.

The Pool I mortgage loan requires monthly interest payments at a variable rate equal to one-month LIBOR plus 2.14%, the Pool I senior mezzanine loan requires monthly interest payments at a variable rate equal to one-month LIBOR plus 5.60%, and the Pool I junior mezzanine loan requires monthly interest payments at a variable rate equal to one-month LIBOR plus 8.50% for a combined weighted average interest rate of LIBOR plus 2.90%.    Pursuant to an interest rate cap agreement, the LIBOR portions of the interest rates due under the Pool I Loans were capped at 4.0%.

At the closing of the refinancing, the Company used the net proceeds from the Pool I Loans after accrued interest and closing costs to repay the then-outstanding $961.1 million in mortgage and mezzanine debt.    The Company also used $10 million of proceeds to fund a reserve with the lenders that the Company can utilize to fund expenditures for work required to be performed under property improvement plans ("PIPs") required by the Franchisors of the hotel properties.    During the term of the Pool I Loans, the Company is required to periodically deposit additional reserves with the lenders that the Company can utilize to fund a portion of future PIP work and other capital improvements.    During April and May 2020, as part of ongoing liquidity preservation measures being taken by the Company in response to the coronavirus pandemic and in conjunction with

---

[2]    Thirty of the Hotel Sales were sales of hotels encumbered by the Pool I Loans, which sales generated funds sufficient to prepay approximately $162.2 million of principal under the Pool I mortgage loan and approximately $31.7 million of principal under the Pool I mezzanine loans.    As a result of the Hotel Sales, the Pool I Loans are secured by liens on 62 of the Company's hotel properties.

actions taken by the Company's Franchisors temporarily suspending obligations of hotel owners to perform capital improvements and fund capital reserves, the Company did not make required capital reserve payments to the mortgage lender of approximately $3.9 million, which resulted in an event of default under the Pool I Loans.

In June 2020, the Company entered into forbearance agreements with the lenders under the Pool I Loans, agreeing to defer the PIP reserves required to be made in 2020 until 2021 and 2022 and temporarily suspending monthly capital reserves for repair and replacement of furniture, fixtures, and equipment ("FF&E"), while agreeing to pay all excess cash flows from the 62 hotel properties serving as loan collateral to account for future PIP reserves until all deferred PIP reserves have been deposited.  During January 2021, the Company entered into amendments to the forbearance agreements, under which the lenders agreed, among other things, to additional deferrals with respect to PIP and FF&E reserves.  The existing events of default will continue to exist in full force and effect until the deferred PIP and FF&E reserves have been deposited and other conditions have been met, but the lenders under the Pool I Loans have agreed to forbear from collecting default interest and enforcing their rights and remedies under the loan documents as a result of the events of default during this period.

In May 2021, the Company and its subsidiaries became party to certain Third Party Restructuring Documents (as defined in the RSA) with the lenders under the Pool I Loans, agreeing to, among other things, (i) forbear and, subject to certain conditions, waive defaults triggered by the filing of the Chapter 11 Cases and consent to the Restructuring Transactions contemplated under the Plan, (ii) defer certain PIP reserves, (iii) temporarily defer certain FF&E reserves, and (iv) the modification of the minimum debt yield test which could allow the Company to meet the minimum debt yield test and receive any excess cash flows from the properties securing the Pool I Loans (which the Company is not currently receiving) sooner than if no modification was made.

(b)    **Pool II Mortgage Loan**

In October 2015, the Company refinanced existing mortgage indebtedness secured by 21 of the Company's hotel properties (the "Pool II Mortgage Loan").  As of the Solicitation Date, the Pool II Mortgage Loan had approximately $232 million in principal amount outstanding.  The Pool II Mortgage Loan carries a fixed annual interest rate of 4.96% per annum.  The Pool II Mortgage Loan is secured by liens on 21 of the Company's hotel properties.

Pursuant to the Pool II Mortgage Loan, the Company agreed to make periodic payments into an escrow account for the PIPs required by the Franchisors of the applicable hotels.  The Company made the final PIP reserve payment during June 2018.  The Company continues to have obligations to make periodic payments into other capital reserves.

In May 2020, as part of ongoing liquidity preservation measures being taken by the Company in response to the coronavirus pandemic and in conjunction with actions taken by the Franchisors temporarily suspending capital improvement and capital reserve obligations, the Company did not make required capital reserve payments to the lender under the Pool II Mortgage Loan in the amount of approximately $300,000, resulting in an event of default thereunder.

In August 2020, the Company entered into a loan modification agreement, whereby (i) the maturity date of the Pool II Mortgage Loan was extended until October 6, 2022, subject to the Company's right to further extend the maturity date for an additional six months until April 6, 2023, upon satisfaction of certain conditions, including prepayment by the Company of at least 5% of the outstanding principal amount under the loan, (ii) the Company agreed to make monthly prepayments of the outstanding principal balance in the amount of $250,000 from October 2021 through September 2022, (iii) the Company's monthly capital reserve obligations for repair and replacement of FF&E was temporarily suspended, and (iv) agreeing to pay the excess cash flows from the 21 hotels securing the Pool II Mortgage Loan, after payment of interest and property operating expenses and certain other amounts, to prepay amounts outstanding under the Pool II Mortgage Loan.

In May 2021, the Company became party to certain Third Party Restructuring Documents with the lender under the Pool II Mortgage Loan, agreeing to, among other things, (i) forbear and, subject to certain conditions, waive defaults triggered by the filing of the Chapter 11 Cases and consent to the Restructuring Transactions contemplated under the Plan, (ii) temporarily suspend the collection of certain FF&E reserves, (iii) modify and temporarily waive certain financial covenants, and (iv) modify the requirement that all excess cash flows from the hotels will prepay the loan, such that all excess cash flows will instead be deposited into a reserve account and such funds may be utilized to fund any shortfalls in the payment of interest and property operating expenses, certain principal, and property improvement plan obligations or other capital expenditures for the hotels.

(c)    <strong>Term Loan</strong>

On April 27, 2017, the Company entered into that certain Second Amended and Restated Term Loan Agreement (as amended, the "<u>Term Loan</u>") in the aggregate principal amount of $310 million, secured by 28 of the Company's hotel properties.[3]  As of the Solicitation Date, the Term Loan has approximately $227.6 million in principal amount outstanding.  The Term Loan requires monthly interest payments at a variable rate of one-month LIBOR plus 3.0%.  Pursuant to an interest rate cap agreement, the LIBOR portions of the interest rates due under the Term Loan were effectively capped at 4.0%.

The Term Loan had an initial maturity date of May 1, 2019, subject to three one-year extension rights at the Company's option which, if all extension rights were exercised, would have resulted in an outside maturity date of May 1, 2022.  In May 2019, the Company used $25 million of the net proceeds from the Pool I Loans to prepay principal under the Term Loan and entered into an amendment to the Term Loan, reducing the commitment from $310 million to $285 million and adding one additional one-year extension term such that the outside maturity date was extended to May 1, 2023.  In May 2020, the Company exercised its option to extend the maturity

---

[3]    Twelve of the Hotel Sales were sales of hotels encumbered by the Term Loan, which sales generated funds sufficient to prepay approximately $56.2 million of principal under the Term Loan.  As a result of the Hotel Sales and the termination of the Georgia Tech Hotel & Conference Center ground lease, the Term Loan is secured by liens on 15 of the Company's hotel properties.

of the Term Loan to May 1, 2021, and in May 2021, the Company exercised its option to extend the maturity date of the Term Loan to May 1, 2022.

In February 2021, the Company defaulted on its Georgia Tech Hotel & Conference Center ground lease, the Company's interest in which serves as a collateral property under the Term Loan, and entered into a forbearance agreement with the lenders under the Term Loan, and, as a result of this default, the ground lessor exercised its right to terminate the ground lease, effective as of March 31, 2021.

During March 2021, the Company became party to certain Third Party Restructuring Documents with the lender under the Term Loan, agreeing to, among other things: (i) forbearance and subject to certain conditions waiver of defaults triggered by the filing of the Chapter 11 Cases and certain defaults related to the Georgia Tech Hotel & Conference Center ground lease, (ii) temporary suspension of FF&E reserves, (iii) $1.3 million in brand-mandated property improvement plan reserves related to hotels that were sold during August 2020 have been credited to reduce the principal outstanding under the Term Loan, (iv) the lien related to the Georgia Tech Hotel & Conference Center ground lease may be released, subject to certain terms and conditions, (v) the borrowers will become obligated to repay $500,000 in principal each quarter for the seven consecutive quarters beginning with the quarter ending June 30, 2021, and the repayment of $9.2 million in principal less the aggregate amount of the quarterly principal prepayments will become a recourse obligation of the borrowers and guarantors, and (vi) certain modifications to the minimum debt yield test which could allow the Company to meet the minimum debt yield test and receive any excess cash flows from the properties securing the Term Loan (which the Company is not currently receiving) sooner than if no modification was made. The lenders additionally waived certain defaults under the Term Loan agreement and consented to the Restructuring Transactions contemplated under the Plan.

### (d)    **HGI Joint Venture**

One of the Company's Non-Debtor Subsidiaries owns a 56.5% joint venture interest in a Hilton Garden Inn located in Blacksburg, Virginia, and the hotel is subject to a mortgage loan (the "HGI JV Loan"). As of the Solicitation Date, the HGI JV Loan has approximately $9.9 million in principal amount outstanding. The HGI JV Loan requires monthly insurance payments based on the outstanding principal and a fixed annual interest rate of 4.31%.

In June 2020, the Company and the lender under the HGI JV Loan agreed to extend the maturity date for 18 months until December 6, 2021. In connection with the extension, the Company and the lender also agreed to certain other modifications to the loan terms, including temporarily suspending the Company's monthly capital reserve obligations for FF&E, a requirement to prepay $525,000 of the then-outstanding principal balance at closing, and a requirement that, until maturity, the Company will utilize any monthly excess cash flows from the property after payment of interest and property operating expenses and certain other amounts to prepay the principal balance of the loan.

In May 2021, the Company became party to certain Third Party Restructuring Documents with the lender under the HGI JV Loan, agreeing to, among other things, (i) forbear and, subject to certain conditions, waive defaults triggered by the filing of the Chapter 11 Cases and consent to

the Restructuring Transactions contemplated under the Prepackaged Plan and (ii) temporarily suspend the collection of FF&E reserves.

### 2.    Other General Unsecured Claims

In addition to their contingent, unsecured obligations outstanding under the Guaranty Claims, the Debtors owe (a) approximately $698,120 in rent obligations owed to the Debtors' landlords and (b) approximately $151,000 in unpaid trade and other ordinary course obligations, excluding professionals' fees.

### 3.    Unsecured Priority Claims

Other Priority Claims consist of any Claim other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

### 4.    Secured Claims

Secured Claims consist of any Claim (a) that is secured by a valid, perfected, and enforceable Lien on Collateral, to the extent of the value of the Claim holder's interest in such Collateral as of the Confirmation Date or (b) to the extent that the holder thereof has a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

### 5.    Intercompany Claims

Intercompany Claims consist of any Claims against a Debtor held by another Debtor.

### 6.    Existing Preferred Equity Interests

On January 12, 2017, the Debtors entered into that certain *Securities Purchase, Voting, and Standstill Agreement* (the "SPA") with the Brookfield Investor, to secure a commitment of up to $400 million by the Brookfield Investor to make capital investments in the Company necessary for the Company to meet its short-term and long-term liquidity requirements and obligations by purchasing units of limited partnership interests in HITOP entitled "Class C Units" (the "Class C Preferred Units" or the "Existing HITOP Preferred Interests") through February 2019.  Following the final closing pursuant to the SPA on February 27, 2019, the Brookfield Investor no longer has any obligations or rights to purchase Existing HITOP Preferred Interests pursuant to the SPA or otherwise.  In addition to holding all of the issued and outstanding Existing HITOP Preferred Interests, the Brookfield Investor holds the sole issued and outstanding redeemable preferred share in HIT (the "Redeemable Preferred Share" or the "Existing HIT Preferred Interests" and together with the Existing HITOP Preferred Interests, the "Existing Preferred Equity Interests").  In connection with its holdings of the Existing Preferred Equity Interests, the Brookfield Investor has significant governance and other rights, including the right to appoint two members of HIT's Board of Directors.[4]  The Existing HITOP Preferred Interests rank senior to all other equity interests in

---

[4]        The Brookfield Investor also has approval rights under the Class C Preferred Units and HITOP's limited partnership agreement that restricts HITOP from taking certain actions without the Brookfield Investor's consent (the "Brookfield Approval Rights").  In general, subject to certain exceptions, prior approval is required before the

HITOP with respect to priority in payment of distributions and in the distribution of assets in the event of the liquidation, dissolution, or winding-up of HITOP, whether voluntary or involuntary, or any other distribution of the assets of HITOP among its equity holders for the purpose of winding up its affairs, and have a mandatory redemption date of no later than March 31, 2022. As of the Solicitation Date, the total liquidation preference of the Existing HITOP Preferred Interests is approximately $462 million.

Commencing on June 30, 2017, holders of Existing HITOP Preferred Interests are entitled to receive, with respect to each Class C Preferred Unit, fixed, quarterly cumulative cash distributions at a rate of 7.50% per annum from legally available funds. If the Company fails to pay these cash distributions when due, the per annum rate will increase to 10% until all accrued and unpaid distributions required to be paid in cash are reduced to zero, and such failure may result in a material breach of the terms of the Existing HITOP Preferred Interests which would trigger the right of the Class C Preferred Unit holder to redeem the Existing HITOP Preferred Interests. In addition and also commencing on June 30, 2017, holders of Existing HITOP Preferred Interests are entitled to receive, with respect to each Class C Unit, a fixed, quarterly, cumulative PIK Distribution at a rate of 5% per annum ("PIK Distributions").[5] If the Company fails to redeem the Brookfield Investor when required to do so pursuant to the amendment and restatement of HITOP's existing limited partnership agreement, the 5% per annum PIK Distribution rate will increase to a per annum rate of 7.50%, and would further increase by 1.25% per annum for the next four quarterly periods thereafter, up to a maximum per annum rate of 12.5%. The Brookfield Investor is also entitled to receive tax distributions under certain limited circumstances.

During each of December 2020, March 2021, and April 2021, the Company entered into amendments to the amended and restated agreement of limited partnership of HITOP (the "LPA Amendments"), with the Brookfield Investor, as the holder of all issued and outstanding Class C Preferred Units. Pursuant to the LPA Amendments, the cash distributions payable to the Brookfield Investor on December 31, 2020 and March 31, 2021 were converted into a PIK Distribution such that, on the applicable date, no cash distribution was paid and the quarterly PIK Distribution paid was at a rate of 12.5% per annum. The LPA Amendments also provide that, if the Company and the Brookfield Investor do not enter into a definitive restructuring support agreement by May 14, 2021 (or if a definitive restructuring support agreement is entered into and then terminated), on that date, HITOP will be required to redeem 60% of the Class C Preferred Units paid as PIK Distributions on December 31, 2020 and March 31, 2021 (*i.e.*, the Class C

---

[5]     Company is permitted to take any of the following actions: equity issuances; organizational document amendments; debt incurrences; affiliate transactions; sale of all or substantially all assets; bankruptcy or insolvency declarations; declarations or payments of dividends or other distributions; redemptions or repurchases of securities; adoption of, and amendments to, the annual business plan (including the annual operating and capital budget) required under the terms of the Redeemable Preferred Share; hiring and compensation decisions related to certain key personnel (including executive officers); property acquisitions and property sales and dispositions that do not meet transaction-size limits and other defined criteria and would be outside of HITOP's normal course of business; entry into new lines of business; settlement of material litigation; changes to material agreements; increasing or decreasing the number of directors on the Company's board of directors; nominating or appointing a director (other than a Redeemable Preferred Director) who is not independent; nominating or appointing the chairperson of the Company's board of directors; and certain other matters.

[5]     The number of Class C Preferred Units delivered in respect of the PIK Distributions on any distribution payment date will be equal to the number obtained by dividing the amount of PIK Distribution by $14.75.

Preferred Units paid in respect of the cash distributions that would have been payable on December 31, 2020 and March 31, 2021 but were converted into a PIK Distribution, as described above) for an amount in cash equal to the liquidation preference of such Class C Preferred Units (a "PIK Redemption"). A PIK Redemption is subject to certain conditions, including that HITOP has Legally Available Funds (as defined in the amended and restated agreement of limited partnership of HITOP) and that cash is available to make the payment after taking into account the actual cost of certain capital expenditures and contractual reserves without requiring the incurrence of additional debt, the issuance of additional securities or the consummation of any asset sales.

## ARTICLE III.

## KEY EVENTS LEADING TO COMMENCEMENT OF THE CHAPTER 11 CASES

During 2019, as part of the Company's investment strategy to continue to pursue the sale of non-core hotels and reallocate capital into other corporate purposes, including debt reduction, the Company commenced marketing for sale a total of 45 hotels. Since then, the hospitality and travel sectors of the economy have been heavily impacted by the novel coronavirus pandemic, and the Debtors' hotel properties have not been the exception. In early March 2020, the Company started to experience the effects of the coronavirus pandemic on its business through softening of demand and revenue weakness across its portfolio triggered by direct guest cancellations at its hotels as well as cancellations of business and industry conventions and meetings in certain of its markets. These conditions significantly worsened over the course of the month and continued through 2020 and into the first and second quarters of 2021 as the level of overall travel has declined significantly due to concerns about the coronavirus pandemic and actions taken by governments, businesses, and other organizations to contain the coronavirus that have included restrictions on travel and the operation of many businesses as well as event cancellations, capacity limits, and social distancing measures. The Company anticipates that demand from business travelers will remain impaired at least until there has been adequate production and widespread distribution of the recently developed coronavirus vaccines, broader lifting of travel restrictions by businesses and governments, and wider re-establishment of consumer confidence in the safety of travel. The below table summarizes the devastating impact that the coronavirus has had on the Company's hotel business and liquidity, comparing pro-forma monthly Occupancy and Average Daily Rate ("ADR") for the months of March through December of 2020 and compared to the same months in 2019, for only the hotels in the Company's portfolio that were owned during both years. This information may not be indicative of any future period.

| Month | Pro Forma Monthly Occupancy | | Pro Forma ADR | |
|---|---|---|---|---|
| | 2020 | 2019 | 2020 | 2019 |
| March | 40.8% | 80.4% | 125.49 | 135.54 |
| April | 15.8% | 81.2% | 93.10 | 131.82 |
| May | 25.9% | 79.5% | 87.90 | 133.70 |
| June | 36.2% | 83.3% | 97.34 | 136.05 |
| July | 42.8% | 82.3% | 100.97 | 131.97 |
| August | 46.6% | 79.7% | 100.13 | 130.03 |
| September | 48.8% | 76.4% | 96.31 | 131.07 |
| October | 52.3% | 81.6% | 96.59 | 134.84 |

| November | 44.3% | 74.3% | 91.14 | 125.04 |
| December | 41.7% | 64.6% | 88.19 | 117.70 |

The table below compares pro-forma monthly Occupancy and ADR of only the hotels in the Company's portfolio that were owned as of March 31, 2021, for the months of January through April 2021 and compared to the same months in 2020.  April 2021 Occupancy and ADR figures are preliminary estimates and are therefore subject to change.

| Month | Pro Forma Monthly Occupancy | | Pro Forma ADR | |
| --- | --- | --- | --- | --- |
| | 2021 | 2020 | 2021 | 2020 |
| January | 46.0% | 67.3% | 91.46 | 123.18 |
| February | 55.1% | 76.1% | 93.76 | 131.63 |
| March | 65.4% | 41.1% | 99.92 | 124.82 |
| April | 66.6% | 16.1% | 105.82 | 93.10 |

As a result of the historically low occupancy rates and lower pricing, the Company did not generate sufficient cash from its operations to cover its obligations and was required to utilize its cash on hand to fund non-hotel expenses such as interest on its debt obligations, payment of distributions on the Existing HITOP Preferred Interests, and general and administrative expenses. During some months, the Company also utilized cash on hand to fund certain hotel operating expenses.

In response to the coronavirus pandemic, the Company has implemented various property-level cost reduction and other liquidity preservation measures.  These measures have included determining to delay most of the PIPs required by the Franchisors that had been scheduled for 2020 as well as all projects scheduled for 2021, and determining not to make $4.2 million of capital reserve payments due to certain of the Company's lenders during April and May 2020.  In addition, the Company negotiated forbearance and loan amendment agreements with certain of its lenders, which included maturity date extensions for two loans that came due during 2020, as described in Article II of this Disclosure Statement.  The Company also worked closely with its third-party property managers to respond to these developments and to implement various property-level cost reduction and other liquidity preservation measures which have included temporary hotel staff reductions and temporary suspension of certain services.  Since the onset of the pandemic, the Company has implemented various corporate overhead savings initiatives, including permanent and temporary reduction in employee headcount, reduction in the 2020 incentive compensation pool and temporary elimination of certain employee benefit programs.  Notwithstanding these measures, the Company has not been able to successfully stem the liquidity crisis caused by the novel coronavirus, and as a result of the forbearance and loan modification agreements the Company has entered into with respect to its indebtedness, as well as the periodic debt yield and debt service coverage tests the Company remains subject to under its indebtedness, the Company does not expect that excess cash flows, if any, generated by its properties will be available to the Company for any other purpose for the foreseeable future.  The Company's cash on hand decreased from $103.2 million at the start of 2020 to $48.4 million by the end of the year, and to $28.3 million by the end of the first quarter of 2021.

During the third quarter of 2020, the Debtors determined that, as a result of the impact of the coronavirus pandemic on the Company's business, absent additional liquidity from a source

other than property operations or additional modifications to the terms of its debt obligations, the Company would no longer have sufficient cash on hand to continue to pay its current obligations during the first half of 2021.

Having made the determination that additional liquidity was needed, the Debtors pursued all available avenues to secure such additional liquidity. Certain potential sources of additional liquidity such as proceeds from refinancings and asset sales, were not available to the Company in any material amount due to the impact of the coronavirus pandemic. Although the Company was successful in negotiating favorable forbearance and loan amendment agreements with its lenders, additional liquidity is still required for the Company to meet its upcoming obligations in the first half of 2021.

In the second quarter of 2020, the Debtors entered into discussions with its largest investor—the Plan Sponsor—regarding a recapitalization of the Company. With the Plan Sponsor holding Brookfield Approval Rights, including regarding potential refinancing transactions, equity issuances, and further debt issuances, the Independent Directors of the Debtors' board of directors determined in an exercise of their reasonable business judgment that a recapitalization with the Plan Sponsor provided the greatest likelihood of securing much-needed capital infusions at a magnitude significant enough to address the Company's expected liquidity shortfall.

In connection with these negotiations, the Debtors engaged restructuring counsel and a financial advisor to analyze their business plan, evaluate all strategic and liquidity alternatives, and negotiate a transaction with the Plan Sponsor and/or any other investors that would allow the Debtors to address their working capital needs for 2021. The proposed Restructuring Transactions, which the Debtors have determined is the most value-maximizing transaction for all the Company's stakeholders, is the result of months of intense, arm's length negotiations between the Debtors and the Plan Sponsor.

As set forth above, the Debtors intend to implement the proposed Restructuring Transactions through the confirmation and consummation of the Plan. Among other things, the Plan provides that the Plan Sponsor will provide a $65 million DIP Facility on a secured basis, to support critical working capital to the Company and a post-Effective Date revolving unsecured Exit Facility in an amount of $25 million. Each holder of a DIP Claim will receive in exchange for its claim its Pro Rata Share, together with the holders of Existing Preferred Interests, of 100% of the New HIT Common Equity Interests. Similarly, each holder of Existing HIT Preferred Interests and Existing HITOP Preferred Interests shall receive, in exchange for its Interest, its Pro Rata Share, together with the holders of DIP Claims, of 100% of the New HIT Common Equity Interests. Additionally, 2% of Existing HITOP Preferred Interests shall be canceled, and the holder of such Existing HITOP Preferred Interests shall receive, in exchange for its Interests, its Pro Rata Share of 2% of New HITOP Interests.

Importantly, holders of General Unsecured Claims will be unimpaired under the Plan and will be paid in full in the ordinary course of business. Holders of the Existing HIT Common Equity Interests, who would otherwise be out of the money absent the Plan, will each receive one CVR in respect of each share of the Allowed Existing HIT Common Equity Interests outstanding immediately prior to the Effective Date. The Restructuring Transactions will provide the Company with the liquidity needed to survive the pandemic and thereby the potential for future

recovery to holders of the Existing Common Interests who would otherwise recover nothing through the CVRs.

The Plan contemplates a comprehensive financial restructuring that will allow the Debtors to recapitalize the Company and provide necessary additional capital through a consensual Plan and Chapter 11 cases that the Debtors expect to be brief.  The Plan will also give the Debtors the opportunity to revitalize their businesses under new ownership.  Accordingly, the Debtors believe the commencement of these Chapter 11 Cases is in the best interests of the Debtors, their creditors, and all other parties in interest.

## ARTICLE IV.

## ANTICIPATED EVENTS DURING CHAPTER 11 CASES

### A.      Commencement of Chapter 11 Cases and First-Day Motions

The Debtors anticipate filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code on May 19, 2021.  The filing of the petitions will commence the Chapter 11 Cases, at which time the Debtors will be afforded the benefits, and will become subject to the limitations, of the Bankruptcy Code.  Notably, the Debtors do not anticipate filing voluntary petitions for the operating Non-Debtor Subsidiaries, who will not be afforded the benefits or become subject to the limitations of the Bankruptcy Code.

The Debtors intend to continue operating their business in the ordinary course during the pendency of the Chapter 11 Cases as they had prior to the Petition Date.  To facilitate the efficient and expeditious implementation of the Plan through the Chapter 11 Cases, and to minimize disruptions to the Debtors' operations on the Petition Date, the Debtors intend to seek to have each of the Chapter 11 Cases assigned to the same bankruptcy judge and administered jointly.  The Debtors also plan to file various motions seeking important relief from the Bankruptcy Court.  Such relief, if granted, will assist in the administration of the Chapter 11 Cases; however, there can be no assurance that the requested relief will be granted by the Bankruptcy Court.

After the commencement of the Chapter 11 Cases, the Debtors intend to file various motions seeking relief from the Bankruptcy Court which, if granted, are expected to promote a seamless transition between the Debtors' prepetition and postpetition business operations, facilitate a smooth reorganization through the Chapter 11 Cases and the Plan, and minimize any disruptions to the Debtors' operations.  The following is a brief overview of certain of the relief the Debtors intend to seek on the Petition Date to maintain their operations in the ordinary course.

### 1.      DIP Financing

The Debtors will seek authorization to enter into a postpetition financing facility with the Plan Sponsor (in its capacity as lender thereunder, the "DIP Lender"), which has agreed to provide to the Debtors with a debtor-in-possession loan facility in the aggregate amount of $65 million, on the terms and subject to the conditions set forth in the that certain debtor-in-possession credit agreement, to be entered into by and among the Debtors, the DIP Lender, and the DIP Agent, and as otherwise provided herein (the "DIP Facility").

27

### 2.    Cash Management System

In the ordinary course of business, the Company utilizes an integrated, centralized cash management system to collect, transfer, and disburse funds generated by their operations (the "Cash Management System"). The Debtors' Cash Management System is comprised of three (3) bank accounts, each held at Wells Fargo, N.A. (the "Bank"), to receive distributions from the Non-Debtor Subsidiaries, pay operating expenses and maintain and manage excess cash (collectively, the "Bank Accounts"). The Cash Management System is tailored to meet the Company's operating needs. The Cash Management System enables the Company to efficiently collect and disburse cash generated by their business, pay their financial obligations, centrally control and monitor corporate funds and available cash, comply with the requirements of their financing agreements, reduce administrative expenses, and efficiently obtain accurate account balances and other financial data. It is critical that the Cash Management System remain intact to ensure seamless continuation of transactions and uninterrupted receipt of cash and payment of expenses. On the Petition Date, the Debtors intend to seek authority from the Bankruptcy Court to continue the use of their existing Cash Management System, Bank Accounts, and related business forms, as well as to continue their intercompany arrangements among the Debtors to avoid a disruption in the Company's operations and to facilitate the efficient administration of the Chapter 11 Cases. The Debtors also intend to seek a suspension of the requirements of section 345(b) of the Bankruptcy Code, which requires that the Bank provides the Debtors with a bond or the deposit of securities to secure the safety of the Debtors' cash and cash equivalents that the Bank holds, unless the court for cause orders otherwise.

### 3.    Trade Payables

In the ordinary course of business, the Debtors rely upon a variety of vendors and service providers to facilitate the operation of the Company's businesses. Pursuant to the Plan, the Debtors intend to pay all vendors and service providers, as well as all other holders of General Unsecured Claims, in full. Certain vendors or service providers might seek to terminate or alter the terms of their agreements with the Debtors if the Debtors fail to honor their obligations as they become due in the ordinary course of business. Moreover, in the event the Debtors default on their trade obligations, certain vendors and service providers may (i) have special statutory rights, (ii) have the right to assert liens against the Debtors or other Company assets, (iii) refuse to provide services for which the Debtors have already contracted, (iv) draw down upon letters of credit or security deposits that tie to the Debtors' payment obligations to the respective vendor or service provider, or (v) take other actions harmful to the Company's operations. To avoid the detrimental effects of potential actions taken by the Debtors' vendors and service providers, and to minimize any disruption to the Debtors' operations on the Petition Date, the Debtors intend to seek authority from the Bankruptcy Court to satisfy their obligations to all vendors and service providers in full in the ordinary course; *provided* that the vendors and service providers continue to provide the Debtors with ordinary course trade terms prior to any unilateral contraction. This unimpaired treatment is consistent with the treatment of all General Unsecured Claims under the Plan. For the Debtors' contract vendors and service providers, the Debtors intend to assume their contracts, and those vendors will continue to provide goods and services on the contract terms.

### 4. Employee Wages and Benefits

The Debtors rely on the expertise and loyalty of their employees to support the success of the Company. The Debtors' workforce would risk exposure to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid compensation, benefits, and reimbursable expenses in the ordinary course. Moreover, if the Debtors were unable to satisfy such obligations, morale and loyalty would be jeopardized at a time when support is critical. In the absence of such payments, the workforce may seek alternative employment opportunities, including with the Debtors' competitors. Loss of valuable employees would distract from the Debtors' focus on administering the Chapter 11 Cases and maximizing the Company's operations. To minimize the uncertainty and potential distractions associated with the Chapter 11 Cases and the potential disruption of the Debtors' operations resulting therefrom, on the Petition Date, the Debtors intend to seek authority from the Bankruptcy Court to continue to honor the Debtors' obligations to its workforce in the ordinary course of business, including (a) the payment of pre- and postpetition wages, salaries, and reimbursable employee expenses, (b) the payment of pre- and postpetition accrued and unpaid employee benefits, and (c) the continuation of the Debtors' employee benefit programs and policies.

### 5. Taxes

Pursuant to the Plan, the Debtors intend to pay all taxes and regulatory obligations in full.

### B. Procedural Motions and Retention of Professionals

The Debtors intend to file several other motions that are common to chapter 11 cases of similar size and complexity as the Chapter 11 Cases, including applications to retain various professionals to assist the Debtors in the Chapter 11 Cases such as counsel, the Debtors' financial advisor, and the solicitation agent for the Debtors.

### C. Solicitation Procedures

Contemporaneously with the filing of their chapter 11 petitions, the Debtors will seek an order of the Bankruptcy Court scheduling the Combined Hearing to consider (i) the adequacy of the Disclosure Statement and the Solicitation in connection therewith, and (ii) confirmation of the Plan. Notice of this hearing will be published and mailed to all known holders of Claims and Interests in accordance with an order of the Bankruptcy Court to be requested by the Debtors.

## ARTICLE V.

## PENDING LITIGATION

As of the Petition Date, the Debtors are involved in certain lawsuits and matters which have arisen in the ordinary course of business. The Debtors do not expect any liability they may have in these matters to have a material adverse effect on their consolidated financial statements. The Debtors cannot, however, predict with certainty the outcome or effect of pending or threatened litigation or legal proceedings, and the eventual outcome could materially differ from their current estimates.

# ARTICLE VI.

# SUMMARY OF PLAN

This Section of the Disclosure Statement summarizes the Plan. This summary is qualified in its entirety by reference to the Plan.

## A. DIP Claims, Administrative Expense Claims, Professional Fee Claims, and U.S. Trustee Fees

### 1. DIP Claims

The Plan provides that the DIP Claims shall be Allowed in the full amount due and owing under the DIP Credit Agreement and the other DIP Loan Documents. Pursuant to the Restructuring Support Agreement, the DIP Lender has agreed convert its DIP Claims into its Pro Rata Share, together with the holders of Existing Preferred Equity Interests, of (x) 100% of the New HIT Common Equity Interests and (y) 2% of New HITOP Interests on the Effective Date.

Upon the distribution of Plan Consideration to the holder of the DIP Claims, all Liens and security interests granted to the DIP Agent to secure the DIP Claims shall be deemed cancelled and shall be of no further force and effect, and the Allowed DIP Claims shall be deemed to be fully satisfied, settled, released, and discharged.

### 2. Administrative Expense Claims

The Plan provides that, except with respect to Allowed Administrative Expense Claims that are Professional Fee Claims, to the extent that a holder of an Allowed Administrative Expense Claim (including a claim arising under section 503(b)(9) of the Bankruptcy Code that has not been paid pursuant to a motion filed in accordance with the Bankruptcy Code), together with the Debtors and the Plan Sponsor, agrees to a less favorable treatment, each holder of an Allowed Administrative Expense Claim shall be paid in full in Cash on the later of (a) the Effective Date or (b) the date such Allowed Administrative Expense Claim becomes due and payable in accordance with its terms (or as soon thereafter as is practicable); *provided, however*, that Allowed Administrative Expense Claims that arise in the ordinary course of the Debtors' business, including administrative claims arising from or with respect to the sale of goods or services on or after the Petition Date and the Debtors' Executory Contracts and Unexpired Leases, shall be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions, without further action by the holders of such Administrative Expense Claims or further approval by the Bankruptcy Court.

### 3. Professional Fee Claims

The Plan provides that, except to the extent that the applicable holder of an Allowed Professional Fee Claim agrees to a less favorable treatment, together with the Debtors and the Plan Sponsor, each holder of a Professional Fee Claim shall be paid in full in Cash.

Under the Plan, on or after the Effective Date, the Debtors shall establish and fund the Fee Escrow Account.  The Debtors shall fund the Fee Escrow Account with Cash equal to the Debtors' good faith estimate of the Allowed Professional Fee Claims (subject to the DIP Budget (as defined in the Interim DIP Order and Final DIP Order)).  Funds held in the Fee Escrow Account shall not be considered property of the Debtors' Estates or property of the Debtors, but shall revert to the Debtors only after all Allowed Professional Fee Claims have been paid in full.  Fees owing to the applicable holder of an Allowed Professional Fee Claim shall be paid in Cash to such holder from funds held in the Fee Escrow Account when such Claims are Allowed by an order of the Bankruptcy Court or authorized to be paid under a Final Order authorizing compensation of Professional Persons; *provided*, that the Debtors' obligations with respect to Allowed Professional Fee Claims shall not be limited by nor deemed limited to the balance of funds held in the Fee Escrow Account.  To the extent that funds held in the Fee Escrow Account are insufficient to satisfy the amount of accrued Allowed Professional Fee Claims, each holder of an Allowed Professional Fee Claim shall have an Allowed Administrative Expense Claim for any such deficiency.  The Fee Escrow Account shall be free and clear of all Liens, Claims, and encumbrances other than the residual interests of the Reorganized Debtors as set forth in the Plan.

### 4.    U.S. Trustee Fees

The Plan provides that the Debtors shall pay all outstanding U.S. Trustee Fees on an ongoing basis on the date such U.S. Trustee Fees become due, until such time as a final decree is entered closing the Chapter 11 Cases, the Chapter 11 Cases are converted or dismissed, or the Bankruptcy Court orders otherwise.

### B.    Classification of Claims and Interests

### 1.    Summary of Classification of Claims and Interests

The following table designates the Classes of Claims against and Interests in each of the Debtors and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (c) presumed to accept or deemed to reject the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, including DIP Claims and Professional Fee Claims, have not been classified.

| Class | | Designation | Impairment | Entitled to Vote |
|---|---|---|---|---|
| Class 1 | | Secured Claims | No | No (Presumed to accept) |
| Class 2 | | Unsecured Priority Claims | No | No (Presumed to accept) |
| Class 3 | | General Unsecured Claims | No | No (Presumed to accept) |
| Class 4 | | Intercompany Claims | No | No (Presumed to accept) |
| | Class 5A | Existing HIT Preferred Interests | Yes | Yes |

| Class | | Designation | Impairment | Entitled to Vote |
|---|---|---|---|---|
| Class 5 | Class 5B | Existing HITOP Preferred Interests | Yes | Yes |
| Class 6 | | Existing HIT Common Equity Interests | Yes | No (Presumed to reject) |
| Class 7 | | Intercompany Interests | No | No (Presumed to accept) |

### 2. Separate Classification of Secured Claims

Under the Plan, although all Secured Claims have been placed in one Class for purposes of nomenclature, each Secured Claim, to the extent secured by a Lien on Collateral different than that securing any additional Secured Claims, shall be treated as being in a separate sub-Class for the purpose of receiving Plan Distributions.

### 3. Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code or "Cramdown."

The Plan contemplates that, because Class 6 is deemed to have rejected the Plan, the Debtors will request confirmation of the Plan, as it may be modified or amended from time to time, under section 1129(b) of the Bankruptcy Code with respect to such Class. Subject to Sections 14.5 and 14.7 of the Plan, the Debtors reserve the right (i) to suspend, revoke or withdraw the Plan, (ii) to alter, amend, or modify the Plan, or, (iii) to alter, amend, modify, revoke, or withdraw any Plan Document, to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary, in each case of clauses (i)–(iii) only upon the prior written consent of the Plan Sponsor in accordance with the RSA.

### 4. Confirmation of All Cases

The Plan provides that, except as otherwise specified therein, the Plan shall not be deemed to have been confirmed unless and until the Plan has been confirmed as to each of the Debtors; *provided*, *however*, that the Debtors, with the prior written consent of the Plan Sponsor, may at any time waive this requirement.

### C. Treatment of Claims and Interests

### 1. Secured Claims (Class 1)

(a) **Treatment:** On the Effective Date or as soon as reasonably practicable thereafter in the ordinary course of business, except to the extent that a holder of a Secured Claim already has been paid during the Chapter 11 Cases or such holder, together with the Debtors, agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Secured Claim, each holder of an Allowed Secured Claim shall receive, at the sole option of the Debtors with the consent of the Plan Sponsor, either (i) payment in full, in Cash, of the unpaid portion of its Allowed Secured Claim, (ii) delivery of the Collateral securing such Allowed Secured Claim, or (iii) other treatment such that the Secured Claim shall be rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code.

(b)     **Voting:**  Class 1 is Unimpaired, and the holders of Allowed Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Allowed Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited.

2.     **Unsecured Priority Claims (Class 2)**

(a)     **Treatment:**  On the Effective Date or as soon as reasonably practicable thereafter in the ordinary course of business, except to the extent that a holder of an Allowed Unsecured Priority Claim already has been paid during the Chapter 11 Cases or such holder, together with the Debtors, agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Unsecured Priority Claim, each holder of an Allowed Unsecured Priority Claim shall receive payment in full in Cash or as otherwise provided in the Bankruptcy Code.  Any ad valorem taxes and other taxes/fees will be extended to maximum statutory periods under, *inter alia*, 11 U.S.C. § 1129(a)(9)(C).  Holders of such Claims will be rendered Unimpaired and as such will be deemed to have accepted the Plan and will not be entitled to vote.

(b)     **Voting:**  Class 2 is Unimpaired, and the holders of Allowed Unsecured Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Allowed Unsecured Priority Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited.

3.     **General Unsecured Claims (Class 3)**

(a)     **Treatment:**  On or as soon as reasonably practicable after the Effective Date, except to the extent that a holder of an Allowed General Unsecured Claim, together with the Debtors, agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed General Unsecured Claim, each holder of an Allowed General Unsecured Claim shall (i) have its Allowed General Unsecured Claim reinstated, and paid in full, on the later to occur of the Effective Date or when such Allowed General Unsecured Claim becomes due in the ordinary course of the Debtors' or Reorganized Debtors' business operations or (ii) have its Allowed General Unsecured Claim otherwise rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code.

(b)     **Voting:**  Class 3 is Unimpaired, and the holders of Allowed General Unsecured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Allowed General Unsecured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited.

4.     **Intercompany Claims (Class 4)**

(a)     **Treatment:**  On the Effective Date, Allowed Intercompany Claims shall be reinstated.

(b)     **Voting:**  Class 4 is Unimpaired, and the holders of Allowed Intercompany Claims are conclusively presumed to have accepted the Plan pursuant to section

1126(f) of the Bankruptcy Code.  Therefore, holders of Allowed Intercompany Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited.

### 5. Existing Preferred Equity Interests (Class 5)

(a)    Existing HIT Preferred Interests (Class 5A)

(i)    <u>Treatment</u>:  On the Effective Date, all outstanding shares, units, and interests (and rights, warrants, options, or other interests to acquire shares and interests) of the Existing HIT Preferred Interests will be extinguished in exchange for each holder's Pro Rata Share, together with the holders of DIP Claims and Class 5B Interests, of 100% of the New HIT Common Equity Interests issued on the Effective Date.

(ii)    <u>Voting</u>:  Class 5A is Impaired, and the holders of Allowed Existing HIT Preferred Interests will be entitled to vote to accept or reject the Plan.

(b)    Existing HITOP Preferred Interests (Class 5B)

(i)    <u>Treatment</u>:   On the Effective Date, (x) 98% of the outstanding shares, units, and interests (and rights, warrants, options, or other interests to acquire shares and interests) of the Existing HITOP Preferred Interests will be transferred to HIT in exchange for each holder's Pro Rata Share, together with the holders of DIP Claims and Class 5A Interests, of 100% of the New HIT Common Equity Interests issued on the Effective Date and (y) 2% of the outstanding shares, units, and interests (and rights, warrants, options, or other interests to acquire shares and interests) of the Existing HITOP Preferred Interests  will be cancelled in exchange for each holder's Pro Rata Share of 2% of New HITOP Interests.

(ii)    <u>Voting</u>:  Class 5B is Impaired, and the holders of Allowed Existing HITOP Preferred Interests will be entitled to vote to accept or reject the Plan.

### 6. Existing HIT Common Equity Interests (Class 6)

(a)    **Treatment:**  On the Effective Date, the Allowed Existing HIT Common Equity Interests shall be cancelled, extinguished and discharged in exchange for each holder receiving one CVR in respect of each share of the Allowed Existing HIT Common Equity Interests outstanding immediately prior to the Effective Date and such holders shall be automatically deemed to have accepted the terms of the CVR Agreement and to be a party thereto, in each case in accordance with the terms of the CVR Agreement.

Notwithstanding the foregoing, the Plan Sponsor has agreed that, on the Effective Date, any Existing HIT Common Equity Interests held by the Plan Sponsor shall be deemed to be fully vested, and shall not entitle the Plan Sponsor to any distributions of CVRs.

(b)    **Voting:**  Class 6 is Impaired.  Each holder of the Allowed Existing HIT Common Equity Interests will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and will not be entitled to vote to accept or reject the Plan.

7.    **Intercompany Interests (Class 7)**

(a)    **Treatment:**  On the Effective Date, the Allowed Intercompany Interests will be retained by the existing holders.

(b)    **Voting:**  Class 7 is Unimpaired, and the holders of Allowed Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  In addition, there are no non-insider claimants in Class 7 to solicit.  Therefore, holders of Allowed Intercompany Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited.

D.    **Means for Implementation**

1.    **Non-Substantive Consolidation**.

The Plan is a joint plan that does not provide for substantive consolidation of the Debtors' Estates, and on the Effective Date, the Debtors' Estates shall not be deemed to be substantively consolidated for purposes hereof.  Except as specifically set forth herein, nothing in the Plan shall constitute or be deemed to constitute an admission that any one of the Debtors is subject to or liable for any claim against any other Debtor.  Additionally, claimants holding Claims and Interests against multiple Debtors, to the extent Allowed in each Debtor's Chapter 11 Case, will be treated as holding a separate Claim or separate Interest, as applicable, against each Debtor's Estate; *provided*, *however*, that no holder of an Allowed Claim shall be entitled to receive more than payment in full of such Allowed Claim.

2.    **Continued Corporate Existence, Vesting of Assets in the Reorganized Debtors, and Assumption of the Indemnification Agreements**.

(a)    Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement (including the Restructuring Transactions (defined below)), on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, limited partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, limited partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective charter and by-laws (or other analogous formation documents) in effect before the Effective Date, except to the extent such charter or bylaws (or other analogous formation documents) is amended by the Plan, the Amended Constituent Documents, or otherwise, and to the extent any such document is amended, such document is deemed to be amended pursuant to the Plan and will be effective without any further action or approval (other than any requisite filings required under applicable state or federal law).

(b)    Except as otherwise provided in the Plan, on and after the Effective Date, all property of the Debtors' Estates, wherever located, including, without limitation, all

claims, rights, Causes of Action, tax attributes (including, without limitation, net operating losses) and rights in respect thereof, and any property, wherever located, and whether acquired by the Debtors under or in connection with the Plan or otherwise, shall vest in the Reorganized Debtors free and clear of all Claims, Liens, charges, other encumbrances and Interests.  On and after the Effective Date, the Reorganized Debtors may operate their business and may use, acquire and dispose of property, wherever located, and prosecute, compromise or settle any Claims (including any Administrative Expense Claims) and Causes of Action without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Plan or the Confirmation Order.  Without limiting the foregoing, the Reorganized Debtors may pay the charges that each incurs on or after the Effective Date for Professional Persons' fees, disbursements, expenses or related support services without application to the Bankruptcy Court.

(c)     On the Effective Date, the Reorganized Debtors shall assume the Indemnifications Agreements.  The Indemnification Agreements shall (a) remain in full force and effect on and after the Effective Date and (b) not be modified, reduced, or discharged without the consent of the beneficiaries thereof.

### 3.     Compromise of Controversies.

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and as consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan constitute a good-faith compromise and settlement of all Claims and controversies resolved under the Plan, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under Bankruptcy Rule 9019, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are within the range of reasonableness, in the best interests of the Debtors, their Estates, their creditors, and other parties in interest, and fair and equitable.  Each provision of the Plan constitutes a part of this settlement that is non-severable from the remaining terms of the Plan.

### 4.     Sources of Cash for Plan Distribution.

Except as otherwise provided in the Plan or Confirmation Order, all Cash required for the payments to be made hereunder shall be obtained from the Debtors' and the Reorganized Debtors' operations, Cash balances, including Cash provided under the DIP Facility, and the Exit Facility.

### 5.     Restructuring Expenses.

To the extent not otherwise paid, the Debtors or the Reorganized Debtors, as applicable, shall promptly pay outstanding and invoiced Restructuring Expenses as follows: (a) on the Effective Date, Restructuring Expenses incurred during the period prior to the Effective Date to the extent invoiced to the Debtors at least one (1) day in advance of the Effective Date and (b) after the Effective Date, any unpaid Restructuring Expenses within ten (10) Business Days of receiving an invoice; *provided*, that such Restructuring Expenses shall be paid in accordance with the terms of any applicable engagement letters or other contractual arrangements without the requirement for the filing of retention applications, fee applications, or any other applications in

the Chapter 11 Cases, and without any requirement for further notice or Bankruptcy Court review or approval, except as otherwise provided in Section 3.3 of the Plan with respect to Professional Fee Claims.

### 6.    Corporate Action.

(a)    On the Effective Date, and subject to Section 133 of the Plan, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects. Among other things, on the Effective Date, the following transactions shall be deemed to have occurred at 11:59 P.M. Eastern Time and shall occur in the sequence described herein: (i) Reorganized HIT shall issue to the holders of DIP Claims the New HIT Common Equity Interests described in Section 3.1 of the Plan, (ii) Reorganized HIT shall issue to the holders of Existing Preferred Equity Interests the New HIT Common Equity Interests described in Section 5.5 of the Plan, which collectively with the New HIT Common Equity Interests exchanged for the DIP Claims, shall constitute 100% of the New HIT Common Equity Interests issued on the Effective Date; (iii) Reorganized HIT shall retain its existing Interests in HITOP; (iv) the Existing HITOP Preferred Interest received by HIT pursuant to Section 5.5(b)(i)(x) of the Plan shall be contributed to HITOP in exchange for 98% of New HITOP Interests issued on the Effective Date; (v) the Existing HITOP Preferred Interests described in Section 5.5(b)(i)(y) of the Plan shall be exchanged for 2% of New HITOP Interests issued on the Effective Date; (vi) Reorganized HIT shall enter into the CVR Agreement, entitling each holder of Existing HIT Common Equity Interests to one CVR for each share of Allowed Existing HIT Common Equity Interests held by such holder pursuant to Section 5.6 of the Plan, and the CVRs shall be deemed to be issued in accordance with the terms of the CVR Agreement; and (vii) the Reorganized Debtors shall enter into the Exit Facility provided by the Exit Facility Lender pursuant to the terms of the Exit Facility Agreement.

(b)    Upon the Effective Date, all matters provided for in the Plan involving the corporate or limited partnership structure of the Reorganized Debtors, and any corporate or limited partnership action required by or of the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders (upon whom the same shall be binding), directors, general partners, managers, or officers of the Debtors or Reorganized Debtors. On or (as applicable) before the Effective Date, the appropriate officers, general partners, or managers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, deliver, and perform or cause to be performed, the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effectuate the Restructuring Transactions) in the name of and on behalf of the Reorganized Debtors, including the Exit Facility and any and all other agreements, documents, securities, and instruments relating to the foregoing, to the extent not previously authorized by the Bankruptcy Court. These authorizations and approvals shall be effective notwithstanding and without regard to any requirements under non-bankruptcy law.

7.    **Exit Facility.**

(a)    On the Effective Date, the Reorganized Debtors shall enter into the Exit Facility, which shall be in form and substance acceptable to the Debtors and the Exit Facility Lender.

(b)    The Confirmation Order shall constitute approval of the Exit Facility (including the transactions contemplated thereby and all payments contemplated thereunder, all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid or to be paid by the Reorganized Debtors in connection therewith), and authorization for the Reorganized Debtors to enter into and perform under the Exit Facility Agreement and such other related documents, and make such payment and any other payment in connection therewith as may be required or appropriate.

(c)    The Reorganized Debtors shall be authorized to execute, deliver, and enter into and perform under the Exit Facility without the need for any further corporate or limited partnership action and without further action by the holders of Claims or Interests.

8.    **Authorization and Issuance of New HIT Common Equity Interests.**

(a)    All existing Interests in HIT shall be cancelled as of the Effective Date and, on the Effective Date, the Debtors or the Reorganized Debtors, as applicable, are authorized to issue or cause to be issued and shall issue the New HIT Common Equity Interests to the Plan Sponsor in accordance with the terms of the Plan and in the amounts determined by the Plan Sponsor, each without the need for any further corporate action. All of the New HIT Common Equity Interests, when so issued, shall be duly authorized, validly issued, fully paid, and non-assessable.

(b)    Upon the Effective Date, unless otherwise consented to by the Plan Sponsor, (i) the New HIT Common Equity Interests shall not be registered under the Securities Laws, and shall not be listed for public trading on any securities exchange, and (ii) none of the Reorganized Debtors shall be a reporting company under the Exchange Act. Except as provided in the Plan or the Confirmation Order, the New HIT Common Equity Interests to be distributed under the Plan shall be issued in the names of such holders or their nominees.

9.    **Exemption from Registration.**

(a)    The offer, issuance, and distribution of the New HIT Common Equity Interests and New HITOP Interests shall be exempt, pursuant to section 1145 of the Bankruptcy Code, if applicable, or any similar federal, state, or local law in reliance on section 4(a)(2) of the Securities Act, or Regulation D promulgated thereunder, or such other exemption as may be available, without further act or action by any Entity, from registration under (i) the Securities Laws, as amended, and all rules and regulations promulgated thereunder, and (ii) any state or local law requiring registration for the offer, issuance, or distribution of securities.

(b)    The New HIT Common Equity Interests and New HITOP Interests shall be issued without registration under the Securities Laws, as amended, or any similar federal, state, or local law in reliance on available exemptions or section 1145 of the Bankruptcy Code and,

if applicable, shall be freely tradable by the recipients thereof, subject to: (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act; (ii) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments; and (iii) any applicable regulatory approval.

(c)     Notwithstanding anything to the contrary in the Plan, no entity shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New HIT Common Equity Interests, the New HITOP Interests, and the shares thereof issued are exempt from registration, settlement, and depository services.

### 10.     Cancellation of Existing Securities and Agreements.

(a)     Except for the purpose of evidencing a right to a Plan Distribution under the Plan and except as otherwise set forth in the Plan, including with respect to Executory Contracts or Unexpired Leases that shall be assumed by the Debtors, on the Effective Date, all agreements, instruments, and other documents evidencing any Existing Preferred Equity Interest, the Existing HIT Common Equity Interests, or any other Interest (other than Intercompany Interests that are not modified by the Plan) and any rights of any holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged.

(b)     Notwithstanding such cancellation and discharge, and subject to Section 7.13 of the Plan, the Existing Preferred Equity Interests and the Existing HIT Common Equity Interests, including any agreements related thereto, shall continue in effect solely to the extent necessary to (i) allow the holders of Allowed Existing Preferred Equity Interests and Existing HIT Common Equity Interests to receive Plan Distributions under the Plan, and (ii) allow the Debtors or the Reorganized Debtors, as applicable, to make post-Effective Date Plan Distributions or take such other action pursuant to the Plan on account of the Allowed Existing Preferred Equity Interests and Allowed Existing HIT Common Equity Interests and to otherwise exercise their rights and discharge their obligations relating to the interests of the holders of such Interests in accordance with the Plan, *provided* that nothing in this section shall affect the discharge of Claims and Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any liability or expense to the Reorganized Debtors.

(c)     Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors of their interests, as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in this section shall be deemed null and void and shall be of no force and effect. Nothing contained herein shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtors or any of their counterparties under any Executory Contract or Unexpired Lease to the extent such Executory Contract or Unexpired Lease has been assumed by the Debtors pursuant to a Final Order of the Bankruptcy Court or hereunder.

### 11.    Officers and Board of Directors.

(a)    To the extent then known and determined, the identities of the members of the New Board, as applicable, and to the extent applicable, the officers of each Reorganized Debtor, shall be disclosed at or prior to the Combined Hearing in accordance with section 1129(a)(5) of the Bankruptcy Code.

(b)    Commencing on the Effective Date, each of the directors, managers, and officers of each of the Reorganized Debtors shall be elected and serve pursuant to the terms of the applicable organizational documents, including any Amended Constituent Documents, of such Reorganized Debtor and may be replaced or removed in accordance with such organizational documents.

### 12.    Restructuring Transactions.

(a)    On or as soon as practicable after the Effective Date, the Reorganized Debtors shall, subject to the consent of the Plan Sponsor, take such actions as may be or become necessary or appropriate to effect the Restructuring Transactions, including (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, financing, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law, (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree, (iii) the filing of appropriate certificates or charters, formation, reincorporation, merger, consolidation, conversion, or dissolution, (iv) the effective sale of the hotels from the Company to the Plan Sponsor, by virtue of the issuance of the New HIT Common Equity Interests to the Plan Sponsor as provided for pursuant to the Plan, (v) the issuance of the New HIT Common Equity Interests and the New HITOP Interests, all of which shall be authorized and approved in all respects in each case without further action being required under applicable law, regulation, order, or rule, (vi) all other actions that the applicable Entities determine to be necessary or appropriate, including (A) making filings or recordings that may be required by applicable law, subject, in each case, to the organizational documents of the Reorganized Debtors, and (B) such other transactions that may be required or necessary to effectuate any of the Restructuring Transactions in the most tax-efficient manner, including mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions or liquidations; and (vii) the execution, delivery, and filing, if applicable, of the Exit Facility.  The Restructuring Transactions may include a taxable transfer of all or a portion of the Debtors' assets or Entities to one or more newly-formed Entities (or an affiliate or subsidiary of such Entity or Entities) formed and controlled by certain holders of Claims against or Interests in the Debtors and, in such case, the New HIT Common Equity Interests and New HITOP Interests to holders of DIP Claims and Existing Preferred Equity Interests pursuant to the Plan may comprise stock (and/or other interests) of such Entity or Entities.

(b)    Each officer, member of the board of directors, manager, or general partner of the Debtors is (and each officer, member of the board, or manager of the Reorganized Debtors shall be) authorized and directed to issue, execute, deliver, file, or record such contracts, securities, instruments, releases, indentures, and other agreements or documents and take such

actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the New HIT Common Equity Interests, the New HITOP Interests, and the CVRs issued pursuant to the Plan, the CVR Agreement, and any Restructuring Transaction in the name of and on behalf of the Reorganized Debtors, all of which shall be authorized and approved in all respects, in each case, without the need for any further approvals, authorization, consents, or any further action required under applicable law, regulation, order, or rule (including, without limitation, any action by the stockholders, directors, managers, or general partners of the Debtors or the Reorganized Debtors) except for those expressly required pursuant to the Plan.

(c)     On the Effective Date, or as soon thereafter as is reasonably practicable, the Reorganized Debtors' respective certificates of incorporation, bylaws, and Limited Partnership Agreement (and other formation and constituent documents relating to limited partnerships) shall be amended as may be required to be consistent with the provisions of the Plan, the New HIT Common Equity Interests, the New HITOP Interests, and the documents related to the Exit Facility, as applicable, and the Bankruptcy Code.  Among other things, such amendments of the Limited Partnership Agreement shall include the elimination of any rights of the holder of the special general partnership interest in HITOP issued in accordance with the Limited Partnership Agreement.  The organizational documents, including the Amended Constituent Documents, for the Reorganized Debtors shall, among other things: (i) authorize the issuance of the New HIT Common Equity Interests, the New HITOP Interests, and the CVRs; and (ii) pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, include a provision prohibiting the issuance of non-voting Equity Securities.

(d)     All matters provided for herein involving the corporate or limited partnership structure of the Debtors or the Reorganized Debtors, to the extent applicable, or any corporate, limited partnership, or related action required by the Debtors or the Reorganized Debtors in connection herewith shall be deemed to have occurred and shall be in effect, without any requirement of further action by the stockholders, members, directors, managers, general partners, or officers of the Debtors or the Reorganized Debtors, and with like effect as though such action had been taken unanimously by the stockholders, members, directors, managers, general partners, or officers, as applicable, of the Debtors or the Reorganized Debtors.

## 13.    Employee Matters.

Subject to Article X of the Plan, on the Effective Date, the Reorganized Debtors shall be deemed to have assumed all Employee Arrangements; *provided*, *however*, that the Debtors' Employee Arrangements with their senior management executives shall be assumed as amended by the provisions contained in the Restructuring Support Agreement.

As of the Effective Date: (x) the Incentive Equity Plan is terminated; (y) all Incentive Equity Awards outstanding as of immediately prior to the Effective Date are (i) in the case of Incentive Equity Awards that are restricted shares of Existing HIT Common Equity Interests, fully vested, and (ii) in the case of Incentive Equity Awards that are restricted stock units, terminated and paid in the form of shares of Existing HIT Common Equity Interests (with each restricted stock unit to be paid in the form of one Existing HIT Common Equity Interest, and with restricted stock units subject to performance-based conditions to be paid assuming maximum performance); and (z) all Existing HIT Common Equity Interests vested or paid under subclause (y) are treated

41

in accordance with Section 5.5(b) of the Plan. The termination of the Incentive Equity Plan and all Incentive Equity Awards outstanding thereunder and the payment of the Incentive Equity Awards are intended to comply with Section 409A of the Internal Revenue Code of 1986, as amended and Treas. Reg. Section 1.409A-3(j)(4)(ix)(A) thereunder.

### 14.    Release of Avoidance Actions.

On the Effective Date, the Debtors, on behalf of themselves and their Estates, shall release any and all Avoidance Actions and the Debtors and the Reorganized Debtors, and any of their successors or assigns, and any Entity acting on behalf of the Debtors or the Reorganized Debtors, shall be deemed to have waived the right to pursue any and all Avoidance Actions, except for Avoidance Actions brought as counterclaims or defenses to claims asserted against the Debtors.

### 15.    Closing of Chapter 11 Cases.

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases; *provided*, as of the Effective Date, the Reorganized Debtors may submit an order to the Bankruptcy Court under certification of counsel closing the Chapter 11 Case of Debtor HITOP and changing the caption of the Chapter 11 Cases accordingly; *provided, further*, that all motions, contested matters, adversary proceedings, and other matters may be heard and adjudicated in the Debtors' Chapter 11 Case that remains open regardless of whether the applicable matter is against HIT or HITOP.. Nothing in the Plan shall authorize the closing of any case effective as of a date that precedes the date any such order is entered. Any request for retroactive relief shall be made on motion served on the U.S. Trustee, and the Bankruptcy Court shall rule on such request after notice and a hearing. Upon the filing of a motion to close the last Chapter 11 Case remaining open, the Reorganized Debtors shall file a final report with respect to all of the Chapter 11 Cases pursuant to Local Rule 3022-1(c).

### 16.    Notice of Effective Date.

On the Effective Date, the Debtors shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

### 17.    Corporate and Other Action.

(a)    On the Effective Date, the Amended Constituent Documents and any other applicable amended and restated corporate or other organizational documents of the Debtors shall be deemed authorized in all respects.

(b)    Any action under the Plan to be taken by or required of the Debtors, including, without limitation, the adoption or amendment of their charter and bylaws or certificate of limited partnership and Limited Partnership Agreement, the issuance of securities and instruments, the Exit Facility, or the selection of officers or directors, shall be authorized and approved in all respects, without any requirement of further action by the Debtors' equity holders, holders of partnership interests, general partner, board of directors, or similar body, as applicable.

(c)      The Debtors shall be authorized to execute, deliver, file, and record such documents (including, without limitation, the Plan Documents), contracts, instruments, releases and other agreements and take such other action as may be necessary to effectuate and further evidence the terms and conditions of the Plan, without the necessity of any further Bankruptcy Court, corporate, limited partnership, board of directors, member, general partner, or stockholder approval or action.  In addition, the selection of the Persons who will serve as the initial managers, officers, and directors of the Reorganized Debtors as of the Effective Date shall be deemed to have occurred and be effective on and after the Effective Date without any requirement of further action by the board of directors or equity holders of the applicable Reorganized Debtors.

### 18.      Approval of Plan Documents.

The solicitation of votes with respect to the Plan shall be deemed a solicitation for the approval of the Plan and all transactions contemplated hereunder (and subject to the terms and conditions set forth herein).  Entry of the Confirmation Order shall constitute approval of the Plan Documents and such transactions.  On the Effective Date, the Debtors shall be authorized to enter into, file, execute, and/or deliver each of the Plan Documents and any other agreement or instrument issued in connection with any Plan Document without the necessity of any further corporate, board, stockholder, manager, general partner, or similar action.

### E.      CVR Distributions and Related Matters

### 1.      CVR Payments.

Holders of CVRs will be entitled to receive distributions subject to the terms and conditions of the CVR Agreement upon certain Monetization Events or upon the Maturity Date (defined below).  A full description of such terms and conditions, including the "waterfall" applicable to all distributions, can be found in the CVR Agreement, attached to the Plan as Exhibit A.

If and when a payment obligation to the holders of CVRs is triggered pursuant to the CVR Agreement, the Reorganized Debtors shall make payments to the holders of CVRs reasonably promptly following the applicable triggering event for such payment, in accordance with the terms and conditions of the CVR Agreement.

Among other limitations on the circumstances under which a payment would be made to holders of the CVRs, no payment will be made to holders of CVRs if the Adjusted EBITDA (as defined in the CVR Agreement) of the applicable assets in the CVR Asset Pool does not exceed certain specified hurdles.

The maximum amount of payments made to holders of CVRs will not be permitted to exceed $6.00 per CVR.

### 2.      Maturity Date of CVRs.

Subject to the conditions and limitations set forth in the CVR Agreement, the holders of CVRs may have the right to receive payments in respect of the CVRs on the fifth anniversary of

the Effective Date (the "Maturity Date"), which may be extended to the seventh anniversary of the Effective Date by the board directors of the Reorganized Company, in its sole discretion. The right to receive payments in respect of CVRs may expire sooner if certain payments have already been made in respect of the CVRs, as set forth in the CVR Agreement.

### 3.    Securities Law Considerations.

The CVRs are not securities and are non-transferable except for certain limited permitted transfers as set forth in the CVR Agreement. The CVRs are not subject to registration under the Securities Laws or any other applicable law.

### 4.    Certain Covenants.

The Reorganized Debtors shall not, and shall not cause or permit their direct or indirect subsidiaries to, amend their constituent documents or enter into or undergo any consolidation, merger, or similar transaction, reorganization, transfer of assets, dissolution, issue or sale of securities, or take any other voluntary action, in each case, for the primary purpose of causing the requirements for payment of the CVRs to not be satisfied.

Without the consent of the Independent Director(s), the Reorganized Debtors shall not, and shall cause their direct or indirect subsidiaries to not, take any action or enter into any agreement that is disproportionately adverse to the economic interests of the holders of the CVRs when compared to the holders of New HIT Common Equity Interest.

The Reorganized Debtors shall not, and shall not cause or permit their direct or indirect subsidiaries to, enter into or engage in certain transactions with an affiliate or a related party.

### 5.    Reporting.

The Reorganized Debtors shall make information available periodically with respect to the CVR Asset Pool on a confidential website only accessible to holders of CVRs and the Plan Sponsor in accordance with the terms of the CVR Agreement.

### 6.    Inconsistency Between Plan and CVR Agreement.

The provisions of Article VIII of the Plan are subject to, and qualified in all respects, by the specific terms and conditions set forth in the CVR Agreement. In the event of an inconsistency between the Plan and the CVR Agreement, the terms and conditions of the CVR Agreement shall govern.

### F.    Distributions

### 1.    Plan Distributions Generally.

One or more Disbursing Agents shall make all Plan Distributions under the Plan to the appropriate holders of Claims and Interests in accordance with the terms of the Plan. For the avoidance of doubt, the Reorganized Debtors may, but are not required to, serve as the Disbursing Agent under the Plan.

### 2. Distribution Record Date.

As of the close of business on the Effective Date, the various lists of holders of Interests in each Class, as maintained by the Debtors or their respective agents, shall be deemed closed, and there shall be no further changes in the record holders of any of the Interests. The Debtors or the Reorganized Debtors shall have no obligation to recognize any transfer of Interests occurring on or after the Effective Date. In addition, with respect to payment of any cure amounts owed pursuant to Bankruptcy Code section 365(b) or disputes over any cure amounts, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a cure amount.

### 3. Date of Plan Distributions.

Except as otherwise provided in the Plan, any Plan Distributions and deliveries to be made under the Plan shall be made on the Effective Date or as otherwise determined in accordance with the Plan, or as soon as practicable thereafter; *provided* that the Reorganized Debtors may implement periodic Plan Distribution dates to the extent they determine them to be appropriate.

### 4. Disbursing Agent.

All Plan Distributions shall be made by the Disbursing Agent, on behalf of the applicable Debtor (unless otherwise provided herein), on or after the Effective Date or as otherwise provided herein. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties, and all reasonable and documented fees and expenses incurred by such Disbursing Agent directly related to Plan Distributions hereunder shall be reimbursed by the Reorganized Debtors. The Reorganized Debtors shall cooperate in good faith with the applicable Disbursing Agent (if other than the Reorganized Debtors) to comply with the reporting and withholding requirements outlined in the Plan. For the avoidance of doubt, the Disbursing Agent shall not have any responsibilities with respect to the CVRs.

### 5. Rights and Powers of Disbursing Agent.

(a) From and after the Effective Date, the Disbursing Agent, solely in its capacity as Disbursing Agent, shall be exculpated by all Entities, including, without limitation, holders of Claims against and Interests in the Debtors and other parties in interest, from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or ultra vires acts of such Disbursing Agent. No holder of a Claim or Interest or other party in interest shall have or pursue any claim or Cause of Action against the Disbursing Agent, solely in its capacity as Disbursing Agent, for making payments in accordance with the Plan or for implementing provisions of the Plan, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or ultra vires acts of such Disbursing Agent.

(b)     The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder, (ii) make all Plan Distributions contemplated hereby, and (iii) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

### 6.      Expenses of Disbursing Agent.

Except as otherwise ordered by the Bankruptcy Court, any reasonable and documented fees and expenses incurred by the Disbursing Agent acting in such capacity (including reasonable documented attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash by the Reorganized Debtors in the ordinary course of business.

### 7.      Delivery of Plan Distributions.

All Plan Distributions to any holder of an Allowed Claim as and when required by the Plan shall be made by the Disbursing Agent.  In the event that any Plan Distribution to any holder is returned as undeliverable, no further Plan Distributions shall be made to such holder unless and until the Disbursing Agent is notified in writing of such holder's then-current address, at which time all currently due, missed Plan Distributions shall be made to such holder as soon as reasonably practicable thereafter without interest.  Nothing herein shall require the Disbursing Agent to attempt to locate holders of undeliverable Plan Distributions and, if located, assist such holders in complying with Section 9.7 of the Plan.

### 8.      Proofs of Claim; Disputed Claims Process.

Notwithstanding section 502(a) of the Bankruptcy Code, and in light of the Unimpaired status of Classes 1, 2, 3, 4, and 7 under the Plan, except as provided in Section ARTICLE VI.G.3 with respect to rejection damage Claims, holders of Claims or Interests need not file Proofs of Claim, and the Reorganized Debtors and the holders of Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims in the ordinary course of business as if the Chapter 11 Cases had not been commenced except that (unless expressly waived pursuant to the Plan) the Allowed amount of such Claims shall be subject to the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 and 503 of the Bankruptcy Code, to the extent applicable.

Upon the Effective Date, all Proofs of Claim filed against the Debtors, regardless of the time of filing, and including Claims filed after the Effective Date, shall be deemed withdrawn, other than as provided below, and such creditor that Files a Proof of Claim with the Bankruptcy Court retains any right it may have to pursue remedies in a forum other than the Bankruptcy Court in accordance with applicable.  Notwithstanding anything in this Section ARTICLE VI.F.8, (a) all Claims against the Debtors that result from the Debtors' rejection of an Executory Contract or Unexpired Lease, (b) disputes regarding the amount of any cure pursuant to section 365 of the Bankruptcy Code, and (c) Claims that the Debtors seek to have determined by the Bankruptcy Court, shall in all cases be determined by the Bankruptcy Court.  From and after the Effective Date,

the Reorganized Debtors may satisfy, dispute, settle, or otherwise compromise any Claim without approval of the Bankruptcy Court in the ordinary course of business.

### 9. Postpetition Interest.

Except as otherwise specifically provided for in the Plan, the Confirmation Order, or another order of the Bankruptcy Court or required by the Bankruptcy Code, or as otherwise agreed by the Reorganized Debtors, interest shall not accrue or be paid on any Claims on or after the Petition Date.

### 10. Unclaimed Property.

Undeliverable Plan Distributions or unclaimed Plan Distributions shall remain in the possession of the Reorganized Debtors until such time as a Plan Distribution becomes deliverable or the holder accepts Plan Distribution, or such Plan Distribution reverts back to the Reorganized Debtors, and shall not be supplemented with any interest, dividends, or other accruals of any kind. Such Plan Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one hundred and eighty (180) days from the date of the attempted Plan Distribution. After such date, all unclaimed property or interest in property shall revert to the Reorganized Debtors, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred. The Reorganized Debtors and the Disbursing Agent shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records and filings with the Bankruptcy Court.

### 11. Time Bar to Cash Payments.

Checks issued by the Disbursing Agent in respect of Allowed Claims shall be null and void if not negotiated within one hundred and eighty (180) days after the date of issuance thereof. Thereafter, the amount represented by such voided check shall irrevocably revert to the Reorganized Debtors, and any Claim in respect of such voided check shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary. Requests for re-issuance of any check shall be made to the Disbursing Agent by the holder of the Allowed Claim to whom such check was originally issued.

### 12. Manner of Payment under Plan.

Except as otherwise specifically provided in the Plan, at the option of the Debtors or the Reorganized Debtors, as applicable, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

### 13. Satisfaction of Claims.

Except as otherwise specifically provided in the Plan, any Plan Distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

14.    **Setoffs.**

Except as otherwise expressly provided for herein, each Reorganized Debtor, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided, however*, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor of any such Claims, rights, and Causes of Action that such Reorganized Debtor may possess against such holder. In no event shall any holder of Claims be entitled to set off any such Claim against any Claim, right, or Cause of Action of the Debtor or Reorganized Debtor (as applicable), unless such holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

15.    **Withholding and Reporting Requirements.**

(a)    <u>Withholding Rights</u>. In connection with the Plan, any party issuing any instrument or making any Plan Distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all Plan Distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements. In the case of a non-Cash Plan Distribution that is subject to withholding, the distributing party may withhold an appropriate portion of such distributed property and either (i) sell such withheld property to generate Cash necessary to pay the withholding tax (or reimburse the distributing party for any advanced payment of the withholding tax), or (ii) pay the withholding tax using its own funds and retain such withheld property. Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. Notwithstanding the foregoing, each Entity that receives a Plan Distribution pursuant to the Plan shall have responsibility for any taxes imposed by any Governmental Unit, including, without limitation, income, withholding, and other taxes, on account of such Distribution. Any party issuing any instrument or making any Distribution pursuant to the Plan has the right, but not the obligation, to not make a Plan Distribution until such holder has made arrangements reasonably satisfactory to such issuing or disbursing party for payment of any such tax obligations.

(b)    <u>Forms</u>. Any party entitled to receive any property as an issuance or Plan Distribution under the Plan shall, upon request, deliver to the Disbursing Agent or such other Person designated by the Reorganized Debtors (which Person shall subsequently deliver to the Disbursing Agent any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a foreign Person) Form W-8 and any other forms or documents reasonably requested by any Reorganized Debtor to reduce or eliminate any withholding required by any federal, state, or local taxing authority.

G.    **Executory Contracts and Unexpired Leases**

1.    **General Treatment; Assumption and Rejection of Executory Contracts or Unexpired Leases.**

(a)    As of and subject to the occurrence of the Effective Date and the payment of any applicable cure amounts owed pursuant to Bankruptcy Code section 365(b), all Executory Contracts and Unexpired Leases to which any of the Debtors are parties, and which have not expired or terminated by their own terms on or prior to the Effective Date, including— subject to Section 7.13—Employee Arrangements, shall be deemed assumed by the Debtors, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease: (1) was previously assumed or rejected previously by the Debtors; (2) was previously expired or terminated pursuant to its own terms, (3) is the subject of a motion to reject filed on or before the Effective Date, or (4) is identified on the Schedule of Rejected Contracts and Leases.

(b)    Subject to the occurrence of the Effective Date, entry of the Confirmation Order shall constitute approval of the assumptions or assumptions and assignments provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a determination by the Bankruptcy Court that the Reorganized Debtors have provided adequate assurance of future performance under each assumed Executory Contract and Unexpired Lease. Each Executory Contract and Unexpired Lease assumed or assumed and assigned pursuant to the Plan shall vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law; *provided* that the assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to affiliates.

(c)    Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests.  To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including any "change of control," "ipso facto," bankruptcy default or similar provisions), then such provision shall be unenforceable or deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate or modify such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

### 2. Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.

The Reorganized Debtors shall satisfy any monetary defaults under any Executory Contract or Unexpired Lease to be assumed hereunder, to the extent required by section 365(b)(1) of the Bankruptcy Code, upon assumption thereof in the ordinary course of business. If a counterparty to any Executory Contract or Unexpired Lease believes any amounts are due as a result of such Debtor's monetary default thereunder, it shall assert a Cure Claim against the Debtors or Reorganized Debtors, as applicable, in the ordinary course of business, subject to all defenses the Debtors or Reorganized Debtors may have with respect to such Cure Claim. Any Cure Claim shall be deemed fully satisfied, released and discharged upon payment by the Reorganized Debtors of the applicable Cure Claim; provided, that nothing herein shall prevent the Reorganized Debtors from paying any Cure Claim despite the failure of the relevant counterparty to assert or file such request for payment of such Cure Claim. The Debtors, with the consent of the Plan Sponsor, or the Reorganized Debtors, as applicable, may settle any Cure Claims without any further notice to or action, order or approval of the Bankruptcy Court.

As set forth in the notice of the Combined Hearing, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan, including an objection regarding the ability of the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), must be filed with the Bankruptcy Court on or before the deadline set by the Bankruptcy Court for objecting to Confirmation of the Plan, or such other deadline as may have been established by order of the Bankruptcy Court. To the extent any such objection is not determined by the Bankruptcy Court at the Combined Hearing, such objection may be heard and determined at a subsequent hearing. Any counterparty to an Executory Contract or Unexpired Lease that does not timely object to the proposed assumption of any Executory Contract or Unexpired Lease by the deadline established by the Bankruptcy Court will be deemed to have consented to such assumption.

In the event of a dispute regarding (a) the amount of any Cure Claim, (b) the ability of the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or (c) any other matter pertaining to assumption or the payment of Cure Claims required by section 365(b)(1) of the Bankruptcy Code, payment of a Cure Claim, if any, shall occur as soon as reasonably practicable after entry of a Final Order or Final Orders resolving such dispute and approving such assumption. The Debtors (with the consent of the Plan Sponsor), or Reorganized Debtors, as applicable, reserve the right at any time to move to reject any Executory Contract or Unexpired Lease prior to the Effective Date based upon the existence of any unresolved dispute or upon a resolution of such dispute that is unfavorable to the Debtors or Reorganized Debtors.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, and full payment of any applicable Cure Claims pursuant to the Plan, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or non-monetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the date that the Reorganized Debtors assume such Executory Contract or Unexpired Lease.

### 3.      Rejection of Executory Contracts or Unexpired Leases.

Unless otherwise provided in the Plan or the Plan Supplement, each Executory Contract and Unexpired Lease, if any, set forth on the Schedule of Rejected Contracts and Leases (which, if any, shall be included in the Plan Supplement) shall be deemed rejected, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under sections 365 and 1123 of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify or supplement the Schedule of Rejected Contracts and Leases at any time through and including the Effective Date.

Proofs of claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court within 30 days after the Effective Date. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estate or property of the foregoing parties, without the need for any objection by the Debtors or the Reorganized Debtors, as applicable, or further notice to, or action, order or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released and discharged, notwithstanding anything in a Proof of Claim to the contrary. Claims arising from the rejection of the Executory Contracts or Unexpired Leases to which any Debtor is a party shall be classified as general unsecured claims, subject to any applicable limitation or defense under the Bankruptcy Code and applicable law.

### 4.      Survival of the Debtors' Indemnification Obligations and Guarantees.

(a)      Any obligations of the Debtors pursuant to their corporate charters, bylaws, Limited Partnership Agreement, or other organizational documents to indemnify current and former officers, directors, agents, and/or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such directors, officers, agents, and/or employees, based upon any act or omission for or on behalf of the Debtors, shall not be discharged or impaired by confirmation of the Plan. Any Claim based on such obligations shall not be a Disputed Claim, Disallowed Claim, or subject to any objection in either case by reason of section 502(e)(1)(B) of the Bankruptcy Code. None of the Reorganized Debtors shall amend and/or restate their respective governance documents before or after the Effective Date to terminate or adversely affect any obligations to provide such indemnification rights or such directors', officers', employees', or agents' indemnification rights.

(b)      In addition, after the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under the D&O Liability Insurance Policies in effect or purchased as of the Petition Date, and all members, managers, directors, and officers who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date, in each case, to the extent set forth in such policies.

(c)     On the Effective Date, all guarantees, indemnities, or other credit support provided by a Debtor in support of the primary obligations of another Debtor or any Non-Debtor Subsidiary shall be Unimpaired by the Plan and reinstated to their position immediately prior to the Petition Date.

**5.      Severance Contracts and Programs.**

Except as otherwise expressly provided in the Plan, a prior order of the Bankruptcy Court or to the extent subject to a motion pending before the Bankruptcy Court as of the Effective Date, all severance benefit plans and policies for former employees (including any severance contracts between one or more of the Debtors and a former employee that were in effect as of or after the Petition Date), to the extent contemplated by the DIP Budget (as defined in the Interim DIP Order and Final DIP Order), are treated as Executory Contracts under the Plan and on the Effective Date shall be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code.

**6.      Insurance Policies.**

All insurance policies (including all directors' and officers' insurance policies and tail or run-off coverage liability insurance) pursuant to which any Debtor has any rights or obligations in effect as of the date of the Confirmation Order shall be deemed and treated as Executory Contracts pursuant to the Plan and shall be assumed by the respective Debtors and the Reorganized Debtors and shall continue in full force and effect thereafter in accordance with their respective terms.  All other insurance policies shall vest in the Reorganized Debtors.

**7.      Intellectual Property Licenses and Agreements.**

All intellectual property contracts, licenses, royalties, or other similar agreements to which the Debtors have any rights or obligations in effect as of the date of the Confirmation Order shall be deemed and treated as Executory Contracts pursuant to the Plan and shall be assumed by the respective Debtors and shall continue in full force and effect unless any such intellectual property contract, license, royalty, or other similar agreement otherwise is specifically rejected pursuant to a separate order of the Bankruptcy Court or is the subject of a separate rejection motion filed by the Debtors.  Unless otherwise noted hereunder, all other intellectual property contracts, licenses, royalties, or other similar agreements shall vest in the Reorganized Debtors and the Reorganized Debtors may take all actions as may be necessary or appropriate to ensure such vesting as contemplated herein.

**8.      Modifications, Amendments, Supplements, Restatements, or Other Agreements.**

Unless otherwise provided herein or by separate order of the Bankruptcy Court, each Executory Contract and Unexpired Lease that is assumed shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such Executory Contract or Unexpired Lease, without regard to whether such agreement, instrument, or other document is listed in any notice of assumed contracts.

9.    **Reservation of Rights.**

(a)    Neither the exclusion nor inclusion of any contract or lease by the Debtors on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, will constitute an admission by the Debtors that any such contract or lease is or is not in fact an Executory Contract or Unexpired Lease or that the Debtors or the Reorganized Debtors or their respective affiliates have any liability thereunder.

(b)    Except as otherwise provided in the Plan, nothing in the Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors and the Reorganized Debtors under any executory or non-Executory Contract or any unexpired or expired lease.

(c)    Nothing in the Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors under any executory or non-Executory Contract or any unexpired or expired lease.

(d)    If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection under the Plan, the Debtors or the Reorganized Debtors, as applicable, shall have 60 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease by filing a notice indicating such altered treatment.

H.    **Conditions Precedent**

1.    **Conditions Precedent to Effective Date**

The following are conditions precedent to the Effective Date of the Plan:

(a)    the Confirmation Order, in form and substance reasonably acceptable to the Debtors and the Plan Sponsor, having become a Final Order and remaining in full force and effect;

(b)    all actions, agreements and documents, including the Plan Documents and the Plan Supplement, in form and substance consistent with, and in form and substance as required by the approvals and consents set forth in, the RSA, being filed with the Bankruptcy Court, executed and delivered, and any conditions (other than the occurrence of the Effective Date or certification by the Debtors that the Effective Date has occurred) contained therein having been satisfied or waived in accordance therewith;

(c)    a chapter 11 trustee, a responsible officer, or an examiner with enlarged powers relating to the operation of the businesses of the Debtors (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) not having been appointed in any of the Chapter 11 Cases;

(d)    the Amended Constituent Documents, in form and substance attached as Exhibits to the Plan Supplement, shall have been filed with the applicable authorities

of the relevant jurisdictions of incorporation or formation and shall have become effective in accordance with such jurisdictions' corporation or limited partnership laws;

(e)     the issuance of the New HIT Common Equity Interests and the CVRs, and the consummation of the Exit Facility;

(f)     the RSA remaining in full force and effect and not having been terminated;

(g)     the payment of Restructuring Expenses incurred during the period prior to the Effective Date to the extent invoiced to the Debtors, except as otherwise provided in Section 3.3 of the Plan with respect to Professional Fee Claims;

(h)     all actions, documents, certificates, and agreements necessary to implement the Plan having been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable laws obtaining;

(i)     all governmental and third-party approvals and consents, including Bankruptcy Court approval, as necessary in connection with the transactions provided for in the Plan, these approvals not being subject to unfulfilled conditions, being in full force and effect, and all applicable waiting periods having expired without any action having been taken by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions; and,

(j)     the payment and satisfaction in full of all statutory fees and obligations then due and payable to the office of the U.S. Trustee.

### 2.     Waiver of Conditions Precedent.

(a)     Except as otherwise provided herein, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action. Each of the conditions precedent in Section 11.1 of the Plan may be waived in writing by the Debtors with the prior written consent of the Plan Sponsor without leave of or order of the Bankruptcy Court.

(b)     The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

### 3.     Effect of Failure of a Condition.

If the conditions listed in Section 11.1 of the Plan are not satisfied or waived in accordance with Section 11.2 of the Plan on or before the first Business Day that is more than 90 days after the date on which the Confirmation Order is entered or by such later date as set forth by the Debtors in a notice filed with the Bankruptcy Court prior to the expiration of such period, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall

(a) constitute a waiver or release of any Claims against or any Interests in the Debtors or claims by the Debtors, (b) prejudice in any manner the rights of any Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtors or the Plan Sponsor, or any other Entity.

## I.    Effect of Confirmation of Plan

### 1.    Vesting of Assets.

Except as otherwise provided herein, or in any agreement, instrument, or other document incorporated in the Plan (including the Restructuring Transactions), on the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all assets and property of the Estates shall vest in the Reorganized Debtors, free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as provided pursuant to the Plan, the Confirmation Order, or the Exit Facility.  On and after the Effective Date, the Reorganized Debtors may take any action, including, without limitation, the operation of their businesses; the use, acquisition, sale, lease and disposition of property; and the entry into transactions, agreements, understandings, or arrangements, whether in or other than in the ordinary course of business, and execute, deliver, implement, and fully perform any and all obligations, instruments, documents, and papers or otherwise in connection with any of the foregoing, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code, except as expressly provided herein.  Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for professional fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

### 2.    Binding Effect.

As of the Effective Date, the Plan shall bind all holders of Claims against and Interests in the Debtors and their respective successors and assigns, notwithstanding whether any such holders were (a) Impaired or Unimpaired under the Plan, (b) deemed to accept or reject the Plan, (c) failed to vote to accept or reject the Plan, or (d) voted to reject the Plan.

### 3.    Deemed Consent to Change of Control of Debtors.

As of the Effective Date, any counterparty to a contract with the Debtors or the Non-Debtor Subsidiaries shall be deemed to have consented to the change of control of the Debtors occurring pursuant to the Plan, and is forever barred and enjoined from declaring a breach, default, or otherwise proceeding against the Debtors or Non-Debtor Subsidiaries with respect to any such counterparty contract provisions otherwise triggered by a change of control of the Debtors; *provided* that such counterparty received actual notice of the Plan and the Disclosure Statement.

### 4.    Discharge of Claims and Termination of Interests.

Upon the Effective Date and in consideration of the Plan Distributions to be made under the Plan, except as otherwise expressly provided herein, each holder (as well as any representatives, trustees, or agents on behalf of each holder) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all

Claims, Interests, rights, and liabilities that arose prior to the Effective Date. Upon the Effective Date, all such Entities shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in the Debtors against the Debtors, the Reorganized Debtors, or any of their assets or property, whether or not such holder has filed a Proof of Claim and whether or not the facts or legal bases therefor were known or existed prior to the Effective Date.

### 5. Term of Injunctions or Stays.

Unless otherwise provided herein, the Confirmation Order, or in a Final Order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

### 6. Injunction.

(a) **Except as otherwise specifically provided in the Plan or the Confirmation Order, as of the Confirmation Date, but subject to the occurrence of the Effective Date, all Persons or Entities, and all other parties in interest, along with their present or former employees, agents, officers, directors, principals, representatives, and affiliates are, with respect to any Claims or Interests being released, exculpated, or discharged pursuant to the Plan, permanently enjoined after the Confirmation Date from: (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting the Debtors, their Estates or any of their property, wherever located, or any direct or indirect transferee of any property, wherever located, of, or direct or indirect successor in interest to, any of the foregoing Persons or any property, wherever located, of any such transferee or successor; (ii) enforcing, levying, attaching (including any pre-judgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtors, or their Estates or any of their property, wherever located, or any direct or indirect transferee of any property, wherever located, of, or direct or indirect successor in interest to, any of the foregoing Persons, or any property, wherever located, of any such transferee or successor; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors or their Estates or any of their property, wherever located, or any direct or indirect transferee of any property, of, or successor in interest to, any of the foregoing Persons; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan to the full extent permitted by applicable law (including, without limitation, commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan) to the fullest extent permitted by applicable law; or (v) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the Debtors or their Estates, or against the property or interests in property of the Debtors or their Estates. Such injunction shall extend to any successors or assignees of the Debtors and their properties and interest in properties;**

*provided, however*, that nothing contained herein shall preclude such Persons from exercising their rights, or obtaining benefits, pursuant to and consistent with the terms of the Plan.

(b)     **By accepting Plan Distributions, each holder of an Allowed Claim or Interest will be deemed to have specifically consented to the injunctions set forth in Section 12.6 of the Plan.**

7.     Releases.

(a)     **Releases by Debtors.**

Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or the Confirmation Order, on and after the Effective Date, for good and valuable consideration, including their cooperation and contributions to the Chapter 11 Cases, the Released Parties shall be deemed released and discharged by the Debtors and their Estates from any and all Claims, obligations, debts, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, asserted or unasserted, existing, or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of federal or state laws, or otherwise, including Avoidance Actions, those Causes of Action based on veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability, or otherwise that the Debtors, their Estates or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity or that any holder of a Claim or Interest or other Entity would have been legally entitled to assert derivatively for or on behalf of the Debtors, or their Estates, based on, relating to or in any manner arising from, in whole or in part, the Debtors, their Estates, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtors and any Released Party, excluding any assumed Executory Contract or Unexpired Lease, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Disclosure Statement, the Restructuring Support Agreement, the Plan Supplement, the Exit Facility Agreement, the DIP Credit Agreement and other DIP Loan Documents, the Chapter 11 Cases, or, in each case, related agreements, instruments, or other documents, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that is determined in a Final Order to have constituted willful misconduct (including, without limitation, actual fraud) or gross negligence; *provided*, that if any Released Party directly or indirectly brings or asserts any Claim or Cause of Action that has been released or is contemplated to be released pursuant to the Plan in any way arising out of or related to any document or transaction that was in existence prior to the Effective Date against any other Released Party, and such Released Party does not abandon such Claim or Cause of Action upon request, then the release set forth in the Plan shall automatically and retroactively be null and void *ab initio* with respect to the Released Party bringing or asserting such Claim or Cause of Action; *provided, further* that the immediately preceding proviso shall not apply to (i) any action by a Released Party in the Bankruptcy Court (or any

other court determined to have competent jurisdiction), including any appeal therefrom, to prosecute the amount, priority, or secured status of any prepetition or ordinary course administrative Claim against the Debtors or (ii) any release or indemnification provided for in any settlement or granted under any other court order; *provided* that, in the case of (i) and (ii), the Debtors shall retain all defenses related to any such action.  Notwithstanding anything contained herein to the contrary, the foregoing release shall not release any obligation of any party under the Plan or any document, instrument, or agreement executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute its finding that each release described in the Plan is:  (i) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Claims; (ii) in the best interests of the Debtors and all holders of Interests and Claims; (iii) fair, equitable and reasonable; (iv) given and made after due notice and opportunity for hearing; and (v) a bar to the Debtors asserting any claim, Cause of Action or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

(b)      **Releases by Releasing Parties.**

Except as otherwise specifically provided in the Plan or the Confirmation Order, on and after the Effective Date, for good and valuable consideration, including the obligations of the Debtors under the Plan, the Plan Consideration and other contracts, instruments, releases, agreements, or documents executed and delivered in connection with the Plan, each Releasing Party shall be deemed to have consented to the Plan and the restructuring embodied herein for all purposes, and shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from any and all Claims, Interests, obligations, debts, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, asserted or unasserted, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of federal or state laws, or otherwise, including Avoidance Actions, those Causes of Action based on veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability, or otherwise that such Releasing Party would have been legally entitled to assert (whether individually or collectively), based on, relating to or in any manner arising from, in whole or in part, the Debtors, the Estates, the liquidation, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtors and any Releasing Party, excluding any assumed Executory Contract or Unexpired Lease, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Disclosure Statement, the Restructuring Support Agreement, the Plan Supplement, the DIP Credit Agreement and other DIP Loan Documents, the Exit Facility Agreement, the Existing Preferred Equity Interests, the Existing HIT Common Equity Interests, the New HIT Common Equity Interests, the New HITOP Interests, the Amended Constituent Documents, or, in each case,

related agreements, instruments, or other documents, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that is determined in a Final Order to have constituted willful misconduct (including, without limitation, actual fraud) or gross negligence; *provided* that any holder of a Claim or Interest that objects to the releases contained in the Plan shall not receive the benefit of the releases set forth in the Plan (even if for any reason otherwise entitled). Notwithstanding anything contained herein to the contrary, the foregoing release shall not release any obligation of any party (i) under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) under any Executory Contract or Unexpired Lease assumed under the Plan, or (iii) any contract or lease between Non-Debtor Subsidiary and a Releasing Party.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute its finding that each release described in the Plan is:  (i) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Claims; (ii) in the best interests of the Debtors and all holders of Interests and Claims; (iii) fair, equitable, and reasonable; and (iv) given and made after due notice and opportunity for hearing.

(c)     Exculpation.

On the Effective Date, except as otherwise provided in the Plan or the Confirmation Order, for good and valuable consideration, to the maximum extent permissible under applicable law, none of the Exculpated Parties shall have or incur any liability to any holder of any Claim or Interest or any other Person for any act or omission in connection with, or arising out of the Debtors' restructuring, including the negotiation, implementation and execution of the Plan, this Disclosure Statement, the Restructuring Support Agreement, the Plan Supplement, the Chapter 11 Cases, the solicitation of votes for and the pursuit of confirmation of the Plan, the consummation of the Plan, the administration of the Plan, or the property to be distributed under the Plan, including all documents ancillary thereto, all decisions, actions, inactions, and alleged negligence or misconduct relating thereto and all activities leading to the promulgation and confirmation of the Plan except for gross negligence or willful misconduct, each as determined by a Final Order of the Bankruptcy Court.  For purposes of the foregoing, it is expressly understood that any act or omission effected with the approval of the Bankruptcy Court conclusively will be deemed not to constitute gross negligence or willful misconduct unless the approval of the Bankruptcy Court was obtained by fraud or misrepresentation, and in all respects, the applicable Persons shall be entitled to rely on the advice of counsel with respect to their duties and responsibilities under, or in connection with, the Chapter 11 Cases, the Plan, and administration thereof.  The Exculpated Parties have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the distributions of the securities pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the

**solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

(d)     Retention of Causes of Action/Reservation of Rights.

**Except as expressly provided in the Plan or in the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights or Causes of Action that the Debtors or the Estates may have, or that the Debtors may choose to assert on behalf of their Estates, under any provision of the Bankruptcy Code or any applicable non-bankruptcy law, including, without limitation, (i) any and all Causes of Action or claims against any Person or Entity, to the extent such Person or Entity asserts a crossclaim, counterclaim, and/or claim for setoff that seeks affirmative relief against the Debtors, their officers, directors or representatives or (ii) the turnover of any property of the Estates to the Debtors.**

**Except as expressly provided in the Plan or in the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights or Causes of Action that the Debtors had immediately prior to the Petition Date or the Effective Date against or regarding any Claim left Unimpaired by the Plan.  The Debtors shall have, retain, reserve and be entitled to commence, assert and pursue all such rights and Causes of Action as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights respecting any Claim left Unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced.**

**Except as expressly provided in the Plan or in the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to release any post-Effective Date obligations of any party under the Plan, or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

(e)     Solicitation of Plan.

As of and subject to the occurrence of the Confirmation Date:  (a) the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including, without limitation, sections 1125(a), (e), and (g) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation, and (b) the Debtors and their respective directors, officers, employees, affiliates, agents, financial advisors, investment bankers, professionals, accountants, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan, and therefore are not, and on account of such offer, issuance, and solicitation will not be, liable at any time for any violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

Notwithstanding anything herein to the contrary, as of the Effective Date, pursuant to section 1125(e) and (g) of the Bankruptcy Code, the Plan Sponsor, DIP Lender, DIP Agent and each of their respective affiliates, agents, representatives, members, principals, equity holders (regardless of whether such interests are held directly or indirectly), officers, directors, managers, employees, advisors and attorneys shall be deemed to have solicited acceptance of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code and applicable non-bankruptcy law, and to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code and applicable non-bankruptcy law, in the offer, issuance, sale, or purchase of a security offered or sold under the Plan of a Reorganized Debtor, and shall not be liable to any Person on account of such solicitation or participation.

(f)     Reimbursement or Contribution.

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (a) such Claim has been adjudicated as noncontingent or (b) the relevant holder of a Claim has filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

(g)     Recoupment.

In no event shall any holder of a Claim be entitled to recoup such Claim against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

(h)     Subordination Rights.

Any Plan Distributions to holders of Claims or Interests shall be received and retained free from any obligations to hold or transfer the same to any other holder and shall not be subject to levy, garnishment, attachment, or other legal process by any holder by reason of claimed contractual subordination rights.  On the Effective Date, any such subordination rights shall be deemed waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property distributed under the Plan, in each case other than as provided in the Plan; *provided* that any such subordination rights shall be preserved in the event the Confirmation Order is vacated, the Effective Date does not occur in accordance with the terms hereunder or the Plan is revoked or withdrawn.

**8.     Ipso Facto and Similar Provisions Ineffective.**

Any term of any policy, contract or other obligation applicable to a Debtor shall be void and of no further force or effect with respect to any Debtor to the extent such policy, contract, or other obligation is conditioned on, creates an obligation of any Debtor as a result of, or gives rise to a right of any Person based on any of the following: (a) the insolvency or financial condition of

a Debtor; (b) the commencement of the Chapter 11 Cases; (c) the confirmation or consummation of this Plan, including any change of control that shall occur as a result of such consummation; or (d) the Restructuring Transactions.

### 9.    No Successor Liability.

The Plan Sponsor (a) is not, and shall not be deemed to assume, agree to perform, pay or otherwise have any responsibilities for any liabilities or obligations of the Debtors or any other Person relating to or arising out of the operations or the assets of the Debtors on or prior to the Effective Date, (b) is not, and shall not be, a successor to the Debtors by reason of any theory of law or equity or responsible for the knowledge or conduct of any Debtor prior to the Effective Date and (c) shall not have any successor or transferee liability of any kind or character.

### J.    Retention of Jurisdiction

### 1.    Retention of Jurisdiction

(a)    Pursuant to sections 105 and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction, to the fullest extent permissible under law, over all matters arising in, arising under, or related to the Chapter 11 Cases for, among other things, the following purposes:

(i)    To hear and determine all matters relating to the assumption or rejection of Executory Contracts or Unexpired Leases, including whether a contract or lease is or was executory or expired;

(ii)    To hear and determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

(iii)    To hear and resolve any disputes arising from or relating to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004, or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

(iv)    To ensure that Plan Distributions are accomplished as provided herein;

(v)    To consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, including any Administrative Expense Claim;

(vi)    To enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

(vii)   To issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court (including, without limitation, with respect to releases, exculpations and indemnifications);

(viii)   To hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(ix)   To hear and determine all matters relating to the allowance, disallowance, liquidation, classification, priority, or estimation of any Claim;

(x)   To resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

(xi)   To hear and determine disputes arising in connection with or related to the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, the Disclosure Statement, any transactions or payments contemplated hereby, or any agreement, instrument, or other document governing or relating to any of the foregoing (including without limitation the Plan Supplement and the Plan Documents); *provided* that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection or dispute resolution clause that refers disputes to a different court and any disputes concerning documents contained in the Plan Supplement shall be governed in accordance with the provisions of such documents;

(xii)   To take any action and issue such orders, including any such action or orders as may be necessary after occurrence of the Effective Date and/or consummation of the Plan, as may be necessary to construe, enforce, implement, execute, and consummate the Plan, including any release or injunction provisions set forth herein, or to maintain the integrity of the Plan following consummation;

(xiii)   To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(xiv)   To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(xv)     To hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(xvi)    To resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases, the Combined Hearing, the deadline by which to file Administrative Expense Claims, or the deadline for responding or objecting to a cure amount owed pursuant to Bankruptcy Code section 365(b), for the purpose of determining whether a Claim or Interest is discharged hereunder, or for any other purpose;

(xvii)   To recover all assets of the Debtors and property of the Estates, wherever located;

(xviii)  To hear and determine any rights, claims or Causes of Action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal or state statute or legal theory; and

(xix)    To enter a final decree closing the Chapter 11 Cases.

(b)      If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, the provisions of Section 13.1 of the Plan shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## 2.      Courts of Competent Jurisdiction

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## K.     Miscellaneous Provisions

### 1.      Payment of Statutory Fees.

On the Effective Date and thereafter as may be required, the Reorganized Debtors shall pay all fees incurred pursuant to section 1930 of chapter 123 of title 28 of the United States Code, together with interest, if any, pursuant to § 3717 of title 31 of the United States Code for each Debtor's case, or until such time as a final decree is entered closing a particular Debtor's case, a Final Order converting such Debtor's case to a case under chapter 7 of the Bankruptcy Code is entered, or a Final Order dismissing such Debtor's case is entered.

### 2.      Substantial Consummation of the Plan.

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 3.    Expedited Determination of Taxes.

The Reorganized Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods of the Debtors through the Effective Date.

### 4.    Exemption from Certain Transfer Taxes.

Pursuant to, and to the fullest extent permitted by, section 1146 of the Bankruptcy Code, any transfers of property pursuant to, in contemplation of, or in connection with, the Plan, including, without limitation, the Confirmation Order, including (a) the Restructuring Transactions, (b) the issuance of the Plan Consideration, (c) the issuance, transfer or exchange of any securities or instruments, (d) the creation, filing or recording of any Lien, mortgage, deed of trust, or other security interest, (e) the making, assignment, filing or recording of any lease or sublease or the making or delivery of any deed, bill of sale, or other instrument of transfer under, pursuant to, in furtherance of, or in connection with the Plan, including, without limitation, any deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated under the Plan or the reinvesting, transfer, or sale of any real or personal property of the Debtors pursuant to, in implementation of or as contemplated in the Plan (whether to one or more of the Reorganized Debtors or otherwise), (f) the grant of Collateral under the Exit Facility, and (g) the issuance, renewal, modification, or securing of indebtedness shall constitute a "transfer under a plan" within the purview of section 1146 of the Bankruptcy Code and shall not be subject to or taxed under any law imposing any document recording tax, stamp tax, conveyance fee, or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing, or recording fee, regulatory filing or recording fee, sales tax, use tax, or other similar tax or governmental assessment.  Upon entry of the Confirmation Order, the appropriate state or local government officials or agents shall forgo the collection of any such tax or governmental assessment, and consistent with the foregoing, each recorder of deeds or similar official for any county, city, or Governmental Unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.

### 5.    Amendments.

(a)    <u>Plan Modifications</u>.  (i) The Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, and upon the written consent of the Plan Sponsor, to amend, modify, or supplement the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code and (ii) after entry of the Confirmation Order, the Debtors may, upon order of the Bankruptcy Court, amend, modify, or supplement the Plan in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, in each case without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as the Bankruptcy Code may otherwise direct.

(b)    <u>Other Amendments</u>.  After the Confirmation Date, so long as such action does not materially adversely affect the treatment of holders of Claims or Interests

hereunder, and upon the written consent of the Plan Sponsor, the Debtors may remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes and effects of the Plan, and any holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented.  Before the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court; *provided*, that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Interests and which shall be consistent with, and subject to the approvals and consents as set forth in, the RSA.

### 6. Effectuating Documents and Further Transactions.

(a)    Each of the officers of the Reorganized Debtors is authorized, in accordance with his or her authority under the resolutions of the applicable owners, board of directors, and general partners, to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

(b)    On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or the Reorganized Debtors, as applicable, and all holders of Interests and Claims receiving Plan Distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### 7. Revocation or Withdrawal of Plan.

The Debtors reserve the right, subject to the prior written consent of the Plan Sponsor, to revoke or withdraw the Plan prior to the Effective Date as to any or all of the Debtors.  If, with respect to a Debtor, the Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date as to such Debtor does not occur on the Effective Date, then, with respect to such Debtor: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing of or limiting of an amount of any Claim or Interest or Class of Claims or Interests), assumption of Executory Contracts or Unexpired Leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, such Debtor or any other Entity, (ii) prejudice in any manner the rights of such Debtor or any other Entity, or (iii) constitute an admission of any sort by any Debtor or the Plan Sponsor, or any other Entity.

### 8. Severability of Plan Provisions.

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, in each case at the election and the request of the Debtors, shall have the power to alter and interpret such term or

provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration, or interpretation; *provided*, however, that any such holding, alteration, or interpretation shall not affect the approvals and consents as set forth in the RSA. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Reorganized Debtors (as the case may be), and (c) nonseverable and mutually dependent.

### 9.    Governing Law.

Except to the extent that the Bankruptcy Code or other U.S. federal law is applicable, or to the extent an exhibit or schedule hereto, or a schedule in the Plan Supplement provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof; *provided* that corporate, limited partnership, or entity governance matters relating to a Debtor or a Reorganized Debtor shall be governed by the laws of the state of incorporation or organization of the Debtors or the Reorganized Debtors.

### 10.    Time.

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

### 11.    Dates of Actions to Implement the Plan.

In the event that any payment or act under the Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 12.    Immediate Binding Effect.

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the holders of Claims and Interests, the Released Parties, and each of their respective successors and assigns, including, without limitation, the Reorganized Debtors.

### 13.    Deemed Acts.

Subject to and conditioned on the occurrence of the Effective Date, whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed

to have been done or to have occurred without any further act by any party, by virtue of the Plan and the Confirmation Order.

### 14. Successor and Assigns.

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or permitted assign, if any, of each such Entity.

### 15. Entire Agreement.

On the Effective Date, the Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

### 16. Exhibits to Plan.

All exhibits, schedules, supplements, and appendices to the Plan (including the Plan Supplement) are incorporated into and are a part of the Plan as if set forth in full therein.

### 17. Reservation of Rights.

The Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests prior to the Effective Date.

### 18. Plan Supplement.

After any of such documents included in the Plan Supplement are filed, copies of such documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Claims and Noticing Agent's website at http://dm.epiq11.com/HospitalityInvestorsTrust or the Bankruptcy Court's website at https://www.pacer.gov/.

### 19. Waiver or Estoppel.

Each holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers filed with the Bankruptcy Court prior to the Confirmation Date.

20.    **Notices**

To be effective, all notices, requests, and demands to or upon the Debtors shall be in writing (including by electronic mail or facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by electronic mail transmission, when received and telephonically confirmed, addressed as follows:

1.    **The Debtors at:**

   Hospitality Investors Trust, Inc.
   Park Avenue Tower,
   65 East 55th Street, Suite 801
   New York, NY 10022
   Attn: HIT Chapter 11 Notices
   Email:  casenotices@hitreit.com

2.    **Office of the U.S. Trustee at:**

   Office of the United States Trustee for the District of Delaware
   844 King Street, Suite 2207, Lockbox 35
   Wilmington, DE 19801
   Attn:  Joseph J. McMahon, Jr. (joseph.mcmahon@usdoj.gov)

3.    **Counsel to the Debtors at:**

   Proskauer Rose LLP
   70 West Madison
   Suite 3800
   Chicago, IL 60602
   Attn:  Jeff J. Marwil (jmarwil@proskauer.com), Paul V. Possinger (ppossinger@proskauer.com), and Jordan E. Sazant (jsazant@proskauer.com)

   - and -

   Proskauer Rose LLP
   Eleven Times Square
   New York, NY 10036
   Attn:  Joshua A. Esses (jesses@proskauer.com)

   - and -

   Potter Anderson & Corroon LLP
   1313 North Market Street
   Wilmington, DE 19801
   Attn:  Jeremy W. Ryan (jryan@potteranderson.com)

4. **The Plan Sponsor at:**

Brookfield Strategic Real Estate Partners II Hospitality REIT II LLC
250 Vesey Street, 11th Floor
New York, NY 10004
Attn: BPG Transactions Legal (realestatenotices@brookfield.com)

5. **Counsel to the Plan Sponsor at:**

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
Attn: Sean A. O'Neal (soneal@cgsh.com)

- and –

Young Conaway Stargatt & Taylor, LLP
Rodney Square, 1000 King Street
Wilmington, DE 19801
Attn:   Pauline K. Morgan
Email: pmorgan@ycst.com

After the occurrence of the Effective Date, the Reorganized Debtors have authority to send a notice to Entities stating that in order to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entities must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the occurrence of the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities that have filed such renewed requests.

## ARTICLE VII.

## FINANCIAL INFORMATION AND PROJECTIONS

The Debtors believe that the Plan is feasible as required by section 1129(a)(11) of the Bankruptcy Code, because Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors.  In connection with the preparation and development of the Plan and for purposes of determining whether the Plan will satisfy this feasibility standard, the Debtors have analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.

In connection with the Disclosure Statement, the Debtors' senior management team ("Management"), in conjunction with the Debtors' professional advisors, prepared financial projections (the "Financial Projections") for fiscal years 2021 through 2025.  The Financial Projections are based on a number of assumptions made by Management with respect to the future performance of the Reorganized Debtors' operations.

THESE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH PUBLISHED GUIDELINES OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION OR GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS FOR PREPARATION AND PRESENTATION OF PROSPECTIVE FINANCIAL INFORMATION.

ALTHOUGH MANAGEMENT HAS PREPARED THE FINANCIAL PROJECTIONS IN GOOD FAITH AND BELIEVES THE ASSUMPTIONS TO BE REASONABLE, THE DEBTORS AND THE REORGANIZED DEBTORS CAN PROVIDE NO ASSURANCE THAT SUCH ASSUMPTIONS WILL BE REALIZED.  AS DESCRIBED IN DETAIL IN THE DISCLOSURE STATEMENT, A VARIETY OF RISK FACTORS COULD AFFECT THE REORGANIZED DEBTORS' FINANCIAL RESULTS AND MUST BE CONSIDERED. ACCORDINGLY, ANY REVIEW OF THE FINANCIAL PROJECTIONS SHOULD TAKE INTO ACCOUNT THE RISK FACTORS SET FORTH IN THE DISCLOSURE STATEMENT AND THE ASSUMPTIONS DESCRIBED HEREIN, INCLUDING ALL RELEVANT QUALIFICATIONS AND FOOTNOTES.

IN PARTICULAR, THE PROJECTIONS SET FORTH HEREIN CONTEMPLATE THE PERFORMANCE OF THE COMPANY IN A CONSENSUAL PRE-PACKAGED BANKRUPTCY SCENARIO.  THE COMPANY HAS NOT PROVIDED PROJECTIONS THAT CONTEMPLATE A NON-CONSENSUAL, CONTESTED BANKRUPTCY OUTCOME OR THAT CONTEMPLATE ANY MATERIAL DELAY IN EMERGENCE FROM CHAPTER 11. IN EITHER SUCH SCENARIO, IT IS POSSIBLE THAT THE PROJECTIONS PROVIDED HEREIN COULD BE MATERIALLY NEGATIVELY IMPACTED.  THE FINANCIAL PROJECTIONS HEREIN SHOULD ONLY BE UTILIZED AND EVALUATED IN THE CONTEXT OF THE CONSENSUAL PLAN AND THE OVERALL CHAPTER 11 TIMELINE THAT IS CONTEMPLATED BY THIS DISCLOSURE STATEMENT.

**Projected Financial Information**

**A.     Overview of Financial Projections**

As discussed above, the Debtors' management prepared the Financial Projections to support the feasibility of the Plan.

The Financial Projections consist of the selected income statement items and selected balance sheet and cash flow items as of December 31 for each year for calendar years 2021 through 2025.  The Financial Projections do not reflect the impact of "fresh start" accounting, which could result in a material change to the projected values of assets and liabilities.  The Financial Projections contained herein are non-GAAP (Generally Accepted Accounting Principles) and are not audited.

The Financial Projections, among other things: (a) are based upon current and projected market conditions; (b) assume emergence from chapter 11 on the Effective Date under the terms expected in the Plan; (c) assume consummation of certain contemplated amendments and/or renewals to agreements with parties including hotel management companies, Franchisors, and secured lenders.

71

THE FINANCIAL PROJECTIONS ARE BASED UPON A NUMBER OF SIGNIFICANT ASSUMPTIONS. ACTUAL OPERATING RESULTS AND VALUES MAY VARY SIGNIFICANTLY FROM THESE FINANCIAL PROJECTIONS. THE DEBTORS' INDEPENDENT AUDITOR HAS NOT COMPILED OR EXAMINED THE FINANCIAL PROJECTIONS TO DETERMINE THE REASONABLENESS THEREOF AND, ACCORDINGLY, HAS NOT EXPRESSED AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT THERETO. NEITHER THE DEBTORS NOR THE REORGANIZED DEBTORS INTEND TO, AND EACH DISCLAIMS ANY OBLIGATION TO: (A) FURNISH UPDATED FINANCIAL PROJECTIONS TO HOLDERS OF CLAIMS OR INTERESTS PRIOR TO THE EFFECTIVE DATE OR TO ANY OTHER PARTY AFTER THE EFFECTIVE DATE; (B) INCLUDE ANY SUCH UPDATED INFORMATION IN ANY DOCUMENTS THAT MAY BE REQUIRED TO BE FILED WITH THE SECURITIES AND EXCHANGE COMMISSION; OR (C) OTHERWISE MAKE SUCH UPDATED INFORMATION PUBLICLY AVAILABLE.

### B.    General Assumptions

#### 1.    Overview

The Financial Projections have been prepared by management and are based upon the Company's detailed operating forecast for the fiscal years ending December 31, 2021 through 2025. The Financial Projections were developed on a property-by-property, bottom-up basis. After completion of this property-by-property buildup, the individual property financials were aggregated to form the consolidated financials. The Financial Projections are based on various strategic reviews, historical performance, management's view of market dynamics, as well as corresponding assumptions regarding average daily rate ("ADR"), occupancy, revenue per available room ("RevPar"), property-level cost structure, and corporate general and administrative expenses.

#### 2.    Effective Date Assumption

The Financial Projections assume an Effective Date of June 30, 2021.

#### 3.    Net Sales

Net sales include primarily hotel room revenues given the select service nature of the properties. Room revenue is driven by RevPar, a product of ADR and occupancy. Management developed assumptions for each properties' RevPar based on historical performance, expected recovery post-pandemic, regional economic and industry trends, the competitive landscape, the customer base, and other external sources.

#### 4.    Hotel Operating Expenses

Hotel operating expenses are primarily comprised of the following:

    i)    Rooms expense such as labor (housekeeping and rooms operation), reservation systems, room supplies, linen and laundry services;

ii) Food and beverage expense primarily include labor and the cost of food and beverage;

iii) Management fees include (a) base management fees paid to third party property managers and are computed as a percentage of gross revenue and (b) incentive management fees may be paid to third party property managers when operating profit or other performance metrics exceed certain threshold levels; and

iv) Other property-level operating costs.

### 5.  General & Administrative Expenses

General & administrative expenses are primarily comprised of corporate-level salaries and benefits, legal and accounting costs, insurance, rent expenses, and other ancillary expenses.

### 6.  Capital Expenditures

Projected capital expenditures include (i) repair and replacement of furniture, fixtures and equipment and routine capital expenditures (a/k/a FF&E) as required, (ii) brand-mandated PIP, and (iii) any other required capital spending.

### 7.  Debt Balance

The Company's post-emergence debt capital structure includes five primary debt facilities: (i) Pool I Loan, which is scheduled to mature in November 2024 with the exercise of all extension options; (ii) Pool II Loan, which is scheduled to mature in April 2023 with the exercise of an extension option; (iii) Term Loan, which is scheduled to mature in May 2023 with the exercise of all extension options; (iv) HGI JV Loan, which is scheduled to mature in December 2021; and (v) mortgage loan for the Company's minority interest in the Westin Virginia Beach hotel, which is scheduled to mature in May 2024. The Financial Projections assume all debt facilities to be refinanced with terms similar to that of the existing facilities.

## C.    Financial Projections

| ($ in millions) | FY 2021E | FY 2022E | FY 2023E |
|---|---|---|---|
| Net Sales | $ 311 | $ 433 | $ 476 |
| *% Growth* | | *39.3%* | *9.9%* |
| Hotel EBITDA | $ 51 | $ 132 | $ 149 |
| *% Growth* | | *158.9%* | *13.1%* |
| *% Margin* | *16.4%* | *30.5%* | *31.4%* |
| G&A | $ (15) | $ (15) | $ (15) |
| *% Growth* | | *2.1%* | *3.0%* |
| Adj. EBITDA | $ 37 | $ 117 | $ 135 |
| *% Growth* | | *220.2%* | *15.1%* |
| *% Margin* | *11.8%* | *27.1%* | *28.4%* |
| Capital Expenditures | $ (8) | $ (33) | $ (39) |
| Free Cash Flow[1] | $ 29 | $ 84 | $ 96 |
| *% Margin* | *9.3%* | *19.4%* | *20.2%* |
| Interest | $ (46) | $ (52) | $ (54) |
| Principal Repayment | $ (5) | $ (16) | $ (0) |
| Levered Free Cash Flow | $ (23) | $ 16 | $ 42 |
| *% Margin* | *(7.4%)* | *3.7%* | *8.8%* |
| *Memo:* | | | |
| *Properties* | *100* | *100* | *100* |
| *Keys* | *12,421* | *12,421* | *12,421* |
| *RevPAR* | *$64.34* | *$92.46* | *$101.76* |
| *Debt Balance[2]* | *$1,313* | *$1,297* | *$1,297* |

Footnotes:

(1) Defined as Adjusted EBITDA less capital expenditures.

(2) Assumes the exit facility is not drawn.

## ARTICLE VIII.

## TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL SECURITIES LAWS

The Solicitation of votes on the Plan before the Petition Date with respect to the Voting Class is being made pursuant to section 4(a)(2) and Regulation D of the Securities Act and only from holders of such claims or interests who are Accredited Investors as defined in Rule 501 of the Securities Act such that it is exempt from registration under applicable securities laws.

The issuance of and the distribution under the Plan of the New HIT Common Equity Interests and New HITOP Interests to holders of DIP Claims and Allowed Interests in the Voting Class shall be exempt from registration under the Securities Act and any other applicable securities laws pursuant to section 1145 of the Bankruptcy Code.

Recipients of new securities issued under the Plan are advised to consult with their own legal advisers as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

## ARTICLE IX.

## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.     In General.

The following discussion summarizes certain U.S. federal income tax considerations to U.S. Holders (as defined below) of Existing HIT Common Equity Interests that will receive CVRs in exchange for their Existing HIT Common Equity Interests.  This discussion does not address all U.S. federal income tax consequences of the consummation of the Plan, nor does it address any tax consequences other than U.S. federal income tax consequences.  For example, this discussion does not discuss any consequences arising under any state, local, or foreign tax laws.  This discussion is based on the current provisions of the Internal Revenue Code of 1986, as amended (the "Tax Code"), applicable Treasury Regulations promulgated thereunder, judicial decisions, published rulings, and administrative pronouncements of the Internal Revenue Service (the "IRS").  No ruling from the IRS has been sought or will be sought, nor will any opinion of counsel be rendered, regarding the U.S. federal income tax consequences discussed below.  No assurance can be given that the IRS will not take a contrary position as to the U.S. federal income tax consequences of the consummation of the Plan, or that any such contrary position would not be sustained by a court.

Changes in legislative, judicial, or administrative authority or interpretations may occur and may be prospective or retroactive in application.  Any such changes could affect the U.S. federal income tax consequences to U.S. Holders, any other beneficial owners of Interests, or the Debtors, and could alter or modify the statements and conclusions discussed below.  No prediction can be made at this time whether any tax legislation will be enacted or, if enacted, whether any changes in the U.S. federal income tax laws would affect the tax consequences of the consummation of the Plan described below.

This discussion assumes that U.S. Holders hold their Interests as capital assets within the meaning of Section 1221 of the Tax Code (generally, property held for investment). The U.S. federal income tax consequences to any particular U.S. Holder will depend on such U.S. Holder's particular situation. This discussion does not address all U.S. federal income tax considerations that may be relevant to a U.S. Holder, including any alternative minimum tax consequences, and does not address the U.S. federal income tax consequences to a U.S. Holder whose Interest is resolved in a manner not explicitly provided for in the Plan. This discussion also does not address the U.S. federal income tax consequences to U.S. Holders subject to special rules under the U.S. federal income tax laws, including financial institutions, insurance companies, dealers in securities or currencies, certain securities traders, tax-exempt organizations, tax-qualified retirement plans, holders that are not U.S. Holders, U.S. Holders that hold their Interests as part of a straddle, hedge, conversion, synthetic security, or other integrated instrument, U.S. Holders whose functional currency is not the U.S. dollar, U.S. Holders that are partnerships or entities treated as a partnership for federal income tax purposes, U.S. Holders that acquired their Interests in connection with the performance of services, and beneficial owners of any U.S. Holder.

**In addition, the following summary does not address the U.S. federal income tax consequences to the Plan Sponsor, the sole holder of the DIP Claims and the Existing Preferred Equity Interests (the only holder of Interests in the Voting Class), as the Plan Sponsor has engaged counsel to advise it as to the tax consequences of the Plan.**

**EACH U.S. HOLDER SHOULD CONSULT ITS OWN TAX ADVISOR REGARDING THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE EXCHANGE OF EXISTING HIT COMMON EQUITY INTERESTS FOR CVRs, AS WELL AS ANY TAX CONSEQUENCES OTHER THAN U.S. FEDERAL INCOME TAX CONSEQUENCES, INCLUDING ANY CONSEQUENCES ARISING UNDER STATE, LOCAL, OR FOREIGN TAX LAWS.**

B.    **Certain U.S. Federal Income Tax Consequences to Holders with Respect to New Contingent Value Rights**

1.    **Contingent Value Rights (CVRs)**

The term "U.S. Holder" means a beneficial owner of Existing HIT Common Equity Interests that, for U.S. federal income tax purposes, is:

- a citizen or individual resident of the United States;
- a corporation, or other entity classified as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof, or the District of Columbia;
- a trust if (1) a court within the United States is able to exercise primary supervision over the trust's administration, and one or more U.S. persons are authorized to control all substantial decisions of the trust or (2) such trust has a valid election in effect under applicable U.S. Treasury Regulations to be treated as a U.S. person; or
- an estate the income of which is subject to U.S. federal income tax regardless of its source.

The U.S. federal income tax treatment of a U.S. Holder that receives CVRs in exchange for its Existing HIT Common Equity Interests, and payments in respect of its CVRs, as well as the amount, timing, and character of any gain recognized by such a U.S. Holder in such exchange or upon receipt of such payments, is uncertain.  There is no legal authority directly addressing the U.S. federal income tax treatment of the receipt of the CVRs or payments received thereunder in connection with the Plan.  The CVRs may be treated as a contract right that is not an equity interest, may be treated as an open transaction or a closed transaction, or may be subject to another differing tax treatment, such as being treated as an equity interest in Reorganized HIT for U.S. federal income tax purposes.  Because the amount payable under the CVRs is entirely contingent upon future events that will determine the amount of the recoveries to U.S. Holders of Existing HIT Common Equity Interests, it is unlikely that the CVRs would be treated as a debt instrument for U.S. federal income tax purposes.  The Debtors do not intend to treat the CVRs as an equity interest in Reorganized HIT for U.S. federal income tax purposes.

*Treatment as a Closed Transaction.*  Under one approach, the CVRs would be treated as having a fair market value that is "reasonably ascertainable" for U.S. federal income tax purposes and the "closed transaction" method would apply to the exchange.  In this case, a U.S. Holder of Existing HIT Common Equity Interests who receives CVRs would recognize gain or (subject to the next sentence) loss on the exchange in an amount equal to the fair market value of the CVRs less the U.S. Holder's adjusted tax basis in the Existing HIT Common Equity Interests.  However, if the CVRs are treated as stock or securities that are substantially identical to the Existing HIT Common Equity Interests, a U.S. Holder will not recognize a loss on the exchange under the wash sale rules.  Any such gain or loss would be capital gain or loss and, if the Existing HIT Common Equity Interests were held for more than a year, long-term capital gain or loss.  The deductibility of capital losses is subject to limitations.  A U.S. Holder's initial tax basis in the CVRs should equal the fair market value of the CVRs as of the Effective Date.  The holding period of the CVRs will begin on the day after the Effective Date.

Under this approach, subject to the discussion below of Section 483 of the Tax Code, payments made pursuant to the CVRs could be treated as a non-taxable return of a U.S. Holder's adjusted tax basis in the CVR to the extent thereof and then a payment in excess of such amount would give rise to gain or income.  Alternatively, any payment prior to the final payment pursuant to the CVR could give rise to gain or income and the final payment would give rise to gain or loss equal to the difference between that payment and the U.S. Holder's basis in the CVR.  Although not entirely free from doubt, if a CVR expires with remaining adjusted tax basis, a U.S. Holder generally should recognize a loss, which loss likely would be a capital loss, in an amount equal to such U.S. Holder's adjusted tax basis in the CVR.  The deductibility of capital losses is subject to limitations.  Each U.S. Holder should consult its tax advisor regarding the treatment in its particular circumstances of the expiration of a CVR.

*Treatment as an Open Transaction.*  Alternatively, if the fair market value of the CVRs cannot be reasonably ascertained for U.S. federal income tax purposes, then "open transaction" treatment could apply to the exchange.  However, the IRS generally takes the view, consistent with Treasury Regulations, that only in "rare and extraordinary cases" is the value of contingent payment obligations so uncertain that open transaction treatment is available.

If the exchange were treated as an open transaction for U.S. federal income tax purposes, the CVRs would not be treated as consideration received for the Existing HIT Common Equity Interests at the time the CVRs are received in the exchange and the U.S. Holder would have no tax basis in the CVRs. Instead, the U.S. Holder would take payments under the CVRs into account when made or deemed made in accordance with the U.S. Holder's regular method of accounting for U.S. federal income tax purposes. A portion of the payments under the CVR would be treated as interest income under Section 483 of the Tax Code (as discussed below) to the extent of the accrued interest income, then as a recovery of the U.S. Holder's basis in the Existing HIT Common Equity Interests exchanged to the extent thereof, and the balance, in general, as capital gain or income. A U.S. Holder may recognize a loss if the total amounts received pursuant to the CVR do not equal or exceed the U.S. Holder's adjusted basis in the Existing HIT Common Equity Interests exchanged.

_Treatment as an Installment Sale._ A U.S. Holder of Existing HIT Common Equity Interests who receives CVRs and realizes gain on the exchange of its Interests for CVRs may be eligible to report its gain under the installment sale rules. It is unclear whether the CVRs would be treated for U.S federal income tax purposes as the right to receive certain cash payments (as opposed to property) and therefore unclear whether installment treatment is appropriate. If installment treatment does not apply, or if a U.S. Holder affirmatively elects for installment sale treatment not to apply, then the exchange will be treated as an "open transaction" or a "closed transaction," as described above. Each U.S. Holder should consult its tax advisor regarding the availability and application of the installment sale method.

Under the installment sale rules, a U.S. Holder's adjusted tax basis in its Existing HIT Common Equity Interests will be allocated in equal annual increments over the period extending from the Effective Date to the final year of the CVR term. For each taxable year during such period, a U.S. Holder will recognize capital gain or loss equal to the difference between the payments made under the CVR received in such year (excluding any portion treated as interest under Section 483 of the Tax Code, as discussed below) and the U.S. Holder's adjusted tax basis in its Existing HIT Common Equity Interests allocated to such year, plus the excess, if any, of the adjusted tax basis allocated to any prior years over the total payments received in such years. In the final year of the CVR term, to the extent the payments received in that year are less than the adjusted tax basis allocated to the final year plus the excess, if any, of the adjusted tax basis allocated to all prior years over the total payments received in such years, a U.S. Holder will recognize a capital loss equal to that shortfall. The deductibility of capital losses is subject to limitations.

Under the installment sale rules, a taxpayer is permitted to use an alternative method to allocate its adjusted tax basis if it is able to demonstrate that the allocation in equal annual increments will substantially and inappropriately defer recovery of basis and the taxpayer obtains a ruling from the IRS approving the alternative method. Each U.S. Holder should consult its tax advisor regarding the availability of any alternative method to allocate its adjusted tax basis and the timing and process to obtain the IRS ruling.

Under Section 453A of the Tax Code, additional annual interest charges will be imposed each year on the portion of a U.S. Holder's tax liability that is deferred by the installment method in connection with sales of any property (e.g., Existing HIT Common Equity Interests) with a sales

price greater than $150,000, to the extent that the aggregate face amount of installment receivables that arise from all such sales in excess of $150,000 by the U.S. Holder (including rights to payments under a CVR) exceeds $5 million (provided such receivables remain outstanding as of the close of such year).  The application of Section 453A of the Tax Code with respect to contingent rights such as the CVRs is unclear.  Each U.S. Holder should consult its tax advisor regarding the applicability of additional annual interest charges under Section 453A of the Tax Code.

*Section 483 of the Tax Code.*  Under any of the approaches described above, it is possible that a portion of the payments, if any, in respect of the CVRs will be characterized as interest under Section 483 of the Tax Code.  The interest amount will equal the excess of the amount of the CVR payment received over its present value as of the Effective Date, calculated using the applicable federal rate as the discount rate.  If Section 483 applies, a U.S. Holder of CVRs must include the amount of interest in its taxable income using such U.S. Holder's regular method of accounting for U.S. federal income tax purposes.

Because the U.S. federal income tax treatment of the CVRs is uncertain, it is possible that the IRS might successfully assert that payments with respect to the CVRs should be treated as other than described above.  If such a position were sustained, all or part of the CVR payment could be treated as ordinary income and could be required to be included in income prior to receipt. U.S. Holders should consult their own tax advisor with respect to the tax consequences resulting from the receipt of the CVRs pursuant to the Plan, including the proper characterization of the receipt of the CVRs and the potential consequences to them of holding, receiving payments under or disposing of the CVRs.

### 2.    Other Tax Consideration

#### (a)    Net Investment Income Tax.

A U.S. Holder that is an individual or estate, or a trust that does not fall into a special class of trusts that is exempt from such tax, is subject to a 3.8% tax on the lesser of (1) the U.S. Holder's "net investment income" (or "undistributed net investment income" in the case of an estate or trust) for the relevant taxable year and (2) the excess of the U.S. Holder's modified adjusted gross income (or adjusted gross income, in the case of an estate or trust) for the taxable year over a certain threshold (which in the case of individuals is between $125,000 and $250,000, depending on the individual's circumstances).  For this purpose, net investment income generally includes dividend income and net gain recognized with respect to a disposition of stock, unless such dividend income or net gain is derived in the ordinary course of the conduct of a trade or business (other than a trade or business that consists of certain passive or trading activities).  If you are a U.S. Holder that is an individual, estate, or trust, please consult your tax advisor regarding the applicability of the net investment income tax with respect to your disposition of Existing HIT Common Equity Interests.

#### (b)    Information Reporting and Backup Withholding

The Reorganized Debtors (or an agent or payor acting on their behalf) may be obligated to provide information returns to U.S. Holders and/or to the IRS in connection with payments made to U.S. Holders and other transactions occurring pursuant to the Plan.

A U.S. Holder may also be subject to backup withholding with respect to payments received pursuant to the CVRs, unless (i) such U.S. Holder is a corporation or otherwise exempt from backup withholding and demonstrates this fact when required or (ii) provides a correct U.S. federal taxpayer identification number, certifies under penalties of perjury that it is exempt from backup withholding and complies with other applicable requirements. A U.S. Holder that does not provide a correct taxpayer identification number or does not otherwise comply with the applicable requirements may be subject to penalties.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a U.S. Holder's U.S. federal income tax liability, and U.S. Holders may obtain a refund of any excess amounts withheld by timely filing.

**THE FOREGOING DISCUSSION OF CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSIDERATIONS IS FOR GENERAL INFORMATION ONLY AND IS NOT TAX ADVICE. U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS REGARDING THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO THEM OF THE EXCHANGE OF EXISTING HIT COMMON EQUITY INTERESTS FOR CVRs, AS WELL AS ANY OTHER TAX CONSEQUENCES, INCLUDING ANY TAX CONSEQUENCES ARISING UNDER STATE, LOCAL, OR FOREIGN TAX LAWS. NEITHER THE PROPONENTS OF THE PLAN NOR THEIR PROFESSIONALS WILL HAVE ANY LIABILITY TO ANY PERSON ARISING FROM OR RELATED TO THE U.S. FEDERAL, STATE, LOCAL, FOREIGN, OR ANY OTHER TAX CONSEQUENCES OF THE PLAN OR THE FOREGOING DISCUSSION.**

## ARTICLE X.

## CERTAIN RISK FACTORS TO BE CONSIDERED

Prior to voting to accept or reject the Plan, holders of Existing Preferred Equity Interests should read and carefully consider the risk factors set forth below, in addition to the information set forth in this Disclosure Statement together with any attachments, exhibits, or documents incorporated by reference hereto. The factors below should not be regarded as the only risks associated with the Plan or its implementation.

### A.     Certain Bankruptcy Law Considerations

### 1.     General

Although the Debtors believe that the Chapter 11 Cases will be of short duration and will not be materially disruptive to the Company's businesses, the Debtors cannot be certain that this will be the case. Although the Plan is designed to minimize the length of the Chapter 11 Cases and to isolate the Company's operating Non-Debtor Subsidiaries from bankruptcy, it is impossible to predict with certainty the amount of time that one or more of the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed. Even if confirmed on a timely basis, bankruptcy proceedings to confirm the Plan could have an adverse effect on the Debtors' business. Among other things, it is possible that bankruptcy proceedings could adversely affect the Company's relationships with their key vendors, customers, and employees. The

proceedings will also involve additional expense and may divert some of the attention of the Debtors' management away from business operations.

### 2.      Risk Related to the Restructuring Support Agreement

The Restructuring Transactions contemplated herein are subject to, and conditioned upon, the Debtors' entry into the Restructuring Support Agreement, which is conditioned upon the board of directors of HIT determining to enter into the Restructuring Support Agreement.  Such determination is not anticipated to be made until May 19, 2021.  Accordingly, if the Debtors do not obtain authority to enter into the Restructuring Support Agreement, including as a result of any change in circumstances between the date hereof and May 19, 2021, the Debtors may not commence the Chapter 11 Cases and file the Plan and Disclosure Statement, thus foregoing seeking to consummate the Restructuring Transactions.

### 3.      Risk of Non-Confirmation of Plan

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate re-solicitation of votes.  Moreover, the Debtors can make no assurances that they will receive the requisite acceptances to confirm the Plan, and even if the Voting Class votes in favor of the Plan or the requirements for "cramdown" are met with respect to any Class that rejects the Plan, the Bankruptcy Court, which may exercise substantial discretion as a court of equity, may choose not to confirm the Plan.  If the Plan is not confirmed, it is unclear what distributions (if any) holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan of reorganization.

### 4.      Risk of Non-Occurrence of Effective Date

Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to the timing of the Effective Date.  If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Article XI of the Plan, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtors and all holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

### 5.      Risk Related to Obtaining First Day Relief

The Debtors have tried to address potential concerns employees, trade creditors, and other key parties in interest that might arise through a variety of provisions incorporated into or contemplated by the Plan, including the Debtors' intention to seek appropriate court orders to ensure a seamless transition between the Debtors' prepetition and postpetition business operations. However, there can be no guarantee that the Debtors will be successful in obtaining the necessary approvals of the Bankruptcy Court for such relief, and as a result, the Debtors' businesses may suffer.

6. **Risk Related to Parties in Interest Objecting to the Debtors' Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that a party in interest will not object or that the Bankruptcy Court will approve the classifications.

7. **Risk Related to Possible Objections to the Plan**

There is a risk that certain parties could oppose and object to either the entirety of the Plan or specific provisions of the Plan. Although the Debtors believe that the Plan complies with all relevant Bankruptcy Code provisions, there can be no guarantee that a party in interest will not file an objection to the Plan or that the Bankruptcy Court will not sustain such an objection, which may have a material negative impact on the value of the Reorganized Debtors.

8. **Conversion to Chapter 7 Cases**

If no plan of reorganization can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.

B. **Additional Factors Affecting Value of Reorganized Debtors**

1. **Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary**

Certain of the information contained in this Disclosure Statement is, by nature, forward-looking, and contains (i) estimates and assumptions which might ultimately prove to be incorrect, and (ii) projections which may be materially different from actual future experiences. There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be Allowed.

C. **Risks Relating to Debtors' Business and Financial Condition**

1. **Risks Associated with COVID-19 in Debtors' Business and Industry**

The novel coronavirus pandemic has caused a significant decline in travel and demand for hotels and guestrooms, which is adversely impacting the Debtors' businesses. The Debtors anticipate that this trend of significantly lower guest demand and revenue across the Company's hotel portfolio will continue and the extent to which the coronavirus pandemic will ultimately impact financial results will depend on future events, which are unknown and cannot be predicted, including how long the pandemic continues and its severity, new information which may emerge

regarding the coronavirus (including, but not limited to, the development and transmission of any new strains of the virus), the efficacy and acceptance of any vaccines or other remedies developed and actions taken to contain the coronavirus pandemic or its impact, consumer preferences, and the duration of governmental and business restrictions on travel, among others. Additional waves of the coronavirus pandemic could lead to new travel restrictions and reductions in economic activity, resulting in further disruptions to the Company's operations and cash flow.

### 2.    Risks Associated with Capital Markets

The coronavirus pandemic has also adversely impacted credit and capital market conditions and the Debtors may be unable to access these markets until conditions normalize. As a result, although the Company has been successful in executing favorable forbearance and loan modification agreements with certain lenders, delaying scheduled maturity dates into 2021 and beyond, the twin impacts of the decline in operating revenues and limited access to capital markets may render such obligations difficult to repay or refinance and thus require additional modifications of the terms.

### 3.    Reliance on the Value of the Company's Brands

Our success depends on the value of the hotel Franchisors' brands and corporate reputations. The Franchisors' names are integral to the Company's business. Maintaining, promoting, and positioning the brand depends largely on factors outside of the Company's control. Furthermore, the loss of a brand license for any reason, including due to the filing of the Chapter 11 Cases, the failure to make required capital expenditures or to comply with other Franchisor requirements, could adversely impact the Debtors' financial condition and the results of the Company's operations.

### 4.    Post-Effective Date Indebtedness

Following the Effective Date, the Reorganized Debtors expect that the Company will have outstanding funded debt of approximately $1.3 billion, and the obligations under this indebtedness could under certain circumstances become fully or partially recourse to the Debtors. The Reorganized Debtors' and the Company's ability to service their debt obligations will depend on, among other things, the Company's compliance with affirmative and negative covenants, and the Company's future operating performance, which depends partly on economic, financial, competitive, and other factors beyond the Reorganized Debtors' control. The Company may not be able to generate sufficient cash from operations to meet its debt service obligations as well as fund necessary capital expenditures. In addition, if the Company needs to refinance its debt, obtain additional financing, or sell assets or equity, it may not be able to do so on commercially reasonable terms, if at all.

### D.    Factors Relating to Securities to be Issued Under Plan Generally

### 1.    No Current Public Market for Securities

There is currently no market for the New HIT Common Equity Interests, and there can be no assurance as to the development or liquidity of any market for any such securities. The Reorganized Debtors are under no obligation to list any securities on any national securities

exchange.  Therefore, there can be no assurance that any of the foregoing securities will be tradable or liquid at any time after the Effective Date.  If a trading market does not develop or is not maintained, holders of the foregoing securities may experience difficulty in reselling such securities or may be unable to sell them at all.  Even if such a market were to exist, such securities could trade at prices higher or lower than the estimated value set forth in this Disclosure Statement depending upon many factors including, without limitation, prevailing interest rates, markets for similar securities, industry conditions, and the performance of, and investor expectations for, the Reorganized Debtors.  Accordingly, holders of these securities may bear certain risks associated with holding securities for an indefinite period of time.

### 2.    Potential Dilution

The ownership percentage represented by the New HIT Common Equity Interests distributed on the Effective Date under the Plan will be subject to dilution from the conversion of any options, warrants, convertible securities, exercisable securities, or other securities that may be issued post-emergence, including pursuant to any management or employee incentive program.

In the future, similar to all companies, additional equity financings or other share issuances by any of the Reorganized Debtors could adversely affect the value of the New HIT Common Equity Interests issuable upon such conversion.  The amount and dilutive effect of the foregoing could be material.

### E.    Risks Related to Investment in New HIT Common Equity Interests

### 1.    Interests Subordinated to Reorganized Debtors' Indebtedness

In any subsequent liquidation, dissolution, or winding up of the Reorganized Debtors, the New HIT Common Equity Interests will rank below all claims against the Reorganized Debtors.  As a result, holders of the New HIT Common Equity Interests will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of the Reorganized Debtors until after all the Reorganized Debtors' obligations to its creditors have been satisfied.

### 2.    Implied Valuation of New HIT Common Equity Interests Not Intended to Represent Trading Value of New HIT Common Equity Interests

The valuation of the Reorganized Debtors may not represent the trading value of the New HIT Common Equity Interests in public or private markets and is subject to additional uncertainties and contingencies, all of which are difficult to predict.  Actual market prices of such securities at issuance will depend upon, among other things:  (a) prevailing interest rates; (b) conditions in the financial markets; (c) the anticipated initial securities holdings of prepetition creditors, some of whom may prefer to liquidate their investment rather than hold it on a long-term basis; and (d) other factors that generally influence the prices of securities.  The actual market price of the New HIT Common Equity Interests is likely to be volatile.  Many factors, including factors unrelated to the Reorganized Debtors' actual operating performance and other factors not possible to predict, could cause the market price of the New HIT Common Equity Interests to rise and fall.  Accordingly, the implied value, stated herein and in the Plan, of the securities to be issued does

not necessarily reflect, and should not be construed as reflecting, values that will be attained for the New HIT Common Equity Interests in the public or private markets, as applicable.

In addition, the issuance of the New HIT Common Equity Interests pursuant to any employee or management inventive plans established post-Effective Date may adversely affect market price of the New HIT Common Equity Interests, decrease the amount of earnings and assets available for distribution to holders of the New HIT Common Equity Interests, or adversely affect the rights and powers, including voting rights, of the holders of the New HIT Common Equity Interests.

### F.   Additional Factors

#### 1.   Debtors Could Withdraw Plan

If the Debtors breach the Restructuring Support Agreement, they may seek to revoke or withdraw the Plan prior to the Confirmation Date.

#### 2.   Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

#### 3.   No Representations Outside Disclosure Statement Are Authorized

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

#### 4.   No Legal or Tax Advice Is Provided by Disclosure Statement

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each Claim or Interest holder should consult their own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest.

This Disclosure Statement is not legal advice to you.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

#### 5.   No Admission Made

Nothing contained herein or in the Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or holders of Claims or Interests.

# ARTICLE XI.

## VOTING PROCEDURES AND REQUIREMENTS

### A.        Voting Instructions and Voting Deadline

Only holders of Class 5 Existing Preferred Equity Interests are entitled to vote to accept or reject the Plan.  The Debtors are providing copies of this Disclosure Statement (including all exhibits and appendices) and related materials and a ballot (collectively, a "Solicitation Package") to record holders of the Class 5 Existing Preferred Equity Interests.

Each ballot contains detailed voting instructions.  Each ballot also sets forth in detail, among other things, the deadlines, procedures, and instructions for voting to accept or reject the Plan, the Voting Record Date for voting purposes, and the applicable standards for tabulating ballots.  The Voting Record Date for determining which holders are entitled to vote on the Plan is May 17, 2021.

Please complete the information requested on the ballot, sign, date, and indicate your vote on the ballot, and return the completed ballot in accordance with the instructions set forth on the ballot.

FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE ACTUALLY RECEIVED VIA EMAIL BY THE SOLICITATION AGENT AT TABULATION@EPIQGLOBAL.COM NO LATER THAN MAY 18, 2021 (THE "VOTING DEADLINE").

AN OTHERWISE PROPERLY COMPLETED, EXECUTED, AND TIMELY RETURNED BALLOT FAILING TO INDICATE EITHER ACCEPTANCE OR REJECTION OF THE PLAN OR INDICATING BOTH ACCEPTANCE AND REJECTION OF THE PLAN WILL NOT BE COUNTED IN DETERMINING THE ACCEPTANCE OR REJECTION OF THE PLAN.

If you are a holder of an Interest in Class 5 and you did not receive a ballot, received a damaged ballot, or lost your ballot, or if you have any questions concerning the procedures for voting on the Plan, please contact the Solicitation Agent by emailing HITREITinfo@epiqglobal.com.

### B.        Deemed Rejection by Class 6 (Existing HIT Common Equity Interests).

The Debtors will request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code over the deemed rejection of the Plan by Class 6 (Existing HIT Common Equity Interests).  Section 1129(b) of the Bankruptcy Code permits the confirmation of a chapter 11 plan notwithstanding the rejection of such plan by one or more impaired classes of claims or equity interests.  Under section 1129(b), a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each rejecting class.  For a more detailed description of the requirements for confirmation of a nonconsensual plan, *see* Article XII.C hereof.

### C.      Agreements Upon Furnishing Ballots

The delivery of an accepting ballot pursuant to one of the procedures set forth above will constitute the agreement of the Claim holder with respect to such ballot to accept: (i) all of the terms of, and conditions to, the Solicitation; and (ii) the terms of the Plan including the injunction, releases, and exculpations set forth in Sections 12.3–12.6 thereof.  All parties in interest retain their right to object to confirmation of the Plan.

### D.      Change of Vote

Any party that has previously submitted to the Solicitation Agent prior to the Voting Deadline a properly completed ballot may revoke such ballot and change its vote by submitting to the Solicitation Agent prior to the Voting Deadline a subsequent, properly completed ballot for acceptance or rejection of the Plan.

### E.      Waivers of Defects, Irregularities, *etc.*

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of ballots will be determined by the Solicitation Agent and/or the Debtors, as applicable, in their sole discretion, which determination will be final and binding.  The Debtors reserve the right to reject any and all ballots submitted by any of their respective Claim or Interest holders not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, be unlawful.  The Debtors further reserve their respective rights to waive any defects or irregularities or conditions of delivery as to any particular ballot by any of their creditors.  The interpretation (including the ballot and the respective instructions thereto) by the applicable Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties.  Unless waived, any defects or irregularities in connection with deliveries of ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determine.  Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of ballots nor will any of them incur any liabilities for failure to provide such notification.  Unless otherwise directed by the Bankruptcy Court, delivery of such ballots will not be deemed to have been made until such irregularities have been cured or waived.  Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

### F.      Miscellaneous

Unless otherwise ordered by the Bankruptcy Court, ballots that are signed, dated, and timely received, but on which a vote to accept or reject the Plan has not been indicated, will not be counted.  The Debtors, in their sole discretion, may request that the Solicitation Agent attempt to contact such voters to cure any such defects in the ballots.  An otherwise properly executed ballot that attempts to partially accept and partially reject the Plan will not be counted as an acceptance of the Plan.

Under the Bankruptcy Code, for purposes of determining whether the requisite acceptances have been received, only holders of Allowed Interests in the Voting Class that actually vote will be counted.  The failure of a holder to deliver a duly executed ballot to the Solicitation Agent will

be deemed to constitute an abstention by such holder with respect to voting on the Plan and such abstention will not be counted as a vote for or against the Plan.

Except as provided below, unless the ballot is timely submitted to the Solicitation Agent before the Voting Deadline together with any other documents required by such ballot, the Debtors may, in their sole discretion, reject such ballot as invalid, and therefore decline to utilize it in connection with seeking confirmation of the Plan.

## ARTICLE XII.

## CONFIRMATION OF PLAN

### A.      Combined Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a confirmation hearing upon appropriate notice to all required parties.  On, or as promptly as practicable after, the Petition Date, the Debtors will request that the Bankruptcy Court schedule the Combined Hearing.  Notice of the Combined Hearing will be provided to all known creditors and equity holders or their representatives.  The Combined Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjourned date made at the Combined Hearing, at any subsequent adjourned Combined Hearing, or pursuant to a notice filed on the docket of the Chapter 11 Cases and served only upon those parties requesting notice pursuant to Bankruptcy Rule 2002.

### B.      Objections to Confirmation

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and applicable local rules, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the Debtors' estates or properties, the basis for the objection and the specific grounds thereof, and must be filed with the Bankruptcy Court, with a copy to the chambers of the United States Bankruptcy Judge appointed to the Chapter 11 Cases, together with proof of service thereof, and served upon the following parties, including such other parties as the Bankruptcy Court may order:

1.      **The Debtors at:**

> Hospitality Investors Trust, Inc.
> Park Avenue Tower,
> 65 East 55th Street, Suite 801
> New York, NY 10022
> Attn: HIT Chapter 11 Notices
> Email:  casenotices@hitreit.com

2.      **Office of the U.S. Trustee at:**

Office of the United States Trustee for the District of Delaware
844 King Street, Suite 2207, Lockbox 35
Wilmington, DE 19801
Attn:  Joseph J. McMahon, Jr. (joseph.mcmahon@usdoj.gov)

3.      **Counsel to the Debtors at:**

Proskauer Rose LLP
70 West Madison
Suite 3800
Chicago, IL 60602
Attn:  Jeff J. Marwil (jmarwil@proskauer.com), Paul V. Possinger
(ppossinger@proskauer.com), and Jordan E. Sazant
(jsazant@proskauer.com)

- and -

Proskauer Rose LLP
Eleven Times Square
New York, NY 10036
Attn:  Joshua A. Esses (jesses@proskauer.com)

- and -
Potter Anderson & Corroon LLP
1313 North Market Street
Wilmington, DE 19801
Telephone:  (302) 984-6000
Attn:  Jeremy W. Ryan (jryan@potteranderson.com)

4.      **The Plan Sponsor at:**

Brookfield Strategic Real Estate Partners II Hospitality REIT II
LLC
250 Vesey Street, 11th Floor
New York, NY 10004
Attn:  BPG Transactions Legal (realestatenotices@brookfield.com)

5.      **Counsel to the Plan Sponsor at:**

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
Attn:  Sean A. O'Neal (soneal@cgsh.com)

- and –

Young Conaway Stargatt & Taylor, LLP
Rodney Square, 1000 King Street
Wilmington, DE 19801
Attn:   Pauline K. Morgan
Email: pmorgan@ycst.com

> **UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY FILED AND SERVED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

### C.    Requirements for Confirmation of Plan

#### 1.    Requirements of Section 1129(a) of the Bankruptcy Code

##### (a)    General Requirements

At the Combined Hearing, the Bankruptcy Court will determine whether the confirmation requirements specified in section 1129(a) of the Bankruptcy Code have been satisfied including, without limitation, whether:

> (i)      the Plan complies with the applicable provisions of the Bankruptcy Code;

> (ii)     the Debtors have complied with the applicable provisions of the Bankruptcy Code;

> (iii)    the Plan has been proposed in good faith and not by any means forbidden by law;

> (iv)    any payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

> (v)     the Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Reorganized Debtors, an affiliate of the Debtors participating in a Plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of the holders of Claims and Interests and with public policy, and the Debtors have disclosed the identity of any insider who will be employed or retained by the Reorganized Debtors, and the nature of any compensation for such insider;

(vi)    with respect to each Class of Claims or Interests, each holder of an impaired Claim or impaired Interest has either accepted the Plan or will receive or retain under the Plan, on account of such holder's Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code;

(vii)    except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (as discussed further below), each Class of Claims either accepted the Plan or is not impaired under the Plan;

(viii)    except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that administrative expenses and priority Claims, other than Priority Tax Claims, will be paid in full on the Effective Date, and that Priority Tax Claims will receive either payment in full on the Effective Date or deferred cash payments over a period not exceeding five years after the Petition Date, of a value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claims;

(ix)    at least one Class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class;

(x)    confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan; and

(xi)    all fees payable under section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Combined Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date.

(b)    **Best Interests Test**

As noted above, with respect to each impaired class of claims and equity interests, confirmation of a plan requires that each such holder either (i) accept the plan or (ii) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the value such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code. This requirement is referred to as the "best interests test."

This test requires a Bankruptcy Court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

As set forth in the liquidation analysis attached hereto as <u>Exhibit C</u>, the Debtors believe that under the Plan all holders of impaired Claims and Interests will receive property with a value not less than the value such holders would receive in a liquidation under chapter 7 of the Bankruptcy Code.  The Debtors' belief is based primarily on the consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of impaired Claims and Interests.

Specifically, the Debtors believe that the only Impaired non-voting Class under the Plan—Class 6 (Existing HIT Common Equity Interests)—will receive property with a greater value than such holders would receive in a liquidation.  Based on a going concern valuation conducted by the Debtors in conjunction with its professional advisors, the value of the assets of the Debtors—namely, their equity interests in the operating subsidiaries that comprise the Company—is less than total liquidation preference of the Existing HITOP Preferred Interests held by the Plan Sponsor, meaning that common equity in HIT is currently estimated to be valueless.  Further, the liquidation value of the Debtors is substantially less than the going concern valuation, and would fully impair the Existing Preferred Equity Interests, again leaving Existing HIT Common Equity Interests completely out of the money.  Accordingly, the CVRs that holders of Existing HIT Common Equity Interests will receive pursuant to the Plan are greater than the value of property such holders would receive in a liquidation.  The Debtors believe that any liquidation analysis is speculative, as it is necessarily premised on assumptions and estimates, which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtors.  There can be no assurance as to values that would actually be realized in a chapter 7 liquidation nor can there be any assurance that a bankruptcy court will accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

(c)    **Feasibility**

Also as noted above, section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization.  For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan.  As part of this analysis, the Debtors have prepared the Financial Projections provided in Article VII hereof.  Based upon such Financial Projections, the Debtors believe they will have sufficient resources to make all payments required pursuant to the Plan and that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.  Moreover, Article X hereof sets forth certain risk factors that could impact the feasibility of the Plan.

(d)    **Equitable Distribution of Voting Power**

On or before the Effective Date, pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, the organizational documents for the Debtors may be amended as necessary to satisfy the provisions of the Bankruptcy Code and, if so, will include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, (i) a provision prohibiting the issuance of non-voting equity securities, and (ii) a provision setting forth an appropriate distribution of voting power among classes of equity securities possessing voting power.

### 2.    Additional Requirements for Non-Consensual Confirmation

Pursuant to the Plan, holders of Interests in Class 6 (Existing HIT Common Equity Interests) will receive one CVR in respect of each share of the Allowed Existing HIT Common Equity Interests outstanding immediately prior to the Effective Date, but are deemed to reject the Plan regardless of such distribution.  The Debtors submit that, in a liquidation of the Debtors' assets, holders of Interests in Class 6 would not be entitled to any recovery and, therefore, they satisfy the "unfair discrimination" and "fair and equitable" tests, as discussed in further detail below.

### (a)    Unfair Discrimination Test

The "unfair discrimination" test applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan.  A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting Class are treated in a manner consistent with the treatment of other Classes whose legal rights are substantially similar to those of the dissenting Class and if no Class of Claims or Interests receives more than it legally is entitled to receive for its Claims or Interests.  This test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

The Debtors believe the Plan satisfies the "unfair discrimination" test.  Claims and Interests of equal priority are receiving comparable treatment and such treatment is fair under the circumstances.

### (b)    Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.,* secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class.  As to dissenting classes, the test sets different standards depending on the type of claims in such class.  The Debtors believe that the Plan satisfies the "fair and equitable" test with respect to any dissenting Classes, which under the Plan is limited to the Class of Existing HIT Common Equity Interests.

The Bankruptcy Code requires that either (i) each holder of an equity interest receive or retain under the plan property of a value equal to the greater of (x) the fixed liquidation preference or redemption price, if any, of such stock and (y) the value of the stock; or (ii) the holders of equity interests that are junior to any dissenting class of equity interests not receive any property under the plan.  Pursuant to the Plan, holders of Interests in Class 5 (Class 5A (Existing HIT Preferred Interests) and Class 5B (Existing HITOP Preferred Interests)) shall receive (x) their Pro Rata Share, together with the holders of DIP Claims, of 100% of the New HIT Common Equity Interests and (y) their Pro Rata Share of 2% of New HITOP Interests; and are entitled to vote to approve or reject their treatment under the Plan.  Holders of Interests in Class 6 (Existing HIT Common Equity Interests) shall receive one CVR in respect of each share of the Allowed Existing HIT Common Equity Interests outstanding immediately prior to the Effective Date.  The Existing HIT Common Equity Interests do not have a liquidation preference or redemption price, and are currently valueless as demonstrated by the valuation analysis conducted by the Debtors in conjunction with

its professional advisors.  Moreover, there are no classes of junior Interest holders and thus no such Interests will receive any distribution under the Plan.

## ARTICLE XIII.

### ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF PLAN

The Debtors have evaluated several alternatives to the Plan.  After studying these alternatives, the Debtors have concluded that the Plan is the best alternative and will maximize recoveries to parties in interest, assuming confirmation and consummation of the Plan.  If the Plan is not confirmed and consummated, the alternatives to the Plan are (i) the preparation and presentation of an alternative plan of reorganization, (ii) a sale of some or all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, or (iii) a liquidation under chapter 7 of the Bankruptcy Code.

### A.     Alternative Plan of Reorganization

If the Plan is not confirmed, the Debtors (or if the Debtors' exclusive period during which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different plan.  Such a plan might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of the Debtors' assets.  The Debtors, however, submit that the Plan, as described herein, enables their creditors and interest holders to realize the most value under the circumstances.

### B.     Sale Under Section 363 of Bankruptcy Code

If the Plan is not confirmed, the Debtors could seek from the Bankruptcy Court, after notice and a hearing, authorization to sell their assets under section 363 of the Bankruptcy Code.  Upon analysis and consideration of this alternative, the Debtors do not believe a sale of their assets under section 363 of the Bankruptcy Code would yield a higher recovery for holders of Claims and Interests than the Plan.

### C.     Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be appointed to liquidate the assets of the Debtors for distribution to the Debtors' creditors in accordance with the priorities established by the Bankruptcy Code.  As noted in Article XII.C of this Disclosure Statement, the Debtors believe that liquidation under chapter 7 would result in smaller distributions to creditors and interest holders than those provided for in the Plan because of the delay resulting from the conversion of the Chapter 11 Cases and the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals that would be required to become familiar with the many legal and factual issues in the Chapter 11 Cases.

# ARTICLE XIV.

## CONCLUSION AND RECOMMENDATION

The Debtors believe the Plan is in the best interests of all stakeholders and urge the holders of Existing Preferred Equity Interests in the Voting Class to vote in favor thereof.

Dated:  May 18, 2021

Respectfully submitted,

**Hospitality Investors Trust, Inc.; and
Hospitality Investors Trust Operating Partnership,
L.P.**

By:  _/s/ Bruce A. Riggins_
Name:  Bruce A. Riggins
Title:  Chief Financial Officer, Hospitality Investors
Trust, Inc.

# **EXHIBIT A**

**Plan**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| *In re* | Chapter 11 |
| HOSPITALITY INVESTORS TRUST, INC., *et al.*,[1] | Case No. 21-_____(___) |
| Debtors. | (Joint Administration Requested) |

## JOINT PREPACKAGED
## CHAPTER 11 PLAN FOR HOSPITALITY INVESTORS TRUST, INC., AND
## HOSPITALITY INVESTORS TRUST OPERATING PARTNERSHIP, L.P.

**PROSKAUER ROSE LLP**
Jeff J. Marwil (*pro hac vice* pending)
Paul V. Possinger (*pro hac vice* pending)
Jordan E. Sazant (DE Bar No. 6515)
70 West Madison, Suite 3800
Chicago, IL 60602
Telephone:  (312) 962-3550
Facsimile:  (312) 962-3551

**PROSKAUER ROSE LLP**
Joshua A. Esses (*pro hac vice* pending)
Eleven Times Square
New York, NY 10036
Telephone:  (212) 969-3000
Facsimile:  (212) 969-2900

*Proposed Attorneys for Debtors and Debtors
in Possession*

**POTTER ANDERSON & CORROON LLP**
Jeremy W. Ryan (DE Bar No. 4057)
R. Stephen McNeill (DE Bar No. 5210)
1313 North Market Street
Wilmington, DE 19801
Telephone:  (302) 984-6000
Facsimile:  (302) 658-1192

*Proposed Attorneys for Debtors and Debtors
in Possession*

Dated:  May 18, 2021
            Wilmington, Delaware

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Hospitality Investors Trust, Inc. (3668) and Hospitality Investors Trust Operating Partnership, L.P. (0136).  The Debtors' executive offices are located at Park Avenue Tower, 65 East 55th Street, Suite 801, New York, NY 10022.

# TABLE OF CONTENTS

**Page**

ARTICLE I. DEFINITIONS AND INTERPRETATION .................................................................2

ARTICLE II. CERTAIN INTER-CREDITOR AND INTER-DEBTOR ISSUES ......................14

    2.1.    Settlement of Certain Inter-Creditor Issues. .................................................14

    2.2.    Intercompany Claims and Intercompany Interests. ...............................14

ARTICLE III. DIP CLAIMS, ADMINISTRATIVE EXPENSE CLAIMS,
              PROFESSIONAL FEE CLAIMS, AND U.S. TRUSTEE FEES ....................15

    3.1.    DIP Claims.....................................................................................................15

    3.2.    Administrative Expense Claims...................................................................15

    3.3.    Professional Fee Claims................................................................................16

    3.4.    U.S. Trustee Fees. .........................................................................................17

ARTICLE IV. CLASSIFICATION OF CLAIMS AND INTERESTS ........................................17

    4.1.    Classification of Claims and Interests.........................................................17

    4.2.    Unimpaired Classes of Claims and Interests. ...........................................18

    4.3.    Impaired Classes of Claims and Interests. ...............................................18

    4.4.    Separate Classification of Secured Claims. ...............................................18

ARTICLE V. TREATMENT OF CLAIMS AND INTERESTS ..................................................19

    5.1.    Secured Claims (Class 1). ............................................................................19

    5.2.    Unsecured Priority Claims (Class 2)...........................................................19

    5.3.    General Unsecured Claims (Class 3). .......................................................19

    5.4.    Intercompany Claims (Class 4)....................................................................20

    5.5.    Existing Preferred Equity Interests (Class 5)..............................................20

    5.6.    Existing HIT Common Equity Interests (Class 6). ...................................21

    5.7.    Intercompany Interests (Class 7). ...............................................................21

ARTICLE VI. ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF
              REJECTION BY ONE OR MORE CLASSES OF CLAIMS OR
              INTERESTS ...................................................................................................21

    6.1.    Class Acceptance Requirement....................................................................21

    6.2.    Tabulation of Votes on a Non-Consolidated Basis.....................................22

6.3.   Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code or "Cramdown." ........................................................................................22

6.4.   Confirmation of All Cases. .......................................................................22

ARTICLE VII. MEANS FOR IMPLEMENTATION.................................................................22

7.1.   Non-Substantive Consolidation. ...............................................................22

7.2.   Continued Corporate Existence, Vesting of Assets in the Reorganized Debtors, and Assumption of the Indemnification Agreements............................22

7.3.   Compromise of Controversies. .................................................................23

7.4.   Sources of Cash for Plan Distribution. ....................................................24

7.5.   Restructuring Expenses............................................................................24

7.6.   Corporate Action.....................................................................................24

7.7.   Exit Facility.............................................................................................25

7.8.   Authorization and Issuance of New HIT Common Equity Interests. ....................25

7.9.   Exemption from Registration....................................................................26

7.10.  Cancellation of Existing Securities and Agreements.................................26

7.11.  Officers and Board of Directors................................................................27

7.12.  Restructuring Transactions. .....................................................................27

7.13.  Employee Matters. ...................................................................................29

7.14.  Release of Avoidance Actions. ..................................................................29

7.15.  Closing of Chapter 11 Cases.....................................................................29

7.16.  Notice of Effective Date. ..........................................................................30

7.17.  Corporate and Other Action......................................................................30

7.18.  Approval of Plan Documents......................................................................30

ARTICLE VIII. CVR DISTRIBUTIONS AND RELATED MATTERS....................................30

8.1.   CVR Payments.........................................................................................30

8.2.   Maturity Date of CVRs.............................................................................31

8.3.   Securities Law Considerations..................................................................31

8.4.   Certain Covenants.....................................................................................31

8.5.   Reporting..................................................................................................32

8.6.   Inconsistency Between Plan and CVR Agreement......................................32

ARTICLE IX. DISTRIBUTIONS ...............................................................................................32

9.1.   Plan Distributions Generally....................................................................32

9.2.   Distribution Record Date. ........................................................................32

9.3.     Date of Plan Distributions..................................................................................32

9.4.     Disbursing Agent..............................................................................................33

9.5.     Rights and Powers of Disbursing Agent...........................................................33

9.6.     Expenses of Disbursing Agent..........................................................................33

9.7.     Delivery of Plan Distributions. ........................................................................33

9.8.     Proofs of Claim; Disputed Claims Process.......................................................34

9.9.     Postpetition Interest. ........................................................................................34

9.10.    Unclaimed Property. ........................................................................................34

9.11.    Time Bar to Cash Payments..............................................................................35

9.12.    Manner of Payment under Plan.........................................................................35

9.13.    Satisfaction of Claims. .....................................................................................35

9.14.    Setoffs. .............................................................................................................35

9.15.    Withholding and Reporting Requirements. .......................................................36

ARTICLE X. EXECUTORY CONTRACTS AND UNEXPIRED LEASES..............................36

10.1.    General Treatment; Assumption and Rejection of Executory Contracts or
         Unexpired Leases..............................................................................................36

10.2.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. ........37

10.3.    Rejection of Executory Contracts or Unexpired Leases. .......................................38

10.4.    Survival of the Debtors' Indemnification Obligations and Guarantees.................39

10.5.    Severance Contracts and Programs...................................................................39

10.6.    Insurance Policies. ...........................................................................................40

10.7.    Intellectual Property Licenses and Agreements.................................................40

10.8.    Modifications, Amendments, Supplements, Restatements, or Other
         Agreements. .....................................................................................................40

10.9.    Reservation of Rights........................................................................................40

ARTICLE XI. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN ............41

11.1.    Conditions Precedent to Effective Date.............................................................41

11.2.    Waiver of Conditions Precedent. ......................................................................42

11.3.    Effect of Failure of a Condition. .......................................................................42

ARTICLE XII. EFFECT OF CONFIRMATION OF PLAN ......................................................42

12.1.    Vesting of Assets. .............................................................................................42

12.2.    Binding Effect...................................................................................................43

12.3.    Deemed Consent to Change of Control of Debtors. ...........................................43

12.4.    Discharge of Claims and Termination of Interests. ...............................................43

12.5.    Term of Injunctions or Stays.......................................................................................43

12.6.    Injunction. ....................................................................................................................44

12.7.    Releases........................................................................................................................44

12.8.    Ipso Facto and Similar Provisions Ineffective. ..........................................................49

12.9.    No Successor Liability. ................................................................................................49

ARTICLE XIII. RETENTION OF JURISDICTION ....................................................................49

13.1.    Retention of Jurisdiction .............................................................................................50

13.2.    Courts of Competent Jurisdiction ...............................................................................52

ARTICLE XIV. MISCELLANEOUS PROVISIONS.....................................................................52

14.1.    Payment of Statutory Fees. ..........................................................................................52

14.2.    Substantial Consummation of the Plan. .......................................................................52

14.3.    Expedited Determination of Taxes. ..............................................................................52

14.4.    Exemption from Certain Transfer Taxes. ....................................................................53

14.5.    Amendments. ...............................................................................................................53

14.6.    Effectuating Documents and Further Transactions.....................................................54

14.7.    Revocation or Withdrawal of Plan..............................................................................54

14.8.    Severability of Plan Provisions. ..................................................................................54

14.9.    Governing Law. ...........................................................................................................55

14.10.  Time. ............................................................................................................................55

14.11.  Dates of Actions to Implement the Plan. ....................................................................55

14.12.  Immediate Binding Effect............................................................................................55

14.13.  Deemed Acts. ...............................................................................................................55

14.14.  Successor and Assigns. ................................................................................................56

14.15.  Entire Agreement. ........................................................................................................56

14.16.  Exhibits to Plan............................................................................................................56

14.17.  Reservation of Rights...................................................................................................56

14.18.  Plan Supplement. .........................................................................................................56

14.19.  Waiver or Estoppel. .....................................................................................................56

14.20.  Notices .........................................................................................................................56

ARTICLE XV. CONCLUSION AND RECOMMENDATION ....................................................58

# INTRODUCTION[2]

Hospitality Investors Trust, Inc., a Maryland corporation, and Hospitality Investors Trust Operating Partnership, L.P., a Delaware limited partnership, hereby propose the following chapter 11 plan under section 1121(c) of the Bankruptcy Code for the resolution of the outstanding claims against, and equity interests in, the Debtors.

After extensive deliberation, the Debtors determined in their business judgment to commence pre-packaged chapter 11 proceedings pursuant to a restructuring support agreement with the Plan Sponsor that allows the Debtors to rationalize their capital structure and provide a sustainable path forward for the Debtors' business.

The Plan reflects the agreement reached among the Debtors and the Plan Sponsor, as set forth in the Restructuring Support Agreement (attached to the Disclosure Statement), to reorganize via a consensual transaction that will provide for the Debtors' emergence from these chapter 11 proceedings under new ownership by the Plan Sponsor. The Debtors believe that the financial restructuring and the other transactions reflected in the Plan will strengthen the Reorganized Debtors' balance sheet and put them in position to maximize value for all stakeholders.

The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. Reference is made to the Disclosure Statement (distributed contemporaneously herewith) for a discussion of the Debtors' history, businesses, properties, projections, the events leading up to solicitation of the Plan, and for a summary and analysis of the Plan and the treatment provided for herein. The Debtors urge all holders of Existing Preferred Equity Interests entitled to vote on the Plan to review the Disclosure Statement and the Plan in full before voting to accept or reject the Plan. There also are other agreements and documents that will be filed with the Bankruptcy Court after commencement of the Chapter 11 Cases that are referenced in the Plan and the Plan Supplement as exhibits. All such exhibits will be incorporated into and are a part of the Plan as if set forth in full herein. Subject to certain restrictions set forth in the Plan, and the requirements set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and Sections 14.5 and 14.7 of the Plan, the Debtors reserve the right to amend, supplement, amend and restate, modify, revoke, or withdraw the Plan prior to the Effective Date.

The Chapter 11 Cases will be consolidated for procedural purposes only and the Debtors will request that they be jointly administered pursuant to an order of the Bankruptcy Court. The Plan constitutes a separate plan of reorganization for each of the Debtors and, notwithstanding anything herein, the Plan may be confirmed and consummated as to each Debtor separate from, and independent of, confirmation and consummation of the Plan as to any other Debtor. If the Plan cannot be confirmed as to one or both of the Debtors, then the Debtors, with the consent of the Plan Sponsor, (a) may revoke the Plan as to all of the Debtors or (b) may revoke the Plan as to one of the Debtors (and any such Debtor's Chapter 11 Case may be converted, continued, or dismissed) and confirm the Plan as to the remaining Debtor to the extent required without the need for re-solicitation as to any holder of a Claim against or Interest in the Debtors for which the Plan

---

[2]    All capitalized terms used but not defined herein have the meanings set forth in Article I.

is not so revoked.  The Debtors also reserve the right to seek confirmation of the Plan pursuant to the "cram down" provisions contained in section 1129(b) of the Bankruptcy Code with respect to any non-accepting Class.

# ARTICLE I.
## DEFINITIONS AND INTERPRETATION

### A.   Definitions.

The following terms shall have the meanings set forth below (such meanings to be equally applicable to both the singular and plural):

**1.1** *"Administrative Expense Claim"* means any right to payment constituting a cost or expense of administration of the Chapter 11 Cases of the kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to sections 328, 330, 363, 364(c)(1), 365, 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code (other than a DIP Claim, Professional Fee Claim, or a claim for fees arising under 28 U.S.C. § 1930) incurred during the period from the Petition Date to the Effective Date, including: (a) any actual and necessary costs and expenses of preserving the Estates, any actual and necessary costs and expenses of operating the Debtors' business, and any indebtedness or obligations incurred or assumed by the Debtors during the Chapter 11 Cases; and (b) any payment to be made under this Plan to cure a default under an assumed, or assumed and assigned, Executory Contract or Unexpired Lease.

**1.2** *"Allowed"* means, with respect to a Claim or Interest under this Plan, a Claim or Interest that is an Allowed Claim, Allowed Interest, Allowed _____ Claim, or Allowed _____ Interest.

**1.3** *"Allowed Claim", "Allowed Interest", "Allowed _____ Claim"* (with respect to a specific type of Claim), or *"Allowed _____ Interest"* (with respect to a specific type of Interest) means, with respect to a Claim or Interest under this Plan: (a) any Claim or Interest (or a portion thereof) as to which no action to dispute, disallow, deny, equitably subordinate, or otherwise limit recovery with respect thereto, or alter the priority thereof (including a claim objection), has been timely commenced within the applicable period of limitation fixed by this Plan or applicable law, or, if an action to dispute, disallow, deny, equitably subordinate, or otherwise limit recovery with respect thereto, or alter priority thereof, has been timely commenced, to the extent such Claim or Interest has been allowed (whether in whole or in part) by a Final Order of a court of competent jurisdiction with respect to the subject matter; or (b) any Claim or Interest or portion thereof that is allowed (i) in any contract, instrument, or other agreement entered into in connection with the Plan, (ii) pursuant to the terms of the Plan, (iii) by Final Order of the Bankruptcy Court, or (iv) with respect to an Administrative Expense Claim only (x) that was incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases to the extent due and owing without defense, offset, recoupment, or counterclaim of any kind, and (y) that is not otherwise Disputed. For the avoidance of doubt, except as specified under Section 10.3 herein with respect to rejection damage Claims, no holders of Claims or Interests are required to file a Proof of Claim or proof of Interest (or move the Bankruptcy Court for allowance) to be an Allowed Claim or Allowed Interest, as applicable, under the Plan.

**1.4**  *"Amended Constituent Documents"* means, on or after the Effective Date, collectively, the amended and restated by-laws, Limited Partnership Agreement, or similar governing documents and the amended and restated certificates of incorporation, certificate of limited partnership, or other formation documents of the Debtors, each in form and substance reasonably acceptable to the Debtors and the Plan Sponsor.  Forms of the Amended Constituent Documents shall be filed as part of the Plan Supplement.

**1.5**  *"Avoidance Actions"* means any and all avoidance, recovery, subordination or other claims, actions or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under sections 502, 510, 542, 544, 545, and 547 through and including 553 of the Bankruptcy Code.

**1.6**  *"Ballot"* means the form distributed prior to the Petition Date to holders of Impaired Interests entitled to vote on the Plan to indicate their acceptance or rejection of the Plan and approved by the Bankruptcy Court pursuant to the Confirmation Order.

**1.7**  *"Bankruptcy Code"* means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

**1.8**  *"Bankruptcy Court"* means the United States Bankruptcy Court for the District of Delaware, or any other court exercising competent jurisdiction over the Chapter 11 Cases or any proceeding therein.

**1.9**  *"Bankruptcy Rules"* means the Federal Rules of Bankruptcy Procedure, as promulgated by the Supreme Court of the United States under section 2075 of title 28 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases, and any local rules of the Bankruptcy Court.

**1.10**  *"Brookfield Investor"* means, collectively, Brookfield Strategic Real Estate Partners II Hospitality REIT II LLC and its successors and permitted assigns.

**1.11**  *"Business Day"* means any day other than a Saturday, Sunday, or a "legal holiday," as defined in Bankruptcy Rule 9006(a).

**1.12**  *"Cash"* means the legal currency of the United States and equivalents thereof.

**1.13**  *"Causes of Action"* means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise.  Causes of Action also include: (i) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (ii) the right to object to or otherwise contest Claims or Interests; (iii) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (iv) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

**1.14**    *"Chapter 11 Cases"* means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Petition Date in the Bankruptcy Court.

**1.15**    *"Claim"* means any "claim" as defined in section 101(5) of the Bankruptcy Code against the Debtors or property of the Debtors, including any Claim arising after the Petition Date.

**1.16**    *"Claims and Noticing Agent"* means Epiq Corporate Restructuring, LLC or any other entity approved by the Bankruptcy Court to act as the Debtors' claims and noticing agent pursuant to 28 U.S.C. § 156(c).

**1.17**    *"Class"* means each category of Claims or Interests established under Article IV of the Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

**1.18**    *"Collateral"* means any property or interest in property of the Estates subject to a Lien to secure the payment or performance of a Claim, which Lien has not been avoided or is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable state law.

**1.19**    *"Combined Hearing"* means a hearing to be held by the Bankruptcy Court to consider approval of the Disclosure Statement and confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

**1.20**    *"Company"* means the Debtors and their non-Debtor affiliates.

**1.21**    *"Confirmation Date"* means the date on which the Court enters the Confirmation Order on the docket of the Chapter 11 Cases.

**1.22**    *"Confirmation Order"* means the order of the Bankruptcy Court approving the Disclosure Statement pursuant to section 1125 of the Bankruptcy Code and confirming this Plan pursuant to section 1129 of the Bankruptcy Code, which order shall be in form and substance reasonably acceptable to the Debtors and the Plan Sponsor.

**1.23**    *"Cure Claim"* means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's default under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

**1.24**    *"CVR" or "CVRs"* means the contingent value rights of holders of Existing HIT Common Equity Interests, to receive contingent Cash payments pursuant to this Plan and the CVR Agreement.

**1.25**    *"CVR Agent"* means Computershare Inc., and its subsidiary Computershare Trust Company, N.A., as agent with respect to the CVRs, and its successors and assigns (if any).

**1.26**    *"CVR Agreement"* means that certain *Contingent Value Rights Agreement*, to be entered into by and between HIT and the CVR Agent as of the Effective Date, substantially in the form attached hereto as <u>Exhibit A</u>, the terms of which are fully incorporated herein, and shall be in form and substance reasonably acceptable to the Debtors and the Brookfield Investor.

**1.27**    *"CVR Asset Pool"* shall have the meaning ascribed thereto in the CVR Agreement.

**1.28**    *"D&O Liability Insurance Policies"* means all insurance policies for directors', managers', and officers' liability (including employment practices liability and fiduciary liability) maintained by the Debtors prior to the Effective Date, including as such policies may extend to employees, including any such policies that are "run-off" or "tail" policies.

**1.29**    *"Debtors"* means, individually or collectively, as the context requires, HIT and HITOP.

**1.30**    *"DIP Agent"* means Trimont Real Estate Advisors, LLC, solely in its capacity as administrative agent and collateral agent under the DIP Credit Agreement, and its successors and assigns.

**1.31**    *"DIP Claims"* means all Claims against any Debtor on account of, arising under or relating to the DIP Obligations.

**1.32**    *"DIP Credit Agreement"* means that certain debtor-in-possession credit agreement, substantially in the form of Exhibit A to the proposed Interim DIP Order and Exhibit A to the *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Secured Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expenses Claims; (II) Modifying the Automatic Stay; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief,* by and among the Debtors, the DIP Lender, and the DIP Agent, (as it may be amended, modified, or supplemented from time to time on the terms and conditions set forth therein), in the aggregate amount of $65 million, and in form and substance acceptable to the Debtors and to the DIP Lender, in its sole discretion.

**1.33**    *"DIP Facility"* means the senior secured, super-priority debtor-in-possession loan facility made available to the Debtors pursuant to the DIP Credit Agreement and the Interim DIP Order and/or Final DIP Order.

**1.34**    *"DIP Facility Undrawn Amount"* means an amount equal to (a) $65 million <u>minus</u> (b) the total principal amount of commitments funded by the DIP Lenders to the Debtors under the DIP Credit Agreement prior to the Effective Date.

**1.35**    *"DIP Financing Invested Capital Amount"* shall have the meaning ascribed thereto in the CVR Agreement.

**1.36**    *"DIP Lender"* means the Initial DIP Lender and any party that becomes a "Lender" (as defined in the DIP Credit Agreement), in each case, for so long as such party holds loans or commitments under the DIP Credit Agreement.

**1.37**    *"DIP Loan Documents"* means the "Loan Documents" as defined in the DIP Credit Agreement, each in form and substance acceptable to the Debtors and to the DIP Lender, in its sole discretion.

**1.38**    *"DIP Obligations"* means the "Obligations" as such term is defined in the DIP Credit Agreement.

**1.39**    *"Disallowed"* means any Claim, or any portion thereof, that has been disallowed by Final Order, pursuant to a provision in this Plan or the Confirmation Order, or pursuant to a settlement between the Debtors, with the consent of the Plan Sponsor, or Reorganized Debtor, as applicable.

**1.40**    *"Disbursing Agent"* means, as applicable, Reorganized HIT or the entity designated by Reorganized HIT to distribute the Plan Consideration.

**1.41**    *"Disclosure Statement"* means the disclosure statement that relates to this Plan, including all exhibits and schedules annexed thereto or referred to therein (in each case, as it or they may be amended, modified, or supplemented from time to time), in form and substance reasonably acceptable to the Debtors and the Plan Sponsor.

**1.42**    *"Disputed"* means, with respect to a Claim or Interest, that portion (including, when appropriate, the whole) of such Claim or Interest that: (a) (i) has not been scheduled by the Debtors in their Schedules, if filed with the Bankruptcy Court, or has been scheduled in a lesser amount or different priority than the amount or priority asserted by the holder of such Claim or Interest, or (ii) has been scheduled as contingent, unliquidated or disputed and for which no Proof of Claim has been timely filed; (b) is the subject of an objection or request for estimation filed in the Bankruptcy Court which has not been withdrawn or overruled by a Final Order; and/or (c) is otherwise disputed by the Debtors in accordance with applicable law or contract, which dispute has not been withdrawn, resolved or overruled by Final Order.

**1.43**    *"Effective Date"* means the date specified by the Debtors in a notice filed with the Bankruptcy Court as the date on which the Plan shall take effect, which date shall be the first Business Day on which all of the conditions set forth in Section 11.1 of this Plan have been satisfied or waived in accordance with the terms hereof and no stay of the Confirmation Order is in effect.

**1.44**    *"Employee Arrangements"* means any employee compensation plans, benefit plans, employment agreements, offer letters, or award letters to which any Debtor is a party.

**1.45**    *"Entity"* shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

**1.46**    *"Equity Security"* means an "equity security" as defined in section 101(16) of the Bankruptcy Code.

**1.47**    *"Estate"* means each estate created in the Chapter 11 Cases pursuant to section 541 of the Bankruptcy Code.

**1.48**    *"Exchange Act"* means the Exchange Act of 1934, as amended.

**1.49**    *"Exculpated Parties"* means collectively and solely in their capacity as such, (a) the Debtors, (b) the Plan Sponsor (c) the DIP Lender, (d) the DIP Agent, and (e) for each of the foregoing Entities in (a) through (d), each such Entity's (and each such Entity's current and former affiliates' and subsidiaries') predecessors, successors and assigns, current and former equity holders (regardless of whether such interests are held directly or indirectly), directors and officers (and any professionals for such directors and officers, in their capacity as such), managers, principals, stockholders, shareholders, members, employees, agents, advisory board members,

financial advisors, partners, attorneys, accountants, managed accounts or funds, management companies, fund advisors, investment bankers, consultants, representatives, and all other retained Professional Persons (in each case solely to the extent serving in such capacity as of the Petition Date).

1.50    *"Executory Contract"* means a contract or lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

1.51    *"Existing HIT Common Equity Interests"* means all existing Interests (other than Intercompany Interests and Existing Preferred Equity Interests) in HIT that are outstanding immediately prior to the Effective Date.

1.52    *"Existing HIT Preferred Interests"* means the sole issued and outstanding redeemable preferred share in HIT, held by the Plan Sponsor.

1.53    *"Existing HITOP Preferred Interests"* means the Class C preferred units of limited partnership interests in HITOP issued in accordance with the *Limited Partnership Agreement and pursuant to that certain Securities Purchase, Voting, and Standstill Agreement* dated January 12, 2017, by and between the Debtors and the Plan Sponsor.

1.54    *"Existing Preferred Equity Interests"* means the Existing HIT Preferred Interests and the Existing HITOP Preferred Interests, collectively.

1.55    *"Exit Facility"* means the secured exit loan facility provided under the Exit Facility Agreement as of the Effective Date, which shall be (i) used for general corporate purposes, including, without limitation, the payment of deferred franchise fees and loan modification fees and (ii) in form and substance acceptable to the Debtors and to the Plan Sponsor, in its sole discretion.

1.56    *"Exit Facility Agent"* means the administrative agent, solely in its capacity as such, under the Exit Facility Agreement and any of its successors or assigns.

1.57    *"Exit Facility Agreement"* means, on and after the Effective Date, that certain credit and guaranty agreement, to be dated on or about the Effective Date, by and among the Reorganized Debtors, the Exit Facility Agent, and the Exit Facility Lender, including any and all documents and instruments executed in connection therewith (in each case, as it may be amended, modified or supplemented from time to time on the terms and conditions set forth therein). The Exit Facility Agreement shall (A) (i) provide for a maximum drawn principal amount of (a) $25 million plus (b) the DIP Facility Undrawn Amount, (ii) bear interest at 15.00 percent per annum payable in cash or in kind, (iii) mature on the date that is three years from the Effective Date and (B) be (x) in form and substance acceptable to the Debtors and to the Exit Facility Lender, in its sole discretion, (y) in form and substance consistent with the DIP Credit Agreement, except as otherwise provided in this Section 1.57, and (z) filed as part of the Plan Supplement.

1.58    *"Exit Facility Lender"* means an affiliate of the Plan Sponsor in its capacity as the lender under the Exit Facility Agreement, and its respective successors and permitted assigns.

**1.59** **_"Fee Escrow Account"_** means an account, either interest-bearing or non-interest bearing, in an amount equal to the total estimated amount (subject to the DIP Budget (as defined in the Interim DIP Order and Final DIP Order)) of unpaid Professional Fee Claims and funded by the Debtors on the Effective Date.

**1.60** **_"Final DIP Order"_** means the Final Order of the Bankruptcy Court authorizing and approving, _inter alia_, the Debtors' entry into the DIP Credit Agreement, in form and substance acceptable to the Debtors and to the Plan Sponsor, its sole discretion.

**1.61** **_"Final Order"_** means an order, ruling or judgment of the Bankruptcy Court or in the applicable court of competent jurisdiction that has been entered on the docket in the Chapter 11 Cases, which has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for a new trial, reargument, or rehearing shall then be pending or (ii) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired; _provided_, that no order or judgment shall fail to be a Final Order solely because of the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure has been or may be filed with respect to such order or judgment; _provided_, _further_, that no order or judgment shall fail to be a Final Order solely because of the susceptibility of a Claim to a challenge under section 502(j) of the Bankruptcy Code.

**1.62** **_"General Unsecured Claim"_** means any Claim other than: (a) a Secured Claim; (b) a DIP Claim; (c) an Unsecured Priority Claims; (d) an Administrative Expense Claim; (e) a Professional Fee Claim; (f) a claim for fees arising under 28 U.S.C. § 1930; and (g) an Intercompany Claim.

**1.63** **_"Governmental Unit"_** means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

**1.64** **_"HIT"_** means Hospitality Investors Trust, Inc., a Maryland corporation.

**1.65** **_"HITOP"_** means Hospitality Investors Trust Operating Partnership, L.P., a Delaware limited partnership.

**1.66** **_"Impaired"_** means, when used in reference to a Class, any Class that is impaired within the meaning of section 1124 of the Bankruptcy Code.

**1.67** **_"Incentive Equity Awards"_** means awards of, or in respect of, Existing HIT Common Equity Interests under the Incentive Equity Plan.

**1.68** **_"Incentive Equity Plan"_** means the _Amended and Restated Employee and Director Incentive Restricted Share Plan of Hospitality Investors Trust, Inc._, as in effect from time to time.

**1.69** **_"Indemnification Agreements"_** means those certain prepetition agreements of the Debtors to indemnify and hold harmless the managers, directors, officers, or employees of the Debtors who

served in such capacity, which agreements are to be assumed according to the provisions of this Plan, including, without limitation, that certain: (i) *Indemnification Agreement*, dated as of December 31, 2014, by and between HIT (f/k/a American Realty Capital Hospitality Trust, Inc.), and the Indemnitee (as defined therein) parties thereto; (ii) *Indemnification Agreement*, dated as of March 31, 2017, by and between HIT and Lowell G. Baron; (iii) *Indemnification Agreement*, dated as of March 31, 2017, by and between HIT and Edward A. Glickman; (iv) *Indemnification Agreement*, dated as of March 31, 2017, by and between HIT and Edward T. Hoganson; (v) *Indemnification Agreement*, dated as of March 31, 2017, by and between HIT and Paul C. Hughes; (vi) *Indemnification Agreement*, dated as of March 31, 2017, by and between HIT and Stephen P. Joyce; (vii) *Indemnification Agreement*, dated as of March 31, 2017, by and between HIT and Jonathan P. Mehlman; (viii) *Indemnification Agreement*, dated as of March 31, 2017, by and between HIT and Stanley R. Perla; (ix) *Indemnification Agreement*, dated as of March 31, 2017, by and between HIT and Abby M. Wenzel; (x) *Indemnification Agreement*, dated as of March 31, 2017, by and between HIT and Bruce G. Wiles; and (xi) *Indemnification Agreement*, dated as of May 8, 2019, by and between HIT and Bruce A. Riggins.

**1.70**    **"Independent Director"** is defined to be an "independent director" as defined under Listing Rule 303A.02 of the New York Stock Exchange Listed Company Manual or any successor provision.

**1.71**    **"Initial DIP Lender"** means Brookfield Strategic Real Estate Partners II Hospitality REIT II LLC.

**1.72**    **"Intercompany Claims"** means the Claims against a Debtor held by another Debtor.

**1.73**    **"Intercompany Interests"** means Interests held by a Debtor.

**1.74**    **"Interest"** means the interest (whether legal, equitable, contractual, or otherwise) of any holders of any class of Equity Securities of the Debtors, represented by shares of common or preferred stock, limited partnership interests or other instruments evidencing an ownership interest in the Debtors, whether or not certificated, transferable, voting or denominated "stock" or a similar security, or any option, warrant or right, contractual or otherwise, to acquire any such interest, including, for the avoidance of doubt, the (a) Existing HIT Common Equity Interests, (b) Incentive Equity Awards, (c) Existing Preferred Equity Interests, and (d) any Claim that is determined to be subordinated to the status of an Equity Security by Final Order of the Bankruptcy Court, whether under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.

**1.75**    **"Interim DIP Order"** means the interim order(s) of the Bankruptcy Court authorizing and approving, *inter alia*, the Debtors' entry into the DIP Credit Agreement on an interim basis, in form and substance acceptable to the Debtors and to the Plan Sponsor, in its sole discretion.

**1.76**    **"Lien"** has the meaning set forth in section 101(37) of the Bankruptcy Code.

**1.77**    **"Limited Partnership Agreement"** means that certain Amended and Restated Agreement of Limited Partnership of HITOP, dated as of March 31, 2017 (as amended from time to time).

**1.78**    **"Monetization Event"** shall have the meaning ascribed thereto in the CVR Agreement.

**1.79** *"New Board"* means the board of directors of Reorganized HIT, which shall initially be comprised of at least four (4) members chosen by the Plan Sponsor, at least one of which shall be an Independent Director.

**1.80** *"New HIT Common Equity Interests"* means the new common equity interests to be issued by Reorganized HIT under this Plan.

**1.81** *"New HITOP Interests"* means the new equity interests, including units, to be issued by Reorganized HITOP under this Plan.

**1.82** *"Non-Debtor Subsidiary"* means any direct or indirect majority owned subsidiary of the Debtors that is not a Debtor in the Chapter 11 Cases.

**1.83** *"Person"* means any individual, corporation, partnership, association, indenture trustee, limited liability company, cooperative, organization, joint stock company, joint venture, estate, fund, trust, unincorporated organization, Governmental Unit or any political subdivision thereof, or any other entity or organization of whatever nature.

**1.84** *"Petition Date"* means May 19, 2021.

**1.85** *"Plan"* means this chapter 11 plan proposed by the Debtors, including the Plan Supplement, all applicable exhibits, supplements, appendices, and schedules hereto and to the Plan Supplement, either in its present form or as the same may be altered, amended, or modified from time to time in accordance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, and the terms hereof, and which shall be in form and substance reasonably acceptable to the Debtors and the Plan Sponsor.

**1.86** *"Plan Consideration"* means, with respect to any Class of Claims or Interests entitled to distributions under this Plan, one or more of Cash, CVRs, New HIT Common Equity Interests, or New HITOP Interests, as applicable.

**1.87** *"Plan Distribution"* means the distribution of the Plan Consideration under the Plan.

**1.88** *"Plan Documents"* means the applicable documents, other than this Plan, to be executed, delivered, assumed, and/or performed in connection with the consummation of this Plan, including the documents to be included in the Plan Supplement and any and all exhibits to this Plan and the Disclosure Statement, each of which shall be in form and substance acceptable to the Debtors and the Plan Sponsor.

**1.89** *"Plan Sponsor"* means the Brookfield Investor.

**1.90** *"Plan Supplement"* means the supplemental appendix to this Plan (as may be amended, modified and/or supplemented) which the Debtors shall file by seven (7) calendar days prior to the deadline for filing objections to this Plan (provided that the Debtors may amend, supplement, or otherwise modify the Plan Supplement prior to the Combined Hearing and/or in accordance with the Plan), which may contain, among other things, draft forms, signed copies, or summaries of material terms, as the case may be, of the following: (a) Amended Constituent Documents; (b) the Exit Facility Agreement; (c) the Schedule of Rejected Contracts and Leases; (d) the list of proposed

directors, officers, and/or managers of the other Reorganized Debtors, as applicable, including the New Board; (e) the compensation arrangement for any insider of the Debtors who will be an officer of the Reorganized Debtors; and (f) any additional documents filed with the Bankruptcy Court before the Effective Date as additional Plan Documents and/or amendments to the Plan Supplement; *provided*, that unless consent rights are otherwise expressly set forth in this Plan, each of the documents in the Plan Supplement (whether or not set forth above), including any alteration, restatement, modification, or replacement thereto, shall be in form and substance reasonably acceptable to the Debtors and Plan Sponsor or as otherwise required by the RSA.

1.91    *"Priority Non-Tax Claim"* means any Claim, other than an Administrative Expense Claim, a Professional Fee Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

1.92    *"Priority Tax Claim"* means any Claim of a Governmental Unit of the kind entitled to priority in payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.93    *"Pro Rata Share"* means, with respect to Allowed Claims or Interests, the proportion that an Allowed Claim or Interest bears to the sum of all Allowed Claims or Interests within such Class.

1.94    *"Professional Fee Claims"* means an Administrative Expense Claim of a Professional Person against the Debtors for compensation for services rendered or reimbursement of costs, expenses or other charges and disbursements incurred during the period from the Petition Date up to, and including, the Effective Date.

1.95    *"Professional Persons"* means all Persons retained by order of the Bankruptcy Court in connection with the Chapter 11 Cases, pursuant to sections 327 or 328 of the Bankruptcy Code, excluding any ordinary course professionals retained pursuant to an order of the Bankruptcy Court or otherwise.

1.96    *"Proof of Claim"* means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

1.97    *"Released Parties"* means (a) the Debtors, (b) the Non-Debtor Subsidiaries, (c) the Reorganized Debtors, (d) the Plan Sponsor, (e) the DIP Lender, (f) the DIP Agent, and (g) for each of the foregoing Entities in (a) through (f), each such Entity's (and each such Entity's current and former affiliates' and subsidiaries') predecessors, successors and assigns, current and former equity holders (regardless of whether such interests are held directly or indirectly), directors and officers (and any professionals for such directors and officers, in their capacity as such), managers, principals, stockholders, shareholders, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, managed accounts or funds, management companies, fund advisors, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; *provided*, however, that a holder of an Existing HIT Common Equity Interest, in such capacity, shall not be a Released Party.

1.98    *"Releasing Parties"* means collectively and solely in their capacity as such, (a) each Released Party, and (b) as to each of the foregoing Entities, each such Entity's (and each such Entity's current and former affiliates' and subsidiaries') predecessors, successors and assigns, current and former equity holders (regardless of whether such interests are held directly or

indirectly), directors and officers (and any professionals for such directors and officers, in their capacity as such), managers, principals, stockholders, shareholders, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, managed accounts or funds, management companies, fund advisors, investment bankers, consultants, representatives, and other professionals; *provided* that the current or former directors, officers, managers, and employees of the Debtors shall not grant releases against the Debtors or Reorganized Debtors with respect to the Indemnification Agreements and Employee Arrangements; *provided further*, *however*, that a holder of an Existing HIT Common Equity Interest, in such capacity, shall not be a Releasing Party.

**1.99** *"Reorganized _____"* means, as the context requires, HIT, HITOP, and the Debtors, on and after the Effective Date, after giving effect to the transactions occurring on the Effective Date in accordance with this Plan.

**1.100** *"Restructuring Expenses"* shall refer to the expenses as described in Section 3(d) of the Restructuring Support Agreement.

**1.101** *"Restructuring Support Agreement" or "RSA"* means that certain *Restructuring Support Agreement*, to be entered into by and among the Debtors and the Plan Sponsor (as may be amended, supplemented, or otherwise modified from time to time in accordance with its terms), which provides for, among other things, the implementation and execution of the Restructuring Transactions (as defined in Section 7.12 of this Plan).

**1.102** *"Schedule of Rejected Contracts and Leases"* means, if filed, a schedule of the contracts and leases to be rejected by the Debtors pursuant to section 365 of the Bankruptcy Code and Article X hereof.  The Schedule of Rejected Contracts and Leases shall be filed as part of the Plan Supplement and may be amended from time to time until the Effective Date, and shall be reasonably acceptable to the Debtors and the Plan Sponsor.

**1.103** *"Schedules"* means, if filed with the Bankruptcy Court, the Debtors' schedules of assets and liabilities and statements of financial affairs, as amended or supplemented from time to time.

**1.104** *"Secured Claim"* means a Claim (a) that is secured by a valid, perfected, and enforceable Lien on Collateral, to the extent of the value of the Claim holder's interest in such Collateral as of the Confirmation Date or (b) to the extent that the holder thereof has a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

**1.105** *"Securities Act"* means the Securities Act of 1933, as amended.

**1.106** *"Securities Laws"* means, collectively, the Exchange Act and Securities Act.

**1.107** *"Unexpired Lease"* means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

**1.108** *"Unimpaired"* means any Claim or Interest in any Class that is not Impaired.

**1.109** *"Unsecured Priority Claims"* means, collectively, the Priority Non-Tax Claims and the Priority Tax Claims.

**1.110** *"U.S. Trustee"* means the United States Trustee for Region 3.

**1.111** *"U.S. Trustee Fees"* means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

**1.112** *"Voting Class"* means Class 5.

**B.     Interpretation; Application of Definitions and Rules of Construction.**

1.   General.

Unless otherwise specified, all section, exhibit, article, or schedule references in this Plan are references to the respective section, exhibit, article, or schedule of or to this Plan. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular article, section, subsection, or clause contained therein.  Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.  The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of this Plan.  The captions and headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  Any reference to an entity as a holder of a Claim or Interest includes that entity's successors and assigns.  Any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions.  Any reference in the Plan to an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified, or supplemented.  In the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine, and the neuter gender.  "$" or "dollars" means Dollars in lawful currency of the United States of America.

2.   Rule of "Contra Proferentum" Not Applicable.

This Plan is the product of extensive negotiations between and among, inter alia, the Debtors the Plan Sponsor and certain other creditors and constituencies.  Each of the foregoing was represented by independent counsel of their choice who either (i) participated in the formulation and documentation of or (ii) was afforded the opportunity to review and provide comments on, the Plan, the Disclosure Statement, and the documents ancillary thereto. Accordingly, unless explicitly stated otherwise, the general rule of contract construction known as "*contra proferentum*" shall not apply to the construction or interpretation of any provision of this Plan, the Disclosure Statement, or any exhibit, schedule, contract, instrument, release, or other document generated in connection therewith as concerns such parties identified above.

**C.     RSA; Consent Rights Required.**

Notwithstanding anything herein to the contrary, so long as the RSA has not been terminated in accordance with its terms, any and all consents and approval rights of the respective parties as set forth in the RSA with respect to (i) the form and substance of this Plan, (ii) the documents to be filed as part of the Plan Supplement, (iii) the other Plan Documents, (iv) any other orders or documents referenced herein or otherwise to be executed in connection with the transactions contemplated hereunder, and/or (v) any other Definitive Documents (as defined in the RSA), including, in each case, any amendments, restatements, supplements, or other modifications thereto, and any consents, waivers, or other deviations under or from any such documents, shall be expressly incorporated herein by this reference and fully enforceable as if stated in full herein; *provided*, *however* (as stated above) the terms of the Confirmation Order and then the Plan control if there is any inconsistency or ambiguity.

### D.    Appendices and Plan Documents.

All Plan Documents and appendices to the Plan are incorporated into the Plan by reference and are a part of the Plan as if set forth in full herein.  The documents contained in the exhibits and Plan Supplement shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.  Holders of Claims and Interests and any other party in interest may review the Plan Documents by accessing the Claims and Noticing Agent's website at http://dm.epiq11.com/HospitalityInvestorsTrust or emailing HITREITinfo@epiqglobal.com.

## ARTICLE II.

## CERTAIN INTER-CREDITOR AND INTER-DEBTOR ISSUES

### 2.1.    *Settlement of Certain Inter-Creditor Issues.*

Pursuant to section 1129 of the Bankruptcy Code, and in consideration for the distributions and other benefits provided under the Plan, the treatment of Claims and Interests under this Plan represents, among other things, the settlement and compromise of certain potential inter-creditor claims and disputes.

### 2.2.    *Intercompany Claims and Intercompany Interests.*

(a)    Intercompany Claims.

Notwithstanding anything to the contrary herein, on the Effective Date, any and all Intercompany Claims shall be reinstated and otherwise survive the Debtors' restructuring by virtue of such Intercompany Claims being left Unimpaired.  To the extent any such Intercompany Claim is reinstated, or otherwise adjusted (including by contribution, distribution in exchange for new debt or equity, or otherwise), paid, or continued as of the Effective Date, any such transaction may be effected on or after the Effective Date without any further action by the Bankruptcy Court, act

or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

(b)    Intercompany Interests.

Notwithstanding anything to the contrary herein, on or after the Effective Date, any and all Intercompany Interests shall be reinstated.

## ARTICLE III.

## DIP CLAIMS, ADMINISTRATIVE EXPENSE CLAIMS, PROFESSIONAL FEE CLAIMS, AND U.S. TRUSTEE FEES

All Claims and Interests, except DIP Claims, Administrative Expense Claims, Professional Fee Claims, and U.S. Trustee Fees, are placed in the Classes set forth in Article IV below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims (including DIP Claims), Professional Fee Claims, and U.S. Trustee Fees have not been classified, and the holders thereof are not entitled to vote on this Plan.  A Claim or Interest is placed in a particular Class only to the extent that such Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under this Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code.  However, a Claim or Interest is placed in a particular Class for the purpose of receiving Plan Distributions only to the extent that such Claim or Interest is an Allowed Claim or an Allowed Interest and has not been paid, released or otherwise settled prior to the Effective Date.

### 3.1.    *DIP Claims*.

The DIP Claims shall be Allowed in the full amount due and owing under the DIP Credit Agreement and the other DIP Loan Documents.  Pursuant to the Restructuring Support Agreement, the DIP Lender has agreed to convert its DIP Claims into its Pro Rata Share, together with the holders of Existing Preferred Equity Interests, of 100% of the New HIT Common Equity Interests.

Upon the distribution of Plan Consideration to the holder of the DIP Claims, all Liens and security interests granted to the DIP Agent to secure the DIP Claims shall be deemed cancelled and shall be of no further force and effect, and the Allowed DIP Claims shall be deemed to be fully satisfied, settled, released, and discharged.

### 3.2.    *Administrative Expense Claims*.

Except with respect to Allowed Administrative Expense Claims that are Professional Fee Claims, to the extent that a holder of an Allowed Administrative Expense Claim (including a claim arising under section 503(b)(9) of the Bankruptcy Code that has not been paid pursuant to a motion filed in accordance with the Bankruptcy Code), together with the Debtors

and the Plan Sponsor, agrees to a less favorable treatment, each holder of an Allowed Administrative Expense Claim shall be paid in full in Cash on the later of (a) the Effective Date or (b) the date such Allowed Administrative Expense Claim becomes due and payable in accordance with its terms (or as soon thereafter as is practicable); *provided, however*, that Allowed Administrative Expense Claims that arise in the ordinary course of the Debtors' business, including administrative claims arising from or with respect to the sale of goods or services on or after the Petition Date and the Debtors' Executory Contracts and Unexpired Leases, shall be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions, without further action by the holders of such Administrative Expense Claims or further approval by the Bankruptcy Court.

### 3.3. *Professional Fee Claims*.

Except to the extent that the applicable holder of an Allowed Professional Fee Claim agrees to a less favorable treatment, together with the Debtors and the Plan Sponsor, each holder of a Professional Fee Claim shall be paid in full in Cash pursuant to this Section 3.3.

(a) <u>Fee Applications</u>

All Entities seeking an award by the Bankruptcy Court of Professional Fee Claims shall file and serve on counsel for the Reorganized Debtors, the U.S. Trustee, counsel for the DIP Lender, and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, or other order of the Court, on or before the date that is forty-five (45) days after the Effective Date, their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred from the Petition Date through the Effective Date.  Objections to any Professional Fee Claims must be filed and served on counsel for the Reorganized Debtors, counsel for the DIP Lender, and the requesting party no later than twenty-one (21) calendar days after the filing of the final applications for compensation or reimbursement (unless otherwise agreed by the party requesting compensation of a Professional Fee Claim).

(b) <u>Post-Effective Date Fees</u>

Upon the Effective Date, any requirement that Professional Persons comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay all Professional Persons without any further notice to, action by or order or approval of the Bankruptcy Court or any other party.

(c) <u>Fee Escrow Account</u>

On or after the Effective Date, the Debtors shall establish and fund the Fee Escrow Account.  The Debtors shall fund the Fee Escrow Account with Cash equal to the Debtors' good faith estimate of the Allowed Professional Fee Claims (subject to the DIP Budget (as defined in the Interim DIP Order and Final DIP Order)).  Funds held in the Fee Escrow Account shall not be considered property of the Debtors' Estates or property of the Debtors, but shall revert to the Debtors only after all Allowed Professional Fee Claims have been paid in full.  Fees owing to the

applicable holder of an Allowed Professional Fee Claim shall be paid in Cash to such holder from funds held in the Fee Escrow Account when such Claims are Allowed by an order of the Bankruptcy Court or authorized to be paid under a Final Order authorizing compensation of Professional Persons; *provided*, that the Debtors' obligations with respect to Allowed Professional Fee Claims shall not be limited by nor deemed limited to the balance of funds held in the Fee Escrow Account.  To the extent that funds held in the Fee Escrow Account are insufficient to satisfy the amount of accrued Allowed Professional Fee Claims, each holder of an Allowed Professional Fee Claim shall have an Allowed Administrative Expense Claim for any such deficiency, which shall be satisfied in accordance with this Section 3.3 of this Plan.  The Fee Escrow Account shall be free and clear of all Liens, Claims, and encumbrances other than the residual interests of the Reorganized Debtors as set forth herein.

### 3.4.    *U.S. Trustee Fees*.

The Debtors shall pay all outstanding U.S. Trustee Fees on an ongoing basis on the date such U.S. Trustee Fees become due, until such time as a final decree is entered closing the Chapter 11 Cases, the Chapter 11 Cases are converted or dismissed, or the Bankruptcy Court orders otherwise.

## ARTICLE IV.

## CLASSIFICATION OF CLAIMS AND INTERESTS

### 4.1.    *Classification of Claims and Interests*.

The following table designates the Classes of Claims against and Interests in the Debtors, and specifies which Classes are: (a) Impaired or Unimpaired by this Plan; (b) entitled to vote to accept or reject this Plan in accordance with section 1126 of the Bankruptcy Code; and (c) presumed to accept or reject this Plan.

| Class | | Designation | Impairment | Entitled to Vote |
|---|---|---|---|---|
| Class 1 | | Secured Claims | No | No (Presumed to accept) |
| Class 2 | | Unsecured Priority Claims | No | No (Presumed to accept) |
| Class 3 | | General Unsecured Claims | No | No (Presumed to accept) |
| Class 4 | | Intercompany Claims | No | No (Presumed to accept) |
| Class 5 | Class 5A | Existing HIT Preferred Interests | Yes | Yes |
| | Class 5B | Existing HITOP Preferred Interests | Yes | Yes |
| Class 6 | | Existing HIT Common Equity Interests | Yes | No (Presumed to reject) |
| Class 7 | | Intercompany Interests | No | No (Presumed to accept) |

If a controversy arises regarding whether any Claim or Interest is properly classified under the Plan, the Bankruptcy Court shall, upon proper motion and notice, determine such controversy at the Combined Hearing. If the Bankruptcy Court finds that the classification of any Claim or Interest is improper, then such Claim or Interest shall be reclassified and the Ballot previously cast by the holder of such Claim or Interest shall be counted in, and the Claim or Interest shall receive the treatment prescribed in, the Class in which the Bankruptcy Court determines such Claim or Interest should have been classified, without the necessity of resoliciting any votes on the Plan.

### 4.2. *Unimpaired Classes of Claims and Interests*.

The following Classes of Claims are Unimpaired and, therefore, presumed to have accepted this Plan and are not entitled to vote on this Plan under section 1126(f) of the Bankruptcy Code:

(a)     Class 1:  Class 1 consists of all Secured Claims.

(b)     Class 2:  Class 2 consists of all Unsecured Priority Claims.

(c)     Class 3:  Class 3 consists of all General Unsecured Claims.

(d)     Class 4:  Class 4 consists of all Intercompany Claims.

(e)     Class 7:  Class 7 consists of all Intercompany Interests.

### 4.3. *Impaired Classes of Claims and Interests*.

The following Class of Interests is Impaired and entitled to vote on this Plan:

(a)     Class 5:  Class 5 consists of all Existing Preferred Equity Interests in Class 5A (Existing HIT Preferred Interests), and Class 5B (Existing HITOP Preferred Interests).

The following Class of Interests is Impaired and deemed to have rejected this Plan and, therefore, is not entitled to vote on this Plan under section 1126(g) of the Bankruptcy Code:

(b)     Class 6:  Class 6 consists of all Existing HIT Common Equity Interests.

### 4.4. *Separate Classification of Secured Claims*.

Although all Secured Claims have been placed in one Class for purposes of nomenclature, each Secured Claim, to the extent secured by a Lien on Collateral different than that securing any additional Secured Claims, shall be treated as being in a separate sub-Class for the purpose of receiving Plan Distributions.

## ARTICLE V.

## TREATMENT OF CLAIMS AND INTERESTS

### 5.1.  *Secured Claims (Class 1)*.

(a)  Treatment: On the Effective Date or as soon as reasonably practicable thereafter in the ordinary course of business, except to the extent that a holder of a Secured Claim already has been paid during the Chapter 11 Cases or such holder, together with the Debtors, agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Secured Claim, each holder of an Allowed Secured Claim shall receive, at the sole option of the Debtors with the consent of the Plan Sponsor, either (i) payment in full, in Cash, of the unpaid portion of its Allowed Secured Claim, (ii) delivery of the Collateral securing such Allowed Secured Claim, or (iii) other treatment such that the Secured Claim shall be rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code.

(b)  Voting: Class 1 is Unimpaired, and the holders of Allowed Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Allowed Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited.

### 5.2.  *Unsecured Priority Claims (Class 2)*.

(a)  Treatment:  On the Effective Date or as soon as reasonably practicable thereafter in the ordinary course of business, except to the extent that a holder of an Allowed Unsecured Priority Claim already has been paid during the Chapter 11 Cases or such holder, together with the Debtors, agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Unsecured Priority Claim, each holder of an Allowed Unsecured Priority Claim shall receive payment in full in Cash or as otherwise provided in the Bankruptcy Code.  Any ad valorem taxes and other taxes/fees will be extended to maximum statutory periods under, *inter alia*, 11 U.S.C. § 1129(a)(9)(C).  Holders of such Claims will be rendered Unimpaired and as such will be deemed to have accepted the Plan and will not be entitled to vote.

(b)  Voting:  Class 2 is Unimpaired, and the holders of Allowed Unsecured Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Allowed Unsecured Priority Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited.

### 5.3.  *General Unsecured Claims (Class 3)*.

(a)  Treatment:  On or as soon as reasonably practicable after the Effective Date, except to the extent that a holder of an Allowed General Unsecured Claim, together with the Debtors, agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed General Unsecured Claim, each holder of an Allowed General Unsecured Claim shall (i) have its Allowed General Unsecured Claim reinstated, and paid in full, on the later to occur of the Effective Date or when such Allowed General Unsecured Claim becomes due in the ordinary course of the Debtors' or Reorganized Debtors'

business operations or (ii) have its Allowed General Unsecured Claim otherwise rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code.

(b)     Voting:  Class 3 is Unimpaired, and the holders of Allowed General Unsecured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Allowed General Unsecured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited.

### 5.4.     *Intercompany Claims (Class 4).*

(a)     Treatment:  On the Effective Date, Allowed Intercompany Claims shall be reinstated.

(b)     Voting:  Class 4 is Unimpaired, and the holders of Allowed Intercompany Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Allowed Intercompany Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited.

### 5.5.     *Existing Preferred Equity Interests (Class 5).*

(a)     ***Existing HIT Preferred Interests (Class 5A).***

(i)     Treatment:  On the Effective Date, all outstanding shares, units, and interests (and rights, warrants, options, or other interests to acquire shares and interests) of the Existing HIT Preferred Interests will be extinguished in exchange for each holder's Pro Rata Share, together with the holders of DIP Claims (exclusive, for the avoidance of doubt, of Claims in respect of the DIP Facility Undrawn Amount) and Class 5B Interests, of 100% of the New HIT Common Equity Interests issued on the Effective Date.

(ii)     Voting:  Class 5A is Impaired, and the holders of Allowed Existing HIT Preferred Interests will be entitled to vote to accept or reject the Plan.

(b)     ***Existing HITOP Preferred Interests (Class 5B).***

(i)     Treatment:  On the Effective Date, (x) 98% of the outstanding shares, units, and interests (and rights, warrants, options, or other interests to acquire shares and interests) of the Existing HITOP Preferred Interests will be transferred to HIT in exchange for each holder's Pro Rata Share, together with the holders of DIP Claims (exclusive, for the avoidance of doubt, of Claims in respect of the DIP Facility Undrawn Amount, of 100% of the New HIT Common Equity Interests issued on the Effective Date and (y) 2% of the outstanding shares, units, and interests (and rights, warrants, options, or other interests to acquire shares and interests) of the Existing HITOP Preferred Interests will be canceled in

exchange for each holder's Pro Rata Share of 2% of New HITOP Interests.

(ii)    Voting:  Class 5B is Impaired, and the holders of Allowed Existing HITOP Preferred Interests will be entitled to vote to accept or reject the Plan.

### 5.6.    *Existing HIT Common Equity Interests (Class 6).*

(a)    Treatment:  On the Effective Date, the Allowed Existing HIT Common Equity Interests shall be cancelled, extinguished and discharged in exchange for each holder receiving one CVR in respect of each share of the Allowed Existing HIT Common Equity Interests outstanding immediately prior to the Effective Date and such holders shall be automatically deemed to have accepted the terms of the CVR Agreement and to be a party thereto, in each case in accordance with the terms of the CVR Agreement.

Notwithstanding the foregoing, the Plan Sponsor has agreed that, on the Effective Date, any Existing HIT Common Equity Interests held by the Plan Sponsor shall be deemed to be fully vested, and shall not entitle the Plan Sponsor to any distributions of CVRs.

(b)    Voting:  Class 6 is Impaired.  Each holder of the Allowed Existing HIT Common Equity Interests will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and will not be entitled to vote to accept or reject the Plan.

### 5.7.    *Intercompany Interests (Class 7).*

(a)    Treatment:  On the Effective Date, the Allowed Intercompany Interests will be retained by the existing holders.

(b)    Voting:  Class 7 is Unimpaired, and the holders of Allowed Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  In addition, there are no non-insider claimants in Class 7 to solicit.  Therefore, holders of Allowed Intercompany Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited.

## ARTICLE VI.

## ACCEPTANCE OR REJECTION OF
## THE PLAN; EFFECT OF REJECTION BY ONE
## OR MORE CLASSES OF CLAIMS OR INTERESTS

### 6.1.    *Class Acceptance Requirement*.

A Class of Claims that is Impaired under the Plan shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of holders of the Allowed Claims in such Class that have voted on the Plan.  A Class of Interests that is Impaired under the Plan shall have accepted the Plan if it is accepted by holders of at least two-thirds in amount of such Interests that have voted on the Plan.

**6.2.**     *Tabulation of Votes on a Non-Consolidated Basis*.

All votes on the Plan shall be tabulated on a non-consolidated basis by Class and by Debtor for the purpose of determining whether the Plan satisfies sections 1129(a)(8) and/or (10) of the Bankruptcy Code.

**6.3.**     *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code or "Cramdown."*

Because Class 6 is deemed to have rejected this Plan, the Debtors will request confirmation of this Plan, as it may be modified or amended from time to time, under section 1129(b) of the Bankruptcy Code with respect to such Class.  Subject to Sections 14.5 and 14.7 of this Plan, the Debtors reserve the right (i) to suspend, revoke or withdraw this Plan, (ii) to alter, amend, or modify this Plan, or, (iii) to alter, amend, modify, revoke, or withdraw any Plan Document, to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary, in each case of clauses (i)–(iii) only upon the prior written consent of the Plan Sponsor in accordance with the RSA.

**6.4.**     *Confirmation of All Cases*.

Except as otherwise specified herein, the Plan shall not be deemed to have been confirmed unless and until the Plan has been confirmed as to each of the Debtors; *provided*, *however*, that the Debtors, with the prior written consent of the Plan Sponsor, may at any time waive this Section 6.4.

# ARTICLE VII.

## MEANS FOR IMPLEMENTATION

**7.1.**     *Non-Substantive Consolidation*.

The Plan is a joint plan that does not provide for substantive consolidation of the Debtors' Estates, and on the Effective Date, the Debtors' Estates shall not be deemed to be substantively consolidated for purposes hereof.  Except as specifically set forth herein, nothing in this Plan shall constitute or be deemed to constitute an admission that any one of the Debtors is subject to or liable for any claim against any other Debtor.  Additionally, claimants holding Claims and Interests against multiple Debtors, to the extent Allowed in each Debtor's Chapter 11 Case, will be treated as holding a separate Claim or separate Interest, as applicable, against each Debtor's Estate; *provided*, *however*, that no holder of an Allowed Claim shall be entitled to receive more than payment in full of such Allowed Claim.

**7.2.**     *Continued Corporate Existence, Vesting of Assets in the Reorganized Debtors, and Assumption of the Indemnification Agreements*.

(a)     Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement (including the Restructuring

Transactions (defined below)), on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, limited partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, limited partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective charter and by-laws (or other analogous formation documents) in effect before the Effective Date, except to the extent such charter or bylaws (or other analogous formation documents) is amended by the Plan, the Amended Constituent Documents, or otherwise, and to the extent any such document is amended, such document is deemed to be amended pursuant to the Plan and will be effective without any further action or approval (other than any requisite filings required under applicable state or federal law).

(b)     Except as otherwise provided in this Plan, on and after the Effective Date, all property of the Debtors' Estates, wherever located, including, without limitation, all claims, rights, Causes of Action, tax attributes (including, without limitation, net operating losses) and rights in respect thereof, and any property, wherever located, and whether acquired by the Debtors under or in connection with this Plan or otherwise, shall vest in the Reorganized Debtors free and clear of all Claims, Liens, charges, other encumbrances and Interests.  On and after the Effective Date, the Reorganized Debtors may operate their business and may use, acquire and dispose of property, wherever located, and prosecute, compromise or settle any Claims (including any Administrative Expense Claims) and Causes of Action without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by this Plan or the Confirmation Order.  Without limiting the foregoing, the Reorganized Debtors may pay the charges that each incurs on or after the Effective Date for Professional Persons' fees, disbursements, expenses or related support services without application to the Bankruptcy Court.

(c)     On the Effective Date, the Reorganized Debtors shall assume the Indemnifications Agreements.  The Indemnification Agreements shall (a) remain in full force and effect on and after the Effective Date and (b) not be modified, reduced, or discharged without the consent of the beneficiaries thereof.

### 7.3.     *Compromise of Controversies.*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and as consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan constitute a good-faith compromise and settlement of all Claims and controversies resolved under the Plan, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under Bankruptcy Rule 9019, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are within the range of reasonableness, in the best interests of the Debtors, their Estates, their creditors, and other parties in interest, and fair and equitable.  Each provision of the Plan constitutes a part of this settlement that is non-severable from the remaining terms of the Plan.

### 7.4.    *Sources of Cash for Plan Distribution.*

Except as otherwise provided in the Plan or Confirmation Order, all Cash required for the payments to be made hereunder shall be obtained from the Debtors' and the Reorganized Debtors' operations, Cash balances, including Cash provided under the DIP Facility, and the Exit Facility.

### 7.5.    *Restructuring Expenses.*

To the extent not otherwise paid, the Debtors or the Reorganized Debtors, as applicable, shall promptly pay outstanding and invoiced Restructuring Expenses as follows:  (a) on the Effective Date, Restructuring Expenses incurred during the period prior to the Effective Date to the extent invoiced to the Debtors at least one (1) day in advance of the Effective Date and (b) after the Effective Date, any unpaid Restructuring Expenses within ten (10) Business Days of receiving an invoice; *provided*, that such Restructuring Expenses shall be paid in accordance with the terms of any applicable engagement letters or other contractual arrangements without the requirement for the filing of retention applications, fee applications, or any other applications in the Chapter 11 Cases, and without any requirement for further notice or Bankruptcy Court review or approval, except as otherwise provided in Section 3.3 hereof with respect to Professional Fee Claims.

### 7.6.    *Corporate Action.*

(a)    On the Effective Date, and subject to Section 7.13 hereof, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects.  Among other things, on the Effective Date, the following transactions shall be deemed to have occurred at 11:59 P.M. Eastern Time and shall occur in the sequence described herein: (i) Reorganized HIT shall issue to the holders of DIP Claims the New HIT Common Equity Interests described in Section 3.1 of the Plan, (ii) Reorganized HIT shall issue to the holders of Existing Preferred Equity Interests the New HIT Common Equity Interests described in Section 5.5 of the Plan, which collectively with the New HIT Common Equity Interests exchanged for the DIP Claims, shall constitute 100% of the New HIT Common Equity Interests issued on the Effective Date; (iii) Reorganized HIT shall retain its existing Interests in HITOP; (iv) the Existing HITOP Preferred Interest received by HIT pursuant to Section 5.5(b)(i)(x) of the Plan shall be contributed to HITOP in exchange for 98% of New HITOP Interests issued on the Effective Date; (v) the Existing HITOP Preferred Interests described in Section 5.5(b)(i)(y) of the Plan shall be exchanged for 2% of New HITOP Interests issued on the Effective Date; (vi) Reorganized HIT shall enter into the CVR Agreement, entitling each holder of Existing HIT Common Equity Interests to one CVR for each share of Allowed Existing HIT Common Equity Interests held by such holder pursuant to Section 5.6 of the Plan, and the CVRs shall be deemed to be issued in accordance with the terms of the CVR Agreement; and (vii) the Reorganized Debtors shall enter into the Exit Facility provided by the Exit Facility Lender pursuant to the terms of the Exit Facility Agreement.

(b)    Upon the Effective Date, all matters provided for in the Plan involving the corporate or limited partnership structure of the Reorganized Debtors, and any corporate or limited partnership action required by or of the Debtors or the Reorganized Debtors in connection with

the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders (upon whom the same shall be binding), directors, general partners, managers, or officers of the Debtors or Reorganized Debtors.  On or (as applicable) before the Effective Date, the appropriate officers, general partners, or managers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, deliver, and perform or cause to be performed, the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effectuate the Restructuring Transactions) in the name of and on behalf of the Reorganized Debtors, including the Exit Facility and any and all other agreements, documents, securities, and instruments relating to the foregoing, to the extent not previously authorized by the Bankruptcy Court.  These authorizations and approvals shall be effective notwithstanding and without regard to any requirements under non-bankruptcy law.

### 7.7. *Exit Facility.*

(a)     On the Effective Date, the Reorganized Debtors shall enter into the Exit Facility, which shall be in form and substance acceptable to the Debtors and the Exit Facility Lender.

(b)     The Confirmation Order shall constitute approval of the Exit Facility (including the transactions contemplated thereby and all payments contemplated thereunder, all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid or to be paid by the Reorganized Debtors in connection therewith), and authorization for the Reorganized Debtors to enter into and perform under the Exit Facility Agreement and such other related documents, and make such payment and any other payment in connection therewith as may be required or appropriate.

(c)     The Reorganized Debtors shall be authorized to execute, deliver, and enter into and perform under the Exit Facility without the need for any further corporate or limited partnership action and without further action by the holders of Claims or Interests.

### 7.8. *Authorization and Issuance of New HIT Common Equity Interests.*

(a)     All existing Interests in HIT shall be cancelled as of the Effective Date and, on the Effective Date, the Debtors or the Reorganized Debtors, as applicable, are authorized to issue or cause to be issued and shall issue the New HIT Common Equity Interests to the Plan Sponsor in accordance with the terms of the Plan and in the amounts determined by the Plan Sponsor, each without the need for any further corporate action.  All of the New HIT Common Equity Interests, when so issued, shall be duly authorized, validly issued, fully paid, and non-assessable.

(b)     Upon the Effective Date, unless otherwise consented to by the Plan Sponsor, (i) the New HIT Common Equity Interests shall not be registered under the Securities Laws, and shall not be listed for public trading on any securities exchange, and (ii) none of the Reorganized Debtors shall be a reporting company under the Exchange Act.  Except as provided in the Plan or

the Confirmation Order, the New HIT Common Equity Interests to be distributed under the Plan shall be issued in the names of such holders or their nominees.

### 7.9.    *Exemption from Registration.*

(a)    The offer, issuance, and distribution of the New HIT Common Equity Interests and New HITOP Interests shall be exempt, pursuant to section 1145 of the Bankruptcy Code, if applicable, or any similar federal, state, or local law in reliance on section 4(a)(2) of the Securities Act, or Regulation D promulgated thereunder, or such other exemption as may be available, without further act or action by any Entity, from registration under (i) the Securities Laws, as amended, and all rules and regulations promulgated thereunder, and (ii) any state or local law requiring registration for the offer, issuance, or distribution of securities.

(b)    The New HIT Common Equity Interests and New HITOP Interests shall be issued without registration under the Securities Laws, as amended, or any similar federal, state, or local law in reliance on available exemptions or section 1145 of the Bankruptcy Code and, if applicable, shall be freely tradable by the recipients thereof, subject to: (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act; (ii) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments; and (iii) any applicable regulatory approval.

(c)    Notwithstanding anything to the contrary in the Plan, no entity shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New HIT Common Equity Interests, the New HITOP Interests, and the shares thereof issued are exempt from registration, settlement, and depository services.

### 7.10.    *Cancellation of Existing Securities and Agreements.*

(a)    Except for the purpose of evidencing a right to a Plan Distribution under the Plan and except as otherwise set forth in the Plan, including with respect to Executory Contracts or Unexpired Leases that shall be assumed by the Debtors, on the Effective Date, all agreements, instruments, and other documents evidencing any Existing Preferred Equity Interest, the Existing HIT Common Equity Interests, or any other Interest (other than Intercompany Interests that are not modified by the Plan) and any rights of any holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged.

(b)    Notwithstanding such cancellation and discharge, and subject to Section 7.13 hereof, the Existing Preferred Equity Interests and the Existing HIT Common Equity Interests, including any agreements related thereto, shall continue in effect solely to the extent necessary to (i) allow the holders of Allowed Existing Preferred Equity Interests and Existing HIT Common Equity Interests to receive Plan Distributions under the Plan, and (ii) allow the Debtors or the Reorganized Debtors, as applicable, to make post-Effective Date Plan Distributions or take such other action pursuant to the Plan on account of the Allowed Existing Preferred Equity Interests and Allowed Existing HIT Common Equity Interests and to otherwise exercise their rights and discharge their obligations relating to the interests of the holders of such Interests in

accordance with the Plan, *provided* that nothing in this section shall affect the discharge of Claims and Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any liability or expense to the Reorganized Debtors.

(c)     Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors of their interests, as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in this section shall be deemed null and void and shall be of no force and effect.  Nothing contained herein shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtors or any of their counterparties under any Executory Contract or Unexpired Lease to the extent such Executory Contract or Unexpired Lease has been assumed by the Debtors pursuant to a Final Order of the Bankruptcy Court or hereunder.

### 7.11.     *Officers and Board of Directors.*

(a)     To the extent then known and determined, the identities of the members of the New Board, as applicable, and to the extent applicable, the officers of each Reorganized Debtor, shall be disclosed at or prior to the Combined Hearing in accordance with section 1129(a)(5) of the Bankruptcy Code.

(b)     Commencing on the Effective Date, each of the directors, managers, and officers of each of the Reorganized Debtors shall be elected and serve pursuant to the terms of the applicable organizational documents, including any Amended Constituent Documents, of such Reorganized Debtor and may be replaced or removed in accordance with such organizational documents.

### 7.12.     *Restructuring Transactions.*

(a)     On or as soon as practicable after the Effective Date, the Reorganized Debtors shall, subject to the consent of the Plan Sponsor, take such actions as may be or become necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan (collectively, the "Restructuring Transactions"), including (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, financing, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law, (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree, (iii) the filing of appropriate certificates or charters, formation, reincorporation, merger, consolidation, conversion, or dissolution, (iv) the effective sale of the hotels from the Company to the Plan Sponsor, by virtue of the issuance of the New HIT Common Equity Interests to the Plan Sponsor as provided for pursuant to the Plan, (v) the issuance of the New HIT Common Equity Interests and the New HITOP Interests, all of which shall be authorized and approved in all respects in each case without further action being required under applicable law, regulation, order, or rule, (vi) all other actions that the applicable Entities determine to be necessary or appropriate, including (A) making filings or recordings that may be required by applicable law, subject, in each

case, to the organizational documents of the Reorganized Debtors, and (B) such other transactions that may be required or necessary to effectuate any of the Restructuring Transactions in the most tax-efficient manner, including mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions or liquidations; and (vii) the execution, delivery, and filing, if applicable, of the Exit Facility. The Restructuring Transactions may include a taxable transfer of all or a portion of the Debtors' assets or Entities to one or more newly-formed Entities (or an affiliate or subsidiary of such Entity or Entities) formed and controlled by certain holders of Claims against or Interests in the Debtors and, in such case, the New HIT Common Equity Interests and New HITOP Interests to holders of DIP Claims and Existing Preferred Equity Interests pursuant to the Plan may comprise stock (and/or other interests) of such Entity or Entities.

(b)    Each officer, member of the board of directors, manager, or general partner of the Debtors is (and each officer, member of the board, or manager of the Reorganized Debtors shall be) authorized and directed to issue, execute, deliver, file, or record such contracts, securities, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the New HIT Common Equity Interests, the New HITOP Interests, and the CVRs issued pursuant to the Plan, the CVR Agreement and any Restructuring Transaction in the name of and on behalf of the Reorganized Debtors, all of which shall be authorized and approved in all respects, in each case, without the need for any further approvals, authorization, consents, or any further action required under applicable law, regulation, order, or rule (including, without limitation, any action by the stockholders, directors, managers, or general partners of the Debtors or the Reorganized Debtors) except for those expressly required pursuant to the Plan.

(c)    On the Effective Date, or as soon thereafter as is reasonably practicable, the Reorganized Debtors' respective certificates of incorporation, bylaws, and Limited Partnership Agreement (and other formation and constituent documents relating to limited partnerships) shall be amended as may be required to be consistent with the provisions of the Plan, the New HIT Common Equity Interests, the New HITOP Interests, and the documents related to the Exit Facility, as applicable, and the Bankruptcy Code. Among other things, such amendments of the Limited Partnership Agreement shall include the elimination of any rights of the holder of the special general partnership interest in HITOP issued in accordance with the Limited Partnership Agreement. The organizational documents, including the Amended Constituent Documents, for the Reorganized Debtors shall, among other things: (i) authorize the issuance of the New HIT Common Equity Interests, the New HITOP Interests, and the CVRs; and (ii) pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, include a provision prohibiting the issuance of non-voting Equity Securities.

(d)    All matters provided for herein involving the corporate or limited partnership structure of the Debtors or the Reorganized Debtors, to the extent applicable, or any corporate, limited partnership, or related action required by the Debtors or the Reorganized Debtors in connection herewith shall be deemed to have occurred and shall be in effect, without any requirement of further action by the stockholders, members, directors, managers, general partners, or officers of the Debtors or the Reorganized Debtors, and with like effect as though such

action had been taken unanimously by the stockholders, members, directors, managers, general partners, or officers, as applicable, of the Debtors or the Reorganized Debtors.

### 7.13.    *Employee Matters.*

Subject to Article X of this Plan, on the Effective Date, the Reorganized Debtors shall be deemed to have assumed all Employee Arrangements; *provided*, *however*, that the Debtors' Employee Arrangements with their senior management executives shall be assumed as amended by the provisions contained in the Restructuring Support Agreement.

As of the Effective Date: (x) the Incentive Equity Plan is terminated; (y) all Incentive Equity Awards outstanding as of immediately prior to the Effective Date are (i) in the case of Incentive Equity Awards that are restricted shares of Existing HIT Common Equity Interests, fully vested, and (ii) in the case of Incentive Equity Awards that are restricted stock units, terminated and paid in the form of shares of Existing HIT Common Equity Interests (with each restricted stock unit to be paid in the form of one Existing HIT Common Equity Interest, and with restricted stock units subject to performance-based conditions to be paid assuming maximum performance); and (z) all Existing HIT Common Equity Interests vested or paid under subclause (y) are treated in accordance with Section 5.5(b) hereof.  The termination of the Incentive Equity Plan and all Incentive Equity Awards outstanding thereunder and the payment of the Incentive Equity Awards are intended to comply with Section 409A of the Internal Revenue Code of 1986, as amended and Treas. Reg. Section 1.409A-3(j)(4)(ix)(A) thereunder.

### 7.14.    *Release of Avoidance Actions.*

On the Effective Date, the Debtors, on behalf of themselves and their Estates, shall release any and all Avoidance Actions and the Debtors and the Reorganized Debtors, and any of their successors or assigns, and any Entity acting on behalf of the Debtors or the Reorganized Debtors, shall be deemed to have waived the right to pursue any and all Avoidance Actions, except for Avoidance Actions brought as counterclaims or defenses to claims asserted against the Debtors.

### 7.15.    *Closing of Chapter 11 Cases.*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases; *provided*, as of the Effective Date, the Reorganized Debtors may submit an order to the Bankruptcy Court under certification of counsel closing the Chapter 11 Case of Debtor HITOP and changing the caption of the Chapter 11 Cases accordingly; *provided, further*, that all motions, contested matters, adversary proceedings, and other matters may be heard and adjudicated in the Debtors' Chapter 11 Case that remains open regardless of whether the applicable matter is against HIT or HITOP.  Nothing in the Plan shall authorize the closing of any case effective as of a date that precedes the date any such order is entered.  Any request for retroactive relief shall be made on motion served on the U.S. Trustee, and the Bankruptcy Court shall rule on such request after notice and a hearing.  Upon the filing of a motion to close the last Chapter 11 Case remaining open, the Reorganized Debtors shall file a final report with respect to all of the Chapter 11 Cases pursuant to Local Rule 3022-1(c).

**7.16.**     *Notice of Effective Date.*

On the Effective Date, the Debtors shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

**7.17.**     *Corporate and Other Action*.

(a)     On the Effective Date, the Amended Constituent Documents and any other applicable amended and restated corporate or other organizational documents of the Debtors shall be deemed authorized in all respects.

(b)     Any action under the Plan to be taken by or required of the Debtors, including, without limitation, the adoption or amendment of their charter and bylaws or certificate of limited partnership and Limited Partnership Agreement, the issuance of securities and instruments, the Exit Facility, or the selection of officers or directors, shall be authorized and approved in all respects, without any requirement of further action by the Debtors' equity holders, holders of partnership interests, general partner, board of directors, or similar body, as applicable.

(c)     The Debtors shall be authorized to execute, deliver, file, and record such documents (including, without limitation, the Plan Documents), contracts, instruments, releases and other agreements and take such other action as may be necessary to effectuate and further evidence the terms and conditions of the Plan, without the necessity of any further Bankruptcy Court, corporate, limited partnership, board of directors, member, general partner, or stockholder approval or action.  In addition, the selection of the Persons who will serve as the initial managers, officers, and directors of the Reorganized Debtors as of the Effective Date shall be deemed to have occurred and be effective on and after the Effective Date without any requirement of further action by the board of directors or equity holders of the applicable Reorganized Debtors.

**7.18.**     *Approval of Plan Documents*.

The solicitation of votes with respect to the Plan shall be deemed a solicitation for the approval of the Plan and all transactions contemplated hereunder (and subject to the terms and conditions set forth herein).  Entry of the Confirmation Order shall constitute approval of the Plan Documents and such transactions.  On the Effective Date, the Debtors shall be authorized to enter into, file, execute, and/or deliver each of the Plan Documents and any other agreement or instrument issued in connection with any Plan Document without the necessity of any further corporate, board, stockholder, manager, general partner, or similar action.

# ARTICLE VIII.

## CVR DISTRIBUTIONS AND RELATED MATTERS

**8.1.**     *CVR Payments.*

Holders of CVRs will be entitled to receive distributions subject to the terms and conditions of the CVR Agreement upon certain Monetization Events or upon the Maturity Date

(defined below).  A full description of such terms and conditions, including the "waterfall" applicable to all distributions, can be found in the CVR Agreement, attached hereto as <u>Exhibit A</u>.

If and when a payment obligation to the holders of CVRs is triggered pursuant to the CVR Agreement, the Reorganized Debtors shall make payments to the holders of CVRs reasonably promptly following the applicable triggering event for such payment, in accordance with the terms and conditions of the CVR Agreement.

Among other limitations on the circumstances under which a payment would be made to holders of the CVRs, no payment will be made to holders of CVRs if the Adjusted EBITDA (as defined in the CVR Agreement) of the applicable assets in the CVR Asset Pool does not exceed certain specified hurdles.

The maximum amount of payments made to holders of CVRs will not be permitted to exceed $6.00 per CVR.

### 8.2.    *Maturity Date of CVRs.*

Subject to the conditions and limitations set forth in the CVR Agreement, the holders of CVRs may have the right to receive payments in respect of the CVRs on the fifth anniversary of the Effective Date (the "<u>Maturity Date</u>"), which may be extended to the seventh anniversary of the Effective Date by the board directors of the Reorganized Company, in its sole discretion.  The right to receive payments in respect of CVRs may expire sooner if certain payments have already been made in respect of the CVRs, as set forth in the CVR Agreement.

### 8.3.    *Securities Law Considerations.*

The CVRs are not securities and are non-transferable except for certain limited permitted transfers as set forth in the CVR Agreement.  The CVRs are not subject to registration under the Securities Laws or any other applicable law.

### 8.4.    *Certain Covenants.*

The Reorganized Debtors shall not, and shall not cause or permit their direct or indirect subsidiaries to, amend their constituent documents or enter into or undergo any consolidation, merger, or similar transaction, reorganization, transfer of assets, dissolution, issue or sale of securities, or take any other voluntary action, in each case, for the primary purpose of causing the requirements for payment of the CVRs to not be satisfied.

Without the consent of the Independent Director(s), the Reorganized Debtors shall not, and shall cause their direct or indirect subsidiaries to not, take any action or enter into any agreement that is disproportionately adverse to the economic interests of the holders of the CVRs when compared to the holders of New HIT Common Equity Interest.

The Reorganized Debtors shall not, and shall not cause or permit their direct or indirect subsidiaries to, enter into or engage in certain transactions with an affiliate or a related party.

### 8.5. *Reporting.*

The Reorganized Debtors shall make information available periodically with respect to the CVR Asset Pool on a confidential website only accessible to holders of CVRs and the Plan Sponsor in accordance with the terms of the CVR Agreement.

### 8.6. *Inconsistency Between Plan and CVR Agreement.*

The provisions of this Article VIII are subject to, and qualified in all respects, by the specific terms and conditions set forth in the CVR Agreement. In the event of an inconsistency between this Plan and the CVR Agreement, the terms and conditions of the CVR Agreement shall govern.

## ARTICLE IX.

## DISTRIBUTIONS

### 9.1. *Plan Distributions Generally.*

One or more Disbursing Agents shall make all Plan Distributions under the Plan to the appropriate holders of Claims and Interests in accordance with the terms of the Plan. For the avoidance of doubt, the Reorganized Debtors may, but are not required to, serve as the Disbursing Agent under the Plan.

### 9.2. *Distribution Record Date.*

As of the close of business on the Effective Date, the various lists of holders of Interests in each Class, as maintained by the Debtors or their respective agents, shall be deemed closed, and there shall be no further changes in the record holders of any of the Interests. The Debtors or the Reorganized Debtors shall have no obligation to recognize any transfer of Interests occurring on or after the Effective Date. In addition, with respect to payment of any cure amounts owed pursuant to Bankruptcy Code section 365(b) or disputes over any cure amounts, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a cure amount.

### 9.3. *Date of Plan Distributions.*

Except as otherwise provided in the Plan, any Plan Distributions and deliveries to be made under the Plan shall be made on the Effective Date or as otherwise determined in accordance with the Plan, or as soon as practicable thereafter; *provided* that the Reorganized Debtors may implement periodic Plan Distribution dates to the extent they determine them to be appropriate.

### 9.4.  Disbursing Agent.

All Plan Distributions shall be made by the Disbursing Agent, on behalf of the applicable Debtor (unless otherwise provided herein), on or after the Effective Date or as otherwise provided herein.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties, and all reasonable and documented fees and expenses incurred by such Disbursing Agent directly related to Plan Distributions hereunder shall be reimbursed by the Reorganized Debtors.  The Reorganized Debtors shall cooperate in good faith with the applicable Disbursing Agent (if other than the Reorganized Debtors) to comply with the reporting and withholding requirements outlined in the Plan.  For the avoidance of doubt, the Disbursing Agent shall not have any responsibilities with respect to the CVRs.

### 9.5.  Rights and Powers of Disbursing Agent.

(a)     From and after the Effective Date, the Disbursing Agent, solely in its capacity as Disbursing Agent, shall be exculpated by all Entities, including, without limitation, holders of Claims against and Interests in the Debtors and other parties in interest, from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or ultra vires acts of such Disbursing Agent.  No holder of a Claim or Interest or other party in interest shall have or pursue any claim or Cause of Action against the Disbursing Agent, solely in its capacity as Disbursing Agent, for making payments in accordance with the Plan or for implementing provisions of the Plan, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or ultra vires acts of such Disbursing Agent.

(b)     The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder, (ii) make all Plan Distributions contemplated hereby, and (iii) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

### 9.6.  Expenses of Disbursing Agent.

Except as otherwise ordered by the Bankruptcy Court, any reasonable and documented fees and expenses incurred by the Disbursing Agent acting in such capacity (including reasonable documented attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash by the Reorganized Debtors in the ordinary course of business.

### 9.7.  Delivery of Plan Distributions.

All Plan Distributions to any holder of an Allowed Claim as and when required by the Plan shall be made by the Disbursing Agent.  In the event that any Plan Distribution to any holder is returned as undeliverable, no further Plan Distributions shall be made to such holder unless and until the Disbursing Agent is notified in writing of such holder's then-current address,

at which time all currently due, missed Plan Distributions shall be made to such holder as soon as reasonably practicable thereafter without interest.  Nothing herein shall require the Disbursing Agent to attempt to locate holders of undeliverable Plan Distributions and, if located, assist such holders in complying with this Section 9.7.

### 9.8.    *Proofs of Claim; Disputed Claims Process.*

Notwithstanding section 502(a) of the Bankruptcy Code, and in light of the Unimpaired status of Classes 1, 2, 3, 4, and 7 under the Plan, except as provided in Section 10.3 with respect to rejection damage Claims, holders of Claims or Interests need not file Proofs of Claim, and the Reorganized Debtors and the holders of Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims in the ordinary course of business as if the Chapter 11 Cases had not been commenced except that (unless expressly waived pursuant to the Plan) the Allowed amount of such Claims shall be subject to the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 and 503 of the Bankruptcy Code, to the extent applicable.

Upon the Effective Date, all Proofs of Claim filed against the Debtors, regardless of the time of filing, and including Claims filed after the Effective Date, shall be deemed withdrawn, other than as provided below, and such creditor that files a Proof of Claim with the Bankruptcy Court retains any right it may have to pursue remedies in a forum other than the Bankruptcy Court in accordance with applicable.  Notwithstanding anything in this Section 9.8, (a) all Claims against the Debtors that result from the Debtors' rejection of an Executory Contract or Unexpired Lease, (b) disputes regarding the amount of any cure pursuant to section 365 of the Bankruptcy Code, and (c) Claims that the Debtors seek to have determined by the Bankruptcy Court, shall in all cases be determined by the Bankruptcy Court.  From and after the Effective Date, the Reorganized Debtors may satisfy, dispute, settle, or otherwise compromise any Claim without approval of the Bankruptcy Court in the ordinary course of business.

### 9.9.    *Postpetition Interest.*

Except as otherwise specifically provided for in the Plan, the Confirmation Order, or another order of the Bankruptcy Court or required by the Bankruptcy Code, or as otherwise agreed by the Reorganized Debtors, interest shall not accrue or be paid on any Claims on or after the Petition Date.

### 9.10.    *Unclaimed Property.*

Undeliverable Plan Distributions or unclaimed Plan Distributions shall remain in the possession of the Reorganized Debtors until such time as a Plan Distribution becomes deliverable or the holder accepts Plan Distribution, or such Plan Distribution reverts back to the Reorganized Debtors, and shall not be supplemented with any interest, dividends, or other accruals of any kind.  Such Plan Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one hundred and eighty (180) days from the date of the attempted Plan Distribution.  After such date, all unclaimed property or interest in property shall revert to the Reorganized Debtors, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred.  The Reorganized Debtors and the Disbursing

Agent shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records and filings with the Bankruptcy Court.

### 9.11.    *Time Bar to Cash Payments.*

Checks issued by the Disbursing Agent in respect of Allowed Claims shall be null and void if not negotiated within one hundred and eighty (180) days after the date of issuance thereof. Thereafter, the amount represented by such voided check shall irrevocably revert to the Reorganized Debtors, and any Claim in respect of such voided check shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary. Requests for re-issuance of any check shall be made to the Disbursing Agent by the holder of the Allowed Claim to whom such check was originally issued.

### 9.12.    *Manner of Payment under Plan.*

Except as otherwise specifically provided in the Plan, at the option of the Debtors or the Reorganized Debtors, as applicable, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

### 9.13.    *Satisfaction of Claims.*

Except as otherwise specifically provided in the Plan, any Plan Distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

### 9.14.    *Setoffs.*

Except as otherwise expressly provided for herein, each Reorganized Debtor, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided, however,* that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor of any such Claims, rights, and Causes of Action that such Reorganized Debtor may possess against such holder. In no event shall any holder of Claims be entitled to set off any such Claim against any Claim, right, or Cause of Action of the Debtor or Reorganized Debtor (as applicable), unless such holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

### 9.15.   *Withholding and Reporting Requirements.*

(a)   <u>Withholding Rights</u>.   In connection with the Plan, any party issuing any instrument or making any Plan Distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all Plan Distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements.   In the case of a non-Cash Plan Distribution that is subject to withholding, the distributing party may withhold an appropriate portion of such distributed property and either (i) sell such withheld property to generate Cash necessary to pay the withholding tax (or reimburse the distributing party for any advanced payment of the withholding tax), or (ii) pay the withholding tax using its own funds and retain such withheld property.   Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan.   Notwithstanding the foregoing, each Entity that receives a Plan Distribution pursuant to the Plan shall have responsibility for any taxes imposed by any Governmental Unit, including, without limitation, income, withholding, and other taxes, on account of such Plan Distribution.   Any party issuing any instrument or making any Plan Distribution pursuant to the Plan has the right, but not the obligation, to not make a Plan Distribution until such holder has made arrangements reasonably satisfactory to such issuing or disbursing party for payment of any such tax obligations.

(b)   <u>Forms</u>.   Any party entitled to receive any property as an issuance or Plan Distribution under the Plan shall, upon request, deliver to the Disbursing Agent or such other Person designated by the Reorganized Debtors (which Person shall subsequently deliver to the Disbursing Agent any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a foreign Person) Form W-8 and any other forms or documents reasonably requested by any Reorganized Debtor to reduce or eliminate any withholding required by any federal, state, or local taxing authority.

## ARTICLE X.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 10.1.   *General Treatment; Assumption and Rejection of Executory Contracts or Unexpired Leases.*

(a)   As of and subject to the occurrence of the Effective Date and the payment of any applicable cure amounts owed pursuant to Bankruptcy Code section 365(b), all Executory Contracts and Unexpired Leases to which any of the Debtors are parties, and which have not expired or terminated by their own terms on or prior to the Effective Date, including—subject to Section 7.13—Employee Arrangements, shall be deemed assumed by the Debtors, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease: (1) was previously assumed or rejected previously by the Debtors; (2) was previously expired or terminated pursuant to its own terms, (3) is the subject of a motion to reject filed on or before the Effective Date, or (4) is identified on the Schedule of Rejected Contracts and Leases.

(b)     Subject to the occurrence of the Effective Date, entry of the Confirmation Order shall constitute approval of the assumptions or assumptions and assignments provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a determination by the Bankruptcy Court that the Reorganized Debtors have provided adequate assurance of future performance under each assumed Executory Contract and Unexpired Lease.  Each Executory Contract and Unexpired Lease assumed or assumed and assigned pursuant to the Plan shall vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law; *provided* that the assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to affiliates.

(c)     Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests.  To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including any "change of control," "ipso facto," bankruptcy default or similar provisions), then such provision shall be unenforceable or deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate or modify such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

### 10.2.     *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

The Reorganized Debtors shall satisfy any monetary defaults under any Executory Contract or Unexpired Lease to be assumed hereunder, to the extent required by section 365(b)(1) of the Bankruptcy Code, upon assumption thereof in the ordinary course of business.  If a counterparty to any Executory Contract or Unexpired Lease believes any amounts are due as a result of such Debtor's monetary default thereunder, it shall assert a Cure Claim against the Debtors or Reorganized Debtors, as applicable, in the ordinary course of business, subject to all defenses the Debtors or Reorganized Debtors may have with respect to such Cure Claim.  Any Cure Claim shall be deemed fully satisfied, released and discharged upon payment by the Reorganized Debtors of the applicable Cure Claim; provided, that nothing herein shall prevent the Reorganized Debtors from paying any Cure Claim despite the failure of the relevant counterparty to assert or file such request for payment of such Cure Claim.  The Debtors, with the consent of the Plan Sponsor, or the Reorganized Debtors, as applicable, may settle any Cure Claims without any further notice to or action, order or approval of the Bankruptcy Court.

Any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan, including an objection regarding the ability of the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), must be filed with the Bankruptcy Court on or before the deadline set by the Bankruptcy Court for objecting to confirmation of the Plan, or such other deadline as may have been established by order of the Bankruptcy Court. To the extent any such objection is not determined by the Bankruptcy Court at the Combined Hearing, such objection may be heard and determined at a subsequent hearing. Any counterparty to an Executory Contract or Unexpired Lease that does not timely object to the proposed assumption of any Executory Contract or Unexpired Lease by the deadline established by the Bankruptcy Court will be deemed to have consented to such assumption.

In the event of a dispute regarding (a) the amount of any Cure Claim, (b) the ability of the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or (c) any other matter pertaining to assumption or the payment of Cure Claims required by section 365(b)(1) of the Bankruptcy Code, payment of a Cure Claim, if any, shall occur as soon as reasonably practicable after entry of a Final Order or Final Orders resolving such dispute and approving such assumption. The Debtors (with the consent of the Plan Sponsor), or Reorganized Debtors, as applicable, reserve the right at any time to move to reject any Executory Contract or Unexpired Lease prior to the Effective Date based upon the existence of any unresolved dispute or upon a resolution of such dispute that is unfavorable to the Debtors or Reorganized Debtors.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, and full payment of any applicable Cure Claims pursuant to the Plan, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or non-monetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the date that the Reorganized Debtors assume such Executory Contract or Unexpired Lease.

### 10.3.    *Rejection of Executory Contracts or Unexpired Leases.*

Unless otherwise provided in the Plan or the Plan Supplement, each Executory Contract and Unexpired Lease, if any, set forth on the Schedule of Rejected Contracts and Leases (which, if any, shall be included in the Plan Supplement) shall be deemed rejected, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under sections 365 and 1123 of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, or supplement the Schedule of Rejected Contracts and Leases at any time through and including the Effective Date.

Proofs of claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court within 30 days after the Effective Date. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the

Estate or property of the foregoing parties, without the need for any objection by the Debtors or the Reorganized Debtors, as applicable, or further notice to, or action, order or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released and discharged, notwithstanding anything in a Proof of Claim to the contrary. Claims arising from the rejection of the Executory Contracts or Unexpired Leases to which any Debtor is a party shall be classified as general unsecured claims, subject to any applicable limitation or defense under the Bankruptcy Code and applicable law.

### 10.4. *Survival of the Debtors' Indemnification Obligations and Guarantees.*

(a)     Any obligations of the Debtors pursuant to their corporate charters, bylaws, Limited Partnership Agreement, or other organizational documents to indemnify current and former officers, directors, agents, and/or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such directors, officers, agents, and/or employees, based upon any act or omission for or on behalf of the Debtors, shall not be discharged or impaired by confirmation of the Plan. Any Claim based on such obligations shall not be a Disputed Claim, Disallowed Claim, or subject to any objection in either case by reason of section 502(e)(1)(B) of the Bankruptcy Code. None of the Reorganized Debtors shall amend and/or restate their respective governance documents before or after the Effective Date to terminate or adversely affect any obligations to provide such indemnification rights or such directors', officers', employees', or agents' indemnification rights.

(b)     In addition, after the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under the D&O Liability Insurance Policies in effect or purchased as of the Petition Date, and all members, managers, directors, and officers who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date, in each case, to the extent set forth in such policies.

(c)     On the Effective Date, all guarantees, indemnities, or other credit support provided by a Debtor in support of the primary obligations of another Debtor or any Non-Debtor Subsidiary shall be Unimpaired by the Plan and reinstated to their position immediately prior to the Petition Date.

### 10.5. *Severance Contracts and Programs.*

Except as otherwise expressly provided in the Plan, a prior order of the Bankruptcy Court or to the extent subject to a motion pending before the Bankruptcy Court as of the Effective Date, all severance benefit plans and policies for former employees (including any severance contracts between one or more of the Debtors and a former employee that were in effect as of or after the Petition Date), to the extent contemplated by the DIP Budget (as defined in the Interim DIP Order and Final DIP Order), are treated as Executory Contracts under the Plan and on the Effective Date shall be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code.

### 10.6.    *Insurance Policies.*

All insurance policies (including all directors' and officers' insurance policies and tail or run-off coverage liability insurance) pursuant to which any Debtor has any rights or obligations in effect as of the date of the Confirmation Order shall be deemed and treated as Executory Contracts pursuant to the Plan and shall be assumed by the respective Debtors and the Reorganized Debtors and shall continue in full force and effect thereafter in accordance with their respective terms.  All other insurance policies shall vest in the Reorganized Debtors.

### 10.7.    *Intellectual Property Licenses and Agreements.*

All intellectual property contracts, licenses, royalties, or other similar agreements to which the Debtors have any rights or obligations in effect as of the date of the Confirmation Order shall be deemed and treated as Executory Contracts pursuant to the Plan and shall be assumed by the respective Debtors and shall continue in full force and effect unless any such intellectual property contract, license, royalty, or other similar agreement otherwise is specifically rejected pursuant to a separate order of the Bankruptcy Court or is the subject of a separate rejection motion filed by the Debtors.  Unless otherwise noted hereunder, all other intellectual property contracts, licenses, royalties, or other similar agreements shall vest in the Reorganized Debtors and the Reorganized Debtors may take all actions as may be necessary or appropriate to ensure such vesting as contemplated herein.

### 10.8.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided herein or by separate order of the Bankruptcy Court, each Executory Contract and Unexpired Lease that is assumed shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such Executory Contract or Unexpired Lease, without regard to whether such agreement, instrument, or other document is listed in any notice of assumed contracts.

### 10.9.    *Reservation of Rights.*

(a)    Neither the exclusion nor inclusion of any contract or lease by the Debtors on any exhibit, schedule, or other annex to this Plan or in the Plan Supplement, nor anything contained in the Plan, will constitute an admission by the Debtors that any such contract or lease is or is not in fact an Executory Contract or Unexpired Lease or that the Debtors or the Reorganized Debtors or their respective affiliates have any liability thereunder.

(b)    Except as otherwise provided in this Plan, nothing in this Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors and the Reorganized Debtors under any executory or non-Executory Contract or any unexpired or expired lease.

(c)    Nothing in this Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors under any executory or non-Executory Contract or any unexpired or expired lease.

(d)      If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection under this Plan, the Debtors or the Reorganized Debtors, as applicable, shall have 60 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease by filing a notice indicating such altered treatment.

## ARTICLE XI.

## CONDITIONS PRECEDENT TO
## CONSUMMATION OF THE PLAN

### 11.1.    *Conditions Precedent to Effective Date*.

The following are conditions precedent to the Effective Date of the Plan:

(a)      the Confirmation Order, in form and substance reasonably acceptable to the Debtors and the Plan Sponsor, having become a Final Order and remaining in full force and effect;

(b)      all actions, agreements and documents, including the Plan Documents and the Plan Supplement, in form and substance consistent with, and in form and substance as required by the approvals and consents set forth in, the RSA, being filed with the Bankruptcy Court, executed and delivered, and any conditions (other than the occurrence of the Effective Date or certification by the Debtors that the Effective Date has occurred) contained therein having been satisfied or waived in accordance therewith;

(c)      a chapter 11 trustee, a responsible officer, or an examiner with enlarged powers relating to the operation of the businesses of the Debtors (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) not having been appointed in any of the Chapter 11 Cases;

(d)      the Amended Constituent Documents, in form and substance attached as Exhibits to the Plan Supplement, shall have been filed with the applicable authorities of the relevant jurisdictions of incorporation or formation and shall have become effective in accordance with such jurisdictions' corporation or limited partnership laws;

(e)      the issuance of the New HIT Common Equity Interests, the New HITOP Interests, and the CVRs, and the consummation of the Exit Facility;

(f)      the RSA remaining in full force and effect and not having been terminated;

(g)      the payment of Restructuring Expenses incurred during the period prior to the Effective Date to the extent invoiced to the Debtors, except as otherwise provided in Section 3.3 hereof with respect to Professional Fee Claims;

(h)      all actions, documents, certificates, and agreements necessary to implement this Plan having been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable laws obtaining;

(i)       all governmental and third-party approvals and consents, including Bankruptcy Court approval, as necessary in connection with the transactions provided for in this Plan, these approvals not being subject to unfulfilled conditions, being in full force and effect, and all applicable waiting periods having expired without any action having been taken by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions; and,

(j)       the payment and satisfaction in full of all statutory fees and obligations then due and payable to the office of the U.S. Trustee.

### 11.2.      *Waiver of Conditions Precedent.*

(a)       Except as otherwise provided herein, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.  Each of the conditions precedent in Section 11.1 of the Plan may be waived in writing by the Debtors with the prior written consent of the Plan Sponsor without leave of or order of the Bankruptcy Court.

(b)       The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

### 11.3.      *Effect of Failure of a Condition.*

If the conditions listed in Section 11.1 of the Plan are not satisfied or waived in accordance with Section 11.2 of the Plan on or before the first Business Day that is more than 90 days after the date on which the Confirmation Order is entered or by such later date as set forth by the Debtors in a notice filed with the Bankruptcy Court prior to the expiration of such period, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (a) constitute a waiver or release of any Claims against or any Interests in the Debtors or claims by the Debtors, (b) prejudice in any manner the rights of any Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtors or the Plan Sponsor, or any other Entity.

### ARTICLE XII.

### **EFFECT OF CONFIRMATION OF PLAN**

### 12.1.      *Vesting of Assets.*

Except as otherwise provided herein, or in any agreement, instrument, or other document incorporated in the Plan (including the Restructuring Transactions), on the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all assets and property of the Estates shall vest in the Reorganized Debtors, free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as provided pursuant to the Plan, the Confirmation Order, or the Exit Facility.  On and after the Effective Date, the Reorganized Debtors may take any action, including, without limitation, the operation of their businesses; the use, acquisition, sale, lease and disposition of property; and the entry into transactions, agreements, understandings, or

arrangements, whether in or other than in the ordinary course of business, and execute, deliver, implement, and fully perform any and all obligations, instruments, documents, and papers or otherwise in connection with any of the foregoing, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code, except as expressly provided herein.  Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for professional fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

### 12.2. *Binding Effect.*

As of the Effective Date, the Plan shall bind all holders of Claims against and Interests in the Debtors and their respective successors and assigns, notwithstanding whether any such holders were (a) Impaired or Unimpaired under the Plan, (b) deemed to accept or reject the Plan, (c) failed to vote to accept or reject the Plan, or (d) voted to reject the Plan.

### 12.3. *Deemed Consent to Change of Control of Debtors.*

As of the Effective Date, any counterparty to a contract with the Debtors or the Non-Debtor Subsidiaries shall be deemed to have consented to the change of control of the Debtors occurring pursuant to this Plan, and is forever barred and enjoined from declaring a breach, default, or otherwise proceeding against the Debtors or Non-Debtor Subsidiaries with respect to any such counterparty contract provisions otherwise triggered by a change of control of the Debtors; *provided* that such counterparty received actual notice of this Plan and the Disclosure Statement.

### 12.4. *Discharge of Claims and Termination of Interests.*

Upon the Effective Date and in consideration of the Plan Distributions to be made under the Plan, except as otherwise expressly provided herein, each holder (as well as any representatives, trustees, or agents on behalf of each holder) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights, and liabilities that arose prior to the Effective Date.  Upon the Effective Date, all such Entities shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in the Debtors against the Debtors, the Reorganized Debtors, or any of their assets or property, whether or not such holder has filed a Proof of Claim and whether or not the facts or legal bases therefor were known or existed prior to the Effective Date.

### 12.5. *Term of Injunctions or Stays.*

Unless otherwise provided herein, the Confirmation Order, or in a Final Order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

**12.6.**     *Injunction.*

(a)     **Except as otherwise specifically provided in the Plan or the Confirmation Order, as of the Confirmation Date, but subject to the occurrence of the Effective Date, all Persons or Entities, and all other parties in interest, along with their present or former employees, agents, officers, directors, principals, representatives, and affiliates are, with respect to any Claims or Interests being released, exculpated, or discharged pursuant to this Plan, permanently enjoined after the Confirmation Date from: (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting the Debtors, their Estates or any of their property, wherever located, or any direct or indirect transferee of any property, wherever located, of, or direct or indirect successor in interest to, any of the foregoing Persons or any property, wherever located, of any such transferee or successor; (ii) enforcing, levying, attaching (including any pre-judgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtors, or their Estates or any of their property, wherever located, or any direct or indirect transferee of any property, wherever located, of, or direct or indirect successor in interest to, any of the foregoing Persons, or any property, wherever located, of any such transferee or successor; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors or their Estates or any of their property, wherever located, or any direct or indirect transferee of any property, of, or successor in interest to, any of the foregoing Persons; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan to the full extent permitted by applicable law (including, without limitation, commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan) to the fullest extent permitted by applicable law; or (v) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the Debtors or their Estates, or against the property or interests in property of the Debtors or their Estates.  Such injunction shall extend to any successors or assignees of the Debtors and their properties and interest in properties; *provided, however*, that nothing contained herein shall preclude such Persons from exercising their rights, or obtaining benefits, pursuant to and consistent with the terms of the Plan.**

(b)     **By accepting Plan Distributions, each holder of an Allowed Claim or Interest will be deemed to have specifically consented to the injunctions set forth in this Section 12.6.**

**12.7.**     *Releases.*

(a)     **Releases by Debtors.**

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or the Confirmation Order, on and after the Effective Date, for good and valuable consideration, including their cooperation and contributions to the Chapter 11 Cases, the Released Parties shall be deemed released and discharged by the Debtors and their Estates from any and all Claims, obligations, debts, rights, suits, damages,**

Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, asserted or unasserted, existing, or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of federal or state laws, or otherwise, including Avoidance Actions, those Causes of Action based on veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability, or otherwise that the Debtors, their Estates or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity or that any holder of a Claim or Interest or other Entity would have been legally entitled to assert derivatively for or on behalf of the Debtors, or their Estates, based on, relating to or in any manner arising from, in whole or in part, the Debtors, their Estates, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtors and any Released Party, excluding any assumed Executory Contract or Unexpired Lease, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Disclosure Statement, the Restructuring Support Agreement, the Plan Supplement, the Exit Facility Agreement, the DIP Credit Agreement and other DIP Loan Documents, the Chapter 11 Cases, or, in each case, related agreements, instruments, or other documents, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that is determined in a Final Order to have constituted willful misconduct (including, without limitation, actual fraud) or gross negligence; *provided*, that if any Released Party directly or indirectly brings or asserts any Claim or Cause of Action that has been released or is contemplated to be released pursuant to the Plan in any way arising out of or related to any document or transaction that was in existence prior to the Effective Date against any other Released Party, and such Released Party does not abandon such Claim or Cause of Action upon request, then the release set forth in the Plan shall automatically and retroactively be null and void *ab initio* with respect to the Released Party bringing or asserting such Claim or Cause of Action; *provided, further* that the immediately preceding proviso shall not apply to (i) any action by a Released Party in the Bankruptcy Court (or any other court determined to have competent jurisdiction), including any appeal therefrom, to prosecute the amount, priority, or secured status of any prepetition or ordinary course administrative Claim against the Debtors or (ii) any release or indemnification provided for in any settlement or granted under any other court order; *provided* that, in the case of (i) and (ii), the Debtors shall retain all defenses related to any such action.  Notwithstanding anything contained herein to the contrary, the foregoing release shall not release any obligation of any party under the Plan or any document, instrument, or agreement executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute its finding that each release described in the Plan is:  (i) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Claims; (ii) in the best interests of the Debtors and all holders of Interests and Claims; (iii) fair, equitable and reasonable; (iv) given and made

after due notice and opportunity for hearing; and (v) a bar to the Debtors asserting any claim, Cause of Action or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

(b)    **Releases by Releasing Parties.**

Except as otherwise specifically provided in the Plan or the Confirmation Order, on and after the Effective Date, for good and valuable consideration, including the obligations of the Debtors under the Plan, the Plan Consideration and other contracts, instruments, releases, agreements, or documents executed and delivered in connection with this Plan, each Releasing Party shall be deemed to have consented to the Plan and the restructuring embodied herein for all purposes, and shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from any and all Claims, Interests, obligations, debts, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, asserted or unasserted, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of federal or state laws, or otherwise, including Avoidance Actions, those Causes of Action based on veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability, or otherwise that such Releasing Party would have been legally entitled to assert (whether individually or collectively), based on, relating to or in any manner arising from, in whole or in part, the Debtors, the Estates, the liquidation, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtors and any Releasing Party, excluding any assumed Executory Contract or Unexpired Lease, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Disclosure Statement, the Restructuring Support Agreement, the Plan Supplement, the DIP Credit Agreement and other DIP Loan Documents, the Exit Facility Agreement, the Existing Preferred Equity Interests, the Existing HIT Common Equity Interests, the New HIT Common Equity Interests, the New HITOP Interests, the Amended Constituent Documents, or, in each case, related agreements, instruments, or other documents, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that is determined in a Final Order to have constituted willful misconduct (including, without limitation, actual fraud) or gross negligence; *provided* that any holder of a Claim or Interest that objects to the releases contained in the Plan shall not receive the benefit of the releases set forth in the Plan (even if for any reason otherwise entitled). Notwithstanding anything contained herein to the contrary, the foregoing release shall not release any obligation of any party (i) under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) under any Executory Contract or Unexpired Lease assumed under the Plan, or (iii) any contract or lease between a Non-Debtor Subsidiary and a Releasing Party.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in the Plan, which includes by reference each of the related provisions and definitions contained in the Plan,

and further, shall constitute its finding that each release described in the Plan is: (i) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Claims; (ii) in the best interests of the Debtors and all holders of Interests and Claims; (iii) fair, equitable, and reasonable; and (iv) given and made after due notice and opportunity for hearing.

(c)     **Exculpation.**

**On the Effective Date, except as otherwise provided in the Plan or the Confirmation Order, for good and valuable consideration, to the maximum extent permissible under applicable law, none of the Exculpated Parties shall have or incur any liability to any holder of any Claim or Interest or any other Person for any act or omission in connection with, or arising out of the Debtors' restructuring, including the negotiation, implementation and execution of the Plan, this Disclosure Statement, the Restructuring Support Agreement, the Plan Supplement, the Chapter 11 Cases, the solicitation of votes for and the pursuit of confirmation of this Plan, the consummation of this Plan, the administration of this Plan, or the property to be distributed under this Plan, including all documents ancillary thereto, all decisions, actions, inactions, and alleged negligence or misconduct relating thereto and all activities leading to the promulgation and confirmation of this Plan except for gross negligence or willful misconduct, each as determined by a Final Order of the Bankruptcy Court. For purposes of the foregoing, it is expressly understood that any act or omission effected with the approval of the Bankruptcy Court conclusively will be deemed not to constitute gross negligence or willful misconduct unless the approval of the Bankruptcy Court was obtained by fraud or misrepresentation, and in all respects, the applicable Persons shall be entitled to rely on the advice of counsel with respect to their duties and responsibilities under, or in connection with, the Chapter 11 Cases, the Plan, and administration thereof. The Exculpated Parties have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the distributions of the securities pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

(d)     **Retention of Causes of Action/Reservation of Rights.**

**Except as expressly provided in the Plan or in the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights or Causes of Action that the Debtors or the Estates may have, or that the Debtors may choose to assert on behalf of their Estates, under any provision of the Bankruptcy Code or any applicable non-bankruptcy law, including, without limitation, (i) any and all Causes of Action or claims against any Person or Entity, to the extent such Person or Entity asserts a crossclaim, counterclaim, and/or claim for setoff that seeks affirmative relief against the Debtors, their officers, directors or representatives or (ii) the turnover of any property of the Estates to the Debtors.**

**Except as expressly provided in the Plan or in the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights or Causes of Action that the Debtors had immediately prior to the Petition Date or the Effective Date against or regarding any Claim left Unimpaired by the Plan.  The Debtors shall have, retain, reserve and be entitled to commence, assert and pursue all such rights and Causes of Action as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights respecting any Claim left Unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced.**

**Except as expressly provided in the Plan or in the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to release any post-Effective Date obligations of any party under the Plan, or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

(e)    Solicitation of Plan.

As of and subject to the occurrence of the Confirmation Date:  (a) the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including, without limitation, sections 1125(a), (e), and (g) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation, and (b) the Debtors and their respective directors, officers, employees, affiliates, agents, financial advisors, investment bankers, professionals, accountants, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan, and therefore are not, and on account of such offer, issuance, and solicitation will not be, liable at any time for any violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

Notwithstanding anything herein to the contrary, as of the Effective Date, pursuant to section 1125(e) and (g) of the Bankruptcy Code, the Plan Sponsor, DIP Lender, and DIP Agent and each of their respective affiliates, agents, representatives, members, principals, equity holders (regardless of whether such interests are held directly or indirectly), officers, directors, managers, employees, advisors and attorneys shall be deemed to have solicited acceptance of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code and applicable non-bankruptcy law, and to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code and applicable non-bankruptcy law, in the offer, issuance, sale, or purchase of a security offered or sold under the Plan of a Reorganized Debtor, and shall not be liable to any Person on account of such solicitation or participation.

(f)    Reimbursement or Contribution.

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever disallowed notwithstanding section

502(j) of the Bankruptcy Code, unless prior to the Effective Date (a) such Claim has been adjudicated as noncontingent or (b) the relevant holder of a Claim has filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

        (g)      Recoupment.

In no event shall any holder of a Claim be entitled to recoup such Claim against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

        (h)      Subordination Rights.

Any Plan Distributions to holders of Claims or Interests shall be received and retained free from any obligations to hold or transfer the same to any other holder and shall not be subject to levy, garnishment, attachment, or other legal process by any holder by reason of claimed contractual subordination rights. On the Effective Date, any such subordination rights shall be deemed waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property distributed under the Plan, in each case other than as provided in the Plan; *provided* that any such subordination rights shall be preserved in the event the Confirmation Order is vacated, the Effective Date does not occur in accordance with the terms hereunder or the Plan is revoked or withdrawn.

### 12.8.      Ipso Facto and Similar Provisions Ineffective.

Any term of any policy, contract or other obligation applicable to a Debtor shall be void and of no further force or effect with respect to any Debtor to the extent such policy, contract, or other obligation is conditioned on, creates an obligation of any Debtor as a result of, or gives rise to a right of any Person based on any of the following: (a) the insolvency or financial condition of a Debtor; (b) the commencement of the Chapter 11 Cases; (c) the confirmation or consummation of this Plan, including any change of control that shall occur as a result of such consummation; or (d) the Restructuring Transactions.

### 12.9.      No Successor Liability.

The Plan Sponsor (a) is not, and shall not be deemed to assume, agree to perform, pay or otherwise have any responsibilities for any liabilities or obligations of the Debtors or any other Person relating to or arising out of the operations or the assets of the Debtors on or prior to the Effective Date, (b) is not, and shall not be, a successor to the Debtors by reason of any theory of law or equity or responsible for the knowledge or conduct of any Debtor prior to the Effective Date and (c) shall not have any successor or transferee liability of any kind or character.

**ARTICLE XIII.**

**<u>RETENTION OF JURISDICTION</u>**

### 13.1.    *Retention of Jurisdiction*

(a)    Pursuant to sections 105 and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction, to the fullest extent permissible under law, over all matters arising in, arising under, or related to the Chapter 11 Cases for, among other things, the following purposes:

(i)    To hear and determine all matters relating to the assumption or rejection of Executory Contracts or Unexpired Leases, including whether a contract or lease is or was executory or expired;

(ii)    To hear and determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

(iii)    To hear and resolve any disputes arising from or relating to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004, or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

(iv)    To ensure that Plan Distributions are accomplished as provided herein;

(v)    To consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, including any Administrative Expense Claim;

(vi)    To enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

(vii)    To issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of this Plan, the Confirmation Order, or any other order of the Bankruptcy Court (including, without limitation, with respect to releases, exculpations and indemnifications);

(viii)    To hear and determine any application to modify this Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in this Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(ix)    To hear and determine all matters relating to the allowance, disallowance, liquidation, classification, priority, or estimation of any Claim;

(x)    To resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

(xi)    To hear and determine disputes arising in connection with or related to the interpretation, implementation, or enforcement of this Plan, the Confirmation Order, the Disclosure Statement, any transactions or payments contemplated hereby, or any agreement, instrument, or other document governing or relating to any of the foregoing (including without limitation the Plan Supplement and the Plan Documents); *provided* that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection or dispute resolution clause that refers disputes to a different court and any disputes concerning documents contained in the Plan Supplement shall be governed in accordance with the provisions of such documents;

(xii)    To take any action and issue such orders, including any such action or orders as may be necessary after occurrence of the Effective Date and/or consummation of the Plan, as may be necessary to construe, enforce, implement, execute, and consummate this Plan, including any release or injunction provisions set forth herein, or to maintain the integrity of this Plan following consummation;

(xiii)    To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(xiv)    To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(xv)    To hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(xvi)    To resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases, the Combined Hearing, the deadline by which to file Administrative Expense Claims, or the deadline for responding or objecting to a cure amount owed pursuant to Bankruptcy Code section 365(b), for the purpose of determining whether a Claim or Interest is discharged hereunder, or for any other purpose;

(xvii)  To recover all assets of the Debtors and property of the Estates, wherever located;

(xviii)  To hear and determine any rights, claims or Causes of Action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal or state statute or legal theory; and

(xix)  To enter a final decree closing the Chapter 11 Cases.

(b)  If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, the provisions of Section 13.1 of the Plan shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

### 13.2. *Courts of Competent Jurisdiction*

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## ARTICLE XIV.

## MISCELLANEOUS PROVISIONS

### 14.1. *Payment of Statutory Fees.*

On the Effective Date and thereafter as may be required, the Reorganized Debtors shall pay all fees incurred pursuant to section 1930 of chapter 123 of title 28 of the United States Code, together with interest, if any, pursuant to § 3717 of title 31 of the United States Code for each Debtor's case, or until such time as a final decree is entered closing a particular Debtor's case, a Final Order converting such Debtor's case to a case under chapter 7 of the Bankruptcy Code is entered, or a Final Order dismissing such Debtor's case is entered.

### 14.2. *Substantial Consummation of the Plan.*

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 14.3. *Expedited Determination of Taxes.*

The Reorganized Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods of the Debtors through the Effective Date.

### 14.4.     *Exemption from Certain Transfer Taxes.*

Pursuant to, and to the fullest extent permitted by, section 1146 of the Bankruptcy Code, any transfers of property pursuant to, in contemplation of, or in connection with, the Plan, including, without limitation, the Confirmation Order, including (a) the Restructuring Transactions, (b) the issuance of the Plan Consideration, (c) the issuance, transfer or exchange of any securities or instruments, (d) the creation, filing or recording of any Lien, mortgage, deed of trust, or other security interest, (e) the making, assignment, filing or recording of any lease or sublease or the making or delivery of any deed, bill of sale, or other instrument of transfer under, pursuant to, in furtherance of, or in connection with the Plan, including, without limitation, any deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated under the Plan or the reinvesting, transfer, or sale of any real or personal property of the Debtors pursuant to, in implementation of or as contemplated in the Plan (whether to one or more of the Reorganized Debtors or otherwise), (f) the grant of Collateral under the Exit Facility, and (g) the issuance, renewal, modification, or securing of indebtedness shall constitute a "transfer under a plan" within the purview of section 1146 of the Bankruptcy Code and shall not be subject to or taxed under any law imposing any document recording tax, stamp tax, conveyance fee, or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing, or recording fee, regulatory filing or recording fee, sales tax, use tax, or other similar tax or governmental assessment.  Upon entry of the Confirmation Order, the appropriate state or local government officials or agents shall forgo the collection of any such tax or governmental assessment, and consistent with the foregoing, each recorder of deeds or similar official for any county, city, or Governmental Unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.

### 14.5.     *Amendments.*

(a)     Plan Modifications.  (i) The Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, and upon the written consent of the Plan Sponsor, to amend, modify, or supplement the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code and (ii) after entry of the Confirmation Order, the Debtors may, upon order of the Bankruptcy Court, amend, modify, or supplement the Plan in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, in each case without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as the Bankruptcy Code may otherwise direct.

(b)     Other Amendments.  After the Confirmation Date, so long as such action does not materially adversely affect the treatment of holders of Claims or Interests hereunder, and upon the written consent of the Plan Sponsor, the Debtors may remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes and effects of the Plan, and any holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented.  Before the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court; *provided*, that such

technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Interests and which shall be consistent with, and subject to the approvals and consents as set forth in, the RSA.

### 14.6.    *Effectuating Documents and Further Transactions.*

(a)    Each of the officers of the Reorganized Debtors is authorized, in accordance with his or her authority under the resolutions of the applicable owners, board of directors, and general partners, to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

(b)    On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or the Reorganized Debtors, as applicable, and all holders of Interests and Claims receiving Plan Distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### 14.7.    *Revocation or Withdrawal of Plan.*

The Debtors reserve the right, subject to the prior written consent of the Plan Sponsor, to revoke or withdraw the Plan prior to the Effective Date as to any or all of the Debtors. If, with respect to a Debtor, the Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date as to such Debtor does not occur on the Effective Date, then, with respect to such Debtor:  (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing of or limiting of an amount of any Claim or Interest or Class of Claims or Interests), assumption of Executory Contracts or Unexpired Leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, such Debtor or any other Entity, (ii) prejudice in any manner the rights of such Debtor or any other Entity, or (iii) constitute an admission of any sort by any Debtor or the Plan Sponsor, or any other Entity.

### 14.8.    *Severability of Plan Provisions.*

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, in each case at the election and the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration, or interpretation; *provided*, however, that any such holding, alteration, or interpretation shall not affect the approvals and consents as set forth in the RSA.  The Confirmation

Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Reorganized Debtors (as the case may be), and (c) nonseverable and mutually dependent.

### 14.9.     *Governing Law.*

Except to the extent that the Bankruptcy Code or other U.S. federal law is applicable, or to the extent an exhibit or schedule hereto, or a schedule in the Plan Supplement provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof; *provided* that corporate, limited partnership, or entity governance matters relating to a Debtor or a Reorganized Debtor shall be governed by the laws of the state of incorporation or organization of the Debtors or the Reorganized Debtors.

### 14.10.    *Time.*

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

### 14.11.    *Dates of Actions to Implement the Plan.*

In the event that any payment or act under the Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 14.12.    *Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the holders of Claims and Interests, the Released Parties, and each of their respective successors and assigns, including, without limitation, the Reorganized Debtors.

### 14.13.    *Deemed Acts.*

Subject to and conditioned on the occurrence of the Effective Date, whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of the Plan and the Confirmation Order.

### 14.14. *Successor and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or permitted assign, if any, of each such Entity.

### 14.15. *Entire Agreement.*

On the Effective Date, the Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

### 14.16. *Exhibits to Plan.*

All exhibits, schedules, supplements, and appendices to the Plan (including the Plan Supplement) are incorporated into and are a part of the Plan as if set forth in full therein.

### 14.17. *Reservation of Rights.*

The Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests prior to the Effective Date.

### 14.18. *Plan Supplement.*

After any of such documents included in the Plan Supplement are filed, copies of such documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Claims and Noticing Agent's website at http://dm.epiq11.com/HospitalityInvestorsTrust or the Bankruptcy Court's website at https://www.pacer.gov/.

### 14.19. *Waiver or Estoppel.*

Each holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers filed with the Bankruptcy Court prior to the Confirmation Date.

### 14.20. *Notices*

To be effective, all notices, requests, and demands to or upon the Debtors shall be in writing (including by electronic mail or facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in

the case of notice by electronic mail transmission, when received and telephonically confirmed, addressed as follows:

1.     **The Debtors at:**

        Hospitality Investors Trust, Inc.
        Park Avenue Tower,
        65 East 55th Street, Suite 801
        New York, NY 10022
        Attn: HIT Chapter 11 Notices
        Email:  casenotices@hitreit.com

2.     **Office of the U.S. Trustee at:**

        Office of the United States Trustee for the District of Delaware
        844 King Street, Suite 2207, Lockbox 35
        Wilmington, DE 19801
        Attn:  Joseph J. McMahon, Jr. (joseph.mcmahon@usdoj.gov)

3.     **Counsel to the Debtors at:**

        Proskauer Rose LLP
        70 West Madison
        Suite 3800
        Chicago, IL 60602
        Attn:  Jeff J. Marwil (jmarwil@proskauer.com), Paul V. Possinger
        (ppossinger@proskauer.com), and Jordan E. Sazant
        (jsazant@proskauer.com)

        - and -

        Proskauer Rose LLP
        Eleven Times Square
        New York, NY 10036
        Attn:  Joshua A. Esses (jesses@proskauer.com)

        - and -

        Potter Anderson & Corroon LLP
        1313 North Market Street
        Wilmington, DE 19801
        Telephone:  (302) 984-6000
        Attn:  Jeremy W. Ryan (jryan@potteranderson.com)

4.      **The Plan Sponsor at:**

Brookfield Strategic Real Estate Partners II Hospitality REIT II LLC
250 Vesey Street, 11th Floor
New York, NY 10004
Attn:  BPG Transactions Legal (realestatenotices@brookfield.com)

5.      **Counsel to the Plan Sponsor at:**

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
Attn:  Sean A. O'Neal (soneal@cgsh.com)

- and -

Young Conaway Stargatt & Taylor, LLP
Rodney Square, 1000 King Street
Wilmington, DE 19801
Attn:   Pauline K. Morgan
Email: pmorgan@ycst.com

After the occurrence of the Effective Date, the Reorganized Debtors have authority to send a notice to Entities stating that in order to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entities must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the occurrence of the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities that have filed such renewed requests.

## ARTICLE XV.

## CONCLUSION AND RECOMMENDATION

The Debtors believe the Plan is in the best interests of all stakeholders and urge the holders of Interests in the Voting Class to vote in favor thereof.

Dated:  May 18, 2021

Respectfully submitted,
**Hospitality Investors Trust, Inc. and**
**Hospitality Investors Trust Operating Partnership,**
**L.P.**

By:  */s/ Bruce A. Riggins*
Name:  Bruce A. Riggins
Title:  Chief Financial Officer, Hospitality Investors
Trust, Inc.

# Exhibit A

## Contingent Value Rights Agreement

**Exhibit Version**

**CONTINGENT VALUE RIGHTS AGREEMENT**

This CONTINGENT VALUE RIGHTS AGREEMENT, dated as of [●] [●], 2021 (this "***Agreement***"), is entered into by and between Hospitality Investors Trust, Inc., a Maryland corporation (the "***Company***"), and Computershare, Inc. ("***Computershare***"), a Delaware corporation, and its wholly owned subsidiary, Computershare Trust Company, N.A., a federally chartered trust company, collectively, as agent with respect to the Contingent Value Rights (the "***CVR Agent***").

**WITNESSETH:**

WHEREAS, on May 19, 2021, the Company and its operating partnership, Hospitality Investors Trust Operating Partnership, L.P., a Delaware limited partnership (the "***OP***"), entered into a Restructuring Support Agreement (as may be subsequently amended or modified from time to time, the "***RSA***") with the Supporting Stockholder;

WHEREAS, on May 19, 2021 (the "***Petition Date***"), the Company and the OP commenced voluntary cases under the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "***Cases***"), and concurrently filed a joint prepackaged plan of reorganization (as may be amended or modified from time to time in accordance with the RSA, the "***Plan***");

WHEREAS, the Company has obtained a debtor-in-possession loan facility (as may be subsequently amended or modified from time to time, the "***DIP Facility***") and a post-confirmation loan facility (as may be subsequently amended or modified from time to time, the "***Exit Facility***") from the Supporting Stockholder;

WHEREAS, pursuant to the Plan, the Company shall grant Contingent Value Rights to holders of the Shares on the Effective Date;

WHEREAS, this Agreement constitutes the CVR Agreement referred to in the RSA and the Plan;

WHEREAS, the Contingent Value Right is a contract right, providing the Holders with the right to receive contingent cash payments if and to the extent payable pursuant to the terms of this Agreement for each Contingent Value Right at a later date and subject to the terms and conditions set forth herein;

WHEREAS, the Company desires to appoint the CVR Agent as its agent with respect to the Contingent Value Rights pursuant to the terms of this Agreement, and the CVR Agent desires to accept such appointment; and

WHEREAS, the CVR Agent has agreed to provide specified services covered by this Agreement.

NOW, THEREFORE, for and in consideration of the agreements contained herein and the consummation of the Plan, it is mutually covenanted and agreed, for the benefit of all Holders, as follows:

# ARTICLE 1
## DEFINITIONS

Section 1.1.    Definitions.

(a)    For all purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(i)    the terms defined in this Article 1 have the meanings assigned to them in this Article 1, and include the plural as well as the singular;

(ii)    the words "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision;

(iii)    unless the context otherwise requires, words describing the singular number shall include the plural and vice versa, words denoting any gender shall include all genders and words denoting natural Persons shall include corporations, partnerships and other Persons and vice versa;

(iv)    references to any Person shall include such Person's successors and permitted assigns; and

(v)    whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by "without limitation".

(b)    The following terms shall have the meanings ascribed to them as follows:

"*2019 Hotel EBITDA*" means, with respect to the Hotel Properties in the CVR Asset Pool or the Excluded Properties, the Adjusted EBITDA for the year ended December 31, 2019 for such Hotel Properties in the CVR Asset Pool or Excluded Properties, as applicable, calculated without giving effect to clause (c) of the first sentence of the definition of Adjusted EBITDA.

"*Additional Adjustment Amount*" means (i) any amount distributed by the CVR Holding Company to its shareholders, members, or partners, or (ii) any principal amount loaned by the CVR Holding Company or any of its direct or indirect Subsidiaries pursuant to any Upstream Intercompany Loan other than (a) any distribution, payment or loan out of net proceeds from a Monetization Event, but only to the extent such amount has not previously been taken into account in the determination of a Total Distributable Amount under Section 2.4(g), and (b) any Permitted Distribution.

"*Adjusted EBITDA*", with respect to one or more Hotel Properties and any Measurement Period, is calculated as net loss (income) and comprehensive loss (income) (calculated in accordance with GAAP) of the applicable Hotel Property or Hotel Properties during the applicable

Measurement Period, excluding (a) the effect of expenses not related to operating the applicable Hotel Property or Hotel Properties, (b) non-cash charges that are not indicative of the operating performance of the applicable Hotel Property or Hotel Properties, and (c) any effects on net loss (income) and comprehensive loss (income) due to (1) a Casualty or Condemnation Event, strike or other labor dispute, fire, war, insurrection, act of God, governmental intervention, terrorism or pandemic or (2) any other event that is reasonably beyond the control of the Company other than to the extent the principal cause of such event is the Company's or any of its Subsidiaries' gross negligence or willful misconduct. Exclusions made for these purposes shall include (to the extent attributable to a particular Hotel Property or Hotel Properties, if applicable): (i) depreciation and amortization; (ii) impairment of goodwill and long-lived assets; (iii) interest expense; (iv) transaction related costs; (v) other loss (income); (vi) gain (loss) on sale of assets, net; (vii) equity in loss (earnings) of unconsolidated entities; (viii) general and administrative expense; and (ix) income tax (benefit) expense.

"***Adjusted EBITDA Threshold***" means, with respect to any Hotel Property, the amount of Adjusted EBITDA for such Hotel Property set forth on Schedule I hereto. Any reference to the Adjusted EBITDA Threshold for the CVR Asset Pool refers to the aggregate Adjusted EBITDA Threshold of all of the Hotel Properties then in the CVR Asset Pool.

"***Adjusted Total CVR Pool Amount***" has the meaning set forth in Section 2.4(g)(i).

"***Affiliate***" means, when used with respect to a specified Person, a Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with such specified Person. As used in this definition, the term "control" (including with correlative meanings, "controlled by" and "under common control with"), when used with respect to any specified Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or other interests, by contract, agreement, obligation, indenture, instrument, lease, promise, arrangement, release, warranty, commitment, undertaking or otherwise.

"***Agreement***" has the meaning set forth in the Preamble.

"***All or Substantially All of the Assets***" means at least eighty percent (80%) of the number of the Hotel Properties comprising the CVR Asset Pool as of the Effective Date.

"*Board of Directors*" means the Board of Directors of the Company.

"***Business Day***" means any day other than a Saturday or Sunday or a day on which banks are required or authorized to close in the City of New York.

"***Calculation Certificate***" has the meaning set forth in Section 2.5(a).

"***Capital Stock***" means, with respect to any Person, all of the shares, interests, rights, participations or other equivalents (however designated) of capital stock of (or other ownership, equity or profit interests or units in, including any limited or general partnership interest and any limited liability company interest) such Person.

"***Cases***" has the meaning set forth in the Recitals.

"*Casualty or Condemnation Event*" means the damage or destruction, in whole or in part, by fire or other casualty, of a Hotel Property or a temporary or permanent taking of a Hotel Property by any governmental authority as the result or in lieu or in anticipation of the exercise of the right of condemnation or eminent domain, of all or any part of any Hotel Property, or any interest therein or right accruing thereto, including any right of access thereto or any change of grade affecting such Hotel Property or any part thereof.

"*Change-of-Control Monetization Event*" means (a) the sale or other disposition (in one transaction or a series of related transactions) of outstanding Voting Securities of (i) the Company or (ii) any direct or indirect Subsidiary(ies) of the Company that, individually or together, directly or indirectly hold(s) 100% of the Company's interest in the Hotel Properties comprising the CVR Asset Pool, representing in the aggregate more than 50.0% of the total voting power of the Voting Securities of the Company or such Subsidiary(ies) (after giving effect to such sale or other disposition) to any Person or "group" (as such term is used in Section 13(d)(3) of the Exchange Act) of Persons, other than a transfer of Voting Securities of the Company or such Subsidiary(ies) to any Affiliates of the holders of the Voting Securities being transferred as part of a reorganization, restructuring or similar transaction that is (x) not treated as a liquidity event for the Supporting Stockholder or its Affiliates that are shareholders of the Company participating in such transaction (as determined in good faith by the Supporting Stockholder) and (y) approved by the Independent Director(s) or, if there are more than two Independent Directors, a majority of the Independent Directors (which approval may be given at any meeting of the Board of Directors or any committee thereof or pursuant to any action taken by written or electronic consent by the Board of Directors or any committee thereof); <u>provided</u> that in the event of a transfer of Voting Securities in direct or indirect Subsidiary(ies) of the Company, this Agreement shall be assigned to the transferee in accordance with <u>Section 4.5</u>, or (b) a reorganization, merger, share exchange, consolidation or other business combination of the Company, or any direct or indirect Subsidiary(ies) of the Company that, individually or together, directly or indirectly hold(s) 100% of the Company's interests in the Hotel Properties comprising the CVR Asset Pool, with or into any other Person in which transaction the Shareholders as of immediately prior to such transaction and their Affiliates own, directly or indirectly (including by or through the Company or any other Person), an aggregate of less than 50.0% of the total voting power of the Voting Securities of the Company or such Subsidiary(ies) or, if the Company or such Subsidiary(ies) is(are) not the acquiring, resulting or surviving Person(s) in such transaction, such acquiring, resulting or surviving Person.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Company*" has the meaning set forth in the Preamble; <u>provided</u> that any reference to any action to be taken by the Company or not to be taken by the Company, or with respect to the assets or liabilities of the Company, shall be deemed to include the Company's direct and indirect Subsidiaries, as applicable.

"*Compelled*" has the meaning set forth in <u>Section 4.3(b)(i)</u>.

"*Confidential Information*" has the meaning set forth in <u>Section 4.3(b)(i)</u>.

"*Confirmation Order*" has the meaning set forth in the Plan.

"**_Contingent Value Rights_**" means the rights of Holders to receive contingent cash payments pursuant to the Plan and this Agreement.

"**_Control_**" (including the terms "controlled," "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of Voting Securities, by contract or otherwise.

"**_CVR Agent_**" means the CVR Agent named in the Preamble, until a successor CVR Agent shall have become such pursuant to the applicable provisions of this Agreement, and thereafter "CVR Agent" shall mean such successor CVR Agent.

"**_CVR Agent Fees_**" has the meaning set forth in <u>Section 3.2(f)</u>.

"**_CVR Asset Pool_**" means the Hotel Properties that were owned by the Company and its Subsidiaries as of immediately prior to the Effective Date that are not Excluded Assets, and other assets directly related to operation of such Hotel Properties that are not Excluded Assets and any mortgage indebtedness and other indebtedness and liabilities (whether known, unknown, absolute, accrued, contingent or otherwise), rights and obligations and agreement related to the operations of such Hotel Properties and excluding any general and administrative expenses incurred by the CVR Holding Company and its Subsidiaries or any other Person, which expenses shall not be the responsibility of the CVR Holding Company and its Subsidiaries.

"**_CVR Distribution Expenses_**" means, with respect to any distribution to Holders in respect of a Distribution Triggering Monetization Event, the Final Payment Date Distribution or a Holdback Payment Distribution, as applicable, the reasonable, documented, out-of-pocket costs and expenses of the Company and any of its Subsidiaries in connection with the performance of its and/or their respective obligations under this Agreement or otherwise in connection with any such distribution to be made to the Holders in respect of such Distribution Triggering Monetization Event, Final Payment Date Distribution or Holdback Payment Distribution, as applicable, including, if applicable to the particular Distribution Triggering Monetization Event, Final Payment Date Distribution or Holdback Payment Distribution: (a) all reasonable, documented, out-of-pocket costs and expenses billed by the Independent Valuer and/or the Independent Investment Banker; (b) the costs and expenses (whether or not reasonable) billed by the Independent Accountant and allocated to the Company pursuant to <u>Section 2.6(a)</u>; and (c) the CVR Agent Fees billed by the CVR Agent in connection with such Distribution Triggering Monetization Event, Final Payment Date Distribution or Holdback Payment Distribution, as applicable; <u>provided</u>, that CVR Distribution Expenses shall not include any costs or expenses to the extent expressly taken into account or given effect to in the calculations of Net Proceeds from Hotel Sale or Net Proceeds from CVR Asset Pool.

"**_CVR Holding Company_**" means the OP or any other Subsidiary of the Company that directly or indirectly owns the Hotel Properties in the CVR Asset Pool.

"**_CVR Payment Date_**" has the meaning set forth in <u>Section 2.5(c)</u>.

"**_CVR Register_**" has the meaning set forth in <u>Section 2.3(b)</u>.

"***DIP Facility***" has the meaning set forth in the Recitals.

"***DIP Financing Invested Capital Amount***" means $[•], representing the amount of outstanding principal and accrued interest and other outstanding obligations through and including the Effective Date under the DIP Facility that is converted to Shares on the Effective Date pursuant to the Plan multiplied by the Excluded Asset Adjustment Factor, which amount shall be subject to reduction from time to time by in accordance with Section 2.4(g).

"***Distribution Triggering Monetization Event***" means a Monetization Event of the type set forth in clause (i) or (ii) of the definition thereof.

"***Effective Date***" means the effective date of the Plan.

"***Exchange Act***" means the Securities Exchange Act of 1934, as amended.

"***Exit Facility***" has the meaning set forth in the Recitals.

"***Excluded Assets***" means the Hotel Properties on Schedule II hereto and other assets directly related to operation of such Hotel Properties and any mortgage indebtedness and other indebtedness and liabilities (whether known, unknown, absolute, accrued, contingent or otherwise), rights and obligations and agreement related to the operations of such Hotel Properties, which shall have been transferred from the CVR Holding Company if requisite consents have been obtained, or, if requisite consents have not been obtained, shall be held by the CVR Holding Company pursuant to arrangements under which it shall be treated, for all purposes applicable under this Agreement and notwithstanding anything to the contrary in this Agreement, as if the Excluded Assets were not part of the CVR Asset Pool.

"***Excluded Asset Adjustment Factor***" means 0.9866, representing (a) one, *minus* (b) the quotient (expressed as a decimal fraction) of (i) the aggregate 2019 Hotel EBITDA of the Excluded Assets, divided by (ii) the sum of (A) the aggregate 2019 Hotel EBITDA of the Excluded Assets and (B) the aggregate 2019 Hotel EBITDA of the Hotel Properties in the CVR Asset Pool.

"***Extended Maturity Date***" means [•], 2028, the seventh anniversary of the Effective Date.

"***Final Payment Date***" means the earlier of (i) the Maturity Date and (ii) the date that is the six-month anniversary of the first occurrence of a Distribution Triggering Monetization Event (or, if not a Business Day, the next Business Day).

"***Final Payment Date Distribution***" means the final distribution to Holders in respect of amounts distributable as of the Final Payment Date.

"***GAAP***" means United States generally accepted accounting principles as in effect from time to time and set forth in the Financial Accounting Standards Board Accounting Standards Codification applied on a basis in all material respects consistent with that of the Company for the 2020 fiscal year (except as required by changes in such generally accepted accounting principles).

"***Governmental Entity***" means United States or non-United States national, federal, state or local governmental, regulatory or administrative authority, agency or commission or any judicial or arbitral body.

"***Holdback***" has the meaning set forth in Section 2.4(d)(iii).

"***Holdback Amount***" has the meaning set forth in Section 2.4(d)(iii).

"***Holdback Payment Distribution***" has the meaning set forth in Section 2.4(d)(vi).

"***Holdback Payment Distribution Payment Date***" has the meaning set forth in Section 2.5(e).

"***Holdback Value***" has the meaning set forth in Section 2.4(d)(vii).

"***Holder***" means a Person in whose name a Contingent Value Right is registered in the CVR Register.

"***Hotel Property***" shall mean each property on which a hotel is operated and in which the Company or any direct or indirect Subsidiary holds an ownership interest, together with the buildings and other improvements thereon and all assets related to the operation of the hotel on the Hotel Property.

"***Indemnitees***" has the meaning set forth in Section 3.2(e).

"***Independent Accountant***" means an independent certified public accounting firm of nationally recognized standing designated by the Company.

"***Independent Director***" means any director of the Company who is an "independent director" as defined under Listing Rule 303A.02 of the New York Stock Exchange Listed Company Manual or any successor provision.

"***Independent Investment Banker***" means an independent and nationally recognized financial services company selected by the Company from a list of at list three (3) candidates provided by the Independent Director(s), each of which has at least ten years of experience advising Persons owning hotel properties similar to those owned by the Company.

"***Independent Valuer***" means an independent and nationally recognized MAI appraiser selected by the Company from a list of at least three (3) candidates provided by the Independent Director(s), each of which has at least ten years of experience valuing hotel properties similar to those owned by the Company.

"***Initial Contingent Value Rights***" has the meaning set forth in Section 2.1(c).

"***Initial Maturity Date***" means [•], 2026, the fifth anniversary of the Effective Date.

"***Losses***" has the meaning set forth in Section 3.2(e).

"*Majority of Holders*" means, at any time, the registered Holder(s) of more than 50% of the total number of Contingent Value Rights registered at such time, as set forth on the CVR Register.

"*Make Available*" means, with respect to any document, notice or information required to be provided to Holders under this Agreement, at the Company's option, either (1) to mail or cause the CVR Agent to mail a notice thereof by first-class mail to the Holders at their addresses as they shall appear on the CVR Register, or (2) to post on the Company's public website.

"*Maturity Date*" means either (i) the Initial Maturity Date, or (ii) if the Company exercises its extension right pursuant to Section 2.7, the Extended Maturity Date.

"*Measurement Period*" means, as applicable, the trailing 12-month period ending on the last day of the calendar quarter preceding the calendar quarter in which the event that has required the Company to calculate the Adjusted EBITDA for any Hotel Property occurs.

"**Monetization Event**" means (i) the consummation of a Change-of-Control Monetization Event, (ii) the consummation of any transaction that does not constitute a Change-of-Control Monetization Event pursuant to which, directly or indirectly, on a cumulative basis following consummation of such transaction, All or Substantially All of the Assets included in the CVR Asset Pool have been sold or otherwise disposed of subsequent to the Effective Date, other than any disposition of all of the Hotel Properties comprising the CVR Asset Pool then owned directly or indirectly by the Company to an Affiliate of the Company or the Supporting Stockholder as part of a reorganization, restructuring or similar transaction that is (x) not treated as a liquidity event for the Supporting Stockholder or its Affiliates that are shareholders of the Company participating in such transaction (as determined by the Supporting Stockholder in good faith) and (y) approved by the Independent Director(s) or, if there are more than two Independent Directors, a majority of the Independent Directors (which approval may be given at any meeting of the Board of Directors or any committee thereof or pursuant to any action taken by written or electronic consent by the Board of Directors or any committee thereof); provided that in the event of any such disposition to an Affiliate of the Company or the Supporting Stockholder that is not the Company or a Subsidiary of the Company, this Agreement shall be assigned to the transferee in accordance with Section 4.5, or (iii) a sale or other disposition of assets remaining in the CVR Asset Pool that occurs subsequent to a Distribution Triggering Monetization Event but prior to the Final Payment Date.

"*Net Proceeds from CVR Asset Pool*" has the meaning set forth in Section 2.4(c).

"*Net Proceeds from Hotel Sale*" means the amount of any cash or non-cash consideration actually received by the Company in any direct or indirect sale of all of the Company's interest in any Hotel Property (with the valuation of any non-cash consideration determined by the Independent Investment Banker) less (i) the mortgage indebtedness and other indebtedness and liabilities (whether known, unknown, absolute, accrued, contingent or otherwise) not assumed by the buyer or to which the buyer does not acquire the assets subject to (with such amounts determined in good faith by the Board of Directors), and (ii) reasonable, documented, out-of-pocket costs and expenses of the Company and any of its Subsidiaries in connection with such sale.

"*Notice of Objection*" has the meaning set forth in <u>Section 2.5(b)</u>.

"*Objection Period*" has the meaning set forth in <u>Section 2.5(b)</u>.

"*Officer's Certificate*" means a certificate signed by the chief executive officer, president, chief financial officer, any vice president, the controller, the treasurer or the secretary, in each case of the Company, in his or her capacity as such an officer, and delivered to the CVR Agent.

"*Permitted Distributions*" means any amount distributed by the CVR Holding Company (a) to the Company to fund costs and expenses of the Company or any of its Subsidiaries, including (i) general and administrative expenses, (ii) to the extent not covered by clause (i), expenses associated with directors, officers, employees, consultants and any other agents of the Company (including any severance or termination payments), (iii) taxes, (iv) payments pursuant to contractual obligations, (v) payments of cash dividends to shareholders of the Company that are not Affiliates of the Supporting Stockholder who shall have been issued preferred stock intended to enable the Company to satisfy the closely held requirements applicable to real estate investment trusts under Section 856(a)(6) of the Code, (vii) payments related to the expenses of or settlement of litigations or disputes, (viii) payments of principal, interest, fees and other expenses associated with indebtedness to the extent that the principal amount of such indebtedness has been (A) contributed to the CVR Holding Company or any of its Subsidiaries or (B) used to fund costs and expenses of the Company or any of its Subsidiaries that the CVR Company would be permitted to distribute funds to the Company to fund under this <u>clause (a)</u>, (ix) capital expenditures (including property improvement plan expenditures), (x) expenses relating to furniture, fixtures and other equipment, (xi) management fees and other charges, fees and expenses to be paid to the property managers or sub-managers, (xii) costs and fees of independent professionals (including legal, accounting, consultants and other professional expenses), technical consultants, operational experts (including quality assurance inspectors) or other third parties retained to perform services for the Company or any of its Subsidiaries, (xiii) costs of attendance by employees at training and manpower development programs, (xiv) association dues, (xv) computer processing charges, (xvi) operational equipment and other lease payments, (xvii) insurance premiums, ground rents, maintenance charges and other charges and impositions and (xviii) franchise fees and expenses; <u>provided</u> that costs and expenses, individually and in the aggregate, covered by this <u>clause (a)</u> shall be consistent in scope and kind with the Company's corporate-level costs and expenses in 2019 and 2020, shall not include costs or expenses primarily relating to assets other than the assets in the CVR Asset Pool and shall be allocated between the CVR Holding Company and assets that are not included in the CVR Asset Pool (including if such assets are Excluded Assets or were acquired by the Company subsequent to the Effective Date) based on the ratio of their respective Adjusted EBITDA for the trailing 12-month period ending on the last day of the calendar quarter preceding the calendar quarter in which the Permitted Distribution was made, and (b) to any Person (including, for the avoidance of doubt, the Company or any of its shareholders, including the Supporting Stockholder) in respect of the Net Proceeds from Hotel Sale of any Hotel Property prior to a Monetization Event that is not a Qualifying CVR Asset Pool Sale.

"*Permitted Transfer*" means: (i) the transfer (upon the death of the Holder) by will or intestacy; (ii) a transfer by instrument to an *inter vivos* or testamentary trust in which the Contingent Value Rights are to be passed to beneficiaries upon the death of the trustee; (iii) transfers made pursuant to a court order of a court of competent jurisdiction in connection

with divorce, bankruptcy or liquidation; or (iv) a transfer made by operation of law (including a consolidation or merger) or without consideration in connection with the dissolution, liquidation or termination of any corporation, limited liability company, partnership or other entity.

"***Permitted Transferee***" means a Person who receives a Contingent Value Right pursuant to a Permitted Transfer and otherwise in accordance with this Agreement.

"***Person***" means any individual, corporation (including not-for-profit), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, Governmental Entity or other entity of any kind or nature.

"***Petition Date***" has the meaning set forth in the Recitals.

"***Plan***" has the meaning set forth in the Recitals.

"***Plan Documents***" means the RSA, the Plan, this Agreement, the DIP Facility, the Exit Facility, and the organizational documents of the Company and the CVR Holding Company adopted as of the Effective Date.

"***Post-Effective Date Contributions***" means, without duplication, any cash contributions or loans made to the CVR Holding Company or any of its Subsidiaries on or after the Effective Date however structured, including cash amounts contributed, paid or loaned to the CVR Holding Company or any of its Subsidiaries on or after the Effective Date pursuant to the Exit Facility; provided, that, except for any cash contributions or loans made to the CVR Holding Company or any of its Subsidiaries pursuant to the Exit Facility: (a) any such loans shall be on terms and conditions that are arm's length in accordance with Section 4.1 (provided, that any such loan shall be deemed to be on arm's length terms for purposes of Section 4.1 if such loan is on terms substantially similar to the terms of the Exit Facility) and (b) any such cash contributions and loans shall only be used for (i) funding the costs and expenses of the CVR Holding Company and its Subsidiaries, including any of the costs and expenses set forth in clauses (i)-(xviii) in clause (a) of the definition of "Permitted Distributions" and (ii) reserves and/or liquidity requirements or needs of the CVR Holding Company and its Subsidiaries, as determined by the Company in its sole discretion.

"***Pre-Petition LPA***" means the Amended and Restated Agreement of Limited Partnership of the OP, dated as of March 31, 2017 and as amended from time to time through the date of the RSA.

"***Pro Rata Payment Amount***" means an amount equal to (i) a fraction, the numerator of which equals the total number of Contingent Value Rights held by such Holder on such date, and the denominator of which equals [•][1], *multiplied by* (ii) the Total Distributable Amount payable pursuant to Section 2.5(c), Section 2.5(d) or Section 2.5(e), as applicable.

---

[1] **Note to Draft**: Such number shall be inserted in the executed CVR Agreement as of the Effective Date and shall be equal to: (i) the number of CVRs to be issued in respect of shares of outstanding common stock (which will include the number of CVRs to be issued in respect of RSUs that are cancelled on the Effective Date), *plus* (ii) the number of CVRs that would otherwise have been issued in respect of shares of common stock (including restricted shares) held

"***Qualifying CVR Asset Pool Sale***" means any direct or indirect sale of all of the Company's interest in any Hotel Property prior to the consummation of a transaction or series of transactions constituting a Distribution Triggering Monetization Event or, if no Distribution Triggering Monetization Event occurs prior to the Final Payment Date, the Final Payment Date, if, at the time of the consummation of such sale, the Adjusted EBITDA for such Hotel Property for the Measurement Period exceeds the Adjusted EBITDA Threshold for such Hotel Property.

"***Related Party***" has the meaning ascribed to the term "related person" in Item 404(a) of Regulation S-K under the Exchange Act.

"***RSA***" has the meaning set forth in the Recitals.

"***Section 2.4(g)(iii) 94% Amount***" has the meaning set forth in Section 2.4(g)(iii).

"***Section 2.4(g)(iv) 94% Amount***" has the meaning set forth in Section 2.4(g)(iv).

"***Securities Act***" means the Securities Act of 1933, as amended.

"***Shares***" means the shares of common stock, par value $0.01 per share, of the Company.

"***Shareholder***" means, in connection with a Change-of-Control Monetization Event, any holder of Shares or equity interests of any applicable Subsidiary of the Company receiving consideration in such Change-of-Control Monetization Event.

"***Subsidiary***" means, with respect to any Person, any corporation, partnership, limited liability company or other organization, whether incorporated or unincorporated, of which the securities or other ownership interests having more than 50% of the ordinary voting power in electing the board of directors or other governing body are, at the time of such determination, owned by such Person or another Subsidiary of such Person.

"***Supporting Stockholder***" means Brookfield Strategic Real Estate Partners II Hospitality REIT II LLC, a Delaware limited liability company, together with its successors and permitted assigns.

"***Supporting Stockholder CVR Asset Pool Invested Amount***" means $395,310,206.34, representing (i) the sum of (A) $379,746,396.50 (the purchase price paid by the Supporting Stockholder to the OP to acquire Class C Units (as defined in the Pre-Petition LPA)) *plus* (B) $16,289,594.88, which represents the Liquidation Preference (as defined in the Pre-Petition LPA) of the Class C Units issued in respect of the portions of the 12/31/20 PIK Distribution Amount (as defined in the Pre-Petition LPA) and the 3/31/21 PIK Distribution Amount (as defined in the Pre-Petition LPA) that correspond to the cash distributions that would have been payable on December 31, 2020 and March 31, 2021 if the Pre-Petition LPA had not been amended on December 24, 2020 and March 30, 2021 (but, for the avoidance of doubt, not any other Class C Units issued as PIK Distributions (as defined in the Pre-Petition LPA)), *plus* (C) $4,643,317.70, representing the accrued and unpaid Class C Cash Distribution Amount (as defined in the Pre-Petition LPA) from

by the Brookfield Investor, which will effectively be cancelled as of the Effective Date pursuant to the Plan, but which number shall be included solely for purposes of this calculation.

and after March 31, 2021 through and including the Petition Date, *multiplied by* (ii) the Excluded Asset Adjustment Factor, which shall be subject to reduction from time to time in accordance with <u>Section 2.4(g)</u>.

"***Tax***" means all federal, state, local and foreign income, profits, franchise, gross receipts, environmental, customs duty, capital stock, severances, stamp, payroll, sales, employment, unemployment, disability, use, property, withholding, excise, production, value added, occupancy and other taxes, together with all interest, penalties and additions imposed with respect to such amounts and any interest in respect of such penalties and additions, in each case, imposed by a Governmental Entity.

"***Total CVR Pool Amount***" has the meaning set forth in <u>Section 2.4(a)</u>.

"***Total Distributable Amount***" has the meaning set forth in <u>Section 2.4(a)</u>.

"***Transfer***" means any sale, assignment, transfer, disposition, mortgage, pledge, participation, donation, gift, bequest, grant, hypothecation, encumbrance or any other similar transaction in any manner, direct or indirect, in whole or in part.

"***Upstream Intercompany Loan***" means a loan made by, or any other indebtedness for money borrowed from, the CVR Holding Company or its direct or indirect Subsidiaries to the Company or its direct or indirect Subsidiaries (other than to the CVR Holding Company or any of its direct and indirect Subsidiaries).

"***Value***" means, with respect to any asset or liability of the CVR Asset Pool or any other asset or liability required to be valued for purposes of calculating the Total CVR Pool Amount or the Total Distributable Amount (<u>provided</u> that the value of a Hotel Property or the CVR Asset Pool shall not include the outstanding principal amount of any Upstream Intercompany Loans), its fair market value. In the case of Hotel Properties, the fair market value shall be determined by the Independent Valuer in accordance with <u>Section 2.4(e)</u> and shall equal the purchase price of the Hotel Property if such Hotel Property were sold for cash for a purchase price equal to its fair market value in an arm's-length transaction under then current conditions for the sale of comparable properties allowing a commercially reasonable marketing period to find a purchaser that is willing to pay a cash price with the benefit of customary due diligence investigations, reduced by the transaction costs which would be payable by the Company in connection with the transaction, assuming (subject to the immediately following sentence) (i) the mortgage loans secured by the Hotel Property were discharged, (ii) the transfer taxes, customary broker fees and other customary costs of closing were paid by the party customarily responsible for such costs and (iii) all other liabilities of the Company which relate to the Hotel Property being sold were discharged by the Company. The fair market value, as determined by the Independent Valuer, shall be reduced by any mortgage indebtedness and other indebtedness and liabilities (whether known, unknown, absolute, accrued, contingent or otherwise) relating to such Hotel Property not assumed or taken subject to, by the buyer, to the extent not otherwise expressly taken into account as a reduction in fair market value in the appraisal. Without duplication, the fair market value of all other assets and liabilities contained in the CVR Asset Pool that are not Hotel Properties shall be determined based on the most recent quarterly balance sheet for the CVR Holding Company furnished by the Company pursuant to <u>Section 4.3(a)</u>. The fair market value of any non-cash consideration actually

received in respect of any Holdback Amount shall be determined by the Independent Investment Banker. The fair market value of any Holdback Amount that remains contingent as of the Final Payment Date but is not yet payable pursuant to the terms of the applicable definitive agreement(s) shall be the Holdback Value of such Holdback Amount; provided that the Holdback Value of such Holdback Amount shall be included in the calculation of the aggregate Value of the CVR Asset Pool as of the Final Payment Date only if the Company elects to so include such Holdback Value in such calculation pursuant to Section 2.4(d)(vi)(A) and such Holdback Value shall the be determined in accordance with Section 2.4(d)(vii).

"*Voting Securities*" means, with respect to any Person, the Capital Stock of such Person, the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election or appointment of directors (or Persons performing similar functions (including a "manager" (as defined under the Delaware Limited Liability Company Act, Title 6 of the Delaware Code, Section 18-101, et seq.)) of such Person.

## ARTICLE 2
## CONTINGENT VALUE RIGHTS

Section 2.1.    Issuance of Contingent Value Rights; Appointment of CVR Agent.

(a)    Pursuant to the Plan, the Contingent Value Rights represent the contractual rights of Holders to receive contingent cash payments if and to the extent payable pursuant to the terms of this Agreement. The initial persons entitled to be Holders shall be the holders of Shares as of immediately prior to the Effective Date (including, without limitation, holders of restricted stock units that as of immediately prior to the Effective Date will be terminated and paid in Shares in accordance with the Plan). Each Holder shall be entitled to one Contingent Value Right for each Share owned as of immediately prior to the Effective Date pursuant to the Plan. Pursuant to the Plan and Confirmation Order, each Holder is automatically deemed to have accepted the terms of this Agreement and is automatically deemed to be a party hereto as if, and with the same effect as if, such Holder had delivered a duly executed counterpart signature page to this Agreement without any further action by any party. For the avoidance of doubt, the Holders are deemed to hereby acknowledge that the Contingent Value Rights are not "securities" within the meaning of the Securities Act, Exchange Act or any other applicable federal, state or foreign securities laws.

(b)    The Company hereby appoints the CVR Agent to act as agent for the Company with respect to the Contingent Value Rights in accordance with the express terms and conditions set forth in this Agreement (and no implied terms and conditions), and the CVR Agent hereby accepts such appointment.

(c)    The maximum aggregate number of Contingent Value Rights that may be outstanding under this CVR Agreement is limited to [•] (the "*Initial Contingent Value Rights*"), which is the number of Contingent Value Rights that were issued pursuant to the Plan and in accordance with Section 2.1(a) above and which Contingent Value Rights were outstanding as of the Effective Date. The number of outstanding Contingent Value Rights at any given time may be less than the number of Initial Contingent Value Rights, if reduced in accordance with Section 2.9 upon the abandonment of a Contingent Value Right. From and after the Effective Date, the

Company shall not be permitted to issue any additional Contingent Value Rights under this CVR Agreement.

Section 2.2.    Non-transferability.    The Contingent Value Rights are non-transferable and shall not be Transferred, other than a Permitted Transfer to a Permitted Transferee. No Holder may Transfer any economic interest in a Contingent Value Right to any other Person. Any final determination regarding whether a proposed transferee is a Permitted Transferee shall be made by the Company, in its discretion, pursuant to Section 2.3(c) below. Any purported Transfer of a Contingent Value Right to anyone other than a Permitted Transferee shall be null and void *ab initio*.

Section 2.3.    No Certificate; Registration; Registration of Transfer; Change of Address.

(a)    The Contingent Value Rights shall not be evidenced by a certificate or other instrument.

(b)    The CVR Agent shall keep a register (the "***CVR Register***") for the registration of Contingent Value Rights in a book-entry position for each Holder. The CVR Register shall set forth the name and address of each Holder and the number of Contingent Value Rights held by such Holder. The CVR Register will be updated as necessary by the CVR Agent to reflect the addition or removal of Holders (including pursuant to any Permitted Transfers or abandonment pursuant to Section 2.9 ), upon receipt of such information by the CVR Agent. The Company or the Company's Affiliates or representatives may receive and inspect a copy of the CVR Register, from time to time, upon request made to the CVR Agent.

(c)    Subject to the restrictions set forth in Section 2.2, every request made to Transfer a Contingent Value Right to a Permitted Transferee must be made in writing to the Company and the CVR Agent and set forth in reasonable detail the circumstances related to the proposed Transfer, and must be accompanied by a written instrument or instruments of transfer and any other requested information or documentation in a form reasonably satisfactory to the Company and the CVR Agent, duly and validly executed by the registered Holder or Holders thereof or by the duly appointed legal representative thereof or by a duly authorized attorney, with such signature to be guaranteed by a guarantor institution that is a participant in a signature guarantee medallion program approved by the Securities Transfer Association. A request for a Transfer of a Contingent Value Right shall be accompanied by documentation establishing the Transfer is to a Permitted Transferee and any other information as may be reasonably requested by the Company or the CVR Agent (including opinions of counsel, if requested by the Company or the CVR Agent). Upon receipt of such a written Transfer request, the Company shall, subject to its reasonable determination that the Transfer instrument is in proper form and the transfer otherwise complies with the other terms and conditions herein, instruct the CVR Agent in writing to register the Transfer of the Contingent Value Rights in the CVR Register. All duly Transferred Contingent Value Rights registered in the CVR Register shall be the valid obligations of the Company, evidencing the same rights and entitling the transferee to the same benefits and rights under this Agreement as those held immediately prior to the Transfer by the transferor. No Transfer of a Contingent Value Right shall be valid until registered in the CVR Register, and any Transfer not duly registered in the CVR Register will be void *ab initio* (unless the Transfer was permissible hereunder and such failure to be duly registered is attributable to the fault of the CVR

Agent to be established by clear and convincing evidence). Any Transfer of the Contingent Value Rights shall be without charge to the Holder; <u>provided</u> that the Company and the CVR Agent may require (i) payment of a sum sufficient to cover any Tax or charge that is imposed in connection with such Transfer, or (ii) that the transferor establish to the reasonable satisfaction of the CVR Agent that such Taxes have been paid. The CVR Agent shall have no obligation to pay any such Taxes or charges and the CVR Agent shall have no duty or obligation to take any action under any section of this Agreement that requires the payment by a Holder of such Taxes or charges unless and until the CVR Agent is satisfied that all such Taxes or charges have been paid. Additionally, the fees and costs related to any legal opinion requested under this <u>Section 2.3(c)</u> shall be the responsibility of the Holder. Any attempted Transfer of a Contingent Value Right, in whole or in part, that is not permitted by this <u>Section 2.3(c)</u>, including any attempted Transfer that is made to any party other than a Permitted Transferee or otherwise not effected in accordance with the terms set forth herein, will be void and of no effect.

(d)     A Holder may make a written request to the CVR Agent to change such Holder's address of record in the CVR Register. The written request must be duly and validly executed by the Holder. Upon receipt of such written notice, the CVR Agent shall promptly record the change of address in the CVR Register.

Section 2.4.     <u>Determination of Total Distributable Amount</u>.

(a)     The amount distributable to Holders pursuant to <u>Section 2.4(g)</u> in respect of a Distribution Triggering Monetization Event (if any), the Final Payment Date Distribution (if any) or a Holdback Payment Distribution (if any) is the "***Total Distributable Amount***" with respect to such Distribution Triggering Monetization Event, Final Payment Date Distribution or Holdback Payment Distribution. The Total Distributable Amount shall be calculated by applying the distribution allocations to the Holders described in <u>Section 2.4(g)</u> to the aggregate Net Proceeds from CVR Asset Pool, the aggregate Value of the CVR Asset Pool and any Holdback Amount, to the extent applicable in accordance with <u>Section 2.4(b)</u> (such amount being hereinafter referred to as the "***Total CVR Pool Amount***").

(b)     Subject to <u>Section 2.4(d)</u> below, the "Total CVR Pool Amount" shall equal:

(i)     in connection with a Distribution Triggering Monetization Event (if any), (A) the Net Proceeds from CVR Asset Pool (determined in accordance with <u>Section 2.4(c)</u>) for such Distribution Triggering Monetization Event *less* (B) the CVR Distribution Expenses incurred in connection with such Distribution Triggering Monetization Event *less* (C) the then-outstanding aggregate amount of Post-Effective Date Contributions (if any);

(ii)     in connection with the Final Payment Date Distribution (if any), the sum of (A) (1) if a Distribution Triggering Monetization Event has occurred prior to the Final Payment Date, (x) the Net Proceeds from CVR Asset Pool from any Monetization Event for which a payment has not yet been made pursuant to <u>Section 2.5(c)</u> and (y) any portion of a Holdback Amount in respect of which the Company has actually received cash prior to the Final Payment Date, or (2) if a Distribution Triggering Monetization Event has not occurred prior to the Final Payment Date, (x)

the Net Proceeds from Hotel Sale for any Qualifying CVR Asset Pool Sale completed prior to the Final Payment Date (reduced by any portion of such Net Proceeds from Hotel Sale that was distributed out of CVR Holding Company in cash and is therefore an Additional Adjustment Amount) and (y) any portion of a Holdback Amount in respect of which the Company has actually received cash prior to the Final Payment Date, in each case to the extent not previously paid or applied pursuant to Section 2.4(g), *plus* (B) the Value of the CVR Asset Pool not sold or transferred prior to the Final Payment Date, *less* (C) the CVR Distribution Expenses incurred in connection with the Final Payment Date Distribution and *less* (D) the then-outstanding aggregate amount of Post-Effective Date Contributions (if any); and

(iii)    in connection with a Holdback Payment Distribution (if any), (A) any Holdback Amount in respect of which the Company has actually received cash *plus* (B) the Value of any Holdback Amount in respect of which the Company has actually received non-cash consideration, in each case, to the extent not previously taken into account in the calculation of a Total CVR Pool Amount *less* (C) the CVR Distribution Expenses incurred in connection with the Holdback Payment Date Distribution.

For the avoidance of doubt, no proceeds from the sale of any Hotel Property prior to a Distribution Triggering Monetization Event or, if no Distribution Triggering Monetization Event has occurred prior to the Final Payment Date, the Final Payment Date that is not a Qualifying CVR Asset Pool Sale shall be included in the calculation of the Total CVR Pool Amount.

(c)    Subject to Section 2.4(d) below, "***Net Proceeds from CVR Asset Pool***" shall be determined and calculated in accordance with this Section 2.4(c) to be equal to:

(i)    (A) in the case of a Monetization Event that is structured as a sale of All or Substantially All of the Assets of the CVR Asset Pool as described in clause (ii) of the definition of Monetization Event or the sale of a Hotel Property as described in clause (iii) of the definition of Monetization Event, the amount of any cash or non-cash consideration payable to the Company (with the Value of any non-cash consideration determined by the Independent Investment Banker) *less* (1) the mortgage indebtedness and other indebtedness and liabilities (whether known, unknown, absolute, accrued, contingent or otherwise) not assumed by the buyer or to which the buyer does not acquire the assets subject to, and (2) reasonable, documented, out-of-pocket costs and expenses of the Company in connection with such Monetization Event, or (B) in the case of a Change-of-Control Monetization Event, (1) the amount of the consideration paid to the Shareholders (with the Value of any non-cash consideration determined by the Independent Investment Banker) *less* (2) the reasonable, documented, out-of-pocket costs and expenses of the Shareholders in connection with such Monetization Event, *plus*

(ii)    in the case of the first occurrence of a Distribution Triggering Monetization Event, the Net Proceeds from Hotel Sale for any Hotel Property that was sold prior to such Distribution Triggering Monetization Event pursuant to a Qualifying CVR Asset Pool Sale.

(d)     Notwithstanding anything to the contrary contained in <u>Section 2.4(b)</u> or <u>Section 2.4(c)</u>:

(i)     the Holders shall not be entitled to receive any payment pursuant to this Agreement if the aggregate Adjusted EBITDA of the Hotel Properties in the CVR Asset Pool at the time of any Distribution Triggering Monetization Event or, if no Distribution Triggering Monetization Event has occurred prior thereto, the Final Payment Date, as applicable, does not exceed the aggregate Adjusted EBITDA Threshold for such Hotel Properties;

(ii)     in the case of a Change-of-Control Monetization Event structured such that cash or non-cash consideration is payable to the Shareholders and less than all of the Capital Stock in the Company or its applicable Subsidiary(ies) is sold pursuant to such Change-of-Control Monetization Event, for the purposes of determining the Net Proceeds from CVR Asset Pool determined pursuant to <u>Section 2.4(c)(i)</u>, the balance of the Capital Stock not sold in such Change-of-Control Monetization Event shall be deemed to have been sold to the same purchaser(s), in the same transaction and for the same amount and type of consideration per share as the shares of Capital Stock actually sold pursuant to such Change-of-Control Monetization Event, such that all of the Capital Stock in the Company or its applicable Subsidiary(ies) shall be deemed to have been sold pursuant to such Change-of Control Monetization Event and any amount payable on the CVR Payment Date with respect to such Change-of-Control Monetization Event shall be the only payment Holders will, if such a Change-of-Control Monetization Event occurs, be entitled to receive under this Agreement other than any additional amount that may become payable to the Holders (A) as part of the Final Payment Date Distribution with respect to any portion of a Holdback Amount actually received prior to the Final Payment Date and, at the election of the Company pursuant to <u>Section 2.4(d)(vi)</u>, the Holdback Value with respect to any portion of a Holdback Amount not actually received in cash prior to the Final Distribution Date or (B) as part of a Holdback Payment Distribution;

(iii)     for the purposes of determining the applicable amount determined pursuant to <u>Section 2.4(c)(i)</u> or the Net Proceeds from Hotel Sale for any Hotel Property, consideration shall not include any amount of such consideration payable (any such amount, a "***Holdback Amount***") pursuant to the applicable transaction that is subject to escrow or similar arrangements pursuant to the terms of the definitive documentation governing such transaction as in effect upon the occurrence thereof (any such arrangement, a "***Holdback***"), including (A) any such consideration that may be paid pursuant to earn-outs, holdbacks, milestones or other contingent arrangements (whether or not related to future earnings or operations), (B) any such consideration placed in escrow or otherwise held back to support indemnification obligations, specified liabilities (including taxes), purchase price adjustments, known or contingent claims (including making provision for such claims as required by applicable law in connection with a dissolution), or other obligations, and (C) any such consideration that is set aside in a separate account for use by the Company or an agent or representative of the Holders in connection with such transaction whose duties include, among other things, managing, addressing,

17

monitoring or otherwise dealing with post-closing matters relating to such transaction to manage, address, monitor or otherwise deal with post-closing matters relating to such transaction; <u>provided</u> that any such Holdback Amount (or a portion thereof) shall be deemed to be included in Net Proceeds from CVR Asset Pool or Net Proceeds from Hotel Sale when released from such escrow or other arrangement and paid to the Company or the Shareholders, as applicable, and any additional amount that would have been payable to the Holders on any CVR Payment Date pursuant to <u>Section 2.5(c)</u> with respect to the Holdback Amount (or a portion thereof) so released and paid prior to the Final Payment Date shall instead be payable to the Holders as part of the Final Payment Date Distribution pursuant to <u>Section 2.5(d)</u>;

(iv)    in no event shall Net Proceeds from CVR Asset Pool or Net Proceeds from Hotel Sale include (A) any consideration received by the Company or the holders of Capital Stock that is not directly attributable to the acquisition of Capital Stock or any assets of the Company, including payments made by the counterparty to a Monetization Event or other applicable transaction in respect of agreements not to compete, employment or consulting arrangements, transition services or other similar arrangements, (B) any portion of the consideration in a Monetization Event or other applicable transaction that is not paid to the Company or the holders of Capital Stock, as applicable, including any portion of the consideration that is used to pay indebtedness (including principal, interest, break fees, management fees and any other fees and expenses), fees and expenses, change of control payments (including transfer and consent fees and severance or other termination payments), bonuses, brokers' commissions or similar fees, or other liabilities of the Company (other than liabilities that have been expressly excluded from the calculation of Net Proceeds from CVR Asset Pool or Net Proceeds from Hotel Sale in accordance with the terms of this Agreement) or (C) any debt (including capital leases), operating leases, accounts payable or other liabilities of the Company assumed, acquired, refinanced or replaced by a counterparty to a Monetization Event or other applicable transaction;

(v)    if the assets subject to a Monetization Event include assets that are not included in the CVR Asset Pool for any reason (including if such assets are Excluded Assets or were acquired by the Company subsequent to the Effective Date), the applicable amount determined pursuant to <u>Section 2.4(c)(i)</u> shall be determined by an Independent Investment Banker, which amount shall represent a proportionate adjustment based on the ratio of the Value of the assets subject to the Monetization Event that are included in the CVR Asset Pool as compared to the Value of the assets subject to the Monetization Event that are not included in the CVR Asset Pool, as adjusted to the extent necessary to reflect a similarly proportionate share, to the extent applicable, of associated indebtedness and other liabilities and costs and expenses;

(vi)    if any portion of a Holdback Amount remains contingent as of the Final Payment Date, then, at the Company's election (acting in its sole discretion), either (A) the Holdback Value of such portion of such Holdback Amount shall be included in the Company's calculation of the Value of the CVR Asset Pool not sold or transferred prior to the Final Payment Date calculated in accordance with <u>Section 2.4(b)(ii)</u> in respect of the Final Payment Date Distribution or (B) Holders shall have

the right to be paid a distribution (any such distribution described in this clause (B), a "*Holdback Payment Distribution*") if and when the Company actually receives consideration in respect of such portion of such Holdback Amount.

(vii)    the Value of any portion of a Holdback Amount that remains contingent as of the Final Payment Date and the Company elects to take into account in the calculation of the Final Payment Date Distribution pursuant to Section 2.4(d)(vi)(A) (the "*Holdback Value*") shall be determined in accordance with the value at which it is reflected on the Company's balance sheet for the quarter ended immediately preceding the Final Payment Date in accordance with GAAP or, if such Holdback Amount is not reflected on the Company's balance sheet for the quarter ended immediately preceding the Final Payment Date in accordance with GAAP, the Value of such Holdback Amount shall be an amount equal to the value at which such Holdback Amount would have been reflected on the Company's balance sheet as of such quarter-end if it had been required to be so reflected in accordance with GAAP as such value is determined in good faith by the Board of Directors;

(viii)    for the avoidance of doubt, following the payment by the Company of a Final Payment Date Distribution that takes into account the Holdback Value of any portion of a Holdback Amount pursuant to Section 2.4(d)(vi)(A), no further amount in respect of such portion of such Holdback Amount shall be payable or distributable pursuant to this Agreement and there shall be no Holdback Payment Distribution with respect to such portion of such Holdback Amount; and

(ix)    in no event shall the Net Proceeds from CVR Asset Pool, Net Proceeds from Hotel Sale or Value include any amount attributable to the outstanding principal amount of any Upstream Intercompany Loans.

(e)    If, prior to the sixtieth (60th) day prior to the Final Payment Date, (i) there has not been a Distribution Triggering Monetization Event or (ii) (A) there has been a Distribution Triggering Monetization Event, (B) there has not been a Change-of-Control Monetization Event and (C) not all of the assets of the CVR Asset Pool have been sold, then the Board of Directors shall, on or prior to such day, appoint an Independent Valuer to determine the Value of the CVR Asset Pool as of the Final Payment Date. The Company shall provide the Independent Valuer with any applicable financial statements and other supporting documentation relating to the applicable Hotel Properties that the Independent Valuer shall reasonably request. The Independent Valuer shall be instructed to make the determination of the Value of the Hotel Properties and submit a report meeting the requirements for an MAI appraisal not later than the twenty-sixth (26th) Business Day prior to the Final Payment Date. The Company shall pay all fees and disbursements due to the Independent Valuer, which fees and disbursements shall constitute CVR Distribution Expenses under this Agreement and shall be deducted from the Net Proceeds from CVR Asset Pool in the calculation of the Total CVR Pool Amount described above in Section 2.4(b). Any decision rendered by the Independent Valuer with respect to the Value of any Hotel Property shall be final, conclusive and binding upon the Company and each Holder (absent manifest error) for purposes of this Agreement.

(f)

(i)        If either there has been a Distribution Triggering Monetization Event in which any consideration has been excluded from the calculation of the Net Proceeds from the CVR Asset Pool for such Distribution Triggering Monetization Event as a result of a Holdback, then the Net Proceeds from CVR Asset Pool shall be re-calculated as of the Final Payment Date to include any portion of the Holdback that has been actually received by the Company or the Shareholders prior to the Final Payment Date, as applicable.  For the avoidance of doubt, following the CVR Payment Date in respect of a Change-of-Control Monetization Event, there shall be no additional amount payable to Holders under this Agreement other than, if applicable, the payment of any amount in respect of any proceeds from a Holdback actually received by the Company or the Shareholders following such CVR Payment Date and prior to the Final Payment Date and the Holdback Value.

(ii)        In connection with any Holdback Payment Distribution in which all or a portion of the Holdback Amount actually received is in non-cash consideration, then the Board of Directors shall appoint an Independent Investment Banker to determine the Value of such non-cash consideration promptly following its actual receipt thereof.  The Company shall provide the Independent Investment Banker with any applicable supporting documentation relating to the applicable non-cash consideration that the Independent Investment Banker shall reasonably request.  The Independent Investment Banker shall be instructed to make the determination of the Holdback Value with respect to such non-cash consideration not later than the tenth (10th) Business Day following such appointment.  The Company shall pay all fees and disbursements due to the Independent Investment Banker, which fees and disbursements shall constitute CVR Distribution Expenses under this Agreement and shall be deducted from the Net Proceeds from CVR Asset Pool in the calculation of the Total CVR Pool Amount described above in Section 2.4(b) with respect to such Holdback Payment Distribution.    Any decision rendered by the Independent Investment Banker with respect to the Value of such non-cash consideration shall be final, conclusive and binding upon the Company and each Holder (absent manifest error) for purposes of this Agreement.

(g)        Subject in all respects to Section 2.4(h), the Total Distributable Amount that shall be distributable to the Holders in connection with a Distribution Triggering Monetization Event, the Final Payment Date Distribution or any Holdback Payment Distribution shall be calculated as follows (with each Holder entitled to receive its Pro Rata Payment Amount of the amounts set forth in this Section 2.4(g) that are distributable to the Holders):

(i)        first, the Total CVR Pool Amount with respect to such Distribution Triggering Monetization Event, Final Payment Date Distribution or Holdback Payment Distribution, as applicable, *plus* the Additional Adjustment Amount as of the calculation date (the sum of such amounts, the "***Adjusted Total CVR Pool Amount***") shall be applied to reduce the DIP Financing Invested Capital Amount (as previously reduced from prior applications in accordance with this Section 2.4(g)(i) and Section 2.4(i)) until the DIP Financing Invested Capital Amount has been reduced to zero;

(ii)      second, if the amount equal to (A) the Adjusted Total CVR Pool Amount with respect to such Distribution Triggering Monetization Event, Final Payment Date Distribution or Holdback Payment Distribution, as applicable, *less* (B) the amount applied to reduce the DIP Financing Invested Capital Amount pursuant to Section 2.4(g)(i) in connection with such Distribution Triggering Monetization Event, Final Payment Date Distribution or Holdback Payment Distribution, as applicable, is greater than zero, the remainder of such Adjusted Total CVR Pool Amount shall be applied to reduce the Supporting Stockholder CVR Asset Pool Invested Amount (as previously reduced from prior applications in accordance with this Section 2.4(g)(ii) and Section 2.4(i)) until the Supporting Stockholder CVR Asset Pool Invested Amount has been reduced to zero;

(iii)      third, if the amount equal to (A) the Adjusted Total CVR Pool Amount *less* (B) the amounts applied to reduce the DIP Financing Invested Capital Amount and the Supporting Stockholder CVR Asset Pool Invested Amount pursuant to Sections 2.4(g)(i) and 2.4(g)(ii) is greater than zero, 6.0% of the remainder of such Adjusted Total CVR Pool Amount shall be distributable to the Holders until 94.0% of such remainder as of the calculation date (the "***Section 2.4(g)(iii) 94% Amount***") *plus* the aggregate amount of any Section 2.4(g)(iii) 94% Amounts calculated from prior applications of this Section 2.4(g)(iii) equals a return of 15.0% per annum accrued starting on the day following the Effective Date and thereafter on the basis of twelve (12) thirty (30)-day months and a three hundred sixty (360)-day year, compounding quarterly, on the DIP Financing Invested Capital Amount balance from time to time;

(iv)      fourth, if the amount equal to (A) the Adjusted Total CVR Pool Amount *less* (B) (x) the amounts applied to reduce the DIP Financing Invested Capital Amount and the Supporting Stockholder CVR Asset Pool Invested Amount pursuant to Sections 2.4(g)(i) and 2.4(g)(ii) and (y) the amounts distributable to the Holders under Section 2.4(g)(iii) is greater than zero, 6.0% of the remainder of such Adjusted Total CVR Pool Amount shall be distributable to the Holders until 94.0% of such remainder as of the calculation date (the "***Section 2.4(g)(iv) 94% Amount***") *plus* the aggregate amount of any Section 2.4(g)(iv) 94% Amounts calculated from prior applications of this Section 2.4(g)(iv) equals a return of 12.5% per annum accrued starting on the day following the Petition Date and thereafter on the basis of twelve (12) thirty (30)-day months and a three hundred sixty (360)-day year, compounding quarterly, on the Supporting Stockholder CVR Asset Pool Invested Amount balance from time to time; and

(v)      fifth, if the amount equal to (A) the Adjusted Total CVR Pool Amount *less* (B)(x) the amounts applied to reduce the DIP Financing Invested Capital Amount and the Supporting Stockholder CVR Asset Pool Invested Amount pursuant to Sections 2.4(g)(i) and 2.4(g)(ii) and (y) the amounts distributable to the Holders under Sections 2.4(g)(iii) and 2.4(g)(iv) is greater than zero, 25.0% of the remainder of such Adjusted Total CVR Pool Amount shall be distributable to the Holders.

(h)     Notwithstanding anything to the contrary contained in this Agreement, the total amount distributable to a Holder under this Agreement may not exceed $6.00 per Contingent Value Right held by such Holder.

(i)     For the avoidance of doubt, (i) any distribution, payment or loan that is an Additional Adjustment Amount shall be deemed to have reduced, as applicable, the balance of the DIP Financing Invested Capital Amount or the Supporting Stockholder CVR Asset Pool Invested Amount, as applicable, on the funding date of such distribution, payment or loan, (ii) any reduction in the DIP Financing Invested Capital Amount or the Supporting Stockholder CVR Asset Pool Invested Amount in connection with a Monetization Event shall be deemed to have occurred on the date of the Monetization Event and (iii) no amount shall be distributable with respect to the sale of a Hotel Property as described in clause (iii) of the definition of Monetization Event prior to the Final Payment Date Distribution, but the Net Proceeds from CVR Asset Pool from any such Monetization Event shall be taken into account in determining the Total Distributable Amount in respect of the Final Payment Date Distribution in accordance with Section 2.4(b)(ii)(A)(1).

(j)     For illustrative purposes only, an example of a calculation of the Total Distributable Amount in accordance with Section 2.4(g) is set forth on Schedule III attached hereto together with a spreadsheet supporting such calculation.

(k)     For the avoidance of doubt and notwithstanding anything to the contrary contained in this Agreement; (i) no Holder shall be entitled to any distribution in excess of its Pro Rata Payment Amount; (ii) the amount by which (A) the amount that would otherwise be distributable to the Holders pursuant to Section 2.4(g) exceeds (B) the aggregate of all of the Pro Rata Payment Amounts with respect to the applicable Distribution Triggering Monetization Event, Final Payment Date Distribution or Holdback Payment Distribution shall, in each case, be for the Company's account, with such excess amount to be used in the Company's sole discretion and without limitation or further obligation to any Holder or otherwise under this Agreement (including any obligation to take such excess into account in the calculation of any Total Distributable Amount with respect to a future Distribution Triggering Monetization Event, Final Payment Date Distribution or Holdback Payment Distribution); and (iii) the amount required to be deposited with the CVR Agent pursuant to Section 2.5 with respect to the Total Distributable Amount shall be the aggregate of the Pro Rata Payment Amounts that are actually distributable to the Holders.

Section 2.5.     Payment Procedures.

(a)     If a Distribution Triggering Monetization Event occurs, then no later than the later of (i) the date upon which the financial information with respect to the CVR Asset Pool for the calendar quarter immediately preceding the calendar quarter in which such Distribution Triggering Monetization Event occurs is required to be provided to the CVR Agent pursuant to Section 4.3(a) and (ii) the date that is thirty (30) days following such Distribution Triggering Monetization Event, the Company shall deliver to the CVR Agent and the CVR Agent shall, pursuant to the confidential, password-protected website that shall be established and administered by the CVR Agent pursuant to Section 4.3(b) make available a certificate with the calculation of Adjusted EBITDA for the Measurement Period for all Hotel Properties in the CVR Asset Pool individually and in the aggregate, and individually for any Hotel Property that was sold prior to such Distribution Triggering Monetization Event in a sale that qualified or did not qualify as a

Qualifying CVR Asset Pool Sale, the corresponding Adjusted EBITDA Threshold for each such Hotel Property, and the Company's calculation of the Net Proceeds from CVR Asset Pool, the Total CVR Pool Amount (if different from the Net Proceeds from CVR Asset Pool) and the Total Distributable Amount with respect to such Distribution Triggering Monetization Event (the "*Calculation Certificate*"), which such Calculation Certificate and the information contained therein shall be deemed to be Confidential Information pursuant to this Agreement and subject to the terms and provisions of Section 4.3(b) hereof. The Company shall Make Available notice of the fact that such Calculation Certificate has been made available on such confidential website. If such Distribution Triggering Monetization Event is the consummation of the direct or indirect sale of All or Substantially All of the Assets and not all of the assets included in the CVR Asset Pool have been sold or the consideration payable in such Distribution Triggering Monetization Event could result in all or any portion of a Holdback Amount becoming payable in accordance with Section 2.4(d)(iii), the Calculation Certificate shall also so indicate and state that the Holders may be entitled to receive an additional cash payment with respect to the remaining assets in the CVR Asset Pool that were not sold in such Distribution Triggering Monetization Event or the Holdback Amount. If an Independent Valuer is appointed pursuant to Section 2.4(e), then on or prior to the twenty-fifth (25th) Business Day prior to the Final Payment Date, the Company will deliver a Calculation Certificate (which Calculation Certificate shall also include the Value calculated in accordance with Section 2.4(b)(ii)(B) and information regarding any elections made by the Company pursuant to Section 2.4(d)(vi)) to the CVR Agent and make available such Calculation Certificate in accordance with the first sentence of this Section 2.5(a).

(b)     Subject to Section 2.5(d), during the twenty (20) Business Day period after the Calculation Certificate is made available to Holders in accordance with Section 2.5(a) (the "*Objection Period*"), the Majority of Holders may send a notice duly and validly executed by such Holders (the "*Notice of Objection*") to the CVR Agent and the Company detailing their objection to any calculation of a Total Distributable Amount hereunder as set forth in the Calculation Certificate by providing a reasonable, good faith basis for their objection; provided however such objection may not relate to any item determined by the Independent Valuer or Independent Investment Banker. Following the receipt of a Notice of Objection, the Company shall permit, and shall cause its Subsidiaries to permit, the Independent Accountant to have access to the records of the Company or its Subsidiaries as may be reasonably necessary to investigate the basis for the Notice of Objection. Any dispute arising from a Notice of Objection will be resolved by the Independent Accountant in accordance with the procedure set forth in Section 2.6, which decision will be final, conclusive and binding on the parties hereto and every Holder (absent manifest error). If a Notice of Objection has not been delivered to the Company within the Objection Period, then the Company's calculations in the Calculation Certificate will be final, conclusive and binding on the parties hereto and every Holder for all purposes of this Agreement.

(c)     If, following the delivery of a Calculation Certificate and the Objection Period or, if applicable, completion of the procedure set forth in Section 2.6(a) with respect to a Distribution Triggering Monetization Event or the Final Payment Date Distribution (with respect to which an Independent Valuer has been appointed pursuant to Section 2.4(e)) for which a Notice of Objection has been duly and validly executed by the Majority of Holders and timely delivered to the CVR Agent, there is a Total Distributable Amount distributable to the Holders with respect to such Distribution Triggering Monetization Event or Final Payment Date Distribution, the Company will deposit with the CVR Agent cash in an amount equal to the Total Distributable

Amount with respect to such Distribution Triggering Monetization Event or Final Payment Date. On the date (a "*CVR Payment Date*") that is not more than five (5) Business Days after receipt of such Total Distributable Amount (and which shall, if with respect to a distribution with respect to the Final Payment Date, be the Final Payment Date), the CVR Agent will then pay to each Holder an amount equal to such Holder's Pro Rata Payment Amount with respect to such Total Distributable Amount by check mailed to the address of each such respective Holder as reflected in the CVR Register, or, if agreed to by the Company with respect to any Holder who has provided the CVR Agent with wire transfer instructions meeting the CVR Agent's requirements, by wire transfer of immediately available funds to such account.

(d)    If a Final Payment Date Distribution is payable to the Holders on the Final Payment Date pursuant to Section 2.4(g) and no Independent Valuer has been appointed pursuant to Section 2.4(e), the Company will, on the fifth (5th) Business Day prior to the Final Payment Date, deposit with the CVR Agent cash in an amount equal to the Total Distributable Amount to be distributed on the Final Payment Date. Holders shall have no right to object to the calculation of this amount pursuant to Section 2.5(b) or otherwise. On the Final Payment Date, the CVR Agent will then pay to each Holder an amount equal to such Holder's Pro Rata Payment Amount with respect to such Total Distributable Amount either by check mailed to the address of each such respective Holder as reflected in the CVR Register, or, if agreed to by the Company, with respect to any Holder who has provided the CVR Agent with wire transfer instructions meeting the CVR Agent's requirements, by wire transfer of immediately available funds to such account.

(e)    If a Holdback Payment Distribution is payable to the Holders at any time pursuant to Section 2.4(d)(vi)(B) and all of the consideration received in respect of the applicable Holdback Amount was cash, the Company will, within ten (10) Business Days after receipt of the cash consideration in respect of the applicable Holdback Amount, deposit with the CVR Agent cash in an amount equal to the Total Distributable Amount with respect to such Holdback Payment Distribution. If a Holdback Payment Distribution is payable to the Holders at any time pursuant to Section 2.4(d)(vi)(B) and some or all of the consideration received in respect of the applicable Holdback Amount was non-cash consideration, the Company will, within ten (10) Business Days after the final determination by the Independent Investment Banker of the Value of such non-cash consideration portion of the Holdback Amount in accordance with Section 2.4(f)(ii), deposit with the CVR Agent cash in an amount equal to the Total Distributable Amount with respect to such Holdback Payment Distribution. In the case of either of the preceding two sentences of this Section 2.5(e), on the date (a "*Holdback Payment Distribution Payment Date*") that is not more than five (5) Business Days after receipt of such Total Distributable Amount, the CVR Agent will then pay to each Holder an amount equal to such Holder's Pro Rata Payment Amount with respect to such Total Distributable Amount in respect of such Holdback Payment Distribution by check mailed to the address of each such respective Holder as reflected in the CVR Register, or, if agreed to by the Company with respect to any Holder who has provided the CVR Agent with wire transfer instructions meeting the CVR Agent's requirements, by wire transfer of immediately available funds to such account.

(f)    The Company and the CVR Agent will be entitled to deduct and withhold, or cause to be deducted or withheld, from the Total Distributable Amount or any other amount payable to the Holders pursuant to this Agreement, such amount as the Company or the CVR Agent is required to deduct and withhold with respect to the making of such payment under the

Code, or any provision of state, local or non-U.S. Tax law. The Holders will deliver to the Company and/or the CVR Agent, as applicable, at the time or times reasonably requested by the Company and/or the CVR Agent, as applicable, such properly completed and executed documentation reasonably requested by the Company and/or the CVR Agent, as applicable, as will permit the Company and/or the CVR Agent to determine the appropriate amount of withholding. To the extent that amounts are so withheld are paid over to or deposited with the relevant Governmental Entity, withheld amounts will be treated for all purposes of this Agreement as having been paid to a Holder in respect of which such deduction and withholding was made.

(g)    The CVR Agent shall have no duty or obligation to calculate, verify or confirm the accuracy, validity or sufficiency of any Total Distributable Amount or any other amount under this Agreement.

(h)    The Company's and CVR Agent's obligation to pay any Total Distributable Amount shall be conditioned on no court or other Governmental Entity of competent jurisdiction having enacted, issued, promulgated, enforced or entered any judgment, injunction or order (whether temporary, preliminary or permanent) that is in effect and restrains, enjoins or otherwise prohibits or imposes any penalty upon the payment of any Total Distributable Amount and the payments being otherwise lawful.

(i)    If the Company requests in writing to the CVR Agent, any funds comprising the cash deposited with the CVR Agent under Section 2.5(c), Section 2.5(d) or Section 2.5(e) that remain undistributed to the Holders twelve (12) months after a CVR Payment Date, the Final Payment Date or a Holdback Payment Distribution Payment Date, as applicable, shall be delivered to the Company by the CVR Agent and any Holders who have not theretofore received payment in respect of such Contingent Value Rights shall thereafter look only to the Company for payment of such amounts, subject to any applicable escheatment laws in effect from time to time. Upon delivery of such funds to the Company, the escheatment obligations of the CVR Agent with respect to such funds shall terminate. Notwithstanding any other provisions of this Agreement, any portion of the funds provided by or on behalf of the Company to the CVR Agent that remains unclaimed one hundred and eighty (180) days after termination of this Agreement in accordance with Section 7.7 (or such earlier date immediately prior to such time as such amounts would otherwise escheat to, or become property of, any Governmental Entity) shall, to the extent permitted by law, become the property of the Company, free and clear of any claims or interest of any person previously entitled thereto, subject to any applicable escheatment laws in effect from time to time.

(j)    All funds received by Computershare under this Agreement that are to be distributed or applied by Computershare in the performance of services hereunder shall be held by Computershare as agent for the Company and deposited in one or more bank accounts to be maintained by Computershare in its name as agent for the Company, and such funds shall be free of any claims by the Company other than reversionary rights and as set forth in Section 2.5(i), and separate from any potential bankruptcy estate of the Company. Computershare shall have no responsibility or liability for any diminution of the funds that may result from any deposit made by Computershare in accordance with this paragraph, including any losses resulting from a default by any bank, financial institution or other third party, except as a result of Computershare's willful misconduct, fraud, bad faith or gross negligence (each as determined by a final, non-appealable

judgment of a court of competent jurisdiction). Computershare may from time to time receive interest, dividends or other earnings in connection with such deposits. Computershare shall not be obligated to pay such interest, dividends or earnings to the Company, any Holder or any other party. Notwithstanding anything to the contrary herein, Company shall be responsible for providing Computershare with sufficient funds to satisfy its payment obligations to the Holders.

Section 2.6.    <u>Review of the Independent Accountant</u>.

(a)    Any dispute arising from the delivery of a Notice of Objection pursuant to <u>Section 2.5(b)</u> will be settled by the Independent Accountant, who will act as an expert, and not as an arbitrator. The Company will engage the Independent Accountant and will reasonably cooperate with the Independent Accountant, including providing the Independent Accountant reasonable access during normal business hours and on reasonable advance notice to relevant personnel, properties, and books and records of the Company. The Independent Accountant will limit its review and determination to the items set forth in the Notice of Objection and to no other matters, and will deliver a written report containing its calculations of each such disputed item. The final determination of the Independent Accountant will be made in strict accordance with the terms of this Agreement. The Independent Accountant will render its written report resolving such items in dispute as soon as possible after completion of written submissions to the Independent Accountant. The Independent Accountant will determine the items in dispute solely based on the Notice of Objection and the written submissions made by the Company and not by independent review and the Independent Accountant will not be permitted to question any judgment or assumption made by the Company in determining the Total Distributable Amount in any case where a judgment or assumption is required in the calculation of the Total Distributable Amount. The costs and expenses billed by the Independent Accountant in connection with the performance of its duties described herein shall be allocated, on the one hand, to the Company (and shall not reduce the Total CVR Pool Amount) and, on the other hand, to the Holders (and shall be treated as CVR Distribution Expenses, and shall reduce the Total CVR Pool Amount), in each case, on a pro rata basis based upon the degree to which the Independent Accountant has accepted the respective positions of the Company, on the one hand, and the Holders (as set forth in the Notice of Objection), on the other hand, and such allocation shall be determined by the Independent Accountant and set forth in its final report. The Company and each Holder will be responsible for its own attorney fees, expenses and costs. The decision of the Independent Accountant will be final, conclusive and binding (absent manifest error) on the parties hereto and each of the Holders.

(b)    The sole and exclusive remedy or recourse for any Holder under this Agreement relating to the Calculation Certificate delivered by the Company and the determination as to whether a distribution is required to be made under this Agreement shall be to, subject to <u>Section 2.5(d)</u>, submit a Notice of Objection and trigger the review by the Independent Accountant pursuant to this <u>Section 2.6</u>.

Section 2.7.    <u>Maturity Date Extension</u>. If the Board of Directors, in its sole discretion, determines that the Company shall exercise its right to extend the Maturity Date pursuant to this <u>Section 2.7</u>, the Company shall exercise such right by delivering a written notice to the CVR Agent no later than ten (10) days prior to the Initial Maturity Date stating that the Board of Directors has determined to extend the Maturity Date to the Extended Maturity Date. The Company shall Make Available such notice to the Holders; <u>provided</u> that any failure so to notify the Holders shall not

affect the validity of such extension (it being understood that any failure so to notify the Holders shall not excuse the CVR Agent from its obligations under this <u>Section 2.7</u>).

Section 2.8.    <u>No Voting, Dividends or Interest; No Equity or Ownership Interest in the Company; No Fiduciary Duties</u>.

(a)    The Contingent Value Rights shall not have any voting or dividend rights, and interest shall not accrue on any amounts payable regarding any Contingent Value Rights to any Holder.

(b)    The Contingent Value Rights shall not represent any equity, stock or other ownership interest in the Company, any Subsidiary or any Affiliate of the Company or any other Person.

(c)    Neither the Company, nor any of its Subsidiaries (including the CVR Holding Company), nor any of their respective officers or directors owe fiduciary duties of any kind to the Holders.

Section 2.9.    <u>Ability to Abandon the Contingent Value Right</u>.    The Holder of a Contingent Value Right may at any time, at such Holder's option, abandon all of such Holder's remaining rights in a Contingent Value Right by delivering to the CVR Agent a notice of abandonment relinquishing such Contingent Value Right to the Company without consideration therefor, in which case such Contingent Value Right shall be deemed canceled and no longer outstanding, and the CVR Agent shall amend the CVR Register accordingly and notify the Company in writing.

# ARTICLE 3
## THE CVR AGENT

Section 3.1.    <u>Certain Duties and Responsibilities</u>.    The CVR Agent shall not have any liability for any actions taken, suffered or omitted to be taken in connection with this Agreement, except to the extent of its willful misconduct, fraud, , bad faith or gross negligence (each as determined by a final, non-appealable judgment of a court of competent jurisdiction).    Anything to the contrary notwithstanding, in no event shall any Person be liable for any special, punitive, indirect, consequential or incidental loss or damage of any kind whatsoever (including but not limited to lost profits) arising out of any act or failure to act hereunder.    The aggregate liability of the CVR Agent with respect to, arising from, or arising in connection with this Agreement, or from all services provided or omitted to be provided under this Agreement, whether in contract, or in tort, or otherwise, is limited to, and shall not exceed, the amounts paid hereunder by the Company to the CVR Agent as fees, but not including reimbursable expenses, during the twelve (12) months immediately preceding the event for which recovery from the CVR Agent is being sought.    No provision of this Agreement shall require the CVR Agent to expend or risk its own funds, take any action that it reasonably believes would expose or subject it to expense or liability, or otherwise incur any financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers. The Company's obligations under this <u>Section 3.1</u> and <u>Section 3.2</u> shall survive the resignation or removal of any CVR Agent, the expiration of the CVRs and the termination of this Agreement.

Section 3.2.     Certain Rights of CVR Agent.  The CVR Agent undertakes to perform such duties and only such duties as are specifically set forth in this Agreement, and no implied duties, covenants or obligations shall be read into this Agreement against the CVR Agent.  In addition:

(a)     the CVR Agent may rely on and shall be protected and shall incur no liability for or in respect of any action taken, suffered or omitted to taken by it in reliance upon any resolution, certificate, statement, instrument, opinion, report, notice, request, instruction, direction, consent, order or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties;

(b)     the CVR Agent may perform any and all of its duties (i) itself (through its directors, officers, or employees) or (ii) through its agents, representatives, attorneys, custodians and/or nominees and the CVR Agent shall not be answerable or accountable for any act, default, neglect or misconduct of any such agents, representatives, attorneys, custodians and/or nominees, absent their gross negligence, bad faith or willful or intentional misconduct (each as determined by a final non-appealable judgment of a court of competent jurisdiction) in the selection and continued employment thereof;

(c)     the permissive rights of the CVR Agent to do things enumerated in this Agreement shall not be construed as a duty;

(d)     the CVR Agent shall not be required to give any note or surety in respect of the execution of such powers or otherwise in respect of the premises;

(e)     the Company agrees to indemnify, defend, protect, save and keep harmless the CVR Agent and its affiliates and their respective successors, assigns, directors, officers, managers, employees, agents, attorneys, accountants and experts (collectively, the "*Indemnitees*"), against any and all loss, liability, obligation, damage, fine, settlement, penalty, action, judgment, suit, cost, disbursement, proceeding, investigation, claim, demand or out-of-pocket expense of any kind or nature whatsoever (including the reasonable and documented, out-of-pocket fees and expenses of legal counsel and the reasonable and documented, out-of-pocket costs and expenses of defending the Indemnitee against any claim of liability arising therefrom) (collectively, "*Losses*") that may be imposed on, incurred by, or asserted against any Indemnitee, at any time, and in any way relating to, arising out of or in connection with the execution, delivery or performance of this Agreement, the enforcement of any rights or remedies in connection with this Agreement, and the payment, transfer or other application of funds pursuant to this Agreement, or as may arise by reason of any act, omission or error of the Indemnitee; provided, however, that no Indemnitee shall be entitled to be so indemnified, defended, protected, saved or kept harmless to the extent such Loss was caused by the willful misconduct, fraud, bad faith or gross negligence of any Indemnitee (each as determined by a final, non-appealable judgment of a court of competent jurisdiction);

(f)     in addition to the indemnification provided under Section 3.2(e), the Company agrees (i) to pay the fees of the CVR Agent in connection with the CVR Agent's performance of its obligations hereunder, as set forth on a mutually agreed upon fee schedule executed by the Company and the CVR Agent on or prior to the date hereof (the "*CVR Agent Fees*"), and (ii) to reimburse the CVR Agent within ten (10) days after written demand for all

reasonable and documented, out-of-pocket expenses and other disbursements incurred in the preparation, delivery, negotiation, amendment, administration and execution of this Agreement and the exercise and performance of its duties hereunder, including all Taxes (other than income, receipt, franchise or similar Taxes) and charges;

(g)    in the event the CVR Agent reasonably believes any ambiguity or uncertainty exists hereunder or in any notice, instruction, direction, request or other communication, paper or document received by the CVR Agent hereunder, the CVR Agent may, in its sole discretion, refrain from taking any action, and shall be fully protected and shall not be liable in any way to the Company or other Person or entity for refraining from taking such action, unless the CVR Agent receives written instructions signed by the Company which eliminate such ambiguity or uncertainty to the reasonable satisfaction of the CVR Agent;

(h)    nothing herein shall preclude the CVR Agent from acting in any other capacity for the Company or for any other Person;

(i)    the CVR Agent shall not incur any liability for not performing any act, duty, obligation or responsibility by reason of any occurrence beyond the control of the CVR Agent (including any act or provision of any present or future law or regulation or governmental authority, any act of God, terrorist acts, shortage of supply, breakdowns or malfunctions, interruptions or malfunction of computer facilities, or loss of data due to power failures or mechanical difficulties with information storage or retrieval systems or failure of any means of communication, labor difficulties, war, civil disorder or epidemic or pandemic); provided, that the CVR Agent shall (i) use its commercially reasonable efforts to end or mitigate the effects of any such occurrence and (ii) resume the performance of its obligations as soon as reasonably practicable after the end of such occurrence;

(j)    whenever the CVR Agent shall deem it necessary or desirable that a fact or matter be proved or established prior to taking, suffering or omitting any action hereunder (including the identity of a Holder), the CVR Agent may rely upon an Officer's Certificate, and such Officer's Certificate shall be full and complete authorization and protection to the CVR Agent. The CVR Agent shall incur no liability for or in respect of any action taken, suffered or omitted by it absent willful misconduct, fraud, bad faith or gross negligence (each as determined by a final, non-appealable judgment of a court of competent jurisdiction) under the provisions of this Agreement in reliance on such Officer's Certificate. The CVR Agent is hereby authorized and directed to accept instructions with respect to the performance of its duties and obligations hereunder from the chief executive officer, president, chief financial officer, any vice president, the controller, the treasurer or the secretary of the Company, and to apply to such officer for advice or instructions in connection with its duties, and it shall not be liable and shall be indemnified for any action taken or suffered to be taken by it in accordance with instructions from such officer. The CVR Agent shall not be held to have notice of any change of authority of any person, until receipt of written notice thereof from the Company;

(k)    the CVR Agent shall not be subject to, nor be required to comply with, or determine if any person or entity has complied with, the Plan Documents (other than this Agreement) or any other agreement between or among the parties hereto, even though reference thereto may be made in this Agreement, or to comply with any notice, instruction, direction,

request or other communication, paper or document other than as expressly set forth in this Agreement; and

(l)     the Company agrees that it shall perform, execute, acknowledge and deliver or cause to be performed, executed, acknowledged or delivered all such further and other acts, instruments and assurances as may reasonably be required by the CVR Agent for the carrying out or performing by the CVR Agent of the provisions of this Agreement.

Section 3.3.    Resignation and Removal; Appointment of Successor.

(a)     The CVR Agent may resign and be discharged from its duties under this Agreement at any time by giving written notice thereof to the Company specifying a date when such resignation shall take effect, which notice shall be sent at least thirty (30) days prior to the date so specified, and such resignation shall take effect on such specified date.

(b)     The Company shall have the right to remove the CVR Agent at any time for any reason or no reason upon at least thirty (30) days' notice, specifying a date when such removal shall take effect.

(c)     If the CVR Agent shall resign, be removed, or become incapable of acting, the Company shall promptly (and in any event within thirty (30) days after giving notice of the CVR Agent's removal or after it has been notified of the CVR Agent's resignation) appoint a qualified successor CVR Agent. The predecessor CVR Agent shall deliver any funds held in connection with this Agreement to any such successor CVR Agent at or prior to the effectiveness of the predecessor CVR Agent's resignation or removal. The successor CVR Agent so appointed shall, forthwith upon its acceptance of such appointment in accordance with this Section 3.3(c), Section 3.3(e) and Section 3.4, become the successor CVR Agent.

(d)     The Company, or at the Company's request the successor CVR Agent, shall give notice of each resignation and each removal of the CVR Agent and each appointment of such successor CVR Agent by Making Available notice of such event to the Holders. Failure to Make Available any such notice to the Holders, however, or any defect therein, shall not affect the legality or validity of the resignation or removal of the CVR Agent or the appointment of a successor CVR Agent, as the case may be.

(e)     Any such successor to the CVR Agent shall agree to be bound by the terms of this Agreement and shall become the CVR Agent hereunder. The CVR Agent shall deliver all of the relevant books and records to the successor CVR Agent.

Section 3.4.    Acceptance of Appointment by Successor. Every successor CVR Agent appointed hereunder shall execute, acknowledge and deliver to the Company and to the retiring CVR Agent an instrument accepting such appointment and a counterpart of this Agreement, and the retiring CVR Agent shall execute and deliver such documentation in connection therewith as the Company may reasonably request, and thereupon such successor CVR Agent, without any further act, deed or conveyance, shall become vested with all the rights, powers, trusts and duties of the retiring CVR Agent.

## ARTICLE 4
## OTHER COVENANTS

Section 4.1.    Certain Transactions.

(a)    The Company shall not cause or permit the CVR Holding Company and its Subsidiaries to enter into or engage in any transactions with an Affiliate or a Related Party except for transactions entered into on an arm's-length basis on terms that are no less favorable to the Company or the applicable Subsidiary thereof than those that can be obtained from an unaffiliated third party.

(b)    The Company shall not, and it shall not cause or permit its Subsidiaries to, enter into or engage in any transactions with an Affiliate or a Related Party (i) with respect to the sale or other disposition of a Hotel Property, (ii) that is a Change-of-Control Monetization Event (except for a reorganization, restructuring or similar transaction that is (x) not treated as a liquidity event for the Supporting Stockholder or its Affiliates that are shareholders of the Company participating in such transaction (as determined in good faith by the Supporting Stockholder) and (y) approved by the Independent Director(s) or, if there are more than two Independent Directors, a majority of the Independent Directors (which approval may be given at any meeting of the Board of Directors or any committee thereof or pursuant to any action taken by written or electronic consent by the Board of Directors or any committee thereof)) or (iii) that relates to fees, reimbursements, costs or expenses the payment of which may be funded out of Permitted Distributions, except, in each case, for transactions entered into on an arm's-length basis on terms that are no less favorable to the Company or the applicable Subsidiary thereof than those that can be obtained from an unaffiliated third party.

Section 4.2.    Certain Actions.

(a)    The Company shall not, and shall not cause or permit the CVR Holding Company and its Subsidiaries to, amend their respective charter, bylaws, limited liability company agreement, shareholders agreement, or other constitutive document, other than the adoption of any amendment or articles supplementary with respect to a class of preferred stock and preferred units by the Company and the CVR Holding Company intended to enable the Company to satisfy the closely held requirements applicable to real estate investment trusts under Section 856(a)(6) of the Code, or enter into or undergo any consolidation, merger, reorganization, transfer of assets, dissolution, issue or sale of securities or take any other voluntary action, which, (i) in the case of each of the foregoing, is for the primary purpose of causing the requirements for payment of the Contingent Value Rights not to be satisfied, or (ii) with respect to amendments to the Company's charter, amends Section 7.1(b) or Section 7.2 of the Company's charter.

(b)    Without the prior approval of the Independent Director(s) or if there are more than two Independent Directors, a majority of the Independent Directors (which approval may be given at any meeting of the Board of Directors or any committee thereof or pursuant to any action taken by written or electronic consent by the Board of Directors or any committee thereof), the Company shall not, and shall not cause or permit the CVR Holding Company and its Subsidiaries to take any action or enter into any agreement that is disproportionately adverse to

the economic interests of the Holders as compared to the economic interests of the shareholders of the Company.

(c)    The Company agrees that at least one member of the Board of Directors must be an Independent Director, except for a period of up to sixty (60) days after the death, removal or resignation of any director, pending the election or appointment of such director's successor.

(d)    For the avoidance of doubt, any decision by the Board of Directors to extend or not to extend the Maturity Date pursuant to Section 2.7 or any amendment of this Agreement pursuant to Section 5.1(a)(v) shall not be deemed to be (i) for the primary purpose of causing the requirements for payment of the Contingent Value Rights not to be satisfied, or (ii) disproportionately adverse to the economic interests of the Holders as compared to the economic interests of the shareholders of the Company.

Section 4.3.    Reporting; Confidentiality.

(a)    The Company shall provide periodic reporting during the term of this Agreement with respect to the CVR Asset Pool to the CVR Agent (for the benefit of, and distribution to, the Holders pursuant to Section 4.3(b)) as follows:

(i)    Annually, within ninety (90) days following the end of each calendar year during the Measurement Period, a consolidated balance sheet of the CVR Holding Company as of the end of such calendar year, together with related consolidated statements of income, cash flow, and changes in financial position for such calendar year, all in reasonable detail and, beginning with financial information for the year ending December 31, 2022, stating in comparative form the respective figures for the corresponding date and period in the prior calendar year and all prepared in accordance with GAAP; provided, however, if such financial information has been audited by an independent certified public accountant acceptable to the Board of Directors, and has been prepared and is available in a form that, in the Company's sole discretion, is appropriate to be provided to Holders pursuant to this Section 4.3, such financial information, in the form provided to the CVR Agent, shall be audited; provided, further, that if such financial information is not provided to the CVR Agent audited pursuant to the preceding proviso, such financial information shall be unaudited and shall be accompanied by an Officer's Certificate by the chief financial officer of the Company on behalf of the Company (which certificate shall state that it is being delivered in such person's capacity as an officer and not in such person's individual capacity and that such person shall have no personal liability) certifying to the Holders that such financial information is unaudited but fairly presents, in all material respects, the financial condition and results of operations of the CVR Asset Pool on a combined basis for the applicable periods in conformity with GAAP; and

(ii)    Quarterly, within forty-five (45) days following the end of the first, second and third calendar quarter of each fiscal year during the Measurement Period, an unaudited consolidated balance sheet of the CVR Holding Company as of the end of such calendar quarter, together with related statements of income, cash flow,

and changes in financial position for such calendar quarter, all in reasonable detail and stating in comparative form the respective figures for the corresponding date and period in the prior calendar quarter, all prepared in accordance with GAAP.

(b)    The CVR Agent shall, pursuant to a confidential, password-protected website that shall be established and administered by the CVR Agent, make the information furnished by the Company pursuant to Section 4.3(a) available to each Holder that agrees, as a condition to receiving a password to access such website, that:

(i)    Any financial information furnished by the Company pursuant to Section 4.3(a) and the password or other information that could be used to access the website contemplated by this Section 4.3(b), and all analyses, compilations, data, studies, notes, interpretations, memoranda or other documents prepared by the Holder or any of its respective representatives containing or based in whole or in part on any such furnished information ("**Confidential Information**") may not be divulged or communicated to any Person, or, other than to evaluate such Holder's interest in the Contingent Value Rights, used for any purpose, in whole or in part, without the prior written consent of the Company; provided that notwithstanding the foregoing, information shall not be Confidential Information and subject to the restrictions set forth in this Section 4.3(b) if such information (1) was, is or becomes generally available to the public other than as a result of the Holder's or one of its representatives' material breach of this Agreement; (2) was, is or becomes available to a Holder or its representatives on a non-confidential basis from a source that was not known by the Holder or its representatives to be bound by a confidentiality agreement with respect to such information or otherwise prohibited from furnishing or making available the information to the Holder or such Holder's representatives by a contractual, legal or fiduciary obligation; or (3) was, is or becomes independently developed by the Holder or its representatives without directly using any Confidential Information; provided further that (A) subject to Section 4.3(b)(ii), Confidential Information may be disclosed if legally compelled (including by deposition, interrogatory, request for documents, subpoena, civil investigative demand or similar process), or in response to a request from a regulatory or self-regulatory or supervisory authority having or asserting jurisdiction over the applicable Holder (collectively, "**Compelled**"), and (B) each Holder may disclose Confidential Information to its officers, employees, agents, accountants, attorneys, and advisors but such Holder shall be responsible for any breach of the agreement set forth in this Section 4.3(b) by any such officer, employee, agent, accountant, attorney, or advisor as if such Persons were subject thereto.

(ii)    If any Holder or representative thereof becomes Compelled to disclose any of the Confidential Information, such Holder shall, to the extent legally permitted, provide the Company with reasonably prompt and, if possible, prior written notice of such requirement to disclose such Confidential Information. Upon receipt of such notice, the Company may seek a protective order or other appropriate remedy at its sole expense. If such protective order or other remedy is not obtained, such Holder and its representatives shall disclose only that portion of the Confidential Information which is legally required to be disclosed (as determined in good faith by

counsel to such Holder) and shall, at the request and sole expense of the Company, take all reasonable steps to preserve the confidentiality of the Confidential Information. In addition, neither such Holder nor any of its representatives will oppose any judicial, administrative, arbitral or other legal action, suit, hearing, inquiry, order, audit, arbitration, mediation, claim, investigation or other proceeding (whether federal, state, local or foreign or public or private) by the Company to obtain an appropriate protective order or other reliable assurance that confidential treatment will be accorded the Confidential Information and such Holder and its representatives will, if and to the extent requested by the Company and legally permissible to do so, cooperate with and assist the Company, at the Company's expense and on a reasonable basis, in connection therewith.

(iii)    Each Holder hereby agrees (on behalf of itself and its representatives) that money damages would not be a sufficient remedy for any breach of its obligations contemplated by this Section 4.3(b), and that in addition to all other remedies, the Company shall be entitled to injunctive or other equitable relief as a remedy for any such breach to the extent provided by law. Each Holder hereby agrees (on behalf of itself and its representatives) to waive any requirement for the securing or posting of any bond in connection with such remedy.

(iv)    Unless extended in writing by mutual agreement of the parties, the obligations under this Section 4.3(b) shall terminate upon the second anniversary of the Final Payment Date, without any further action by any party.

(c)    The Company shall Make Available to the Holders, within ninety (90) days after the end of each calendar year beginning with the calendar year ending [December 31, 2021], an Officer's Certificate on behalf of the Company (which certificate shall state that it is being delivered in such person's capacity as an officer and not in such person's individual capacity and that such person shall have no personal liability) stating that to the Company's knowledge, each entity has kept, observed, performed and fulfilled the covenants and agreements contained in this Agreement in all material respects and is not in default in the performance or observance in any material respect of the terms, provisions and conditions of this Agreement (or, if a default shall have occurred, describing all such defaults of which he or she may have knowledge) and what action the Company is taking or proposes to take with respect thereto).

Section 4.4.    Payment to Holders by the CVR Agent.  Upon receipt by the CVR Agent of any amount paid to it pursuant to Section 2.5(c), Section 2.5(d) or Section 2.5(e), as applicable, for payment to the Holders in accordance with the terms of this Agreement, the CVR Agent shall promptly pay such amounts to the Holders in the manner provided for in Section 2.5 and in accordance with the terms of this Agreement. The CVR Agent shall have no liability of any kind, and shall not be obligated to make any payments, unless and until it receives an amount paid to it pursuant to Section 2.5(c), Section 2.5(d) or Section 2.5(e), as applicable.

Section 4.5.    Assignment.  Except for assignments occurring through operation of law, neither the Company nor the CVR Agent shall, in whole or in part, assign any of its rights or obligations under this Agreement; provided that the Company may assign any of its obligations hereunder to an Affiliate of the Company as long as the Company causes such Affiliate to perform

the Company's obligations hereunder and remains responsible for any breach of this Agreement by such Affiliate. In the event an assignment by the Company to an Affiliate pursuant to the preceding sentence occurs, the Company shall deliver to the CVR Agent an Officer's Certificate stating that such assignment complies with this <u>Section 4.5</u>. Any Person into which the CVR Agent or any successor CVR Agent may be merged or with which it may be consolidated, or any Person to which the CVR Agent shall sell all or substantially all of its assets, or any Person resulting from any merger or consolidation to which the CVR Agent or any successor CVR Agent shall be a party, or any Person succeeding to the corporate trust, stock transfer or other shareholder services business of the CVR Agent or any successor CVR Agent, shall be the successor to the CVR Agent under this Agreement without the execution or filing of any paper or any further act on the part of any of the parties hereto, but only if such Person would be eligible for appointment as a successor CVR Agent under the provisions of <u>Section 3.4</u> hereof. Without limiting the generality of the foregoing, the CVR Agent agrees to use reasonable best efforts to provide the Company with written notice of any such event. No Holder shall, in whole or in part, assign any of its rights or obligations under this Agreement except in accordance with a Permitted Transfer in accordance with <u>Section 2.3(b)-(c)</u>. Any purported assignment that is not permitted by this <u>Section 4.3</u> shall be null and void and of no effect.

Section 4.6.    <u>No Obligation to Pursue or Consummate Monetization Event</u>. Notwithstanding anything in this Agreement to the contrary, none of the Company, the CVR Holding Company or any of their Subsidiaries or Affiliates (including the Supporting Stockholder or any of its Affiliates) shall be in any way obligated or required to pursue, discuss, negotiate or consummate any Monetization Event or any transactions or series of transactions that is intended to or likely to lead to a Monetization Event.

**ARTICLE 5**
**AMENDMENTS**

Section 5.1.    <u>Amendments Without Consent of Holders</u>.

(a)    Without the consent of any Holders, the Company and the CVR Agent, at any time and from time to time, may enter into one or more amendments hereto, for any of the following purposes:

(i)    to evidence the succession of another Person to the Company and the assumption of any such successor of the rights and obligations of the Company herein if such succession and assumption is in accordance with the terms of this Agreement;

(ii)    to evidence the succession of another Person selected in accordance with the terms hereof as a successor CVR Agent and the assumption by any successor of the covenants and obligations of the CVR Agent herein if such succession and assumption is in accordance with the terms of this Agreement;

(iii)    to add to the covenants of the Company such further covenants, restrictions, conditions or provisions as the Company and the CVR Agent shall consider to be for the protection of the Holders; <u>provided</u> <u>that</u> in each case, such

35

provisions shall not adversely affect the interests of the Holders in any material respect;

      (iv)    to cure any ambiguity, to correct or supplement any provision herein that may be defective or inconsistent with any other provision herein, or to make any other provisions with respect to matters or questions arising under this Agreement; provided that in each case, such provisions shall not adversely affect the interests of the Holders in any material respect; or

      (v)    as necessary to ensure that the Contingent Value Rights are not subject to registration under the Securities Act or result in the Company or the Contingent Value Rights being required to register under the Exchange Act or any other applicable law.

(b)    Promptly after the execution by the Company and the CVR Agent of any amendment pursuant to the provisions of this Section 5.1, the Company shall prepare and Make Available a notice thereof to the Holders setting forth in general terms the substance of such amendment; provided that any failure so to notify the Holders shall not affect the validity of such amendment (it being understood that any failure so to notify the Holders shall not excuse the CVR Agent from its obligations under Section 5.3).

Section 5.2.    Amendments with Consent of Holders.

(a)    Subject to Section 5.1 (which amendments pursuant to Section 5.1 may be made without the consent of the Holders), with the consent of the Majority of Holders, the Company and the CVR Agent may enter into one or more amendments hereto to add, eliminate or change any provisions of this Agreement, even if such addition, elimination or change is in any way adverse to the interests of the Holders. It shall not be necessary for any written consent of the Majority of Holders under this Section 5.2(a) to approve the particular form of any proposed amendment, but shall be sufficient if such written consent approves the substance thereof.

(b)    Promptly after the execution by the Company and the CVR Agent of any amendment pursuant to the provisions of this Section 5.2, the Company shall Make Available a notice thereof to the Holders, setting forth in general terms the substance of such amendment; provided, that any failure so to notify the Holders shall not affect the validity of such amendment (it being understood that any failure so to notify the Holders shall not excuse the CVR Agent from its obligations under Section 5.3).

Section 5.3.    Execution of Amendments.  Prior to executing any amendment permitted by this Article 5, the CVR Agent shall be entitled to receive, and shall be fully protected in and shall incur no liability for relying upon, an Officer's Certificate stating that the execution of such amendment is authorized or permitted by this Agreement. The CVR Agent shall execute any amendment authorized pursuant to this Article 5 if the amendment does not materially and adversely affect the CVR Agent's own rights or duties under this Agreement or otherwise. Otherwise, the CVR Agent may, but need not, execute such amendment. No amendment to this Agreement shall be effective unless executed by the CVR Agent. The CVR Agent agrees that time

is of the essence in connection with any amendment to this Agreement that it is directed to execute by the Company in accordance with this <u>Section 5</u>.

Section 5.4.    <u>Effect of Amendments</u>.  Upon the execution of any amendment under this <u>Article 5</u>, this Agreement shall be modified in accordance therewith, such amendment shall form a part of this Agreement for all purposes and every Holder shall be bound thereby.

## ARTICLE 6
## CONSOLIDATION, MERGER, SALE, CONVEYANCE OR CONVERSION

Section 6.1.    <u>No Prohibitions on the Company</u>.

(a)    Subject to <u>Section 4.2</u>, nothing in this Agreement shall prohibit or prevent the Company or any of its Subsidiaries from consolidating with or merging into any other Person or conveying, transferring or leasing its properties and assets, in whole or in part, to any Person or from converting from a corporation to another business entity, including a limited liability company, organized in another jurisdiction.

(b)    Nothing in this Agreement shall prohibit or prevent the Company or any of its Subsidiaries from selling any of its rights, in whole or in part, to any or all of the assets of the CVR Asset Pool.

## ARTICLE 7
## OTHER PROVISIONS OF GENERAL APPLICATION

Section 7.1.    <u>Notices to the CVR Agent, the Company and the Holders</u>.

(a)    Unless otherwise indicated, any notice, request, instruction or other document to be given hereunder by any party to the other shall be in writing and delivered personally or sent by registered or certified mail, postage prepaid, by electronic mail or overnight courier:

(i)    If to the Company:

Hospitality Investors Trust, Inc.
Park Avenue Tower
65 East 55th St. | Suite 801
New York, NY 10022
Attention: Paul C. Hughes, Esq.
Email: phughes@hitreit.com

with a copy (which shall not constitute notice) to:

Brookfield Property Group
250 Vesey Street, 11th Floor
New York, NY 10281
Attention: BPG Transactions Legal
Email: realestatenotices@brookfield.com

(ii)       If to the CVR Agent:

Computershare Trust Company, N.A.
150 Royall Street
Canton, MA 02021
Attention: Corporate Actions Relationship Manager

or to such other persons or addresses as may be designated in writing by the party to receive such notice as provided above. Any notice, request, instruction or other document given as provided above shall be deemed given to the receiving party upon actual receipt, if delivered personally; three (3) Business Days after deposit in the mail, if sent by registered or certified mail; upon confirmation of successful receipt if sent by electronic mail (the receiving party shall confirm receipt of any notice received by electronic mail reasonably promptly following its receipt; provided that if a notice is given by electronic mail and such confirmation of successful receipt is not confirmed by the receiving party within two (2) Business Days after the transmission of such notice, such notice, request, instruction or other document shall be followed up within one (1) Business Day after the expiration of such two (2) Business Day period by dispatch pursuant to one of the other methods described herein); or on the next Business Day after deposit with an overnight courier, if sent by an overnight courier; provided, however, that for any information or notices that the Company is required to Make Available pursuant to this Agreement, such information or notices shall be validly delivered to the applicable recipients thereof if delivered in accordance with the term "Make Available" pursuant to this Agreement.

(b)       Where this Agreement provides for notice to Holders, such notice shall be sufficiently given (unless otherwise herein expressly provided) if in writing and Made Available, not later than the latest date, and not earlier than the earliest date, prescribed for the giving of such notice. In any case where notice to Holders is given by mail, neither the failure to mail such notice, nor any defect in any notice so mailed, to any particular Holder shall affect the sufficiency of such notice with respect to other Holders.

Section 7.2.    Effect of Headings; Construction.    The headings herein are for convenience of reference only, do not constitute part of this Agreement and shall not be deemed to limit or otherwise affect any of the provisions of this Agreement. Where a reference in this Agreement is made to a Section, such reference shall be to a Section of this Agreement unless otherwise indicated.

Section 7.3.    Benefits of Agreement; Holders are Third Party Beneficiaries.    Nothing in this Agreement, express or implied, shall give to any Person (other than the parties hereto and their permitted successors and assigns hereunder) any benefit or any legal or equitable right, remedy or claim under this Agreement or under any covenant or provision herein contained, all such covenants and provisions being for the sole benefit of the parties hereto and their permitted successors and assigns. Notwithstanding the foregoing, each of the Holders shall be an intended third party beneficiary of this Agreement. The Holders will have no rights hereunder or with respect to the matters contemplated hereby except as are expressly set forth in this Agreement. Except for the rights of and exercisable by the CVR Agent set forth herein, the Majority of Holders will have the sole right, on behalf of all Holders, by virtue of or under any provision of this

Agreement, to institute any action or proceeding at law or in equity with respect to this Agreement, and no individual Holder or other group of Holders will be entitled to exercise such rights.

Section 7.4.    Governing Law and Venue; Waiver of Jury Trial.

(a)    THIS AGREEMENT SHALL BE DEEMED TO BE MADE IN AND IN ALL RESPECTS SHALL BE INTERPRETED, CONSTRUED AND GOVERNED BY AND IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK WITHOUT REGARD TO THE CONFLICT OF LAW PRINCIPLES THEREOF TO THE EXTENT THAT SUCH PRINCIPLES WOULD DIRECT A MATTER TO ANOTHER JURISDICTION. The parties hereby irrevocably submit to the exclusive personal jurisdiction of the Commercial Division of the Supreme Court of the State of New York and the federal courts of the United States of America located in the Southern District of New York (and any appellate courts therefrom) in respect of the interpretation and enforcement of the provisions of this Agreement and of the documents referred to in this Agreement (subject to Section 2.4(e), Section 2.5(b) and Section 2.6), and in respect of the transactions contemplated hereby, and hereby waive, and agree not to assert, as a defense in any action, suit or proceeding for the interpretation or enforcement of this Agreement or of any such document, that it is not subject thereto or that such action, suit or proceeding may not be brought or is not maintainable in said courts or that the venue thereof may not be appropriate or that this Agreement or any such document may not be enforced in or by such courts, and the parties hereto irrevocably agree that all claims relating to such action, proceeding or transactions shall be heard and determined in such courts. The parties hereby consent to and grant any such court jurisdiction over the person of such parties and, to the extent permitted by law, over the subject matter of such dispute and agree that mailing of process or other papers in connection with any such action or proceeding in the manner provided in Section 7.1 or in such other manner as may be permitted by law shall be valid and sufficient service thereof.

(b)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (i) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (ii) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (iii) EACH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (iv) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 7.4.

Section 7.5.    Severability Clause. The provisions of this Agreement shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions of this Agreement. If any provision of this Agreement, or the application of such provision to any Person or any circumstance, is invalid or unenforceable,

(a) the Company and the CVR Agent shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible to the fullest extent permitted by applicable law to such end that the transactions contemplated by this Agreement are fulfilled to the extent possible, and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application of such provision, in any other jurisdiction; provided, however, that if any such excluded provision shall materially and adversely affect the rights, immunities, liabilities, duties or obligations of the CVR Agent, the CVR Agent shall be entitled to resign immediately upon written notice to the Company.

Section 7.6.   Counterparts.   This Agreement may be executed in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

Section 7.7.   Termination.   This Agreement shall terminate and be of no further force or effect, and the parties hereto shall have no liability hereunder, (a) automatically, following the completion of the payments required to occur on the CVR Payment Date pursuant to Section 2.5(c) or, if a payment is required to occur pursuant to Section 2.5(d) or Section 2.5(e), as applicable, following the completion of any and all payments required to be made in accordance with Section 2.5(d) or Section 2.5(e), as applicable, or (b) by the Company, if there shall be any judgment, injunction or order enacted, issued, promulgated, enforced or entered into by any court or other Governmental Entity of competent jurisdiction that permanently restrains, enjoins or otherwise prohibits the payment of any Total Distributable Amount and such judgment, injunction or order shall have become final and non-appealable, upon written notice of the same to the CVR Agent; provided that Article 1, Section 2.4(h), the last sentence of Section 2.5(b), Section 2.6, Section 2.8, Article 3, Article 6 and this Article 7 shall survive the termination of this Agreement, in each case, to the extent applicable.

Section 7.8.   Entire Agreement.   This Agreement constitutes the entire agreement, and supersedes all other prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof and thereof, and this Agreement supersedes any and all other oral or written agreements hereto made with respect to the Contingent Value Rights. As it relates to the CVR Agent, this Agreement represents the entire understanding of the CVR Agent with reference to the Contingent Value Rights, and this Agreement supersedes any and all other oral or written agreements hereto made with respect to the Contingent Value Rights. With regard to the Company and the Holders, if and to the extent that any provision of this Agreement is inconsistent or conflicts with the Plan Documents, this Agreement shall govern and be controlling (except as may be otherwise required by applicable law), and this Agreement may be amended, modified, supplemented or altered only in accordance with the terms of Article 5. No party shall be bound by, or be liable for, any alleged representation, promise, inducement or statement of intention not contained herein.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be executed on its behalf by its duly authorized officers as of the day and year first above written.

HOSPITALITY INVESTORS TRUST, INC.

By: _____

    Name:

    Title:

COMPUTERSHARE INC.
COMPUTERSHARE TRUST COMPANY, N.A.

By: _____

    Name:

    Title:

**Schedule I**

**Adjusted EBITDA Thresholds**

**[Attached]**

**Project Continental**  *CONFIDENTIAL*

*Hotel EBITDA Threshold Calculation ($ thousands)*

### Loan Pool Summary

| | Number of Hotels |
|---|---|
| DB Mortgage Trust | 2 |
| 92-Pack | 62 |
| Term Loan | 15 |
| Equity Inns Pool 2 | 21 |
| Unsecured | 0 |
| **Total** | **100** |

The EBITDA threshold for each property is equal to the lesser of (i) 50% of 2019 Hotel EBITDA and (ii) 100% of 2020 Hotel EBITDA.

| Hotel ID | Hotel Name | Loan Pool | EBITDA Threshold |
|---|---|---|---|
| Westin VA | Westin Virginia Beach Town Center | DB Mortgage Trust | $ 151.2 |
| HGI Burg | Hilton Garden Inn Blacksburg | DB Mortgage Trust | 60.1 |
| CY Asheville | Courtyard Asheville | 92-Pack | 346.6 |
| CY Athens | Courtyard Athens | 92-Pack | (228.3) |
| CY Balt | Courtyard Baltimore Inner Harbor | 92-Pack | (1,140.9) |
| CY Columbus | Courtyard Columbus Downtown | Term Loan | (410.8) |
| CY Dallas | Courtyard Dallas | 92-Pack | (40.8) |
| CY Dalton | Courtyard Dalton | Equity Inns Pool 2 | 558.8 |
| CY Flagstaff | Courtyard Flagstaff | Term Loan | 1,553.0 |
| CY Houston | Courtyard Houston | Equity Inns Pool 2 | (352.2) |
| CY Jacksonville | Courtyard Jacksonville | 92-Pack | 236.6 |
| CY Knoxville | Courtyard Knoxville | 92-Pack | 129.5 |
| CY Louisville | Courtyard Louisville | 92-Pack | 168.6 |
| CY Orlando | Courtyard Orlando | 92-Pack | (83.7) |
| CY Prov | Courtyard Providence | 92-Pack | (143.5) |
| CY Carlsbad | Courtyard Carlsbad | Equity Inns Pool 2 | (87.1) |
| CY Sarasota | Courtyard Sarasota | 92-Pack | 140.8 |
| CY Tallahassee | Courtyard Tallahassee | 92-Pack | 223.7 |
| DT Baton Rouge | Doubletree Baton Rouge | Term Loan | 546.0 |
| ES Orlando | Embassy Suites Orlando | 92-Pack | 130.5 |
| FFIS Atlanta | Fairfield Inn & Suites Atlanta | 92-Pack | (4.5) |
| FFIS Dallas | Fairfield Inn & Suites Dallas | 92-Pack | (376.5) |
| FFIS Denver | Fairfield Inn & Suites Denver Airport | Term Loan | (420.0) |
| FFIS Bellevue | Fairfield Inn & Suites Seattle Bellevue | Term Loan | (392.1) |
| HIS Boynton Beach | Hampton Inn & Suites Boynton Beach | 92-Pack | 1,180.1 |
| HIS El Paso | Hampton Inn Suites El Paso Airport | Term Loan | 673.2 |
| HIS Franklin | Hampton Inn & Suites Franklin | 92-Pack | 110.0 |
| HI Albany | Hampton Inn Albany | 92-Pack | (424.3) |
| HI Austin | Hampton Inn Austin | Equity Inns Pool 2 | (293.6) |
| HI Glen Burnie | Hampton Inn Glenn Burnie | 92-Pack | (17.2) |
| HI Beckley | Hampton Inn Beckley | 92-Pack | 784.4 |
| HI Birmingham | Hampton Inn Birmingham | 92-Pack | (320.4) |
| HI Boca Raton | Hampton Inn Boca Raton | 92-Pack | 258.0 |

The EBITDA threshold for each property is equal to the lesser of (i) 50% of 2019 Hotel EBITDA and (ii) 100% of 2020 Hotel EBITDA.

| Hotel ID | Hotel Name | Loan Pool | EBITDA Threshold |
|----------|-----------|-----------|------------------|
| HI Deerfield | Hampton Inn Deerfield Beach | 92-Pack | 165.4 |
| HI Peabody | Hampton Inn Peabody | 92-Pack | (135.4) |
| HI Urbana | Hampton Inn Urbana | Equity Inns Pool 2 | (61.4) |
| HI Gastonia | Hampton Inn Gastonia | 92-Pack | 339.0 |
| HI Naperville | Hampton Inn Naperville | Equity Inns Pool 2 | (283.9) |
| HI College Station | Hampton Inn College Station | Equity Inns Pool 2 | (361.5) |
| HI Madison Heights | Hampton Inn Madison Heights | 92-Pack | 130.1 |
| HI East Lansing | Hampton Inn East Lansing | Equity Inns Pool 2 | (11.3) |
| HI Ft Wayne | Hampton Inn Fort Wayne Southwest | Term Loan | 280.8 |
| HI Grand Rapids | Hampton Inn Grand Rapids | 92-Pack | (112.1) |
| HI Indianapolis | Hampton Inn Indianapolis | Equity Inns Pool 2 | 48.0 |
| HI Alcoa | Hampton Inn Alcoa | Equity Inns Pool 2 | 91.4 |
| HI Medford | Hampton Inn Medford | Term Loan | 402.6 |
| HI Memphis | Hampton Inn Memphis | 92-Pack | (87.0) |
| HI Milford | Hampton Inn Milford | Equity Inns Pool 2 | (297.7) |
| HI Norfolk | Hampton Inn Norfolk | 92-Pack | 597.8 |
| HI Orlando | Hampton Inn Orlando | Equity Inns Pool 2 | (496.7) |
| HI Palm Beach | Hampton Inn Palm Beach Gardens | 92-Pack | 813.7 |
| HI Scranton | Hampton Inn Scranton | 92-Pack | (8.6) |
| HI State College | Hampton Inn State College | 92-Pack | (109.0) |
| HI WPB | Hampton Inn West Palm Beach | 92-Pack | 861.2 |
| HGI Rio Rancho | Hilton Garden Inn Rio Rancho | Equity Inns Pool 2 | 266.0 |
| HGI Round Rock | Hilton Garden Inn Round Rock | 92-Pack | 86.9 |
| HGI Ft Collins | Hilton Garden Inn Fort Collins | Term Loan | 62.9 |
| HGI Louisville | Hilton Garden Inn Louisville | Equity Inns Pool 2 | 17.5 |
| HGI Monterey | Hilton Garden Inn Monterey | Term Loan | 734.2 |
| HWS Augusta | Homewood Suites Augusta | Equity Inns Pool 2 | 188.1 |
| HWS Peabody | Homewood Suites Peabody | 92-Pack | 469.1 |
| HWS Chicago | Homewood Suites Chicago | 92-Pack | (1,382.3) |
| HWS Windsor Locks | Homewood Suites Windsor Locks | 92-Pack | (30.8) |
| HWS Orlando | Homewood Suites Orlando | Equity Inns Pool 2 | 936.8 |
| HWS Phoenix | Homewood Suites Phoenix | 92-Pack | 900.5 |
| HWS San Antonio | Homewood Suites San Antonio | 92-Pack | 101.8 |
| HWS Seattle | Homewood Suites Seattle | Equity Inns Pool 2 | 611.7 |
| HWS Strat | Homewood Suites Stratford | Equity Inns Pool 2 | 839.6 |
| HH ATL Cobb | Hyatt House Atlanta Cobb Galleria | Term Loan | 404.0 |
| HP Albuquerque | Hyatt Place Albuquerque | 92-Pack | 228.9 |
| HP Las Vegas | Hyatt Place Las Vegas | 92-Pack | 319.9 |
| HP Memphis | Hyatt Place Memphis | 92-Pack | 35.9 |
| HP Miami | Hyatt Place Miami | 92-Pack | (386.4) |
| HP Minneapolis | Hyatt Place Minneapolis | 92-Pack | (658.0) |
| HP Franklin | Hyatt Place Franklin | 92-Pack | (192.4) |
| HP Tampa | Hyatt Place Tampa | 92-Pack | 252.9 |
| RI Boise | Residence Inn Boise | 92-Pack | 790.6 |
| RI Chattanooga | Residence Inn Chattanooga | 92-Pack | 726.9 |

The EBITDA threshold for each property is equal to the lesser of (i) 50% of 2019 Hotel EBITDA and (ii) 100% of 2020 Hotel EBITDA.

| Hotel ID | Hotel Name | Loan Pool | EBITDA Threshold |
|---|---|---|---|
| RI Ft Myers | Residence Inn Fort Myers | 92-Pack | 609.8 |
| RI Ft Wayne | Residence Inn Fort Wayne Southwest | Term Loan | 885.5 |
| RI Jacksonville | Residence Inn Jacksonville | Equity Inns Pool 2 | 465.4 |
| RI Knoxville | Residence Inn Knoxville | 92-Pack | 505.2 |
| RI Lexington | Residence Inn Lexington | 92-Pack | 528.9 |
| RI El Segundo | Residence Inn LA El Segundo | 92-Pack | 1,500.0 |
| RI Macon | Residence Inn Macon | 92-Pack | 536.6 |
| RI Germantown | Residence Inn Memphis Germantown | Term Loan | 464.7 |
| RI San Diego | Residence Inn San Diego | 92-Pack | 862.6 |
| RI Sarasota | Residence Inn Sarasota | 92-Pack | 501.0 |
| RI Savannah | Residence Inn Savannah | 92-Pack | 437.0 |
| RI Tallahassee | Residence Inn Tallahassee | 92-Pack | 515.5 |
| RI Tampa North | Residence Inn Tampa North | 92-Pack | 685.9 |
| RI Sabal Park | Residence Inn Sabal Park | 92-Pack | 908.3 |
| SHS Asheville | Springhill Suites Asheville | Equity Inns Pool 2 | 190.8 |
| SHS Round Rock | Springhill Suites Round Rock | 92-Pack | 29.3 |
| SHS Denver | Springhill Suites Denver Airport | Term Loan | 10.6 |
| SHS Flagstaff | Springhill Suites Flagstaff | Term Loan | 922.4 |
| SHS Grand Rapids | Springhill Suites Grand Rapids | 92-Pack | 71.9 |
| SHS Lexington | Springhill Suites Lexington | 92-Pack | 268.3 |
| SHS San Diego | Springhill Suites San Diego | 92-Pack | 46.3 |
| TPS Savannah | TownePlace Suites Savannah | Equity Inns Pool 2 | 560.9 |
| Total (100) | | | $ 21,111.5 |

**Schedule II**

**Excluded Assets**

1.  Hilton-Blacksburg

**2.**  VA Beach Westin

**Schedule III**

**Total Distributable Amount Calculation Example**

**[Attached]**

<u>**SCHEDULE I**</u>

The following is an illustration of the application of the provisions of the Agreement when the following sequence of events has occurred:

1. The Petition Date is May 19, 2021, and the Effective Date is June 30, 2021.

    a. The CVR Asset Pool has 98 Hotel Properties in it.

    b. The Excluded Asset Adjustment Factor is 0.9866.

    c. The initial DIP Financing Invested Capital Amount is $55.2 million ($55.9 million X 0.9866).

    d. The Supporting Stockholder CVR Asset Pool Invested Amount is $402.0 million ($407.4 million X 0.9866).

    e. 39,962,380 Contingent Value Rights issued (which number shall be reduced for any forfeited CVRs), which number of Contingent Value Rights would have been 40,000,000 if the 37,620 Shares owned by the Supporting Stockholder prior to the Effective Date were not effectively cancelled pursuant to the Plan.

2. On December 31, 2021, CVR Holding Company makes a distribution funded from operating cash flow of CVR Holding Company to the Company of $26.0 million and $15.3 million of that amount is a Permitted Distribution used to fund general and administrative costs allocable to CVR Holding Company and other eligible costs and expenses.

    a. The total amount of the distribution, less the amount of the Permitted Distribution, will be an Additional Adjustment Amount and the DIP Financing Invested Capital Amount is therefore deemed to have been reduced by $10.7 million to $44.5 million as of the date of the distribution for purposes of calculating the return of 15.0% contemplated by Section 2.4(g)(iii).

3. On March 31, 2022, one Hotel Property in the CVR Asset Pool is sold for $20 million net proceeds from the sale (net of any mortgage indebtedness or other liabilities and transaction costs) and $15 million of the net proceeds are distributed to the Company in a transaction that is <u>not</u> a sale of All or Substantially All of the Assets but <u>is</u> a Qualifying CVR Asset Pool Sale

    a. Assuming that no portion of the distribution qualifies as a Permitted Distribution, the distribution will be an Additional Adjustment Amount

and the DIP Financing Invested Capital Amount is therefore deemed to have been reduced by $15 million to $29.5 million as of the date of the distribution for purposes of calculating the return of 15.0% contemplated by Section 2.4(g)(iii).

4. On June 30, 2022, one Hotel Property is sold for cash in a transaction that is not a sale of All or Substantially All of the Assets or a Qualifying CVR Asset Pool Sale and $1 million of the net proceeds (net of any mortgage indebtedness or other liabilities and transaction costs) from the sale are distributed to the Company.

   a. The distribution will not be an Additional Adjustment Amount because the sale was not a Qualifying CVR Asset Pool Sale.

5. On December 31, 2022, CVR Holding Company makes a distribution funded from operating cash flow of CVR Holding Company to the Company of $26.0 million and $15.3 million of that amount is of that amount is a Permitted Distribution used to fund general and administrative costs allocable to CVR Holding Company and other eligible costs and expenses.

   a. The total amount of the distribution, less the amount of the Permitted Distribution, will be an Additional Adjustment Amount and the DIP Financing Invested Capital Amount is therefore deemed to have been reduced by $10.7 million to $18.8 million as of the date of the distribution for purposes of calculating the return of 15.0% contemplated by Section 2.4(g)(iii).

6. On March 31, 2023, the Company borrows $5.0 million under the Exit Facility which is contributed to the CVR Holding Company as a Post-Effective Date Contribution.

7. On March 31, 2023, CVR Holding Company refinances a mortgage loan secured by 15 of the Hotel Properties on substantially same terms as the mortgage loan being refinanced and the $300,000 difference between the gross proceeds from the new loan and principal amount of the old loan is used by CVR Holding Company to pay transaction costs for the refinancing.

   a. This transaction has no impact on any calculation required by Section 2.4 because it is funded using CVR Holding Company's capital resources and no amounts are distributed out of CVR Holding Company.

8. On June 30, 2023, 78 Hotel Properties in the CVR Asset Pool are sold for $502 million in net cash proceeds (contract price, less debt and other liabilities not assumed, less transaction costs, including a $2 million escrow described below in 8(a)) in a transaction that is a sale of All or Substantially All of the Assets because at least 80% of the Hotel Properties in the CVR Asset Pool have now been sold and therefore qualifies as a Distribution Triggering Monetization Event.

a. The transaction consideration includes a $2 million escrow that will be released to CVR Holding Company at the end of an indemnity survival period on August 31, 2023.

b. The aggregate Adjusted EBITDA of the 78 properties sold in the transaction exceeds the aggregate Adjusted EBITDA Threshold for the properties and Holders are therefore entitled to receive payments pursuant to the Agreement.

c. The following is the calculation of Total CVR Pool Amount pursuant to Section 2.4(b):

| | |
|---|---|
| Net cash proceeds from June 30, 2023 sale | $500 million |
| Net cash proceeds from March 31, 2022 sale not previously distributed | $5 million |
| CVR Distribution Expenses | $(1.0) million |
| Post-Effective Date Contributions[1] | $(5.2) million |
| **Total** | **$498.8 million** |

d. The following is the calculation of the Total Distributable Amount for the Distribution Triggering Monetization Event that will be paid out to Holders pursuant to Section 2.4(g):

| | |
|---|---|
| Total CVR Pool Amount | $498.8 million |
| DIP Financing Invested Capital Amount (until reduced to zero) pursuant to 2.4(g)(i) | $(18.8) million[2] |
| CVR Asset Pool Invested Amount (until reduced to zero) pursuant to 2.4(g)(ii) | $(402.0) million |

---

[1] Assumes principal outstanding plus $0.2 million of accrued interest (assuming not previously paid) for the three months while principal was outstanding under the Exit Facility.

[2] This is amount shown to reflect reductions in paragraphs 2.a, 3.a, and 5.a. above

121873869v14

| | |
|---|---|
| *Until 94% of sum of Total CVR Pool Amount plus the Additional Amount (after prior applications) results in a return of 15.0% per annum on the DIP Financing Invested Capital Amount, 6.0% payable to Holders pursuant to 2.4(g)(iii)* | |
| A return of 15.0% per annum on the DIP Financing Invested Capital Amount | $(12.4) million |
| 6.0% payable to Holders pursuant to 2.4(g)(iii) | $(0.8) million |
| *Until 94% of sum of Total CVR Pool Amount plus the Additional Amount (after prior applications results in a return of 12.5% per annum accrued on the basis of twelve (12) thirty (30)-day months and a three hundred sixty (360)-day year, compounding quarterly, on the Supporting Stockholder CVR Asset Pool Invested Amount, 6.0% payable to Holders pursuant to 2.4(g)(iv)* | |
| A return of 12.5% per annum on the Supporting Stockholder CVR Asset Pool Invested Amount | $(61.0) million |
| 6.0% payable to Holders pursuant to 2.4(g)(iv) | $(3.9) million |
| **Remaining Accumulated return of 12.5% per annum on the Supporting Stockholder CVR Asset Pool Invested Amount** | **$51.2 million** |
| **Total Distributable Amount** | **$4.7 million** |

121873869v14

9.  On August 25, 2023,[3] a distribution of $0.12 per Contingent Value Right[4] is paid to the Holders in accordance with Section 2.5(c).

10. On August 15, 2023, 12 Hotel Properties are sold for $100 million in cash and 150,000 shares of stock in the acquirer.

    a.  The transaction consideration also includes an earn-out based on future hotel performance payable no earlier than August 1, 2024.

    b.  None of the cash or stock consideration received is distributed upstream to the Company. They remain on the balance sheet of CVR Holding Company.

11. On August 31, 2023, the $2 million escrow from the Distribution Triggering Monetization Event is released to CVR Holding Company.

12. October 9, 2023,[5] pursuant to Section 2.4(e), an Independent Valuer is appointed to determine the Value of the 6 Hotel Properties remaining in the CVR Asset Pool.

13. On December 31, 2023,[6] the Final Payment Date occurs, and a distribution of $2.35 per Contingent Value Right[7] is paid to the Holders in accordance with Section 2.5(c):

---

[3] This date calculated assuming (i) financial information with respect to the CVR Asset Pool for the calendar quarter immediately preceding the calendar quarter in which such Distribution Triggering Monetization Event occurs (i.e. the quarter ended March 31, 2023) has already been provided, and (ii) the Calculation Certificate required by Section 2.5(a) is made available on July 30, 2023, the latest possible date contemplated under these circumstances by Section 2.5(a).

[4] Represents $4.7 million Total Distributable Amount divided by 40,000,000 Contingent Value Rights, of which $4.69 million would have been distributable to Holders in accordance with such Holders' respective Pro Rata Payment Amounts after adjusting for the amount allocable to Contingent Value Rights that would have been issued in respect of Shares owned by the Supporting Stockholder prior to the Effective Date that were effectively cancelled pursuant to the Plan (which amount is for the Company's account and may be used in the Company's sole discretion in accordance with Section 2.4(k), including by distributing to the Supporting Stockholder).

[5] The 60th day prior to the Final Payment Date.

[6] The six-month anniversary of the Distribution Triggering Monetization Event.

[7] Represents $94.0 million Total Distributable Amount for the Final Payment Date divided by 40,000,000 Contingent Value Rights, of which $93.91 million would have been distributable to Holders in accordance with such Holders' respective Pro Rata Payment Amounts after adjusting for the amount allocable to Contingent Value Rights that would have been issued in respect of Shares owned by the Supporting Stockholder prior to the Effective Date that were effectively cancelled pursuant to the Plan (which amount is for the Company's account and may be used in the Company's sole discretion in accordance with Section 2.4(k), including by distributing to the Supporting Stockholder).

a. Because the aggregate Adjusted EBITDA Threshold was met in connection with the Distribution Triggering Monetization Event, the Adjusted EBITDA of the remaining 6 Hotel Properties is not relevant.

b. The following is the calculation of the Net Proceeds from CVR Asset Pool for the August 15, 2023 sale (which is a Monetization Event) pursuant to Section 2.4(c) as follows:

| | |
|---|---|
| The gross cash proceeds from the August 15, 2023 sale | $100 million |
| Transaction costs | $(1) million |
| The Value[8] of the 150,000 shares of stock issued in the August 15, 2023 sale | $100 million |
| Debt and other liabilities not assumed by buyer in transaction | $(1) million |
| **Total** | **$198 million** |

c. The following is the calculation of the Total CVR Pool Amount on the Final Payment Date pursuant to Section 2.4(b) as follows:

| | |
|---|---|
| Escrow release on August 31, 2023 | $2 million |
| Net Proceeds from CVR Asset Pool for the August 15, 2023 sale | $198 million |
| The Value of the 6 Hotel Properties and other assets directly related to operation of such Hotel Properties remaining in the CVR Asset Pool (net of any mortgage indebtedness or other liabilities and transaction costs) | $220 million |

---

[8] As determined by the Independent Investment Banker.

121873869v14

| The Value of the earn-out from the August 15, 2023 sale[9] | $1 million |
|---|---|
| CVR Distribution Expenses | $(1.0) million |
| **Total** | **$420 million** |

d.  The following is the calculation of the Total Distributable Amount on the Final Payment Date pursuant to Section 2.4(b) as follows:

| *Until 94% of sum of Total CVR Pool Amount plus the Additional Amount (after prior applications results in a return of 12.5% per annum accrued on the basis of twelve (12) thirty (30)-day months and a three hundred sixty (360)-day year, compounding quarterly, on the Supporting Stockholder CVR Asset Pool Invested Amount, 6.0% payable to Holders pursuant to 2.4(g)(iv)* | |
|---|---|
| A return of 12.5% per annum on the Supporting Stockholder CVR Asset Pool Invested Amount | $(54.5) million[10] |
| 6.0% payable to Holders pursuant to 2.4(g)(iv) | $(3.5) million |
| **Remaining Total CVR Pool Amount** | **$362.0 million** |

[9] Included in the Final Payment Date Distribution because the Company has elected to include the Holdback Value in the Company's calculation of the Value of the CVR Asset Pool pursuant to Section 2.4(d)(vi)(A). Represents the carrying value of the earn-out on the September 30, 2023 GAAP balance sheet for the CVR Holding Company furnished by the Company.

[10] Includes additional amounts accrued between June 30, 2023 and December 31, 2023.

121873869v14

| | |
|---|---|
| 25% of any remaining Total CVR Pool Amount payable to Holders pursuant to 2.4(g)(v)[11] | $(90.5) million |
| **Total Distributable Amount** | **$94.0 million** |

14. During the term of the Agreement, Holders have received total distributions of $2.47 per Contingent Value Right.

15. On or after December 31, 2024, if the Company requests in writing to the CVR Agent, the CVR Agent shall return to the Company any funds comprising the cash deposited with the CVR Agent under Section 2.5(c), Section 2.5(d) or Section 2.5(e), as applicable.

---

[11] Subject to the $6.00 cap on the per Contingent Value Right amount payable to Holders in Section 2.4(h).

121873869v14

**Base Assumptions**

| | Amount |
|---|---|
| CVR Asset Pool Properties | 98 |
| Number of CVRs Effectively Issued (mms) | 40.000 |
| Excluded Asset Adj. Factor | 0.9866x |
| Estimated Run-Rate G&A Expenses for HIT | $ 15.5 |

| Step | Date of Transaction | Description | | Notes |
|---|---|---|---|---|
| (1) | 6/30/2021 | **Effective Date** | | |
| | | ***Initial Balances Assumptions*** | **Amount** | |
| | | *DIP Financing* | | |
| | | Initial DIP Invested Capital | $ 55.9 | << This amount assumes $55 million DIP funding plus accrued interest |
| | | DIP Financing Invested Capital Amount | $ 55.2 | |
| | | Return on Capital % (compounded quarterly) | 15.0% | |
| | | *Supporting Stockholder (BAM) CVR Asset Pool Investment* | | |
| | | Supporting Stockholder CVR Asset Pool Investment | $ 407.4 | << Estimated AMT accrued @ 7.5% thru petition (5/19/21) and 12.5% from petition thru effective date (6/30/21 |
| | | Supporting Stockholder CVR Asset Pool Invested Amount | $ 402.0 | |
| | | Return on Capital % (compounded quarterly) | 12.5% | |
| (2) | 12/31/2021 | **Distribution** | | Remaining Hotels 98 |
| | | CVR Holding Company distribution to the Company | $ 26.0 | |
| | | (-) Amount used to fund G&A allocable to the CVR Holding Company | (15.3) | |
| | | Distribution Amount that Reduces DIP Financing Invested Capital Amount | $ 10.7 | << Distribution to the Company, net of the Permitted Distribution, reduces DIP invested capital balance |
| | | Pre-Transaction DIP Financing Invested Capital Amount | $ 55.2 | << Invested capital is original invested capital |
| | Section 2.5(g)(i) | (-) Distribution | (10.7) | |
| | | **Post-Transaction DIP Financing Invested Capital Amount** | **$ 44.5** | |
| (3) | 3/31/2022 | **Qualifying CVR Asset Pool Sale of one (1) hotel** | | Remaining Hotels 97 |
| | | Sale of one hotel | $ 20.0 | << Represents net proceeds above Mortgage debt, transaction costs and other liabilities |
| | | (-) Amount retained by the CVR Holding Company | (5.0) | |
| | | Distribution Amount that Reduces DIP Financing Invested Capital Amount | $ 15.0 | |
| | | Pre-Transaction DIP Financing Invested Capital Amount | $ 44.5 | << Invested capital amount after distribution in step 2 |
| | Section 2.5(g)(i) | (-) Distribution | (15.0) | |
| | | **Post-Transaction DIP Financing Invested Capital Amount** | **$ 29.5** | |
| (4) | 6/30/2022 | **Non-Qualifying CVR Asset Pool Sale of one (1) hotel** | | Remaining Hotels 96 |
| | | Sale of one hotel & distribution made to the Company | $ 1.0 | << Represents net proceeds above Mortgage debt, transaction costs and other liabilities |
| | | **Distributions made from non-qualify asset sales will not reduce the invested capital or return on capital amounts | | |
| (5) | 12/31/2022 | **Distribution** | | Remaining Hotels 96 |
| | | CVR Holding Company distribution to the Company | $ 26.0 | |
| | | (-) Amount used to fund G&A allocable to the CVR Holding Company | (15.3) | |
| | | Distribution Amount that Reduces DIP Financing Invested Capital Amount | 10.7 | << Distribution to the Company, net of the Permitted Distribution, reduces DIP invested capital balance |
| | | Pre-Transaction DIP Financing Invested Capital Amount | $ 29.5 | << Invested capital is original invested capital |
| | Section 2.5(g)(i) | (-) Distribution | (10.7) | |
| | | **Post-Transaction DIP Financing Invested Capital Amount** | **$ 18.8** | |
| (6) | 3/31/2023 | **Borrowing under the Exit Facility** | | Remaining Hotels 96 |
| | | Post-Effective Date Contribution into CVR Holding Company | $ 5.0 | << Borrows on the Exit Facility, which does not increase invested capital balance |
| | | **Borrowing does not increase the invested capital amount at this time; it will be deducted from net proceeds upon a monetization event | | |
| | | **This assumes the exit facility is cash pay but it will come off the top | | |
| (7) | 3/31/2023 | **Refinancing of Mortgage Loans** | << No impact as no distribution or contribution | Remaining Hotels 96 |
| | | No change in calculations | | |

| Step | Date of Transaction | Description | | | Notes |
|---|---|---|---|---|---|

| (8) | 6/30/2023 | Initial Monetization Event | | | Remaining Hotels | 18 |
| | | Sale of 78 hotels for cash triggering Initial Monetization Event | | | |
| | | Escrow (released at end of indemnity survival period) | $ 2.0 | |
| | | Net Cash Proceeds from Monetization Event | $ 500.0 | << Represents net proceeds above Mortgage debt, transaction costs and other liabilities |
| | | **Monetization Event Total Distributable Value Calculation** | | |
| | | Net Cash Proceeds from Monetization Event | $ 500.0 | |
| | | (+) Net Cash Proceeds from Step 3 Sale Not Previously Distributed | 5.0 | << From Step 3 that was not previously distributed |
| | | (-) CVR Distribution Expenses | (1.0) | |
| | | (-) Repayment of the Borrowing under the Exit Facility from Step 6 | (5.2) | << From Step 6; was not used to increase invested capital amount; repayment includes accrued interest |
| | | **Total Distributable Value from Initial Monetization Event** | $ 498.8 | |
| | Section 2.5(g)(i) | Less: Remaining DIP Financing Invested Capital Amount | (18.8) | << Remaining DIP Financing Invested Capital Amount after step 6 |
| | | **Remaining Distributable Value** | $ 480.0 | |
| | Section 2.5(g)(ii) | Less: Supporting Stockholder CVR Asset Pool Invested Amount | (402.0) | << Supporting Stockholder CVR Asset Pool Invested Amount |
| | | **Remaining Distributable Value** | $ 78.1 | << DIP Financing Invested Capital & Supporting Stockholder CVR Asset Pool Invested Amount FULLY Repaid |
| | | Value to CVRs | 6.0% | $ 4.7 | |
| | | Value to Repay Return on Capital Amounts | 94.0% | $ 73.4 | |
| | | **Value to Repay Return on Capital Amounts (DIP & Supporting Stockholder)** | $ 73.4 | |
| | Section 2.5(g)(iii) | Less: Acc. Return (@ 15%) on DIP Financing Invested Capital thru 6/30/23 | (12.4) | << Repayment of 100% of accrued return on DIP financing invested capital through 6/30/23 |
| | | **Value to Repay Return on Capital Amounts (Supporting Stockholder)** | $ 61.0 | |
| | Section 2.5(g)(iv) | Less: Acc. Return (@ 12.5%) on Sup. Stockholder Invested Amt. thru 6/30/23 | (61.0) | << Repayment of ONLY part of the accrued return on Sup. Stockholder invested capital through 6/30/23 |
| | | **Remaining Distributable Value** | $ - | |
| | | *Memo:* | | |
| | | *Remaining Acc. Return (@ 12.5%) on Sup. Stockholder Invested Amt. thru 6/30/23* | 51.2 | |

| (9) | 8/25/2023 | Distribution to CVRs | | | Remaining Hotels | 18 |
| | | Total Value to CVRs from Initial Monetization Event | $ 4.7 | << Represents total value from step 8 |
| | | Number of CVRs Effectively Issued (mms) | 40.0 | << Represents assumption from step 1 |
| | | **Distribution per CVR** | $ 0.12 | << Represents actual $$ per CVR (not millions) |

| (10) | 8/15/2023 | Sale of Additional Properties | | | Remaining Hotels | 6 |
| | | 12 Hotels sold 50% cash and 50% stock; Includes an earnout | | |
| | | See step 13 for the final payment date and release of proceeds | | |
| | | **No trigger at this point for distribution | | |

| (11) | 8/31/2023 | End of the indemnity survival period releasing the Escrow | | | Remaining Hotels | 6 |
| | | Escrow is released (from step 8 Initial ME) but **NOT** distributed to the Company at this time | | |
| | | **No trigger at this point for distribution to occur (see step 13 for distribution) | << No distribution = no payment trigger |

| (12) | 10/9/2023 | Independent Valuer Assesses Remaining 6 Hotel Properties | | | Remaining Hotels | 6 |
| | | Values the remaining hotels after the subsequent monetization event and the earnout | | |
| | | **No trigger at this point for distribution to occur | | |

| (13) | 12/31/2023 | Final Payment Date | | | Remaining Hotels | 0 |
| | | Pays out proceeds from subsequent monetization event, holdback and earnout | | |
| | | **Monetization Event Total Distributable Value Calculation** | | |
| | | Gross Cash Proceeds from Sale in step 10 | $ 100.0 | << See step 10 (represents the 50% cash) |
| | | Value of Stock received from Sale in step 10 | 100.0 | << See step 10 (represents the 50% stock valued by the independent investment banker) |
| | | Debt / other liabilities not assumed in Sale in step 10 | (1.0) | |
| | | Transaction Costs from Sale in step 10 | (1.0) | |
| | | **Value from Subsequent Monetization Event** | $ 198.0 | |
| | | Escrow amount from Initial Monetization Event | 2.0 | << Escrow is distributed, trigger payment (was released in step 11) |
| | | Value of Monetization Properties (valued by Independent Valuer) & Other Related Assets | 220.0 | << Valued by the independent investment banker & balance sheet (for other related assets) |
| | | Value of earnout | 1.0 | << See step 10 (represents the value of the earnout valued by the independent investment banker) |
| | | CVR Distribution Expenses | (1.0) | << Expenses for CVR Distribution |
| | | **Total Distributable Value at Final Payment Date** | $ 420.0 | |
| | Section 2.5(g)(iv) | Acc. Return (@ 12.5%) on Sup. Stockholder Invested Amt. thru 12/31/23 | 54.5 | << Repayment of remaining accrued return on Sup. Stockholder invested capital through 12/31/23 |
| | | Value to Repay Return on Capital Amounts | 94.0% | |
| | | **Implied Threshold for CVR Hurdle 2** | $ 58.0 | |
| | | Value to CVRs | 6.0% | $ 3.5 | |
| | | Value to Repay Return on Capital Amounts | 94.0% | $ 54.5 | |
| | | **Remaining Distributable Value** | $ 362.0 | |
| | Section 2.5(g)(v) | Value to CVRs | 25.0% | $ 90.5 | |
| | Section 2.5(g)(v) | Value to Supporting Stockholder (BAM) | 75.0% | $ 271.5 | |
| | | Total Value to CVRs (step 13 Only) | $ 94.0 | |
| | | Number of CVRs Effectively Issued (mms) | 40.0 | |
| | | **Distribution per CVR** | $ 2.35 | << Represents actual $$ per CVR (not millions) |
| | | **Total Distribution per CVR (Step 9 & 13)** | $ 2.47 | << Represents actual $$ per CVR (not millions) |

**Project Continental**
*DIP Invested Capital Debt Schedule ($ millions, unless stated otherwise)*

DRAFT - Subject to Material Change
*Highly Confidential*

**_Key Assumptions_**

| | | | |
|---|---|---|---|
| Initial Invest. Date | | 6/30/2021 | |
| Return on Capital Amount | | 15.0% | |
| Return on Cap. Calc. | 30.0 | 90.0 | 360.0 << Return is calculated on 30 / 360 (per CVR agreement) |
| Initial DIP Invested Capital | | 55.2 | |

| | DIP Financing Invested Capital | | | | | | Original Invested Capital Balance | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Invested Capital | | | | | | | | | |
| Date | Beginning Balance | (+) PIK Interest | (+) Add. Contribution | (-) Invested Cap. Repayment | (-) Return on Cap. Repayment | Ending Balance | Beginning Balance | (+) Add. Cont. / (-) Dist. | Ending Balance | Notes |
| Jun-21 | | | | | | $ 55.2 | | | | |
| Sep-21 | 55.2 | 2.1 | | | | 57.3 | 55.2 | | 55.2 | |
| Dec-21 | 57.3 | 2.1 | | (10.7) | | 48.7 | 55.2 | (10.7) | 44.5 | << Step 2: Upstream Distribution - amount pays down DIP Invested Capital |
| Mar-22 | 48.7 | 1.8 | | (15.0) | | 35.5 | 44.5 | (15.0) | 29.5 | << Step 3: QCAP Sale - amount pays down DIP Invested Capital |
| Jun-22 | 35.5 | 1.3 | | | | 36.9 | 29.5 | | 29.5 | |
| Sep-22 | 36.9 | 1.4 | | | | 38.3 | 29.5 | | 29.5 | |
| Dec-22 | 38.3 | 1.4 | | (10.7) | | 29.0 | 29.5 | (10.7) | 18.8 | << Step 5: Upstream Distribution - amount pays down DIP Invested Capital |
| Mar-23 | 29.0 | 1.1 | | | | 30.1 | 18.8 | - | 18.8 | |
| Jun-23 | 30.1 | 1.1 | | (18.8) | (12.4) | - | 18.8 | (18.8) | - | << Step 8: Initial monetization event (repays full original invested amount and return on capital) |
| Sep-23 | - | - | | | | - | - | | - | |
| Dec-23 | - | - | | | | - | - | | - | |
| Mar-24 | - | - | | | | - | - | | - | |
| Jun-24 | - | - | | | | - | - | | - | |
| Sep-24 | - | - | | | | - | - | | - | |
| Dec-24 | - | - | | | | - | - | | - | |
| Mar-25 | - | - | | | | - | - | | - | |
| Jun-25 | - | - | | | | - | - | | - | |
| Sep-25 | - | - | | | | - | - | | - | |
| Dec-25 | - | - | | | | - | - | | - | |

**Project Continental**  
*Supporting Stockholder Invested Capital Debt Schedule ($ millions, unless stated otherwise)*

DRAFT - Subject to Material Change  
*Highly Confidential*

**_Key Assumptions_**

| | | | | |
|---|---|---|---|---|
| Initial Invest. Date | 6/30/2021 | | | |
| Return on Capital Amount | 12.5% | | | |
| Return on Cap. Calc. | 30.0 | 90.0 | 360.0 | << Return is calculated on 30 / 360 (per Class C Distribution Definition) |
| Initial Supporting Stockholder Invested Capital | 402.0 | | | |

| Date | DIP Financing Invested Capital | | | | | | Original Invested Capital Balance | | | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| | Invested Capital | | | | | | | | | |
| | Beginning Balance | (+) PIK Interest | (+) Add. Contribution | (-) Invested Cap. Repayment | (-) Return on Cap. Repayment | Ending Balance | Beginning Balance | (+) Add. Cont. / (-) Dist. | Ending Balance | |
| Jun-21 | | | | | | $ 402.0 | | | | |
| Sep-21 | 402.0 | 12.6 | | | | 414.5 | 402.0 | | 402.0 | |
| Dec-21 | 414.5 | 13.0 | | | | 427.5 | 402.0 | | 402.0 | |
| Mar-22 | 427.5 | 13.4 | | | | 440.8 | 402.0 | | 402.0 | |
| Jun-22 | 440.8 | 13.8 | | | | 454.6 | 402.0 | | 402.0 | |
| Sep-22 | 454.6 | 14.2 | | | | 468.8 | 402.0 | | 402.0 | |
| Dec-22 | 468.8 | 14.7 | | | | 483.5 | 402.0 | | 402.0 | |
| Mar-23 | 483.5 | 15.1 | | | | 498.6 | 402.0 | | 402.0 | |
| Jun-23 | 498.6 | 15.6 | | (402.0) | (61.0) | 51.2 | 402.0 | (402.0) | - | << Step 8: Initial monetization event (repays full original invested amount and partial return on c... |
| Sep-23 | 51.2 | 1.6 | | | | 52.8 | - | | - | |
| Dec-23 | 52.8 | 1.7 | | | (54.5) | - | - | | - | << Step 13: Final Payment Date (repays the remaining return on capital) |
| Mar-24 | - | - | | | | - | - | | - | |
| Jun-24 | - | - | | | | - | - | | - | |
| Sep-24 | - | - | | | | - | - | | - | |
| Dec-24 | - | - | | | | - | - | | - | |
| Mar-25 | - | - | | | | - | - | | - | |
| Jun-25 | - | - | | | | - | - | | - | |
| Sep-25 | - | - | | | | - | - | | - | |
| Dec-25 | - | - | | | | - | - | | - | |

**Project Continental**      <span style="color:red">**DRAFT - Subject to Material Change**</span>

*Excluded Assets Calculation*      <span style="color:red">*Highly Confidential*</span>

### *Excluded Asset Adjustment Factor Calculation*

|  | 2019 Property Hotel EBITDA |
|---|---|
| Excluded Assets | 1,957 |
| Total 100 Properties | 146,285 |

| ***Excluded Asset Adjustment Factor*** | 0.9866 |
|---|---|

| Hotel ID | 2019 Property Hotel EBITDA | |
|---|---|---|
| Westin VA | $ 1,172 | <<Excluded Asset |
| HGI Burg | 785 | <<Excluded Asset |
| CY Asheville | 1,087 | |
| CY Athens | 1,219 | |
| CY Balt | 3,118 | |
| CY Columbus | 1,882 | |
| CY Dallas | 1,802 | |
| CY Dalton | 1,118 | |
| CY Flagstaff | 3,106 | |
| CY Houston | 917 | |
| CY Jacksonville | 826 | |
| CY Knoxville | 967 | |
| CY Louisville | 3,176 | |
| CY Orlando | 1,156 | |
| CY Prov | 4,037 | |
| CY Carlsbad | 1,380 | |
| CY Sarasota | 724 | |
| CY Tallahassee | 1,377 | |
| DT Baton Rouge | 1,092 | |
| ES Orlando | 3,514 | |
| FFIS Atlanta | 905 | |
| FFIS Dallas | 861 | |
| FFIS Denver | 1,768 | |
| FFIS Bellevue | 1,791 | |
| HIS Boynton Beach | 2,360 | |
| HIS El Paso | 1,691 | |
| HIS Franklin | 1,288 | |
| HI Albany | 1,518 | |
| HI Austin | 669 | |
| HI Glen Burnie | 845 | |
| HI Beckley | 1,569 | |
| HI Birmingham | 721 | |

| | |
|---|---|
| HI Boca Raton | 1,027 |
| HI Deerfield | 800 |
| HI Peabody | 1,485 |
| HI Urbana | 1,407 |
| HI Gastonia | 1,061 |
| HI Naperville | 968 |
| HI College Station | 283 |
| HI Madison Heights | 830 |
| HI East Lansing | 663 |
| HI Ft Wayne | 1,656 |
| HI Grand Rapids | 847 |
| HI Indianapolis | 923 |
| HI Alcoa | 755 |
| HI Medford | 866 |
| HI Memphis | 1,266 |
| HI Milford | 696 |
| HI Norfolk | 1,196 |
| HI Orlando | 1,967 |
| HI Palm Beach | 1,987 |
| HI Scranton | 1,318 |
| HI State College | 1,202 |
| HI WPB | 1,722 |
| HGI Rio Rancho | 1,410 |
| HGI Round Rock | 1,137 |
| HGI Ft Collins | 1,110 |
| HGI Louisville | 528 |
| HGI Monterey | 4,275 |
| HWS Augusta | 376 |
| HWS Peabody | 938 |
| HWS Chicago | 3,492 |
| HWS Windsor Locks | 1,212 |
| HWS Orlando | 3,713 |
| HWS Phoenix | 1,910 |
| HWS San Antonio | 952 |
| HWS Seattle | 4,383 |
| HWS Strat | 1,679 |
| HH ATL Cobb | 2,105 |
| HP Albuquerque | 1,575 |
| HP Las Vegas | 1,705 |
| HP Memphis | 973 |
| HP Miami | 808 |
| HP Minneapolis | 719 |
| HP Franklin | 909 |
| HP Tampa | 1,333 |
| RI Boise | 1,581 |
| RI Chattanooga | 1,454 |
| RI Ft Myers | 1,220 |

| | |
|---|---:|
| RI Ft Wayne | 1,771 |
| RI Jacksonville | 931 |
| RI Knoxville | 1,010 |
| RI Lexington | 1,164 |
| RI El Segundo | 4,003 |
| RI Macon | 1,093 |
| RI Germantown | 929 |
| RI San Diego | 1,725 |
| RI Sarasota | 1,002 |
| RI Savannah | 874 |
| RI Tallahassee | 1,176 |
| RI Tampa North | 1,372 |
| RI Sabal Park | 1,817 |
| SHS Asheville | 1,045 |
| SHS Round Rock | 722 |
| SHS Denver | 1,388 |
| SHS Flagstaff | 1,845 |
| SHS Grand Rapids | 1,005 |
| SHS Lexington | 1,505 |
| SHS San Diego | 1,902 |
| TPS Savannah | 1,143 |
| **Total (100)** | **$   146,285** |

x  **Project Continental**                                                    <span style="color:red">**DRAFT - Subject to Material Change**</span>

*Initial DIP Invested Capital Calculation*                                     <span style="color:red">*Highly Confidential*</span>

### Assumptions

| | |
|---|---|
| Assumed Effective Date | 6/30/2021 |
| Assumed Petition / Funding Date | 5/19/2021 |
| Invested Capital | $  55,000,000 |
| PIK Dist. Rate | 15.0% |
| Interest Calculation | Actual / Actual |
| Days in Year | 365 |

| Days | | 42 |
|---|---|---|
| | **5/19/2021** | **6/30/2021** |
| Beginning Balance | | $   55,000,000 |
| (+) PIK Dist (15.0%) | | 949,315 |
| **Ending Balance** | $   55,000,000 | $   55,949,315 |

x

x

**Project Continental**                                    <span style="color:red">**DRAFT - Subject to Material Change**</span>

*Initial Supporting Stockholder Invested Capital Initial Balance*          <span style="color:red">*Highly Confidential*</span>

### Assumptions

| | |
|---|---|
| Assumed Effective Date | 6/30/2021 |
| Assumed Petition Date | 5/19/2021 |
| Invested Capital | $  379,746,397 |
| PIK Dist. Rate | 12.5% |
| Cash Dist. Rate | 7.5% |
| Interest Calculation | 30 / 360 |
| Days in Year | 360 |

### 7.5% through petition date (assumed 4/30/21); 12.5% thereafter

| Days | 90 | 90 | 49 | 42 |
|---|---|---|---|---|
| | **12/31/2020** | **3/31/2021** | **5/19/2021** | **6/30/2021** |
| Beginning Balance | $  427,706,286 | $  441,072,108 | $  454,855,611 | $  462,594,474 |
| (+) PIK Dist (12.5%) | 13,365,821 | 13,783,503 | 7,738,863 | 6,746,169 |
| **Ending Balance** | **$  441,072,108** | **$  454,855,611** | **$  462,594,474** | **$  469,340,643** |
| | | | | |
| Cash Dist. (7.5%) | 8,019,493 | 8,270,102 | 4,643,318 | - |
| Cash Dist. (12.5%) | - | - | - | 6,746,169 |
| | | | | |
| Total Cash Dist. (7.5% & 12.5%) | | | | $  27,679,082 |
| (+) Invested Capital | | | | 379,746,397 |
| **Total Amount Accrued through Effective Date** | | | | **$  407,425,479** |

x

**<u>EXHIBIT B</u>**

**Organizational Chart**



[1] The Company wholly owns 98 of its hotels, and two hotels are partially-owned through joint ventures with unaffiliated third-parties.

**EXHIBIT C**

**Liquidation Analysis**

**Liquidation Analysis**

## I.    Overview

The Debtors, with the assistance of Jefferies, prepared this liquidation analysis the ("Liquidation Analysis") in connection with the Disclosure Statement[1] the purpose of evaluating whether the Plan meets the "best interest" test of section 1129(a)(7) of the Bankruptcy Code.  The Debtors believe that the Plan meets this test and that the members of each impaired class that have not voted to accept the Plan or that are not deemed to accept the Plan will receive under the Plan at least as much as they would if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  This analysis is summarized below.

In determining whether the best interest test has been met, the first step is to determine the dollar amount that would be generated from a hypothetical liquidation of the Debtors' assets, which are comprised primarily of cash and direct and indirect equity interests in the other entities that comprise the HIT enterprise, including direct equity interests in HITOP and indirect equity interests in the HITOP's direct and indirect subsidiaries.  Such amount should be reduced by the costs and expenses of the liquidation.  Remaining liquidation proceeds then would be applied to any amounts necessary to satisfy the property-level secured debt claims, administrative fees and expenses and other priority claims, including any incremental administrative claims that may result from the liquidation of the Debtors' assets.  Any remaining available cash distribution would be available for distribution to holders of Claims against (and Interests in) the Debtors in accordance with the priority scheme established by section 726 of the Bankruptcy Code.

The Liquidation Analysis has been prepared assuming that, in the event that the Debtors file the Chapter 11 Cases, such cases convert to chapter 7 on May 19, 2021 (the "Liquidation Date").  A chapter 7 trustee (the "Trustee") would be appointed or elected to commence the liquidation of the Debtors and/or all of their assets.  Thus, this Liquidation Analysis has been prepared based on the Debtors' latest balance sheet as of March 31, 2021 and pro forma certain items as of May 19, 2021.

Estimating recoveries in any hypothetical chapter 7 liquidation is an uncertain process due to the number of unknown variables and is necessarily speculative.  Thus, this Liquidation Analysis relies upon the extensive use of estimates and assumptions that, although considered reasonable by the Debtors and their advisors, are inherently subject to significant business, economic and competitive uncertainties, and contingencies beyond the control of the Debtors.

NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE ESTIMATES AND ASSUMPTIONS HEREIN OR THE ABILITY TO ACHIEVE FORECASTED RESULTS. THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THIS LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTORS WERE, IN FACT, TO UNDERGO SUCH A LIQUIDATION.  IN THE EVENT THE CHAPTER 11 CASES ARE

---

[1] All capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Disclosure Statement.  To the extent that a definition of a term in the text of this Liquidation Analysis and the definition of such term in the Disclosure Statement are inconsistent, the definition included in the Disclosure Statement shall control and govern.

CONVERTED TO CHAPTER 7, ACTUAL RESULTS MAY VARY MATERIALLY FROM THE ESTIMATES AND PROJECTIONS SET FORTH IN THIS LIQUIDATION ANALYSIS AND THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED WOULD BE REALIZED.

NOTHING CONTAINED IN THIS LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION OR ADMISSION OF THE DEBTORS OR ANY OF THEIR AFFILIATES.

EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THIS LIQUIDATION ANALYSIS WAS PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT THE ANALYSIS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THE DEBTORS DO NOT INTEND AND DO NOT UNDERTAKE ANY OBLIGATION TO UPDATE OR OTHERWISE REVISE THIS LIQUIDATION ANALYSIS (OR ANY OTHER PART OF THE DISCLOSURE STATEMENT) TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THIS LIQUIDATION ANALYSIS IS PREPARED OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS.  THEREFORE, THIS LIQUIDATION ANALYSIS SHOULD NOT BE RELIED ON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.  IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF INTERESTS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THIS LIQUIDATION ANALYSIS.

THIS LIQUIDATION ANALYSIS WAS DEVELOPED SOLELY FOR PURPOSES OF THE DISCLOSURE STATEMENT AND PLAN AND TO ENABLE THE HOLDERS OF INTERESTS ENTITLED TO VOTE ON THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE RESTRUCTURING AND PLAN AND SHOULD NOT BE USED OR RELIED ON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF SECURITIES OF, OR CLAIMS OR INTERESTS IN, THE DEBTORS OR ANY OF THEIR AFFILIATES.

## II.    General Assumptions

The conversion of the Debtors' Chapter 11 Cases to chapter 7 would entail a forced sale of the Debtors' and their non-debtor property-owning subsidiaries' assets in one or more sales and/or liquidations of tangible assets, which, for purposes of this Liquidation Analysis, is assumed would take place over one year.

To estimate the net proceeds of a chapter 7 liquidation, this Liquidation Analysis estimates the proceeds that would be realized from a chapter 7 sale of the Debtors' and their non-debtor property owning subsidiaries' assets.  Without limitation, it is assumed that the following factors could adversely affect the net proceeds that would be realized from a chapter 7 liquidation:

   (i)     Sale process to be run by the Trustee;
   (ii)    Increasing length of time involved in the sale process and related expenditures;
   (iii)   Possible discounts buyers would require when purchasing individual or a subset of the assets; and
   (iv)    Potential limited universe of prospective buyers.

This Liquidation Analysis assumes that there are no recoveries from the pursuit of any potential preferences, fraudulent conveyances, or other causes of action and does not include the estimated costs of pursuing those actions.

*Net Liquidation Proceeds Summary*

| ($ millions) | Recovery Rates Low | Recovery Rates High | Book Value | Liquidation Value Low | Liquidation Value High |
|---|---|---|---|---|---|
| **Debtor Gross Proceeds:** | | | | | |
| Cash[1] | 100% | 100% | $ 2 | $ 2 | $ 2 |
| Prepaid Expenses & Other Assets | 10% | 20% | 2 | 0 | 0 |
| Total Non-Real Estate Proceeds | | | $ 4 | $ 3 | $ 3 |
| Mortgage Properties Residual Value (after Mortgages)[2] | - | 1% | $ 278 | - | 2 |
| **Total Debtor Gross Proceeds** | | | | $ 3 | $ 5 |
| **Debtor Liquidation Costs:** | | | | | |
| Wind Down Costs | | | | (4) | (4) |
| Chapter 7 Trustee Fees | | | | (0) | (0) |
| Other Professional Fees | | | | - | - |
| Total Debtor Liquidation Costs | | | | $ (4) | $ (4) |
| **Total Debtor Proceeds Less Liquidation Costs** | | | | $ - | $ 1 |

*Debtor Recovery Summary from Proceeds Less Liquidation Costs*

| ($ millions) | Estimated Claims Low | Estimated Claims High | $ Recovery Low | $ Recovery High | % Recovery Low | % Recovery High |
|---|---|---|---|---|---|---|
| Deficiency Claims of Secured Creditors at Property Level[3] | 502 | 265 | - | 1 | - | 0% |
| General Unsecured Claims | 7 | 7 | - | 0 | - | 0% |
| Existing Preferred Equity[4] | 462 | 462 | - | - | - | - |
| **Total Claims** | $ 972 | $ 735 | $ - | $ 1 | - | 0% |
| *Existing Common Equity* | | | - | - | - | - |

*Footnotes*

(1) Represents cash balance of the operating partnership (excludes all encumbered and joint-venture property accounts).

(2) Represents residual value flowing to Holdco from certain pools of assets based on net proceeds from sales.

(3) Represents residual claims to holdco after sales of properties (i.e. deficiency claims of certain individual pools post property sales).

(4) Amount accrued through 5/18/21.

## III.    Notes to Liquidation Analysis

Note A – Cash & Cash Equivalents

The unrestricted cash balance is estimated as of May 19, 2021 based on the Debtors' latest available weekly cash flow budget as of May 11, 2021.  The balance excludes the cash held in encumbered property accounts and joint-venture property accounts, but includes cash accounts at the operating partnership.

Note B – Prepaid Expenses & Other Assets

The prepaid expenses and other assets balance are estimated to be $2.0 million as of March 31, 2021 and are comprised of trade receivables, deferred tax assets and other prepaid professional fees.  The Debtors estimate that a majority of the prepaid expenses and other assets will have no value in a liquidation.  In aggregate, the Debtors estimate a 10% to 20% recovery on these assets.

Note C – Mortgaged Properties

Mortgaged properties residual value represents the value of the Debtors' interest in their subsidiaries that own real properties which are burdened by secured property-level mortgages, after accounting for the mortgage claims at each property.  The properties, not including the two joint venture properties, are pooled into three separate secured loans.  This Liquidation Analysis assumes various values in a liquidation of each individual property through exercise of remedies by the respective mortgage lenders, which reflect the accelerated timeline and uncertainty of a liquidation sales process.  The estimated net proceeds of the mortgaged properties accounted for any restricted cash held by lenders and net of estimated broker and selling expenses.  In aggregate, the Debtors assume a 0% to 1% recovery to them from the liquidation of the mortgage properties after accounting for mortgage claims at each property.

Note D – Chapter 7 Trustee Fees and Wind Down Costs

Wind down costs consist primarily of the ordinary course general and administrative costs that will be required to operate the Debtors' businesses for a one-year period after the Liquidation Date.  The Debtors assume that the wind down costs will be approximately $3.7 million in aggregate.  This amount represents approximately 25% of the Debtors' estimated general and administrative expenses for the next twelve months following the Liquidation Date.

Trustee fees include those fees associated with the appointment of the Trustee in accordance with section 326 of the Bankruptcy Code.  Trustee fees are calculated at 3.0% of the gross proceeds available to the Debtors of a liquidation (excluding cash).  Trustee fees are assumed to range from approximately $6,000 to $75,000.

Note E – Other Professional Fees

Chapter 7 professional fees include legal, financial and accounting fees expected to be incurred during the liquidation period.  The Debtors assume that professional fees will be none given the limited non-mortgaged assets available for disposition at the Debtors.

Note F – Administrative Claims

Administrative claims arising in a hypothetical chapter 7 liquidation may include, among other things: (a) accrued and unpaid professional fees; (b) postpetition trade payables; (c) accrued postpetition employee obligations; (d) accrued taxes; (e) accrued utility payments; (f) Bankruptcy

Code section 503(b)(9) claims; and (g) other liabilities incurred by the Estates in the ordinary course of business.

This Liquidation Analysis assumes there will be no Administrative Claims outstanding as of the Liquidation Date. The total amount of Administrative Claims allowed in these Chapter 11 Cases could differ materially from the assumptions set forth in this Liquidation Analysis, thereby reducing recoveries available to Holders of Claims and Interests in a chapter 7 liquidation.

Note G – Secured Property-Level Debt Claims

The Secured Property-Level Debt Claims consist of the $1.3 billion in mortgage debt which is divided into three distinct mortgage pools (excluding the joint-venture properties). The Liquidation Analysis assumes that the aggregate amount of residual secured property-level debt claims attributable to the Debtors after repayment of all mortgage indebtedness is approximately $502 million to $265 million.

This Liquidation Analysis assumes that the deficiency claims of secured creditors at the property level will receive a 0% recovery in a chapter 7 liquidation from the Debtors' Gross Proceeds available for distribution.

Note I – General Unsecured Claims

These claims reflect the estimated amounts of pre-petition accounts payable and accrued expenses and lease liabilities attributable to the Debtors. This Liquidation Analysis assumes there will be approximately $7 million of General Unsecured Claims outstanding as of the Liquidation Date.

Note J – Existing Preferred Equity

This Liquidation Analysis assumes that the aggregate principal amount owed, as of the Liquidation Date, in respect of the Preferred Equity Interests is $462 million. This Liquidation Analysis assumes that the Preferred Equity will receive no recovery in a chapter 7 liquidation.

Note K – Existing Common Equity

This Liquidation Analysis assumes that the Existing Common Equity will receive no recovery in a chapter 7 liquidation.