# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* | Chapter 11 |
| HOSPITALITY INVESTORS TRUST, INC., *et al.*,[1] | Case No. 21-10831 (CTG) |
| Debtors. | (Jointly Administered) |

## JOINT PREPACKAGED
## CHAPTER 11 PLAN FOR HOSPITALITY INVESTORS TRUST, INC., AND
## HOSPITALITY INVESTORS TRUST OPERATING PARTNERSHIP, L.P.

**PROSKAUER ROSE LLP**
Jeff J. Marwil (admitted *pro hac vice*)
Paul V. Possinger (admitted *pro hac vice*)
Jordan E. Sazant (DE Bar No. 6515)
70 West Madison, Suite 3800
Chicago, IL 60602
Telephone:  (312) 962-3550
Facsimile:  (312) 962-3551

**PROSKAUER ROSE LLP**
Joshua A. Esses (admitted *pro hac vice*)
Eleven Times Square
New York, NY 10036
Telephone:  (212) 969-3000
Facsimile:  (212) 969-2900

*Attorneys for Debtors and Debtors in
Possession*

**POTTER ANDERSON & CORROON LLP**
Jeremy W. Ryan (DE Bar No. 4057)
R. Stephen McNeill (DE Bar No. 5210)
1313 North Market Street
Wilmington, DE 19801
Telephone:  (302) 984-6000
Facsimile:  (302) 658-1192

*Attorneys for Debtors and Debtors in
Possession*

Dated:  June 14, 2021
        Wilmington, Delaware

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Hospitality Investors Trust, Inc. (3668); and Hospitality Investors Trust Operating Partnership, L.P. (0136).  The Debtors' executive offices are located at Park Avenue Tower, 65 East 55th Street, Suite 801, New York, NY 10022.

# TABLE OF CONTENTS

**Page**

ARTICLE I. DEFINITIONS AND INTERPRETATION...............................................................2

ARTICLE II. CERTAIN INTER-CREDITOR AND INTER-DEBTOR ISSUES .......................14

    2.1.    Settlement of Certain Inter-Creditor Issues. ..........................................14

    2.2.    Intercompany Claims and Intercompany Interests. ...............................14

ARTICLE III. DIP CLAIMS, ADMINISTRATIVE EXPENSE CLAIMS,
               PROFESSIONAL FEE CLAIMS, AND U.S. TRUSTEE FEES ......................15

    3.1.    DIP Claims...............................................................................................15

    3.2.    Administrative Expense Claims...............................................................15

    3.3.    Professional Fee Claims...........................................................................16

    3.4.    U.S. Trustee Fees. ...................................................................................17

ARTICLE IV. CLASSIFICATION OF CLAIMS AND INTERESTS ........................................17

    4.1.    Classification of Claims and Interests......................................................17

    4.2.    Unimpaired Classes of Claims and Interests. ..........................................18

    4.3.    Impaired Classes of Claims and Interests. ...............................................18

    4.4.    Separate Classification of Secured Claims. .............................................18

ARTICLE V. TREATMENT OF CLAIMS AND INTERESTS .................................................18

    5.1.    Secured Claims (Class 1). .......................................................................18

    5.2.    Unsecured Priority Claims (Class 2)........................................................19

    5.3.    General Unsecured Claims (Class 3). ......................................................19

    5.4.    Intercompany Claims (Class 4)................................................................19

    5.5.    Existing Preferred Equity Interests (Class 5)...........................................20

    5.6.    Existing HIT Common Equity Interests (Class 6). ..................................20

    5.7.    Intercompany Interests (Class 7). ............................................................21

ARTICLE VI. ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF
               REJECTION BY ONE OR MORE CLASSES OF CLAIMS OR
               INTERESTS .............................................................................................21

    6.1.    Class Acceptance Requirement.................................................................21

    6.2.    Tabulation of Votes on a Non-Consolidated Basis...................................21

6.3.    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code or
       "Cramdown." ...........................................................................................21

6.4.    Confirmation of All Cases. ...................................................................22

ARTICLE VII. MEANS FOR IMPLEMENTATION.................................................22

7.1.    Non-Substantive Consolidation. ...........................................................22

7.2.    Continued Corporate Existence, Vesting of Assets in the Reorganized
       Debtors, and Assumption of the Indemnification Agreements...............22

7.3.    Compromise of Controversies. .............................................................23

7.4.    Sources of Cash for Plan Distribution. ..................................................23

7.5.    Restructuring Expenses.........................................................................23

7.6.    Corporate Action...................................................................................24

7.7.    Exit Facility...........................................................................................25

7.8.    Authorization and Issuance of New HIT Common Equity Interests. .....25

7.9.    Exemption from Registration.................................................................25

7.10.   Cancellation of Existing Securities and Agreements.............................26

7.11.   Officers and Board of Directors............................................................27

7.12.   Restructuring Transactions. ..................................................................27

7.13.   Employee Matters. ................................................................................28

7.14.   Release of Avoidance Actions. .............................................................29

7.15.   Closing of Chapter 11 Cases.................................................................29

7.16.   Notice of Effective Date. ......................................................................29

7.17.   Corporate and Other Action..................................................................29

7.18.   Approval of Plan Documents.................................................................30

ARTICLE VIII. CVR DISTRIBUTIONS AND RELATED MATTERS ...................30

8.1.    CVR Payments.......................................................................................30

8.2.    Maturity Date of CVRs..........................................................................31

8.3.    Securities Law Considerations...............................................................31

8.4.    Certain Covenants. ................................................................................31

8.5.    Reporting...............................................................................................31

8.6.    Inconsistency Between Plan and CVR Agreement.................................32

ARTICLE IX. DISTRIBUTIONS ...........................................................................32

9.1.    Plan Distributions Generally..................................................................32

9.2.    Distribution Record Date. ......................................................................32

9.3.     Date of Plan Distributions....................................................................32

9.4.     Disbursing Agent. ...............................................................................32

9.5.     Rights and Powers of Disbursing Agent. .............................................33

9.6.     Expenses of Disbursing Agent.............................................................33

9.7.     Delivery of Plan Distributions. ...........................................................33

9.8.     Proofs of Claim; Disputed Claims Process...........................................33

9.9.     Postpetition Interest. ...........................................................................34

9.10.    Unclaimed Property. ...........................................................................34

9.11.    Time Bar to Cash Payments.................................................................34

9.12.    Manner of Payment under Plan............................................................35

9.13.    Satisfaction of Claims. ........................................................................35

9.14.    Setoffs. ...............................................................................................35

9.15.    Withholding and Reporting Requirements. ..........................................35

ARTICLE X. EXECUTORY CONTRACTS AND UNEXPIRED LEASES..............................36

10.1.    General Treatment; Assumption and Rejection of Executory Contracts or
         Unexpired Leases..................................................................................36

10.2.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. ........37

10.3.    Rejection of Executory Contracts or Unexpired Leases. .......................38

10.4.    Survival of the Debtors' Indemnification Obligations and Guarantees.................38

10.5.    Severance Contracts and Programs.......................................................39

10.6.    Insurance Policies. ..............................................................................39

10.7.    Intellectual Property Licenses and Agreements.....................................39

10.8.    Modifications, Amendments, Supplements, Restatements, or Other
         Agreements. ........................................................................................40

10.9.    Reservation of Rights...........................................................................40

ARTICLE XI. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN ............40

11.1.    Conditions Precedent to Effective Date................................................40

11.2.    Waiver of Conditions Precedent. .........................................................41

11.3.    Effect of Failure of a Condition. ..........................................................42

ARTICLE XII. EFFECT OF CONFIRMATION OF PLAN ........................................................42

12.1.    Vesting of Assets. ...............................................................................42

12.2.    Binding Effect......................................................................................42

12.3.    Deemed Consent to Change of Control of Debtors. ..............................43

12.4.    Discharge of Claims and Termination of Interests. ...............................................43

12.5.    Term of Injunctions or Stays...................................................................................43

12.6.    Injunction. .............................................................................................................43

12.7.    Releases..................................................................................................................44

12.8.    Ipso Facto and Similar Provisions Ineffective. ......................................................49

12.9.    No Successor Liability...........................................................................................50

ARTICLE XIII. RETENTION OF JURISDICTION ....................................................................50

13.1.    Retention of Jurisdiction .......................................................................................50

13.2.    Courts of Competent Jurisdiction ..........................................................................52

ARTICLE XIV. MISCELLANEOUS PROVISIONS....................................................................52

14.1.    Payment of Statutory Fees. ....................................................................................52

14.2.    Substantial Consummation of the Plan. ..................................................................53

14.3.    Expedited Determination of Taxes. ........................................................................53

14.4.    Exemption from Certain Transfer Taxes. ...............................................................53

14.5.    Amendments. .........................................................................................................53

14.6.    Effectuating Documents and Further Transactions..................................................54

14.7.    Revocation or Withdrawal of Plan..........................................................................54

14.8.    Severability of Plan Provisions...............................................................................55

14.9.    Governing Law. .....................................................................................................55

14.10.  Time. ......................................................................................................................55

14.11.  Dates of Actions to Implement the Plan. ................................................................55

14.12.  Immediate Binding Effect.......................................................................................55

14.13.  Deemed Acts. .........................................................................................................56

14.14.  Successor and Assigns. ..........................................................................................56

14.15.  Entire Agreement. ..................................................................................................56

14.16.  Exhibits to Plan. .....................................................................................................56

14.17.  Reservation of Rights..............................................................................................56

14.18.  Plan Supplement. ...................................................................................................56

14.19.  Waiver or Estoppel. ...............................................................................................57

14.20.  Notices ...................................................................................................................57

ARTICLE XV. CONCLUSION AND RECOMMENDATION .....................................................59

# INTRODUCTION[2]

Hospitality Investors Trust, Inc., a Maryland corporation, and Hospitality Investors Trust Operating Partnership, L.P., a Delaware limited partnership, hereby propose the following chapter 11 plan under section 1121(c) of the Bankruptcy Code for the resolution of the outstanding claims against, and equity interests in, the Debtors.

After extensive deliberation, the Debtors determined in their business judgment to commence pre-packaged chapter 11 proceedings pursuant to a restructuring support agreement with the Plan Sponsor that allows the Debtors to rationalize their capital structure and provide a sustainable path forward for the Debtors' business.

The Plan reflects the agreement reached among the Debtors and the Plan Sponsor, as set forth in the Restructuring Support Agreement (attached to the Disclosure Statement), to reorganize via a consensual transaction that will provide for the Debtors' emergence from these chapter 11 proceedings under new ownership by the Plan Sponsor. The Debtors believe that the financial restructuring and the other transactions reflected in the Plan will strengthen the Reorganized Debtors' balance sheet and put them in position to maximize value for all stakeholders.

The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. Reference is made to the Disclosure Statement (distributed contemporaneously herewith) for a discussion of the Debtors' history, businesses, properties, projections, the events leading up to solicitation of the Plan, and for a summary and analysis of the Plan and the treatment provided for herein. The Debtors urge all holders of Existing Preferred Equity Interests entitled to vote on the Plan to review the Disclosure Statement and the Plan in full before voting to accept or reject the Plan. There also are other agreements and documents that will be filed with the Bankruptcy Court after commencement of the Chapter 11 Cases that are referenced in the Plan and the Plan Supplement as exhibits. All such exhibits will be incorporated into and are a part of the Plan as if set forth in full herein. Subject to certain restrictions set forth in the Plan, and the requirements set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and Sections 14.5 and 14.7 of the Plan, the Debtors reserve the right to amend, supplement, amend and restate, modify, revoke, or withdraw the Plan prior to the Effective Date.

The Chapter 11 Cases will be consolidated for procedural purposes only and the Debtors will request that they be jointly administered pursuant to an order of the Bankruptcy Court. The Plan constitutes a separate plan of reorganization for each of the Debtors and, notwithstanding anything herein, the Plan may be confirmed and consummated as to each Debtor separate from, and independent of, confirmation and consummation of the Plan as to any other Debtor. If the Plan cannot be confirmed as to one or both of the Debtors, then the Debtors, with the consent of the Plan Sponsor, (a) may revoke the Plan as to all of the Debtors or (b) may revoke the Plan as to one of the Debtors (and any such Debtor's Chapter 11 Case may be converted, continued, or dismissed) and confirm the Plan as to the remaining Debtor to the extent required without the need for re-solicitation as to any holder of a Claim against or Interest in the Debtors for which the Plan

---

[2]    All capitalized terms used but not defined herein have the meanings set forth in Article I.

is not so revoked.  The Debtors also reserve the right to seek confirmation of the Plan pursuant to the "cram down" provisions contained in section 1129(b) of the Bankruptcy Code with respect to any non-accepting Class.

# ARTICLE I.
## DEFINITIONS AND INTERPRETATION

### A.    Definitions.

The following terms shall have the meanings set forth below (such meanings to be equally applicable to both the singular and plural):

**1.1**    *"Administrative Expense Claim"* means any right to payment constituting a cost or expense of administration of the Chapter 11 Cases of the kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to sections 328, 330, 363, 364(c)(1), 365, 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code (other than a DIP Claim, Professional Fee Claim, or a claim for fees arising under 28 U.S.C. § 1930) incurred during the period from the Petition Date to the Effective Date, including: (a) any actual and necessary costs and expenses of preserving the Estates, any actual and necessary costs and expenses of operating the Debtors' business, and any indebtedness or obligations incurred or assumed by the Debtors during the Chapter 11 Cases; and (b) any payment to be made under this Plan to cure a default under an assumed, or assumed and assigned, Executory Contract or Unexpired Lease.

**1.2**    *"Allowed"* means, with respect to a Claim or Interest under this Plan, a Claim or Interest that is an Allowed Claim, Allowed Interest, Allowed _____ Claim, or Allowed _____ Interest.

**1.3**    *"Allowed Claim", "Allowed Interest", "Allowed _____ Claim"* (with respect to a specific type of Claim), or *"Allowed _____ Interest"* (with respect to a specific type of Interest) means, with respect to a Claim or Interest under this Plan: (a) any Claim or Interest (or a portion thereof) as to which no action to dispute, disallow, deny, equitably subordinate, or otherwise limit recovery with respect thereto, or alter the priority thereof (including a claim objection), has been timely commenced within the applicable period of limitation fixed by this Plan or applicable law, or, if an action to dispute, disallow, deny, equitably subordinate, or otherwise limit recovery with respect thereto, or alter priority thereof, has been timely commenced, to the extent such Claim or Interest has been allowed (whether in whole or in part) by a Final Order of a court of competent jurisdiction with respect to the subject matter; or (b) any Claim or Interest or portion thereof that is allowed (i) in any contract, instrument, or other agreement entered into in connection with the Plan, (ii) pursuant to the terms of the Plan, (iii) by Final Order of the Bankruptcy Court, or (iv) with respect to an Administrative Expense Claim only (x) that was incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases to the extent due and owing without defense, offset, recoupment, or counterclaim of any kind, and (y) that is not otherwise Disputed. For the avoidance of doubt, except as specified under Section 10.3 herein with respect to rejection damage Claims, no holders of Claims or Interests are required to file a Proof of Claim or proof of Interest (or move the Bankruptcy Court for allowance) to be an Allowed Claim or Allowed Interest, as applicable, under the Plan.

**1.4**    ***"Amended Constituent Documents"*** means, on or after the Effective Date, collectively, the amended and restated by-laws, Limited Partnership Agreement, or similar governing documents and the amended and restated certificates of incorporation, certificate of limited partnership, or other formation documents of the Debtors, each in form and substance reasonably acceptable to the Debtors and the Plan Sponsor.  Forms of the Amended Constituent Documents shall be filed as part of the Plan Supplement.

**1.5**    ***"Avoidance Actions"*** means any and all avoidance, recovery, subordination or other claims, actions or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under sections 502, 510, 542, 544, 545, and 547 through and including 553 of the Bankruptcy Code.

**1.6**    ***"Ballot"*** means the form distributed prior to the Petition Date to holders of Impaired Interests entitled to vote on the Plan to indicate their acceptance or rejection of the Plan and approved by the Bankruptcy Court pursuant to the Confirmation Order.

**1.7**    ***"Bankruptcy Code"*** means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

**1.8**    ***"Bankruptcy Court"*** means the United States Bankruptcy Court for the District of Delaware, or any other court exercising competent jurisdiction over the Chapter 11 Cases or any proceeding therein.

**1.9**    ***"Bankruptcy Rules"*** means the Federal Rules of Bankruptcy Procedure, as promulgated by the Supreme Court of the United States under section 2075 of title 28 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases, and any local rules of the Bankruptcy Court.

**1.10**    ***"Brookfield Investor"*** means, collectively, Brookfield Strategic Real Estate Partners II Hospitality REIT II LLC and its successors and permitted assigns.

**1.11**    ***"Business Day"*** means any day other than a Saturday, Sunday, or a "legal holiday," as defined in Bankruptcy Rule 9006(a).

**1.12**    ***"Cash"*** means the legal currency of the United States and equivalents thereof.

**1.13**    ***"Causes of Action"*** means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise.  Causes of Action also include: (i) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (ii) the right to object to or otherwise contest Claims or Interests; (iii) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (iv) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

**1.14**    *"Chapter 11 Cases"* means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Petition Date in the Bankruptcy Court.

**1.15**    *"Claim"* means any "claim" as defined in section 101(5) of the Bankruptcy Code against the Debtors or property of the Debtors, including any Claim arising after the Petition Date.

**1.16**    *"Claims and Noticing Agent"* means Epiq Corporate Restructuring, LLC or any other entity approved by the Bankruptcy Court to act as the Debtors' claims and noticing agent pursuant to 28 U.S.C. § 156(c).

**1.17**    *"Class"* means each category of Claims or Interests established under Article IV of the Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

**1.18**    *"Collateral"* means any property or interest in property of the Estates subject to a Lien to secure the payment or performance of a Claim, which Lien has not been avoided or is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable state law.

**1.19**    *"Combined Hearing"* means a hearing to be held by the Bankruptcy Court to consider approval of the Disclosure Statement and confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

**1.20**    *"Company"* means the Debtors and their non-Debtor affiliates.

**1.21**    *"Confirmation Date"* means the date on which the Court enters the Confirmation Order on the docket of the Chapter 11 Cases.

**1.22**    *"Confirmation Order"* means the order of the Bankruptcy Court approving the Disclosure Statement pursuant to section 1125 of the Bankruptcy Code and confirming this Plan pursuant to section 1129 of the Bankruptcy Code, which order shall be in form and substance reasonably acceptable to the Debtors and the Plan Sponsor.

**1.23**    *"Cure Claim"* means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's default under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

**1.24**    *"CVR" or "CVRs"* means the contingent value rights of holders of Existing HIT Common Equity Interests, to receive contingent Cash payments pursuant to this Plan and the CVR Agreement.

**1.25**    *"CVR Agent"* means Computershare Inc., and its subsidiary Computershare Trust Company, N.A., as agent with respect to the CVRs, and its successors and assigns (if any).

**1.26**    *"CVR Agreement"* means that certain *Contingent Value Rights Agreement*, to be entered into by and between HIT and the CVR Agent as of the Effective Date, substantially in the form attached hereto as <u>Exhibit A</u>, the terms of which are fully incorporated herein, and shall be in form and substance reasonably acceptable to the Debtors and the Brookfield Investor.

1.27    *"CVR Asset Pool"* shall have the meaning ascribed thereto in the CVR Agreement.

1.28    *"D&O Liability Insurance Policies"* means all insurance policies for directors', managers', and officers' liability (including employment practices liability and fiduciary liability) maintained by the Debtors prior to the Effective Date, including as such policies may extend to employees, including any such policies that are "run-off" or "tail" policies.

1.29    *"Debtors"* means, individually or collectively, as the context requires, HIT and HITOP.

1.30    *"DIP Agent"* means Trimont Real Estate Advisors, LLC, solely in its capacity as administrative agent and collateral agent under the DIP Credit Agreement, and its successors and assigns.

1.31    *"DIP Claims"* means all Claims against any Debtor on account of, arising under or relating to the DIP Obligations.

1.32    *"DIP Credit Agreement"* means that certain debtor-in-possession credit agreement, substantially in the form of Exhibit A to the proposed Interim DIP Order and Exhibit A to the *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Secured Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expenses Claims; (II) Modifying the Automatic Stay; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief,* by and among the Debtors, the DIP Lender, and the DIP Agent, (as it may be amended, modified, or supplemented from time to time on the terms and conditions set forth therein), in the aggregate amount of $65 million, and in form and substance acceptable to the Debtors and to the DIP Lender, in its sole discretion.

1.33    *"DIP Facility"* means the senior secured, super-priority debtor-in-possession loan facility made available to the Debtors pursuant to the DIP Credit Agreement and the Interim DIP Order and/or Final DIP Order.

1.34    *"DIP Facility Undrawn Amount"* means an amount equal to (a) $65 million <u>minus</u> (b) the total principal amount of commitments funded by the DIP Lenders to the Debtors under the DIP Credit Agreement prior to the Effective Date.

1.35    *"DIP Financing Invested Capital Amount"* shall have the meaning ascribed thereto in the CVR Agreement.

1.36    *"DIP Lender"* means the Initial DIP Lender and any party that becomes a "Lender" (as defined in the DIP Credit Agreement), in each case, for so long as such party holds loans or commitments under the DIP Credit Agreement.

1.37    *"DIP Loan Documents"* means the "Loan Documents" as defined in the DIP Credit Agreement, each in form and substance acceptable to the Debtors and to the DIP Lender, in its sole discretion.

1.38    *"DIP Obligations"* means the "Obligations" as such term is defined in the DIP Credit Agreement.

**1.39**    *"Disallowed"* means any Claim, or any portion thereof, that has been disallowed by Final Order, pursuant to a provision in this Plan or the Confirmation Order, or pursuant to a settlement between the Debtors, with the consent of the Plan Sponsor, or Reorganized Debtor, as applicable.

**1.40**    *"Disbursing Agent"* means, as applicable, Reorganized HIT or the entity designated by Reorganized HIT to distribute the Plan Consideration.

**1.41**    *"Disclosure Statement"* means the disclosure statement that relates to this Plan, including all exhibits and schedules annexed thereto or referred to therein (in each case, as it or they may be amended, modified, or supplemented from time to time), in form and substance reasonably acceptable to the Debtors and the Plan Sponsor.

**1.42**    *"Disputed"* means, with respect to a Claim or Interest, that portion (including, when appropriate, the whole) of such Claim or Interest that: (a) (i) has not been scheduled by the Debtors in their Schedules, if filed with the Bankruptcy Court, or has been scheduled in a lesser amount or different priority than the amount or priority asserted by the holder of such Claim or Interest, or (ii) has been scheduled as contingent, unliquidated or disputed and for which no Proof of Claim has been timely filed; (b) is the subject of an objection or request for estimation filed in the Bankruptcy Court which has not been withdrawn or overruled by a Final Order; and/or (c) is otherwise disputed by the Debtors in accordance with applicable law or contract, which dispute has not been withdrawn, resolved or overruled by Final Order.

**1.43**    *"Effective Date"* means the date specified by the Debtors in a notice filed with the Bankruptcy Court as the date on which the Plan shall take effect, which date shall be the first Business Day on which all of the conditions set forth in Section 11.1 of this Plan have been satisfied or waived in accordance with the terms hereof and no stay of the Confirmation Order is in effect.

**1.44**    *"Employee Arrangements"* means any employee compensation plans, benefit plans, employment agreements, offer letters, or award letters to which any Debtor is a party.

**1.45**    *"Entity"* shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

**1.46**    *"Equity Security"* means an "equity security" as defined in section 101(16) of the Bankruptcy Code.

**1.47**    *"Estate"* means each estate created in the Chapter 11 Cases pursuant to section 541 of the Bankruptcy Code.

**1.48**    *"Exchange Act"* means the Exchange Act of 1934, as amended.

**1.49**    *"Exculpated Parties"* means collectively and solely in their capacity as such, (a) the Debtors and (b) each such Debtor's predecessors, successors and assigns, directors and officers (and any professionals for such directors and officers, in their capacity as such), managers, members, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and all other retained Professional Persons (in each case solely to the extent serving in such capacity as of the Petition Date).

**1.50**    *"Executory Contract"* means a contract or lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

**1.51**    *"Existing HIT Common Equity Interests"* means all existing Interests (other than Intercompany Interests and Existing Preferred Equity Interests) in HIT that are outstanding immediately prior to the Effective Date.

**1.52**    *"Existing HIT Preferred Interests"* means the sole issued and outstanding redeemable preferred share in HIT, held by the Plan Sponsor.

**1.53**    *"Existing HITOP Preferred Interests"* means the Class C preferred units of limited partnership interests in HITOP issued in accordance with the *Limited Partnership Agreement and pursuant to that certain Securities Purchase, Voting, and Standstill Agreement* dated January 12, 2017, by and between the Debtors and the Plan Sponsor.

**1.54**    *"Existing Preferred Equity Interests"* means the Existing HIT Preferred Interests and the Existing HITOP Preferred Interests, collectively.

**1.55**    *"Exit Facility"* means the secured exit loan facility provided under the Exit Facility Agreement as of the Effective Date, which shall be (i) used for general corporate purposes, including, without limitation, the payment of deferred franchise fees and loan modification fees and (ii) in form and substance acceptable to the Debtors and to the Plan Sponsor, in its sole discretion.

**1.56**    *"Exit Facility Agent"* means the administrative agent, solely in its capacity as such, under the Exit Facility Agreement and any of its successors or assigns.

**1.57**    *"Exit Facility Agreement"* means, on and after the Effective Date, that certain credit and guaranty agreement, to be dated on or about the Effective Date, by and among the Reorganized Debtors, the Exit Facility Agent, and the Exit Facility Lender, including any and all documents and instruments executed in connection therewith (in each case, as it may be amended, modified or supplemented from time to time on the terms and conditions set forth therein).  The Exit Facility Agreement shall (A) (i) provide for a maximum drawn principal amount of (a) $25 million plus (b) the DIP Facility Undrawn Amount, (ii) bear interest at 15.00 percent per annum payable in cash or in kind, (iii) mature on the date that is three years from the Effective Date and (B) be (x) in form and substance acceptable to the Debtors and to the Exit Facility Lender, in its sole discretion, (y) in form and substance consistent with the DIP Credit Agreement, except as otherwise provided in this Section 1.57, and (z) filed as part of the Plan Supplement.

**1.58**    *"Exit Facility Lender"* means an affiliate of the Plan Sponsor in its capacity as the lender under the Exit Facility Agreement, and its respective successors and permitted assigns.

**1.59**    *"Fee Escrow Account"* means an account, either interest-bearing or non-interest bearing, in an amount equal to the total estimated amount (subject to the DIP Budget (as defined in the Interim DIP Order and Final DIP Order)) of unpaid Professional Fee Claims and funded by the Debtors on the Effective Date.

**1.60** *"Final DIP Order"* means the Final Order of the Bankruptcy Court authorizing and approving, *inter alia*, the Debtors' entry into the DIP Credit Agreement, in form and substance acceptable to the Debtors and to the Plan Sponsor, its sole discretion.

**1.61** *"Final Order"* means an order, ruling or judgment of the Bankruptcy Court or in the applicable court of competent jurisdiction that has been entered on the docket in the Chapter 11 Cases, which has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for a new trial, reargument, or rehearing shall then be pending or (ii) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired; *provided*, that no order or judgment shall fail to be a Final Order solely because of the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure has been or may be filed with respect to such order or judgment; *provided*, *further*, that no order or judgment shall fail to be a Final Order solely because of the susceptibility of a Claim to a challenge under section 502(j) of the Bankruptcy Code.

**1.62** *"General Unsecured Claim"* means any Claim other than: (a) a Secured Claim; (b) a DIP Claim; (c) an Unsecured Priority Claims; (d) an Administrative Expense Claim; (e) a Professional Fee Claim; (f) a claim for fees arising under 28 U.S.C. § 1930; and (g) an Intercompany Claim.

**1.63** *"Governmental Unit"* means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

**1.64** *"HIT"* means Hospitality Investors Trust, Inc., a Maryland corporation.

**1.65** *"HITOP"* means Hospitality Investors Trust Operating Partnership, L.P., a Delaware limited partnership.

**1.66** *"Impaired"* means, when used in reference to a Class, any Class that is impaired within the meaning of section 1124 of the Bankruptcy Code.

**1.67** *"Incentive Equity Awards"* means awards of, or in respect of, Existing HIT Common Equity Interests under the Incentive Equity Plan.

**1.68** *"Incentive Equity Plan"* means the *Amended and Restated Employee and Director Incentive Restricted Share Plan of Hospitality Investors Trust, Inc.*, as in effect from time to time.

**1.69** *"Indemnification Agreements"* means those certain prepetition agreements of the Debtors to indemnify and hold harmless the managers, directors, officers, or employees of the Debtors who served in such capacity, which agreements are to be assumed according to the provisions of this Plan, including, without limitation, that certain: (i) *Indemnification Agreement*, dated as of December 31, 2014, by and between HIT (f/k/a American Realty Capital Hospitality Trust, Inc.), and the Indemnitee (as defined therein) parties thereto; (ii) *Indemnification Agreement*, dated as of March 31, 2017, by and between HIT and Lowell G. Baron; (iii) *Indemnification Agreement*, dated

as of March 31, 2017, by and between HIT and Edward A. Glickman; (iv) *Indemnification Agreement*, dated as of March 31, 2017, by and between HIT and Edward T. Hoganson; (v) *Indemnification Agreement*, dated as of March 31, 2017, by and between HIT and Paul C. Hughes; (vi) *Indemnification Agreement*, dated as of March 31, 2017, by and between HIT and Stephen P. Joyce; (vii) *Indemnification Agreement*, dated as of March 31, 2017, by and between HIT and Jonathan P. Mehlman; (viii) *Indemnification Agreement*, dated as of March 31, 2017, by and between HIT and Stanley R. Perla; (ix) *Indemnification Agreement*, dated as of March 31, 2017, by and between HIT and Abby M. Wenzel; (x) *Indemnification Agreement*, dated as of March 31, 2017, by and between HIT and Bruce G. Wiles; and (xi) *Indemnification Agreement*, dated as of May 8, 2019, by and between HIT and Bruce A. Riggins.

**1.70** *"Independent Director"* is defined to be an "independent director" as defined under Listing Rule 303A.02 of the New York Stock Exchange Listed Company Manual or any successor provision.

**1.71** *"Initial DIP Lender"* means Brookfield Strategic Real Estate Partners II Hospitality REIT II LLC.

**1.72** *"Intercompany Claims"* means the Claims against a Debtor held by another Debtor.

**1.73** *"Intercompany Interests"* means Interests held by a Debtor.

**1.74** *"Interest"* means the interest (whether legal, equitable, contractual, or otherwise) of any holders of any class of Equity Securities of the Debtors, represented by shares of common or preferred stock, limited partnership interests or other instruments evidencing an ownership interest in the Debtors, whether or not certificated, transferable, voting or denominated "stock" or a similar security, or any option, warrant or right, contractual or otherwise, to acquire any such interest, including, for the avoidance of doubt, the (a) Existing HIT Common Equity Interests, (b) Incentive Equity Awards, (c) Existing Preferred Equity Interests, and (d) any Claim that is determined to be subordinated to the status of an Equity Security by Final Order of the Bankruptcy Court, whether under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.

**1.75** *"Interim DIP Order"* means the interim order(s) of the Bankruptcy Court authorizing and approving, *inter alia*, the Debtors' entry into the DIP Credit Agreement on an interim basis, in form and substance acceptable to the Debtors and to the Plan Sponsor, in its sole discretion.

**1.76** *"Lien"* has the meaning set forth in section 101(37) of the Bankruptcy Code.

**1.77** *"Limited Partnership Agreement"* means that certain Amended and Restated Agreement of Limited Partnership of HITOP, dated as of March 31, 2017 (as amended from time to time).

**1.78** *"Monetization Event"* shall have the meaning ascribed thereto in the CVR Agreement.

**1.79** *"New Board"* means the board of directors of Reorganized HIT, which shall initially be comprised of at least four (4) members chosen by the Plan Sponsor, at least one of which shall be an Independent Director.

**1.80** *"New HIT Common Equity Interests"* means the new common equity interests to be issued by Reorganized HIT under this Plan.

**1.81** *"New HITOP Interests"* means the new equity interests, including units, to be issued by Reorganized HITOP under this Plan.

**1.82** *"Non-Debtor Subsidiary"* means any direct or indirect majority owned subsidiary of the Debtors that is not a Debtor in the Chapter 11 Cases.

**1.83** *"Person"* means any individual, corporation, partnership, association, indenture trustee, limited liability company, cooperative, organization, joint stock company, joint venture, estate, fund, trust, unincorporated organization, Governmental Unit or any political subdivision thereof, or any other entity or organization of whatever nature.

**1.84** *"Petition Date"* means May 19, 2021.

**1.85** *"Plan"* means this chapter 11 plan proposed by the Debtors, including the Plan Supplement, all applicable exhibits, supplements, appendices, and schedules hereto and to the Plan Supplement, either in its present form or as the same may be altered, amended, or modified from time to time in accordance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, and the terms hereof, and which shall be in form and substance reasonably acceptable to the Debtors and the Plan Sponsor.

**1.86** *"Plan Consideration"* means, with respect to any Class of Claims or Interests entitled to distributions under this Plan, one or more of Cash, CVRs, New HIT Common Equity Interests, or New HITOP Interests, as applicable.

**1.87** *"Plan Distribution"* means the distribution of the Plan Consideration under the Plan.

**1.88** *"Plan Documents"* means the applicable documents, other than this Plan, to be executed, delivered, assumed, and/or performed in connection with the consummation of this Plan, including the documents to be included in the Plan Supplement and any and all exhibits to this Plan and the Disclosure Statement, each of which shall be in form and substance acceptable to the Debtors and the Plan Sponsor.

**1.89** *"Plan Sponsor"* means the Brookfield Investor.

**1.90** *"Plan Supplement"* means the supplemental appendix to this Plan (as may be amended, modified and/or supplemented) which the Debtors shall file by seven (7) calendar days prior to the deadline for filing objections to this Plan (provided that the Debtors may amend, supplement, or otherwise modify the Plan Supplement prior to the Combined Hearing and/or in accordance with the Plan), which may contain, among other things, draft forms, signed copies, or summaries of material terms, as the case may be, of the following: (a) Amended Constituent Documents; (b) the Exit Facility Agreement; (c) the Schedule of Rejected Contracts and Leases; (d) the list of proposed directors, officers, and/or managers of the other Reorganized Debtors, as applicable, including the New Board; (e) the compensation arrangement for any insider of the Debtors who will be an officer of the Reorganized Debtors; and (f) any additional documents filed with the Bankruptcy Court before the Effective Date as additional Plan Documents and/or amendments to the Plan

Supplement; *provided*, that unless consent rights are otherwise expressly set forth in this Plan, each of the documents in the Plan Supplement (whether or not set forth above), including any alteration, restatement, modification, or replacement thereto, shall be in form and substance reasonably acceptable to the Debtors and Plan Sponsor or as otherwise required by the RSA.

1.91    *"Priority Non-Tax Claim"* means any Claim, other than an Administrative Expense Claim, a Professional Fee Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

1.92    *"Priority Tax Claim"* means any Claim of a Governmental Unit of the kind entitled to priority in payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.93    *"Pro Rata Share"* means, with respect to Allowed Claims or Interests, the proportion that an Allowed Claim or Interest bears to the sum of all Allowed Claims or Interests within such Class.

1.94    *"Professional Fee Claims"* means an Administrative Expense Claim of a Professional Person against the Debtors for compensation for services rendered or reimbursement of costs, expenses or other charges and disbursements incurred during the period from the Petition Date up to, and including, the Effective Date.

1.95    *"Professional Persons"* means all Persons retained by order of the Bankruptcy Court in connection with the Chapter 11 Cases, pursuant to sections 327 or 328 of the Bankruptcy Code, excluding any ordinary course professionals retained pursuant to an order of the Bankruptcy Court or otherwise.

1.96    *"Proof of Claim"* means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

1.97    *"Released Parties"* means (a) the Debtors, (b) the Non-Debtor Subsidiaries, (c) the Reorganized Debtors, (d) the Plan Sponsor, (e) the DIP Lender, (f) the DIP Agent, and (g) for each of the foregoing Entities in (a) through (f), each such Entity's (and each such Entity's current and former affiliates' and subsidiaries') predecessors, successors and assigns, current and former equity holders (regardless of whether such interests are held directly or indirectly), directors and officers (and any professionals for such directors and officers, in their capacity as such), managers, principals, stockholders, shareholders, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, managed accounts or funds, management companies, fund advisors, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; *provided*, however, that a holder of an Existing HIT Common Equity Interest, in such capacity, shall not be a Released Party.

1.98    *"Releasing Parties"* means collectively and solely in their capacity as such, (a) each Released Party, and (b) as to each of the foregoing Entities, each such Entity's (and each such Entity's current and former affiliates' and subsidiaries') predecessors, successors and assigns, current and former equity holders (regardless of whether such interests are held directly or indirectly), directors and officers (and any professionals for such directors and officers, in their capacity as such), managers, principals, stockholders, shareholders, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, managed accounts or funds, management companies, fund advisors, investment bankers, consultants, representatives,

and other professionals; *provided* that the current or former directors, officers, managers, and employees of the Debtors shall not grant releases against the Debtors or Reorganized Debtors with respect to the Indemnification Agreements and Employee Arrangements; *provided further, however*, that a holder of an Existing HIT Common Equity Interest, in such capacity, shall not be a Releasing Party; *and provided further, however*, that, for the avoidance of doubt, holders of Claims in Classes 1, 2, and 3, in such capacity, shall not be a Releasing Party.

**1.99** *"Reorganized _____"* means, as the context requires, HIT, HITOP, and the Debtors, on and after the Effective Date, after giving effect to the transactions occurring on the Effective Date in accordance with this Plan.

**1.100** *"Restructuring Expenses"* shall refer to the expenses as described in Section 3(d) of the Restructuring Support Agreement.

**1.101** *"Restructuring Support Agreement" or "RSA"* means that certain *Restructuring Support Agreement*, to be entered into by and among the Debtors and the Plan Sponsor (as may be amended, supplemented, or otherwise modified from time to time in accordance with its terms), which provides for, among other things, the implementation and execution of the Restructuring Transactions (as defined in Section 7.12 of this Plan).

**1.102** *"Schedule of Rejected Contracts and Leases"* means, if filed, a schedule of the contracts and leases to be rejected by the Debtors pursuant to section 365 of the Bankruptcy Code and Article X hereof. The Schedule of Rejected Contracts and Leases shall be filed as part of the Plan Supplement and may be amended from time to time until the Effective Date, and shall be reasonably acceptable to the Debtors and the Plan Sponsor.

**1.103** *"Schedules"* means, if filed with the Bankruptcy Court, the Debtors' schedules of assets and liabilities and statements of financial affairs, as amended or supplemented from time to time.

**1.104** *"Secured Claim"* means a Claim (a) that is secured by a valid, perfected, and enforceable Lien on Collateral, to the extent of the value of the Claim holder's interest in such Collateral as of the Confirmation Date or (b) to the extent that the holder thereof has a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

**1.105** *"Securities Act"* means the Securities Act of 1933, as amended.

**1.106** *"Securities Laws"* means, collectively, the Exchange Act and Securities Act.

**1.107** *"Unexpired Lease"* means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

**1.108** *"Unimpaired"* means any Claim or Interest in any Class that is not Impaired.

**1.109** *"Unsecured Priority Claims"* means, collectively, the Priority Non-Tax Claims and the Priority Tax Claims.

**1.110** *"U.S. Trustee"* means the United States Trustee for Region 3.

**1.111** *"U.S. Trustee Fees"* means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

**1.112** *"Voting Class"* means Class 5.

### B.    Interpretation; Application of Definitions and Rules of Construction.

1.    General.

Unless otherwise specified, all section, exhibit, article, or schedule references in this Plan are references to the respective section, exhibit, article, or schedule of or to this Plan. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular article, section, subsection, or clause contained therein. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of this Plan. The captions and headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. Any reference to an entity as a holder of a Claim or Interest includes that entity's successors and assigns. Any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions. Any reference in the Plan to an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified, or supplemented. In the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine, and the neuter gender. "$" or "dollars" means Dollars in lawful currency of the United States of America.

2.    Rule of "Contra Proferentum" Not Applicable.

This Plan is the product of extensive negotiations between and among, inter alia, the Debtors the Plan Sponsor and certain other creditors and constituencies. Each of the foregoing was represented by independent counsel of their choice who either (i) participated in the formulation and documentation of or (ii) was afforded the opportunity to review and provide comments on, the Plan, the Disclosure Statement, and the documents ancillary thereto. Accordingly, unless explicitly stated otherwise, the general rule of contract construction known as "*contra proferentum*" shall not apply to the construction or interpretation of any provision of this Plan, the Disclosure Statement, or any exhibit, schedule, contract, instrument, release, or other document generated in connection therewith as concerns such parties identified above.

### C.    RSA; Consent Rights Required.

Notwithstanding anything herein to the contrary, so long as the RSA has not been terminated in accordance with its terms, any and all consents and approval rights of the respective parties as set forth in the RSA with respect to (i) the form and substance of this Plan, (ii) the documents to be filed as part of the Plan Supplement, (iii) the other Plan Documents, (iv) any other orders or documents referenced herein or otherwise to be executed in connection with the

transactions contemplated hereunder, and/or (v) any other Definitive Documents (as defined in the RSA), including, in each case, any amendments, restatements, supplements, or other modifications thereto, and any consents, waivers, or other deviations under or from any such documents, shall be expressly incorporated herein by this reference and fully enforceable as if stated in full herein; *provided*, *however* (as stated above) the terms of the Confirmation Order and then the Plan control if there is any inconsistency or ambiguity.

### D.    Appendices and Plan Documents.

All Plan Documents and appendices to the Plan are incorporated into the Plan by reference and are a part of the Plan as if set forth in full herein.  The documents contained in the exhibits and Plan Supplement shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.  Holders of Claims and Interests and any other party in interest may review the Plan Documents by accessing the Claims and Noticing Agent's website at http://dm.epiq11.com/HospitalityInvestorsTrust or emailing HITREITinfo@epiqglobal.com.

### ARTICLE II.

### CERTAIN INTER-CREDITOR AND INTER-DEBTOR ISSUES

### 2.1.    *Settlement of Certain Inter-Creditor Issues.*

Pursuant to section 1129 of the Bankruptcy Code, and in consideration for the distributions and other benefits provided under the Plan, the treatment of Claims and Interests under this Plan represents, among other things, the settlement and compromise of certain potential inter-creditor claims and disputes.

### 2.2.    *Intercompany Claims and Intercompany Interests.*

(a)    Intercompany Claims.

Notwithstanding anything to the contrary herein, on the Effective Date, any and all Intercompany Claims shall be reinstated and otherwise survive the Debtors' restructuring by virtue of such Intercompany Claims being left Unimpaired.  To the extent any such Intercompany Claim is reinstated, or otherwise adjusted (including by contribution, distribution in exchange for new debt or equity, or otherwise), paid, or continued as of the Effective Date, any such transaction may be effected on or after the Effective Date without any further action by the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

(b)    Intercompany Interests.

Notwithstanding anything to the contrary herein, on or after the Effective Date, any and all Intercompany Interests shall be reinstated.

### ARTICLE III.

## DIP CLAIMS, ADMINISTRATIVE EXPENSE CLAIMS, PROFESSIONAL FEE CLAIMS, AND U.S. TRUSTEE FEES

All Claims and Interests, except DIP Claims, Administrative Expense Claims, Professional Fee Claims, and U.S. Trustee Fees, are placed in the Classes set forth in Article IV below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims (including DIP Claims), Professional Fee Claims, and U.S. Trustee Fees have not been classified, and the holders thereof are not entitled to vote on this Plan.  A Claim or Interest is placed in a particular Class only to the extent that such Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under this Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code.  However, a Claim or Interest is placed in a particular Class for the purpose of receiving Plan Distributions only to the extent that such Claim or Interest is an Allowed Claim or an Allowed Interest and has not been paid, released or otherwise settled prior to the Effective Date.

### 3.1.    *DIP Claims*.

The DIP Claims shall be Allowed in the full amount due and owing under the DIP Credit Agreement and the other DIP Loan Documents.  Pursuant to the Restructuring Support Agreement, the DIP Lender has agreed to convert its DIP Claims into its Pro Rata Share, together with the holders of Existing Preferred Equity Interests, of 100% of the New HIT Common Equity Interests.

Upon the distribution of Plan Consideration to the holder of the DIP Claims, all Liens and security interests granted to the DIP Agent to secure the DIP Claims shall be deemed cancelled and shall be of no further force and effect, and the Allowed DIP Claims shall be deemed to be fully satisfied, settled, released, and discharged.

### 3.2.    *Administrative Expense Claims*.

Except with respect to Allowed Administrative Expense Claims that are Professional Fee Claims, to the extent that a holder of an Allowed Administrative Expense Claim (including a claim arising under section 503(b)(9) of the Bankruptcy Code that has not been paid pursuant to a motion filed in accordance with the Bankruptcy Code), together with the Debtors and the Plan Sponsor, agrees to a less favorable treatment, each holder of an Allowed Administrative Expense Claim shall be paid in full in Cash on the later of (a) the Effective Date or (b) the date such Allowed Administrative Expense Claim becomes due and payable in accordance with its terms (or as soon thereafter as is practicable); *provided, however*, that Allowed Administrative Expense Claims that arise in the ordinary course of the Debtors' business, including administrative claims arising from or with respect to the sale of goods or services on or after the Petition Date and the Debtors' Executory Contracts and Unexpired Leases, shall be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such

15

transactions, without further action by the holders of such Administrative Expense Claims or further approval by the Bankruptcy Court.

### 3.3. *Professional Fee Claims*.

Except to the extent that the applicable holder of an Allowed Professional Fee Claim agrees to a less favorable treatment, together with the Debtors and the Plan Sponsor, each holder of a Professional Fee Claim shall be paid in full in Cash pursuant to this Section 3.3.

(a) <u>Fee Applications</u>

All Entities seeking an award by the Bankruptcy Court of Professional Fee Claims shall file and serve on counsel for the Reorganized Debtors, the U.S. Trustee, counsel for the DIP Lender, and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, or other order of the Court, on or before the date that is forty-five (45) days after the Effective Date, their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred from the Petition Date through the Effective Date. Objections to any Professional Fee Claims must be filed and served on counsel for the Reorganized Debtors, counsel for the DIP Lender, and the requesting party no later than twenty-one (21) calendar days after the filing of the final applications for compensation or reimbursement (unless otherwise agreed by the party requesting compensation of a Professional Fee Claim).

(b) <u>Post-Effective Date Fees</u>

Upon the Effective Date, any requirement that Professional Persons comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay all Professional Persons without any further notice to, action by or order or approval of the Bankruptcy Court or any other party.

(c) <u>Fee Escrow Account</u>

On or after the Effective Date, the Debtors shall establish and fund the Fee Escrow Account. The Debtors shall fund the Fee Escrow Account with Cash equal to the Debtors' good faith estimate of the Allowed Professional Fee Claims (subject to the DIP Budget (as defined in the Interim DIP Order and Final DIP Order)). Funds held in the Fee Escrow Account shall not be considered property of the Debtors' Estates or property of the Debtors, but shall revert to the Debtors only after all Allowed Professional Fee Claims have been paid in full. Fees owing to the applicable holder of an Allowed Professional Fee Claim shall be paid in Cash to such holder from funds held in the Fee Escrow Account when such Claims are Allowed by an order of the Bankruptcy Court or authorized to be paid under a Final Order authorizing compensation of Professional Persons; *provided*, that the Debtors' obligations with respect to Allowed Professional Fee Claims shall not be limited by nor deemed limited to the balance of funds held in the Fee Escrow Account. To the extent that funds held in the Fee Escrow Account are insufficient to satisfy the amount of accrued Allowed Professional Fee Claims, each holder of an Allowed Professional Fee Claim shall have an Allowed Administrative Expense Claim for any such deficiency, which shall be satisfied in accordance with this Section 3.3 of this Plan. The Fee

Escrow Account shall be free and clear of all Liens, Claims, and encumbrances other than the residual interests of the Reorganized Debtors as set forth herein.

### 3.4. *U.S. Trustee Fees*.

The Debtors shall pay all outstanding U.S. Trustee Fees on an ongoing basis on the date such U.S. Trustee Fees become due, until such time as a final decree is entered closing the Chapter 11 Cases, the Chapter 11 Cases are converted or dismissed, or the Bankruptcy Court orders otherwise.

## ARTICLE IV.

## CLASSIFICATION OF CLAIMS AND INTERESTS

### 4.1. *Classification of Claims and Interests*.

The following table designates the Classes of Claims against and Interests in the Debtors, and specifies which Classes are: (a) Impaired or Unimpaired by this Plan; (b) entitled to vote to accept or reject this Plan in accordance with section 1126 of the Bankruptcy Code; and (c) presumed to accept or reject this Plan.

| Class | | Designation | Impairment | Entitled to Vote |
|---|---|---|---|---|
| Class 1 | | Secured Claims | No | No (Presumed to accept) |
| Class 2 | | Unsecured Priority Claims | No | No (Presumed to accept) |
| Class 3 | | General Unsecured Claims | No | No (Presumed to accept) |
| Class 4 | | Intercompany Claims | No | No (Presumed to accept) |
| Class 5 | Class 5A | Existing HIT Preferred Interests | Yes | Yes |
| | Class 5B | Existing HITOP Preferred Interests | Yes | Yes |
| Class 6 | | Existing HIT Common Equity Interests | Yes | No (Presumed to reject) |
| Class 7 | | Intercompany Interests | No | No (Presumed to accept) |

If a controversy arises regarding whether any Claim or Interest is properly classified under the Plan, the Bankruptcy Court shall, upon proper motion and notice, determine such controversy at the Combined Hearing. If the Bankruptcy Court finds that the classification of any Claim or Interest is improper, then such Claim or Interest shall be reclassified and the Ballot previously cast by the holder of such Claim or Interest shall be counted in, and the Claim or Interest shall receive the treatment prescribed in, the Class in which the Bankruptcy Court determines such Claim or Interest should have been classified, without the necessity of resoliciting any votes on the Plan.

**4.2.**     *Unimpaired Classes of Claims and Interests*.

The following Classes of Claims are Unimpaired and, therefore, presumed to have accepted this Plan and are not entitled to vote on this Plan under section 1126(f) of the Bankruptcy Code:

    (a)     Class 1:  Class 1 consists of all Secured Claims.

    (b)     Class 2:  Class 2 consists of all Unsecured Priority Claims.

    (c)     Class 3:  Class 3 consists of all General Unsecured Claims.

    (d)     Class 4:  Class 4 consists of all Intercompany Claims.

    (e)     Class 7:  Class 7 consists of all Intercompany Interests.

**4.3.**     *Impaired Classes of Claims and Interests*.

The following Class of Interests is Impaired and entitled to vote on this Plan:

    (a)     Class 5:  Class 5 consists of all Existing Preferred Equity Interests in Class 5A (Existing HIT Preferred Interests), and Class 5B (Existing HITOP Preferred Interests).

The following Class of Interests is Impaired and deemed to have rejected this Plan and, therefore, is not entitled to vote on this Plan under section 1126(g) of the Bankruptcy Code:

    (b)     Class 6:  Class 6 consists of all Existing HIT Common Equity Interests.

**4.4.**     *Separate Classification of Secured Claims*.

Although all Secured Claims have been placed in one Class for purposes of nomenclature, each Secured Claim, to the extent secured by a Lien on Collateral different than that securing any additional Secured Claims, shall be treated as being in a separate sub-Class for the purpose of receiving Plan Distributions.

## ARTICLE V.

## TREATMENT OF CLAIMS AND INTERESTS

**5.1.**     *Secured Claims (Class 1)*.

    (a)     <u>Treatment</u>: On the Effective Date or as soon as reasonably practicable thereafter in the ordinary course of business, except to the extent that a holder of a Secured Claim already has been paid during the Chapter 11 Cases or such holder, together with the Debtors, agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Secured Claim, each holder of an Allowed Secured Claim shall receive, at the sole option of the Debtors with the consent of the Plan Sponsor, either (i) payment

in full, in Cash, of the unpaid portion of its Allowed Secured Claim, (ii) delivery of the Collateral securing such Allowed Secured Claim, or (iii) other treatment such that the Secured Claim shall be rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code.

(b)    <u>Voting</u>: Class 1 is Unimpaired, and the holders of Allowed Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Allowed Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited.

**5.2.    *Unsecured Priority Claims (Class 2)*.**

(a)    <u>Treatment</u>:  On the Effective Date or as soon as reasonably practicable thereafter in the ordinary course of business, except to the extent that a holder of an Allowed Unsecured Priority Claim already has been paid during the Chapter 11 Cases or such holder, together with the Debtors, agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Unsecured Priority Claim, each holder of an Allowed Unsecured Priority Claim shall receive payment in full in Cash or as otherwise provided in the Bankruptcy Code.  Any ad valorem taxes and other taxes/fees will be extended to maximum statutory periods under, *inter alia*, 11 U.S.C. § 1129(a)(9)(C).  Holders of such Claims will be rendered Unimpaired and as such will be deemed to have accepted the Plan and will not be entitled to vote.

(b)    <u>Voting</u>:  Class 2 is Unimpaired, and the holders of Allowed Unsecured Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Allowed Unsecured Priority Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited.

**5.3.    *General Unsecured Claims (Class 3)*.**

(a)    <u>Treatment</u>:  On or as soon as reasonably practicable after the Effective Date, except to the extent that a holder of an Allowed General Unsecured Claim, together with the Debtors, agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed General Unsecured Claim, each holder of an Allowed General Unsecured Claim shall (i) have its Allowed General Unsecured Claim reinstated, and paid in full, on the later to occur of the Effective Date or when such Allowed General Unsecured Claim becomes due in the ordinary course of the Debtors' or Reorganized Debtors' business operations or (ii) have its Allowed General Unsecured Claim otherwise rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code.

(b)    <u>Voting</u>:  Class 3 is Unimpaired, and the holders of Allowed General Unsecured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Allowed General Unsecured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited.

**5.4.    *Intercompany Claims (Class 4)*.**

(a)    <u>Treatment</u>:  On the Effective Date, Allowed Intercompany Claims shall be reinstated.

(b)    Voting:  Class 4 is Unimpaired, and the holders of Allowed Intercompany Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Allowed Intercompany Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited.

### 5.5.    *Existing Preferred Equity Interests (Class 5).*

(a)    *Existing HIT Preferred Interests (Class 5A).*

(i)    Treatment:  On the Effective Date, all outstanding shares, units, and interests (and rights, warrants, options, or other interests to acquire shares and interests) of the Existing HIT Preferred Interests will be extinguished in exchange for each holder's Pro Rata Share, together with the holders of DIP Claims (exclusive, for the avoidance of doubt, of Claims in respect of the DIP Facility Undrawn Amount) and Class 5B Interests, of 100% of the New HIT Common Equity Interests issued on the Effective Date.

(ii)    Voting:  Class 5A is Impaired, and the holders of Allowed Existing HIT Preferred Interests will be entitled to vote to accept or reject the Plan.

(b)    *Existing HITOP Preferred Interests (Class 5B).*

(i)    Treatment:  On the Effective Date, (x) 98% of the outstanding shares, units, and interests (and rights, warrants, options, or other interests to acquire shares and interests) of the Existing HITOP Preferred Interests will be transferred to HIT in exchange for each holder's Pro Rata Share, together with the holders of DIP Claims (exclusive, for the avoidance of doubt, of Claims in respect of the DIP Facility Undrawn Amount) and Class 5A Interests, of 100% of the New HIT Common Equity Interests issued on the Effective Date and (y) 2% of the outstanding shares, units, and interests (and rights, warrants, options, or other interests to acquire shares and interests) of the Existing HITOP Preferred Interests will be canceled in exchange for each holder's Pro Rata Share of 2% of New HITOP Interests.

(ii)    Voting:  Class 5B is Impaired, and the holders of Allowed Existing HITOP Preferred Interests will be entitled to vote to accept or reject the Plan.

### 5.6.    *Existing HIT Common Equity Interests (Class 6).*

(a)    Treatment:  On the Effective Date, the Allowed Existing HIT Common Equity Interests shall be cancelled, extinguished and discharged in exchange for each holder receiving one CVR in respect of each share of the Allowed Existing HIT Common Equity Interests outstanding immediately prior to the Effective Date and such holders shall be automatically

deemed to have accepted the terms of the CVR Agreement and to be a party thereto, in each case in accordance with the terms of the CVR Agreement.

Notwithstanding the foregoing, the Plan Sponsor has agreed that, on the Effective Date, any Existing HIT Common Equity Interests held by the Plan Sponsor shall be deemed to be fully vested, and shall not entitle the Plan Sponsor to any distributions of CVRs.

(b)    Voting:  Class 6 is Impaired.  Each holder of the Allowed Existing HIT Common Equity Interests will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and will not be entitled to vote to accept or reject the Plan.

### 5.7.    *Intercompany Interests (Class 7).*

(a)    Treatment:  On the Effective Date, the Allowed Intercompany Interests will be retained by the existing holders.

(b)    Voting:  Class 7 is Unimpaired, and the holders of Allowed Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  In addition, there are no non-insider claimants in Class 7 to solicit.  Therefore, holders of Allowed Intercompany Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited.

## ARTICLE VI.

## ACCEPTANCE OR REJECTION OF
## THE PLAN; EFFECT OF REJECTION BY ONE
## OR MORE CLASSES OF CLAIMS OR INTERESTS

### 6.1.    *Class Acceptance Requirement*.

A Class of Claims that is Impaired under the Plan shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of holders of the Allowed Claims in such Class that have voted on the Plan.  A Class of Interests that is Impaired under the Plan shall have accepted the Plan if it is accepted by holders of at least two-thirds in amount of such Interests that have voted on the Plan.

### 6.2.    *Tabulation of Votes on a Non-Consolidated Basis*.

All votes on the Plan shall be tabulated on a non-consolidated basis by Class and by Debtor for the purpose of determining whether the Plan satisfies sections 1129(a)(8) and/or (10) of the Bankruptcy Code.

### 6.3.    *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code or "Cramdown."*

Because Class 6 is deemed to have rejected this Plan, the Debtors will request confirmation of this Plan, as it may be modified or amended from time to time, under section 1129(b) of the Bankruptcy Code with respect to such Class.  Subject to Sections 14.5 and 14.7 of

this Plan, the Debtors reserve the right (i) to suspend, revoke or withdraw this Plan, (ii) to alter, amend, or modify this Plan, or, (iii) to alter, amend, modify, revoke, or withdraw any Plan Document, to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary, in each case of clauses (i)–(iii) only upon the prior written consent of the Plan Sponsor in accordance with the RSA.

### 6.4.    *Confirmation of All Cases*.

Except as otherwise specified herein, the Plan shall not be deemed to have been confirmed unless and until the Plan has been confirmed as to each of the Debtors; *provided*, *however*, that the Debtors, with the prior written consent of the Plan Sponsor, may at any time waive this Section 6.4.

## ARTICLE VII.

## MEANS FOR IMPLEMENTATION

### 7.1.    *Non-Substantive Consolidation*.

The Plan is a joint plan that does not provide for substantive consolidation of the Debtors' Estates, and on the Effective Date, the Debtors' Estates shall not be deemed to be substantively consolidated for purposes hereof.  Except as specifically set forth herein, nothing in this Plan shall constitute or be deemed to constitute an admission that any one of the Debtors is subject to or liable for any claim against any other Debtor.  Additionally, claimants holding Claims and Interests against multiple Debtors, to the extent Allowed in each Debtor's Chapter 11 Case, will be treated as holding a separate Claim or separate Interest, as applicable, against each Debtor's Estate; *provided*, *however*, that no holder of an Allowed Claim shall be entitled to receive more than payment in full of such Allowed Claim.

### 7.2.    *Continued Corporate Existence, Vesting of Assets in the Reorganized Debtors, and Assumption of the Indemnification Agreements*.

(a)    Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement (including the Restructuring Transactions (defined below)), on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, limited partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, limited partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective charter and by-laws (or other analogous formation documents) in effect before the Effective Date, except to the extent such charter or bylaws (or other analogous formation documents) is amended by the Plan, the Amended Constituent Documents, or otherwise, and to the extent any such document is amended, such document is deemed to be amended pursuant to the Plan and will be effective without any further action or approval (other than any requisite filings required under applicable state or federal law).

(b)    Except as otherwise provided in this Plan, on and after the Effective Date, all property of the Debtors' Estates, wherever located, including, without limitation, all claims, rights, Causes of Action, tax attributes (including, without limitation, net operating losses) and rights in respect thereof, and any property, wherever located, and whether acquired by the Debtors under or in connection with this Plan or otherwise, shall vest in the Reorganized Debtors free and clear of all Claims, Liens, charges, other encumbrances and Interests.  On and after the Effective Date, the Reorganized Debtors may operate their business and may use, acquire and dispose of property, wherever located, and prosecute, compromise or settle any Claims (including any Administrative Expense Claims) and Causes of Action without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by this Plan or the Confirmation Order.  Without limiting the foregoing, the Reorganized Debtors may pay the charges that each incurs on or after the Effective Date for Professional Persons' fees, disbursements, expenses or related support services without application to the Bankruptcy Court.

(c)    On the Effective Date, the Reorganized Debtors shall assume the Indemnifications Agreements.  The Indemnification Agreements shall (a) remain in full force and effect on and after the Effective Date and (b) not be modified, reduced, or discharged without the consent of the beneficiaries thereof.

### 7.3.    *Compromise of Controversies.*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and as consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan constitute a good-faith compromise and settlement of all Claims and controversies resolved under the Plan, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under Bankruptcy Rule 9019, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are within the range of reasonableness, in the best interests of the Debtors, their Estates, their creditors, and other parties in interest, and fair and equitable.  Each provision of the Plan constitutes a part of this settlement that is non-severable from the remaining terms of the Plan.

### 7.4.    *Sources of Cash for Plan Distribution.*

Except as otherwise provided in the Plan or Confirmation Order, all Cash required for the payments to be made hereunder shall be obtained from the Debtors' and the Reorganized Debtors' operations, Cash balances, including Cash provided under the DIP Facility, and the Exit Facility.

### 7.5.    *Restructuring Expenses.*

To the extent not otherwise paid, the Debtors or the Reorganized Debtors, as applicable, shall promptly pay outstanding and invoiced Restructuring Expenses as follows: (a) on the Effective Date, Restructuring Expenses incurred during the period prior to the Effective Date to the extent invoiced to the Debtors at least one (1) day in advance of the Effective Date and (b) after the Effective Date, any unpaid Restructuring Expenses within ten (10) Business Days of receiving an invoice; *provided*, that such Restructuring Expenses shall be paid in accordance with

the terms of any applicable engagement letters or other contractual arrangements without the requirement for the filing of retention applications, fee applications, or any other applications in the Chapter 11 Cases, and without any requirement for further notice or Bankruptcy Court review or approval, except as otherwise provided in Section 3.3 hereof with respect to Professional Fee Claims.

### 7.6. *Corporate Action.*

(a)    On the Effective Date, and subject to Section 7.13 hereof, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects.  Among other things, on the Effective Date, the following transactions shall be deemed to have occurred at 11:59 P.M. Eastern Time and shall occur in the sequence described herein: (i) Reorganized HIT shall issue to the holders of DIP Claims the New HIT Common Equity Interests described in Section 3.1 of the Plan, (ii) Reorganized HIT shall issue to the holders of Existing Preferred Equity Interests the New HIT Common Equity Interests described in Section 5.5 of the Plan, which collectively with the New HIT Common Equity Interests exchanged for the DIP Claims, shall constitute 100% of the New HIT Common Equity Interests issued on the Effective Date; (iii) Reorganized HIT shall retain its existing Interests in HITOP; (iv) the Existing HITOP Preferred Interest received by HIT pursuant to Section 5.5(b)(i)(x) of the Plan shall be contributed to HITOP in exchange for 98% of New HITOP Interests issued on the Effective Date; (v) the Existing HITOP Preferred Interests described in Section 5.5(b)(i)(y) of the Plan shall be exchanged for 2% of New HITOP Interests issued on the Effective Date; (vi) Reorganized HIT shall enter into the CVR Agreement, entitling each holder of Existing HIT Common Equity Interests to one CVR for each share of Allowed Existing HIT Common Equity Interests held by such holder pursuant to Section 5.6 of the Plan, and the CVRs shall be deemed to be issued in accordance with the terms of the CVR Agreement; and (vii) the Reorganized Debtors shall enter into the Exit Facility provided by the Exit Facility Lender pursuant to the terms of the Exit Facility Agreement.

(b)    Upon the Effective Date, all matters provided for in the Plan involving the corporate or limited partnership structure of the Reorganized Debtors, and any corporate or limited partnership action required by or of the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders (upon whom the same shall be binding), directors, general partners, managers, or officers of the Debtors or Reorganized Debtors.  On or (as applicable) before the Effective Date, the appropriate officers, general partners, or managers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, deliver, and perform or cause to be performed, the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effectuate the Restructuring Transactions) in the name of and on behalf of the Reorganized Debtors, including the Exit Facility and any and all other agreements, documents, securities, and instruments relating to the foregoing, to the extent not previously authorized by the Bankruptcy Court.  These authorizations and

approvals shall be effective notwithstanding and without regard to any requirements under non-bankruptcy law.

### 7.7.    *Exit Facility.*

(a)    On the Effective Date, the Reorganized Debtors shall enter into the Exit Facility, which shall be in form and substance acceptable to the Debtors and the Exit Facility Lender.

(b)    The Confirmation Order shall constitute approval of the Exit Facility (including the transactions contemplated thereby and all payments contemplated thereunder, all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid or to be paid by the Reorganized Debtors in connection therewith), and authorization for the Reorganized Debtors to enter into and perform under the Exit Facility Agreement and such other related documents, and make such payment and any other payment in connection therewith as may be required or appropriate.

(c)    The Reorganized Debtors shall be authorized to execute, deliver, and enter into and perform under the Exit Facility without the need for any further corporate or limited partnership action and without further action by the holders of Claims or Interests.

### 7.8.    *Authorization and Issuance of New HIT Common Equity Interests.*

(a)    All existing Interests in HIT shall be cancelled as of the Effective Date and, on the Effective Date, the Debtors or the Reorganized Debtors, as applicable, are authorized to issue or cause to be issued and shall issue the New HIT Common Equity Interests to the Plan Sponsor in accordance with the terms of the Plan and in the amounts determined by the Plan Sponsor, each without the need for any further corporate action.  All of the New HIT Common Equity Interests, when so issued, shall be duly authorized, validly issued, fully paid, and non-assessable.

(b)    Upon the Effective Date, unless otherwise consented to by the Plan Sponsor, (i) the New HIT Common Equity Interests shall not be registered under the Securities Laws, and shall not be listed for public trading on any securities exchange, and (ii) none of the Reorganized Debtors shall be a reporting company under the Exchange Act.  Except as provided in the Plan or the Confirmation Order, the New HIT Common Equity Interests to be distributed under the Plan shall be issued in the names of such holders or their nominees.

### 7.9.    *Exemption from Registration.*

(a)    The offer, issuance, and distribution of the New HIT Common Equity Interests and New HITOP Interests shall be exempt, pursuant to section 1145 of the Bankruptcy Code, if applicable, or any similar federal, state, or local law in reliance on section 4(a)(2) of the Securities Act, or Regulation D promulgated thereunder, or such other exemption as may be available, without further act or action by any Entity, from registration under (i) the Securities

Laws, as amended, and all rules and regulations promulgated thereunder, and (ii) any state or local law requiring registration for the offer, issuance, or distribution of securities.

(b)    The New HIT Common Equity Interests and New HITOP Interests shall be issued without registration under the Securities Laws, as amended, or any similar federal, state, or local law in reliance on available exemptions or section 1145 of the Bankruptcy Code and, if applicable, shall be freely tradable by the recipients thereof, subject to: (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act; (ii) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments; and (iii) any applicable regulatory approval.

(c)    Notwithstanding anything to the contrary in the Plan, no entity shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New HIT Common Equity Interests, the New HITOP Interests, and the shares thereof issued are exempt from registration, settlement, and depository services.

### 7.10.    *Cancellation of Existing Securities and Agreements.*

(a)    Except for the purpose of evidencing a right to a Plan Distribution under the Plan and except as otherwise set forth in the Plan, including with respect to Executory Contracts or Unexpired Leases that shall be assumed by the Debtors, on the Effective Date, all agreements, instruments, and other documents evidencing any Existing Preferred Equity Interest, the Existing HIT Common Equity Interests, or any other Interest (other than Intercompany Interests that are not modified by the Plan) and any rights of any holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged.

(b)    Notwithstanding such cancellation and discharge, and subject to Section 7.13 hereof, the Existing Preferred Equity Interests and the Existing HIT Common Equity Interests, including any agreements related thereto, shall continue in effect solely to the extent necessary to (i) allow the holders of Allowed Existing Preferred Equity Interests and Existing HIT Common Equity Interests to receive Plan Distributions under the Plan, and (ii) allow the Debtors or the Reorganized Debtors, as applicable, to make post-Effective Date Plan Distributions or take such other action pursuant to the Plan on account of the Allowed Existing Preferred Equity Interests and Allowed Existing HIT Common Equity Interests and to otherwise exercise their rights and discharge their obligations relating to the interests of the holders of such Interests in accordance with the Plan, *provided* that nothing in this section shall affect the discharge of Claims and Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any liability or expense to the Reorganized Debtors.

(c)    Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors of their interests, as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in this section shall be deemed null and void and shall be of no force and effect.  Nothing contained herein shall be

deemed to cancel, terminate, release, or discharge the obligation of the Debtors or any of their counterparties under any Executory Contract or Unexpired Lease to the extent such Executory Contract or Unexpired Lease has been assumed by the Debtors pursuant to a Final Order of the Bankruptcy Court or hereunder.

### 7.11.    *Officers and Board of Directors.*

(a)     To the extent then known and determined, the identities of the members of the New Board, as applicable, and to the extent applicable, the officers of each Reorganized Debtor, shall be disclosed at or prior to the Combined Hearing in accordance with section 1129(a)(5) of the Bankruptcy Code.

(b)     Commencing on the Effective Date, each of the directors, managers, and officers of each of the Reorganized Debtors shall be elected and serve pursuant to the terms of the applicable organizational documents, including any Amended Constituent Documents, of such Reorganized Debtor and may be replaced or removed in accordance with such organizational documents.

### 7.12.    *Restructuring Transactions.*

(a)     On or as soon as practicable after the Effective Date, the Reorganized Debtors shall, subject to the consent of the Plan Sponsor, take such actions as may be or become necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan (collectively, the "Restructuring Transactions"), including (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, financing, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law, (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree, (iii) the filing of appropriate certificates or charters, formation, reincorporation, merger, consolidation, conversion, or dissolution, (iv) the effective sale of the hotels from the Company to the Plan Sponsor, by virtue of the issuance of the New HIT Common Equity Interests to the Plan Sponsor as provided for pursuant to the Plan, (v) the issuance of the New HIT Common Equity Interests and the New HITOP Interests, all of which shall be authorized and approved in all respects in each case without further action being required under applicable law, regulation, order, or rule, (vi) all other actions that the applicable Entities determine to be necessary or appropriate, including (A) making filings or recordings that may be required by applicable law, subject, in each case, to the organizational documents of the Reorganized Debtors, and (B) such other transactions that may be required or necessary to effectuate any of the Restructuring Transactions in the most tax-efficient manner, including mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions or liquidations; and (vii) the execution, delivery, and filing, if applicable, of the Exit Facility. The Restructuring Transactions may include a taxable transfer of all or a portion of the Debtors' assets or Entities to one or more newly-formed Entities (or an affiliate or subsidiary of such Entity or Entities) formed and controlled by certain holders of Claims against or Interests in the Debtors and, in such case, the New HIT Common Equity Interests

and New HITOP Interests to holders of DIP Claims and Existing Preferred Equity Interests pursuant to the Plan may comprise stock (and/or other interests) of such Entity or Entities.

(b)      Each officer, member of the board of directors, manager, or general partner of the Debtors is (and each officer, member of the board, or manager of the Reorganized Debtors shall be) authorized and directed to issue, execute, deliver, file, or record such contracts, securities, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the New HIT Common Equity Interests, the New HITOP Interests, and the CVRs issued pursuant to the Plan, the CVR Agreement and any Restructuring Transaction in the name of and on behalf of the Reorganized Debtors, all of which shall be authorized and approved in all respects, in each case, without the need for any further approvals, authorization, consents, or any further action required under applicable law, regulation, order, or rule (including, without limitation, any action by the stockholders, directors, managers, or general partners of the Debtors or the Reorganized Debtors) except for those expressly required pursuant to the Plan.

(c)      On the Effective Date, or as soon thereafter as is reasonably practicable, the Reorganized Debtors' respective certificates of incorporation, bylaws, and Limited Partnership Agreement (and other formation and constituent documents relating to limited partnerships) shall be amended as may be required to be consistent with the provisions of the Plan, the New HIT Common Equity Interests, the New HITOP Interests, and the documents related to the Exit Facility, as applicable, and the Bankruptcy Code.  Among other things, such amendments of the Limited Partnership Agreement shall include the elimination of any rights of the holder of the special general partnership interest in HITOP issued in accordance with the Limited Partnership Agreement.  The organizational documents, including the Amended Constituent Documents, for the Reorganized Debtors shall, among other things: (i) authorize the issuance of the New HIT Common Equity Interests, the New HITOP Interests, and the CVRs; and (ii) pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, include a provision prohibiting the issuance of non-voting Equity Securities.

(d)      All matters provided for herein involving the corporate or limited partnership structure of the Debtors or the Reorganized Debtors, to the extent applicable, or any corporate, limited partnership, or related action required by the Debtors or the Reorganized Debtors in connection herewith shall be deemed to have occurred and shall be in effect, without any requirement of further action by the stockholders, members, directors, managers, general partners, or officers of the Debtors or the Reorganized Debtors, and with like effect as though such action had been taken unanimously by the stockholders, members, directors, managers, general partners, or officers, as applicable, of the Debtors or the Reorganized Debtors.

### 7.13.    *Employee Matters.*

Subject to Article X of this Plan, on the Effective Date, the Reorganized Debtors shall be deemed to have assumed all Employee Arrangements; *provided*, *however*, that the Debtors' Employee Arrangements with their senior management executives shall be assumed as amended by the provisions contained in the Restructuring Support Agreement.

As of the Effective Date: (x) the Incentive Equity Plan is terminated; (y) all Incentive Equity Awards outstanding as of immediately prior to the Effective Date are (i) in the case of Incentive Equity Awards that are restricted shares of Existing HIT Common Equity Interests, fully vested, and (ii) in the case of Incentive Equity Awards that are restricted stock units, terminated and paid in the form of shares of Existing HIT Common Equity Interests (with each restricted stock unit to be paid in the form of one Existing HIT Common Equity Interest, and with restricted stock units subject to performance-based conditions to be paid assuming maximum performance); and (z) all Existing HIT Common Equity Interests vested or paid under subclause (y) are treated in accordance with Section 5.5(b) hereof.  The termination of the Incentive Equity Plan and all Incentive Equity Awards outstanding thereunder and the payment of the Incentive Equity Awards are intended to comply with Section 409A of the Internal Revenue Code of 1986, as amended and Treas. Reg. Section 1.409A-3(j)(4)(ix)(A) thereunder.

### 7.14.    *Release of Avoidance Actions.*

On the Effective Date, the Debtors, on behalf of themselves and their Estates, shall release any and all Avoidance Actions and the Debtors and the Reorganized Debtors, and any of their successors or assigns, and any Entity acting on behalf of the Debtors or the Reorganized Debtors, shall be deemed to have waived the right to pursue any and all Avoidance Actions, except for Avoidance Actions brought as counterclaims or defenses to claims asserted against the Debtors.

### 7.15.    *Closing of Chapter 11 Cases.*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases; *provided*, as of the Effective Date, the Reorganized Debtors may submit an order to the Bankruptcy Court under certification of counsel closing the Chapter 11 Case of Debtor HITOP and changing the caption of the Chapter 11 Cases accordingly; *provided, further*, that all motions, contested matters, adversary proceedings, and other matters may be heard and adjudicated in the Debtors' Chapter 11 Case that remains open regardless of whether the applicable matter is against HIT or HITOP.  Nothing in the Plan shall authorize the closing of any case effective as of a date that precedes the date any such order is entered.  Any request for retroactive relief shall be made on motion served on the U.S. Trustee, and the Bankruptcy Court shall rule on such request after notice and a hearing.  Upon the filing of a motion to close the last Chapter 11 Case remaining open, the Reorganized Debtors shall file a final report with respect to all of the Chapter 11 Cases pursuant to Local Rule 3022-1(c).

### 7.16.    *Notice of Effective Date.*

On the Effective Date, the Debtors shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

### 7.17.    *Corporate and Other Action*.

(a)    On the Effective Date, the Amended Constituent Documents and any other applicable amended and restated corporate or other organizational documents of the Debtors shall be deemed authorized in all respects.

(b) Any action under the Plan to be taken by or required of the Debtors, including, without limitation, the adoption or amendment of their charter and bylaws or certificate of limited partnership and Limited Partnership Agreement, the issuance of securities and instruments, the Exit Facility, or the selection of officers or directors, shall be authorized and approved in all respects, without any requirement of further action by the Debtors' equity holders, holders of partnership interests, general partner, board of directors, or similar body, as applicable.

(c) The Debtors shall be authorized to execute, deliver, file, and record such documents (including, without limitation, the Plan Documents), contracts, instruments, releases and other agreements and take such other action as may be necessary to effectuate and further evidence the terms and conditions of the Plan, without the necessity of any further Bankruptcy Court, corporate, limited partnership, board of directors, member, general partner, or stockholder approval or action. In addition, the selection of the Persons who will serve as the initial managers, officers, and directors of the Reorganized Debtors as of the Effective Date shall be deemed to have occurred and be effective on and after the Effective Date without any requirement of further action by the board of directors or equity holders of the applicable Reorganized Debtors.

### 7.18. *Approval of Plan Documents*.

The solicitation of votes with respect to the Plan shall be deemed a solicitation for the approval of the Plan and all transactions contemplated hereunder (and subject to the terms and conditions set forth herein). Entry of the Confirmation Order shall constitute approval of the Plan Documents and such transactions. On the Effective Date, the Debtors shall be authorized to enter into, file, execute, and/or deliver each of the Plan Documents and any other agreement or instrument issued in connection with any Plan Document without the necessity of any further corporate, board, stockholder, manager, general partner, or similar action.

## ARTICLE VIII.

## CVR DISTRIBUTIONS AND RELATED MATTERS

### 8.1. *CVR Payments.*

Holders of CVRs will be entitled to receive distributions subject to the terms and conditions of the CVR Agreement upon certain Monetization Events or upon the Maturity Date (defined below). A full description of such terms and conditions, including the "waterfall" applicable to all distributions, can be found in the CVR Agreement, attached hereto as Exhibit A.

If and when a payment obligation to the holders of CVRs is triggered pursuant to the CVR Agreement, the Reorganized Debtors shall make payments to the holders of CVRs reasonably promptly following the applicable triggering event for such payment, in accordance with the terms and conditions of the CVR Agreement.

Among other limitations on the circumstances under which a payment would be made to holders of the CVRs, no payment will be made to holders of CVRs if the Adjusted

EBITDA (as defined in the CVR Agreement) of the applicable assets in the CVR Asset Pool does not exceed certain specified hurdles.

The maximum amount of payments made to holders of CVRs will not be permitted to exceed $6.00 per CVR.

### 8.2.    *Maturity Date of CVRs.*

Subject to the conditions and limitations set forth in the CVR Agreement, the holders of CVRs may have the right to receive payments in respect of the CVRs on the fifth anniversary of the Effective Date (the "<u>Maturity Date</u>"), which may be extended to the seventh anniversary of the Effective Date by the board directors of the Reorganized Company, in its sole discretion.  The right to receive payments in respect of CVRs may expire sooner if certain payments have already been made in respect of the CVRs, as set forth in the CVR Agreement.

### 8.3.    *Securities Law Considerations.*

The CVRs are not securities and are non-transferable except for certain limited permitted transfers as set forth in the CVR Agreement.  The CVRs are not subject to registration under the Securities Laws or any other applicable law.

### 8.4.    *Certain Covenants.*

The Reorganized Debtors shall not, and shall not cause or permit their direct or indirect subsidiaries to, amend their constituent documents or enter into or undergo any consolidation, merger, or similar transaction, reorganization, transfer of assets, dissolution, issue or sale of securities, or take any other voluntary action, in each case, for the primary purpose of causing the requirements for payment of the CVRs to not be satisfied.

Without the consent of the Independent Director(s), the Reorganized Debtors shall not, and shall cause their direct or indirect subsidiaries to not, take any action or enter into any agreement that is disproportionately adverse to the economic interests of the holders of the CVRs when compared to the holders of New HIT Common Equity Interest.

The Reorganized Debtors shall not, and shall not cause or permit their direct or indirect subsidiaries to, enter into or engage in certain transactions with an affiliate or a related party.

### 8.5.    *Reporting.*

The Reorganized Debtors shall make information available periodically with respect to the CVR Asset Pool on a confidential website only accessible to holders of CVRs and the Plan Sponsor in accordance with the terms of the CVR Agreement.

**8.6.**     ***Inconsistency Between Plan and CVR Agreement.***

The provisions of this Article VIII are subject to, and qualified in all respects, by the specific terms and conditions set forth in the CVR Agreement.  In the event of an inconsistency between this Plan and the CVR Agreement, the terms and conditions of the CVR Agreement shall govern.

## ARTICLE IX.

## DISTRIBUTIONS

**9.1.**     ***Plan Distributions Generally.***

One or more Disbursing Agents shall make all Plan Distributions under the Plan to the appropriate holders of Claims and Interests in accordance with the terms of the Plan.  For the avoidance of doubt, the Reorganized Debtors may, but are not required to, serve as the Disbursing Agent under the Plan.

**9.2.**     ***Distribution Record Date.***

As of the close of business on the Effective Date, the various lists of holders of Interests in each Class, as maintained by the Debtors or their respective agents, shall be deemed closed, and there shall be no further changes in the record holders of any of the Interests.  The Debtors or the Reorganized Debtors shall have no obligation to recognize any transfer of Interests occurring on or after the Effective Date.  In addition, with respect to payment of any cure amounts owed pursuant to Bankruptcy Code section 365(b) or disputes over any cure amounts, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a cure amount.

**9.3.**     ***Date of Plan Distributions.***

Except as otherwise provided in the Plan, any Plan Distributions and deliveries to be made under the Plan shall be made on the Effective Date or as otherwise determined in accordance with the Plan, or as soon as practicable thereafter; *provided* that the Reorganized Debtors may implement periodic Plan Distribution dates to the extent they determine them to be appropriate.

**9.4.**     ***Disbursing Agent.***

All Plan Distributions shall be made by the Disbursing Agent, on behalf of the applicable Debtor (unless otherwise provided herein), on or after the Effective Date or as otherwise provided herein.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties, and all reasonable and documented fees and expenses incurred by such Disbursing Agent directly related to Plan Distributions hereunder shall be reimbursed by the Reorganized Debtors.  The Reorganized Debtors shall cooperate in good faith with the applicable Disbursing Agent (if other than the Reorganized Debtors) to comply with the

reporting and withholding requirements outlined in the Plan.  For the avoidance of doubt, the Disbursing Agent shall not have any responsibilities with respect to the CVRs.

### 9.5.    *Rights and Powers of Disbursing Agent.*

(a)    From and after the Effective Date, the Disbursing Agent, solely in its capacity as Disbursing Agent, shall be exculpated by all Entities, including, without limitation, holders of Claims against and Interests in the Debtors and other parties in interest, from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or ultra vires acts of such Disbursing Agent.  No holder of a Claim or Interest or other party in interest shall have or pursue any claim or Cause of Action against the Disbursing Agent, solely in its capacity as Disbursing Agent, for making payments in accordance with the Plan or for implementing provisions of the Plan, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or ultra vires acts of such Disbursing Agent.

(b)    The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder, (ii) make all Plan Distributions contemplated hereby, and (iii) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

### 9.6.    *Expenses of Disbursing Agent.*

Except as otherwise ordered by the Bankruptcy Court, any reasonable and documented fees and expenses incurred by the Disbursing Agent acting in such capacity (including reasonable documented attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash by the Reorganized Debtors in the ordinary course of business.

### 9.7.    *Delivery of Plan Distributions.*

All Plan Distributions to any holder of an Allowed Claim as and when required by the Plan shall be made by the Disbursing Agent.  In the event that any Plan Distribution to any holder is returned as undeliverable, no further Plan Distributions shall be made to such holder unless and until the Disbursing Agent is notified in writing of such holder's then-current address, at which time all currently due, missed Plan Distributions shall be made to such holder as soon as reasonably practicable thereafter without interest.  Nothing herein shall require the Disbursing Agent to attempt to locate holders of undeliverable Plan Distributions and, if located, assist such holders in complying with this Section 9.7.

### 9.8.    *Proofs of Claim; Disputed Claims Process.*

Notwithstanding section 502(a) of the Bankruptcy Code, and in light of the Unimpaired status of Classes 1, 2, 3, 4, and 7 under the Plan, except as provided in Section 10.3

with respect to rejection damage Claims, holders of Claims or Interests need not file Proofs of Claim, and the Reorganized Debtors and the holders of Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims in the ordinary course of business as if the Chapter 11 Cases had not been commenced except that (unless expressly waived pursuant to the Plan) the Allowed amount of such Claims shall be subject to the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 and 503 of the Bankruptcy Code, to the extent applicable.

Upon the Effective Date, all Proofs of Claim filed against the Debtors, regardless of the time of filing, and including Claims filed after the Effective Date, shall be deemed withdrawn, other than as provided below, and such creditor that files a Proof of Claim with the Bankruptcy Court retains any right it may have to pursue remedies in a forum other than the Bankruptcy Court in accordance with applicable.  Notwithstanding anything in this Section 9.8, (a) all Claims against the Debtors that result from the Debtors' rejection of an Executory Contract or Unexpired Lease, (b) disputes regarding the amount of any cure pursuant to section 365 of the Bankruptcy Code, and (c) Claims that the Debtors seek to have determined by the Bankruptcy Court, shall in all cases be determined by the Bankruptcy Court.  From and after the Effective Date, the Reorganized Debtors may satisfy, dispute, settle, or otherwise compromise any Claim without approval of the Bankruptcy Court in the ordinary course of business.

### 9.9.    *Postpetition Interest.*

Except as otherwise specifically provided for in the Plan, the Confirmation Order, or another order of the Bankruptcy Court or required by the Bankruptcy Code, or as otherwise agreed by the Reorganized Debtors, interest shall not accrue or be paid on any Claims on or after the Petition Date.

### 9.10.    *Unclaimed Property.*

Undeliverable Plan Distributions or unclaimed Plan Distributions shall remain in the possession of the Reorganized Debtors until such time as a Plan Distribution becomes deliverable or the holder accepts Plan Distribution, or such Plan Distribution reverts back to the Reorganized Debtors, and shall not be supplemented with any interest, dividends, or other accruals of any kind.  Such Plan Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one hundred and eighty (180) days from the date of the attempted Plan Distribution.  After such date, all unclaimed property or interest in property shall revert to the Reorganized Debtors, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred.  The Reorganized Debtors and the Disbursing Agent shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records and filings with the Bankruptcy Court.

### 9.11.    *Time Bar to Cash Payments.*

Checks issued by the Disbursing Agent in respect of Allowed Claims shall be null and void if not negotiated within one hundred and eighty (180) days after the date of issuance thereof.  Thereafter, the amount represented by such voided check shall irrevocably revert to the Reorganized Debtors, and any Claim in respect of such voided check shall be discharged and

forever barred, notwithstanding any federal or state escheat laws to the contrary. Requests for re-issuance of any check shall be made to the Disbursing Agent by the holder of the Allowed Claim to whom such check was originally issued.

### 9.12.    *Manner of Payment under Plan.*

Except as otherwise specifically provided in the Plan, at the option of the Debtors or the Reorganized Debtors, as applicable, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

### 9.13.    *Satisfaction of Claims.*

Except as otherwise specifically provided in the Plan, any Plan Distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

### 9.14.    *Setoffs.*

Except as otherwise expressly provided for herein, each Reorganized Debtor, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided, however*, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor of any such Claims, rights, and Causes of Action that such Reorganized Debtor may possess against such holder. In no event shall any holder of Claims be entitled to set off any such Claim against any Claim, right, or Cause of Action of the Debtor or Reorganized Debtor (as applicable), unless such holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

### 9.15.    *Withholding and Reporting Requirements.*

(a)    <u>Withholding Rights</u>. In connection with the Plan, any party issuing any instrument or making any Plan Distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all Plan Distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements. In the case of a non-Cash Plan Distribution that is subject to withholding, the distributing party may withhold an appropriate portion of such distributed property and either (i) sell such withheld property to generate Cash necessary to pay the withholding tax (or reimburse the distributing party for any advanced payment of the withholding tax), or (ii) pay the withholding tax using its own funds and retain such withheld

property.  Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan.  Notwithstanding the foregoing, each Entity that receives a Plan Distribution pursuant to the Plan shall have responsibility for any taxes imposed by any Governmental Unit, including, without limitation, income, withholding, and other taxes, on account of such Plan Distribution.  Any party issuing any instrument or making any Plan Distribution pursuant to the Plan has the right, but not the obligation, to not make a Plan Distribution until such holder has made arrangements reasonably satisfactory to such issuing or disbursing party for payment of any such tax obligations.

(b)    Forms.  Any party entitled to receive any property as an issuance or Plan Distribution under the Plan shall, upon request, deliver to the Disbursing Agent or such other Person designated by the Reorganized Debtors (which Person shall subsequently deliver to the Disbursing Agent any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a foreign Person) Form W-8 and any other forms or documents reasonably requested by any Reorganized Debtor to reduce or eliminate any withholding required by any federal, state, or local taxing authority.

## ARTICLE X.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 10.1.    *General Treatment; Assumption and Rejection of Executory Contracts or Unexpired Leases.*

(a)    As of and subject to the occurrence of the Effective Date and the payment of any applicable cure amounts owed pursuant to Bankruptcy Code section 365(b), all Executory Contracts and Unexpired Leases to which any of the Debtors are parties, and which have not expired or terminated by their own terms on or prior to the Effective Date, including—subject to Section 7.13—Employee Arrangements, shall be deemed assumed by the Debtors, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease: (1) was previously assumed or rejected previously by the Debtors; (2) was previously expired or terminated pursuant to its own terms, (3) is the subject of a motion to reject filed on or before the Effective Date, or (4) is identified on the Schedule of Rejected Contracts and Leases.

(b)    Subject to the occurrence of the Effective Date, entry of the Confirmation Order shall constitute approval of the assumptions or assumptions and assignments provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a determination by the Bankruptcy Court that the Reorganized Debtors have provided adequate assurance of future performance under each assumed Executory Contract and Unexpired Lease.  Each Executory Contract and Unexpired Lease assumed or assumed and assigned pursuant to the Plan shall vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law; *provided* that the assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to affiliates.

(c)    Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests.  To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including any "change of control," "ipso facto," bankruptcy default or similar provisions), then such provision shall be unenforceable or deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate or modify such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

### 10.2.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.

The Reorganized Debtors shall satisfy any monetary defaults under any Executory Contract or Unexpired Lease to be assumed hereunder, to the extent required by section 365(b)(1) of the Bankruptcy Code, upon assumption thereof in the ordinary course of business.  If a counterparty to any Executory Contract or Unexpired Lease believes any amounts are due as a result of such Debtor's monetary default thereunder, it shall assert a Cure Claim against the Debtors or Reorganized Debtors, as applicable, in the ordinary course of business, subject to all defenses the Debtors or Reorganized Debtors may have with respect to such Cure Claim.  Any Cure Claim shall be deemed fully satisfied, released and discharged upon payment by the Reorganized Debtors of the applicable Cure Claim; provided, that nothing herein shall prevent the Reorganized Debtors from paying any Cure Claim despite the failure of the relevant counterparty to assert or file such request for payment of such Cure Claim.  The Debtors, with the consent of the Plan Sponsor, or the Reorganized Debtors, as applicable, may settle any Cure Claims without any further notice to or action, order or approval of the Bankruptcy Court.

Any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan, including an objection regarding the ability of the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), must be filed with the Bankruptcy Court on or before the deadline set by the Bankruptcy Court for objecting to confirmation of the Plan, or such other deadline as may have been established by order of the Bankruptcy Court.  To the extent any such objection is not determined by the Bankruptcy Court at the Combined Hearing, such objection may be heard and determined at a subsequent hearing.  Any counterparty to an Executory Contract or Unexpired Lease that does not timely object to the proposed assumption of any Executory Contract or Unexpired Lease by the deadline established by the Bankruptcy Court will be deemed to have consented to such assumption.

In the event of a dispute regarding (a) the amount of any Cure Claim, (b) the ability of the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or (c) any other matter pertaining to assumption or the payment of Cure Claims required by section 365(b)(1) of the Bankruptcy Code, payment of a Cure Claim, if any, shall occur as soon as reasonably practicable after entry of a Final Order or Final Orders resolving such dispute and approving such assumption. The Debtors (with the consent of the Plan Sponsor), or Reorganized Debtors, as applicable, reserve the right at any time to move to reject any Executory Contract or Unexpired Lease prior to the Effective Date based upon the existence of any unresolved dispute or upon a resolution of such dispute that is unfavorable to the Debtors or Reorganized Debtors.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, and full payment of any applicable Cure Claims pursuant to the Plan, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or non-monetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the date that the Reorganized Debtors assume such Executory Contract or Unexpired Lease.

### 10.3.    *Rejection of Executory Contracts or Unexpired Leases.*

Unless otherwise provided in the Plan or the Plan Supplement, each Executory Contract and Unexpired Lease, if any, set forth on the Schedule of Rejected Contracts and Leases (which, if any, shall be included in the Plan Supplement) shall be deemed rejected, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under sections 365 and 1123 of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, or supplement the Schedule of Rejected Contracts and Leases at any time through and including the Effective Date.

Proofs of claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court within 30 days after the Effective Date. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed within such time shall not be entitled to a distribution in these Chapter 11 Cases absent further Bankruptcy Court order. Claims arising from the rejection of the Executory Contracts or Unexpired Leases to which any Debtor is a party shall be classified as general unsecured claims, subject to any applicable limitation or defense under the Bankruptcy Code and applicable law.

### 10.4.    *Survival of the Debtors' Indemnification Obligations and Guarantees.*

(a)    Any obligations of the Debtors pursuant to their corporate charters, bylaws, Limited Partnership Agreement, or other organizational documents to indemnify current and former officers, directors, agents, and/or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such directors, officers, agents, and/or employees, based upon any act or omission for or on behalf of the Debtors, shall not be discharged or impaired by confirmation of the Plan. Any Claim based on such obligations shall not be a Disputed Claim,

Disallowed Claim, or subject to any objection in either case by reason of section 502(e)(1)(B) of the Bankruptcy Code. None of the Reorganized Debtors shall amend and/or restate their respective governance documents before or after the Effective Date to terminate or adversely affect any obligations to provide such indemnification rights or such directors', officers', employees', or agents' indemnification rights.

(b)    In addition, after the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under the D&O Liability Insurance Policies in effect or purchased as of the Petition Date, and all members, managers, directors, and officers who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date, in each case, to the extent set forth in such policies.

(c)    On the Effective Date, all guarantees, indemnities, or other credit support provided by a Debtor in support of the primary obligations of another Debtor or any Non-Debtor Subsidiary shall be Unimpaired by the Plan and reinstated to their position immediately prior to the Petition Date.

### 10.5.    *Severance Contracts and Programs.*

Except as otherwise expressly provided in the Plan, a prior order of the Bankruptcy Court or to the extent subject to a motion pending before the Bankruptcy Court as of the Effective Date, all severance benefit plans and policies for former employees (including any severance contracts between one or more of the Debtors and a former employee that were in effect as of or after the Petition Date), to the extent contemplated by the DIP Budget (as defined in the Interim DIP Order and Final DIP Order), are treated as Executory Contracts under the Plan and on the Effective Date shall be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code.

### 10.6.    *Insurance Policies.*

All insurance policies (including all directors' and officers' insurance policies and tail or run-off coverage liability insurance) pursuant to which any Debtor has any rights or obligations in effect as of the date of the Confirmation Order shall be deemed and treated as Executory Contracts pursuant to the Plan and shall be assumed by the respective Debtors and the Reorganized Debtors and shall continue in full force and effect thereafter in accordance with their respective terms. All other insurance policies shall vest in the Reorganized Debtors.

### 10.7.    *Intellectual Property Licenses and Agreements.*

All intellectual property contracts, licenses, royalties, or other similar agreements to which the Debtors have any rights or obligations in effect as of the date of the Confirmation Order shall be deemed and treated as Executory Contracts pursuant to the Plan and shall be assumed by the respective Debtors and shall continue in full force and effect unless any such intellectual property contract, license, royalty, or other similar agreement otherwise is specifically rejected pursuant to a separate order of the Bankruptcy Court or is the subject of a separate rejection motion filed by the Debtors. Unless otherwise noted hereunder, all other intellectual

property contracts, licenses, royalties, or other similar agreements shall vest in the Reorganized Debtors and the Reorganized Debtors may take all actions as may be necessary or appropriate to ensure such vesting as contemplated herein.

### 10.8.    Modifications, Amendments, Supplements, Restatements, or Other Agreements.

Unless otherwise provided herein or by separate order of the Bankruptcy Court, each Executory Contract and Unexpired Lease that is assumed shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such Executory Contract or Unexpired Lease, without regard to whether such agreement, instrument, or other document is listed in any notice of assumed contracts.

### 10.9.    Reservation of Rights.

(a)    Neither the exclusion nor inclusion of any contract or lease by the Debtors on any exhibit, schedule, or other annex to this Plan or in the Plan Supplement, nor anything contained in the Plan, will constitute an admission by the Debtors that any such contract or lease is or is not in fact an Executory Contract or Unexpired Lease or that the Debtors or the Reorganized Debtors or their respective affiliates have any liability thereunder.

(b)    Except as otherwise provided in this Plan, nothing in this Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors and the Reorganized Debtors under any executory or non-Executory Contract or any unexpired or expired lease.

(c)    Nothing in this Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors under any executory or non-Executory Contract or any unexpired or expired lease.

(d)    If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection under this Plan, the Debtors or the Reorganized Debtors, as applicable, shall have 60 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease by filing a notice indicating such altered treatment.

## ARTICLE XI.

## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

### 11.1.    Conditions Precedent to Effective Date.

The following are conditions precedent to the Effective Date of the Plan:

(a)    the Confirmation Order, in form and substance reasonably acceptable to the Debtors and the Plan Sponsor, having become a Final Order and remaining in full force and effect;

(b)      all actions, agreements and documents, including the Plan Documents and the Plan Supplement, in form and substance consistent with, and in form and substance as required by the approvals and consents set forth in, the RSA, being filed with the Bankruptcy Court, executed and delivered, and any conditions (other than the occurrence of the Effective Date or certification by the Debtors that the Effective Date has occurred) contained therein having been satisfied or waived in accordance therewith;

(c)      a chapter 11 trustee, a responsible officer, or an examiner with enlarged powers relating to the operation of the businesses of the Debtors (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) not having been appointed in any of the Chapter 11 Cases;

(d)      the Amended Constituent Documents, in form and substance attached as Exhibits to the Plan Supplement, shall have been filed with the applicable authorities of the relevant jurisdictions of incorporation or formation and shall have become effective in accordance with such jurisdictions' corporation or limited partnership laws;

(e)      the issuance of the New HIT Common Equity Interests, the New HITOP Interests, and the CVRs, and the consummation of the Exit Facility;

(f)      the RSA remaining in full force and effect and not having been terminated;

(g)      the payment of Restructuring Expenses incurred during the period prior to the Effective Date to the extent invoiced to the Debtors, except as otherwise provided in Section 3.3 hereof with respect to Professional Fee Claims;

(h)      all actions, documents, certificates, and agreements necessary to implement this Plan having been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable laws obtaining;

(i)      all governmental and third-party approvals and consents, including Bankruptcy Court approval, as necessary in connection with the transactions provided for in this Plan, these approvals not being subject to unfulfilled conditions, being in full force and effect, and all applicable waiting periods having expired without any action having been taken by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions; and,

(j)      the payment and satisfaction in full of all statutory fees and obligations then due and payable to the office of the U.S. Trustee.

### 11.2.    *Waiver of Conditions Precedent.*

(a)      Except as otherwise provided herein, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.  Each of the conditions precedent in Section 11.1 of the Plan may be waived in writing by the Debtors with the prior written consent of the Plan Sponsor without leave of or order of the Bankruptcy Court.

(b)    The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

### 11.3.    *Effect of Failure of a Condition.*

If the conditions listed in Section 11.1 of the Plan are not satisfied or waived in accordance with Section 11.2 of the Plan on or before the first Business Day that is more than 90 days after the date on which the Confirmation Order is entered or by such later date as set forth by the Debtors in a notice filed with the Bankruptcy Court prior to the expiration of such period, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (a) constitute a waiver or release of any Claims against or any Interests in the Debtors or claims by the Debtors, (b) prejudice in any manner the rights of any Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtors or the Plan Sponsor, or any other Entity.

## ARTICLE XII.

## EFFECT OF CONFIRMATION OF PLAN

### 12.1.    *Vesting of Assets.*

Except as otherwise provided herein, or in any agreement, instrument, or other document incorporated in the Plan (including the Restructuring Transactions), on the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all assets and property of the Estates shall vest in the Reorganized Debtors, free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as provided pursuant to the Plan, the Confirmation Order, or the Exit Facility.  On and after the Effective Date, the Reorganized Debtors may take any action, including, without limitation, the operation of their businesses; the use, acquisition, sale, lease and disposition of property; and the entry into transactions, agreements, understandings, or arrangements, whether in or other than in the ordinary course of business, and execute, deliver, implement, and fully perform any and all obligations, instruments, documents, and papers or otherwise in connection with any of the foregoing, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code, except as expressly provided herein.  Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for professional fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

### 12.2.    *Binding Effect.*

As of the Effective Date, the Plan shall bind all holders of Claims against and Interests in the Debtors and their respective successors and assigns, notwithstanding whether any such holders were (a) Impaired or Unimpaired under the Plan, (b) deemed to accept or reject the Plan, (c) failed to vote to accept or reject the Plan, or (d) voted to reject the Plan.

### 12.3.    *Deemed Consent to Change of Control of Debtors.*

As of the Effective Date, any counterparty to a contract with the Debtors or the Non-Debtor Subsidiaries shall be deemed to have consented to the change of control of the Debtors occurring pursuant to this Plan, and is forever barred and enjoined from declaring a breach, default, or otherwise proceeding against the Debtors or Non-Debtor Subsidiaries with respect to any such counterparty contract provisions otherwise triggered by a change of control of the Debtors; *provided* that such counterparty received actual notice of this Plan and the Disclosure Statement.

### 12.4.    *Discharge of Claims and Termination of Interests.*

Upon the Effective Date and in consideration of the Plan Distributions to be made under the Plan, except as otherwise expressly provided herein, each holder (as well as any representatives, trustees, or agents on behalf of each holder) of a Claim or Interest shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights, and liabilities that arose prior to the Effective Date.  Upon the Effective Date, all such Entities shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in the Debtors against the Debtors, the Reorganized Debtors, or any of their assets or property, whether or not such holder has filed a Proof of Claim and whether or not the facts or legal bases therefor were known or existed prior to the Effective Date; *provided*, *however*, that nothing contained in this Section 12.4 or otherwise shall affect the rights of holders of Claims or Interests to enforce any rights contained in the Plan.

### 12.5.    *Term of Injunctions or Stays.*

Unless otherwise provided herein, the Confirmation Order, or in a Final Order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

### 12.6.    *Injunction.*

(a)    **Except as otherwise specifically provided in the Plan or the Confirmation Order, as of the Confirmation Date, but subject to the occurrence of the Effective Date, all Persons or Entities, and all other parties in interest, along with their present or former employees, agents, officers, directors, principals, representatives, and affiliates are, with respect to any Claims or Interests being released, exculpated, or discharged pursuant to this Plan, permanently enjoined after the Confirmation Date from: (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting the Debtors, their Estates or any of their property, wherever located, or any direct or indirect transferee of any property, wherever located, of, or direct or indirect successor in interest to, any of the foregoing Persons or any property, wherever located, of any such transferee or successor; (ii) enforcing, levying,**

attaching (including any pre-judgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtors, or their Estates or any of their property, wherever located, or any direct or indirect transferee of any property, wherever located, of, or direct or indirect successor in interest to, any of the foregoing Persons, or any property, wherever located, of any such transferee or successor; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors or their Estates or any of their property, wherever located, or any direct or indirect transferee of any property, of, or successor in interest to, any of the foregoing Persons; or (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan to the full extent permitted by applicable law (including, without limitation, commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan) to the fullest extent permitted by applicable law.  Such injunction shall extend to any successors or assignees of the Debtors and their properties and interest in properties; *provided, however*, that nothing contained herein shall preclude such Persons from exercising their rights, or obtaining benefits, pursuant to and consistent with the terms of the Plan.

(b)    **By accepting Plan Distributions, each holder of an Allowed Claim or Interest will be deemed to have specifically consented to the injunctions set forth in this Section 12.6.**

12.7.    *Releases.*

(a)    **Releases by Debtors.**

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or the Confirmation Order, on and after the Effective Date, for good and valuable consideration, including their cooperation and contributions to the Chapter 11 Cases, the Released Parties shall be deemed released and discharged by the Debtors and their Estates from any and all Claims, obligations, debts, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, asserted or unasserted, existing, or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of federal or state laws, or otherwise, including Avoidance Actions, those Causes of Action based on veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability, or otherwise that the Debtors, their Estates or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity or that any holder of a Claim or Interest or other Entity would have been legally entitled to assert derivatively for or on behalf of the Debtors, or their Estates, based on, relating to or in any manner arising from, in whole or in part, the Debtors, their Estates, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtors and any Released Party, excluding any assumed Executory Contract or Unexpired Lease, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Disclosure Statement, the Restructuring**

Support Agreement, the Plan Supplement, the Exit Facility Agreement, the DIP Credit Agreement and other DIP Loan Documents, the Chapter 11 Cases, or, in each case, related agreements, instruments, or other documents, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that is determined in a Final Order to have constituted willful misconduct (including, without limitation, actual fraud) or gross negligence; *provided*, that if any Released Party directly or indirectly brings or asserts any Claim or Cause of Action that has been released or is contemplated to be released pursuant to the Plan in any way arising out of or related to any document or transaction that was in existence prior to the Effective Date against any other Released Party, and such Released Party does not abandon such Claim or Cause of Action upon request, then the release set forth in the Plan shall automatically and retroactively be null and void *ab initio* with respect to the Released Party bringing or asserting such Claim or Cause of Action against the Releasing Party unless the Releasing Party obtains a contrary order of the Bankruptcy Court on notice; *provided, further* that the immediately preceding proviso shall not apply to (i) any action by a Released Party in the Bankruptcy Court (or any other court determined to have competent jurisdiction), including any appeal therefrom, to prosecute the amount, priority, or secured status of any prepetition or ordinary course administrative Claim against the Debtors or (ii) any release or indemnification provided for in any settlement or granted under any other court order; *provided* that, in the case of (i) and (ii), the Debtors shall retain all defenses related to any such action.  Notwithstanding anything contained herein to the contrary, the foregoing release shall not release any obligation of any party under the Plan or any document, instrument, or agreement executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute its finding that each release described in the Plan is:  (i) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Claims; (ii) in the best interests of the Debtors and all holders of Interests and Claims; (iii) fair, equitable and reasonable; (iv) given and made after due notice and opportunity for hearing; and (v) a bar to the Debtors asserting any claim, Cause of Action or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

(b)    **Releases by Releasing Parties.**

Except as otherwise specifically provided in the Plan or the Confirmation Order, on and after the Effective Date, for good and valuable consideration, including the obligations of the Debtors under the Plan, the Plan Consideration and other contracts, instruments, releases, agreements, or documents executed and delivered in connection with this Plan, each Releasing Party shall be deemed to have consented to the Plan and the restructuring embodied herein for all purposes, and shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from any and all Claims, Interests, obligations, debts, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or

unforeseen, asserted or unasserted, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of federal or state laws, or otherwise, including Avoidance Actions, those Causes of Action based on veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability, or otherwise that such Releasing Party would have been legally entitled to assert (whether individually or collectively), based on, relating to or in any manner arising from, in whole or in part, the Debtors, the Estates, the liquidation, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtors and any Releasing Party, excluding any assumed Executory Contract or Unexpired Lease, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Disclosure Statement, the Restructuring Support Agreement, the Plan Supplement, the DIP Credit Agreement and other DIP Loan Documents, the Exit Facility Agreement, the Existing Preferred Equity Interests, the Existing HIT Common Equity Interests, the New HIT Common Equity Interests, the New HITOP Interests, the Amended Constituent Documents, or, in each case, related agreements, instruments, or other documents, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that is determined in a Final Order to have constituted willful misconduct (including, without limitation, actual fraud) or gross negligence; *provided* that any holder of a Claim or Interest that objects to the releases contained in the Plan shall not receive the benefit of the releases set forth in the Plan (even if for any reason otherwise entitled). Notwithstanding anything contained herein to the contrary, the foregoing release shall not release any obligation of any party (i) under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) under any Executory Contract or Unexpired Lease assumed under the Plan, or (iii) under any contract or lease between a Non-Debtor Subsidiary and a Releasing Party.

Notwithstanding anything to the contrary in the Plan, Plan Supplement, or Confirmation Order, until a Claim arising prior to the Effective Date in Plan Classes 1, 2, and 3 (including cure claims related to the assumption of executory contracts and unexpired releases, and claims for damages related to the rejection of the same), or which is an Administrative Claim or Priority Tax Claim (collectively, the "Unimpaired Claims") has been (x) paid in full in accordance with applicable law, or on terms agreed to between the holder of such Claim and the Debtors or Reorganized Debtors, or in accordance with the terms and conditions of the particular transaction giving rise to such Claim, or (y) otherwise satisfied or disposed of as determined by a court of competent jurisdiction, (a) the provisions of section 12.4 (Discharge of Claims and Termination of Interests), this section 12.7(b) (Releases by Releasing Parties) and section 12.6 (Injunction) of the Plan shall not apply or take effect with respect to such Claim, (b) such Claim shall not be deemed settled, satisfied, resolved, released, discharged, barred, or enjoined, (c) the property of each of the Debtors' Estates that vests in the applicable Reorganized Debtor pursuant to the Plan shall not be free and clear of such Claims, and (d) any Liens of holders of Unimpaired Claims shall not be deemed released. Holders of Unimpaired Claims shall not be required to file a Proof of Claim with the Bankruptcy Court, except for claims for damages related to the rejection of executory contracts and unexpired releases ("Rejection Damages Claims"). Holders of

Unimpaired Claims other than those holding Rejection Damages Claims shall not be subject to any claims resolution process in Bankruptcy Court in connection with their Claims, and shall retain all their rights under applicable non-bankruptcy law to pursue their Claims against the Debtors or Reorganized Debtors or other Entity in any forum with jurisdiction over the parties. The Debtors and Reorganized Debtors shall retain all defenses, counterclaims, rights to setoff, and rights to recoupment as to Unimpaired Claims. If the Debtors or the Reorganized Debtors dispute any Unimpaired Claim, such dispute shall be determined, resolved or adjudicated in the manner as if the Chapter 11 Cases had not been commenced, except with respect to Rejection Damages Claims, which shall be determined, resolved, or adjudicated as set forth in Article X of the Plan.  Notwithstanding the foregoing, any holder of a Claim that is not a Rejection Damages Claim who files a Proof of Claim shall be subject to the Article X of the Plan unless and until such holder withdraws such Proof of Claim.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute its finding that each release described in the Plan is:  (i) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Claims; (ii) in the best interests of the Debtors and all holders of Interests and Claims; (iii) fair, equitable, and reasonable; and (iv) given and made after due notice and opportunity for hearing.

(c)      Exculpation.

On the Effective Date, except as otherwise provided in the Plan or the Confirmation Order, for good and valuable consideration, to the maximum extent permissible under applicable law, none of the Exculpated Parties shall have or incur any liability to any holder of any Claim or Interest or any other Person for any act or omission in connection with, or arising out of the Debtors' restructuring, including the negotiation, implementation and execution of the Plan, this Disclosure Statement, the Restructuring Support Agreement, the Plan Supplement, the Chapter 11 Cases, the solicitation of votes for and the pursuit of confirmation of this Plan, the consummation of this Plan, the administration of this Plan, or the property to be distributed under this Plan, including all documents ancillary thereto, all decisions, actions, inactions, and alleged negligence or misconduct relating thereto and all activities leading to the promulgation and confirmation of this Plan except for gross negligence or willful misconduct, each as determined by a Final Order of the Bankruptcy Court.  For purposes of the foregoing, it is expressly understood that any act or omission effected with the approval of the Bankruptcy Court conclusively will be deemed not to constitute gross negligence or willful misconduct unless the approval of the Bankruptcy Court was obtained by fraud or misrepresentation, and in all respects, the applicable Persons shall be entitled to rely on the advice of counsel with respect to their duties and responsibilities under, or in connection with, the Chapter 11 Cases, the Plan, and administration thereof.  The Exculpated Parties have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the distributions of the securities pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable

**at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

(d) **Retention of Causes of Action/Reservation of Rights.**

**Except as expressly provided in the Plan or in the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights or Causes of Action that the Debtors or the Estates may have, or that the Debtors may choose to assert on behalf of their Estates, under any provision of the Bankruptcy Code or any applicable non-bankruptcy law, including, without limitation, (i) any and all Causes of Action or claims against any Person or Entity, to the extent such Person or Entity asserts a crossclaim, counterclaim, and/or claim for setoff that seeks affirmative relief against the Debtors, their officers, directors or representatives or (ii) the turnover of any property of the Estates to the Debtors.**

**Except as expressly provided in the Plan or in the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights or Causes of Action that the Debtors had immediately prior to the Petition Date or the Effective Date against or regarding any Claim left Unimpaired by the Plan. The Debtors shall have, retain, reserve and be entitled to commence, assert and pursue all such rights and Causes of Action as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights respecting any Claim left Unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced.**

**Except as expressly provided in the Plan or in the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to release any post-Effective Date obligations of any party under the Plan, or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

(e) Solicitation of Plan.

As of and subject to the occurrence of the Confirmation Date: (a) the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including, without limitation, sections 1125(a), (e), and (g) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation, and (b) the Debtors and their respective directors, officers, employees, affiliates, agents, financial advisors, investment bankers, professionals, accountants, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan, and therefore are not, and on account of such offer, issuance, and solicitation will not be, liable at any time for any violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

Notwithstanding anything herein to the contrary, as of the Effective Date, pursuant to section 1125(e) and (g) of the Bankruptcy Code, the Plan Sponsor, DIP Lender, and DIP Agent and each of their respective affiliates, agents, representatives, members, principals, equity holders (regardless of whether such interests are held directly or indirectly), officers, directors, managers, employees, advisors and attorneys shall be deemed to have solicited acceptance of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code and applicable non-bankruptcy law, and to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code and applicable non-bankruptcy law, in the offer, issuance, sale, or purchase of a security offered or sold under the Plan of a Reorganized Debtor, and shall not be liable to any Person on account of such solicitation or participation.

(f)     Reimbursement or Contribution.

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (a) such Claim has been adjudicated as noncontingent or (b) the relevant holder of a Claim has filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

(g)     Recoupment.

In no event shall any holder of a Claim be entitled to recoup such Claim against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

(h)     Subordination Rights.

Any Plan Distributions to holders of Claims or Interests shall be received and retained free from any obligations to hold or transfer the same to any other holder and shall not be subject to levy, garnishment, attachment, or other legal process by any holder by reason of claimed contractual subordination rights.  On the Effective Date, any such subordination rights shall be deemed waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property distributed under the Plan, in each case other than as provided in the Plan; *provided* that any such subordination rights shall be preserved in the event the Confirmation Order is vacated, the Effective Date does not occur in accordance with the terms hereunder or the Plan is revoked or withdrawn.

## 12.8.     **Ipso Facto and Similar Provisions Ineffective.**

Any term of any policy, contract or other obligation applicable to a Debtor shall be void and of no further force or effect with respect to any Debtor to the extent such policy, contract, or other obligation is conditioned on, creates an obligation of any Debtor as a result of, or gives rise to a right of any Person based on any of the following: (a) the insolvency or financial condition of

a Debtor; (b) the commencement of the Chapter 11 Cases; (c) the confirmation or consummation of this Plan, including any change of control that shall occur as a result of such consummation; or (d) the Restructuring Transactions.

### 12.9.    No Successor Liability.

The Plan Sponsor (a) is not, and shall not be deemed to assume, agree to perform, pay or otherwise have any responsibilities for any liabilities or obligations of the Debtors or any other Person relating to or arising out of the operations or the assets of the Debtors on or prior to the Effective Date, (b) is not, and shall not be, a successor to the Debtors by reason of any theory of law or equity or responsible for the knowledge or conduct of any Debtor prior to the Effective Date and (c) shall not have any successor or transferee liability of any kind or character.

### ARTICLE XIII.

### RETENTION OF JURISDICTION

### 13.1.    *Retention of Jurisdiction*

(a)    Pursuant to sections 105 and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction, to the fullest extent permissible under law, over all matters arising in, arising under, or related to the Chapter 11 Cases for, among other things, the following purposes:

(i)    To hear and determine all matters relating to the assumption or rejection of Executory Contracts or Unexpired Leases, including whether a contract or lease is or was executory or expired;

(ii)    To hear and determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

(iii)    To hear and resolve any disputes arising from or relating to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004, or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

(iv)    To ensure that Plan Distributions are accomplished as provided herein;

(v)    To consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, including any Administrative Expense Claim;

(vi)    To enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

(vii)   To issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of this Plan, the Confirmation Order, or any other order of the Bankruptcy Court (including, without limitation, with respect to releases, exculpations and indemnifications);

(viii)  To hear and determine any application to modify this Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in this Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(ix)    To hear and determine all matters relating to the allowance, disallowance, liquidation, classification, priority, or estimation of any Claim;

(x)     To resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

(xi)    To hear and determine disputes arising in connection with or related to the interpretation, implementation, or enforcement of this Plan, the Confirmation Order, the Disclosure Statement, any transactions or payments contemplated hereby, or any agreement, instrument, or other document governing or relating to any of the foregoing (including without limitation the Plan Supplement and the Plan Documents); *provided* that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection or dispute resolution clause that refers disputes to a different court and any disputes concerning documents contained in the Plan Supplement shall be governed in accordance with the provisions of such documents;

(xii)   To take any action and issue such orders, including any such action or orders as may be necessary after occurrence of the Effective Date and/or consummation of the Plan, as may be necessary to construe, enforce, implement, execute, and consummate this Plan, including any release or injunction provisions set forth herein, or to maintain the integrity of this Plan following consummation;

(xiii)  To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(xiv)    To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(xv)    To hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(xvi)    To resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases, the Combined Hearing, the deadline by which to file Administrative Expense Claims, or the deadline for responding or objecting to a cure amount owed pursuant to Bankruptcy Code section 365(b), for the purpose of determining whether a Claim or Interest is discharged hereunder, or for any other purpose;

(xvii)    To recover all assets of the Debtors and property of the Estates, wherever located;

(xviii)    To hear and determine any rights, claims or Causes of Action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal or state statute or legal theory; and

(xix)    To enter a final decree closing the Chapter 11 Cases.

(b)    If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, the provisions of Section 13.1 of the Plan shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

**13.2.**    *Courts of Competent Jurisdiction*

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## ARTICLE XIV.

## MISCELLANEOUS PROVISIONS

**14.1.**    *Payment of Statutory Fees.*

On the Effective Date and thereafter as may be required, the Reorganized Debtors shall pay all fees incurred pursuant to section 1930 of chapter 123 of title 28 of the United States Code, together with interest, if any, pursuant to § 3717 of title 31 of the United States Code for

each Debtor's case, or until such time as a final decree is entered closing a particular Debtor's case, a Final Order converting such Debtor's case to a case under chapter 7 of the Bankruptcy Code is entered, or a Final Order dismissing such Debtor's case is entered.

### 14.2.    *Substantial Consummation of the Plan.*

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 14.3.    *Expedited Determination of Taxes.*

The Reorganized Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods of the Debtors through the Effective Date.

### 14.4.    *Exemption from Certain Transfer Taxes.*

Pursuant to, and to the fullest extent permitted by, section 1146 of the Bankruptcy Code, any transfers of property pursuant to, in contemplation of, or in connection with, the Plan, including, without limitation, the Confirmation Order, including (a) the Restructuring Transactions, (b) the issuance of the Plan Consideration, (c) the issuance, transfer or exchange of any securities or instruments, (d) the creation, filing or recording of any Lien, mortgage, deed of trust, or other security interest, (e) the making, assignment, filing or recording of any lease or sublease or the making or delivery of any deed, bill of sale, or other instrument of transfer under, pursuant to, in furtherance of, or in connection with the Plan, including, without limitation, any deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated under the Plan or the reinvesting, transfer, or sale of any real or personal property of the Debtors pursuant to, in implementation of or as contemplated in the Plan (whether to one or more of the Reorganized Debtors or otherwise), (f) the grant of Collateral under the Exit Facility, and (g) the issuance, renewal, modification, or securing of indebtedness shall constitute a "transfer under a plan" within the purview of section 1146 of the Bankruptcy Code and shall not be subject to or taxed under any law imposing any document recording tax, stamp tax, conveyance fee, or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing, or recording fee, regulatory filing or recording fee, sales tax, use tax, or other similar tax or governmental assessment.  Upon entry of the Confirmation Order, the appropriate state or local government officials or agents shall forgo the collection of any such tax or governmental assessment, and consistent with the foregoing, each recorder of deeds or similar official for any county, city, or Governmental Unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.

### 14.5.    *Amendments.*

(a)    <u>Plan Modifications</u>.  (i) The Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, and upon the written consent of the Plan Sponsor, to amend, modify, or supplement the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code and (ii) after entry

of the Confirmation Order, the Debtors may, upon order of the Bankruptcy Court, amend, modify, or supplement the Plan in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, in each case without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as the Bankruptcy Code may otherwise direct.

(b)    Other Amendments.  After the Confirmation Date, so long as such action does not materially adversely affect the treatment of holders of Claims or Interests hereunder, and upon the written consent of the Plan Sponsor, the Debtors may remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes and effects of the Plan, and any holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented.  Before the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court; *provided*, that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Interests and which shall be consistent with, and subject to the approvals and consents as set forth in, the RSA.

### 14.6.    *Effectuating Documents and Further Transactions.*

(a)    Each of the officers of the Reorganized Debtors is authorized, in accordance with his or her authority under the resolutions of the applicable owners, board of directors, and general partners, to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

(b)    On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or the Reorganized Debtors, as applicable, and all holders of Interests and Claims receiving Plan Distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### 14.7.    *Revocation or Withdrawal of Plan.*

The Debtors reserve the right, subject to the prior written consent of the Plan Sponsor, to revoke or withdraw the Plan prior to the Effective Date as to any or all of the Debtors. If, with respect to a Debtor, the Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date as to such Debtor does not occur on the Effective Date, then, with respect to such Debtor:  (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing of or limiting of an amount of any Claim or Interest or Class of Claims or Interests), assumption of Executory Contracts or Unexpired Leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, such Debtor or any

other Entity, (ii) prejudice in any manner the rights of such Debtor or any other Entity, or (iii) constitute an admission of any sort by any Debtor or the Plan Sponsor, or any other Entity.

### 14.8. *Severability of Plan Provisions.*

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, in each case at the election and the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration, or interpretation; *provided*, however, that any such holding, alteration, or interpretation shall not affect the approvals and consents as set forth in the RSA. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Reorganized Debtors (as the case may be), and (c) nonseverable and mutually dependent.

### 14.9. *Governing Law.*

Except to the extent that the Bankruptcy Code or other U.S. federal law is applicable, or to the extent an exhibit or schedule hereto, or a schedule in the Plan Supplement provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof; *provided* that corporate, limited partnership, or entity governance matters relating to a Debtor or a Reorganized Debtor shall be governed by the laws of the state of incorporation or organization of the Debtors or the Reorganized Debtors.

### 14.10. *Time.*

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

### 14.11. *Dates of Actions to Implement the Plan.*

In the event that any payment or act under the Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 14.12. *Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be

immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the holders of Claims and Interests, the Released Parties, and each of their respective successors and assigns, including, without limitation, the Reorganized Debtors.

### 14.13.    *Deemed Acts.*

Subject to and conditioned on the occurrence of the Effective Date, whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of the Plan and the Confirmation Order.

### 14.14.    *Successor and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or permitted assign, if any, of each such Entity.

### 14.15.    *Entire Agreement.*

On the Effective Date, the Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

### 14.16.    *Exhibits to Plan.*

All exhibits, schedules, supplements, and appendices to the Plan (including the Plan Supplement) are incorporated into and are a part of the Plan as if set forth in full therein.

### 14.17.    *Reservation of Rights.*

The Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests prior to the Effective Date.

### 14.18.    *Plan Supplement.*

After any of such documents included in the Plan Supplement are filed, copies of such documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Claims and Noticing Agent's website at http://dm.epiq11.com/HospitalityInvestorsTrust or the Bankruptcy Court's website at https://www.pacer.gov/.

### 14.19. *Waiver or Estoppel.*

Each holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers filed with the Bankruptcy Court prior to the Confirmation Date.

### 14.20. *Notices*

To be effective, all notices, requests, and demands to or upon the Debtors shall be in writing (including by electronic mail or facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by electronic mail transmission, when received and telephonically confirmed, addressed as follows:

1. **The Debtors at:**

    Hospitality Investors Trust, Inc.
    Park Avenue Tower,
    65 East 55th Street, Suite 801
    New York, NY 10022
    Attn: HIT Chapter 11 Notices
    Email: casenotices@hitreit.com

2. **Office of the U.S. Trustee at:**

    Office of the United States Trustee for the District of Delaware
    844 King Street, Suite 2207, Lockbox 35
    Wilmington, DE 19801
    Attn: Joseph J. McMahon, Jr. (joseph.mcmahon@usdoj.gov)

3. **Counsel to the Debtors at:**

    Proskauer Rose LLP
    70 West Madison
    Suite 3800
    Chicago, IL 60602
    Attn: Jeff J. Marwil (jmarwil@proskauer.com), Paul V. Possinger (ppossinger@proskauer.com), and Jordan E. Sazant (jsazant@proskauer.com)

    - and -

    Proskauer Rose LLP
    Eleven Times Square

New York, NY 10036
Attn:  Joshua A. Esses (jesses@proskauer.com)

- and -

Potter Anderson & Corroon LLP
1313 North Market Street
Wilmington, DE 19801
Telephone:  (302) 984-6000
Attn:  Jeremy W. Ryan (jryan@potteranderson.com)

**4.**     **The Plan Sponsor at:**

Brookfield Strategic Real Estate Partners II Hospitality REIT II LLC
250 Vesey Street, 11th Floor
New York, NY 10004
Attn:  BPG Transactions Legal (realestatenotices@brookfield.com)

**5.**     **Counsel to the Plan Sponsor at:**

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
Attn:  Sean A. O'Neal (soneal@cgsh.com)

- and -

Young Conaway Stargatt & Taylor, LLP
Rodney Square, 1000 King Street
Wilmington, DE 19801
Attn:   Pauline K. Morgan
Email: pmorgan@ycst.com

After the occurrence of the Effective Date, the Reorganized Debtors have authority to send a notice to Entities stating that in order to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entities must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the occurrence of the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities that have filed such renewed requests.

## ARTICLE XV.

## <u>CONCLUSION AND RECOMMENDATION</u>

The Debtors believe the Plan is in the best interests of all stakeholders and urge the holders of Interests in the Voting Class to vote in favor thereof.

Dated:  June 14, 2021

Respectfully submitted,

**Hospitality Investors Trust, Inc. and
Hospitality Investors Trust Operating Partnership,
L.P.**

By:  */s/ Bruce A. Riggins*
Name:  Bruce A. Riggins
Title:  Chief Financial Officer, Hospitality Investors
Trust, Inc.

## Exhibit A

**Contingent Value Rights Agreement**

**Proposed updates to Exhibit Version**

## CONTINGENT VALUE RIGHTS AGREEMENT

This CONTINGENT VALUE RIGHTS AGREEMENT, dated as of [●] [●], 2021 (this "***Agreement***"), is entered into by and between Hospitality Investors Trust, Inc., a Maryland corporation (the "***Company***"), and Computershare, Inc. ("***Computershare***"), a Delaware corporation, and its wholly owned subsidiary, Computershare Trust Company, N.A., a federally chartered trust company, collectively, as agent with respect to the Contingent Value Rights (the "***CVR Agent***").

## WITNESSETH:

WHEREAS, on May 19, 2021, the Company and its operating partnership, Hospitality Investors Trust Operating Partnership, L.P., a Delaware limited partnership (the "***OP***"), entered into a Restructuring Support Agreement (as may be subsequently amended or modified from time to time, the "***RSA***") with the Supporting Stockholder;

WHEREAS, on May 19, 2021 (the "***Petition Date***"), the Company and the OP commenced voluntary cases under the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "***Cases***"), and concurrently filed a joint prepackaged plan of reorganization (as may be amended or modified from time to time in accordance with the RSA, the "***Plan***");

WHEREAS, the Company has obtained a debtor-in-possession loan facility (as may be subsequently amended or modified from time to time, the "***DIP Facility***") and a post-confirmation loan facility (as may be subsequently amended or modified from time to time, the "***Exit Facility***") from the Supporting Stockholder;

WHEREAS, pursuant to the Plan, the Company shall grant Contingent Value Rights to holders of the Shares on the Effective Date;

WHEREAS, this Agreement constitutes the CVR Agreement referred to in the RSA and the Plan;

WHEREAS, the Contingent Value Right is a contract right, providing the Holders with the right to receive contingent cash payments if and to the extent payable pursuant to the terms of this Agreement for each Contingent Value Right at a later date and subject to the terms and conditions set forth herein;

WHEREAS, the Company desires to appoint the CVR Agent as its agent with respect to the Contingent Value Rights pursuant to the terms of this Agreement, and the CVR Agent desires to accept such appointment; and

WHEREAS, the CVR Agent has agreed to provide specified services covered by this Agreement.

NOW, THEREFORE, for and in consideration of the agreements contained herein and the consummation of the Plan, it is mutually covenanted and agreed, for the benefit of all Holders, as follows:

# ARTICLE 1
## DEFINITIONS

Section 1.1.    Definitions.

(a)    For all purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(i)    the terms defined in this Article 1 have the meanings assigned to them in this Article 1, and include the plural as well as the singular;

(ii)    the words "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision;

(iii)    unless the context otherwise requires, words describing the singular number shall include the plural and vice versa, words denoting any gender shall include all genders and words denoting natural Persons shall include corporations, partnerships and other Persons and vice versa;

(iv)    references to any Person shall include such Person's successors and permitted assigns; and

(v)    whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by "without limitation".

(b)    The following terms shall have the meanings ascribed to them as follows:

"*2019 Hotel EBITDA*" means, with respect to the Hotel Properties in the CVR Asset Pool or the Excluded Properties, the Adjusted EBITDA for the year ended December 31, 2019 for such Hotel Properties in the CVR Asset Pool or Excluded Properties, as applicable, calculated without giving effect to clause (c) of the first sentence of the definition of Adjusted EBITDA.

"*Additional Adjustment Amount*" means (i) any amount distributed by the CVR Holding Company to its shareholders, members, or partners, or (ii) any principal amount loaned by the CVR Holding Company or any of its direct or indirect Subsidiaries pursuant to any Upstream Intercompany Loan other than (a) any distribution, payment or loan out of net proceeds from a Monetization Event, but only to the extent such amount has not previously been taken into account in the determination of a Total Distributable Amount under Section 2.4(g), and (b) any Permitted Distribution.

"*Adjusted EBITDA*", with respect to one or more Hotel Properties and any Measurement Period, is calculated as net loss (income) and comprehensive loss (income) (calculated in accordance with GAAP) of the applicable Hotel Property or Hotel Properties during the applicable

Measurement Period, excluding (a) the effect of expenses not related to operating the applicable Hotel Property or Hotel Properties, (b) non-cash charges that are not indicative of the operating performance of the applicable Hotel Property or Hotel Properties, and (c) any effects on net loss (income) and comprehensive loss (income) due to (1) a Casualty or Condemnation Event, strike or other labor dispute, fire, war, insurrection, act of God, governmental intervention, terrorism or pandemic or (2) any other event that is reasonably beyond the control of the Company other than to the extent the principal cause of such event is the Company's or any of its Subsidiaries' gross negligence or willful misconduct. Exclusions made for these purposes shall include (to the extent attributable to a particular Hotel Property or Hotel Properties, if applicable): (i) depreciation and amortization; (ii) impairment of goodwill and long-lived assets; (iii) interest expense; (iv) transaction related costs; (v) other loss (income); (vi) gain (loss) on sale of assets, net; (vii) equity in loss (earnings) of unconsolidated entities; (viii) general and administrative expense; and (ix) income tax (benefit) expense.

"***Adjusted EBITDA Threshold***" means, with respect to any Hotel Property, the amount of Adjusted EBITDA for such Hotel Property set forth on Schedule I hereto. Any reference to the Adjusted EBITDA Threshold for the CVR Asset Pool refers to the aggregate Adjusted EBITDA Threshold of all of the Hotel Properties then in the CVR Asset Pool.

"***Adjusted Total CVR Pool Amount***" has the meaning set forth in Section 2.4(g)(i).

"***Affiliate***" means, when used with respect to a specified Person, a Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with such specified Person. As used in this definition, the term "control" (including with correlative meanings, "controlled by" and "under common control with"), when used with respect to any specified Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or other interests, by contract, agreement, obligation, indenture, instrument, lease, promise, arrangement, release, warranty, commitment, undertaking or otherwise.

"***Agreement***" has the meaning set forth in the Preamble.

"***All or Substantially All of the Assets***" means at least eighty percent (80%) of the number of the Hotel Properties comprising the CVR Asset Pool as of the Effective Date.

"***Board of Directors***" means the Board of Directors of the Company.

"***Business Day***" means any day other than a Saturday or Sunday or a day on which banks are required or authorized to close in the City of New York.

"***Calculation Certificate***" has the meaning set forth in Section 2.5(a).

"***Capital Stock***" means, with respect to any Person, all of the shares, interests, rights, participations or other equivalents (however designated) of capital stock of (or other ownership, equity or profit interests or units in, including any limited or general partnership interest and any limited liability company interest) such Person.

"***Cases***" has the meaning set forth in the Recitals.

"*Casualty or Condemnation Event*" means the damage or destruction, in whole or in part, by fire or other casualty, of a Hotel Property or a temporary or permanent taking of a Hotel Property by any governmental authority as the result or in lieu or in anticipation of the exercise of the right of condemnation or eminent domain, of all or any part of any Hotel Property, or any interest therein or right accruing thereto, including any right of access thereto or any change of grade affecting such Hotel Property or any part thereof.

"*Change-of-Control Monetization Event*" means (a) the sale or other disposition (in one transaction or a series of related transactions) of outstanding Voting Securities of (i) the Company or (ii) any direct or indirect Subsidiary(ies) of the Company that, individually or together, directly or indirectly hold(s) 100% of the Company's interest in the Hotel Properties comprising the CVR Asset Pool, representing in the aggregate more than 50.0% of the total voting power of the Voting Securities of the Company or such Subsidiary(ies) (after giving effect to such sale or other disposition) to any Person or "group" (as such term is used in Section 13(d)(3) of the Exchange Act) of Persons, other than a transfer of Voting Securities of the Company or such Subsidiary(ies) to any Affiliates of the holders of the Voting Securities being transferred as part of a reorganization, restructuring or similar transaction that is (x) not treated as a liquidity event for the Supporting Stockholder or its Affiliates that are shareholders of the Supporting Stockholder in such transaction (as determined in good faith by the Supporting Stockholder) and (y) approved by the Independent Director(s) or, if there are more than two Independent Directors, a majority of the Independent Directors (which approval may be given at any meeting of the Board of Directors or any committee thereof or pursuant to any action taken by written or electronic consent by the Board of Directors or any committee thereof); provided that in the event of a transfer of Voting Securities in direct or indirect Subsidiary(ies) of the Company, this Agreement shall be assigned to the transferee in accordance with Section 4.5, or (b) a reorganization, merger, share exchange, consolidation or other business combination of the Company, or any direct or indirect Subsidiary(ies) of the Company that, individually or together, directly or indirectly hold(s) 100% of the Company's interests in the Hotel Properties comprising the CVR Asset Pool, with or into any other Person in which transaction the Shareholders as of immediately prior to such transaction and their Affiliates own, directly or indirectly (including by or through the Company or any other Person), an aggregate of less than 50.0% of the total voting power of the Voting Securities of the Company or such Subsidiary(ies) or, if the Company or such Subsidiary(ies) is(are) not the acquiring, resulting or surviving Person(s) in such transaction, such acquiring, resulting or surviving Person.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Company*" has the meaning set forth in the Preamble; provided that any reference to any action to be taken by the Company or not to be taken by the Company, or with respect to the assets or liabilities of the Company, shall be deemed to include the Company's direct and indirect Subsidiaries, as applicable.

"*Compelled*" has the meaning set forth in Section 4.3(b)(i).

"*Confidential Information*" has the meaning set forth in Section 4.3(b)(i).

"*Confirmation Order*" has the meaning set forth in the Plan.

"**_Contingent Value Rights_**" means the rights of Holders to receive contingent cash payments pursuant to the Plan and this Agreement.

"**_Control_**" (including the terms "controlled," "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of Voting Securities, by contract or otherwise.

"**_CVR Agent_**" means the CVR Agent named in the Preamble, until a successor CVR Agent shall have become such pursuant to the applicable provisions of this Agreement, and thereafter "CVR Agent" shall mean such successor CVR Agent.

"**_CVR Agent Fees_**" has the meaning set forth in Section 3.2(f).

"**_CVR Asset Pool_**" means the Hotel Properties that were owned by the Company and its Subsidiaries as of immediately prior to the Effective Date that are not Excluded Assets, and other assets directly related to operation of such Hotel Properties that are not Excluded Assets and any mortgage indebtedness and other indebtedness and liabilities (whether known, unknown, absolute, accrued, contingent or otherwise), rights and obligations and agreement related to the operations of such Hotel Properties and excluding any general and administrative expenses incurred by the CVR Holding Company and its Subsidiaries or any other Person, which expenses shall not be the responsibility of the CVR Holding Company and its Subsidiaries.

"**_CVR Distribution Expenses_**" means, with respect to any distribution to Holders in respect of a Distribution Triggering Monetization Event, the Final Payment Date Distribution or a Holdback Payment Distribution, as applicable, the reasonable, documented, out-of-pocket costs and expenses of the Company and any of its Subsidiaries in connection with the performance of its and/or their respective obligations under this Agreement or otherwise in connection with any such distribution to be made to the Holders in respect of such Distribution Triggering Monetization Event, Final Payment Date Distribution or Holdback Payment Distribution, as applicable, including, if applicable to the particular Distribution Triggering Monetization Event, Final Payment Date Distribution or Holdback Payment Distribution: (a) all reasonable, documented, out-of-pocket costs and expenses billed by the Independent Valuer and/or the Independent Investment Banker; (b) the costs and expenses (whether or not reasonable) billed by the Independent Accountant and allocated to the Company pursuant to Section 2.6(a); and (c) the CVR Agent Fees billed by the CVR Agent in connection with such Distribution Triggering Monetization Event, Final Payment Date Distribution or Holdback Payment Distribution, as applicable; provided, that CVR Distribution Expenses shall not include any costs or expenses to the extent expressly taken into account or given effect to in the calculations of Net Proceeds from Hotel Sale or Net Proceeds from CVR Asset Pool.

"**_CVR Holding Company_**" means the OP or any other Subsidiary of the Company that directly or indirectly owns the Hotel Properties in the CVR Asset Pool.

"**_CVR Payment Date_**" has the meaning set forth in Section 2.5(c).

"**_CVR Register_**" has the meaning set forth in Section 2.3(b).

"***DIP Facility***" has the meaning set forth in the Recitals.

"***DIP Financing Invested Capital Amount***" means $[•], representing the amount of outstanding principal and accrued interest and other outstanding obligations through and including the Effective Date under the DIP Facility that is converted to Shares on the Effective Date pursuant to the Plan multiplied by the Excluded Asset Adjustment Factor, which amount shall be subject to reduction from time to time by in accordance with Section 2.4(g).

"***Distribution Triggering Monetization Event***" means a Monetization Event of the type set forth in clause (i) or (ii) of the definition thereof.

"***Effective Date***" means the effective date of the Plan.

"***Exchange Act***" means the Securities Exchange Act of 1934, as amended.

"***Exit Facility***" has the meaning set forth in the Recitals.

"***Excluded Assets***" means the Hotel Properties on Schedule II hereto and other assets directly related to operation of such Hotel Properties and any mortgage indebtedness and other indebtedness and liabilities (whether known, unknown, absolute, accrued, contingent or otherwise), rights and obligations and agreement related to the operations of such Hotel Properties, which shall have been transferred from the CVR Holding Company if requisite consents have been obtained, or, if requisite consents have not been obtained, shall be held by the CVR Holding Company pursuant to arrangements under which it shall be treated, for all purposes applicable under this Agreement and notwithstanding anything to the contrary in this Agreement, as if the Excluded Assets were not part of the CVR Asset Pool.

"***Excluded Asset Adjustment Factor***" means 0.9866, representing (a) one, *minus* (b) the quotient (expressed as a decimal fraction) of (i) the aggregate 2019 Hotel EBITDA of the Excluded Assets, divided by (ii) the sum of (A) the aggregate 2019 Hotel EBITDA of the Excluded Assets and (B) the aggregate 2019 Hotel EBITDA of the Hotel Properties in the CVR Asset Pool.

"***Extended Maturity Date***" means [•], 2028, the seventh anniversary of the Effective Date.

"***Final Payment Date***" means the earlier of (i) the Maturity Date and (ii) the date that is the six-month anniversary of the first occurrence of a Distribution Triggering Monetization Event (or, if not a Business Day, the next Business Day).

"***Final Payment Date Distribution***" means the final distribution to Holders in respect of amounts distributable as of the Final Payment Date.

"***GAAP***" means United States generally accepted accounting principles as in effect from time to time and set forth in the Financial Accounting Standards Board Accounting Standards Codification applied on a basis in all material respects consistent with that of the Company for the 2020 fiscal year (except as required by changes in such generally accepted accounting principles).

"***Governmental Entity***" means United States or non-United States national, federal, state or local governmental, regulatory or administrative authority, agency or commission or any judicial or arbitral body.

"***Holdback***" has the meaning set forth in Section 2.4(d)(iii).

"***Holdback Amount***" has the meaning set forth in Section 2.4(d)(iii).

"***Holdback Payment Distribution***" has the meaning set forth in Section 2.4(d)(vi).

"***Holdback Payment Distribution Payment Date***" has the meaning set forth in Section 2.5(e).

"***Holdback Value***" has the meaning set forth in Section 2.4(d)(vii).

"***Holder***" means a Person in whose name a Contingent Value Right is registered in the CVR Register.

"***Hotel Property***" shall mean each property on which a hotel is operated and in which the Company or any direct or indirect Subsidiary holds an ownership interest, together with the buildings and other improvements thereon and all assets related to the operation of the hotel on the Hotel Property.

"***Indemnitees***" has the meaning set forth in Section 3.2(e).

"***Independent Accountant***" means an independent certified public accounting firm of nationally recognized standing designated by the Company.

"***Independent Director***" means any director of the Company who is an "independent director" as defined under Listing Rule 303A.02 of the New York Stock Exchange Listed Company Manual or any successor provision.

"***Independent Investment Banker***" means an independent and nationally recognized financial services company selected by the Company from a list of at list three (3) candidates provided by the Independent Director(s), each of which has at least ten years of experience advising Persons owning hotel properties similar to those owned by the Company.

"***Independent Valuer***" means an independent and nationally recognized MAI appraiser selected by the Company from a list of at least three (3) candidates provided by the Independent Director(s), each of which has at least ten years of experience valuing hotel properties similar to those owned by the Company.

"***Initial Contingent Value Rights***" has the meaning set forth in Section 2.1(c).

"***Initial Maturity Date***" means [•], 2026, the fifth anniversary of the Effective Date.

"***Losses***" has the meaning set forth in Section 3.2(e).

"*Majority of Holders*" means, at any time, the registered Holder(s) of more than 50% of the total number of Contingent Value Rights registered at such time, as set forth on the CVR Register.

"*Make Available*" means, with respect to any document, notice or information required to be provided to Holders under this Agreement, at the Company's option, either (1) to mail or cause the CVR Agent to mail a notice thereof by first-class mail to the Holders at their addresses as they shall appear on the CVR Register, or (2) to post on the Company's public website.

"*Maturity Date*" means either (i) the Initial Maturity Date, or (ii) if the Company exercises its extension right pursuant to Section 2.7, the Extended Maturity Date.

"*Measurement Period*" means, as applicable, the trailing 12-month period ending on the last day of the calendar quarter preceding the calendar quarter in which the event that has required the Company to calculate the Adjusted EBITDA for any Hotel Property occurs.

"*Monetization Event*" means (i) the consummation of a Change-of-Control Monetization Event, (ii) the consummation of any transaction that does not constitute a Change-of-Control Monetization Event pursuant to which, directly or indirectly, on a cumulative basis following consummation of such transaction, All or Substantially All of the Assets included in the CVR Asset Pool have been sold or otherwise disposed of subsequent to the Effective Date, other than any disposition of all of the Hotel Properties comprising the CVR Asset Pool then owned directly or indirectly by the Company to an Affiliate of the Company or the Supporting Stockholder as part of a reorganization, restructuring or similar transaction that is (x) not treated as a liquidity event for the Supporting Stockholder or its Affiliates that are shareholders of the Company participating in such transaction (as determined by the Supporting Stockholder in good faith) and (y) approved by the Independent Director(s) or, if there are more than two Independent Directors, a majority of the Independent Directors (which approval may be given at any meeting of the Board of Directors or any committee thereof or pursuant to any action taken by written or electronic consent by the Board of Directors or any committee thereof); provided that in the event of any such disposition to an Affiliate of the Company or the Supporting Stockholder that is not the Company or a Subsidiary of the Company, this Agreement shall be assigned to the transferee in accordance with Section 4.5, or (iii) a sale or other disposition of assets remaining in the CVR Asset Pool that occurs subsequent to a Distribution Triggering Monetization Event but prior to the Final Payment Date.

"*Net Proceeds from CVR Asset Pool*" has the meaning set forth in Section 2.4(c).

"*Net Proceeds from Hotel Sale*" means the amount of any cash or non-cash consideration actually received by the Company in any direct or indirect sale of all of the Company's interest in any Hotel Property (with the valuation of any non-cash consideration determined by the Independent Investment Banker) less (i) the mortgage indebtedness and other indebtedness and liabilities (whether known, unknown, absolute, accrued, contingent or otherwise) not assumed by the buyer or to which the buyer does not acquire the assets subject to (with such amounts determined in good faith by the Board of Directors), and (ii) reasonable, documented, out-of-pocket costs and expenses of the Company and any of its Subsidiaries in connection with such sale.

8

"*Notice of Objection*" has the meaning set forth in <u>Section 2.5(b)</u>.

"*Objection Period*" has the meaning set forth in <u>Section 2.5(b)</u>.

"*Officer's Certificate*" means a certificate signed by the chief executive officer, president, chief financial officer, any vice president, the controller, the treasurer or the secretary, in each case of the Company, in his or her capacity as such an officer, and delivered to the CVR Agent.

"*Permitted Distributions*" means any amount distributed by the CVR Holding Company (a) to the Company to fund costs and expenses of the Company or any of its Subsidiaries, including (i) general and administrative expenses, (ii) to the extent not covered by clause (i), expenses associated with directors, officers, employees, consultants and any other agents of the Company (including any severance or termination payments), (iii) taxes, (iv) payments pursuant to contractual obligations, (v) payments of cash dividends to shareholders of the Company that are not Affiliates of the Supporting Stockholder who shall have been issued preferred stock intended to enable the Company to satisfy the closely held requirements applicable to real estate investment trusts under Section 856(a)(6) of the Code, (vii) payments related to the expenses of or settlement of litigations or disputes, (viii) payments of principal, interest, fees and other expenses associated with indebtedness to the extent that the principal amount of such indebtedness has been (A) contributed to the CVR Holding Company or any of its Subsidiaries or (B) used to fund costs and expenses of the Company or any of its Subsidiaries that the CVR Company would be permitted to distribute funds to the Company to fund under this <u>clause (a)</u>, (ix) capital expenditures (including property improvement plan expenditures), (x) expenses relating to furniture, fixtures and other equipment, (xi) management fees and other charges, fees and expenses to be paid to the property managers or sub-managers, (xii) costs and fees of independent professionals (including legal, accounting, consultants and other professional expenses), technical consultants, operational experts (including quality assurance inspectors) or other third parties retained to perform services for the Company or any of its Subsidiaries, (xiii) costs of attendance by employees at training and manpower development programs, (xiv) association dues, (xv) computer processing charges, (xvi) operational equipment and other lease payments, (xvii) insurance premiums, ground rents, maintenance charges and other charges and impositions and (xviii) franchise fees and expenses; <u>provided</u> that costs and expenses, individually and in the aggregate, covered by this <u>clause (a)</u> shall be consistent in scope and kind with the Company's corporate-level costs and expenses in 2019 and 2020, shall not include costs or expenses primarily relating to assets other than the assets in the CVR Asset Pool and shall be allocated between the CVR Holding Company and assets that are not included in the CVR Asset Pool (including if such assets are Excluded Assets or were acquired by the Company subsequent to the Effective Date) based on the ratio of their respective Adjusted EBITDA for the trailing 12-month period ending on the last day of the calendar quarter preceding the calendar quarter in which the Permitted Distribution was made, and (b) to any Person (including, for the avoidance of doubt, the Company or any of its shareholders, including the Supporting Stockholder) in respect of the Net Proceeds from Hotel Sale of any Hotel Property prior to a Monetization Event that is not a Qualifying CVR Asset Pool Sale.

"*Permitted Transfer*" means: (i) the transfer (upon the death of the Holder) by will or intestacy; (ii) a transfer by instrument to an *inter vivos* or testamentary trust in which the Contingent Value Rights are to be passed to beneficiaries upon the death of the trustee; (iii) transfers made pursuant to a court order of a court of competent jurisdiction in connection

with divorce, bankruptcy or liquidation; or (iv) a transfer made by operation of law (including a consolidation or merger) or without consideration in connection with the dissolution, liquidation or termination of any corporation, limited liability company, partnership or other entity.

"***Permitted Transferee***" means a Person who receives a Contingent Value Right pursuant to a Permitted Transfer and otherwise in accordance with this Agreement.

"***Person***" means any individual, corporation (including not-for-profit), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, Governmental Entity or other entity of any kind or nature.

"***Petition Date***" has the meaning set forth in the Recitals.

"***Plan***" has the meaning set forth in the Recitals.

"***Plan Documents***" means the RSA, the Plan, this Agreement, the DIP Facility, the Exit Facility, and the organizational documents of the Company and the CVR Holding Company adopted as of the Effective Date.

"***Post-Effective Date Contributions***" means, without duplication, any cash contributions or loans made to the CVR Holding Company or any of its Subsidiaries on or after the Effective Date however structured, including cash amounts contributed, paid or loaned to the CVR Holding Company or any of its Subsidiaries on or after the Effective Date pursuant to the Exit Facility; provided, that, except for any cash contributions or loans made to the CVR Holding Company or any of its Subsidiaries pursuant to the Exit Facility: (a) any such loans shall be on terms and conditions that are arm's length in accordance with Section 4.1 (provided, that any such loan shall be deemed to be on arm's length terms for purposes of Section 4.1 if such loan is on terms substantially similar to the terms of the Exit Facility) and (b) any such cash contributions and loans shall only be used for (i) funding the costs and expenses of the CVR Holding Company and its Subsidiaries, including any of the costs and expenses set forth in clauses (i)-(xviii) in clause (a) of the definition of "Permitted Distributions" and (ii) reserves and/or liquidity requirements or needs of the CVR Holding Company and its Subsidiaries, as determined by the Company in its sole discretion.

"***Pre-Petition LPA***" means the Amended and Restated Agreement of Limited Partnership of the OP, dated as of March 31, 2017 and as amended from time to time through the date of the RSA.

"***Pro Rata Payment Amount***" means an amount equal to (i) a fraction, the numerator of which equals the total number of Contingent Value Rights held by such Holder on such date, and the denominator of which equals [•][1], *multiplied by* (ii) the Total Distributable Amount payable pursuant to Section 2.5(c), Section 2.5(d) or Section 2.5(e), as applicable.

---

[1] **Note to Draft**:  Such number shall be inserted in the executed CVR Agreement as of the Effective Date and shall be equal to:  (i) the number of CVRs to be issued in respect of shares of outstanding common stock (which will include the number of CVRs to be issued in respect of RSUs that are cancelled on the Effective Date), *plus* (ii) the number of CVRs that would otherwise have been issued in respect of shares of common stock (including restricted shares) held

"*Qualifying CVR Asset Pool Sale*" means any direct or indirect sale of all of the Company's interest in any Hotel Property prior to the consummation of a transaction or series of transactions constituting a Distribution Triggering Monetization Event or, if no Distribution Triggering Monetization Event occurs prior to the Final Payment Date, the Final Payment Date, if, at the time of the consummation of such sale, the Adjusted EBITDA for such Hotel Property for the Measurement Period exceeds the Adjusted EBITDA Threshold for such Hotel Property.

"*Related Party*" has the meaning ascribed to the term "related person" in Item 404(a) of Regulation S-K under the Exchange Act.

"*RSA*" has the meaning set forth in the Recitals.

"*Section 2.4(g)(iii) 94% Amount*" has the meaning set forth in <u>Section 2.4(g)(iii)</u>.

"*Section 2.4(g)(iv) 94% Amount*" has the meaning set forth in <u>Section 2.4(g)(iv)</u>.

"*Securities Act*" means the Securities Act of 1933, as amended.

"*Shares*" means the shares of common stock, par value $0.01 per share, of the Company.

"*Shareholder*" means, in connection with a Change-of-Control Monetization Event, any holder of Shares or equity interests of any applicable Subsidiary of the Company receiving consideration in such Change-of-Control Monetization Event.

"*Subsidiary*" means, with respect to any Person, any corporation, partnership, limited liability company or other organization, whether incorporated or unincorporated, of which the securities or other ownership interests having more than 50% of the ordinary voting power in electing the board of directors or other governing body are, at the time of such determination, owned by such Person or another Subsidiary of such Person.

"*Supporting Stockholder*" means Brookfield Strategic Real Estate Partners II Hospitality REIT II LLC, a Delaware limited liability company, together with its successors and permitted assigns.

"*Supporting Stockholder CVR Asset Pool Invested Amount*" means $395,310,206.34, representing (i) the sum of (A) $379,746,396.50 (the purchase price paid by the Supporting Stockholder to the OP to acquire Class C Units (as defined in the Pre-Petition LPA)) *plus* (B) $16,289,594.88, which represents the Liquidation Preference (as defined in the Pre-Petition LPA) of the Class C Units issued in respect of the portions of the 12/31/20 PIK Distribution Amount (as defined in the Pre-Petition LPA) and the 3/31/21 PIK Distribution Amount (as defined in the Pre-Petition LPA) that correspond to the cash distributions that would have been payable on December 31, 2020 and March 31, 2021 if the Pre-Petition LPA had not been amended on December 24, 2020 and March 30, 2021 (but, for the avoidance of doubt, not any other Class C Units issued as PIK Distributions (as defined in the Pre-Petition LPA)), *plus* (C) $4,643,317.70, representing the accrued and unpaid Class C Cash Distribution Amount (as defined in the Pre-Petition LPA) from

by the Brookfield Investor, which will effectively be cancelled as of the Effective Date pursuant to the Plan, but which number shall be included solely for purposes of this calculation.

and after March 31, 2021 through and including the Petition Date, *multiplied by* (ii) the Excluded Asset Adjustment Factor, which shall be subject to reduction from time to time in accordance with Section 2.4(g).

"***Tax***" means all federal, state, local and foreign income, profits, franchise, gross receipts, environmental, customs duty, capital stock, severances, stamp, payroll, sales, employment, unemployment, disability, use, property, withholding, excise, production, value added, occupancy and other taxes, together with all interest, penalties and additions imposed with respect to such amounts and any interest in respect of such penalties and additions, in each case, imposed by a Governmental Entity.

"***Total CVR Pool Amount***" has the meaning set forth in Section 2.4(a).

"***Total Distributable Amount***" has the meaning set forth in Section 2.4(a).

"***Transfer***" means any sale, assignment, transfer, disposition, mortgage, pledge, participation, donation, gift, bequest, grant, hypothecation, encumbrance or any other similar transaction in any manner, direct or indirect, in whole or in part.

"***Upstream Intercompany Loan***" means a loan made by, or any other indebtedness for money borrowed from, the CVR Holding Company or its direct or indirect Subsidiaries to the Company or its direct or indirect Subsidiaries (other than to the CVR Holding Company or any of its direct and indirect Subsidiaries).

"***Value***" means, with respect to any asset or liability of the CVR Asset Pool or any other asset or liability required to be valued for purposes of calculating the Total CVR Pool Amount or the Total Distributable Amount (provided that the value of a Hotel Property or the CVR Asset Pool shall not include the outstanding principal amount of any Upstream Intercompany Loans), its fair market value. In the case of Hotel Properties, the fair market value shall be determined by the Independent Valuer in accordance with Section 2.4(e) and shall equal the purchase price of the Hotel Property if such Hotel Property were sold for cash for a purchase price equal to its fair market value in an arm's-length transaction under then current conditions for the sale of comparable properties allowing a commercially reasonable marketing period to find a purchaser that is willing to pay a cash price with the benefit of customary due diligence investigations, reduced by the transaction costs which would be payable by the Company in connection with the transaction, assuming (subject to the immediately following sentence) (i) the mortgage loans secured by the Hotel Property were discharged, (ii) the transfer taxes, customary broker fees and other customary costs of closing were paid by the party customarily responsible for such costs and (iii) all other liabilities of the Company which relate to the Hotel Property being sold were discharged by the Company. The fair market value, as determined by the Independent Valuer, shall be reduced by any mortgage indebtedness and other indebtedness and liabilities (whether known, unknown, absolute, accrued, contingent or otherwise) relating to such Hotel Property not assumed or taken subject to, by the buyer, to the extent not otherwise expressly taken into account as a reduction in fair market value in the appraisal. Without duplication, the fair market value of all other assets and liabilities contained in the CVR Asset Pool that are not Hotel Properties shall be determined based on the most recent quarterly balance sheet for the CVR Holding Company furnished by the Company pursuant to Section 4.3(a). The fair market value of any non-cash consideration actually

received in respect of any Holdback Amount shall be determined by the Independent Investment Banker. The fair market value of any Holdback Amount that remains contingent as of the Final Payment Date but is not yet payable pursuant to the terms of the applicable definitive agreement(s) shall be the Holdback Value of such Holdback Amount; provided that the Holdback Value of such Holdback Amount shall be included in the calculation of the aggregate Value of the CVR Asset Pool as of the Final Payment Date only if the Company elects to so include such Holdback Value in such calculation pursuant to Section 2.4(d)(vi)(A) and such Holdback Value shall the be determined in accordance with Section 2.4(d)(vii).

"***Voting Securities***" means, with respect to any Person, the Capital Stock of such Person, the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election or appointment of directors (or Persons performing similar functions (including a "manager" (as defined under the Delaware Limited Liability Company Act, Title 6 of the Delaware Code, Section 18-101, et seq.)) of such Person.

### ARTICLE 2
### CONTINGENT VALUE RIGHTS

Section 2.1.    Issuance of Contingent Value Rights; Appointment of CVR Agent.

(a)    Pursuant to the Plan, the Contingent Value Rights represent the contractual rights of Holders to receive contingent cash payments if and to the extent payable pursuant to the terms of this Agreement. The initial persons entitled to be Holders shall be the holders of Shares as of immediately prior to the Effective Date (including, without limitation, holders of restricted stock units that as of immediately prior to the Effective Date will be terminated and paid in Shares in accordance with the Plan). Each Holder shall be entitled to one Contingent Value Right for each Share owned as of immediately prior to the Effective Date pursuant to the Plan. Pursuant to the Plan and Confirmation Order, each Holder is automatically deemed to have accepted the terms of this Agreement and is automatically deemed to be a party hereto as if, and with the same effect as if, such Holder had delivered a duly executed counterpart signature page to this Agreement without any further action by any party. For the avoidance of doubt, the Holders are deemed to hereby acknowledge that the Contingent Value Rights are not "securities" within the meaning of the Securities Act, Exchange Act or any other applicable federal, state or foreign securities laws.

(b)    The Company hereby appoints the CVR Agent to act as agent for the Company with respect to the Contingent Value Rights in accordance with the express terms and conditions set forth in this Agreement (and no implied terms and conditions), and the CVR Agent hereby accepts such appointment.

(c)    The maximum aggregate number of Contingent Value Rights that may be outstanding under this CVR Agreement is limited to [•] (the "***Initial Contingent Value Rights***"), which is the number of Contingent Value Rights that were issued pursuant to the Plan and in accordance with Section 2.1(a) above and which Contingent Value Rights were outstanding as of the Effective Date. The number of outstanding Contingent Value Rights at any given time may be less than the number of Initial Contingent Value Rights, if reduced in accordance with Section 2.9 upon the abandonment of a Contingent Value Right. From and after the Effective Date, the

Company shall not be permitted to issue any additional Contingent Value Rights under this CVR Agreement.

Section 2.2.    <u>Non-transferability</u>. The Contingent Value Rights are non-transferable and shall not be Transferred, other than a Permitted Transfer to a Permitted Transferee. No Holder may Transfer any economic interest in a Contingent Value Right to any other Person. Any final determination regarding whether a proposed transferee is a Permitted Transferee shall be made by the Company, in its discretion, pursuant to <u>Section 2.3(c)</u> below. Any purported Transfer of a Contingent Value Right to anyone other than a Permitted Transferee shall be null and void *ab initio*.

Section 2.3.    <u>No Certificate; Registration; Registration of Transfer; Change of Address</u>.

(a)    The Contingent Value Rights shall not be evidenced by a certificate or other instrument.

(b)    The CVR Agent shall keep a register (the "***CVR Register***") for the registration of Contingent Value Rights in a book-entry position for each Holder. The CVR Register shall set forth the name and address of each Holder and the number of Contingent Value Rights held by such Holder. The CVR Register will be updated as necessary by the CVR Agent to reflect the addition or removal of Holders (including pursuant to any Permitted Transfers or abandonment pursuant to <u>Section 2.9</u> ), upon receipt of such information by the CVR Agent. The Company or the Company's Affiliates or representatives may receive and inspect a copy of the CVR Register, from time to time, upon request made to the CVR Agent.

(c)    Subject to the restrictions set forth in <u>Section 2.2</u>, every request made to Transfer a Contingent Value Right to a Permitted Transferee must be made in writing to the Company and the CVR Agent and set forth in reasonable detail the circumstances related to the proposed Transfer, and must be accompanied by a written instrument or instruments of transfer and any other requested information or documentation in a form reasonably satisfactory to the Company and the CVR Agent, duly and validly executed by the registered Holder or Holders thereof or by the duly appointed legal representative thereof or by a duly authorized attorney, with such signature to be guaranteed by a guarantor institution that is a participant in a signature guarantee medallion program approved by the Securities Transfer Association. A request for a Transfer of a Contingent Value Right shall be accompanied by documentation establishing the Transfer is to a Permitted Transferee and any other information as may be reasonably requested by the Company or the CVR Agent (including opinions of counsel, if requested by the Company or the CVR Agent). Upon receipt of such a written Transfer request, the Company shall, subject to its reasonable determination that the Transfer instrument is in proper form and the transfer otherwise complies with the other terms and conditions herein, instruct the CVR Agent in writing to register the Transfer of the Contingent Value Rights in the CVR Register. All duly Transferred Contingent Value Rights registered in the CVR Register shall be the valid obligations of the Company, evidencing the same rights and entitling the transferee to the same benefits and rights under this Agreement as those held immediately prior to the Transfer by the transferor. No Transfer of a Contingent Value Right shall be valid until registered in the CVR Register, and any Transfer not duly registered in the CVR Register will be void *ab initio* (unless the Transfer was permissible hereunder and such failure to be duly registered is attributable to the fault of the CVR

Agent to be established by clear and convincing evidence).  Any Transfer of the Contingent Value Rights shall be without charge to the Holder; <u>provided</u> that the Company and the CVR Agent may require (i) payment of a sum sufficient to cover any Tax or charge that is imposed in connection with such Transfer, or (ii) that the transferor establish to the reasonable satisfaction of the CVR Agent that such Taxes have been paid.  The CVR Agent shall have no obligation to pay any such Taxes or charges and the CVR Agent shall have no duty or obligation to take any action under any section of this Agreement that requires the payment by a Holder of such Taxes or charges unless and until the CVR Agent is satisfied that all such Taxes or charges have been paid.  Additionally, the fees and costs related to any legal opinion requested under this <u>Section 2.3(c)</u> shall be the responsibility of the Holder.  Any attempted Transfer of a Contingent Value Right, in whole or in part, that is not permitted by this <u>Section 2.3(c)</u>, including any attempted Transfer that is made to any party other than a Permitted Transferee or otherwise not effected in accordance with the terms set forth herein, will be void and of no effect.

(d)    A Holder may make a written request to the CVR Agent to change such Holder's address of record in the CVR Register.  The written request must be duly and validly executed by the Holder.  Upon receipt of such written notice, the CVR Agent shall promptly record the change of address in the CVR Register.

Section 2.4.    <u>Determination of Total Distributable Amount</u>.

(a)    The amount distributable to Holders pursuant to <u>Section 2.4(g)</u> in respect of a Distribution Triggering Monetization Event (if any), the Final Payment Date Distribution (if any) or a Holdback Payment Distribution (if any) is the "***Total Distributable Amount***" with respect to such Distribution Triggering Monetization Event, Final Payment Date Distribution or Holdback Payment Distribution. The Total Distributable Amount shall be calculated by applying the distribution allocations to the Holders described in <u>Section 2.4(g)</u> to the aggregate Net Proceeds from CVR Asset Pool, the aggregate Value of the CVR Asset Pool and any Holdback Amount, to the extent applicable in accordance with <u>Section 2.4(b)</u> (such amount being hereinafter referred to as the "***Total CVR Pool Amount***").

(b)    Subject to <u>Section 2.4(d)</u> below, the "Total CVR Pool Amount" shall equal:

(i)    in connection with a Distribution Triggering Monetization Event (if any), (A) the Net Proceeds from CVR Asset Pool (determined in accordance with <u>Section 2.4(c)</u>) for such Distribution Triggering Monetization Event *less* (B) the CVR Distribution Expenses incurred in connection with such Distribution Triggering Monetization Event *less* (C) the then-outstanding aggregate amount of Post-Effective Date Contributions (if any);

(ii)    in connection with the Final Payment Date Distribution (if any), the sum of (A) (1) if a Distribution Triggering Monetization Event has occurred prior to the Final Payment Date, (x) the Net Proceeds from CVR Asset Pool from any Monetization Event for which a payment has not yet been made pursuant to <u>Section 2.5(c)</u> and (y) any portion of a Holdback Amount in respect of which the Company has actually received cash prior to the Final Payment Date, or (2) if a Distribution Triggering Monetization Event has not occurred prior to the Final Payment Date, (x)

15

the Net Proceeds from Hotel Sale for any Qualifying CVR Asset Pool Sale completed prior to the Final Payment Date (reduced by any portion of such Net Proceeds from Hotel Sale that was distributed out of CVR Holding Company in cash and is therefore an Additional Adjustment Amount) and (y) any portion of a Holdback Amount in respect of which the Company has actually received cash prior to the Final Payment Date, in each case to the extent not previously paid or applied pursuant to Section 2.4(g), *plus* (B) the Value of the CVR Asset Pool not sold or transferred prior to the Final Payment Date, *less* (C) the CVR Distribution Expenses incurred in connection with the Final Payment Date Distribution and *less* (D) the then-outstanding aggregate amount of Post-Effective Date Contributions (if any); and

        (iii)    in connection with a Holdback Payment Distribution (if any), (A) any Holdback Amount in respect of which the Company has actually received cash *plus* (B) the Value of any Holdback Amount in respect of which the Company has actually received non-cash consideration, in each case, to the extent not previously taken into account in the calculation of a Total CVR Pool Amount *less* (C) the CVR Distribution Expenses incurred in connection with the Holdback Payment Date Distribution.

For the avoidance of doubt, no proceeds from the sale of any Hotel Property prior to a Distribution Triggering Monetization Event or, if no Distribution Triggering Monetization Event has occurred prior to the Final Payment Date, the Final Payment Date that is not a Qualifying CVR Asset Pool Sale shall be included in the calculation of the Total CVR Pool Amount.

        (c)    Subject to Section 2.4(d) below, "***Net Proceeds from CVR Asset Pool***" shall be determined and calculated in accordance with this Section 2.4(c) to be equal to:

        (i)    (A) in the case of a Monetization Event that is structured as a sale of All or Substantially All of the Assets of the CVR Asset Pool as described in clause (ii) of the definition of Monetization Event or the sale of a Hotel Property as described in clause (iii) of the definition of Monetization Event, the amount of any cash or non-cash consideration payable to the Company (with the Value of any non-cash consideration determined by the Independent Investment Banker) *less* (1) the mortgage indebtedness and other indebtedness and liabilities (whether known, unknown, absolute, accrued, contingent or otherwise) not assumed by the buyer or to which the buyer does not acquire the assets subject to, and (2) reasonable, documented, out-of-pocket costs and expenses of the Company in connection with such Monetization Event, or (B) in the case of a Change-of-Control Monetization Event, (1) the amount of the consideration paid to the Shareholders (with the Value of any non-cash consideration determined by the Independent Investment Banker) *less* (2) the reasonable, documented, out-of-pocket costs and expenses of the Shareholders in connection with such Monetization Event, *plus*

        (ii)    in the case of the first occurrence of a Distribution Triggering Monetization Event, the Net Proceeds from Hotel Sale for any Hotel Property that was sold prior to such Distribution Triggering Monetization Event pursuant to a Qualifying CVR Asset Pool Sale.

16

(d)      Notwithstanding anything to the contrary contained in <u>Section 2.4(b)</u> or <u>Section 2.4(c)</u>:

(i)      the Holders shall not be entitled to receive any payment pursuant to this Agreement if the aggregate Adjusted EBITDA of the Hotel Properties in the CVR Asset Pool at the time of any Distribution Triggering Monetization Event or, if no Distribution Triggering Monetization Event has occurred prior thereto, the Final Payment Date, as applicable, does not exceed the aggregate Adjusted EBITDA Threshold for such Hotel Properties;

(ii)      in the case of a Change-of-Control Monetization Event structured such that cash or non-cash consideration is payable to the Shareholders and less than all of the Capital Stock in the Company or its applicable Subsidiary(ies) is sold pursuant to such Change-of-Control Monetization Event, for the purposes of determining the Net Proceeds from CVR Asset Pool determined pursuant to <u>Section 2.4(c)(i)</u>, the balance of the Capital Stock not sold in such Change-of-Control Monetization Event shall be deemed to have been sold to the same purchaser(s), in the same transaction and for the same amount and type of consideration per share as the shares of Capital Stock actually sold pursuant to such Change-of-Control Monetization Event, such that all of the Capital Stock in the Company or its applicable Subsidiary(ies) shall be deemed to have been sold pursuant to such Change-of-Control Monetization Event and any amount payable on the CVR Payment Date with respect to such Change-of-Control Monetization Event shall be the only payment Holders will, if such a Change-of-Control Monetization Event occurs, be entitled to receive under this Agreement other than any additional amount that may become payable to the Holders (A) as part of the Final Payment Date Distribution with respect to any portion of a Holdback Amount actually received prior to the Final Payment Date and, at the election of the Company pursuant to <u>Section 2.4(d)(vi)</u>, the Holdback Value with respect to any portion of a Holdback Amount not actually received in cash prior to the Final Distribution Date or (B) as part of a Holdback Payment Distribution;

(iii)      for the purposes of determining the applicable amount determined pursuant to <u>Section 2.4(c)(i)</u> or the Net Proceeds from Hotel Sale for any Hotel Property, consideration shall not include any amount of such consideration payable (any such amount, a "***Holdback Amount***") pursuant to the applicable transaction that is subject to escrow or similar arrangements pursuant to the terms of the definitive documentation governing such transaction as in effect upon the occurrence thereof (any such arrangement, a "***Holdback***"), including (A) any such consideration that may be paid pursuant to earn-outs, holdbacks, milestones or other contingent arrangements (whether or not related to future earnings or operations), (B) any such consideration placed in escrow or otherwise held back to support indemnification obligations, specified liabilities (including taxes), purchase price adjustments, known or contingent claims (including making provision for such claims as required by applicable law in connection with a dissolution), or other obligations, and (C) any such consideration that is set aside in a separate account for use by the Company or an agent or representative of the Holders in connection with such transaction whose duties include, among other things, managing, addressing,

17

monitoring or otherwise dealing with post-closing matters relating to such transaction to manage, address, monitor or otherwise deal with post-closing matters relating to such transaction; <u>provided</u> that any such Holdback Amount (or a portion thereof) shall be deemed to be included in Net Proceeds from CVR Asset Pool or Net Proceeds from Hotel Sale when released from such escrow or other arrangement and paid to the Company or the Shareholders, as applicable, and any additional amount that would have been payable to the Holders on any CVR Payment Date pursuant to <u>Section 2.5(c)</u> with respect to the Holdback Amount (or a portion thereof) so released and paid prior to the Final Payment Date shall instead be payable to the Holders as part of the Final Payment Date Distribution pursuant to <u>Section 2.5(d)</u>;

(iv)    in no event shall Net Proceeds from CVR Asset Pool or Net Proceeds from Hotel Sale include (A) any consideration received by the Company or the holders of Capital Stock that is not directly attributable to the acquisition of Capital Stock or any assets of the Company, including payments made by the counterparty to a Monetization Event or other applicable transaction in respect of agreements not to compete, employment or consulting arrangements, transition services or other similar arrangements, (B) any portion of the consideration in a Monetization Event or other applicable transaction that is not paid to the Company or the holders of Capital Stock, as applicable, including any portion of the consideration that is used to pay indebtedness (including principal, interest, break fees, management fees and any other fees and expenses), fees and expenses, change of control payments (including transfer and consent fees and severance or other termination payments), bonuses, brokers' commissions or similar fees, or other liabilities of the Company (other than liabilities that have been expressly excluded from the calculation of Net Proceeds from CVR Asset Pool or Net Proceeds from Hotel Sale in accordance with the terms of this Agreement) or (C) any debt (including capital leases), operating leases, accounts payable or other liabilities of the Company assumed, acquired, refinanced or replaced by a counterparty to a Monetization Event or other applicable transaction;

(v)    if the assets subject to a Monetization Event include assets that are not included in the CVR Asset Pool for any reason (including if such assets are Excluded Assets or were acquired by the Company subsequent to the Effective Date), the applicable amount determined pursuant to <u>Section 2.4(c)(i)</u> shall be determined by an Independent Investment Banker, which amount shall represent a proportionate adjustment based on the ratio of the Value of the assets subject to the Monetization Event that are included in the CVR Asset Pool as compared to the Value of the assets subject to the Monetization Event that are not included in the CVR Asset Pool, as adjusted to the extent necessary to reflect a similarly proportionate share, to the extent applicable, of associated indebtedness and other liabilities and costs and expenses;

(vi)    if any portion of a Holdback Amount remains contingent as of the Final Payment Date, then, at the Company's election (acting in its sole discretion), either (A) the Holdback Value of such portion of such Holdback Amount shall be included in the Company's calculation of the Value of the CVR Asset Pool not sold or transferred prior to the Final Payment Date calculated in accordance with <u>Section 2.4(b)(ii)</u> in respect of the Final Payment Date Distribution or (B) Holders shall have

the right to be paid a distribution (any such distribution described in this clause (B), a "***Holdback Payment Distribution***") if and when the Company actually receives consideration in respect of such portion of such Holdback Amount.

(vii)    the Value of any portion of a Holdback Amount that remains contingent as of the Final Payment Date and the Company elects to take into account in the calculation of the Final Payment Date Distribution pursuant to Section 2.4(d)(vi)(A) (the "***Holdback Value***") shall be determined in accordance with the value at which it is reflected on the Company's balance sheet for the quarter ended immediately preceding the Final Payment Date in accordance with GAAP or, if such Holdback Amount is not reflected on the Company's balance sheet for the quarter ended immediately preceding the Final Payment Date in accordance with GAAP, the Value of such Holdback Amount shall be an amount equal to the value at which such Holdback Amount would have been reflected on the Company's balance sheet as of such quarter-end if it had been required to be so reflected in accordance with GAAP as such value is determined in good faith by the Board of Directors;

(viii)    for the avoidance of doubt, following the payment by the Company of a Final Payment Date Distribution that takes into account the Holdback Value of any portion of a Holdback Amount pursuant to Section 2.4(d)(vi)(A), no further amount in respect of such portion of such Holdback Amount shall be payable or distributable pursuant to this Agreement and there shall be no Holdback Payment Distribution with respect to such portion of such Holdback Amount;  and

(ix)    in no event shall the Net Proceeds from CVR Asset Pool, Net Proceeds from Hotel Sale or Value include any amount attributable to the outstanding principal amount of any Upstream Intercompany Loans.

(e)    If, prior to the sixtieth (60th) day prior to the Final Payment Date, (i) there has not been a Distribution Triggering Monetization Event or (ii) (A) there has been a Distribution Triggering Monetization Event, (B) there has not been a Change-of-Control Monetization Event and (C) not all of the assets of the CVR Asset Pool have been sold, then the Board of Directors shall, on or prior to such day, appoint an Independent Valuer to determine the Value of the CVR Asset Pool as of the Final Payment Date. The Company shall provide the Independent Valuer with any applicable financial statements and other supporting documentation relating to the applicable Hotel Properties that the Independent Valuer shall reasonably request. The Independent Valuer shall be instructed to make the determination of the Value of the Hotel Properties and submit a report meeting the requirements for an MAI appraisal not later than the twenty-sixth (26th) Business Day prior to the Final Payment Date. The Company shall pay all fees and disbursements due to the Independent Valuer, which fees and disbursements shall constitute CVR Distribution Expenses under this Agreement and shall be deducted from the Net Proceeds from CVR Asset Pool in the calculation of the Total CVR Pool Amount described above in Section 2.4(b). Any decision rendered by the Independent Valuer with respect to the Value of any Hotel Property shall be final, conclusive and binding upon the Company and each Holder (absent manifest error) for purposes of this Agreement.

(f)

(i)        If either there has been a Distribution Triggering Monetization Event in which any consideration has been excluded from the calculation of the Net Proceeds from the CVR Asset Pool for such Distribution Triggering Monetization Event as a result of a Holdback, then the Net Proceeds from CVR Asset Pool shall be re-calculated as of the Final Payment Date to include any portion of the Holdback that has been actually received by the Company or the Shareholders prior to the Final Payment Date, as applicable.  For the avoidance of doubt, following the CVR Payment Date in respect of a Change-of-Control Monetization Event, there shall be no additional amount payable to Holders under this Agreement other than, if applicable, the payment of any amount in respect of any proceeds from a Holdback actually received by the Company or the Shareholders following such CVR Payment Date and prior to the Final Payment Date and the Holdback Value.

(ii)        In connection with any Holdback Payment Distribution in which all or a portion of the Holdback Amount actually received is in non-cash consideration, then the Board of Directors shall appoint an Independent Investment Banker to determine the Value of such non-cash consideration promptly following its actual receipt thereof.  The Company shall provide the Independent Investment Banker with any applicable supporting documentation relating to the applicable non-cash consideration that the Independent Investment Banker shall reasonably request. The Independent Investment Banker shall be instructed to make the determination of the Holdback Value with respect to such non-cash consideration not later than the tenth (10th) Business Day following such appointment.  The Company shall pay all fees and disbursements due to the Independent Investment Banker, which fees and disbursements shall constitute CVR Distribution Expenses under this Agreement and shall be deducted from the Net Proceeds from CVR Asset Pool in the calculation of the Total CVR Pool Amount described above in Section 2.4(b) with respect to such Holdback Payment Distribution.   Any decision rendered by the Independent Investment Banker with respect to the Value of such non-cash consideration shall be final, conclusive and binding upon the Company and each Holder (absent manifest error) for purposes of this Agreement.

(g)        Subject in all respects to Section 2.4(h), the Total Distributable Amount that shall be distributable to the Holders in connection with a Distribution Triggering Monetization Event, the Final Payment Date Distribution or any Holdback Payment Distribution shall be calculated as follows (with each Holder entitled to receive its Pro Rata Payment Amount of the amounts set forth in this Section 2.4(g) that are distributable to the Holders):

(i)        first, the Total CVR Pool Amount with respect to such Distribution Triggering Monetization Event, Final Payment Date Distribution or Holdback Payment Distribution, as applicable, *plus* the Additional Adjustment Amount as of the calculation date (the sum of such amounts, the "***Adjusted Total CVR Pool Amount***") shall be applied to reduce the DIP Financing Invested Capital Amount (as previously reduced from prior applications in accordance with this Section 2.4(g)(i) and Section 2.4(j)) until the DIP Financing Invested Capital Amount has been reduced to zero;

(ii)    second, if the amount equal to (A) the Adjusted Total CVR Pool Amount with respect to such Distribution Triggering Monetization Event, Final Payment Date Distribution or Holdback Payment Distribution, as applicable, *less* (B) the amount applied to reduce the DIP Financing Invested Capital Amount pursuant to Section 2.4(g)(i) in connection with such Distribution Triggering Monetization Event, Final Payment Date Distribution or Holdback Payment Distribution, as applicable, is greater than zero, the remainder of such Adjusted Total CVR Pool Amount shall be applied to reduce the Supporting Stockholder CVR Asset Pool Invested Amount (as previously reduced from prior applications in accordance with this Section 2.4(g)(ii) and Section 2.4(j)) until the Supporting Stockholder CVR Asset Pool Invested Amount has been reduced to zero;

(iii)    third, if the amount equal to (A) the Adjusted Total CVR Pool Amount *less* (B) the amounts applied to reduce the DIP Financing Invested Capital Amount and the Supporting Stockholder CVR Asset Pool Invested Amount pursuant to Sections 2.4(g)(i) and 2.4(g)(ii) is greater than zero, 6.0% of the remainder of such Adjusted Total CVR Pool Amount shall be distributable to the Holders until 94.0% of such remainder as of the calculation date (the "***Section 2.4(g)(iii) 94% Amount***") *plus* the aggregate amount of any Section 2.4(g)(iii) 94% Amounts calculated from prior applications of this Section 2.4(g)(iii) equals a return of 15.0% per annum accrued starting on the day following the Effective Date and thereafter on the basis of twelve (12) thirty (30)-day months and a three hundred sixty (360)-day year, compounding quarterly, on the DIP Financing Invested Capital Amount balance from time to time;

(iv)    fourth, if the amount equal to (A) the Adjusted Total CVR Pool Amount *less* (B) (x) the amounts applied to reduce the DIP Financing Invested Capital Amount and the Supporting Stockholder CVR Asset Pool Invested Amount pursuant to Sections 2.4(g)(i) and 2.4(g)(ii) and (y) the amounts distributable to the Holders under Section 2.4(g)(iii) is greater than zero, 6.0% of the remainder of such Adjusted Total CVR Pool Amount shall be distributable to the Holders until 94.0% of such remainder as of the calculation date (the "***Section 2.4(g)(iv) 94% Amount***") *plus* the aggregate amount of any Section 2.4(g)(iv) 94% Amounts calculated from prior applications of this Section 2.4(g)(iv) equals a return of 12.5% per annum accrued starting on the day following the Petition Date and thereafter on the basis of twelve (12) thirty (30)-day months and a three hundred sixty (360)-day year, compounding quarterly, on the Supporting Stockholder CVR Asset Pool Invested Amount balance from time to time; and

(v)    fifth, if the amount equal to (A) the Adjusted Total CVR Pool Amount *less* (B)(x) the amounts applied to reduce the DIP Financing Invested Capital Amount and the Supporting Stockholder CVR Asset Pool Invested Amount pursuant to Sections 2.4(g)(i) and 2.4(g)(ii) and (y) the amounts distributable to the Holders under Sections 2.4(g)(iii) and 2.4(g)(iv) is greater than zero, 25.0% of the remainder of such Adjusted Total CVR Pool Amount shall be distributable to the Holders.

(h)    Notwithstanding anything to the contrary contained in this Agreement, the total amount distributable to a Holder under this Agreement may not exceed $6.00 per Contingent Value Right held by such Holder.

(i)    For the avoidance of doubt, (i) any distribution, payment or loan that is an Additional Adjustment Amount shall be deemed to have reduced, as applicable, the balance of the DIP Financing Invested Capital Amount or the Supporting Stockholder CVR Asset Pool Invested Amount, as applicable, on the funding date of such distribution, payment or loan, (ii) any reduction in the DIP Financing Invested Capital Amount or the Supporting Stockholder CVR Asset Pool Invested Amount in connection with a Monetization Event shall be deemed to have occurred on the date of the Monetization Event and (iii) no amount shall be distributable with respect to the sale of a Hotel Property as described in clause (iii) of the definition of Monetization Event prior to the Final Payment Date Distribution, but the Net Proceeds from CVR Asset Pool from any such Monetization Event shall be taken into account in determining the Total Distributable Amount in respect of the Final Payment Date Distribution in accordance with Section 2.4(b)(ii)(A)(1).

(j)    For illustrative purposes only, an example of a calculation of the Total Distributable Amount in accordance with Section 2.4(g) is set forth on Schedule III attached hereto together with a spreadsheet supporting such calculation.

(k)    For the avoidance of doubt and notwithstanding anything to the contrary contained in this Agreement; (i) no Holder shall be entitled to any distribution in excess of its Pro Rata Payment Amount; (ii) the amount by which (A) the amount that would otherwise be distributable to the Holders pursuant to Section 2.4(g) exceeds (B) the aggregate of all of the Pro Rata Payment Amounts with respect to the applicable Distribution Triggering Monetization Event, Final Payment Date Distribution or Holdback Payment Distribution shall, in each case, be for the Company's account, with such excess amount to be used in the Company's sole discretion and without limitation or further obligation to any Holder or otherwise under this Agreement (including any obligation to take such excess into account in the calculation of any Total Distributable Amount with respect to a future Distribution Triggering Monetization Event, Final Payment Date Distribution or Holdback Payment Distribution); and (iii) the amount required to be deposited with the CVR Agent pursuant to Section 2.5 with respect to the Total Distributable Amount shall be the aggregate of the Pro Rata Payment Amounts that are actually distributable to the Holders.

Section 2.5.    Payment Procedures.

(a)    If a Distribution Triggering Monetization Event occurs, then no later than the later of (i) the date upon which the financial information with respect to the CVR Asset Pool for the calendar quarter immediately preceding the calendar quarter in which such Distribution Triggering Monetization Event occurs is required to be provided to the CVR Agent pursuant to Section 4.3(a) and (ii) the date that is thirty (30) days following such Distribution Triggering Monetization Event, the Company shall deliver to the CVR Agent and the CVR Agent shall, pursuant to the confidential, password-protected website that shall be established and administered by the CVR Agent pursuant to Section 4.3(b) make available a certificate with the calculation of Adjusted EBITDA for the Measurement Period for all Hotel Properties in the CVR Asset Pool individually and in the aggregate, and individually for any Hotel Property that was sold prior to such Distribution Triggering Monetization Event in a sale that qualified or did not qualify as a

Qualifying CVR Asset Pool Sale, the corresponding Adjusted EBITDA Threshold for each such Hotel Property, and the Company's calculation of the Net Proceeds from CVR Asset Pool, the Total CVR Pool Amount (if different from the Net Proceeds from CVR Asset Pool) and the Total Distributable Amount with respect to such Distribution Triggering Monetization Event (the "*Calculation Certificate*"), which such Calculation Certificate and the information contained therein shall be deemed to be Confidential Information pursuant to this Agreement and subject to the terms and provisions of Section 4.3(b) hereof. The Company shall Make Available notice of the fact that such Calculation Certificate has been made available on such confidential website. If such Distribution Triggering Monetization Event is the consummation of the direct or indirect sale of All or Substantially All of the Assets and not all of the assets included in the CVR Asset Pool have been sold or the consideration payable in such Distribution Triggering Monetization Event could result in all or any portion of a Holdback Amount becoming payable in accordance with Section 2.4(d)(iii), the Calculation Certificate shall also so indicate and state that the Holders may be entitled to receive an additional cash payment with respect to the remaining assets in the CVR Asset Pool that were not sold in such Distribution Triggering Monetization Event or the Holdback Amount. If an Independent Valuer is appointed pursuant to Section 2.4(e), then on or prior to the twenty-fifth (25th) Business Day prior to the Final Payment Date, the Company will deliver a Calculation Certificate (which Calculation Certificate shall also include the Value calculated in accordance with Section 2.4(b)(ii)(B) and information regarding any elections made by the Company pursuant to Section 2.4(d)(vi)) to the CVR Agent and make available such Calculation Certificate in accordance with the first sentence of this Section 2.5(a).

(b)     Subject to Section 2.5(d), during the twenty (20) Business Day period after the Calculation Certificate is made available to Holders in accordance with Section 2.5(a) (the "*Objection Period*"), the Majority of Holders may send a notice duly and validly executed by such Holders (the "*Notice of Objection*") to the CVR Agent and the Company detailing their objection to any calculation of a Total Distributable Amount hereunder as set forth in the Calculation Certificate by providing a reasonable, good faith basis for their objection; provided however such objection may not relate to any item determined by the Independent Valuer or Independent Investment Banker. Following the receipt of a Notice of Objection, the Company shall permit, and shall cause its Subsidiaries to permit, the Independent Accountant to have access to the records of the Company or its Subsidiaries as may be reasonably necessary to investigate the basis for the Notice of Objection. Any dispute arising from a Notice of Objection will be resolved by the Independent Accountant in accordance with the procedure set forth in Section 2.6, which decision will be final, conclusive and binding on the parties hereto and every Holder (absent manifest error). If a Notice of Objection has not been delivered to the Company within the Objection Period, then the Company's calculations in the Calculation Certificate will be final, conclusive and binding on the parties hereto and every Holder for all purposes of this Agreement.

(c)     If, following the delivery of a Calculation Certificate and the Objection Period or, if applicable, completion of the procedure set forth in Section 2.6(a) with respect to a Distribution Triggering Monetization Event or the Final Payment Date Distribution (with respect to which an Independent Valuer has been appointed pursuant to Section 2.4(e)) for which a Notice of Objection has been duly and validly executed by the Majority of Holders and timely delivered to the CVR Agent, there is a Total Distributable Amount distributable to the Holders with respect to such Distribution Triggering Monetization Event or Final Payment Date Distribution, the Company will deposit with the CVR Agent cash in an amount equal to the Total Distributable

Amount with respect to such Distribution Triggering Monetization Event or Final Payment Date. On the date (a "***CVR Payment Date***") that is not more than five (5) Business Days after receipt of such Total Distributable Amount (and which shall, if with respect to a distribution with respect to the Final Payment Date, be the Final Payment Date), the CVR Agent will then pay to each Holder an amount equal to such Holder's Pro Rata Payment Amount with respect to such Total Distributable Amount by check mailed to the address of each such respective Holder as reflected in the CVR Register, or, if agreed to by the Company with respect to any Holder who has provided the CVR Agent with wire transfer instructions meeting the CVR Agent's requirements, by wire transfer of immediately available funds to such account.

(d)     If a Final Payment Date Distribution is payable to the Holders on the Final Payment Date pursuant to Section 2.4(g) and no Independent Valuer has been appointed pursuant to Section 2.4(e), the Company will, on the fifth (5th) Business Day prior to the Final Payment Date, deposit with the CVR Agent cash in an amount equal to the Total Distributable Amount to be distributed on the Final Payment Date.  Holders shall have no right to object to the calculation of this amount pursuant to Section 2.5(b) or otherwise. On the Final Payment Date, the CVR Agent will then pay to each Holder an amount equal to such Holder's Pro Rata Payment Amount with respect to such Total Distributable Amount either by check mailed to the address of each such respective Holder as reflected in the CVR Register, or, if agreed to by the Company, with respect to any Holder who has provided the CVR Agent with wire transfer instructions meeting the CVR Agent's requirements, by wire transfer of immediately available funds to such account.

(e)     If a Holdback Payment Distribution is payable to the Holders at any time pursuant to Section 2.4(d)(vi)(B) and all of the consideration received in respect of the applicable Holdback Amount was cash, the Company will, within ten (10) Business Days after receipt of the cash consideration in respect of the applicable Holdback Amount, deposit with the CVR Agent cash in an amount equal to the Total Distributable Amount with respect to such Holdback Payment Distribution.  If a Holdback Payment Distribution is payable to the Holders at any time pursuant to Section 2.4(d)(vi)(B) and some or all of the consideration received in respect of the applicable Holdback Amount was non-cash consideration, the Company will, within ten (10) Business Days after the final determination by the Independent Investment Banker of the Value of such non-cash consideration portion of the Holdback Amount in accordance with Section 2.4(f)(ii), deposit with the CVR Agent cash in an amount equal to the Total Distributable Amount with respect to such Holdback Payment Distribution.  In the case of either of the preceding two sentences of this Section 2.5(e), on the date (a "***Holdback Payment Distribution Payment Date***") that is not more than five (5) Business Days after receipt of such Total Distributable Amount, the CVR Agent will then pay to each Holder an amount equal to such Holder's Pro Rata Payment Amount with respect to such Total Distributable Amount in respect of such Holdback Payment Distribution by check mailed to the address of each such respective Holder as reflected in the CVR Register, or, if agreed to by the Company with respect to any Holder who has provided the CVR Agent with wire transfer instructions meeting the CVR Agent's requirements, by wire transfer of immediately available funds to such account.

(f)     The Company and the CVR Agent will be entitled to deduct and withhold, or cause to be deducted or withheld, from the Total Distributable Amount or any other amount payable to the Holders pursuant to this Agreement, such amount as the Company or the CVR Agent is required to deduct and withhold with respect to the making of such payment under the

Code, or any provision of state, local or non-U.S. Tax law. The Holders will deliver to the Company and/or the CVR Agent, as applicable, at the time or times reasonably requested by the Company and/or the CVR Agent, as applicable, such properly completed and executed documentation reasonably requested by the Company and/or the CVR Agent, as applicable, as will permit the Company and/or the CVR Agent to determine the appropriate amount of withholding. To the extent that amounts are so withheld are paid over to or deposited with the relevant Governmental Entity, withheld amounts will be treated for all purposes of this Agreement as having been paid to a Holder in respect of which such deduction and withholding was made.

(g)     The CVR Agent shall have no duty or obligation to calculate, verify or confirm the accuracy, validity or sufficiency of any Total Distributable Amount or any other amount under this Agreement.

(h)     The Company's and CVR Agent's obligation to pay any Total Distributable Amount shall be conditioned on no court or other Governmental Entity of competent jurisdiction having enacted, issued, promulgated, enforced or entered any judgment, injunction or order (whether temporary, preliminary or permanent) that is in effect and restrains, enjoins or otherwise prohibits or imposes any penalty upon the payment of any Total Distributable Amount and the payments being otherwise lawful.

(i)     If the Company requests in writing to the CVR Agent, any funds comprising the cash deposited with the CVR Agent under Section 2.5(c), Section 2.5(d) or Section 2.5(e) that remain undistributed to the Holders twelve (12) months after a CVR Payment Date, the Final Payment Date or a Holdback Payment Distribution Payment Date, as applicable, shall be delivered to the Company by the CVR Agent and any Holders who have not theretofore received payment in respect of such Contingent Value Rights shall thereafter look only to the Company for payment of such amounts, subject to any applicable escheatment laws in effect from time to time. Upon delivery of such funds to the Company, the escheatment obligations of the CVR Agent with respect to such funds shall terminate.  Notwithstanding any other provisions of this Agreement, any portion of the funds provided by or on behalf of the Company to the CVR Agent that remains unclaimed one hundred and eighty (180) days after termination of this Agreement in accordance with Section 7.7 (or such earlier date immediately prior to such time as such amounts would otherwise escheat to, or become property of, any Governmental Entity) shall, to the extent permitted by law, become the property of the Company, free and clear of any claims or interest of any person previously entitled thereto, subject to any applicable escheatment laws in effect from time to time.

(j)     All funds received by Computershare under this Agreement that are to be distributed or applied by Computershare in the performance of services hereunder shall be held by Computershare as agent for the Company and deposited in one or more bank accounts to be maintained by Computershare in its name as agent for the Company, and such funds shall be free of any claims by the Company other than reversionary rights and as set forth in Section 2.5(i), and separate from any potential bankruptcy estate of the Company.  Computershare shall have no responsibility or liability for any diminution of the funds that may result from any deposit made by Computershare in accordance with this paragraph, including any losses resulting from a default by any bank, financial institution or other third party, except as a result of Computershare's willful misconduct, fraud, bad faith or gross negligence (each as determined by a final, non-appealable

judgment of a court of competent jurisdiction).  Computershare may from time to time receive interest, dividends or other earnings in connection with such deposits.  Computershare shall not be obligated to pay such interest, dividends or earnings to the Company, any Holder or any other party.  Notwithstanding anything to the contrary herein, Company shall be responsible for providing Computershare with sufficient funds to satisfy its payment obligations to the Holders.

Section 2.6.    Review of the Independent Accountant.

(a)    Any dispute arising from the delivery of a Notice of Objection pursuant to Section 2.5(b) will be settled by the Independent Accountant, who will act as an expert, and not as an arbitrator.  The Company will engage the Independent Accountant and will reasonably cooperate with the Independent Accountant, including providing the Independent Accountant reasonable access during normal business hours and on reasonable advance notice to relevant personnel, properties, and books and records of the Company.  The Independent Accountant will limit its review and determination to the items set forth in the Notice of Objection and to no other matters, and will deliver a written report containing its calculations of each such disputed item. The final determination of the Independent Accountant will be made in strict accordance with the terms of this Agreement.  The Independent Accountant will render its written report resolving such items in dispute as soon as possible after completion of written submissions to the Independent Accountant.  The Independent Accountant will determine the items in dispute solely based on the Notice of Objection and the written submissions made by the Company and not by independent review and the Independent Accountant will not be permitted to question any judgment or assumption made by the Company in determining the Total Distributable Amount in any case where a judgment or assumption is required in the calculation of the Total Distributable Amount. The costs and expenses billed by the Independent Accountant in connection with the performance of its duties described herein shall be allocated, on the one hand, to the Company (and shall not reduce the Total CVR Pool Amount) and, on the other hand, to the Holders (and shall be treated as CVR Distribution Expenses, and shall reduce the Total CVR Pool Amount), in each case, on a pro rata basis based upon the degree to which the Independent Accountant has accepted the respective positions of the Company, on the one hand, and the Holders (as set forth in the Notice of Objection), on the other hand, and such allocation shall be determined by the Independent Accountant and set forth in its final report. The Company and each Holder will be responsible for its own attorney fees, expenses and costs.  The decision of the Independent Accountant will be final, conclusive and binding (absent manifest error) on the parties hereto and each of the Holders.

(b)    The sole and exclusive remedy or recourse for any Holder under this Agreement relating to the Calculation Certificate delivered by the Company and the determination as to whether a distribution is required to be made under this Agreement shall be to, subject to Section 2.5(d), submit a Notice of Objection and trigger the review by the Independent Accountant pursuant to this Section 2.6.

Section 2.7.    Maturity Date Extension. If the Board of Directors, in its sole discretion, determines that the Company shall exercise its right to extend the Maturity Date pursuant to this Section 2.7, the Company shall exercise such right by delivering a written notice to the CVR Agent no later than ten (10) days prior to the Initial Maturity Date stating that the Board of Directors has determined to extend the Maturity Date to the Extended Maturity Date. The Company shall Make Available such notice to the Holders; provided that any failure so to notify the Holders shall not

affect the validity of such extension (it being understood that any failure so to notify the Holders shall not excuse the CVR Agent from its obligations under this <u>Section 2.7</u>).

Section 2.8.    <u>No Voting, Dividends or Interest; No Equity or Ownership Interest in the Company; No Fiduciary Duties</u>.

(a)    The Contingent Value Rights shall not have any voting or dividend rights, and interest shall not accrue on any amounts payable regarding any Contingent Value Rights to any Holder.

(b)    The Contingent Value Rights shall not represent any equity, stock or other ownership interest in the Company, any Subsidiary or any Affiliate of the Company or any other Person.

(c)    Neither the Company, nor any of its Subsidiaries (including the CVR Holding Company), nor any of their respective officers or directors owe fiduciary duties of any kind to the Holders.

Section 2.9.    <u>Ability to Abandon the Contingent Value Right</u>.    The Holder of a Contingent Value Right may at any time, at such Holder's option, abandon all of such Holder's remaining rights in a Contingent Value Right by delivering to the CVR Agent a notice of abandonment relinquishing such Contingent Value Right to the Company without consideration therefor, in which case such Contingent Value Right shall be deemed canceled and no longer outstanding, and the CVR Agent shall amend the CVR Register accordingly and notify the Company in writing.

# ARTICLE 3
# THE CVR AGENT

Section 3.1.    <u>Certain Duties and Responsibilities</u>.    The CVR Agent shall not have any liability for any actions taken, suffered or omitted to be taken in connection with this Agreement, except to the extent of its willful misconduct, fraud, , bad faith or gross negligence (each as determined by a final, non-appealable judgment of a court of competent jurisdiction).  Anything to the contrary notwithstanding, in no event shall any Person be liable for any special, punitive, indirect, consequential or incidental loss or damage of any kind whatsoever (including but not limited to lost profits) arising out of any act or failure to act hereunder.  The aggregate liability of the CVR Agent with respect to, arising from, or arising in connection with this Agreement, or from all services provided or omitted to be provided under this Agreement, whether in contract, or in tort, or otherwise, is limited to, and shall not exceed, the amounts paid hereunder by the Company to the CVR Agent as fees, but not including reimbursable expenses, during the twelve (12) months immediately preceding the event for which recovery from the CVR Agent is being sought.  No provision of this Agreement shall require the CVR Agent to expend or risk its own funds, take any action that it reasonably believes would expose or subject it to expense or liability, or otherwise incur any financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers. The Company's obligations under this <u>Section 3.1</u> and <u>Section 3.2</u> shall survive the resignation or removal of any CVR Agent, the expiration of the CVRs and the termination of this Agreement.

Section 3.2.    Certain Rights of CVR Agent.  The CVR Agent undertakes to perform such duties and only such duties as are specifically set forth in this Agreement, and no implied duties, covenants or obligations shall be read into this Agreement against the CVR Agent.  In addition:

(a)    the CVR Agent may rely on and shall be protected and shall incur no liability for or in respect of any action taken, suffered or omitted to taken by it in reliance upon any resolution, certificate, statement, instrument, opinion, report, notice, request, instruction, direction, consent, order or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties;

(b)    the CVR Agent may perform any and all of its duties (i) itself (through its directors, officers, or employees) or (ii) through its agents, representatives, attorneys, custodians and/or nominees and the CVR Agent shall not be answerable or accountable for any act, default, neglect or misconduct of any such agents, representatives, attorneys, custodians and/or nominees, absent their gross negligence, bad faith or willful or intentional misconduct (each as determined by a final non-appealable judgment of a court of competent jurisdiction) in the selection and continued employment thereof;

(c)    the permissive rights of the CVR Agent to do things enumerated in this Agreement shall not be construed as a duty;

(d)    the CVR Agent shall not be required to give any note or surety in respect of the execution of such powers or otherwise in respect of the premises;

(e)    the Company agrees to indemnify, defend, protect, save and keep harmless the CVR Agent and its affiliates and their respective successors, assigns, directors, officers, managers, employees, agents, attorneys, accountants and experts (collectively, the "*Indemnitees*"), against any and all loss, liability, obligation, damage, fine, settlement, penalty, action, judgment, suit, cost, disbursement, proceeding, investigation, claim, demand or out-of-pocket expense of any kind or nature whatsoever (including the reasonable and documented, out-of-pocket fees and expenses of legal counsel and the reasonable and documented, out-of-pocket costs and expenses of defending the Indemnitee against any claim of liability arising therefrom) (collectively, "*Losses*") that may be imposed on, incurred by, or asserted against any Indemnitee, at any time, and in any way relating to, arising out of or in connection with the execution, delivery or performance of this Agreement, the enforcement of any rights or remedies in connection with this Agreement, and the payment, transfer or other application of funds pursuant to this Agreement, or as may arise by reason of any act, omission or error of the Indemnitee; provided, however, that no Indemnitee shall be entitled to be so indemnified, defended, protected, saved or kept harmless to the extent such Loss was caused by the willful misconduct, fraud, bad faith or gross negligence of any Indemnitee (each as determined by a final, non-appealable judgment of a court of competent jurisdiction);

(f)    in addition to the indemnification provided under Section 3.2(e), the Company agrees (i) to pay the fees of the CVR Agent in connection with the CVR Agent's performance of its obligations hereunder, as set forth on a mutually agreed upon fee schedule executed by the Company and the CVR Agent on or prior to the date hereof (the "*CVR Agent Fees*"), and (ii) to reimburse the CVR Agent within ten (10) days after written demand for all

28

reasonable and documented, out-of-pocket expenses and other disbursements incurred in the preparation, delivery, negotiation, amendment, administration and execution of this Agreement and the exercise and performance of its duties hereunder, including all Taxes (other than income, receipt, franchise or similar Taxes) and charges;

(g)     in the event the CVR Agent reasonably believes any ambiguity or uncertainty exists hereunder or in any notice, instruction, direction, request or other communication, paper or document received by the CVR Agent hereunder, the CVR Agent may, in its sole discretion, refrain from taking any action, and shall be fully protected and shall not be liable in any way to the Company or other Person or entity for refraining from taking such action, unless the CVR Agent receives written instructions signed by the Company which eliminate such ambiguity or uncertainty to the reasonable satisfaction of the CVR Agent;

(h)     nothing herein shall preclude the CVR Agent from acting in any other capacity for the Company or for any other Person;

(i)     the CVR Agent shall not incur any liability for not performing any act, duty, obligation or responsibility by reason of any occurrence beyond the control of the CVR Agent (including any act or provision of any present or future law or regulation or governmental authority, any act of God, terrorist acts, shortage of supply, breakdowns or malfunctions, interruptions or malfunction of computer facilities, or loss of data due to power failures or mechanical difficulties with information storage or retrieval systems or failure of any means of communication, labor difficulties, war, civil disorder or epidemic or pandemic); provided, that the CVR Agent shall (i) use its commercially reasonable efforts to end or mitigate the effects of any such occurrence and (ii) resume the performance of its obligations as soon as reasonably practicable after the end of such occurrence;

(j)     whenever the CVR Agent shall deem it necessary or desirable that a fact or matter be proved or established prior to taking, suffering or omitting any action hereunder (including the identity of a Holder), the CVR Agent may rely upon an Officer's Certificate, and such Officer's Certificate shall be full and complete authorization and protection to the CVR Agent.  The CVR Agent shall incur no liability for or in respect of any action taken, suffered or omitted by it absent willful misconduct, fraud, bad faith or gross negligence (each as determined by a final, non-appealable judgment of a court of competent jurisdiction) under the provisions of this Agreement in reliance on such Officer's Certificate.  The CVR Agent is hereby authorized and directed to accept instructions with respect to the performance of its duties and obligations hereunder from the chief executive officer, president, chief financial officer, any vice president, the controller, the treasurer or the secretary of the Company, and to apply to such officer for advice or instructions in connection with its duties, and it shall not be liable and shall be indemnified for any action taken or suffered to be taken by it in accordance with instructions from such officer. The CVR Agent shall not be held to have notice of any change of authority of any person, until receipt of written notice thereof from the Company;

(k)     the CVR Agent shall not be subject to, nor be required to comply with, or determine if any person or entity has complied with, the Plan Documents (other than this Agreement) or any other agreement between or among the parties hereto, even though reference thereto may be made in this Agreement, or to comply with any notice, instruction, direction,

request or other communication, paper or document other than as expressly set forth in this Agreement; and

(l)    the Company agrees that it shall perform, execute, acknowledge and deliver or cause to be performed, executed, acknowledged or delivered all such further and other acts, instruments and assurances as may reasonably be required by the CVR Agent for the carrying out or performing by the CVR Agent of the provisions of this Agreement.

Section 3.3.    Resignation and Removal; Appointment of Successor.

(a)    The CVR Agent may resign and be discharged from its duties under this Agreement at any time by giving written notice thereof to the Company specifying a date when such resignation shall take effect, which notice shall be sent at least thirty (30) days prior to the date so specified, and such resignation shall take effect on such specified date.

(b)    The Company shall have the right to remove the CVR Agent at any time for any reason or no reason upon at least thirty (30) days' notice, specifying a date when such removal shall take effect.

(c)    If the CVR Agent shall resign, be removed, or become incapable of acting, the Company shall promptly (and in any event within thirty (30) days after giving notice of the CVR Agent's removal or after it has been notified of the CVR Agent's resignation) appoint a qualified successor CVR Agent.  The predecessor CVR Agent shall deliver any funds held in connection with this Agreement to any such successor CVR Agent at or prior to the effectiveness of the predecessor CVR Agent's resignation or removal.  The successor CVR Agent so appointed shall, forthwith upon its acceptance of such appointment in accordance with this Section 3.3(c), Section 3.3(e) and Section 3.4, become the successor CVR Agent.

(d)    The Company, or at the Company's request the successor CVR Agent, shall give notice of each resignation and each removal of the CVR Agent and each appointment of such successor CVR Agent by Making Available notice of such event to the Holders.  Failure to Make Available any such notice to the Holders, however, or any defect therein, shall not affect the legality or validity of the resignation or removal of the CVR Agent or the appointment of a successor CVR Agent, as the case may be.

(e)    Any such successor to the CVR Agent shall agree to be bound by the terms of this Agreement and shall become the CVR Agent hereunder.  The CVR Agent shall deliver all of the relevant books and records to the successor CVR Agent.

Section 3.4.    Acceptance of Appointment by Successor.  Every successor CVR Agent appointed hereunder shall execute, acknowledge and deliver to the Company and to the retiring CVR Agent an instrument accepting such appointment and a counterpart of this Agreement, and the retiring CVR Agent shall execute and deliver such documentation in connection therewith as the Company may reasonably request, and thereupon such successor CVR Agent, without any further act, deed or conveyance, shall become vested with all the rights, powers, trusts and duties of the retiring CVR Agent.

# ARTICLE 4
# OTHER COVENANTS

Section 4.1.   Certain Transactions.

(a)   The Company shall not cause or permit the CVR Holding Company and its Subsidiaries to enter into or engage in any transactions with an Affiliate or a Related Party except for transactions entered into on an arm's-length basis on terms that are no less favorable to the Company or the applicable Subsidiary thereof than those that can be obtained from an unaffiliated third party.

(b)   The Company shall not, and it shall not cause or permit its Subsidiaries to, enter into or engage in any transactions with an Affiliate or a Related Party (i) with respect to the sale or other disposition of a Hotel Property, (ii) that is a Change-of-Control Monetization Event (except for a reorganization, restructuring or similar transaction that is (x) not treated as a liquidity event for the Supporting Stockholder or its Affiliates that are shareholders of the Company participating in such transaction (as determined in good faith by the Supporting Stockholder) and (y) approved by the Independent Director(s) or, if there are more than two Independent Directors, a majority of the Independent Directors (which approval may be given at any meeting of the Board of Directors or any committee thereof or pursuant to any action taken by written or electronic consent by the Board of Directors or any committee thereof)) or (iii) that relates to fees, reimbursements, costs or expenses the payment of which may be funded out of Permitted Distributions, except, in each case, for transactions entered into on an arm's-length basis on terms that are no less favorable to the Company or the applicable Subsidiary thereof than those that can be obtained from an unaffiliated third party.

Section 4.2.   Certain Actions.

(a)   The Company shall not, and shall not cause or permit the CVR Holding Company and its Subsidiaries to, amend their respective charter, bylaws, limited liability company agreement, shareholders agreement, or other constitutive document, other than the adoption of any amendment or articles supplementary with respect to a class of preferred stock and preferred units by the Company and the CVR Holding Company intended to enable the Company to satisfy the closely held requirements applicable to real estate investment trusts under Section 856(a)(6) of the Code, or enter into or undergo any consolidation, merger, reorganization, transfer of assets, dissolution, issue or sale of securities or take any other voluntary action, which, (i) in the case of each of the foregoing, is for the primary purpose of causing the requirements for payment of the Contingent Value Rights not to be satisfied, or (ii) with respect to amendments to the Company's charter, amends Section 7.1(b) or Section 7.2 of the Company's charter.

(b)   Without the prior approval of the Independent Director(s) or if there are more than two Independent Directors, a majority of the Independent Directors (which approval may be given at any meeting of the Board of Directors or any committee thereof or pursuant to any action taken by written or electronic consent by the Board of Directors or any committee thereof), the Company shall not, and shall not cause or permit the CVR Holding Company and its Subsidiaries to take any action or enter into any agreement that is disproportionately adverse to

the economic interests of the Holders as compared to the economic interests of the shareholders of the Company.

(c)    The Company agrees that at least one member of the Board of Directors must be an Independent Director, except for a period of up to sixty (60) days after the death, removal or resignation of any director, pending the election or appointment of such director's successor.

(d)    For the avoidance of doubt, any decision by the Board of Directors to extend or not to extend the Maturity Date pursuant to Section 2.7 or any amendment of this Agreement pursuant to Section 5.1(a)(v) shall not be deemed to be (i) for the primary purpose of causing the requirements for payment of the Contingent Value Rights not to be satisfied, or (ii) disproportionately adverse to the economic interests of the Holders as compared to the economic interests of the shareholders of the Company.

Section 4.3.    Reporting; Confidentiality.

(a)    The Company shall provide periodic reporting during the term of this Agreement with respect to the CVR Asset Pool to the CVR Agent (for the benefit of, and distribution to, the Holders pursuant to Section 4.3(b)) as follows:

(i)    Annually, within ninety (90) days following the end of each calendar year, a consolidated balance sheet of the CVR Holding Company as of the end of such calendar year, together with related consolidated statements of income and cash flow for such calendar year, all in reasonable detail and, beginning with financial information for the year ending December 31, 2022, stating in comparative form the respective figures for the corresponding date and period in the prior calendar year and all prepared in accordance with GAAP; provided, however, if such financial information has been audited by an independent certified public accountant acceptable to the Board of Directors, and has been prepared and is available in a form that, in the Company's sole discretion, is appropriate to be provided to Holders pursuant to this Section 4.3, such financial information, in the form provided to the CVR Agent, shall be audited; provided, further, that if such financial information is not provided to the CVR Agent audited pursuant to the preceding proviso, such financial information shall be unaudited and shall be accompanied by an Officer's Certificate by the chief financial officer of the Company on behalf of the Company (which certificate shall state that it is being delivered in such person's capacity as an officer and not in such person's individual capacity and that such person shall have no personal liability) certifying to the Holders that such financial information is unaudited but fairly presents, in all material respects, the financial condition and results of operations of the CVR Asset Pool on a combined basis for the applicable periods in conformity with GAAP; and

(ii)    Quarterly, within forty-five (45) days following the end of the first, second and third calendar quarter of each fiscal year, an unaudited consolidated balance sheet of the CVR Holding Company as of the end of such calendar quarter, together with related statements of income and cash flow for such calendar quarter, all

in reasonable detail and stating in comparative form the respective figures for the corresponding date and period in the prior comparative period, all prepared in accordance with GAAP.

(b)    The CVR Agent shall, pursuant to a confidential, password-protected website that shall be established and administered by the CVR Agent, make the information furnished by the Company pursuant to Section 4.3(a) available to each Holder that agrees, as a condition to receiving a password to access such website, that:

(i)    Any financial information furnished by the Company pursuant to Section 4.3(a) and the password or other information that could be used to access the website contemplated by this Section 4.3(b), and all analyses, compilations, data, studies, notes, interpretations, memoranda or other documents prepared by the Holder or any of its respective representatives containing or based in whole or in part on any such furnished information ("*Confidential Information*") may not be divulged or communicated to any Person, or, other than to evaluate such Holder's interest in the Contingent Value Rights, used for any purpose, in whole or in part, without the prior written consent of the Company; provided that notwithstanding the foregoing, information shall not be Confidential Information and subject to the restrictions set forth in this Section 4.3(b) if such information (1) was, is or becomes generally available to the public other than as a result of the Holder's or one of its representatives' material breach of this Agreement; (2) was, is or becomes available to a Holder or its representatives on a non-confidential basis from a source that was not known by the Holder or its representatives to be bound by a confidentiality agreement with respect to such information or otherwise prohibited from furnishing or making available the information to the Holder or such Holder's representatives by a contractual, legal or fiduciary obligation; or (3) was, is or becomes independently developed by the Holder or its representatives without directly using any Confidential Information; provided further that (A) subject to Section 4.3(b)(ii), Confidential Information may be disclosed if legally compelled (including by deposition, interrogatory, request for documents, subpoena, civil investigative demand or similar process), or in response to a request from a regulatory or self-regulatory or supervisory authority having or asserting jurisdiction over the applicable Holder (collectively, "*Compelled*"), and (B) each Holder may disclose Confidential Information to its officers, employees, agents, accountants, attorneys, and advisors but such Holder shall be responsible for any breach of the agreement set forth in this Section 4.3(b) by any such officer, employee, agent, accountant, attorney, or advisor as if such Persons were subject thereto.

(ii)    If any Holder or representative thereof becomes Compelled to disclose any of the Confidential Information, such Holder shall, to the extent legally permitted, provide the Company with reasonably prompt and, if possible, prior written notice of such requirement to disclose such Confidential Information.  Upon receipt of such notice, the Company may seek a protective order or other appropriate remedy at its sole expense.  If such protective order or other remedy is not obtained, such Holder and its representatives shall disclose only that portion of the Confidential Information which is legally required to be disclosed (as determined in good faith by

counsel to such Holder) and shall, at the request and sole expense of the Company, take all reasonable steps to preserve the confidentiality of the Confidential Information. In addition, neither such Holder nor any of its representatives will oppose any judicial, administrative, arbitral or other legal action, suit, hearing, inquiry, order, audit, arbitration, mediation, claim, investigation or other proceeding (whether federal, state, local or foreign or public or private) by the Company to obtain an appropriate protective order or other reliable assurance that confidential treatment will be accorded the Confidential Information and such Holder and its representatives will, if and to the extent requested by the Company and legally permissible to do so, cooperate with and assist the Company, at the Company's expense and on a reasonable basis, in connection therewith.

(iii)    Each Holder hereby agrees (on behalf of itself and its representatives) that money damages would not be a sufficient remedy for any breach of its obligations contemplated by this Section 4.3(b), and that in addition to all other remedies, the Company shall be entitled to injunctive or other equitable relief as a remedy for any such breach to the extent provided by law. Each Holder hereby agrees (on behalf of itself and its representatives) to waive any requirement for the securing or posting of any bond in connection with such remedy.

(iv)    Unless extended in writing by mutual agreement of the parties, the obligations under this Section 4.3(b) shall terminate upon the second anniversary of the Final Payment Date, without any further action by any party.

(c)    The Company shall Make Available to the Holders, within ninety (90) days after the end of each calendar year beginning with the calendar year ending [December 31, 2021], an Officer's Certificate on behalf of the Company (which certificate shall state that it is being delivered in such person's capacity as an officer and not in such person's individual capacity and that such person shall have no personal liability) stating that to the Company's knowledge, each entity has kept, observed, performed and fulfilled the covenants and agreements contained in this Agreement in all material respects and is not in default in the performance or observance in any material respect of the terms, provisions and conditions of this Agreement (or, if a default shall have occurred, describing all such defaults of which he or she may have knowledge) and what action the Company is taking or proposes to take with respect thereto).

Section 4.4.    Payment to Holders by the CVR Agent. Upon receipt by the CVR Agent of any amount paid to it pursuant to Section 2.5(c), Section 2.5(d) or Section 2.5(e), as applicable, for payment to the Holders in accordance with the terms of this Agreement, the CVR Agent shall promptly pay such amounts to the Holders in the manner provided for in Section 2.5 and in accordance with the terms of this Agreement. The CVR Agent shall have no liability of any kind, and shall not be obligated to make any payments, unless and until it receives an amount paid to it pursuant to Section 2.5(c), Section 2.5(d) or Section 2.5(e), as applicable.

Section 4.5.    Assignment. Except for assignments occurring through operation of law, neither the Company nor the CVR Agent shall, in whole or in part, assign any of its rights or obligations under this Agreement; provided that the Company may assign any of its obligations hereunder to an Affiliate of the Company as long as the Company causes such Affiliate to perform

34

the Company's obligations hereunder and remains responsible for any breach of this Agreement by such Affiliate.  In the event an assignment by the Company to an Affiliate pursuant to the preceding sentence occurs, the Company shall deliver to the CVR Agent an Officer's Certificate stating that such assignment complies with this <u>Section 4.5</u>.  Any Person into which the CVR Agent or any successor CVR Agent may be merged or with which it may be consolidated, or any Person to which the CVR Agent shall sell all or substantially all of its assets, or any Person resulting from any merger or consolidation to which the CVR Agent or any successor CVR Agent shall be a party, or any Person succeeding to the corporate trust, stock transfer or other shareholder services business of the CVR Agent or any successor CVR Agent, shall be the successor to the CVR Agent under this Agreement without the execution or filing of any paper or any further act on the part of any of the parties hereto, but only if such Person would be eligible for appointment as a successor CVR Agent under the provisions of <u>Section 3.4</u> hereof.  Without limiting the generality of the foregoing, the CVR Agent agrees to use reasonable best efforts to provide the Company with written notice of any such event.  No Holder shall, in whole or in part, assign any of its rights or obligations under this Agreement except in accordance with a Permitted Transfer in accordance with <u>Section 2.3(b)-(c)</u>.  Any purported assignment that is not permitted by this <u>Section 4.3</u> shall be null and void and of no effect.

Section 4.6.    <u>No Obligation to Pursue or Consummate Monetization Event</u>.  Notwithstanding anything in this Agreement to the contrary, none of the Company, the CVR Holding Company or any of their Subsidiaries or Affiliates (including the Supporting Stockholder or any of its Affiliates) shall be in any way obligated or required to pursue, discuss, negotiate or consummate any Monetization Event or any transactions or series of transactions that is intended to or likely to lead to a Monetization Event.

# ARTICLE 5
# AMENDMENTS

Section 5.1.    <u>Amendments Without Consent of Holders</u>.

(a)    Without the consent of any Holders, the Company and the CVR Agent, at any time and from time to time, may enter into one or more amendments hereto, for any of the following purposes:

(i)    to evidence the succession of another Person to the Company and the assumption of any such successor of the rights and obligations of the Company herein if such succession and assumption is in accordance with the terms of this Agreement;

(ii)    to evidence the succession of another Person selected in accordance with the terms hereof as a successor CVR Agent and the assumption by any successor of the covenants and obligations of the CVR Agent herein if such succession and assumption is in accordance with the terms of this Agreement;

(iii)    to add to the covenants of the Company such further covenants, restrictions, conditions or provisions as the Company and the CVR Agent shall consider to be for the protection of the Holders; <u>provided</u> <u>that</u> in each case, such

provisions shall not adversely affect the interests of the Holders in any material respect;

(iv)    to cure any ambiguity, to correct or supplement any provision herein that may be defective or inconsistent with any other provision herein, or to make any other provisions with respect to matters or questions arising under this Agreement; provided that in each case, such provisions shall not adversely affect the interests of the Holders in any material respect; or

(v)    as necessary to ensure that the Contingent Value Rights are not subject to registration under the Securities Act or result in the Company or the Contingent Value Rights being required to register under the Exchange Act or any other applicable law.

(b)    Promptly after the execution by the Company and the CVR Agent of any amendment pursuant to the provisions of this Section 5.1, the Company shall prepare and Make Available a notice thereof to the Holders setting forth in general terms the substance of such amendment; provided that any failure so to notify the Holders shall not affect the validity of such amendment (it being understood that any failure so to notify the Holders shall not excuse the CVR Agent from its obligations under Section 5.3).

Section 5.2.    Amendments with Consent of Holders.

(a)    Subject to Section 5.1 (which amendments pursuant to Section 5.1 may be made without the consent of the Holders), with the consent of the Majority of Holders, the Company and the CVR Agent may enter into one or more amendments hereto to add, eliminate or change any provisions of this Agreement, even if such addition, elimination or change is in any way adverse to the interests of the Holders.  It shall not be necessary for any written consent of the Majority of Holders under this Section 5.2(a) to approve the particular form of any proposed amendment, but shall be sufficient if such written consent approves the substance thereof.

(b)    Promptly after the execution by the Company and the CVR Agent of any amendment pursuant to the provisions of this Section 5.2, the Company shall Make Available a notice thereof to the Holders, setting forth in general terms the substance of such amendment; provided, that any failure so to notify the Holders shall not affect the validity of such amendment (it being understood that any failure so to notify the Holders shall not excuse the CVR Agent from its obligations under Section 5.3).

Section 5.3.    Execution of Amendments.  Prior to executing any amendment permitted by this Article 5, the CVR Agent shall be entitled to receive, and shall be fully protected in and shall incur no liability for relying upon, an Officer's Certificate stating that the execution of such amendment is authorized or permitted by this Agreement.  The CVR Agent shall execute any amendment authorized pursuant to this Article 5 if the amendment does not materially and adversely affect the CVR Agent's own rights or duties under this Agreement or otherwise.  Otherwise, the CVR Agent may, but need not, execute such amendment. No amendment to this Agreement shall be effective unless executed by the CVR Agent. The CVR Agent agrees that time

is of the essence in connection with any amendment to this Agreement that it is directed to execute by the Company in accordance with this <u>Section 5</u>.

Section 5.4.    <u>Effect of Amendments</u>.  Upon the execution of any amendment under this <u>Article 5</u>, this Agreement shall be modified in accordance therewith, such amendment shall form a part of this Agreement for all purposes and every Holder shall be bound thereby.

**ARTICLE 6**
**CONSOLIDATION, MERGER, SALE, CONVEYANCE OR CONVERSION**

Section 6.1.    <u>No Prohibitions on the Company</u>.

(a)    Subject to <u>Section 4.2</u>, nothing in this Agreement shall prohibit or prevent the Company or any of its Subsidiaries from consolidating with or merging into any other Person or conveying, transferring or leasing its properties and assets, in whole or in part, to any Person or from converting from a corporation to another business entity, including a limited liability company, organized in another jurisdiction.

(b)    Nothing in this Agreement shall prohibit or prevent the Company or any of its Subsidiaries from selling any of its rights, in whole or in part, to any or all of the assets of the CVR Asset Pool.

**ARTICLE 7**
**OTHER PROVISIONS OF GENERAL APPLICATION**

Section 7.1.    <u>Notices to the CVR Agent, the Company and the Holders</u>.

(a)    Unless otherwise indicated, any notice, request, instruction or other document to be given hereunder by any party to the other shall be in writing and delivered personally or sent by registered or certified mail, postage prepaid, by electronic mail or overnight courier:

(i)    If to the Company:

Hospitality Investors Trust, Inc.
Park Avenue Tower
65 East 55th St. | Suite 801
New York, NY 10022
Attention: Paul C. Hughes, Esq.
Email: phughes@hitreit.com

with a copy (which shall not constitute notice) to:

Brookfield Property Group
250 Vesey Street, 11th Floor
New York, NY 10281
Attention:  BPG Transactions Legal
Email:  realestatenotices@brookfield.com

(ii)     If to the CVR Agent:

Computershare Trust Company, N.A.
150 Royall Street
Canton, MA 02021
Attention: Corporate Actions Relationship Manager

or to such other persons or addresses as may be designated in writing by the party to receive such notice as provided above.  Any notice, request, instruction or other document given as provided above shall be deemed given to the receiving party upon actual receipt, if delivered personally; three (3) Business Days after deposit in the mail, if sent by registered or certified mail; upon confirmation of successful receipt if sent by electronic mail (the receiving party shall confirm receipt of any notice received by electronic mail reasonably promptly following its receipt; provided that if a notice is given by electronic mail and such confirmation of successful receipt is not confirmed by the receiving party within two (2) Business Days after the transmission of such notice, such notice, request, instruction or other document shall be followed up within one (1) Business Day after the expiration of such two (2) Business Day period by dispatch pursuant to one of the other methods described herein); or on the next Business Day after deposit with an overnight courier, if sent by an overnight courier; provided, however, that for any information or notices that the Company is required to Make Available pursuant to this Agreement, such information or notices shall be validly delivered to the applicable recipients thereof if delivered in accordance with the term "Make Available" pursuant to this Agreement.

(b)     Where this Agreement provides for notice to Holders, such notice shall be sufficiently given (unless otherwise herein expressly provided) if in writing and Made Available, not later than the latest date, and not earlier than the earliest date, prescribed for the giving of such notice.  In any case where notice to Holders is given by mail, neither the failure to mail such notice, nor any defect in any notice so mailed, to any particular Holder shall affect the sufficiency of such notice with respect to other Holders.

Section 7.2.    Effect of Headings; Construction.  The headings herein are for convenience of reference only, do not constitute part of this Agreement and shall not be deemed to limit or otherwise affect any of the provisions of this Agreement.  Where a reference in this Agreement is made to a Section, such reference shall be to a Section of this Agreement unless otherwise indicated.

Section 7.3.    Benefits of Agreement; Holders are Third Party Beneficiaries.  Nothing in this Agreement, express or implied, shall give to any Person (other than the parties hereto and their permitted successors and assigns hereunder) any benefit or any legal or equitable right, remedy or claim under this Agreement or under any covenant or provision herein contained, all such covenants and provisions being for the sole benefit of the parties hereto and their permitted successors and assigns.  Notwithstanding the foregoing, each of the Holders shall be an intended third party beneficiary of this Agreement.  The Holders will have no rights hereunder or with respect to the matters contemplated hereby except as are expressly set forth in this Agreement.  Except for the rights of and exercisable by the CVR Agent set forth herein, the Majority of Holders will have the sole right, on behalf of all Holders, by virtue of or under any provision of this

38

Agreement, to institute any action or proceeding at law or in equity with respect to this Agreement, and no individual Holder or other group of Holders will be entitled to exercise such rights.

Section 7.4.    <u>Governing Law and Venue; Waiver of Jury Trial</u>.

(a)    THIS AGREEMENT SHALL BE DEEMED TO BE MADE IN AND IN ALL RESPECTS SHALL BE INTERPRETED, CONSTRUED AND GOVERNED BY AND IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK WITHOUT REGARD TO THE CONFLICT OF LAW PRINCIPLES THEREOF TO THE EXTENT THAT SUCH PRINCIPLES WOULD DIRECT A MATTER TO ANOTHER JURISDICTION.  The parties hereby irrevocably submit to the exclusive personal jurisdiction of the Commercial Division of the Supreme Court of the State of New York and the federal courts of the United States of America located in the Southern District of New York (and any appellate courts therefrom) in respect of the interpretation and enforcement of the provisions of this Agreement and of the documents referred to in this Agreement (subject to <u>Section 2.4(e)</u>, <u>Section 2.5(b)</u> and <u>Section 2.6</u>), and in respect of the transactions contemplated hereby, and hereby waive, and agree not to assert, as a defense in any action, suit or proceeding for the interpretation or enforcement of this Agreement or of any such document, that it is not subject thereto or that such action, suit or proceeding may not be brought or is not maintainable in said courts or that the venue thereof may not be appropriate or that this Agreement or any such document may not be enforced in or by such courts, and the parties hereto irrevocably agree that all claims relating to such action, proceeding or transactions shall be heard and determined in such courts.  The parties hereby consent to and grant any such court jurisdiction over the person of such parties and, to the extent permitted by law, over the subject matter of such dispute and agree that mailing of process or other papers in connection with any such action or proceeding in the manner provided in <u>Section 7.1</u> or in such other manner as may be permitted by law shall be valid and sufficient service thereof.

(b)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.  EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (i) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (ii) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (iii) EACH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (iv) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 7.4</u>.

Section 7.5.    <u>Severability Clause</u>.  The provisions of this Agreement shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions of this Agreement.  If any provision of this Agreement, or the application of such provision to any Person or any circumstance, is invalid or unenforceable,

(a) the Company and the CVR Agent shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible to the fullest extent permitted by applicable law to such end that the transactions contemplated by this Agreement are fulfilled to the extent possible, and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application of such provision, in any other jurisdiction; provided, however, that if any such excluded provision shall materially and adversely affect the rights, immunities, liabilities, duties or obligations of the CVR Agent, the CVR Agent shall be entitled to resign immediately upon written notice to the Company.

Section 7.6.    Counterparts.    This Agreement may be executed in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

Section 7.7.    Termination.    This Agreement shall terminate and be of no further force or effect, and the parties hereto shall have no liability hereunder, (a) automatically, following the completion of the payments required to occur on the CVR Payment Date pursuant to Section 2.5(c) or, if a payment is required to occur pursuant to Section 2.5(d) or Section 2.5(e), as applicable, following the completion of any and all payments required to be made in accordance with Section 2.5(d) or Section 2.5(e), as applicable, or (b) by the Company, if there shall be any judgment, injunction or order enacted, issued, promulgated, enforced or entered into by any court or other Governmental Entity of competent jurisdiction that permanently restrains, enjoins or otherwise prohibits the payment of any Total Distributable Amount and such judgment, injunction or order shall have become final and non-appealable, upon written notice of the same to the CVR Agent; provided that Article 1, Section 2.4(h), the last sentence of Section 2.5(b), Section 2.6, Section 2.8, Article 3, Article 6 and this Article 7 shall survive the termination of this Agreement, in each case, to the extent applicable.

Section 7.8.    Entire Agreement.    This Agreement constitutes the entire agreement, and supersedes all other prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof and thereof, and this Agreement supersedes any and all other oral or written agreements hereto made with respect to the Contingent Value Rights. As it relates to the CVR Agent, this Agreement represents the entire understanding of the CVR Agent with reference to the Contingent Value Rights, and this Agreement supersedes any and all other oral or written agreements hereto made with respect to the Contingent Value Rights. With regard to the Company and the Holders, if and to the extent that any provision of this Agreement is inconsistent or conflicts with the Plan Documents, this Agreement shall govern and be controlling (except as may be otherwise required by applicable law), and this Agreement may be amended, modified, supplemented or altered only in accordance with the terms of Article 5. No party shall be bound by, or be liable for, any alleged representation, promise, inducement or statement of intention not contained herein.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be executed on its behalf by its duly authorized officers as of the day and year first above written.

HOSPITALITY INVESTORS TRUST, INC.

By: _____
     Name:
     Title:

COMPUTERSHARE INC.
COMPUTERSHARE TRUST COMPANY, N.A.

By: _____
     Name:
     Title:

**Schedule I**

**Adjusted EBITDA Thresholds**

**[Attached]**

**Project Continental**                                                                                    *CONFIDENTIAL*

*Hotel EBITDA Threshold Calculation ($ thousands)*

**Loan Pool Summary**

|                     | Number of Hotels |
|---------------------|------------------|
| DB Mortgage Trust   | 2                |
| 92-Pack             | 62               |
| Term Loan           | 15               |
| Equity Inns Pool 2  | 21               |
| Unsecured           | 0                |
| **Total**           | **100**          |

The EBITDA threshold for each property is equal to the lesser of (i) 50% of 2019 Hotel EBITDA and (ii) 100% of 2020 Hotel EBITDA.

| Hotel ID | Hotel Name | Loan Pool | EBITDA Threshold |
|----------|------------|-----------|-----------------:|
| Westin VA | Westin Virginia Beach Town Center | DB Mortgage Trust | $ 151.2 |
| HGI Burg | Hilton Garden Inn Blacksburg | DB Mortgage Trust | 60.1 |
| CY Asheville | Courtyard Asheville | 92-Pack | 346.6 |
| CY Athens | Courtyard Athens | 92-Pack | (228.3) |
| CY Balt | Courtyard Baltimore Inner Harbor | 92-Pack | (1,140.9) |
| CY Columbus | Courtyard Columbus Downtown | Term Loan | (410.8) |
| CY Dallas | Courtyard Dallas | 92-Pack | (40.8) |
| CY Dalton | Courtyard Dalton | Equity Inns Pool 2 | 558.8 |
| CY Flagstaff | Courtyard Flagstaff | Term Loan | 1,553.0 |
| CY Houston | Courtyard Houston | Equity Inns Pool 2 | (352.2) |
| CY Jacksonville | Courtyard Jacksonville | 92-Pack | 236.6 |
| CY Knoxville | Courtyard Knoxville | 92-Pack | 129.5 |
| CY Louisville | Courtyard Louisville | 92-Pack | 168.6 |
| CY Orlando | Courtyard Orlando | 92-Pack | (83.7) |
| CY Prov | Courtyard Providence | 92-Pack | (143.5) |
| CY Carlsbad | Courtyard Carlsbad | Equity Inns Pool 2 | (87.1) |
| CY Sarasota | Courtyard Sarasota | 92-Pack | 140.8 |
| CY Tallahassee | Courtyard Tallahassee | 92-Pack | 223.7 |
| DT Baton Rouge | Doubletree Baton Rouge | Term Loan | 546.0 |
| ES Orlando | Embassy Suites Orlando | 92-Pack | 130.5 |
| FFIS Atlanta | Fairfield Inn & Suites Atlanta | 92-Pack | (4.5) |
| FFIS Dallas | Fairfield Inn & Suites Dallas | 92-Pack | (376.5) |
| FFIS Denver | Fairfield Inn & Suites Denver Airport | Term Loan | (420.0) |
| FFIS Bellevue | Fairfield Inn & Suites Seattle Bellevue | Term Loan | (392.1) |
| HIS Boynton Beach | Hampton Inn & Suites Boynton Beach | 92-Pack | 1,180.1 |
| HIS El Paso | Hampton Inn Suites El Paso Airport | Term Loan | 673.2 |
| HIS Franklin | Hampton Inn & Suites Franklin | 92-Pack | 110.0 |
| HI Albany | Hampton Inn Albany | 92-Pack | (424.3) |
| HI Austin | Hampton Inn Austin | Equity Inns Pool 2 | (293.6) |
| HI Glen Burnie | Hampton Inn Glenn Burnie | 92-Pack | (17.2) |
| HI Beckley | Hampton Inn Beckley | 92-Pack | 784.4 |
| HI Birmingham | Hampton Inn Birmingham | 92-Pack | (320.4) |
| HI Boca Raton | Hampton Inn Boca Raton | 92-Pack | 258.0 |

The EBITDA threshold for each property is equal to the lesser of (i) 50% of 2019 Hotel EBITDA and (ii) 100% of 2020 Hotel EBITDA.

| Hotel ID | Hotel Name | Loan Pool | EBITDA Threshold |
|---|---|---|---|
| HI Deerfield | Hampton Inn Deerfield Beach | 92-Pack | 165.4 |
| HI Peabody | Hampton Inn Peabody | 92-Pack | (135.4) |
| HI Urbana | Hampton Inn Urbana | Equity Inns Pool 2 | (61.4) |
| HI Gastonia | Hampton Inn Gastonia | 92-Pack | 339.0 |
| HI Naperville | Hampton Inn Naperville | Equity Inns Pool 2 | (283.9) |
| HI College Station | Hampton Inn College Station | Equity Inns Pool 2 | (361.5) |
| HI Madison Heights | Hampton Inn Madison Heights | 92-Pack | 130.1 |
| HI East Lansing | Hampton Inn East Lansing | Equity Inns Pool 2 | (11.3) |
| HI Ft Wayne | Hampton Inn Fort Wayne Southwest | Term Loan | 280.8 |
| HI Grand Rapids | Hampton Inn Grand Rapids | 92-Pack | (112.1) |
| HI Indianapolis | Hampton Inn Indianapolis | Equity Inns Pool 2 | 48.0 |
| HI Alcoa | Hampton Inn Alcoa | Equity Inns Pool 2 | 91.4 |
| HI Medford | Hampton Inn Medford | Term Loan | 402.6 |
| HI Memphis | Hampton Inn Memphis | 92-Pack | (87.0) |
| HI Milford | Hampton Inn Milford | Equity Inns Pool 2 | (297.7) |
| HI Norfolk | Hampton Inn Norfolk | 92-Pack | 597.8 |
| HI Orlando | Hampton Inn Orlando | Equity Inns Pool 2 | (496.7) |
| HI Palm Beach | Hampton Inn Palm Beach Gardens | 92-Pack | 813.7 |
| HI Scranton | Hampton Inn Scranton | 92-Pack | (8.6) |
| HI State College | Hampton Inn State College | 92-Pack | (109.0) |
| HI WPB | Hampton Inn West Palm Beach | 92-Pack | 861.2 |
| HGI Rio Rancho | Hilton Garden Inn Rio Rancho | Equity Inns Pool 2 | 266.0 |
| HGI Round Rock | Hilton Garden Inn Round Rock | 92-Pack | 86.9 |
| HGI Ft Collins | Hilton Garden Inn Fort Collins | Term Loan | 62.9 |
| HGI Louisville | Hilton Garden Inn Louisville | Equity Inns Pool 2 | 17.5 |
| HGI Monterey | Hilton Garden Inn Monterey | Term Loan | 734.2 |
| HWS Augusta | Homewood Suites Augusta | Equity Inns Pool 2 | 188.1 |
| HWS Peabody | Homewood Suites Peabody | 92-Pack | 469.1 |
| HWS Chicago | Homewood Suites Chicago | 92-Pack | (1,382.3) |
| HWS Windsor Locks | Homewood Suites Windsor Locks | 92-Pack | (30.8) |
| HWS Orlando | Homewood Suites Orlando | Equity Inns Pool 2 | 936.8 |
| HWS Phoenix | Homewood Suites Phoenix | 92-Pack | 900.5 |
| HWS San Antonio | Homewood Suites San Antonio | 92-Pack | 101.8 |
| HWS Seattle | Homewood Suites Seattle | Equity Inns Pool 2 | 611.7 |
| HWS Strat | Homewood Suites Stratford | Equity Inns Pool 2 | 839.6 |
| HH ATL Cobb | Hyatt House Atlanta Cobb Galleria | Term Loan | 404.0 |
| HP Albuquerque | Hyatt Place Albuquerque | 92-Pack | 228.9 |
| HP Las Vegas | Hyatt Place Las Vegas | 92-Pack | 319.9 |
| HP Memphis | Hyatt Place Memphis | 92-Pack | 35.9 |
| HP Miami | Hyatt Place Miami | 92-Pack | (386.4) |
| HP Minneapolis | Hyatt Place Minneapolis | 92-Pack | (658.0) |
| HP Franklin | Hyatt Place Franklin | 92-Pack | (192.4) |
| HP Tampa | Hyatt Place Tampa | 92-Pack | 252.9 |
| RI Boise | Residence Inn Boise | 92-Pack | 790.6 |
| RI Chattanooga | Residence Inn Chattanooga | 92-Pack | 726.9 |

The EBITDA threshold for each property is equal to the lesser of (i) 50% of 2019 Hotel EBITDA and (ii) 100% of 2020 Hotel EBITDA.

| Hotel ID | Hotel Name | Loan Pool | EBITDA Threshold |
|---|---|---|---|
| RI Ft Myers | Residence Inn Fort Myers | 92-Pack | 609.8 |
| RI Ft Wayne | Residence Inn Fort Wayne Southwest | Term Loan | 885.5 |
| RI Jacksonville | Residence Inn Jacksonville | Equity Inns Pool 2 | 465.4 |
| RI Knoxville | Residence Inn Knoxville | 92-Pack | 505.2 |
| RI Lexington | Residence Inn Lexington | 92-Pack | 528.9 |
| RI El Segundo | Residence Inn LA El Segundo | 92-Pack | 1,500.0 |
| RI Macon | Residence Inn Macon | 92-Pack | 536.6 |
| RI Germantown | Residence Inn Memphis Germantown | Term Loan | 464.7 |
| RI San Diego | Residence Inn San Diego | 92-Pack | 862.6 |
| RI Sarasota | Residence Inn Sarasota | 92-Pack | 501.0 |
| RI Savannah | Residence Inn Savannah | 92-Pack | 437.0 |
| RI Tallahassee | Residence Inn Tallahassee | 92-Pack | 515.5 |
| RI Tampa North | Residence Inn Tampa North | 92-Pack | 685.9 |
| RI Sabal Park | Residence Inn Sabal Park | 92-Pack | 908.3 |
| SHS Asheville | Springhill Suites Asheville | Equity Inns Pool 2 | 190.8 |
| SHS Round Rock | Springhill Suites Round Rock | 92-Pack | 29.3 |
| SHS Denver | Springhill Suites Denver Airport | Term Loan | 10.6 |
| SHS Flagstaff | Springhill Suites Flagstaff | Term Loan | 922.4 |
| SHS Grand Rapids | Springhill Suites Grand Rapids | 92-Pack | 71.9 |
| SHS Lexington | Springhill Suites Lexington | 92-Pack | 268.3 |
| SHS San Diego | Springhill Suites San Diego | 92-Pack | 46.3 |
| TPS Savannah | TownePlace Suites Savannah | Equity Inns Pool 2 | 560.9 |
| **Total (100)** | | | $ 21,111.5 |

**Schedule II**

**Excluded Assets**

1.  Hilton-Blacksburg

**2.**  VA Beach Westin

**Schedule III**

**Total Distributable Amount Calculation Example**

**[Attached]**

## <u>SCHEDULE I</u>

The following is an illustration of the application of the provisions of the Agreement when the following sequence of events has occurred:

1. The Petition Date is May 19, 2021, and the Effective Date is June 30, 2021.

    a. The CVR Asset Pool has 98 Hotel Properties in it.

    b. The Excluded Asset Adjustment Factor is 0.9866.

    c. The initial DIP Financing Invested Capital Amount is $55.2 million ($55.9 million X 0.9866).

    d. The Supporting Stockholder CVR Asset Pool Invested Amount is $402.0 million ($407.4 million X 0.9866).

    e. 39,962,380 Contingent Value Rights issued (which number shall be reduced for any forfeited CVRs), which number of Contingent Value Rights would have been 40,000,000 if the 37,620 Shares owned by the Supporting Stockholder prior to the Effective Date were not effectively cancelled pursuant to the Plan.

2. On December 31, 2021, CVR Holding Company makes a distribution funded from operating cash flow of CVR Holding Company to the Company of $26.0 million and $15.3 million of that amount is a Permitted Distribution used to fund general and administrative costs allocable to CVR Holding Company and other eligible costs and expenses.

    a. The total amount of the distribution, less the amount of the Permitted Distribution, will be an Additional Adjustment Amount and the DIP Financing Invested Capital Amount is therefore deemed to have been reduced by $10.7 million to $44.5 million as of the date of the distribution for purposes of calculating the return of 15.0% contemplated by Section 2.4(g)(iii).

3. On March 31, 2022, one Hotel Property in the CVR Asset Pool is sold for $20 million net proceeds from the sale (net of any mortgage indebtedness or other liabilities and transaction costs) and $15 million of the net proceeds are distributed to the Company in a transaction that <u>is not</u> a sale of All or Substantially All of the Assets but <u>is</u> a Qualifying CVR Asset Pool Sale

    a. Assuming that no portion of the distribution qualifies as a Permitted Distribution, the distribution will be an Additional Adjustment Amount

and the DIP Financing Invested Capital Amount is therefore deemed to have been reduced by $15 million to $29.5 million as of the date of the distribution for purposes of calculating the return of 15.0% contemplated by Section 2.4(g)(iii).

4. On June 30, 2022, one Hotel Property is sold for cash in a transaction that is not a sale of All or Substantially All of the Assets or a Qualifying CVR Asset Pool Sale and $1 million of the net proceeds (net of any mortgage indebtedness or other liabilities and transaction costs) from the sale are distributed to the Company.

   a. The distribution will not be an Additional Adjustment Amount because the sale was not a Qualifying CVR Asset Pool Sale.

5. On December 31, 2022, CVR Holding Company makes a distribution funded from operating cash flow of CVR Holding Company to the Company of $26.0 million and $15.3 million of that amount is of that amount is a Permitted Distribution used to fund general and administrative costs allocable to CVR Holding Company and other eligible costs and expenses.

   a. The total amount of the distribution, less the amount of the Permitted Distribution, will be an Additional Adjustment Amount and the DIP Financing Invested Capital Amount is therefore deemed to have been reduced by $10.7 million to $18.8 million as of the date of the distribution for purposes of calculating the return of 15.0% contemplated by Section 2.4(g)(iii).

6. On March 31, 2023, the Company borrows $5.0 million under the Exit Facility which is contributed to the CVR Holding Company as a Post-Effective Date Contribution.

7. On March 31, 2023, CVR Holding Company refinances a mortgage loan secured by 15 of the Hotel Properties on substantially same terms as the mortgage loan being refinanced and the $300,000 difference between the gross proceeds from the new loan and principal amount of the old loan is used by CVR Holding Company to pay transaction costs for the refinancing.

   a. This transaction has no impact on any calculation required by Section 2.4 because it is funded using CVR Holding Company's capital resources and no amounts are distributed out of CVR Holding Company.

8. On June 30, 2023, 78 Hotel Properties in the CVR Asset Pool are sold for $502 million in net cash proceeds (contract price, less debt and other liabilities not assumed, less transaction costs, including a $2 million escrow described below in 8(a)) in a transaction that is a sale of All or Substantially All of the Assets because at least 80% of the Hotel Properties in the CVR Asset Pool have now been sold and therefore qualifies as a Distribution Triggering Monetization Event.

a. The transaction consideration includes a $2 million escrow that will be released to CVR Holding Company at the end of an indemnity survival period on August 31, 2023.

b. The aggregate Adjusted EBITDA of the 78 properties sold in the transaction exceeds the aggregate Adjusted EBITDA Threshold for the properties and Holders are therefore entitled to receive payments pursuant to the Agreement.

c. The following is the calculation of Total CVR Pool Amount pursuant to Section 2.4(b):

| | |
|---|---|
| Net cash proceeds from June 30, 2023 sale | $500 million |
| Net cash proceeds from March 31, 2022 sale not previously distributed | $5 million |
| CVR Distribution Expenses | $(1.0) million |
| Post-Effective Date Contributions[1] | $(5.2) million |
| **Total** | **$498.8 million** |

d. The following is the calculation of the Total Distributable Amount for the Distribution Triggering Monetization Event that will be paid out to Holders pursuant to Section 2.4(g):

| | |
|---|---|
| Total CVR Pool Amount | $498.8 million |
| DIP Financing Invested Capital Amount (until reduced to zero) pursuant to 2.4(g)(i) | $(18.8) million[2] |
| CVR Asset Pool Invested Amount (until reduced to zero) pursuant to 2.4(g)(ii) | $(402.0) million |

---

[1] Assumes principal outstanding plus $0.2 million of accrued interest (assuming not previously paid) for the three months while principal was outstanding under the Exit Facility.

[2] This is amount shown to reflect reductions in paragraphs 2.a, 3.a, and 5.a. above

| | |
|---|---|
| *Until 94% of sum of Total CVR Pool Amount plus the Additional Amount (after prior applications) results in a return of 15.0% per annum on the DIP Financing Invested Capital Amount, 6.0% payable to Holders pursuant to 2.4(g)(iii)* | |
| A return of 15.0% per annum on the DIP Financing Invested Capital Amount | $(12.4) million |
| 6.0% payable to Holders pursuant to 2.4(g)(iii) | $(0.8) million |
| *Until 94% of sum of Total CVR Pool Amount plus the Additional Amount (after prior applications results in a return of 12.5% per annum accrued on the basis of twelve (12) thirty (30)-day months and a three hundred sixty (360)-day year, compounding quarterly, on the Supporting Stockholder CVR Asset Pool Invested Amount, 6.0% payable to Holders pursuant to 2.4(g)(iv)* | |
| A return of 12.5% per annum on the Supporting Stockholder CVR Asset Pool Invested Amount | $(61.0) million |
| 6.0% payable to Holders pursuant to 2.4(g)(iv) | $(3.9) million |
| **Remaining Accumulated return of 12.5% per annum on the Supporting Stockholder CVR Asset Pool Invested Amount** | **$51.2 million** |
| **Total Distributable Amount** | **$4.7 million** |

4

9.  On August 25, 2023,[3] a distribution of $0.12 per Contingent Value Right[4] is paid to the Holders in accordance with Section 2.5(c).

10. On August 15, 2023, 12 Hotel Properties are sold for $100 million in cash and 150,000 shares of stock in the acquirer.

    a.  The transaction consideration also includes an earn-out based on future hotel performance payable no earlier than August 1, 2024.

    b.  None of the cash or stock consideration received is distributed upstream to the Company. They remain on the balance sheet of CVR Holding Company.

11. On August 31, 2023, the $2 million escrow from the Distribution Triggering Monetization Event is released to CVR Holding Company.

12. October 9, 2023,[5] pursuant to Section 2.4(e), an Independent Valuer is appointed to determine the Value of the 6 Hotel Properties remaining in the CVR Asset Pool.

13. On December 31, 2023,[6] the Final Payment Date occurs, and a distribution of $2.35 per Contingent Value Right[7] is paid to the Holders in accordance with Section 2.5(c):

---

[3] This date calculated assuming (i) financial information with respect to the CVR Asset Pool for the calendar quarter immediately preceding the calendar quarter in which such Distribution Triggering Monetization Event occurs (i.e. the quarter ended March 31, 2023) has already been provided, and (ii) the Calculation Certificate required by Section 2.5(a) is made available on July 30, 2023, the latest possible date contemplated under these circumstances by Section 2.5(a).

[4] Represents $4.7 million Total Distributable Amount divided by 40,000,000 Contingent Value Rights, of which $4.69 million would have been distributable to Holders in accordance with such Holders' respective Pro Rata Payment Amounts after adjusting for the amount allocable to Contingent Value Rights that would have been issued in respect of Shares owned by the Supporting Stockholder prior to the Effective Date that were effectively cancelled pursuant to the Plan (which amount is for the Company's account and may be used in the Company's sole discretion in accordance with Section 2.4(k), including by distributing to the Supporting Stockholder).

[5] The 60th day prior to the Final Payment Date.

[6] The six-month anniversary of the Distribution Triggering Monetization Event.

[7] Represents $94.0 million Total Distributable Amount for the Final Payment Date divided by 40,000,000 Contingent Value Rights, of which $93.91 million would have been distributable to Holders in accordance with such Holders' respective Pro Rata Payment Amounts after adjusting for the amount allocable to Contingent Value Rights that would have been issued in respect of Shares owned by the Supporting Stockholder prior to the Effective Date that were effectively cancelled pursuant to the Plan (which amount is for the Company's account and may be used in the Company's sole discretion in accordance with Section 2.4(k), including by distributing to the Supporting Stockholder).

a. Because the aggregate Adjusted EBITDA Threshold was met in connection with the Distribution Triggering Monetization Event, the Adjusted EBITDA of the remaining 6 Hotel Properties is not relevant.

b. The following is the calculation of the Net Proceeds from CVR Asset Pool for the August 15, 2023 sale (which is a Monetization Event) pursuant to Section 2.4(c) as follows:

| The gross cash proceeds from the August 15, 2023 sale | $100 million |
| Transaction costs | $(1) million |
| The Value[8] of the 150,000 shares of stock issued in the August 15, 2023 sale | $100 million |
| Debt and other liabilities not assumed by buyer in transaction | $(1) million |
| **Total** | **$198 million** |

c. The following is the calculation of the Total CVR Pool Amount on the Final Payment Date pursuant to Section 2.4(b) as follows:

| Escrow release on August 31, 2023 | $2 million |
| Net Proceeds from CVR Asset Pool for the August 15, 2023 sale | $198 million |
| The Value of the 6 Hotel Properties and other assets directly related to operation of such Hotel Properties remaining in the CVR Asset Pool (net of any mortgage indebtedness or other liabilities and transaction costs) | $220 million |

---

[8] As determined by the Independent Investment Banker.

| | |
|---|---|
| The Value of the earn-out from the August 15, 2023 sale[9] | $1 million |
| CVR Distribution Expenses | $(1.0) million |
| **Total** | **$420 million** |

    d.   The following is the calculation of the Total Distributable Amount on the Final Payment Date pursuant to Section 2.4(b) as follows:

| | |
|---|---|
| *Until 94% of sum of Total CVR Pool Amount plus the Additional Amount (after prior applications results in a return of 12.5% per annum accrued on the basis of twelve (12) thirty (30)-day months and a three hundred sixty (360)-day year, compounding quarterly, on the Supporting Stockholder CVR Asset Pool Invested Amount, 6.0% payable to Holders pursuant to 2.4(g)(iv)* | |
| A return of 12.5% per annum on the Supporting Stockholder CVR Asset Pool Invested Amount | $(54.5) million[10] |
| 6.0% payable to Holders pursuant to 2.4(g)(iv) | $(3.5) million |
| **Remaining Total CVR Pool Amount** | **$362.0 million** |

---

[9] Included in the Final Payment Date Distribution because the Company has elected to include the Holdback Value in the Company's calculation of the Value of the CVR Asset Pool pursuant to Section 2.4(d)(vi)(A). Represents the carrying value of the earn-out on the September 30, 2023 GAAP balance sheet for the CVR Holding Company furnished by the Company.

[10] Includes additional amounts accrued between June 30, 2023 and December 31, 2023.

121873869v14

| 25% of any remaining Total CVR Pool Amount payable to Holders pursuant to 2.4(g)(v)[11] | $(90.5) million |
|---|---|
| **Total Distributable Amount** | **$94.0 million** |

14. During the term of the Agreement, Holders have received total distributions of $2.47 per Contingent Value Right.

15. On or after December 31, 2024, if the Company requests in writing to the CVR Agent, the CVR Agent shall return to the Company any funds comprising the cash deposited with the CVR Agent under Section 2.5(c), Section 2.5(d) or Section 2.5(e), as applicable.

---

[11] Subject to the $6.00 cap on the per Contingent Value Right amount payable to Holders in Section 2.4(h).

121873869v14

**Base Assumptions**

| | |
|---|---|
| CVR Asset Pool Properties | 98 |
| Number of CVRs Effectively Issued (mms) | 40.000 |
| Excluded Asset Adj. Factor | 0.9866x |
| Estimated Run-Rate G&A Expenses for HIT | $ 15.5 |

| Step | Date of Transaction | Description | | Notes |
|---|---|---|---|---|
| (1) | 6/30/2021 | Effective Date | | |
| | | ***Initial Balances Assumptions*** | **Amount** | |
| | | *DIP Financing* | | |
| | | Initial DIP Invested Capital | $  55.9 | << This amount assumes $55 million DIP funding plus accrued interest |
| | | DIP Financing Invested Capital Amount | $  55.2 | |
| | | Return on Capital % (compounded quarterly) | 15.0% | |
| | | *Supporting Stockholder (BAM) CVR Asset Pool Investment* | | |
| | | Supporting Stockholder CVR Asset Pool Investment | $  407.4 | << Estimated AMT accrued @ 7.5% thru petition (5/19/21) and 12.5% from petition thru effective date (6/30/21 |
| | | Supporting Stockholder CVR Asset Pool Invested Amount | $  402.0 | |
| | | Return on Capital % (compounded quarterly) | 12.5% | |
| | | | | |
| (2) | 12/31/2021 | Distribution | | Remaining Hotels   98 |
| | | CVR Holding Company distribution to the Company | $  26.0 | |
| | | (-) Amount used to fund G&A allocable to the CVR Holding Company | (15.3) | |
| | | Distribution Amount that Reduces DIP Financing Invested Capital Amount | $  10.7 | << Distribution to the Company, net of the Permitted Distribution, reduces DIP invested capital balance |
| | | | | |
| | | Pre-Transaction DIP Financing Invested Capital Amount | $  55.2 | << Invested capital is original invested capital |
| | Section 2.5(g)(i) | (-) Distribution | (10.7) | |
| | | **Post-Transaction DIP Financing Invested Capital Amount** | **$  44.5** | |
| | | | | |
| (3) | 3/31/2022 | Qualifying CVR Asset Pool Sale of one (1) hotel | | Remaining Hotels   97 |
| | | Sale of one hotel | $  20.0 | << Represents net proceeds above Mortgage debt, transaction costs and other liabilities |
| | | (-) Amount retained by the CVR Holding Company | (5.0) | |
| | | Distribution Amount that Reduces DIP Financing Invested Capital Amount | $  15.0 | |
| | | | | |
| | | Pre-Transaction DIP Financing Invested Capital Amount | $  44.5 | << Invested capital amount after distribution in step 2 |
| | Section 2.5(g)(i) | (-) Distribution | (15.0) | |
| | | **Post-Transaction DIP Financing Invested Capital Amount** | **$  29.5** | |
| | | | | |
| (4) | 6/30/2022 | Non-Qualifying CVR Asset Pool Sale of one (1) hotel | | Remaining Hotels   96 |
| | | Sale of one hotel & distribution made to the Company | $  1.0 | << Represents net proceeds above Mortgage debt, transaction costs and other liabilities |
| | | | | |
| | | **Distributions made from non-qualify asset sales will not reduce the invested capital or return on capital amounts | | |
| | | | | |
| (5) | 12/31/2022 | Distribution | | Remaining Hotels   96 |
| | | CVR Holding Company distribution to the Company | $  26.0 | |
| | | (-) Amount used to fund G&A allocable to the CVR Holding Company | (15.3) | |
| | | Distribution Amount that Reduces DIP Financing Invested Capital Amount | $  10.7 | << Distribution to the Company, net of the Permitted Distribution, reduces DIP invested capital balance |
| | | | | |
| | | Pre-Transaction DIP Financing Invested Capital Amount | $  29.5 | << Invested capital is original invested capital |
| | Section 2.5(g)(i) | (-) Distribution | (10.7) | |
| | | **Post-Transaction DIP Financing Invested Capital Amount** | **$  18.8** | |
| | | | | |
| (6) | 3/31/2023 | Borrowing under the Exit Facility | | Remaining Hotels   96 |
| | | Post-Effective Date Contribution into CVR Holding Company | $  5.0 | << Borrows on the Exit Facility, which does not increase invested capital balance |
| | | | | |
| | | **Borrowing does not increase the invested capital amount at this time; it will be deducted from net proceeds upon a monetization event | | |
| | | **This assumes the exit facility is cash pay but it will come off the top | | |
| | | | | |
| (7) | 3/31/2023 | Refinancing of Mortgage Loans | << No impact as no distribution or contribution | Remaining Hotels   96 |
| | | No change in calculations | | |

| Step | Date of Transaction | Description | | | Notes |
|---|---|---|---|---|---|

| (8) | 6/30/2023 | Initial Monetization Event | | | Remaining Hotels | 18 |
| | | Sale of 78 hotels for cash triggering Initial Monetization Event | | | |
| | | Escrow (released at end of indemnity survival period) | $ 2.0 | | |
| | | Net Cash Proceeds from Monetization Event | $ 500.0 | | << Represents net proceeds above Mortgage debt, transaction costs and other liabilities |
| | | | | | |
| | | **Monetization Event Total Distributable Value Calculation** | | | |
| | | Net Cash Proceeds from Monetization Event | $ 500.0 | | |
| | | (+) Net Cash Proceeds from Step 3 Sale Not Previously Distributed | 5.0 | | << From Step 3 that was not previously distributed |
| | | (-) CVR Distribution Expenses | (1.0) | | |
| | | (-) Repayment of the Borrowing under the Exit Facility from Step 6 | (5.2) | | << From Step 6; was not used to increase invested capital amount; repayment includes accrued interest |
| | | **Total Distributable Value from Initial Monetization Event** | $ 498.8 | | |
| Section 2.5(g)(i) | | Less: Remaining DIP Financing Invested Capital Amount | (18.8) | | << Remaining DIP Financing Invested Capital Amount after step 6 |
| | | **Remaining Distributable Value** | $ 480.0 | | |
| Section 2.5(g)(ii) | | Less: Supporting Stockholder CVR Asset Pool Invested Amount | (402.0) | | << Supporting Stockholder CVR Asset Pool Invested Amount |
| | | **Remaining Distributable Value** | $ 78.1 | | << DIP Financing Invested Capital & Supporting Stockholder CVR Asset Pool Invested Amount FULLY Repaid |
| | | | | | |
| | | Value to CVRs | 6.0% $ 4.7 | | |
| | | Value to Repay Return on Capital Amounts | 94.0% $ 73.4 | | |
| | | | | | |
| | | **Value to Repay Return on Capital Amounts (DIP & Supporting Stockholder)** | $ 73.4 | | |
| Section 2.5(g)(iii) | | Less: Acc. Return (@ 15%) on DIP Financing Invested Capital thru 6/30/23 | (12.4) | | << Repayment of 100% of accrued return on DIP financing invested capital through 6/30/23 |
| | | **Value to Repay Return on Capital Amounts (Supporting Stockholder)** | $ 61.0 | | |
| Section 2.5(g)(iv) | | Less: Acc. Return (@ 12.5%) on Sup. Stockholder Invested Amt. thru 6/30/23 | (61.0) | | << Repayment of ONLY part of the accrued return on Sup. Stockholder invested capital through 6/30/23 |
| | | **Remaining Distributable Value** | $ - | | |
| | | *Memo:* | | | |
| | | *Remaining Acc. Return (@ 12.5%) on Sup. Stockholder Invested Amt. thru 6/30/23* | 51.2 | | |

| (9) | 8/25/2023 | Distribution to CVRs | | | Remaining Hotels | 18 |
| | | Total Value to CVRs from Initial Monetization Event | $ 4.7 | | << Represents total value from step 8 |
| | | Number of CVRs Effectively Issued (mms) | 40.0 | | << Represents assumption from step 1 |
| | | | | | |
| | | **Distribution per CVR** | $ 0.12 | | << Represents actual $$ per CVR (not millions) |

| (10) | 8/15/2023 | Sale of Additional Properties | | | Remaining Hotels | 6 |
| | | 12 Hotels sold 50% cash and 50% stock; Includes an earnout | | | |
| | | See step 13 for the final payment date and release of proceeds | | | |
| | | **No trigger at this point for distribution to occur | | | |

| (11) | 8/31/2023 | End of the indemnity survival period releasing the Escrow | | | Remaining Hotels | 6 |
| | | Escrow is released (from step 8 Initial ME) but **NOT** distributed to the Company at this time | | | |
| | | **No trigger at this point for distribution to occur (see step 13 for distribution) | << No distribution = no payment trigger | |

| (12) | 10/9/2023 | Independent Valuer Assesses Remaining 6 Hotel Properties | | | Remaining Hotels | 6 |
| | | Values the remaining hotels after the subsequent monetization event and the earnout | | | |
| | | **No trigger at this point for distribution to occur | | | |

| (13) | 12/31/2023 | Final Payment Date | | | Remaining Hotels | 0 |
| | | Pays out proceeds from subsequent monetization event, holdback and earnout | | | |
| | | | | | |
| | | **Monetization Event Total Distributable Value Calculation** | | | |
| | | Gross Cash Proceeds from Sale in step 10 | $ 100.0 | | << See step 10 (represents the 50% cash) |
| | | Value of Stock received from Sale in step 10 | 100.0 | | << See step 10 (represents the 50% stock valued by the independent investment banker) |
| | | Debt / other liabilities not assumed in Sale in step 10 | (1.0) | | |
| | | Transaction Costs from Sale in step 10 | (1.0) | | |
| | | **Value from Subsequent Monetization Event** | $ 198.0 | | |
| | | Escrow amount from Initial Monetization Event | 2.0 | | << Escrow is distributed, trigger payment (was released in step 11) |
| | | Value of Remaining Properties (valued by Independent Valuer) & Other Related Assets | 220.0 | | << Valued by the independent investment banker & balance sheet (for other related assets) |
| | | Value of earnout | 1.0 | | << See step 10 (represents the value of the earnout valued by the independent investment banker) |
| | | CVR Distribution Expenses | (1.0) | | << Expenses for CVR Distribution |
| | | **Total Distributable Value at Final Payment Date** | $ 420.0 | | |
| | | | | | |
| Section 2.5(g)(iv) | | Acc. Return (@ 12.5%) on Sup. Stockholder Invested Amt. thru 12/31/23 | 54.5 | | << Repayment of remaining accrued return on Sup. Stockholder invested capital through 12/31/23 |
| | | Value to Repay Return on Capital Amounts | 94.0% | | |
| | | **Implied Threshold for CVR Hurdle 2** | $ 58.0 | | |
| | | | | | |
| | | Value to CVRs | 6.0% $ 3.5 | | |
| | | Value to Repay Return on Capital Amounts | 94.0% $ 54.5 | | |
| | | | | | |
| | | **Remaining Distributable Value** | $ 362.0 | | |
| | | | | | |
| Section 2.5(g)(v) | | Value to CVRs | 25.0% $ 90.5 | | |
| Section 2.5(g)(v) | | Value to Supporting Stockholder (BAM) | 75.0% $ 271.5 | | |
| | | | | | |
| | | Total Value to CVRs (step 13 Only) | $ 94.0 | | |
| | | Number of CVRs Effectively Issued (mms) | 40.0 | | |
| | | | | | |
| | | **Distribution per CVR** | $ 2.35 | | << Represents actual $$ per CVR (not millions) |
| | | | | | |
| | | **Total Distribution per CVR (Step 9 & 13)** | $ 2.47 | | << Represents actual $$ per CVR (not millions) |

**Project Continental**                                                                                      <span style="color:red">**DRAFT - Subject to Material Change**</span>
*DIP Invested Capital Debt Schedule ($ millions, unless stated otherwise)*                                                    *<span style="color:red">Highly Confidential</span>*



### Key Assumptions

| | | | |
|---|---|---|---|
| Initial Invest. Date | 6/30/2021 | | |
| Return on Capital Amount | 15.0% | | |
| Return on Cap. Calc. | 30.0 | 90.0 | 360.0 | << Return is calculated on 30 / 360 (per CVR agreement) |
| Initial DIP Invested Capital | 55.2 | | |

| | DIP Financing Invested Capital | | | | | | Original Invested Capital Balance | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Invested Capital | | | | | | | | | |
| **Date** | **Beginning Balance** | **(+) PIK Interest** | **(+) Add. Contribution** | **(-) Invested Cap. Repayment** | **(-) Return on Cap. Repayment** | **Ending Balance** | **Beginning Balance** | **(+) Add. Cont. / (-) Dist.** | **Ending Balance** | **Notes** |
| Jun-21 | | | | | | $ 55.2 | | | | |
| Sep-21 | 55.2 | 2.1 | | | | 57.3 | 55.2 | | 55.2 | |
| Dec-21 | 57.3 | 2.1 | | (10.7) | | 48.7 | 55.2 | (10.7) | 44.5 | << Step 2: Upstream Distribution - amount pays down DIP Invested Capital |
| Mar-22 | 48.7 | 1.8 | | (15.0) | | 35.5 | 44.5 | (15.0) | 29.5 | << Step 3: QCAP Sale - amount pays down DIP Invested Capital |
| Jun-22 | 35.5 | 1.3 | | | | 36.9 | 29.5 | | 29.5 | |
| Sep-22 | 36.9 | 1.4 | | | | 38.3 | 29.5 | | 29.5 | |
| Dec-22 | 38.3 | 1.4 | | (10.7) | | 29.0 | 29.5 | (10.7) | 18.8 | << Step 5: Upstream Distribution - amount pays down DIP Invested Capital |
| Mar-23 | 29.0 | 1.1 | | | | 30.1 | 18.8 | - | 18.8 | |
| Jun-23 | 30.1 | 1.1 | | (18.8) | (12.4) | - | 18.8 | (18.8) | - | << Step 8: Initial monetization event (repays full original invested amount and return on capital) |
| Sep-23 | - | - | | | | - | - | | - | |
| Dec-23 | - | - | | | | - | - | | - | |
| Mar-24 | - | - | | | | - | - | | - | |
| Jun-24 | - | - | | | | - | - | | - | |
| Sep-24 | - | - | | | | - | - | | - | |
| Dec-24 | - | - | | | | - | - | | - | |
| Mar-25 | - | - | | | | - | - | | - | |
| Jun-25 | - | - | | | | - | - | | - | |
| Sep-25 | - | - | | | | - | - | | - | |
| Dec-25 | - | - | | | | - | - | | - | |

**Project Continental**

*Supporting Stockholder Invested Capital Debt Schedule ($ millions, unless stated otherwise)*

DRAFT - Subject to Material Change

*Highly Confidential*

### Key Assumptions

| | | | |
|---|---|---|---|
| Initial Invest. Date | | 6/30/2021 | |
| Return on Capital Amount | | 12.5% | |
| Return on Cap. Calc. | 30.0 | 90.0 | 360.0 << Return is calculated on 30 / 360 (per Class C Distribution Definition) |
| Initial Supporting Stockholder Invested Capital | | 402.0 | |

| Date | DIP Financing Invested Capital | | | | | | Original Invested Capital Balance | | | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| | Invested Capital | | | | | | | | | |
| | Beginning Balance | (+) PIK Interest | (+) Add. Contribution | (-) Invested Cap. Repayment | (-) Return on Cap. Repayment | Ending Balance | Beginning Balance | (+) Add. Cont. / (-) Dist. | Ending Balance | |
| Jun-21 | | | | | | $ 402.0 | | | | |
| Sep-21 | 402.0 | 12.6 | | | | 414.5 | 402.0 | | 402.0 | |
| Dec-21 | 414.5 | 13.0 | | | | 427.5 | 402.0 | | 402.0 | |
| Mar-22 | 427.5 | 13.4 | | | | 440.8 | 402.0 | | 402.0 | |
| Jun-22 | 440.8 | 13.8 | | | | 454.6 | 402.0 | | 402.0 | |
| Sep-22 | 454.6 | 14.2 | | | | 468.8 | 402.0 | | 402.0 | |
| Dec-22 | 468.8 | 14.7 | | | | 483.5 | 402.0 | | 402.0 | |
| Mar-23 | 483.5 | 15.1 | | | | 498.6 | 402.0 | | 402.0 | |
| Jun-23 | 498.6 | 15.6 | | (402.0) | (61.0) | 51.2 | 402.0 | (402.0) | - | << Step 8: Initial monetization event (repays full original invested amount and partial return on c... |
| Sep-23 | 51.2 | 1.6 | | | | 52.8 | - | | - | |
| Dec-23 | 52.8 | 1.7 | | | (54.5) | - | - | | - | << Step 13: Final Payment Date (repays the remaining return on capital) |
| Mar-24 | - | - | | | | - | - | | - | |
| Jun-24 | - | - | | | | - | - | | - | |
| Sep-24 | - | - | | | | - | - | | - | |
| Dec-24 | - | - | | | | - | - | | - | |
| Mar-25 | - | - | | | | - | - | | - | |
| Jun-25 | - | - | | | | - | - | | - | |
| Sep-25 | - | - | | | | - | - | | - | |
| Dec-25 | - | - | | | | - | - | | - | |

**Project Continental**      **DRAFT - Subject to Material Change**

*Excluded Assets Calculation*      *Highly Confidential*

### **Excluded Asset Adjustment Factor Calculation**

| | 2019 Property Hotel EBITDA |
|---|---|
| Excluded Assets | 1,957 |
| Total 100 Properties | 146,285 |

**Excluded Asset Adjustment Factor** | **0.9866** |

| Hotel ID | 2019 Property Hotel EBITDA | |
|---|---|---|
| Westin VA | $ 1,172 | <<Excluded Asset |
| HGI Burg | 785 | <<Excluded Asset |
| CY Asheville | 1,087 | |
| CY Athens | 1,219 | |
| CY Balt | 3,118 | |
| CY Columbus | 1,882 | |
| CY Dallas | 1,802 | |
| CY Dalton | 1,118 | |
| CY Flagstaff | 3,106 | |
| CY Houston | 917 | |
| CY Jacksonville | 826 | |
| CY Knoxville | 967 | |
| CY Louisville | 3,176 | |
| CY Orlando | 1,156 | |
| CY Prov | 4,037 | |
| CY Carlsbad | 1,380 | |
| CY Sarasota | 724 | |
| CY Tallahassee | 1,377 | |
| DT Baton Rouge | 1,092 | |
| ES Orlando | 3,514 | |
| FFIS Atlanta | 905 | |
| FFIS Dallas | 861 | |
| FFIS Denver | 1,768 | |
| FFIS Bellevue | 1,791 | |
| HIS Boynton Beach | 2,360 | |
| HIS El Paso | 1,691 | |
| HIS Franklin | 1,288 | |
| HI Albany | 1,518 | |
| HI Austin | 669 | |
| HI Glen Burnie | 845 | |
| HI Beckley | 1,569 | |
| HI Birmingham | 721 | |

| | |
|---|---|
| HI Boca Raton | 1,027 |
| HI Deerfield | 800 |
| HI Peabody | 1,485 |
| HI Urbana | 1,407 |
| HI Gastonia | 1,061 |
| HI Naperville | 968 |
| HI College Station | 283 |
| HI Madison Heights | 830 |
| HI East Lansing | 663 |
| HI Ft Wayne | 1,656 |
| HI Grand Rapids | 847 |
| HI Indianapolis | 923 |
| HI Alcoa | 755 |
| HI Medford | 866 |
| HI Memphis | 1,266 |
| HI Milford | 696 |
| HI Norfolk | 1,196 |
| HI Orlando | 1,967 |
| HI Palm Beach | 1,987 |
| HI Scranton | 1,318 |
| HI State College | 1,202 |
| HI WPB | 1,722 |
| HGI Rio Rancho | 1,410 |
| HGI Round Rock | 1,137 |
| HGI Ft Collins | 1,110 |
| HGI Louisville | 528 |
| HGI Monterey | 4,275 |
| HWS Augusta | 376 |
| HWS Peabody | 938 |
| HWS Chicago | 3,492 |
| HWS Windsor Locks | 1,212 |
| HWS Orlando | 3,713 |
| HWS Phoenix | 1,910 |
| HWS San Antonio | 952 |
| HWS Seattle | 4,383 |
| HWS Strat | 1,679 |
| HH ATL Cobb | 2,105 |
| HP Albuquerque | 1,575 |
| HP Las Vegas | 1,705 |
| HP Memphis | 973 |
| HP Miami | 808 |
| HP Minneapolis | 719 |
| HP Franklin | 909 |
| HP Tampa | 1,333 |
| RI Boise | 1,581 |
| RI Chattanooga | 1,454 |
| RI Ft Myers | 1,220 |

| | |
|---|---:|
| RI Ft Wayne | 1,771 |
| RI Jacksonville | 931 |
| RI Knoxville | 1,010 |
| RI Lexington | 1,164 |
| RI El Segundo | 4,003 |
| RI Macon | 1,093 |
| RI Germantown | 929 |
| RI San Diego | 1,725 |
| RI Sarasota | 1,002 |
| RI Savannah | 874 |
| RI Tallahassee | 1,176 |
| RI Tampa North | 1,372 |
| RI Sabal Park | 1,817 |
| SHS Asheville | 1,045 |
| SHS Round Rock | 722 |
| SHS Denver | 1,388 |
| SHS Flagstaff | 1,845 |
| SHS Grand Rapids | 1,005 |
| SHS Lexington | 1,505 |
| SHS San Diego | 1,902 |
| TPS Savannah | 1,143 |
| **Total (100)** | **$    146,285** |

x  **Project Continental**                                      <span style="color:red">**DRAFT - Subject to Material Change**</span>

*Initial DIP Invested Capital Calculation*                       <span style="color:red">*Highly Confidential*</span>

### Assumptions

| | |
|---|---|
| Assumed Effective Date | 6/30/2021 |
| Assumed Petition / Funding Date | 5/19/2021 |
| Invested Capital | $  55,000,000 |
| PIK Dist. Rate | 15.0% |
| Interest Calculation | Actual / Actual |
| Days in Year | 365 |

| Days | | 42 |
|---|---|---|
| | **5/19/2021** | **6/30/2021** |
| Beginning Balance | | $   55,000,000 |
| (+) PIK Dist (15.0%) | | 949,315 |
| x  **Ending Balance** | $   55,000,000 | $   55,949,315 |

**Project Continental**                                                    <span style="color:red">**DRAFT - Subject to Material Change**</span>

*Initial Supporting Stockholder Invested Capital Initial Balance*                    <span style="color:red">*Highly Confidential*</span>

### Assumptions

| | |
|---|---|
| Assumed Effective Date | 6/30/2021 |
| Assumed Petition Date | 5/19/2021 |
| Invested Capital | $ 379,746,397 |
| PIK Dist. Rate | 12.5% |
| Cash Dist. Rate | 7.5% |
| Interest Calculation | 30 / 360 |
| Days in Year | 360 |

### 7.5% through petition date (assumed 4/30/21); 12.5% thereafter

| Days | 90 | 90 | 49 | 42 |
|---|---|---|---|---|
| | 12/31/2020 | 3/31/2021 | 5/19/2021 | 6/30/2021 |
| Beginning Balance | $ 427,706,286 | $ 441,072,108 | $ 454,855,611 | $ 462,594,474 |
| (+) PIK Dist (12.5%) | 13,365,821 | 13,783,503 | 7,738,863 | 6,746,169 |
| **Ending Balance** | **$ 441,072,108** | **$ 454,855,611** | **$ 462,594,474** | **$ 469,340,643** |
| | | | | |
| Cash Dist. (7.5%) | 8,019,493 | 8,270,102 | 4,643,318 | - |
| Cash Dist. (12.5%) | - | - | - | 6,746,169 |
| | | | | |
| Total Cash Dist. (7.5% & 12.5%) | | | | $ 27,679,082 |
| (+) Invested Capital | | | | 379,746,397 |
| **Total Amount Accrued through Effective Date** | | | | **$ 407,425,479** |